CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

**2384CV02704 John Doe Individually and on Behalf of All Others Similarly Situated et al vs. Atrius Health Inc**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Torts | **FILE DATE:** | 11/28/2023 |
| **ACTION CODE:** | B99 | **CASE TRACK:** | F - Fast Track |
| **DESCRIPTION:** | Other Tortious Action | | |
| **CASE DISPOSITION DATE:** | 04/09/2025 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 04/09/2025 |
| **CASE JUDGE:** | | **CASE SESSION:** | Business Litigation 1 |

**PARTIES**

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| Plaintiff | Attorney |
|---|---|
| Jane Doe Individually and on Behalf of All Others Similarly Situated | **Attorney** 343480<br>Thomas Tucker Merrigan<br>Sweeney Merrigan Law<br>Sweeney Merrigan Law<br>268 Summer St LL<br>Boston, MA 02210<br>Work Phone (413) 522-2557<br>Added Date: 11/28/2023 |
| | **Attorney** 681627<br>Jonathan Tucker Merrigan<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 11/28/2023 |
| | **Attorney** 686289<br>Ryan Hawkins<br>Sweeney Merrigan Law LLP<br>Sweeney Merrigan Law LLP<br>268 Summer St LL<br>Boston, MA 02210<br>Work Phone (617) 830-5767<br>Added Date: 12/12/2023 |
| | **Attorney** 703701<br>Erin E McHugh<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 11/28/2023 |
| | **Attorney** 706672<br>Justin C Kenney<br>Ahmad, Zavitsanos, and Mensing PLLC<br>Ahmad, Zavitsanos, and Mensing PLLC<br>1221 McKinney St<br>Suite 2500<br>Houston, TX 77010<br>Work Phone (802) 258-7114<br>Added Date: 12/04/2023 |
| | **Attorney** HV24097455TX<br>Nathan B Campbell<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 11/28/2023 |
| | **Attorney** HV24076463TX<br>Foster C Johnson<br>Ahmad, Zavitsanos & Mensing, P.C. |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | |
|---|---|
| | 1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 11/28/2023<br>**Attorney** **HV20856750TX**<br>David E Warden<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 11/28/2023<br>**Attorney** **PHV6299686IL**<br>Alex J Dravillas<br>Keller Postman LLC<br>150 N. Riverside Plaza<br>Suite 4100<br>Chicago, IL 60606<br>Work Phone (312) 741-5220<br>Added Date: 11/28/2023<br>**Attorney** **PHV1029692DC**<br>Sara Aguiniga<br>Keller Postman LLC<br>1100 Vermon Avenue, N.W.<br>12th Floor<br>Washington, DC 20005<br>Work Phone (209) 918-1123<br>Added Date: 11/28/2023 |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| Plaintiff | Attorney | |
|---|---|---|
| John Doe Individually and on Behalf of All Others Similarly Situated | **Attorney**<br>Thomas Tucker Merrigan<br>Sweeney Merrigan Law<br>Sweeney Merrigan Law<br>268 Summer St LL<br>Boston, MA 02210<br>Work Phone (413) 522-2557<br>Added Date: 11/28/2023 | **343480** |
| | **Attorney**<br>Jonathan Tucker Merrigan<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 11/28/2023 | **681627** |
| | **Attorney**<br>Ryan Hawkins<br>Sweeney Merrigan Law LLP<br>Sweeney Merrigan Law LLP<br>268 Summer St LL<br>Boston, MA 02210<br>Work Phone (617) 830-5767<br>Added Date: 12/12/2023 | **686289** |
| | **Attorney**<br>Erin E McHugh<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 11/28/2023 | **703701** |
| | **Attorney**<br>Justin C Kenney<br>Ahmad, Zavitsanos, and Mensing PLLC<br>Ahmad, Zavitsanos, and Mensing PLLC<br>1221 McKinney St<br>Suite 2500<br>Houston, TX 77010<br>Work Phone (802) 258-7114<br>Added Date: 12/04/2023 | **706672** |
| | **Attorney**<br>Nathan B Campbell<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 11/28/2023 | **HV24097455TX** |
| | **Attorney**<br>Foster C Johnson<br>Ahmad, Zavitsanos & Mensing, P.C. | **HV24076463TX** |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | |
|---|---|---|
| | 1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 11/28/2023 | |
| | **Attorney**<br>David E Warden<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 11/28/2023 | **HV20856750TX** |
| | **Attorney**<br>Alex J Dravillas<br>Keller Postman LLC<br>150 N. Riverside Plaza<br>Suite 4100<br>Chicago, IL 60606<br>Work Phone (312) 741-5220<br>Added Date: 11/28/2023 | **PHV6299686IL** |
| | **Attorney**<br>Sara Aguiniga<br>Keller Postman LLC<br>1100 Vermon Avenue, N.W.<br>12th Floor<br>Washington, DC 20005<br>Work Phone (209) 918-1123<br>Added Date: 11/28/2023 | **PHV1029692DC** |
| | **Attorney**<br>Carl J Gustafson<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Work Phone (713) 600-4924<br>Added Date: 11/28/2023 | **HV24125261TX** |

| | |
|---|---|
| **Defendant**<br>Atrius Health Inc | **Attorney** 633246<br>Anthony E Fuller<br>Hogan Lovells LLP<br>Hogan Lovells LLP<br>125 High St<br>20th Floor<br>Boston, MA 02110<br>Work Phone (617) 371-1000<br>Added Date: 11/28/2023<br>**Attorney** 558906<br>Maria R Durant<br>Hogan Lovells US LLP<br>Hogan Lovells US LLP<br>125 High St<br>Suite 2010<br>Boston, MA 02110<br>Work Phone (617) 371-1024<br>Added Date: 11/28/2023<br>**Attorney** 679637<br>Adam Cooke<br>Hogan Lovells US LLP<br>Hogan Lovells US LLP<br>555 Thirteenth St NW<br>Columbia Square<br>Washington, DC 20004<br>Work Phone (202) 637-5479<br>Added Date: 11/28/2023<br>**Attorney** 709197<br>Kayla H Ghantous<br>Hogan Lovells US LLP<br>Hogan Lovells US LLP<br>125 High St<br>Suite 2010<br>Boston, MA 02110<br>Work Phone (617) 702-7749<br>Added Date: 11/28/2023 |
| **Other interested party**<br>Ryan, Esq. (PHV for Atrius), Allison<br>Hogan Lovelis US LLP<br>555 Thirteenth Street NW<br>Washington, DC 20004 | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 11/28/2023 | Civil Filing Fee (per Plaintiff)<br><br>Dismissed Type: Fees / Fines<br>dismissed-case transferred<br>Dismissed Date: 11/28/2023<br>Dismissed Amount: 240.00<br>Dismissing Clerk / Judge: Kazanjian, Hon. Helene<br>Dismissed By: LTBOOK84 | 240.00 | 0.00 | 240.00 | 0.00 |
| 11/28/2023 | Civil Security Fee (G.L. c. 262, § 4A)<br><br>Dismissed Type: Fees / Fines<br>dismissed-case transferred<br>Dismissed Date: 11/28/2023<br>Dismissed Amount: 20.00<br>Dismissing Clerk / Judge: Kazanjian, Hon. Helene<br>Dismissed By: LTBOOK84 | 20.00 | 0.00 | 20.00 | 0.00 |
| 11/28/2023 | Civil Surcharge (G.L. c. 262, § 4C)<br><br>Dismissed Type: Fees / Fines<br>dismissed-case transferred<br>Dismissed Date: 11/28/2023<br>Dismissed Amount: 15.00<br>Dismissing Clerk / Judge: Kazanjian, Hon. Helene<br>Dismissed By: LTBOOK84 | 15.00 | 0.00 | 15.00 | 0.00 |
| | **Total** | **275.00** | **0.00** | **275.00** | **0.00** |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

**INFORMATIONAL DOCKET ENTRIES**

| Date | Ref | Description | Judge |
|---|---|---|---|
| 11/28/2023 | | Attorney appearance<br>On this date Jonathan Tucker Merrigan, Esq. added for Plaintiff John Doe | |
| 11/28/2023 | | Attorney appearance<br>On this date Victoria M Santoro, Esq. added for Plaintiff John Doe | |
| 11/28/2023 | | Attorney appearance<br>On this date Erin E McHugh, Esq. added for Plaintiff John Doe | |
| 11/28/2023 | | Attorney appearance<br>On this date Jonathan Tucker Merrigan, Esq. added for Plaintiff Jane Doe | |
| 11/28/2023 | | Attorney appearance<br>On this date Victoria M Santoro, Esq. added for Plaintiff Jane Doe | |
| 11/28/2023 | | Attorney appearance<br>On this date Erin E McHugh, Esq. added for Plaintiff Jane Doe | |
| 11/28/2023 | | Case assigned to:<br>DCM Track F - Fast Track was added on 11/28/2023 | |
| 11/28/2023 | | Case transferred from another court.<br><br>Transferred from Norfolk Superior Court [2282CV00982] accepted into the Suffolk Superior Civil Court Business Litigation Session (See P#29) | |
| 11/28/2023 | 1 | Complaint and Jury Demand | |
| 11/28/2023 | 2 | Civil action cover sheet filed.<br><br>Re: Complaint ($14,000,000.00+) | |
| 11/28/2023 | 3 | Plaintiffs John Doe Individually and on Behalf of All Others Similarly Situated, Jane Doe Individually and on Behalf of All Others Similarly Situated's Motion for<br>Impoundment of Personal Identifying Information; with affidavit - ALLOWED.<br>Dated: 11/8/22<br><br>Judge: Sanders, Hon. Janet L | Sanders |
| 11/28/2023 | 4 | Service Returned for<br>Defendant Atrius Health Inc: Service through person in charge / agent; by delivering in hand to Janice Luisi on 12/6/22 | |
| 11/28/2023 | 5 | Notice of Removal to the United States District Court filed by<br><br>Applies To: Atrius Health Inc (Defendant) | |
| 11/28/2023 | | Attorney appearance<br>On this date Maria R Durant, Esq. added for Defendant Atrius Health Inc | |
| 11/28/2023 | | Attorney appearance<br>On this date Kayla H Ghantous, Esq. added for Defendant Atrius Health Inc | |
| 11/28/2023 | | Attorney appearance<br>On this date Adam Cooke, Esq. added for Defendant Atrius Health Inc | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 11/28/2023 | 6 | ORDER: It is ORDERED that the Clerk of this Court shall impound the Plaintiff's name in this case Any such materials that identify the plaintiff shall be publicly filed with the name redacted. An unredacted copy shall be filed under seal.<br>The filer of any document shall ensure that the Plaintiff's name is redacted from all public filings. The Clerk shall redact any individual docket entries as necessary. The docket and case filings shall otherwise remain available to the public. Dated: 11/8/23 (See P#6 for complete order) | Sanders |
| 11/28/2023 | 7 | Defendant's Notice of intent to file motion of Notice of Remval<br><br>Applies To: Atrius Health Inc (Defendant) | |
| 11/28/2023 | 8 | MEMORANDUM & ORDER:<br><br>ON PLAINTIFFS' MOTION TO REMAND: Conclusion - For the foregoing reasons, the Court finds that it lacks subject-matter jurisdiction over his matter, and the matter is not removable under 2 U.S.C. Sec. 1442(a)(1). Plaintiffs' motion to remand is therefore GRANTED. Dated: 10/20/23 (F. Dennis Saylor IV (Chief Judge, United States District Court)<br><br>Judge: Unassigned | Unassigned |
| 11/28/2023 | 9 | ORDER: OF REMAND<br>In accordance with the Court's Memorandum and Order dated October 20, 2023, the above-entitled action is hereby REMANDED to Norfolk County Superior Court. (Savior, C.J.) | Unassigned |
| 11/28/2023 | 10 | Corporate Disclosure Statement filed<br><br>Applies To: Atrius Health Inc (Defendant) | |
| 11/28/2023 | 11 | Kayla H Ghantous, Esq.'s MOTION to admit counsel pro hac vice: Allison Ryan for Defendant Atrius Health Inc | |
| 11/28/2023 | | Docket Note: See United States District Court Docket for Allowance of Motion for Pro Hac Vice for Allison Ryan, Esq. | |
| 11/28/2023 | 12 | Defendant Atrius Health Inc's Assented to Motion to Extend Time to respond to Plaintiffs Complaint | |
| 11/28/2023 | | Docket Note: See USDC Docket Sheet: granting Motion to extend time to file Answer. Answer due 30 days after motion to remand is decided.<br>Dated: 12/30/2022 (McKillop, USDC)<br><br>Applies To: Atrius Health Inc (Defendant) | |
| 11/28/2023 | | Notice of Appearance<br><br>Applies To: Ryan, Esq. (PHV for Atrius), Allison (Other interested party) | |
| 11/28/2023 | 13 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Seth Meyer for Plaintiffs | |
| 11/28/2023 | 14 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Nathan Campbell for Plaintiffs | |
| 11/28/2023 | 15 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Foster C. Johnson for Plantiffs | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | |
|---|---|---|
| 11/28/2023 | 16 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: David Warden for Plaintiffs |
| 11/28/2023 | 17 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Alex Dravillas for Plaintffs |
| 11/28/2023 | | Docket Note: See USDC Docket Sheet for GRANTING of Motions for Pro Hac Vice for Seth Meyer, Esq., Nathan Campbell, Esq., Foster C. Johnson, Esq., David Warden, Esq., and Alex Dravillas, Esq. |
| 11/28/2023 | | Attorney appearance<br>On this date Seth A Meyer added for Plaintiff John Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date Seth A Meyer added for Plaintiff Jane Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date Nathan B Campbell added for Plaintiff John Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date Nathan B Campbell added for Plaintiff Jane Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date Foster C Johnson added for Plaintiff John Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date Foster C Johnson added for Plaintiff Jane Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date David E Warden added for Plaintiff John Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date David E Warden added for Plaintiff Jane Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date Alex J Dravillas added for Plaintiff John Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date Alex J Dravillas added for Plaintiff Jane Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | 18 | Plaintiffs John Doe Individually and on Behalf of All Others Similarly Situated, Jane Doe Individually and on Behalf of All Others Similarly Situated's Motion to<br>Remand |
| 11/28/2023 | 19 | John Doe Individually and on Behalf of All Others Similarly Situated, Jane Doe Individually and on Behalf of All Others Similarly Situated's Memorandum of Law in Support of Plaintiffs' Motion to Remand |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | |
|---|---|---|
| 11/28/2023 | 20 | Defendant Atrius Health Inc's Assented to Motion to Extend Time to Respond to Plaintiffs' Motion to Remand |
| 11/28/2023 | | Attorney appearance<br>On this date Anthony E Fuller, Esq. added for Defendant Atrius Health Inc |
| 11/28/2023 | | Docket Note: See USDC Docket Sheet Granting Motion for Extension of Time to Respond to Motion to Remand<br>ALLOWED (McKillop, DJ) USDC Dated: 4/10/23 |
| 11/28/2023 | 21 | Opposition to Plaintiffs' Motion to Remand (P#18) filed by Atrius Health Inc |
| 11/28/2023 | 22 | John Doe Individually and on Behalf of All Others Similarly Situated, Jane Doe Individually and on Behalf of All Others Similarly Situated's Motion for leave to File Reply (Unopposed) |
| 11/28/2023 | | Docket Note: See USDC Docket Sheet for Electronic Order Granting Unopposed Motion to File Reply (McKillop, USDC Dated: 5/5/23) |
| 11/28/2023 | 23 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Sara Aguiniga for Plaintffs |
| 11/28/2023 | | Docket Note: See USDC Docket Sheet for Electronic Order: GRANTING Motion to appear Pro Hac Vice Sara Aguiniga (USDC Dated 5/16/23) |
| 11/28/2023 | | Attorney appearance<br>On this date Sara Aguiniga, Esq. added for Plaintiff John Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date Sara Aguiniga, Esq. added for Plaintiff Jane Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | 24 | Plaintiffs John Doe Individually and on Behalf of All Others Similarly Situated, Jane Doe Individually and on Behalf of All Others Similarly Situated's Reply in Support of tis Motion to Remand |
| 11/28/2023 | | Attorney appearance<br>On this date Seth A Meyer dismissed/withdrawn for Plaintiff John Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Attorney appearance<br>On this date Seth A Meyer dismissed/withdrawn for Plaintiff Jane Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | 25 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Carl J Gustafson for Plaintiffs |
| 11/28/2023 | | Docket Note: See Docket Sheet received from U.S. District Court - Chief Judge J Dennis Saylor, IV: Electronic ORDER entered GRANTING Motion for Carl J Gustafson to appear Pro Hac Vice for Plaintiffs (USDC Dated 9/15/23) |
| 11/28/2023 | | Attorney appearance<br>On this date Carl J Gustafson added for Plaintiff John Doe Individually and on Behalf of All Others Similarly Situated |
| 11/28/2023 | | Chief Judge F. Dennis Saylor, IV: ORDER entered: For the foregoing reasons, the Court finds that it lacks subject matter jurisdiction over this matter, and the matter is not removable under 28 U.S.C. Sec 1442(a)(1) . Plaintiffs' motion to remand is therefore GRANTED. |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 11/28/2023 | 26 | General correspondence regarding Certified copy of docket entries received from U.S. District Court | |
| 11/28/2023 | 27 | Defendant Atrius Health Inc's Assented to Motion to Transfer to the Business Litigation Session and Stay Response Deadline | |
| 11/28/2023 | 28 | Atrius Health Inc's Memorandum in support of Assented tp Motion to Transfer to the Business Litigation Session and Stay Response Deadline | |
| 11/28/2023 | | Endorsement on Motion to Transfer to the Business Litigation Session and Stay Response Deadline (#27.0): ALLOWED subject to acceptance by the BLS administrative justice. The deadline for response to the suit by Atrius is STAYED until further order of the Court. Dated: 11/20/23 | Leighton |
| 11/28/2023 | 29 | NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION<br><br>The court (Leighton, J.) has previously allowed a Motion to Transfer this case to the Business Litigation Session in Suffolk County. After review of that Motion and the relevant pleadings, this case has been accepted into the Suffolk Business Litigation Session and will be assigned to BLS1. As soon as the original papers are received from the Clerk's Office in the county that is transferring the case (Norfolk), this case will be given a new Suffolk County docket number. The parties will be notified accordingly. Dated: November 21, 2023 (See P#29 for complete notice)<br><br>Judge: Salinger, Hon. Kenneth W | Salinger |
| 11/28/2023 | 30 | General correspondence regarding Copy of docket entries received from Norfolk Superior Court | |
| 11/28/2023 | | Civil action cover sheet mailed re: BLS | |
| 12/01/2023 | | Attorney appearance electronically filed. | |
| 12/12/2023 | | Attorney appearance<br>On this date Ryan Hawkins, Esq. added for Plaintiff John Doe Individually and on Behalf of All Others Similarly Situated | |
| 12/12/2023 | | Attorney appearance<br>On this date Ryan Hawkins, Esq. added for Plaintiff Jane Doe Individually and on Behalf of All Others Similarly Situated | |
| 12/12/2023 | | Attorney appearance electronically filed. | |
| 12/12/2023 | 31 | Amended: First Class Action amended complaint filed by John Doe Individually and on Behalf of All Others Similarly Situated, Jane Doe Individually and on Behalf of All Others Similarly Situated | |
| 01/02/2024 | | The following form was generated:<br><br>Notice to Appear - BLS<br>Sent On: 01/02/2024 15:38:21 | |
| 01/03/2024 | 32 | ORDER: Order RE: Rule 16 Conference<br>See p.32 for full Order.<br>(dated 1/2/2024) Notice Sent 1/3/24 | Krupp |

| | | | |
|---|---|---|---|
| 01/30/2024 | 33 | Defendant Atrius Health Inc's Assented to Motion to Stay Proceedings pending Completion of Interlocutory Appeals and Consolidation | |
| 01/31/2024 | | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on: 01/31/2024 02:00 PM<br>Has been: Canceled For the following reason: Joint request of parties<br>Hon. Peter B Krupp, Presiding<br>Staff:<br>Gloria Brooks, Assistant Clerk Magistrate | Krupp |
| 01/31/2024 | | Endorsement on Motion to Stay Proceedings pending Completion of Interlocutory Appeals and Consolidation (#33.0): ALLOWED<br>This case is stayed pending a decision in the Vita appeals. The hearing scheduled for 1/31/24 is CANCELED. Within 14 days after a decision in the Vita appeals, the parties shall notify the Court and purpose three dates within 60 days thereafter that are mutually agreeable to the parties for the Court to conduct the Rule 16 conference.<br>(Dated: 1/30/24) Notice Sent 2/1/24 | Krupp |
| 12/05/2024 | 34 | Joint Notice Regarding Rule 16 Conference | |
| 01/07/2025 | | Endorsement on Submission of Joint Notice Regarding Rule 16 Conference (#34.0): ALLOWED<br>Insofar as the Court will conduct a Rule 16 Conference on 1/15/2025 at 11:00 am over Zoom on this Docket and the other 15 dockets listed. The Court requests the parties to confer in advance about a workable schedule to bring these matters to resolution.<br>(Dated 1/6/2025)<br><br>Notice Sent 1/8/25 | Krupp |
| 01/15/2025 | | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on: 01/15/2025 11:00 AM<br>Has been: Held via Video/Phone<br>Hon. Peter B Krupp, Presiding | Krupp |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 01/15/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Victoria M Santoro, Esq. vsantoro@santoroandgray.com<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Plaintiff: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Defendant: Maria R Durant, Esq. maria.durant@hoganlovells.com<br>Defendant: Adam Cooke, Esq. adam.a.cooke@hoganlovells.com<br>Defendant: Kayla H Ghantous, Esq. kayla.ghantous@hoganlovells.com<br>Defendant: Anthony E Fuller, Esq. anthony.fuller@hoganlovells.com<br>Other interested party: Allison Ryan, Esq. (PHV for Atrius) Hogan Lovells US LLP 555 Thirteenth Street NW, Washington, DC 20004<br>Sent On: 01/15/2025 15:47:16 | |
| 01/30/2025 | 35 | ORDER: Scheduling Order<br>See paper #35<br>dated (1/15/25)<br><br>Notice Sent 2/3/25 | Krupp |
| 02/06/2025 | | Attorney appearance electronically filed. | |
| 03/03/2025 | | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on: 03/19/2025 02:00 PM<br>Has been: Rescheduled For the following reason: By Court prior to date<br>Hon. Peter B Krupp, Presiding | Krupp |

CRTR2709-CR

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| | | |
|---|---|---|
| 03/03/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Plaintiff: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Defendant: Maria R Durant, Esq. maria.durant@hoganlovells.com<br>Defendant: Kayla H Ghantous, Esq. kayla.ghantous@hoganlovells.com<br>Defendant: Adam Cooke, Esq. adam.a.cooke@hoganlovells.com<br>Defendant: Anthony E Fuller, Esq. anthony.fuller@hoganlovells.com<br>Other interested party: Allison Ryan, Esq. (PHV for Atrius) Hogan Lovelis US LLP 555 Thirteenth Street NW, Washington, DC 20004<br>Sent On: 03/03/2025 12:31:07 |
| 03/14/2025 | 36 | Amended: Second Class Action and Demand for Jury Trial amended complaint filed by John Doe Individually and on Behalf of All Others Similarly Situated |
| 03/21/2025 | 37 | Defendant Atrius Health Inc's Notice of Filing of Notice of Removal to US District Court<br><br>(U.S. Dist.# 25cv-10670-FDS) |
| 03/24/2025 | | Defendant Atrius Health Inc's Notice of filing Notice of Removal (Certified)<br>(U.S. Dist.# 25cv-10670-FDS) |
| 04/09/2025 | | REMOVED to the U.S. District Court of Massachusetts |
| 04/09/2025 | | Case transferred to another court. |

I HEREBY ATTEST AND CERTIFY ON
April 16, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ___
Assistant Clerk

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number
Docketed on 10/18/2022

1

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. ~~2282CV00982~~<br>23-2704-BLS1<br><br>SUFFOLK SUPERIOR COURT<br>CIVIL CLERK'S OFFICE<br>FILED<br>NOV 28 2023<br>JOHN E. POWERS, III<br>ACTING CLERK MAGISTRATE |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs John Doe and Jane Doe ("Plaintiffs"), individually and on behalf of all other persons similarly situated, bring suit against Defendant Atrius Health, Inc. ("Defendant"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

**NATURE OF ACTION AND ALLEGATIONS**

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. As Defendant's Medical Information Privacy Notice explains to patients, Defendant is prohibited by law from "selling your health information to others" or "using or disclosing your health information" for "promotional communications" without patients'

"written authorization."[1] Defendant's Privacy Notice further notes that Defendant is "required by law to protect the privacy of your health information."[2]

3. Contrary to these assurances, Defendant does not follow this policy, nor the law prohibiting such disclosures.

4. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent.

5. Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these rerouting tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

6. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272,

---

[1] https://www.atriushealth.org/patient-information/privacy-practices. Defendant's current Privacy Notice went into effect on September 30, 2022. Defendant's prior "Notice of Privacy Practices" may be found at https://web.archive.org/web/20220713190254/https://www.atriushealth.org/patient-information/privacy-practices. That Privacy Notice informed patients that "Access" to patients' medical records and other information maintained by Atrius Health "is restricted to clinicians and staff who need the information for treatment, payment, or health care operations purposes." Defendant's prior Privacy Notice further promised patients that "We will not use or share your information other than as described here unless you tell us we can in writing." Defendant's prior Privacy Notice also promised that Defendant would "never share your information" for "Marketing Purposes" or "Sale of your information" unless "you give written permission."

[2] https://www.atriushealth.org/patient-information/privacy-practices

§ 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

7. On behalf of themselves and all similarly situated persons, Plaintiffs seek an order enjoining Defendant from further unauthorized disclosures of their personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

**PARTIES TO THE ACTION**

8. Defendant Atrius Health, Inc. is a Massachusetts corporation with its principal office at 275 Grove St., Suite 3-300, Newton, Massachusetts, 02466. Defendant is the parent company for more than 30 medical practice locations in Massachusetts, including Harvard Vanguard Copley, Harvard Vanguard Chestnut-Hill Roxbury, Harvard Vanguard Beverly, Harvard Vanguard Braintree, Harvard Vanguard Burlington, Harvard Vanguard Cambridge, Harvard Vanguard Chelmsford, Harvard Vanguard Quincy, Harvard Vanguard Concord, Duxbury-PMG, Bourne-PMG, and Dedham Medical Associates.[3]

9. Plaintiff, Jane Doe, is an individual living in Norfolk County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at Harvard Vanguard Quincy, one of Defendant's facilities,[4] and thus also a patient of Defendant.

10. Plaintiff, John Doe, is an individual living in Middlesex County, Massachusetts, has been treated by Defendant's physicians, a patient at Harvard Vanguard Chelmsford, one of Defendant's facilities,[5] and thus also a patient of Defendant.

[3] https://www.atriushealth.org/locations; *see also* https://www.atriushealth.org/about-us
[4] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[5] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

## JURISDICTION AND VENUE

11. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 363 Highland Avenue, Fall River, Massachusetts, 02720. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

12. Venue is appropriate in this Court because Plaintiff, Jane Doe, resides in Norfolk County and the acts or conduct giving rise to the cause of action took place in Norfolk. G.L. c. 223, § 8(4).

## FACTUAL BACKGROUND

### A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.

13. Plaintiff Jane Doe is a patient of Defendant who receives treatment at Harvard Vanguard Quincy.[6]

14. Plaintiff John Doe is a patient of Defendant who receives treatment at, among other of Defendant's facilities, Harvard Vanguard Chelmsford.[7]

15. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

16. Medical patients in Massachusetts such as John Doe and Jane Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

17. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

---

[6] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[7] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

18. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

19. Defendant operates websites for patients, including www.atriushealth.org.

20. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

21. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

22. Defendant's disclosures of patients' personal healthcare information occurs because Defendant intentionally deploys source code on the websites it operates, including www.southcoast.org, that causes patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

23. By design, third parties receive and record the exact contents of a patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

24. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

25. The basic command that web browsers use to exchange data and user communications is called a GET request.[8] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

26. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

27. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

28. Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties. Typically, users are provided no notice that these disclosures are being made. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

29. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

[8] https://www.w3schools.com/tags/ref_httpmethods.asp

30. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

31. These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

32. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

33. Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

34. For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer

advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[9]

35. Because of their uniquely identifying character, IP address are considered protected personally identifiable information by HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(O). Tracking pixels can (and typically do) collect website visitors' IP addresses.

36. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

37. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

38. Cookies fall within the personal identifiers protected by HIPAA. *See* 45 C.F.R. § 164.51(b)(2)(i)(H), (J), (M), and (R), and tracking pixels can collect cookies from website visitors.

39. A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

---

[9] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

40. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[10] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[11] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[12]

41. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[13]

42. Browser-fingerprints are considered protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R), and tracking pixels can collect browser-fingerprints from website visitors.

43. A fourth kind of personally identifying information is the unique user identifier (such as Facebook's "Facebook ID") that permits companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is a number string that is connected to a user's Facebook profile.[14] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[15]

---

[10] https://www.blog.google/products/chrome/building-a-more-private-web/
[11] https://pixelprivacy.com/resources/browser-fingerprinting/
[12] https://www.blog.google/products/chrome/building-a-more-private-web/
[13] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[14] https://www.facebook.com/help/211813265517027
[15] https://smallseotools.com/find-facebook-id/

44. Unique personal identifiers such as a person's Facebook ID are protected by HIPAA, 45 C.F.R. § 164.514(2)(i)(R), and are likewise capable of collection through pixel trackers.

**D. Facebook**

45. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

46. Facebook describes itself as a "real identity" platform.[16] This means that users are permitted only one account and must share "the name they go by in everyday life."[17] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[18]

47. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[19] Facebook has since evolved into one of the largest advertising companies in the world.[20] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[21] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[22]

48. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion

---

[16] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[17] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[18] https://www.facebook.com/help/406644739431633
[19] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[20] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[21] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[22] https://www.facebook.com/business/ads/ad-targeting

users.[23]

49. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

50. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

51. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[24] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

---

[23] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/
[24] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

52. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

53. One of Facebook's most powerful tools is called the "Meta Pixel."

54. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[25] Once activated, the Meta Pixel "tracks the people and type of actions they take."[26] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[27]

55. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences.

56. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

---

[25] https://developers.facebook.com/docs/meta-pixel/
[26] https://www.facebook.com/business/goals/retargeting
[27] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

57. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[28] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[29]

58. Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[30]

59. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[31]

60. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[32] Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[33]

61. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

---

[28] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[29] https://www.oviond.com/understanding-the-facebook-pixel
[30] https://developers.facebook.com/docs/meta-pixel/get-started
[31] https://developers.facebook.com/docs/meta-pixel/get-started
[32] https://developers.facebook.com/docs/meta-pixel/
[33] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients

62. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[34] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[35] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[36]

63. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[37]

64. Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

65. If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

66. Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[38] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[39]

---

[34] https://developers.facebook.com/docs/meta-pixel/
[35] https://developers.facebook.com/docs/meta-pixel/
[36] https://developers.facebook.com/docs/meta-pixel/
[37] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[38] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[39] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

67. Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching.[40] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

68. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[41] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[42]

69. Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

70. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

---

[40] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[41] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[42] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

71. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

72. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[43] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[44]

73. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.southcoast.org, and target users with advertising based on their web activity.

[43] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[44] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

**D. Defendant has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

74. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

75. Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[45] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

76. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[46] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[47] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

[45] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[46] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[47] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

77. Meta Pixel is wildly popular and embedded on millions of websites. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems.[48] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

78. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

79. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is transmitted to Facebook via the Meta Pixel.

[48] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

80. This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

81. For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides.



82. All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

83. Defendant discloses such Personal Health Information even when patients are searching for doctors to assist with them conditions such as HIV:



Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

84. Unbeknownst to patients, even their searches across Defendant's website for information about the most sensitive medical conditions imaginable, including HIV, psychotherapy, and addiction treatment are automatically sent to Facebook, along with patients' personally identifying information:



85. Defendant also discloses patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, and communications made when patients are researching specific medical conditions such as COVID-19.

86. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients Personal Health Information to their private identities and target them with advertising.

87. Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the website that Defendant maintains at www.atriushealth.org. Plaintiff continued to have his privacy violated when Defendant permitted Facebook and other companies to send him targeted advertising related to his medical condition.

88. For example, Plaintiff John Doe visited Defendant's website in 2022 at www.atriushealth.org and entered data, including sensitive medical information, such as details about his medical condition and doctor. The information that Plaintiff John Doe transmitted included queries about treatment for shoulder injuries.

89. After entering his medical information on Defendant's website, Plaintiff John Doe began receiving ads on his Facebook page related to his medical condition, including advertisements for shoulder braces.

90. As a result of Defendant's compliance and aid in the illegal interception and disclosure of John Doe's Personal Health Information, Plaintiff received advertisements that were specifically tailored to his Personal Health Information, including sensitive medical information, that Plaintiff entered on Defendant's website. These advertisements were tailored and directed to Plaintiff by Facebook as part of Facebook's advertising business in which Facebook profits from providing third parties with access to those individuals most likely to be interested in their products or services, otherwise known as the "target audience."[49]

91. Plaintiff Jane Doe also visited Defendant's website at www.atriushealth.org in 2022 and entered data, including sensitive medical information, such as details about her medical condition and doctor. Defendant facilitated the disclosure of Plaintiff Jane Doe's Personal Health Information, including sensitive medical information, to Facebook without her consent or authorization when she entered information on the website that Defendant maintains at www.artriushealth.org.

92. Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data.

**F. Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

93. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

[49] https://www.facebook.com/business/ads/ad-targeting?content

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

94. For example, when Plaintiff Jane Doe visited Defendant's website in 2022 at www.southcoast.org, there was no indication that Meta Pixel was embedded on that website or that it would collect and transmit her sensitive medical data to Facebook.

95. Plaintiffs and their fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

96. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




97. Defendant's current "Notice of Privacy Practices," which went into effect on September 30, 2022, gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express written authorization from patients:

> [W]e will use and disclose your health information only with a written authorization from you. This includes, except for limited

> circumstances allowed by federal privacy law, not using or disclosing psychotherapy notes about you, selling your health information to others, or using or disclosing your health information for certain promotional communications that are prohibited marketing communications under federal law, without your written authorization.[50]

98. Defendant's prior "Notice of Privacy Practices" likewise not only assured patients that Atrius would protect their Personal Health Information, but also expressly promised that Defendant would *never* sell or share patients' health information for marketing purposes without patients' written consent:

> Protecting patient privacy is an important element of the trust between our caregivers and their patients, and an important legal and ethical obligation. Atrius Health is deeply committed to protecting our patients' rights to privacy, and to safeguarding patient information....[51]
>
> In these cases we never share your information unless you give us written permission:
>
> - Marketing purposes
> - Sale of your information

99. Even if a patient stumbled upon Defendant's carefully concealed "Notice of Privacy Practices," nothing in Defendant's various privacy notices would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

100. Defendant does not have a legal right to share Plaintiffs and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by laws by the Health Insurance Portability and Accountability Act of 1996's ("HIPAA") privacy rules, which protect all electronically protected health information a covered entity like Defendant "creates, receives, maintains, or transmits" in electronic form. 45 C.F.R.

---

[50] https://www.atriushealth.org/patient-information/privacy-practices
[51] https://web.archive.org/web/20220517025937/https://www.atriushealth.org/patient-information/privacy-practices

§ 160.103. HIPAA's privacy rules do not permit Defendant to sell patient information to Facebook in return for access to Meta Pixel. Further, HIPAA does not permit Defendant to disclose patients' Protected Health Information to an advertising and marketing company like Facebook without express written authorization from patients. 45 C.F.R. § 164.508.

101. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

102. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

103. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiffs and Class Members' Personal Health Information to Facebook or aid in the same.

**G. The disclosures of personal patient data to Facebook are unnecessary.**

104. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website.

105. For example, it possible for a health care website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without

allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

106. Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**H. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

107. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiffs and Class Member's privacy interests.

108. Patient health information is specifically protected under federal law by HIPAA.

109. HIPAA sets national standards for safeguarding protected health information. For example, HIPAA limits the permissible uses of health information and prohibits disclosure of this information without express written authorization from patients. 45 C.F.R. § 164.502. These prohibitions include prohibitions against disclosing personally identifying data such patient names, IP addresses, and other unique characteristics or codes. 45 C.F.R. § 164.514(b)(2)(i). HIPAA also requires that covered entities like Defendant implement appropriate safeguards to protect this information. 45 C.F.R. § 164.530(c)(1). And both HIPAA and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. 42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

110. Given the application of HIPAA and state law to Defendant, Plaintiffs and the Members of the Class had a reasonable expectation of privacy in their protected health information.

111. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

112. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

113. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[52]

114. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[53]

115. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly

---

[52] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[53] https://www.wired.co.uk/article/apple-ios14-facebook

worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[54]

116. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

### I. Plaintiffs' Personal Health Data that Defendant collected, disclosed, and used is Plaintiffs' property, has economic value, and its illicit disclosure has caused Plaintiffs harm.

117. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

118. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[55]

119. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[56] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data

[54] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/
[55] https://ig.ft.com/how-much-is-your-personal-data-worth/
[56] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

can vary from $15 to more than $40 per user.[57]

120. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[58] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[59]

121. Despite the protections afforded by HIPAA, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by HIPAA, state laws, and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[60]

122. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[61] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[62]

123. A myriad of other companies and apps such as DataCoup, Nielsen Computer,

[57] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[58] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[59] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[60] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[61] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app
[62] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[63]

124. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs and the Class Member's property.

**J. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

125. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

126. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

127. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

128. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that

[63] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

information is subsequently disseminated and exploited.

129. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**K. Facebook's history of egregious privacy violations.**

130. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

131. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

132. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

133. Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

134. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps

could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[64]

135. That same year, Facebook was sued in the Northern District of California after it was discovered that Facebook had been tracking users across other websites, even after they had logged out of their Facebook accounts, by installing cookies on users' computers.[65] The class action suit, which alleged that Facebook had violated numerous privacy, communications, and wiretapping laws eventually settled for $90 million.[66]

136. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[67]

137. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

---

[64] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[65] https://www.cnet.com/personal-finance/facebooks-90-million-data-tracking-settlement-tomorrow-is-the-deadline-to-file-claim/
[66] https://www.cnet.com/personal-finance/facebooks-90-million-data-tracking-settlement-tomorrow-is-the-deadline-to-file-claim/
[67] A similar case is pending in Texas.

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

138. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[68] Some companies were even able to read users' private messages.

139. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[69] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

140. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective ... at preventing the receipt of sensitive data."[70]

141. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[71] When a user was having her

---

[68] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html
[69] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[70] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[71] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[72]

142. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[73]

143. These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[74]

144. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients'

[72] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[73] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[74] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

expense.

## TOLLING, CONCEALMENT, AND ESTOPPEL

145. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

146. Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

147. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

148. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

149. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiffs' Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

150. Defendant's conduct violates the law and breaches its express and implied privacy promises.

151. Defendant's unlawful conduct has injured Plaintiffs and Class Members.

152. Defendant's conduct is ongoing.

153. Plaintiffs bring this action individually and as a class action against Defendant.

154. Plaintiffs seek class certification for the following proposed Class:

> **The Atrius Health Class:** During the fullest period allowed by law, all Massachusetts residents who are, or were, patients of Atrius Health, Inc. or any of its affiliates and who exchanged communications at Atrius Health, Inc's websites, including www.atriushealth.org, and any other Atrius Health, Inc. affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

155. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

156. Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

157. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

158. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information

maintained by Defendants.

159. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate G.L. c. 272, § 99;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' Personal Health Information to Facebook;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

160. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

161. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other

members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

162. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

163. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

164. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

165. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiffs and the Class)

166. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

167. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

168. All conditions precedent to this action have been performed or have occurred.

169. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

170. Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

171. Defendant qualifies as a person under the statute.

172. All alleged communications between Plaintiffs or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones,

tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

173. An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire … communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

174. Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

175. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire … communication." G.L. c. 272, § 99B(3).

176. The "intercepting devices" used in this case include, but are not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

h. Computer servers of third parties (including Facebook) to which Plaintiffs and Class Members' communications were disclosed.

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

177. Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

178. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

179. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

Date Filed 10/17/2022 2:10 PM
Superior Court - Norfolk
Docket Number

k. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

l. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

180. Plaintiffs and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

181. Neither Plaintiffs nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiffs or Class Members' consent.

182. Plaintiffs and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

183. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

184. In addition to statutory damages, Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiffs and the Class)**

185. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

186. Plaintiffs bring this claim on behalf of herself and all members of the Class.

187. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

188. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

189. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

190. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

191. Plaintiffs and Class Members are patients of Defendant.

192. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

193. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

194. The information disclosed included personally identifiable information, Plaintiffs and Class Members' statues as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

195. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

196. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

197. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a

reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

198. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

199. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

200. Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

201. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

202. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

203. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

204. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

205. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Class)**

206. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

207. Plaintiffs bring this claim on behalf of themselves and all members of the Class

208. All conditions precedent to this action have been performed or occurred.

209. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

210. As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs or Class Members.

211. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

212. Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Express Contract**
**(On Behalf of Plaintiffs and the Class)**

213. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

214. Plaintiffs bring this claim on behalf of herself and all members of the Class.

215. Plaintiffs and Class Members entered into written agreements with Defendant as part of the medical services Defendant provided to Plaintiffs and Class Members. The agreements involved a mutual exchange of consideration whereby Defendant provided these services in exchange for payment from Class Members, Class Members' insurance carriers, and/or government programs remitting payment on Class Members' behalf.

216. Plaintiffs and Class Members and/or their insurance carriers paid Defendant for its services and performed under these agreements.

217. Defendant's disclosure of Plaintiffs and Class Members' Private Health Information without their consent constitutes a material breach of the terms of these agreements by Defendant.

218. As a direct and proximate result of Defendant's breach of contract with Plaintiffs and Class Members, Plaintiffs and Class Members have been irreparably harmed.

219. Accordingly, Plaintiffs, individually and on behalf of the Class, respectfully request this Court award all available damages for Defendant's breach of express contract.

**COUNT V**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

220. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

221. Plaintiffs bring this claim on behalf of herself and all members of the Class

222. Through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, as well as implied contracts for the Defendant to retain and protect the privacy of Plaintiffs' and Class Members' Private Health Information.

223. Specifically, Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendant when they first went for medical treatment at one of Defendant's facilities.

224. The valid and enforceable implied contracts to provide medical healthcare services that Plaintiffs and Class Members entered into with Defendant included Defendant's promise to not disclose nonpublic Private Health Information given to Defendant without their consent. Plaintiffs and Class Members provided this Private Health Information in reliance of that promise.

225. Defendant solicited and invited Plaintiffs and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services.

226. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's complied with relevant laws and regulations, including

HIPAA, and would not allow third parties to collect or exploit their communications with Defendant without their consent.

227. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

228. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' Private Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Private Health Information through the use of Defendant's websites.

229. Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

230. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

231. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiffs and Class Members' Private Health Information without consent.

232. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly

collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

233. A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

234. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

235. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiffs and Class Members' consent.

236. As a result of Defendant's failure to fulfill the data privacy promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare with data privacy they paid for and the healthcare they received.

237. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class

Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

238. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

239. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

240. Plaintiffs and the Class Members are also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

241. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

242. Plaintiffs hereby plead this Count in the alternative to Counts IV and V.

243. Plaintiffs bring this claim on behalf of herself and all members of the Class.

244. Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

245. Plaintiffs and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

246. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

247. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

248. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in her favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiffs as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f. Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiffs and Class Members may be entitled.

**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFFS JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Dated: October 17, 2022

Date Filed 10/17/2022 2:10 PM Docketed on 10/18/2022
Superior Court - Norfolk
Docket Number

2

| CIVIL ACTION COVER SHEET | DOCKET NUMBER ~~2282CV00982~~ 23-2704 | Trial Court of Massachusetts The Superior Court COUNTY |
|---|---|---|

| | |
|---|---|
| Plaintiff: John and Jane Doe | Defendant: Atrius Health Group, Inc. |
| ADDRESS: c/o Sweeney Merrigan Law | ADDRESS: 275 Grove Street, Suite 3-300 |
| 268 Summer St., LL | Newton, MA 02466 |
| Boston, MA 02210 | |
| Plaintiff Attorney: Jonathan T. Merrigan | Defendant Attorney: |
| ADDRESS: Sweeney Merrigan Law | ADDRESS: |
| 268 Summer Street, LL | |
| Boston, MA 02210 | |
| BBO: 681627 | BBO: |

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B99 | Violation of MA Wiretapping Law | F | ☒ YES ☐ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A? ☐ YES ☒ NO

Is there a class action under Mass. R. Civ. P. 23? ☒ YES ☐ NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

SUFFOLK SUPERIOR COURT CIVIL CLERK'S OFFICE FILED NOV 28 2023 JOHN E. POWERS, III ACTING CLERK MAGISTRATE

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**

A. Documented medical expenses to date
1. Total hospital expenses
2. Total doctor expenses
3. Total chiropractic expenses
4. Total physical therapy expenses
5. Total other expenses (describe below)

Subtotal (1-5): $0.00

B. Documented lost wages and compensation to date
C. Documented property damages to date
D. Reasonably anticipated future medical and hospital expenses
E. Reasonably anticipated lost wages
F. Other documented items of damages (describe below) $50,000,000.00+

Plaintiffs and Class Members have suffered damages pursuant to G.L.c.272 Â§99.

TOTAL (A-F): $50,000,000+

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

Defendant disclosed Plaintiffs and Class Members' personal health information to third parties in violation of G.L. c. 272 Â§ 99.

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | Defendant breached express and implied contractual duties by disclosing Class Members' personal information. | $14,000,000.00+ |
| | Total | $14,000,000.00+ |

Signature of Attorney/Unrepresented Plaintiff: X /s/ Jonathan T. Merrigan Date: October 17, 2022

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney/Unrepresented Plaintiff: X /s/ Jonathan T. Merrigan Date: October 17, 2022



I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Assistant Clerk

Date Filed 10/25/2022 1:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

3

Docketed 10/28/2022

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S. SUPERIOR COURT

JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs

v.

ATRIUS HEALTH, INC.

Defendant.

C.A. No. ~~2282CV00982~~ 23-2704-BLS1

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**PLAINTIFFS' MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION**

Allowed 11/8/22

Now come the Plaintiffs, John Doe and Jane Doe, individually and on behalf of all others similarly situated, to impound their names and/or other identifying information for the pendency of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule 2[1]. The material sought to be impounded are the plaintiffs' names and/or other identifying information[2] for the pendency of this matter. Impoundment is necessary in this matter because the facts of the underlying action relate directly and specifically to all plaintiffs' sensitive medical information. Specifically, the claim arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent. Therefore, in order to protect the medical

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."

[2] This could include social media handles, IP addresses, etc.

Date Filed 10/25/2022 1:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

information that will necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect the plaintiff, whose personal medical information has already been improperly used by the Defendant. Plaintiffs recognize that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiffs' full names would have the unwelcome effect of making impoundment a more laborious, tedious and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order (attached at Exhibit B) would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW Plaintiffs' Motion for Impoundment of Personal Identifying Information and request a hearing on the same.

Date Filed 10/25/2022 1:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

**COUNSEL FOR PLAINTIFFS JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______________
Assistant Clerk

Dated: October 25, 2022

Date Filed 10/25/2022 1:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Docketed 10/28/2022

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S. SUPERIOR COURT

JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs

v.

ATRIUS HEALTH, INC.

Defendant.

C.A. No. ~~2282CV00982~~ 23-2704-BLS1

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**AFFIDAVIT OF ATTORNEY J. TUCKER MERRIGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION**

I, J. Tucker Merrigan, hereby state and depose:

1. I am counsel for the Plaintiffs in the above-captioned case.
2. The information inappropriately obtained by the Defendant in this matter is of a highly sensitive, personal and confidential nature.
3. In order to protect the privacy interests of the Plaintiffs in this case, it is necessary to proceed under a pseudonym so as not to cause further harm by additional, repeated disclosure of highly confidential medical information throughout the course of this litigation.
4. Allowing the plaintiffs to file under a pseudonym also allows for the most efficient disclosure of documents and discovery.

Signed under the pains and penalties of perjury this 25th day of October, 2022.

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

Date Filed 12/14/2022 3:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

4

Docketed 12/15/22

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: TORT - MOTOR VEHICLE TORT - CONTRACT - EQUITABLE RELIEF - OTHER)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO. 2282CV00982
23-2704-BLS1

John Doe and Jane Doe, Individually and on Behalf of Other Similarly Situated

Plaintiff(s)

v.

Atrius Health, Inc.

Defendant(s)

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon J. Tucker Merrigan, Esq. plaintiff's attorney, whose address is 268 Summer St. LL, Boston, MA 02210, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WITNESS, Heidi E. Brieger Esquire, at ______________ the ______________ day of ______________, in the year of our Lord two thousand and ______________

Walter F. Timilty
Clerk.

NOTES:
1. This summons is issued pursuant to Rules 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

F-33

Date Filed 12/14/2022 3:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982

# PROOF OF SERVICE OF PROCESS

Middlesex Sheriff's Office • 40 Brick Kiln Rd, Chelmsford, MA 01824 • 617-547-1171
Middlesex, ss.

December 7, 2022

I hereby certify and return that on 12/6/2022 at 9:35 AM I served a true and attested copy of the SUMMONS AND COMPLAINT & JURY DEMAND in this action in the following manner: To wit, by delivering in hand to JANICE LUISI, agent, person in charge at the time of service for ATRIUS HEALTH INC., at 275 GROVE Street SUITE -300 NEWTON, MA 02459 . Fees: Attest ($5.00) Basic Service Fee ($30.00) Postage and Handling ($3.00) Travel ($5.12) Conveyance ($4.50) Total: $47.62

Laurie Aufiero
Laurie Aufiero

Deputy Sheriff

, 20

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO.

..............................., *Plaintiff*

v.

..............................., *Defendant*

SUMMONS

(Mass. R. Civ. P.4)

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

22013801

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982



5

Docketed on 12/27/2022

23-2704-BLS1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. ________________<br><br>[Massachusetts Superior Court Case No. 2282CV00982]<br><br>**DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1442(a)(1)** |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
MICHAEL JOSEPH DONOVAN / ... POWERS, III
ACTING CLERK MAGISTRATE

## NOTICE OF REMOVAL

For more than 15 years, the federal government has engaged non-governmental entities to help construct a nationwide health information technology infrastructure designed to improve patient engagement and access to care. Since 2011, Atrius Health, Inc. ("Atrius Health") has been one of those entities. Plaintiffs John Doe and Jane Doe now challenge Atrius Health's efforts to implement the federal government's directives and promote patient engagement and access to care. Atrius Health removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and sets forth below a "short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a).

## NATURE OF THE REMOVED ACTION

1. On October 18, 2022, Plaintiffs filed a Class Action Complaint ("Complaint") against Atrius Health in Norfolk County Superior Court, Case No. 2282CV00982. Atrius Health was served on December 6, 2022.

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

Certified to be a true and correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts
By: [signature]
Deputy Clerk
Date: 12/27/2022

2. Atrius Health is a non-profit multi-specialty, multi-site medical group practice in Eastern Massachusetts. An early adopter of electronic health records (EHR) and data analytics, Atrius Health delivers a system of connected care for adult and pediatric patients.

3. Plaintiffs allege that a tracking "pixel" from Facebook, which is now known as Meta (the "Meta Pixel"), is "[o]ne of the world's most prevalent tracking pixels," Compl. ¶ 31, and is "embedded on millions of websites," including "many of the top hospitals in the United States," *id.* ¶ 77. The Meta Pixel is a snippet of JavaScript code.[1] Plaintiffs allege that "Facebook touted Meta Pixel (which it originally called Facebook Pixel) as 'a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website.'"[2] According to the Complaint, "tracking pixels" facilitate collection of "dozens of data points about individual website users who interact with a website." *Id.* ¶ 31.

4. The federal government and health care providers across the country use tracking pixels to improve their website functions and user experience. For example, the Privacy Policy on the website Medicare.gov states: "We use third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov. These third-party services may collect information through the use of web beacons (also called pixels) that are located on our pages. A web beacon . . . in combination with a cookie, allows us to collect information regarding the use of the web page that contains the web beacon."[3]

---

[1] Facebook, *Meta for Developers: Get Started*, available at https://developers.facebook.com/docs/meta-pixel/get-started.
[2] Compl. ¶ 54 (quoting Meta, *Announcing Facebook Pixel*, available at https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/).
[3] Medicare.gov, *Privacy Policy*, available at https://www.medicare.gov/privacy-policy; *see also* CMS.gov, *Privacy Policy* (same disclosure in privacy policy), available at https://www.cms.gov/About-CMS/Agency-Information/Aboutwebsite/Privacy-Policy.

5. Atrius Health and its vendors operate the website www.atriushealth.org. That website is "designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues [and] treatment options, and joining support groups." *Id.* ¶ 20. Plaintiffs' Complaint alleges that Atrius Health is "among" the healthcare providers that "have embedded Meta Pixel." *Id.* ¶ 79. According to Plaintiffs, when the Meta Pixel code snippet is triggered, a user's browser sends information to Facebook in data packets. *See, e.g.*, *id.* ¶¶ 61, 69. Plaintiffs do not allege that social security numbers, medical insurance numbers, birth dates, or medical test results were disclosed to third parties like Facebook. Plaintiffs instead point to internet protocol (IP) addresses, "tracking cookies," "browser-fingerprints," and a user's Facebook ID. *Id.* ¶¶ 33–44.

6. Plaintiff John Doe is allegedly a Facebook user and patient of Atrius Health, and when he purportedly visited the Atrius Health website in 2022, he alleges that information from his interactions with the website were transmitted to Facebook based on instructions from the Meta Pixel. *Id.* ¶¶ 10, 88–89, 92. Plaintiff John Doe does not allege whether he was logged into Facebook when he visited the Atrius Health website, what web browser he was using, or how that web browser was configured. Plaintiff Jane Doe is also allegedly a patient of Atrius Health, and when she purportedly visited the Atrius Health website in 2022, she alleges that information about her interactions was sent to Facebook because of the Meta Pixel. *Id.* ¶¶ 9, 91–92. Plaintiff Jane Doe does not allege that she has a Facebook account or that she was logged into a Facebook account when she visited the Atrius Health website. Nor does she allege what browser she was using or how it was configured.

7. Plaintiffs contend that the information allegedly disclosed is protected under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). *Id.* ¶¶ 35, 38, 42, 44. Plaintiffs further contend that Atrius Health violated HIPAA privacy rules by "allowing Facebook to capture and exploit patients' Protected Health Information" without "express written authorization from patients." *Id.* ¶¶ 99–100 (citing 45 C.F.R. § 164.508).

8. Based on these allegations, Plaintiffs assert the following claims on behalf of a putative class of Massachusetts residents: (1) interception of wire communications in violation of Mass. G.L. c. 272, § 99, *id.* ¶¶ 166–84; (2) invasion of privacy in violation of Mass. G.L. c. 214, § 1B, *id.* ¶¶ 185–205; (3) "breach of fiduciary duty and/or common law duty of confidentiality," *id.* ¶¶ 206–12; (4) breach of express contract, *id.* ¶¶ 213–19; (5) breach of implied contract, *id.* ¶¶ 220–40; and (6) unjust enrichment, *id.* ¶¶ 241–48.

**BASIS FOR REMOVAL**

9. Pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a), Atrius Health removes this case to federal court. The statute authorizes the removal of state court cases against "any officer (or any person acting under that officer) of the United States or any agency thereof . . . for or relating to any act under color of such office." *Id.* § 1442(a)(1).

10. There is no presumption against federal officer removal, *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31, 38 (D. Mass. 2020), and under binding Supreme Court precedent, the federal officer removal statute must be "liberally construed." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007). Private defendants routinely remove state court actions under this statute when acting under color of federal office. *See, e.g.*, *Moore v. Elec. Boat Corp.*, 25 F.4th 30 (1st Cir. 2022).

11. To meet the low bar for removal, the defendant must show (1) it is a "person" under the statute and was "acting under a federal officer's authority," (2) that "the charged conduct was carried out 'for or relating to' the asserted official authority," and (3) that the defendant "will assert a colorable federal defense." *Moore*, 25 F.4th at 34 (citation omitted).

12. Atrius Health meets each of these requirements. First, companies qualify as "person[s]" under the statute, so Atrius Health clearly meets this threshold element. In addition, Atrius Health acted under federal officer authority because it developed its website and patient portal in conjunction with a series of federal programs that sought to create a nationwide health information technology infrastructure. Second, the alleged conduct at issue in Plaintiffs' Complaint was carried out "for or relating to" Atrius Health's authority under federal incentive and interoperability initiatives centered on Medicare and Medicaid, including the Meaningful Use program, Merit-based Incentive Payment System (MIPS), and the Primary Care First program. Through these initiatives, the federal government provides monetary incentives and guidance to providers, including Atrius Health, to enhance patient engagement and expand online access to their EHR. Under federal direction, Atrius Health has gathered data demonstrating expanded patient access and improved patient engagement. Third, Atrius Health intends to assert a colorable federal defense to Plaintiffs' claims.

13. Courts across the country have upheld federal officer removal in similar privacy class actions against healthcare defendants related to their websites. *See Doe I v. UPMC,* 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), *interlocutory appeal denied,* 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020) ("UPMC has shown that by its participation in the Meaningful Use [p]rogram, it was 'acting under' DHHS when it engaged in the conduct at issue in the Complaint."); *Doe v. ProMedica Health Sys., Inc.,* 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020), *appeal denied,*

2020 WL 7705713 (N.D. Ohio Dec. 14, 2020) ("Because Defendant's participation assisted the federal government in achieving that goal [creating an interoperable system of patient EHR], Defendant has satisfied the 'acting under' prong."). Removal is proper here as well.

***Background on Federal Programs***

14. Stretching back to 2004, the federal government has tried to spur "a nationwide implementation of interoperable health information technology in both the public and private health care sectors."[4] To that end, President George W. Bush signed an Executive Order calling for the establishment of the Office of the National Coordinator for Health Information Technology (ONC) within the Department of Health and Human Services (HHS).

15. In the Health Information Technology for Economic and Clinical Health Act of 2009, Congress followed up on that Executive action, *see* American Recovery and Investment Act of 2009, 111 P.L. No. 5 § 3001(a)(1), 123 Stat. 115, 230 (2009), and directed billions of dollars of federal funds to the Centers of Medicare and Medicaid Services (CMS) within HHS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." 123 Stat. at 246 (codified at 42 U.S.C. § 300jj-31).

16. Following that mandate, the ONC enlisted private healthcare providers, including Atrius Health, to help build that nationwide infrastructure. In doing so, the ONC recognized that private healthcare providers are essential to the development of the Congressionally-directed infrastructure precisely because they have direct access to patients. The government has therefore tried to augment "a provider's ability to influence patient engagement by providing a wider range

[4] Exec. Order No. 13,335, 69 Fed. Reg. 24,057 (Apr. 27, 2004), available at https://www.govinfo.gov/content/pkg/WCPD-2004-05-03/pdf/WCPD-2004-05-03-Pg702.pdf.

of technologies and methods for a patient's use." Medicare and Medicaid Programs; Electronic Health Record Incentive Program-Stage 3 and Modifications to Meaningful Use in 2015 Through 2017, 80 Fed. Reg. 62,761, 62,848 (Dec. 15, 2015).

17. In furtherance of its goals, the ONC issues guidance to private providers in the form of strategic plans. For instance, in the 2015–2020 plan, the ONC required "federal agencies" to "collaborate with . . . private stakeholders to . . . [b]uild a culture of electronic health information access and use."[5] The 2020–2025 plan underscores the collaboration that has already occurred: "The federal government and private sector have worked together to help digitize health information and healthcare."[6]

18. Medicare and Medicaid EHR incentive and interoperability initiatives have been at the center of these federal efforts. For instance, CMS established the Meaningful Use program in 2011, which has been followed by various other initiatives and programs. *See* 42 C.F.R. §§ 495.2–495.370. The goal of these initiatives has been to increase patients' "meaningful use" and engagement with their EHR.[7]

19. Since 2011, federal EHR interoperability initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program, have offered incentive payments to Medicare and Medicaid providers when they voluntarily provide program reports and meet specific criteria for increasing patient engagement.[8]

---

[5] ONC, *Federal Health Information Technology Strategic Plan 2015-2020*, available at https://dashboard.healthit.gov/strategic-plan/federal-health-it-strategic-plan-2015-2020.php.

[6] ONC, *Federal Health Information Technology Strategic Plan 2020-2025* (*2020–2025 Strategic Plan*), available at https://www.healthit.gov/sites/default/files/page/2020-01/2020-2025FederalHealthIT%20StrategicPlan_0.pdf.

[7] *See* CMS.gov, *Promoting Interoperability Programs*, available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms.

[8] *See id.* (noting history of interoperability programs); CMS.gov, *Traditional MIPS Overview*, available at https://qpp.cms.gov/mips/traditional-mips (describing promoting interoperability

20. The program requirements for increasing patient engagement include implementing certified EHR technology based on federal standards and technical specifications to facilitate patients viewing their medical records. *See* 45 C.F.R. § 170.315. Once ONC certifies that a particular technology complies with federal standards, the developer can market the product to healthcare providers. To meet the numerous federal requirements, CMS recommends that providers create patient "portals" to facilitate access to providers and EHR. CMS has explained that the portals "must be engaging and user-friendly," and to make that happen, providers should "actively promote and facilitate portal use."[9]

21. HHS requires program participants to show patients' increased engagement over time. Those providers that voluntarily meet the engagement criteria, qualify for higher federal payments. *See* 42 U.S.C. § 1395w-4.

22. For instance, one objective of the Meaningful Use program was to "[p]rovide patients the ability to view online, download, and transmit their health information within 4 business days of the information being available to the [provider]." 42 C.F.R. § 495.22(e)(8)(i). To meet that objective, providers had to show that more than fifty (50) percent of Medicaid patients received access to view, download, and transmit their health information to a third party—a percentage that went up over time. *Compare id.* § 495.22(e)(8) (50 percent in 2015), *with id.* § 495.24(d)(5)(i)(B) (80 percent in 2019).

---

component); CMS.gov, *2021 Promoting Interoperability: Traditional MIPS*, available at https://qpp.cms.gov/mips/explore-measures?tab=advancingCareInformation&py=2021#measures (detailing 2021 MIPS requirements for Promoting Interoperability component)

[9] ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013), available at https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

23. In addition to the Meaningful Use program and MIPS initiatives promoting interoperability, CMS created another program, the Primary Care First program, that incentivizes physicians who may not participate in the other initiatives. Under the Primary Care First program, CMS enters into participant agreements with certain providers to, among other things, further incentivize patient access and EHR interoperability. For instance, participants must ensure that patients receive access to their EHR within one business day and that their EHR technology enables a patient to "[i]dentify, record, and access information directly and electronically shared by a patient." 45 C.F.R. § 170.315(e)(3).

24. Aside from incentive programs, CMS also provided an example of how to engage with beneficiaries: it created its own portal and promoted patient engagement through the use of third-party services on its websites. By working with over two dozen third-parties,[10] CMS is able to "collect basic information about visits to Medicare.gov." *See* Ex. A, Medicare.gov, *Privacy Policy*, available at https://www.medicare.gov/privacy-policy. CMS "use[s] third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov." *Id.* These services include "the use of web beacons (also called pixels)," which CMS uses "to better target Medicare advertisements." *Id.*

25. CMS also engaged Facebook to "place[] a cookie or pixel . . . for conversion tracking on certain pages of CMS website. [This] allows Facebook Ads to measure the

[10] *See* Medicare.gov, *Privacy information regarding third-party services*, available at https://www.medicare.gov/third-party-privacy-policies.

performance of CMS advertisements based on consumer activity and to report the ad performance to CMS."[11]

***Atrius Health is a "person"***

26. Federal officer removal can be effectuated by "any person acting under" a federal officer. 28 U.S.C. § 1442(a)(1).

27. Courts have repeatedly held that corporations qualify as "person[s]" under the statute. *See, e.g.*, *Moore,* 25 F.4th at 34–38; *see also Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 357 & n.9 (1st Cir. 2009).

28. Atrius Health is a Massachusetts non-profit corporation, Compl. ¶ 8, and thus qualifies as a "person."

***Atrius Health is "acting under" Federal Authority***

29. The "acting under" element for federal officer removal—must be "broad[ly]" and "liberally construe[d]." *See Moore*, 25 F.4th at 34 n.3. This element involves "an effort to *assist,* or to help *carry out,* the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152 (emphasis in original).

30. Atrius Health readily meets that requirement. First, on behalf of itself and its providers, Atrius Health has been a longstanding participant in Medicare and Medicaid EHR incentive programs and initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program. Through its voluntary participation, Atrius Health has assisted and continues to assist the federal government in carrying out its goal of creating a nationwide healthcare information technology infrastructure. *See* ONC, *2020–2025 Strategic Plan*. This work has

---

[11] *See* HHS, *Third Party Websites and Applications Privacy Impact Assessment –Facebook Ads* (Sept. 4, 2018), available at https://www.hhs.gov/pia/third-party-websites-and-applications-pia-facebook-ads.html.

included development of its patient portal to meet interoperability standards and filing periodic reports attesting to efforts to increase patient engagement.

31. Second, the government has modeled how to best enhance patient engagement. That includes development of a patient portal and analyzing patient engagement, including with digital marketing tools. Furthermore, the federal government has shown participants how to enhance patient engagement on its own websites by using third-party services to track users' engagement with those websites, including on the CMS website and the HHS website. *See* Ex. B, CMS.gov, *Privacy Policy*, available at https://www.cms.gov/privacy; Ex. C, HHS.gov, *HHS Privacy Policy Notice*, available at https://www.hhs.gov/web/policies-and-standards/hhs-web-policies/privacy/index.html.

32. Third, the federal government has created an office devoted to promoting patient engagement with health records and closely monitors private providers' work to achieve that goal. In exchange for carrying out the work of improving patient access and engagement, Atrius Health and other private providers have received payments and direction through various federal programs and initiatives, including the Meaningful Use program, MIPS, and the Primary Care First program. Such exchanges are akin to a government-contractor relationship. *See Moore*, 25 F.4th at 34 n.3.

33. Finally, the Primary Care First program includes promoting interoperability and patient access to records as an element of improving patient care. As part of the program, Atrius Health has entered into Primary Care First participation agreements for almost all of its clinical facilities, ensuring that it attains the interoperability benchmarks that are part of the federal government's efforts to improve primary care and interoperability. The federal government would

not be able to "carry out" these important federal healthcare initiatives without participation by providers like Atrius Health. *See Watson*, 551 U.S. at 152.

***Atrius Health's Conduct Taken "for or relating to" the Asserted Federal Authority***

34. The "for or relating to" element means that the Plaintiffs' claims must be "related to" the activity Atrius Health took while "acting under" the federal officer. *See Moore*, 25 F.4th at 35–36. "No causal link is required," and the required nexus "is not to be understood as anything more than a 'related to' nexus." *Id.* The Supreme Court has stated "that the ordinary meaning of the phrase 'relating to' is 'a broad one,' holding that it normally means in 'association with or connection with.'" *Id.* at 35 n.4 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992)).

35. As detailed above, the Complaint focuses on Atrius Health's alleged use of a common website analytical tool, the Meta Pixel. *See, e.g.*, Compl. ¶¶ 4–6, 22, 32, 82, 85–92. As Plaintiffs allege, and the government's own use of pixels shows, "[a] third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic." *Id.* ¶ 74. Plaintiffs thus challenge development of Atrius Health's website that helps to promote patient engagement.

36. "Any single claim is independently sufficient to satisfy the 'for or relating to' requirement under § 1442(a)(1)." *Moore*, 25 F.4th at 35. Whether it is the wiretapping claim or the more general invasion of privacy claim advanced in the Complaint, Plaintiffs target Atrius Health's actions taken in response to federal program incentives.

37. For instance, Plaintiffs argue that Atrius Health's conduct violated Massachusetts' wiretapping statute, *see* Compl. ¶¶ 165–84, and in support of that claim, Plaintiffs contend that Atrius Health "aided in the interception of 'contents'" of Plaintiffs' communications, including

"Log-Ins," to the patient portal, *id.* ¶ 179. Placing log-ins to the patient portal in various places on the website promotes portal engagement and thus helps meet interoperability standards in various federal EHR programs and initiatives. Accordingly, at least one claim "relat[es] to" Atrius Health's role in carrying out the federal government's goal of creating a national healthcare information technology infrastructure.

38. In a similar case, *UPMC*, the plaintiffs there also asserted state law claims against a defendant healthcare provider based on alleged disclosure of personally identifiable information to third parties for marketing purposes and without the plaintiffs' knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The district court for the Western District of Pennsylvania found that as a Meaningful Use participant, "UMPC must, among other things, raise awareness and increase usability of the UPMC website and [its] portal." *Id.* at *6. The court then concluded that targeting disclosure of information to third parties, such as Facebook, "plainly" established "a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability." *Id.* The same is true of Plaintiffs' claims here.

***Atrius Health's Colorable Federal Defense***

39. The final element for removal under Section 1442 merely requires that the defendant assert a "colorable federal defense." *See Mesa v. California*, 489 U.S. 121, 129–30 (1989) (colorable federal defense is "defensive" and "based in federal law"). A federal defense is "colorable" as long as it is not "wholly insubstantial and frivolous," even if it is not "clearly sustainable." *Moore*, 25 F.4th at 36 (citations omitted).

40. Atrius Health intends to argue that the information allegedly disclosed, including information about website interactions and Facebook IDs, was not protected health information

under HIPAA. Plaintiffs' assertion that the allegedly disclosed information falls under the category of individually identifiable health information, *see* Compl. ¶¶ 42, 44 (citing 45 C.F.R. § 164.514(b)(2)(i)(R)), requires interpretation of federal law.

41. HIPAA lies at the center of Plaintiffs' claims and whether the information at issue was HIPAA-protected is a question of federal law. As such, Atrius Health has established a colorable federal defense. Atrius Health may identify additional defenses that involve federal law as it continues to review Plaintiffs' Complaint.

**PROCEDURAL REQUIREMENTS**

42. All the procedural requirements for removal under 28 U.S.C. § 1446 are satisfied.

43. Atrius Health is filing this Notice of Removal within thirty (30) days of its receipt of the Complaint by formal "service," which occurred on December 6, 2023. 28 U.S.C. § 1446(b); *see also Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347–48 (1999) ("formal service" required to start 30-day period pursuant to § 1446(b)).

44. This Court is the corresponding federal court for the Norfolk County Superior Court of the Commonwealth of Massachusetts, where the suit was originally filed. Venue is therefore proper under 28 U.S.C. §§ 101 and 1441(a).

45. Atrius Health has attached a copy of the Complaint and all other publicly available filings from the state court docket as Exhibits D–I.

46. Upon filing this Notice, Atrius Health will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the Norfolk County Superior Court. 28 U.S.C. § 1446.

**WHEREFORE,** Notice is given that this action is removed from the Norfolk County Superior Court of the Commonwealth of Massachusetts to the United States District Court for

the District of Massachusetts.

Dated: December 23, 2022

Respectfully submitted,

**HOGAN LOVELLS US LLP**

*/s/ Kayla H. Ghantous*

By: Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*pro hac vice forthcoming*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Atrius Health, Inc.*

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2022, copies of the foregoing Notice of Removal and accompanying exhibits were sent via electronic mail and overnight delivery, as indicated below, to:

Sweeney Merrigan Law
J. Tucker Merrigan
Victoria Santoro Mair
Erin E. McHugh
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Ahmad, Zavitsanos, & Mensing, P.C.
Foster C. Johnson
David Warden
Nathan Campbell
1221 McKinney Street, Suite 3460
Houston, Texas 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Keller Postman LLC
Seth Meyer
Alex Dravillas
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Counsel for Plaintiffs John Doe and Jane Doe, Individually and on Behalf of all Others Similarly Situated*

/s/ Kayla H. Ghantous
*Counsel for Atrius Health, Inc.*

# Exhibit A

An official website of the United States government

Here's how you know

Menu

Search Medicare

# Privacy policy


- Types of information we collect
- How CMS uses information collected on Medicare.gov
- How CMS uses cookies & other technologies on Medicare.gov
- Your choices about tracking & data collection on Medicare.gov
- How CMS uses third-party websites & applications with Medicare.gov
- How CMS protects your personal information
- How long CMS keeps data & how it's accessed
- Children & privacy on Medicare.gov
- Links to other sites
- Additional privacy information


## Medicare.gov privacy policy

Protecting your privacy is very important to us. This privacy policy describes what information we collect, why we collect it, and what we do with it. This privacy notice is for Medicare.gov, es.Medicare.gov, and other Medicare.gov subdirectories, like Medicare.gov/physiciancompare. These websites are referred to as "Medicare.gov" throughout the rest of this notice and are maintained and operated by the Centers for Medicare & Medicaid Services (CMS). This notice of privacy policy aligns with the CMS Website Privacy Policy.

Medicare.gov doesn't collect name, contact information, Medicare Number, or other similar information through these websites unless you choose to provide it. We do collect other, limited, non-personally identifiable information automatically from visitors who read, browse, and/or download information from our website. We do this so we can understand how the website is being used and how we can make it more helpful. For more information, see Types of information we collect.

Personally identifiable information (PII), defined by the Office of Management and Budget (OMB), refers to information that can be used to distinguish or trace an individual's identity, like their name, Medicare Number, biometric records, etc. alone, or when combined with other

personal or identifying information which is linked or linkable to a specific individual, like date and place of birth, mother's maiden name, etc. Medicare Fee-for-Service eligibility and enrollment information and claims data are considered protected health information (PHI) under the Health Insurance Portability and Accountability Act (1996) (HIPAA) regulations. Read more about our privacy practices regarding PHI.

For example, we collect PII/PHI if you elect to create a user account on Medicare.gov, use Medicare.gov to apply for Medicare coverage, enroll in a plan, or use other tools that provide personalized services or information through Medicare.gov. We collect this information to be able to provide you access to the personalized information and services that Medicare.gov is designed to offer you. We don't sell any information you provide when you visit Medicare.gov. For information on how we share information, see How CMS uses information collected on Medicare.gov.

## Types of information we collect

### Information which is automatically collected:

**When you browse:**

Certain information about your visit can be collected when you browse websites. When you browse Medicare.gov, we, and in some cases, our third-party service providers, can collect the following types of information about your visit, including:

- Domain from which you accessed the internet (like Verizon.com if you're using a Verizon account).
- IP address (an IP or internet protocol address is a number that's automatically assigned to a device connected to the internet).
- Approximate geographic location based on the IP address of the user's local system.
- Operating system for the device that you're using and information about the browser you used when visiting the site. The operating system is software that directs a computer's basic functions, like executing programs and managing storage.
- Date and time of your visit.
- Pages you visited.
- Address of the website that connected you to Medicare.gov (like Google.com or Bing.com).
- Device type (like desktop computer, tablet, or type of mobile device).
- Screen resolution.
- Browser language.
- Geographic location.

- Time spent on page.
- Scroll depth (measures how much of a web page was viewed).
- Your actions on Medicare.gov (like clicking a button).

For more information, see How CMS uses third-party websites & applications with Medicare.gov.

We use this information to:

- Measure the number of visitors to Medicare.gov
- Help make our website more useful for visitors
- Improve our public education and outreach through digital advertising

Also, this information is sometimes used to personalize the content we show you on third-party sites. For more information on our practices, see How CMS uses third-party websites & applications with Medicare.gov.

## Information you may provide:

**When you request information:**

We collect information, including your email address or mobile phone number, to deliver alerts or eNewsletters. We use this information to complete the subscription process and provide you with information. You can opt out of these communications at any time by editing your subscription preferences.

**When you submit forms:**

We collect PII/PHI on paper or electronic forms, like Medicare coverage enrollment, authorizations to disclose personal health information, medical payment requests or appeals. When you specifically and knowingly provide us PII/PHI, like your name, email address, Social Security Number, or other unique identifier, we only use this information to fulfill the stated purpose on the form. If you choose to provide us with PII/PHI through a paper or electronic form, we'll maintain the information you provide only as long as needed to respond to your question or to fulfill the stated purpose of the communication.

**When you enroll in Medicare:**

When you apply for Medicare, you can sign up for Medicare Part A (Hospital Insurance) and Medicare Part B (Medical Insurance) through the Social Security Administration (SSA) website. All PII you provide to the SSA is subject to the SSA's privacy policies. Any PII that you supply to SSA that qualifies as PHI will also be subject to the HIPAA regulations.

For specific details on the data collected by the systems that make up Medicare.gov, visit the Privacy Impact Assessments (PIAs).

## How CMS uses information collected on Medicare.gov

If we maintain your PII/PHI in a system designed to retrieve information about you by personal identifier (name, personal email address, home mailing address, personal or mobile phone number, etc.), we'll protect it in accordance with the Privacy Act of 1974 (5 U.S.C. Section 552a).

Prior to requesting PII/PHI on a form on Medicare.gov, we'll provide you with a Privacy Act Statement.

### Sending you Medicare messages:

We use the email address or the mobile phone number you provide us to send emails or Short Message Service (SMS) messages (text messages) related to Medicare. If you give us permission, we'll send you emails and text messages. We also may use the phone number you provide to call you about Medicare services.

### Responding to you through Live Chat:

We use web chat to collect name, email, phone number, and description of the request from Medicare.gov users who choose to provide this information to request a Medicare Call Center representative contact them.

### Conducting surveys to improve services:

We also use online surveys to collect opinions and feedback. You don't have to answer these questions. If you do answer these questions, don't include any PII/PHI in your answers. We analyze and use the information from these surveys to improve the Medicare.gov websites. The information is available only to CMS managers, members of the CMS communications and web teams, and other designated federal staff and contractors who require this information to perform their duties.

### Using third-party tools for website analytics:

We use a variety of third-party web tools for web analytics. We use these tools to collect basic information about visits to Medicare.gov. This information is then used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Helping make the website more useful to visitors

CMS staff analyzes the data collected from these tools. Reports are available only to CMS managers, teams who implement programs represented on Medicare.gov, members of the CMS communications and web teams, and other designated federal staff and contractors who need this information to perform their jobs.

## Using third-party tools for outreach and education through digital advertising:

We use third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov. These third-party services may collect information through the use of web beacons (also called pixels) that are located on our pages. A web beacon is a see-through graphic image (usually 1 pixel x 1 pixel) that's placed on a web page and, in combination with a cookie, allows us to collect information regarding the use of the web page that contains the web beacon.

We use web beacons to tell when a user is redirected to Medicare.gov by clicking or otherwise interacting with a Medicare advertisement that we ran on another website. This is known as "click tracking" or "conversion tracking," and we use it to better target Medicare advertisements (known as "retargeting") to inform consumers or people with Medicare about Medicare deadlines and the services available through Medicare.gov. For more information on how these tools work, see How CMS uses third-party websites & applications with Medicare.gov.

We also use third-party tools to help deliver advertising. Vendors that operate the third-party tools may also gather information about your visits to third-party sites outside of Medicare.gov. While we don't track your internet activity outside of Medicare.gov, our vendors may use information collected automatically by visiting Medicare.gov, and combine it with data they collect elsewhere for targeted advertising purposes. You can opt out of this type of data collection via Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on Medicare.gov.

The outreach and education analytics tools provide reports which aggregate data like the number of clicks on advertisements. The reports are available only to CMS managers, teams who implement programs represented on Medicare.gov, members of the Medicare.gov communications and web teams, and other designated federal staff and contractors who need this information to perform their duties.

# How CMS uses cookies & other technologies on Medicare.gov

The Office of Management and Budget Memo M-10-22, Guidance for Online Use of Web Measurement and Customization Technologies, allows federal agencies to use session and persistent cookies to improve the delivery of services.

When you visit a website, its server may generate a piece of text known as a "cookie" to place on your device. The cookie, which is unique to your browser, allows the server to "remember" specific information about your visit while you're connected. The cookie makes it easier for you to use the dynamic features of web pages. Information that you enter into Medicare.gov isn't associated with cookies on Medicare.gov. Depending on the third-party tool's business practices, privacy policies, terms of service, and/or the privacy settings you selected, information you've provided to third parties could be used to identify you when you visit Medicare.gov. These third parties don't/won't share your identity with CMS or the Department of Health and Human Services (HHS).

There are 2 types of cookies - single session (temporary) and multi-session (persistent). Single session cookies last only as long as your internet browser is open. Once you close your browser, the session cookie disappears. Persistent cookies are stored on your device for longer periods. Both types of cookies create an ID that's unique to your device.

- **Session cookies:** We use session cookies for technical purposes, like to allow better navigation through our website. These cookies let our server know that you're continuing a visit to our website. The OMB Memo M-10-22 Guidance defines our use of session cookies as "Usage Tier 1—Single Session." The policy says, "This tier encompasses any use of single session web measurement and customization technologies."
- **Persistent cookies:** We use persistent cookies to understand the differences between new and returning visitors to Medicare.gov. Persistent cookies remain on your device between visits to our website until they expire or are removed by the user. The OMB Memorandum M-10-22 Guidance defines our use of persistent cookies as "Usage Tier 2—Multi-session without personally identifiable information." The policy says, "This tier encompasses any use of multi-session web measurement and customization technologies when no PII is collected." We don't use persistent cookies to collect PII. We don't identify a user by using cookies.

CMS also uses these technologies on Medicare.gov:

- **Persistent cookies for digital advertising:** Similar to persistent cookies identified above, CMS uses persistent cookies for outreach through digital advertising. These cookies can also be created on third-party websites and remain on your device between

visits to our website until they expire or you remove them. Consistent with OMB guidance for "Usage Tier 2", we don't use persistent cookies for outreach to collect PII. CMS doesn't identify a user by using such technologies.

- **Web beacons for digital advertising** (also called pixels and/or tracking tags): See-through images placed on certain pages of Medicare.gov are typically used in conjunction with cookies and aren't stored on your device. When you access these pages, web beacons generate a notice of your visit. For information on how we use web beacons, see How CMS uses third-party websites & applications with Medicare.gov.
- **Website log files:** These are used as an analysis tool and to tell how visitors use Medicare.gov, how often they return, and how they navigate through the website.
- **Flash:** Flash is used to assess the performance of the site and as a player for selected videos depending on the browser a device is using.
- **Local Storage Objects:** We use Flash Local Storage Objects ("LSOs") to store your preferences and to personalize your visit.

## Your choices about tracking & data collection on Medicare.gov

Medicare.gov offers a Privacy Manager which gives you control over what tracking and data collection takes place during your visit. Third-party tools are enabled by default to provide a quality consumer experience.

The Privacy Manager provides you with the choice to opt in or to opt out of the different categories of third-party tools used by Medicare.gov: Advertising, Analytics, or Social Media. The Privacy Manager prevents cookies, web beacons, and Local Storage Objects from being placed on your device. The Privacy Manager also prevents third-party tools from loading regardless of your cookie settings, which provides you with an additional layer of privacy that prevents the tool from loading at all. Because the Privacy Manager creates a cookie in your browser, the opt in and opt out choices you make through the Privacy Manager will only be effective on the device and browser you used to make your choices, and your choices will expire when the cookie expires. Once the cookie is created, the Privacy Manager will retain your settings for 3 years from the date of your most recent visit. You may revisit the Privacy Manager to change or renew your choices at any time.

Modify privacy options

If you disable cookies in your browser, our Privacy Manager won't be able to store your preferences and won't function properly. If you don't wish to use our Privacy Manager to opt

out of the tools used by Medicare.gov, you can opt out of tools individually, or via the Digital Advertising Alliance ("DAA") AdChoices icon, discussed in the next subsection.

If you opt out of the tools used by Medicare.gov via the Privacy Manager or by opting out of the tools directly, you'll still have access to information and resources at Medicare.gov. Or, if you don't want to use the website, you can get Medicare information by calling us at 1-800-MEDICARE (1-800-633-4227). TTY users can call 1-877-486-2048.

**AdChoices:** We include the AdChoices icon on all digital advertising that uses "conversion tracking" or "retargeting." To learn about conversion tracking, targeted advertising, and retargeting, see How CMS uses third-party websites & applications with Medicare.gov. The AdChoices icon is usually at or near the corner of digital ads. When you click on the AdChoices icon, it will provide information on what company served the ad and information on how to opt out. Learn more about AdChoices.

**Do Not Track:** We automatically observe the "Do Not Track" browser setting for digital advertising that uses "conversion tracking" or "retargeting." If "Do Not Track" is set before a device visits Medicare.gov, third-party conversion tracking and retargeting tools won't load on the website. To learn more about conversion tracking and retargeting, see How CMS uses third-party websites & applications with Medicare.gov. Learn more about Do Not Track and how to set the Do Not Track setting in your browser.

## How CMS uses third-party websites & applications with Medicare.gov

Medicare.gov uses a variety of technologies and social media services to communicate and interact with the public. These third-party websites and applications include popular social networking and media websites, open source software communities, and more.

### Third-party websites:

Your activity on the third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites. You should review the privacy policies of all websites before using them so you understand how your information may be used. You may want to adjust your account privacy settings on any third-party website to match your preferences on Medicare.gov.

### Website analytics tools:

These tools collect basic site usage information, like:

- How many visits Medicare.gov gets
- The pages visited by consumers
- Time spent on Medicare.gov
- The number of return visits to Medicare.gov
- The approximate geographic location of the device used to access Medicare.gov
- Types of devices used

This information is used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Improving your experience

Use the Medicare.gov Privacy Manager to opt out of website analytics tools.

## Digital advertising tools for outreach & education:

We use third-party tools to support our digital advertising outreach and education efforts. These tools enable us to reach new people and provide information to previous visitors. To use these tools, we use these technologies on Medicare.gov:

**Click tracking:** We use click tracking to identify the ads that are most helpful to consumers and efficient for outreach. This enables us to improve the performance of ads that consumers click on. When users click on links from ads, data about what ad was viewed is collected. Reports are generated about ad performance – including the total number of views and clicks an ad received.

**Conversion tracking:** We use conversion tracking to identify ads that are helpful to consumers and efficient for outreach. It enables us to improve the performance of ads viewed by consumers. When a Medicare.gov ad is viewed on a third-party site (like a banner ad), a cookie is placed in the browser of the device the ad was viewed on. If this device later visits Medicare.gov, the visit is linked to the ad viewed on the same device. Use the Medicare.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on Medicare.gov.

**Retargeting:** We use retargeting to provide information to consumers who have previously visited Medicare.gov, like reminders about upcoming enrollment deadlines. Retargeting enables us to improve the performance of ads by delivering them to relevant audiences, like recent visitors to Medicare.gov. During a visit to Medicare.gov, a cookie is placed in the browser of the devices used to view the website. When that same device is used to visit third-party websites that are displaying Medicare.gov ads, ads for Medicare.gov may be shown to that device because it had previously visited Medicare.gov. Using these cookies, we don't collect information about the third-party websites visited by a device. Reports are generated about ad performance – including the total number of views and clicks an ad received. Use the Medicare.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on Medicare.gov.

**Targeted advertising:** We use third-party vendors to engage in targeted advertising (also called online behavioral or interest-based advertising) to provide information to consumers across their online activities. Targeted advertising involves the collection of data from a particular computer or device. Data regarding web viewing behaviors or application use is gathered to predict user preferences or interests. We can have ads delivered to computers or devices based on the preferences or interests inferred from the web-viewing behaviors or application use.

Third-party vendors engaged by us may also target advertising based on information automatically collected (not information you provide) when you browse our websites or other websites on the internet. You can opt out of this type of data collection via our Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on Medicare.gov.

We may consider new third-party tools or the use of new third-party websites, but we'll first assess the tool or website before it's used in connection with Medicare.gov. We'll provide notice to the public before adding any new tool to Medicare.gov. These assessments include a description about how information will be collected, accessed, secured, and stored. See a list of the third-party tools currently being used on Medicare.gov. See risk assessments for third-party websites and applications.

## How CMS protects your personal information

We're committed to protecting information entrusted with us at Medicare.gov. If you visit Medicare.gov and choose to provide us with PII/PHI, we store your PII/PHI in a record system that can retrieve information about you by personal identifier (like name, personal email

address, home mailing address, or personal or mobile phone number, etc.). We'll protect the information you provide in accordance with applicable law, including the requirements of the Privacy Act of 1974 (5 U.S.C. Section 552a) and the regulations promulgated under HIPAA as amended (45 CFR 160-164). Privacy Act protections include the publication of Privacy Act System of Record Notices (SORN) in the Federal Register, which provide public notice about how we'll use and disclose PII. SORN are also available on CMS.gov.

The original system of records notice entitled, "1-800 Medicare Choice (HELPLINE)" was published in the Federal Register on February 26, 2008. View the system of records and modifications.

For more information about Medicare.gov's privacy policy, email Privacy@cms.hhs.gov.

Third-party services are web-based technologies that aren't exclusively operated or controlled by a government entity, or that involve significant participation of a nongovernment entity. These services may be separate websites or may be applications embedded within our websites. The list of third-party services includes links to relevant third-party privacy policies.

## How long CMS keeps data & how it's accessed

We'll keep data collected long enough to achieve the specified objective for which they were collected. Once the specified objective is achieved, the data will be retired or destroyed in accordance with published draft records schedules of CMS as approved by the National Archives and Records Administration.

We don't store information from cookies on our systems. The persistent cookies used with third-party tools on Medicare.gov can be stored on a user's local system and are set to expire at varying time periods depending upon the cookie. We assess whether the expiration date of a cookie exceeds one year and provides an explanation as to why cookies with a longer life are used on the site in the associated Third-Party Website or Application Privacy Impact Assessment.

## Children & privacy on Medicare.gov

We believe it's important to protect the privacy of children online. The Children's Online Privacy Protection Act (COPPA) governs information gathered online from or about children under the age of 13. Medicare.gov isn't intended to solicit information of any kind from children under age 13. If you believe that we've received information from a child under age 13, call us at 1-800-MEDICARE (1-800-633-4227). TTY users can call 1-877-486-2048.

# Links to other sites

Medicare.gov may link to other HHS websites, other government websites, and/or private organizations (like health care providers). We link to other websites solely for your convenience and education. When you follow a link to an external site, you're leaving Medicare.gov and the external site's privacy and security policies will apply. Non-federal websites don't necessarily operate under the same laws, regulations, and policies as federal websites. Other than third-party websites highlighted in this privacy notice, we aren't responsible for the contents of external web pages and a link to a page doesn't constitute an endorsement.

## Social media & other sites that require registration

We use social media websites (listed below) to:

- Increase government transparency
- Improve information sharing
- Promote public participation
- Encourage partnership with CMS

**Social media websites aren't government websites or applications. They're controlled or operated by the social media website.** We don't own, manage, or control social media websites. In addition, we don't collect, maintain, or disseminate information posted by visitors to those social media websites. If you choose to provide information to a social media website through registration or other interaction with the website, the use of any information you provide is controlled by your relationship with the social media website. For example, any information that you provide to register on Facebook is voluntarily contributed and isn't maintained by us. This information may be available to our social media page administrators in whole or part, based on a user's privacy settings on the social media website. However, we won't use PII, if provided by you to a social media website or other website that requires registration, for targeted advertising or retargeting. Although you may voluntarily contribute to a social media website with the intent to share the information with others on a CMS social media page, to protect your privacy, don't disclose PII about yourself or others.

We don't keep separate records or accounting of any social media website users or their interaction with the Medicare.gov pages on social media websites. We don't store or share this information. User information is retained by social media websites in accordance with the website's policies. See each social media website's privacy policy to see how long user information is retained after an account has been deleted. To learn more about how each social media website uses and maintains information visit their privacy policy, as follows:

- Google Plus
- Facebook
- Twitter
- YouTube

## Additional privacy information

Get more information about CMS privacy policies.

Updated: April 25, 2018

### Site Menu

### Take Action

### CMS & HHS Websites

### Helpful Links

## Signup for email updates

ENTER YOUR EMAIL ADDRESS

name@example.com

☐ By checking this box, you consent to our data privacy policy.

Next

About Medicare | Medicare Glossary

Nondiscrimination / Accessibility | Privacy Policy | Privacy Setting | Linking Policy | Using this site | Plain Writing

A federal government website managed and paid for by the U.S. Centers for Medicare and Medicaid Services.
7500 Security Boulevard, Baltimore, MD 21244

Medicare.gov

# Exhibit B

An official website of the United States government Here's how you know

Pages in this section


- Web Policies & Important Links
- CMS Web Archive
- **CMS.gov Privacy Policy**
- Centers for Medicare & Medicaid Services (CMS) Website Privacy Policy
- CMS.gov Accessibility and Compliance with Section 508
- Freedom of Information Act
- No Fear Act
- CMS Accessibility & Nondiscrimination for Individuals with Disabilities Notice
- Link to Us
- Policy for Linking to Outside Websites
- CMS.gov External Link Disclaimer
- CMS/HHS Vulnerability Disclosure Policy
- Information Quality Guidelines
- CMS/HHS Policy for the Transition to Internet Protocol Version 6 (Ipv6)
- Security Protocols to Protect Information
- Help
- About This Website
- CMS Contractor Website Guidelines
- CMS.gov Email Updates


Feedback


Types of information we collect
How CMS uses information collected on CMS.gov
How CMS uses cookies & other technologies on CMS.gov
Your choices about tracking & data collection on CMS.gov
How CMS uses third-party websites & applications with CMS.gov
How CMS protects your personal information
How long CMS keeps data & how it's accessed
Children & privacy on CMS.gov
Links to other sites
Additional privacy information

## CMS.gov Privacy Policy

Protecting your privacy is very important to us. This privacy policy describes what information we collect, why we collect it, and what we do with it. This privacy notice covers CMS.gov, marketplace.cms.gov, innovation.cms.gov, partnershipforpatients.cms.gov, and hfpp.cms.gov. These websites are referred to as "CMS.gov" throughout the rest of this notice and are maintained and operated by the Centers for Medicare & Medicaid Services (CMS). The privacy notice for other CMS websites not listed above is available at https://www.cms.gov/About-CMS/Agency-Information/Aboutwebsite/Privacy-Policy.html.

CMS.gov doesn't collect name, contact information, or other similar information through these websites unless you choose to provide it. We do collect other, limited, non-personally identifiable information automatically from visitors who read, browse, and/or download information from our website. We do this so we can understand how the website is being used and how we can make it more helpful. For more information, see Types of information we collect.

Personally identifiable information (PII), defined by the Office of Management and Budget (OMB), refers to information that can be used to distinguish or trace an individual's identity, like their name, Medicare Number, biometric records, etc. alone, or when combined with other personal or identifying information which is linked or linkable to a specific individual, like date and place of birth, mother's maiden name, etc. Medicare Fee-for-Service eligibility and enrollment information and claims data are considered protected health information (PHI) under the Health Insurance Portability and Accountability Act (1996) (HIPAA) regulations.

We don't sell any information you provide when you visit CMS.gov. For information on how we share information, see How CMS uses information collected on CMS.gov.

## Types of information we collect

### Information which is automatically collected:

**When you browse:**

Certain information about your visit can be collected when you browse websites. When you browse CMS.gov, we, and in some cases, our third-party service providers, can collect the following types of information about your visit, including:

- Domain from which you accessed the internet (like Verizon.com if you're using a Verizon account).
- IP address (an IP or internet protocol address is a number that's automatically assigned to a device connected to the internet).
- Approximate geographic location based on the IP address of the user's local system.
- Operating system for the device that you're using and information about the browser you used when visiting the site. The operating system is software that directs a computer's basic functions, like executing programs and managing storage.
- Date and time of your visit.
- Pages you visited.
- Address of the website that connected you to CMS.gov (like Google.com or Bing.com).
- Device type (like desktop computer, tablet, or type of mobile device).
- Screen resolution.
- Browser language.
- Geographic location.
- Time spent on page.
- Scroll depth (measures how much of a web page was viewed).

Feedback

- Scroll depth (measures how much of a web page was viewed).
- Your actions on CMS.gov (like clicking a button).

For more information, see How CMS uses third-party websites & applications with CMS.gov.

We use this information to:

- Measure the number of visitors to CMS.gov.
- Help make our website more useful for visitors.
- Improve our public education and outreach through digital advertising.

Also, this information is sometimes used to personalize the content we show you on third-party sites. For more information on our practices, see How CMS uses third-party websites & applications with CMS.gov.

### Information you may provide:

#### When you request information:

We collect information, including your email address, to deliver alerts or eNewsletters. We use this information to complete the subscription process and provide you with information. You can opt out of these communications at any time by editing your subscription preferences.

## How CMS uses information collected on CMS.gov

### Sending you CMS messages:

We use the email address you provide us to send emails related to CMS.

### Conducting surveys to improve services:

We use online surveys to collect opinions and feedback. You don't have to answer these questions. If you do answer these questions, don't include any PII/PHI in your answers. We analyze and use the information from these surveys to improve the CMS.gov website. The information is available only to CMS managers, members of the CMS communications and web teams, and other designated federal staff and contractors who require this information to perform their duties.

### Using third-party tools for website analytics

We use a variety of third-party web tools for web analytics. We don't collect any PII/PHI with these tools. We use these tools to collect basic information about visits to CMS.gov. This information is then used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Helping make the website more useful to visitors

CMS staff analyzes the data collected from these tools. Reports are available only to CMS managers, teams who implement programs represented on CMS.gov, members of the CMS communications and web teams, and other designated federal staff and contractors who need this information to perform their jobs.

### Using third-party tools for outreach and education through digital advertising:

We use third-party web services to conduct outreach and education through the use of digital advertising for

CMS.gov. These third-party services may collect information through the use of web beacons (also called pixels) that are located on our pages. A web beacon is a see-through graphic image (usually 1 pixel x 1 pixel) that's placed on a web page and, in combination with a cookie, allows us to collect information regarding the use of the web page that contains the web beacon.

We use web beacons to tell when a user is redirected to CMS.gov by clicking or otherwise interacting with a CMS advertisement that we ran on another website. This is known as "click tracking" or "conversion tracking," and we use it to better target CMS advertisements (known as "retargeting") to inform consumers about the services available through CMS.gov. For more information on how these tools work, see How CMS uses third-party websites & applications with CMS.gov.

We also use third-party tools to help deliver advertising. Vendors that operate the third-party tools may also gather information about your visits to third-party sites outside of CMS.gov. While we don't track your internet activity outside of CMS.gov, our vendors may use information collected automatically by visiting CMS.gov, and combine it with data they collect elsewhere for targeted advertising purposes. You can opt out of this type of data collection via Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on CMS.gov.

The outreach and education analytics tools provide reports which aggregate data like the number of clicks on advertisements. The reports are available only to CMS managers, teams who implement programs represented on CMS.gov, members of the CMS.gov communications and web teams, and other designated federal staff and contractors who need this information to perform their duties.

## How CMS uses cookies & other technologies on CMS.gov

The Office of Management and Budget Memo M-10-22, Guidance for Online Use of Web Measurement and Customization Technologies, allows federal agencies to use session and persistent cookies to improve the delivery of services.

When you visit a website, its server may generate a piece of text known as a "cookie" to place on your device. The cookie, which is unique to your browser, allows the server to "remember" specific information about your visit while you're connected. The cookie makes it easier for you to use the dynamic features of web pages. Information that you enter into CMS.gov isn't associated with cookies on CMS.gov. Depending on the third-party tool's business practices, privacy policies, terms of service, and/or the privacy settings you selected, information you've provided to third parties could be used to identify you when you visit CMS.gov. These third parties don't/won't share your identity with CMS or the Department of Health and Human Services (HHS).

There are 2 types of cookies - single session (temporary) and multi-session (persistent). Single session cookies last only as long as your internet browser is open. Once you close your browser, the session cookie disappears. Persistent cookies are stored on your device for longer periods. Both types of cookies create an ID that's unique to your device.

Feedback

- **Session cookies:** We use session cookies for technical purposes, like to allow better navigation through our website. These cookies let our server know that you're continuing a visit to our website. The OMB Memo M-10-22 Guidance defines our use of session cookies as "Usage Tier 1—Single Session." The policy says, "This tier encompasses any use of single session web measurement and customization technologies."
- **Persistent cookies:** We use persistent cookies to understand the differences between new and returning visitors to CMS.gov. Persistent cookies remain on your device between visits to our website until they expire or are removed by the user. The OMB Memorandum M-10-22 Guidance defines our use of persistent cookies as "Usage Tier 2—Multi-session without personally identifiable information." The policy says, "This tier encompasses any use of multi-session web measurement and customization technologies when no PII is collected." We don't use persistent cookies to collect PII. We don't identify a user by using cookies.

CMS also uses these technologies on CMS.gov:

- **Persistent cookies for digital advertising**: Similar to persistent cookies identified above, CMS uses persistent cookies for outreach through digital advertising. These cookies can also be created on third-party websites and remain on your device between visits to our website until they expire or you remove them. Consistent with OMB guidance for "Usage Tier 2", we don't use persistent cookies for outreach to collect PII. CMS doesn't identify a user by using such technologies.
- **Web beacons for digital advertising (also called pixels and/or tracking tags)**: See-through images placed on certain pages of CMS.gov are typically used in conjunction with cookies and aren't stored on your device. When you access these pages, web beacons generate a notice of your visit. For information on how we use web beacons, see How CMS uses third-party websites & applications with CMS.gov.
- **Website log files**: These are used as an analysis tool and to tell how visitors use CMS.gov, how often they return, and how they navigate through the website.
- **Flash**: Flash is used to assess the performance of the site and as a player for selected videos depending on the browser a device is using.
- **Local Storage Objects**: We use Flash Local Storage Objects ("LSOs") to store your preferences and to personalize your visit.

## Your choices about tracking & data collection on CMS.gov

CMS.gov offers a Privacy Manager which gives you control over what tracking and data collection takes place during your visit. Third-party tools are enabled by default to provide a quality consumer experience.

The Privacy Manager provides you with the choice to opt in or to opt out of the different categories of third-party tools used by CMS.gov: Advertising, Analytics, or Social Media. The Privacy Manager prevents cookies, web beacons, and Local Storage Objects from being placed on your device. The Privacy Manager also prevents third-party tools from loading regardless of your cookie settings, which provides you with an additional layer of privacy that prevents the tool from loading at all. Because the Privacy Manager creates a cookie in your browser, the opt in and opt out choices you make through the Privacy Manager will only be effective on the device and browser you used to make your choices, and your choices will expire when the cookie expires. Once the cookie is created, the Privacy Manager will retain your settings for 3 years from the date of your most recent visit. You may revisit the Privacy Manager to change or renew your choices at any time.

Modify privacy options

If you disable cookies in your browser, our Privacy Manager won't be able to store your preferences and won't function properly. If you don't wish to use our Privacy Manager to opt out of the tools used by CMS.gov, you can opt out of tools individually, or via the Digital Advertising Alliance ("DAA") AdChoices icon, discussed in the next subsection.

If you opt out of the tools used by CMS.gov via the Privacy Manager or by opting out of the tools directly, you'll still have access to information and resources at CMS.gov.

**AdChoices**: We include the AdChoices icon on all digital advertising that uses "conversion tracking" or "retargeting." To learn about conversion tracking, targeted advertising, and retargeting, see How CMS uses third-party websites & applications with CMS.gov. The AdChoices icon is usually at or near the corner of digital ads. When you click on the AdChoices icon, it will provide information on what company served the ad and information on how to opt out. Learn more about AdChoices.

Feedback

**Do Not Track**: We automatically observe the "Do Not Track" browser setting for digital advertising that uses "conversion tracking" or "retargeting." If "Do Not Track" is set before a device visits CMS.gov, third-party conversion tracking and retargeting tools won't load on the website. To learn more about conversion tracking and retargeting, see How CMS uses third-party websites & applications with CMS.gov. Learn more about Do Not Track and how to set the Do Not Track setting in your browser.

## How CMS uses third-party websites & applications with CMS.gov

How CMS uses third-party websites & applications with CMS.gov

CMS.gov uses a variety of technologies and social media services to communicate and interact with the public. These third-party websites and applications include popular social networking and media websites, open source software communities, and more.

### Third-party websites:

Your activity on the third-party websites that CMS.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites. You should review the privacy policies of all websites before using them so you understand how your information may be used.

### Website analytics tools:

These tools collect basic site usage information, like:

- How many visits CMS.gov gets
- The pages visited
- Time spent on CMS.gov
- The number of return visits to CMS.gov
- The approximate geographic location of the device used to access CMS.gov
- Types of devices used

This information is used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Improving your experience

Use the CMS.gov Privacy Manager to opt out of website analytics tools.

### Digital advertising tools for outreach & education:

We use third-party tools to support our digital advertising outreach and education efforts. These tools enable us to reach new people and provide information to previous visitors. To use these tools, we use these technologies on CMS.gov:

**Click tracking**: We use click tracking to identify the ads that are most helpful to consumers and efficient for outreach. This enables us to improve the performance of ads that consumers click on. When users click on links from ads, data about what ad was viewed is collected. Reports are generated about ad performance – including the total number of views and clicks an ad received.

**Conversion tracking**: We use conversion tracking to identify ads that are helpful to consumers and efficient for outreach. It enables us to improve the performance of ads viewed by consumers. When a CMS.gov ad is viewed on a third-party site (like a banner ad), a cookie is placed in the browser of the device the ad was viewed on. If this device later visits CMS.gov, the visit is linked to the ad viewed on the same device. Use the CMS.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on CMS.gov.

Feedback

**Retargeting**: We use retargeting to provide information to consumers who have previously visited CMS.gov, like reminders about upcoming enrollment deadlines. Retargeting enables us to improve the performance of ads by delivering them to relevant audiences, like recent visitors to CMS.gov. During a visit to CMS.gov, a cookie is placed in the browser of the devices used to view the website. When that same device is used to visit third-party websites that are displaying CMS.gov ads, ads for CMS.gov may be shown to that device because it had previously visited CMS.gov. Using these cookies, we don't collect information about the third-party

websites visited by a device. Reports are generated about ad performance – including the total number of views and clicks an ad received. Use the CMS.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on CMS.gov.

**Targeted advertising:** We use third-party vendors to engage in targeted advertising (also called online behavioral or interest-based advertising) to provide information to consumers across their online activities. Targeted advertising involves the collection of data from a particular computer or device. Data regarding web viewing behaviors or application use is gathered to predict user preferences or interests. We can have ads delivered to computers or devices based on the preferences or interests inferred from the web-viewing behaviors or application use.

Third-party vendors engaged by us may also target advertising based on information automatically collected (not information you provide) when you browse our websites or other websites on the internet. You can opt out of this type of data collection via our Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on CMS.gov.

We may consider new third-party tools or the use of new third-party websites, but we'll first assess the tool or website before it's used in connection with CMS.gov. We'll provide notice to the public before adding any new tool to CMS.gov. These assessments include a description about how information will be collected, accessed, secured, and stored. See a list of the third-party tools currently being used on CMS.gov. See risk assessments for third-party websites and applications.

## How CMS protects your personal information

You don't have to give us personal information when you visit CMS.gov, but if you want to get alerts or e-newsletters, you'll need to give us your email address to subscribe.

If you choose to give us PII in an email, request for information, paper or electronic form, questionnaire, survey, etc., we'll the information you give us only long enough to respond to your question or to fulfill the stated purpose of the communication.

If we need to contact you, we'll save your personal information in a record system designed to retrieve information about you by personal identifier (name, personal email address, home mailing address, personal or mobile phone number, etc.) and keep the information you give us safe according to the Privacy Act of 1974, as amended (5 U.S.C. Section 552a).

If we have a record system to retrieve information about you so we can carry out our mission, a Privacy Act Notification Statement should be prominently displayed out in the open on the public-facing website or form asking you for PII. The statement has to address these 5 criteria:

1. The legal authorization we have to collect information about you
2. Why we're collecting information
3. Routine ways we disclose information outside of our websites
4. Whether or not you legally have to give us the information we're asking for
5. What happens if you choose to not us the information we're asking for

For more information about CMS.gov's privacy policy, email Privacy@cms.hhs.gov.

Third-party services are web-based technologies that aren't exclusively operated or controlled by a government entity, or that involve significant participation of a nongovernment entity. These services may be separate websites or may be applications embedded within our websites. The list of third-party services includes links to relevant third-party privacy policies.

## How long CMS keeps data & how it's accessed

We'll keep data collected long enough to achieve the specified objective for which they were collected. Once the specified objective is achieved, the data will be retired or destroyed in accordance with published draft records schedules of CMS as approved by the National Archives and Records Administration.

We don't store information from cookies on our systems. The persistent cookies used with third-party tools on CMS.gov can be stored on a user's local system and are set to expire at varying time periods depending upon the cookie. We assess whether the expiration date of a cookie exceeds one year and provides an explanation as to why cookies with a longer life are used on the site in the associated Third-Party Website or Application Privacy Impact Assessment.

## Children & privacy on CMS.gov

We believe it's important to protect the privacy of children online. The Children's Online Privacy Protection Act (COPPA) governs information gathered online from or about children under the age of 13. CMS.gov isn't intended to solicit information of any kind from children under age 13.

## Links to other sites

CMS.gov may link to other HHS websites, other government websites, and/or private organizations (like health care providers). We link to other websites solely for your convenience and education. When you follow a link to an external site, you're leaving CMS.gov and the external site's privacy and security policies will apply. Non-federal websites don't necessarily operate under the same laws, regulations, and policies as federal websites. Other than third-party websites highlighted in this privacy notice, we aren't responsible for the contents of external web pages and a link to a page doesn't constitute an endorsement.

### Social media & other sites that require registration

We use social media websites (listed below) to:

- Increase government transparency
- Improve information sharing
- Promote public participation
- Encourage partnership with CMS

**Social media websites aren't government websites or applications. They're controlled or operated by the social media website.** We don't own, manage, or control social media websites. In addition, we don't collect, maintain, or disseminate information posted by visitors to those social media websites. If you choose to provide information to a social media website through registration or other interaction with the website, the use of any information you provide is controlled by your relationship with the social media website. For example, any information that you provide to register on Facebook is voluntarily contributed and isn't maintained by us. This information may be available to our social media page administrators in whole or part, based on a user's privacy settings on the social media website. However, we won't use PII, if provided by you to a social media website or other website that requires registration, for targeted advertising or retargeting. Although you may voluntarily contribute to a social media website with the intent to share the information with others on a CMS social media page, to protect your privacy, don't disclose PII about yourself or others.

We don't keep separate records or accounting of any social media website users or their interaction with the CMS.gov pages on social media websites. We don't store or share this information. User information is retained by social media websites in accordance with the website's policies. See each social media website's privacy policy to see how long user information is retained after an account has been deleted. To learn more about how each social media website uses and maintains information visit their privacy policy, as follows:

- Facebook

- Twitter
- YouTube
- LinkedIn

## Additional privacy information

Get more information about CMS privacy policies.

# Exhibit C

HHS.gov U.S. Department of Health & Human Services

Home > Digital Communications > Policies & Standards > HHS Web Policies > HHS Privacy Policy Notice

# HHS Privacy Policy Notice

External Link and Website Disclaimer Policy (https://www.hhs.gov/web/policies-and-standards/hhs-web-policies/disclaimer/index.html)

This privacy policy describes what information HHS collects from you when you visit our websites and how we handle that information. This policy applies to HHS.gov (https://www.hhs.gov/) and a number of other HHS websites with unique domains, such as StopBullying.gov (http://www.stopbullying.gov/). However, some HHS websites maintain their own privacy policies. You can find links to the applicable privacy policy in the footer of every HHS website.

For HHS.gov and other HHS websites under this privacy policy:

- We do not collect personally identifiable information (PII) about you unless you choose to provide that information to us.
- Any personally identifiable information (PII) you choose to provide is protected by privacy and security practices.
- We may automatically collect and temporarily store information related to your visit to our website that is not personally identifiable information (PII).
- **HHS does not disclose, give, sell, or transfer any personally identifiable information (PII) about our visitors unless required for law enforcement or by federal law.**

See the topics below for detailed information on HHS privacy:

- HHS Privacy Program (#HHS-Privacy-Program)
- What is Personally Identifiable Information (PII)? (#what-is-pii)
- HHS Privacy Officials (#HHS-Privacy-Officials)
- Information Automatically Collected and Stored (#Information-Automatically-Collected)
- Personally Identifiable Information (PII) Voluntarily Submitted to HHS (#Personal-Information-Voluntarily)
- Interaction with Children Online (#Interaction-Children-Online)

- Cookies (#Cookies)
- Demographic and Interest Data (#Demographic-and-Interest)
- Third-Party Websites and Applications Used by HHS (#Third-Party-Websites)
- Website Security (#Website-Security)

**Health Information Privacy**

For more information on your health information privacy and security rights, or on the HIPAA Privacy and Security Rules, visit the HHS Office for Civil Rights (https://www.hhs.gov/ocr/privacy/index.html) website.

---

## HHS Privacy Program

It is the mission of HHS to enhance and protect the health and well-being of all Americans. HHS fulfills that mission by providing effective health and human services and fostering advances in medicine, public health, and social services. HHS recognizes the importance of protecting the personally identifiable information (PII) entrusted to us by millions of members of public and employees alike, and has built a robust privacy program to safeguard this information and ensure that HHS upholds Americans' privacy rights.

**Privacy Impact Assessments (PIAs)**

The list of PIAs and Third-Party Websites and Applications (TWPA) PIAs is available at HHS Privacy Impact Assessments (https://www.hhs.gov/pia/) .

**Publicly Available Agency Policies on Privacy**

For a list of all publicly available HHS privacy policies, including any directives, instructions, handbooks, manuals, or other guidance, visit:

- HHS OCIO Cybersecurity Policies, Standards and Charters (https://www.hhs.gov/about/agencies/asa/ocio/cybersecurity/index.html)
- HHS Information Security and Privacy Program (https://www.hhs.gov/ocio/securityprivacy/index.html)
- HHS Privacy Impact Assessments (PIAs) & Resources (https://www.hhs.gov/ocio/securityprivacy/privacyresources/pias.html)

**Publicly Available Agency Reports on Privacy**

For a list of the Department's publicly available privacy reports, see HHS Plans & Reports (https://www.hhs.gov/ocio/plans/index.html) .

**Privacy Act Information**

To learn more about what is covered under the Privacy Act, please read information about the Privacy Act at HHS (https://www.hhs.gov/foia/privacy/index.html) . If you have privacy questions or issues regarding the Privacy Act,

contact an HHS Privacy Act Contact (https://www.hhs.gov/foia/contacts/index.html#privacy). Also see the Privacy Act of 1974 (http://www.justice.gov/opcl/privacyact1974.htm) (Department of Justice).

- **System of Records Notices (SORNs)**
  HHS publishes SORNs to provide public notice of the records it maintains about individuals which are retrieved by personal identifier. For a list of all of the Department's systems of records see HHS SORNs (https://www.hhs.gov/foia/privacy/sorns/index.html).

- **Computer Matching Notices and Agreements (CMAs)**
  For the complete list of the HHS matching programs currently in effect including the matching agreements and public notice describing each program, see HHS Computer Matching Agreements (https://www.hhs.gov/foia/privacy/cmas/index.html).

- **Exemptions to the Privacy Act.**
  For more information on the Department's final rules published in the *Federal Register* that promulgate Privacy Act exemptions claimed for HHS's systems of records, see the HHS Privacy Act (https://www.hhs.gov/foia/privacy/sorns/hhs-exempt-systems/index.html).

- **Privacy Act Implementation Rules**
  For a list of Privacy Act implementation rules promulgated pursuant to 5 U.S.C. § 552a(f), see the HHS Privacy Act (https://www.hhs.gov/foia/privacy/index.html).

- **Instructions for Submitting a Privacy Act Request**
  For instructions for individuals who wish to request access to or amendment of their records pursuant to 5 U.S.C. § 552a(d), see How to Make a Privacy Request (https://www.hhs.gov/foia/privacy/how-make-privacy-act-request.html).

**Contact Information for Submitting a Privacy Question or Complaint**
Individuals who wish to submit a privacy question or complaint should submit it to one of these contacts:

- HHS Office for Civil Rights (OCR) Contacts (https://www.hhs.gov/ocr/about-us/contact-us/index.html), if the question or complaint involves health information or HIPAA.

- HHS Privacy Act Contacts (https://www.hhs.gov/foia/contacts/index.html#privacy), if the question or complaint concerns federal agency records about individuals retrieved by personal identifier.

- For all other privacy questions and complaints, contact HHS Privacy Officials (#HHS-Privacy-Officials).

---

## What is Personally Identifiable Information (PII)?

PII is information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual.

PII can include:

- Sensitive data, such as medical, financial, or legal information;
- "Neutral" information, such as name, facial photos, or work address; and
- Contextual information, such as a file for a specific health condition that contains a list of treated patients.

---

## HHS Privacy Officials

Contact Information for the Senior Agency Official for Privacy

The HHS Chief Information Officer (CIO) also holds the position of Senior Agency Official for Privacy (SAOP), ensuring privacy receives senior-level recognition and has visibility across the Department.

For HHS SAOP please email:

**Chief Information Officer**
**Senior Agency Official for Privacy**
Email: PrivacyProgramMailbox@hhs.gov (mailto:PrivacyProgramMailbox@hhs.gov)

Contact Information for the HHS Operating Divisions Senior Officials for Privacy

Each Operating Division has, at a minimum, a Senior Official for Privacy (SOP) to oversee privacy compliance activities. The SOP contact information is included below:

**Administration for Children and Families (ACF)**
Anita Alford
OCIO.Privacy@acf.hhs.gov (mailto:OCIO.Privacy@acf.hhs.gov)

**Administration of Community Living (ACL)**
Jacques Newgen
Jacques.Newgen@acl.hhs.gov (mailto:Jacques.Newgen@acl.hhs.gov)

**Agency for Healthcare Research and Quality (AHRQ)**
Mark Yu
AHRQSecureAHRQ@ahrq.hhs.gov (mailto:AHRQSecureAHRQ@ahrq.hhs.gov)

**Centers for Disease Control and Prevention (CDC)**
Beverly Walker
BEWalker@cdc.gov (mailto:BEWalker@cdc.gov)

**Centers for Medicare and Medicaid Services (CMS)**
Michael Pagels
privacy@cms.hhs.gov (mailto:privacy@cms.hhs.gov)

**Food and Drug Administration (FDA)**
Cullen Cowley
FDAPrivacyOffice@fda.hhs.gov (mailto:FDAPrivacyOffice@fda.hhs.gov) .

**Health Resources and Services Administration (HRSA)**
Brent Kopp
hrsaprivacy@hrsa.gov (mailto:hrsaprivacy@hrsa.gov)

**Indian Health Service (IHS)**
Heather H. McClane
Heather.McClane@ihs.gov (mailto:Heather.McClane@ihs.gov)

**National Institutes of Health (NIH)**
Celeste Dade-Vinson
privacy@mail.nih.gov (mailto:privacy@mail.nih.gov)

**Office of Inspector General (OIG)**
OIG Senior Official for Privacy
SOP@oig.hhs.gov (mailto:SOP@oig.hhs.gov)

**Office of the Secretary (OS) and Program Support Center (PSC)**
Vanessa Baur
OSPrivacyMailbox@hhs.gov (mailto:OSPrivacyMailbox@hhs.gov)

**Substance Abuse and Mental Health Services Administration (SAMHSA)**
Michael Hodnett
Info.Privacy@samhsa.hhs.gov (mailto:Info.Privacy@samhsa.hhs.gov)

---

## Information Automatically Collected and Stored

When you visit our websites, we use Google's Universal Analytics (UA) software to automatically gather and temporarily store a variety of information about your visit. The basic information we collect during your visit includes:

- The name of the domain you use to access the Internet (for example, Verizon.com if you are using a Verizon online account or stanford.edu if you are connecting from Stanford University's domain);
- The date and time of your visit to our website;

- The pages and documents you viewed on our website;
- The URL of the website you visited prior to ours;
- The type and version of your Web browser and operating system; and
- Your location at the time of your visit, down to the city-level.

We do not associate any of the data we automatically collect with your personally identifiable information (PII). Instead, we aggregate this data from all users' visits in order to improve our website and provide a better user experience to our visitors. The aggregate data is available only to Web managers and other designated staff who require this information to perform their duties. We retain this information only for as long as needed for proper analysis. The Google Analytics Privacy Policy is available at https://www.google.com/intl/en/policies/privacy/ (https://www.google.com/intl/en/policies/privacy/)

## Personally Identifiable Information (PII) Voluntarily Submitted to HHS

If you choose to provide HHS with your personally identifiable information (PII) —for example, by completing a "Contact Us" form, leaving a comment, sending an email, or completing a survey—we may use that information to respond to your message and/or help us get you the information or services you requested. Submitting personally identifiable information (PII) such as name, address, telephone number, email address, etc. is voluntary and is not required to access information on our website.

We retain the information only for as long as necessary to respond to your question or request, in most cases no longer than three months. We maintain and destroy information submitted electronically as required by the Federal Records Act and the National Archives and Records Administration's (NARA) records schedules. It may be subject to disclosure in certain cases (for example, if required by a Freedom of Information Act (FOIA) request, court order, or Congressional access request, or if authorized by a Privacy Act SORN). The information is subject to the Privacy Act if maintained in a Privacy Act system.

HHS also automatically receives information when you visit our websites that is not personally identifiable information (PII). For more information, see Information Automatically Collected and Stored (#Information-Automatically-Collected) .

For more information, see:

- HHS FOIA and Privacy Act Statutes and Resources (https://www.hhs.gov/foia/statutes-and-resources/index.html)
- HHS System of Records Notices (https://www.hhs.gov/foia/privacy/sorns.html)

## Interaction with Children Online

The Department will take all reasonable steps necessary to protect the privacy and safety of any child from whom we collect information, as required by the Children's Online Privacy Protection Act (COPPA) (https://www.ftc.gov/enforcement/rules/rulemaking-regulatory-reform-proceedings/childrens-online-privacy-protection-rule). A child's parent or guardian is required to provide consent before HHS collects, uses, or shares personally identifiable information (PII) from a child under age 13.

Specific HHS websites will provide information and instructions for how we obtain consent when collecting information about a child. The website will specify exactly what how the information is used, who sees it, and how long it is kept.

If you are under 13 and visit any websites, the law says that you and your parents are in charge of what personally identifiable information (PII) the websites can know about you. Some examples of personally identifiable information (PII) are your full name, home address, email address, phone number, age, and gender.

## Cookies

Websites can automatically place small text files, known as "cookies," on their visitors' computers. Cookies identify the unique browser used by the visitor unless you delete them or they expire. On each subsequent visit to the website, the visitor's browser will retrieve the cookie, allowing HHS to aggregate the number of return visitors. HHS uses "cookies" to test and optimize our websites' design and content. We use two types of cookies on HHS websites:

- We use **session cookies** to gather data for technical purposes, such as improving navigation through our website and generating statistics about how the website is used. Session cookies are temporary text files that expire when you leave our website. Cookies delete automatically from your computer as soon as they expire. **We do not use session cookies to collect personally identifiable information (PII), and we do not share data collected from session cookies.**

- We use **multi-session cookies**, or persistent cookies, to customize our website for frequent visitors and to test variations of website design and content. Multi-session cookies are cookies that are stored over more than a single session on your computer. **We do not use multi-session cookies to collect personally identifiable information (PII), and we do not share data collected from multi-session cookies.** Our multi-session cookies expire two years after your last visit to our website. These cookies delete automatically from your computer as soon as they expire.

You can block cookies from your computer by opting out (http://www.usa.gov/optout_instructions.shtml). Blocking session cookies from your computer will not affect your access to the content and tools on our websites. Blocking multi-session or persistent cookies may affect the personalization of the information on these websites.

## Demographic and Interest Data

On some portions of our website, we have enabled Google's Universal Analytics (UA) and other third-party software (listed below) to provide aggregate demographic and interest data of our visitors. **While some websites use these tools to present you with advertisements, HHS only uses them to measure demographic data. HHS has no control over advertisements presented to you on other websites.** This means that third-party vendors, including Google**, may show you public health campaign advertisements created by HHS and its agencies on non-government websites based on your visits to HHS websites.** For the software listed below, we have included links to the company's websites where you can opt-out of having these tools collect data and/or serve you interest-based advertising.

**DoubleClick**: HHS uses DoubleClick to understand the characteristics and demographics of the people who visit HHS websites. HHS staff only conducts analyses on the aggregated data from DoubleClick. DoubleClick does not collect personally identifiable information (PII) from HHS websites. The DoubleClick Privacy Policy is available at https://www.google.com/intl/en/policies/privacy/ (https://www.google.com/intl/en/policies/privacy/)

.

You can opt-out of receiving DoubleClick advertising at https://support.google.com/ads/answer/2662922?hl=en (https://support.google.com/ads/answer/2662922?hl=en) .

**Quantcast**: HHS uses Quantcast to understand the characteristics and demographics of the people who visit HHS websites. HHS staff only conducts analyses on the aggregated data from Quantcast. Quantcast does not collect personally identifiable information (PII) from HHS websites. The Quantcast Privacy Policy is available at https://www.quantcast.com/how-we-do-it/consumer-choice/privacy-policy/ (https://www.quantcast.com/how-we-do-it/consumer-choice/privacy-policy/) .

You can opt-out of Quantcast at https://www.quantcast.com/opt-out/ (https://www.quantcast.com/opt-out/) .

---

## Third-Party Websites and Applications Used by HHS

HHS maintains official pages or accounts on third-party websites in order to better engage and communicate with the public. Third-party websites are websites that we do not maintain or control. We have accounts on some third-party websites so we can connect with people interested in health and human services information. Examples of third-party websites that HHS uses include YouTube, Facebook, Instagram, and Twitter.

All official HHS information available on third-party websites is also available on HHS websites. The third-party website's security and privacy policies govern your activity on their website. Users of third-party websites often share information with the public, user communities, and/or the third-party organization

operating the website. It is important for you to review the privacy policies of third-party websites so you understand how they use and share your information. You should also adjust the privacy settings of your account on any third-party website to match your preferences.

If you have an account or profile with a third-party website and choose to follow, like, friend, or comment on a third-party website managed by HHS, certain personally identifiable information (PII) associated with your account may be available to us based on the privacy policies of the third-party website and your privacy settings within that website. **We do not share personally identifiable information available through these websites.**

HHS conducts and publishes a Privacy Impact Assessment (PIA) (https://www.hhs.gov/pia/index.html) for each use of a third-party website. Each use of a third-party website may have unique features or practices. HHS sometimes collects and uses the information made available through third-party websites.

In order to comply with the Federal Records Act (https://www.archives.gov/records-mgmt) , HHS archives some information that users submit or publish when engaging with the HHS through official HHS pages or accounts on third-party websites (e.g., by sending a message, posting a comment, "following," "friending," or taking similar actions). This information may contain personally identifiable information (PII), such as an individual's username, other public account information, and any information provided in a message or comment, when such information is available based on the user's privacy settings and the terms of the site. For example:

- On Facebook, HHS may automatically archive posts, messages, replies and comments sent to or from official HHS.gov accounts in the following sections: 'About,' 'Albums,' 'Event details,' 'Event discussions,' 'Photo activity,' 'Private messages,' 'Reviews' and 'Timeline activity'.

---

HHS uses the following third-party websites and applications.

**AddThis**: HHS offers AddThis on its websites, giving visitors the option to bookmark and share HHS website content on certain social media websites. Using AddThis on HHS websites does not require registration or personally identifiable information (PII). The AddThis Privacy Policy is available at http://www.addthis.com/privacy (http://www.addthis.com/privacy) .

**ArchiveSocial:** HHS uses ArchiveSocial to interface directly with each social network to capture and preserve data in its native form. The ArchiveSocial Privacy Policy is available at https://archivesocial.com/privacy/ (https://archivesocial.com/privacy/) .

**Bit.ly**: HHS uses Bit.ly to shorten long URLs for use in email and social media messages. Bit.ly provides analytics on how many people clicked on the URLs distributed by HHS. Bit.ly analytics do not provide any personally identifiable information (PII) about the visitors who click the shortened links. The Bit.ly Privacy

Policy is available at http://bit.ly/pages/privacy (http://bit.ly/pages/privacy) .

**CrazyEgg**: HHS uses CrazyEgg to obtain information on how visitors are interacting with specific pages on HHS.gov websites. This allows HHS to evaluate and, if necessary or beneficial, to modify its websites to improve value and usability. The data CrazyEgg collects includes information about how visitors navigate around a website and the most commonly clicked links on a specific page. CrazyEgg does not collect personally identifiable information (PII). The Crazy Egg Privacy Policy is available at http://www.crazyegg.com/privacy (http://www.crazyegg.com/privacy) .

**Google AdWords**: HHS occasionally uses Google AdWords to provide online advertisement delivery and tracking. HHS may employ tools provided by Google AdWords to support Display Advertising, including Remarketing, Google Display Network Impression Reporting, data collection via advertising cookies and anonymous identifiers, the DoubleClick Campaign Manager integration, and Google Analytics Demographics and Interest Reporting. This means that third-party vendors, including Google**, may show you public health campaign advertisements created by HHS and its agencies on non-government websites based on your visits to HHS websites.** To implement these tools, HHS and third-party vendors, including Google, use first-party cookies and third-party cookies together to inform, optimize, and serve ads based on past visits to HHS websites. These cookies collect information about visits to HHS websites, but do not collect personally identifiable information (PII). The Google AdWords Privacy Policy is available at https://www.google.com/intl/en/policies/privacy/ (https://www.google.com/intl/en/policies/privacy/) .

**Google Analytics**: HHS may employ tools provided by Google Analytics to support Display Advertising, including Remarketing, Google Display Network Impression Reporting, data collection via advertising cookies and anonymous identifiers, the DoubleClick Campaign Manager integration and/or Google Analytics Demographics and Interest Reporting. This means that third-party vendors, including Google, may show you public health campaign advertisements created by HHS and its agencies on non-government websites based on your visits to HHS websites. To implement these tools, HHS and third-party vendors, including Google, use first-party cookies and third-party cookies together to inform, optimize, and serve ads based on past visits to HHS websites. These cookies collect information about visits to HHS websites, but do not collect personally identifiable information (PII). The Google Analytics Privacy Policy is available at https://www.google.com/intl/en/policies/privacy/ (https://www.google.com/intl/en/policies/privacy/) .

**Pagefreezer:** HHS uses Pagefreezer archiving software to archive content from the HHS.gov website and five topical websites. This software does not require users to submit personally identifiable information (PII), nor does HHS ask for this information. Pagefreezer Privacy Policy is available at https://www.pagefreezer.com/privacy-policy/ (https://www.pagefreezer.com/privacy-policy/) .

**Qualtrics**: HHS uses Qualtrics survey software approved by the Federal Risk and Authorization Management Program (FEDRamp) to collect feedback from HHS website visitors. Qualtrics is implemented on HHS websites both as on-page and pop-up surveys. HHS uses survey results to measure visitor satisfaction with HHS websites. This survey software does not require users to submit personally identifiable information (PII), nor does HHS ask for this information in its surveys. The survey reports are available only to HHS managers, members of the HHS Communications and Web Teams, and other designated HHS staff who require this information to perform their job duties. The Qualtrics Privacy Policy is available at https://www.qualtrics.com/privacy-statement/ (https://www.qualtrics.com/privacy-statement/).

**Salesforce**: HHS uses Salesforce to email newsletters and other messages to visitors who subscribe to them on HHS websites. Only HHS staff and managers who email newsletters using Salesforce or monitor the results of email initiatives have access to the subscriber lists. Salesforce never allows access to the subscriber lists to anyone outside of HHS for any purpose. Salesforce also provides aggregate data, such as email open rates and total clicks on links. The Salesforce Privacy Policy is available at https://www.salesforce.com/company/privacy/full_privacy/ (https://www.salesforce.com/company/privacy/full_privacy/).

**Siteimprove**: HHS uses Siteimprove to manage our website. It provides the ASPA Digital team with information allowing them to make incremental changes to the sites managed by this team. Areas that Siteimprove provides information includes broken links, misspellings, accessibility, analytics, etc. Only HHS staff and managers who manage the ASPA managed websites have access to the Siteimprove information. The Siteimprove Privacy Policy is available at https://siteimprove.com/en/privacy/privacy-policy/ (https://siteimprove.com/en/privacy/privacy-policy/).

**Widgets**: HHS offers widgets that provide specific HHS site content to any website that includes the widget code. You can install an HHS widget on any website simply by adding the HHS-provided code to a website's source HTML code. If you choose to install HHS widgets, they will not collect any type of personally identifiable information (PII) from your websites visitors.

---

## Website Security

In order to maintain website security and ensure HHS websites are available to the public, we use software programs to monitor traffic and identify unauthorized attempts to upload or change information or otherwise cause damage to HHS websites. Law enforcement may use information from these tools to help identify an individual in the event of investigations and as part of any required legal process.

The U.S. Government maintains this website and there are federal laws that protect it. The government can arrest and prosecute individuals for illegal activity if they violate these laws.

**HHS Headquarters**

U.S. Department of Health & Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201
Toll Free Call Center: 1-877-696-6775

# Exhibit D

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| NORFOLK, S.S. | | SUPERIOR COURT |
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2282CV00982 |
| Plaintiffs | § | |
| v. | § | |
| ATRIUS HEALTH, INC. | § | |
| Defendant. | § | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs John Doe and Jane Doe ("Plaintiffs"), individually and on behalf of all other persons similarly situated, bring suit against Defendant Atrius Health, Inc. ("Defendant"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. As Defendant's Medical Information Privacy Notice explains to patients, Defendant is prohibited by law from "selling your health information to others" or "using or disclosing your health information" for "promotional communications" without patients'

"written authorization."[1] Defendant's Privacy Notice further notes that Defendant is "required by law to protect the privacy of your health information."[2]

3. Contrary to these assurances, Defendant does not follow this policy, nor the law prohibiting such disclosures.

4. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent.

5. Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these rerouting tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

6. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272,

[1] https://www.atriushealth.org/patient-information/privacy-practices. Defendant's current Privacy Notice went into effect on September 30, 2022. Defendant's prior "Notice of Privacy Practices" may be found at https://web.archive.org/web/20220713190254/https://www.atriushealth.org/patient-information/privacy-practices. That Privacy Notice informed patients that "Access" to patients' medical records and other information maintained by Atrius Health "is restricted to clinicians and staff who need the information for treatment, payment, or health care operations purposes." Defendant's prior Privacy Notice further promised patients that "We will not use or share your information other than as described here unless you tell us we can in writing." Defendant's prior Privacy Notice also promised that Defendant would "never share your information" for "Marketing Purposes" or "Sale of your information" unless "you give written permission."
[2] https://www.atriushealth.org/patient-information/privacy-practices

§ 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

7. On behalf of themselves and all similarly situated persons, Plaintiffs seek an order enjoining Defendant from further unauthorized disclosures of their personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

**PARTIES TO THE ACTION**

8. Defendant Atrius Health, Inc. is a Massachusetts corporation with its principal office at 275 Grove St., Suite 3-300, Newton, Massachusetts, 02466. Defendant is the parent company for more than 30 medical practice locations in Massachusetts, including Harvard Vanguard Copley, Harvard Vanguard Chestnut-Hill Roxbury, Harvard Vanguard Beverly, Harvard Vanguard Braintree, Harvard Vanguard Burlington, Harvard Vanguard Cambridge, Harvard Vanguard Chelmsford, Harvard Vanguard Quincy, Harvard Vanguard Concord, Duxbury-PMG, Bourne-PMG, and Dedham Medical Associates.[3]

9. Plaintiff, Jane Doe, is an individual living in Norfolk County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at Harvard Vanguard Quincy, one of Defendant's facilities,[4] and thus also a patient of Defendant.

10. Plaintiff, John Doe, is an individual living in Middlesex County, Massachusetts, has been treated by Defendant's physicians, a patient at Harvard Vanguard Chelmsford, one of Defendant's facilities,[5] and thus also a patient of Defendant.

---

[3] https://www.atriushealth.org/locations; *see also* https://www.atriushealth.org/about-us
[4] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[5] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

## JURISDICTION AND VENUE

11. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 363 Highland Avenue, Fall River, Massachusetts, 02720. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

12. Venue is appropriate in this Court because Plaintiff, Jane Doe, resides in Norfolk County and the acts or conduct giving rise to the cause of action took place in Norfolk. G.L. c. 223, § 8(4).

## FACTUAL BACKGROUND

**A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

13. Plaintiff Jane Doe is a patient of Defendant who receives treatment at Harvard Vanguard Quincy.[6]

14. Plaintiff John Doe is a patient of Defendant who receives treatment at, among other of Defendant's facilities, Harvard Vanguard Chelmsford.[7]

15. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

16. Medical patients in Massachusetts such as John Doe and Jane Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

17. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

---

[6] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[7] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

18. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

19. Defendant operates websites for patients, including www.atriushealth.org.

20. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

21. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

22. Defendant's disclosures of patients' personal healthcare information occurs because Defendant intentionally deploys source code on the websites it operates, including www.southcoast.org, that causes patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

23. By design, third parties receive and record the exact contents of a patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

24. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

25. The basic command that web browsers use to exchange data and user communications is called a GET request.[8] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

26. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

27. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

28. Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties. Typically, users are provided no notice that these disclosures are being made. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

29. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

[8] https://www.w3schools.com/tags/ref_httpmethods.asp

30. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

31. These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

32. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

33. Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

34. For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer

advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[9]

35. Because of their uniquely identifying character, IP address are considered protected personally identifiable information by HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(O). Tracking pixels can (and typically do) collect website visitors' IP addresses.

36. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

37. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

38. Cookies fall within the personal identifiers protected by HIPAA. *See* 45 C.F.R. § 164.51(b)(2)(i)(H), (J), (M), and (R), and tracking pixels can collect cookies from website visitors.

39. A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

[9] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

40. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[10] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[11] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[12]

41. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[13]

42. Browser-fingerprints are considered protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R), and tracking pixels can collect browser-fingerprints from website visitors.

43. A fourth kind of personally identifying information is the unique user identifier (such as Facebook's "Facebook ID") that permits companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is a number string that is connected to a user's Facebook profile.[14] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[15]

[10] https://www.blog.google/products/chrome/building-a-more-private-web/
[11] https://pixelprivacy.com/resources/browser-fingerprinting/
[12] https://www.blog.google/products/chrome/building-a-more-private-web/
[13] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[14] https://www.facebook.com/help/211813265517027
[15] https://smallseotools.com/find-facebook-id/

44. Unique personal identifiers such as a person's Facebook ID are protected by HIPAA, 45 C.F.R. § 164.514(2)(i)(R), and are likewise capable of collection through pixel trackers.

**D. Facebook**

45. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

46. Facebook describes itself as a "real identity" platform.[16] This means that users are permitted only one account and must share "the name they go by in everyday life."[17] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[18]

47. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[19] Facebook has since evolved into one of the largest advertising companies in the world.[20] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[21] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[22]

48. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion

---

[16] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[17] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[18] https://www.facebook.com/help/406644739431633
[19] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[20] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[21] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[22] https://www.facebook.com/business/ads/ad-targeting

users.[23]

49. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

50. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

51. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[24] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

---

[23] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/
[24] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

52. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

53. One of Facebook's most powerful tools is called the "Meta Pixel."

54. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[25] Once activated, the Meta Pixel "tracks the people and type of actions they take."[26] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[27]

55. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences.

56. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

---

[25] https://developers.facebook.com/docs/meta-pixel/
[26] https://www.facebook.com/business/goals/retargeting
[27] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

57. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[28] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[29]

58. Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[30]

59. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[31]

60. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[32] Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[33]

61. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

---

[28] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[29] https://www.oviond.com/understanding-the-facebook-pixel
[30] https://developers.facebook.com/docs/meta-pixel/get-started
[31] https://developers.facebook.com/docs/meta-pixel/get-started
[32] https://developers.facebook.com/docs/meta-pixel/
[33] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients

62. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[34] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[35] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[36]

63. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[37]

64. Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

65. If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

66. Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[38] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[39]

---

[34] https://developers.facebook.com/docs/meta-pixel/
[35] https://developers.facebook.com/docs/meta-pixel/
[36] https://developers.facebook.com/docs/meta-pixel/
[37] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[38] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[39] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

67. Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching.[40] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

68. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[41] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[42]

69. Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

70. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

---

[40] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[41] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[42] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

71. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

72. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[43] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[44]

73. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.southcoast.org, and target users with advertising based on their web activity.

---

[43] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[44] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

**D. Defendant has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

74. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

75. Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[45] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

76. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[46] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[47] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

[45] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[46] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[47] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

77. Meta Pixel is wildly popular and embedded on millions of websites. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems.[48] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

78. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

79. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is transmitted to Facebook via the Meta Pixel.

[48] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

80. This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

81. For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides.



82. All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

83. Defendant discloses such Personal Health Information even when patients are searching for doctors to assist with them conditions such as HIV:



84. Unbeknownst to patients, even their searches across Defendant's website for information about the most sensitive medical conditions imaginable, including HIV, psychotherapy, and addiction treatment are automatically sent to Facebook, along with patients' personally identifying information:



85. Defendant also discloses patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, and communications made when patients are researching specific medical conditions such as COVID-19.

86. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients Personal Health Information to their private identities and target them with advertising.

87. Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the website that Defendant maintains at www.atriushealth.org. Plaintiff continued to have his privacy violated when Defendant permitted Facebook and other companies to send him targeted advertising related to his medical condition.

88. For example, Plaintiff John Doe visited Defendant's website in 2022 at www.atriushealth.org and entered data, including sensitive medical information, such as details about his medical condition and doctor. The information that Plaintiff John Doe transmitted included queries about treatment for shoulder injuries.

89. After entering his medical information on Defendant's website, Plaintiff John Doe began receiving ads on his Facebook page related to his medical condition, including advertisements for shoulder braces.

90. As a result of Defendant's compliance and aid in the illegal interception and disclosure of John Doe's Personal Health Information, Plaintiff received advertisements that were specifically tailored to his Personal Health Information, including sensitive medical information, that Plaintiff entered on Defendant's website. These advertisements were tailored and directed to Plaintiff by Facebook as part of Facebook's advertising business in which Facebook profits from providing third parties with access to those individuals most likely to be interested in their products or services, otherwise known as the "target audience."[49]

91. Plaintiff Jane Doe also visited Defendant's website at www.atriushealth.org in 2022 and entered data, including sensitive medical information, such as details about her medical condition and doctor. Defendant facilitated the disclosure of Plaintiff Jane Doe's Personal Health Information, including sensitive medical information, to Facebook without her consent or authorization when she entered information on the website that Defendant maintains at www.artriushealth.org.

92. Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data.

**F. Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

93. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

[49] https://www.facebook.com/business/ads/ad-targeting?content

94. For example, when Plaintiff Jane Doe visited Defendant's website in 2022 at www.southcoast.org, there was no indication that Meta Pixel was embedded on that website or that it would collect and transmit her sensitive medical data to Facebook.

95. Plaintiffs and their fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

96. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




97. Defendant's current "Notice of Privacy Practices," which went into effect on September 30, 2022, gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express written authorization from patients:

> [W]e will use and disclose your health information only with a written authorization from you. This includes, except for limited

> circumstances allowed by federal privacy law, not using or disclosing psychotherapy notes about you, selling your health information to others, or using or disclosing your health information for certain promotional communications that are prohibited marketing communications under federal law, without your written authorization.[50]

98. Defendant's prior "Notice of Privacy Practices" likewise not only assured patients that Atrius would protect their Personal Health Information, but also expressly promised that Defendant would *never* sell or share patients' health information for marketing purposes without patients' written consent:

> Protecting patient privacy is an important element of the trust between our caregivers and their patients, and an important legal and ethical obligation. Atrius Health is deeply committed to protecting our patients' rights to privacy, and to safeguarding patient information....[51]
>
> In these cases we never share your information unless you give us written permission:
>
> - Marketing purposes
> - Sale of your information

99. Even if a patient stumbled upon Defendant's carefully concealed "Notice of Privacy Practices," nothing in Defendant's various privacy notices would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

100. Defendant does not have a legal right to share Plaintiffs and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by laws by the Health Insurance Portability and Accountability Act of 1996's ("HIPAA") privacy rules, which protect all electronically protected health information a covered entity like Defendant "creates, receives, maintains, or transmits" in electronic form. 45 C.F.R.

[50] https://www.atriushealth.org/patient-information/privacy-practices

[51] https://web.archive.org/web/20220517025937/https://www.atriushealth.org/patient-information/privacy-practices

§ 160.103. HIPAA's privacy rules do not permit Defendant to sell patient information to Facebook in return for access to Meta Pixel. Further, HIPAA does not permit Defendant to disclose patients' Protected Health Information to an advertising and marketing company like Facebook without express written authorization from patients. 45 C.F.R. § 164.508.

101. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

102. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

103. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiffs and Class Members' Personal Health Information to Facebook or aid in the same.

**G. The disclosures of personal patient data to Facebook are unnecessary.**

104. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website.

105. For example, it possible for a health care website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without

allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

106. Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**H. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

107. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiffs and Class Member's privacy interests.

108. Patient health information is specifically protected under federal law by HIPAA.

109. HIPAA sets national standards for safeguarding protected health information. For example, HIPAA limits the permissible uses of health information and prohibits disclosure of this information without express written authorization from patients. 45 C.F.R. § 164.502. These prohibitions include prohibitions against disclosing personally identifying data such patient names, IP addresses, and other unique characteristics or codes. 45 C.F.R. § 164.514(b)(2)(i). HIPAA also requires that covered entities like Defendant implement appropriate safeguards to protect this information. 45 C.F.R. § 164.530(c)(1). And both HIPAA and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. 42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

110. Given the application of HIPAA and state law to Defendant, Plaintiffs and the Members of the Class had a reasonable expectation of privacy in their protected health information.

111. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

112. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

113. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[52]

114. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[53]

115. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly

[52] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[53] https://www.wired.co.uk/article/apple-ios14-facebook

worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[54]

116. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

## I. Plaintiffs' Personal Health Data that Defendant collected, disclosed, and used is Plaintiffs' property, has economic value, and its illicit disclosure has caused Plaintiffs harm.

117. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

118. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[55]

119. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[56] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data

[54] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/
[55] https://ig.ft.com/how-much-is-your-personal-data-worth/
[56] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

can vary from $15 to more than $40 per user.[57]

120. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[58] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[59]

121. Despite the protections afforded by HIPAA, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by HIPAA, state laws, and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[60]

122. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[61] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[62]

123. A myriad of other companies and apps such as DataCoup, Nielsen Computer,

---

[57] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[58] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[59] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[60] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[61] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app
[62] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[63]

124. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs and the Class Member's property.

**J. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

125. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

126. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

127. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

128. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that

[63] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

information is subsequently disseminated and exploited.

129. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**K. Facebook's history of egregious privacy violations.**

130. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

131. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

132. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

133. Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

134. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps

could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[64]

135. That same year, Facebook was sued in the Northern District of California after it was discovered that Facebook had been tracking users across other websites, even after they had logged out of their Facebook accounts, by installing cookies on users' computers.[65] The class action suit, which alleged that Facebook had violated numerous privacy, communications, and wiretapping laws eventually settled for $90 million.[66]

136. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[67]

137. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

---

[64] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[65] https://www.cnet.com/personal-finance/facebooks-90-million-data-tracking-settlement-tomorrow-is-the-deadline-to-file-claim/
[66] https://www.cnet.com/personal-finance/facebooks-90-million-data-tracking-settlement-tomorrow-is-the-deadline-to-file-claim/
[67] A similar case is pending in Texas.

138. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[68] Some companies were even able to read users' private messages.

139. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[69] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

140. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[70]

141. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[71] When a user was having her

[68] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html
[69] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[70] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[71] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[72]

142. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[73]

143. These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[74]

144. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients'

[72] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[73] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[74] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

expense.

## TOLLING, CONCEALMENT, AND ESTOPPEL

145. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

146. Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

147. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

148. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

149. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiffs' Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

150. Defendant's conduct violates the law and breaches its express and implied privacy promises.

151. Defendant's unlawful conduct has injured Plaintiffs and Class Members.

152. Defendant's conduct is ongoing.

153. Plaintiffs bring this action individually and as a class action against Defendant.

154. Plaintiffs seek class certification for the following proposed Class:

> **The Atrius Health Class:** During the fullest period allowed by law, all Massachusetts residents who are, or were, patients of Atrius Health, Inc. or any of its affiliates and who exchanged communications at Atrius Health, Inc's websites, including www.atriushealth.org, and any other Atrius Health, Inc. affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

155. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

156. Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

157. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

158. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information

maintained by Defendants.

159. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate G.L. c. 272, § 99;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' Personal Health Information to Facebook;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

160. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

161. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other

members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

162. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

163. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

164. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

165. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiffs and the Class)

166. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

167. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

168. All conditions precedent to this action have been performed or have occurred.

169. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

170. Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

171. Defendant qualifies as a person under the statute.

172. All alleged communications between Plaintiffs or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones,

tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

173. An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire … communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

174. Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

175. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire … communication." G.L. c. 272, § 99B(3).

176. The "intercepting devices" used in this case include, but are not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

h. Computer servers of third parties (including Facebook) to which Plaintiffs and Class Members' communications were disclosed.

177. Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

178. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

179. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

k. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

l. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

180. Plaintiffs and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

181. Neither Plaintiffs nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiffs or Class Members' consent.

182. Plaintiffs and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

183. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

184. In addition to statutory damages, Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiffs and the Class)**

185. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

186. Plaintiffs bring this claim on behalf of herself and all members of the Class.

187. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

188. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

189. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

190. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

191. Plaintiffs and Class Members are patients of Defendant.

192. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

193. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

194. The information disclosed included personally identifiable information, Plaintiffs and Class Members' statues as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

195. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

196. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

197. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a

reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

198. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

199. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

200. Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

201. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

202. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

203. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

204. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

205. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Class)**

206. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

207. Plaintiffs bring this claim on behalf of themselves and all members of the Class

208. All conditions precedent to this action have been performed or occurred.

209. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

210. As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs or Class Members.

211. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

212. Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Express Contract**
**(On Behalf of Plaintiffs and the Class)**

213. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

214. Plaintiffs bring this claim on behalf of herself and all members of the Class.

215. Plaintiffs and Class Members entered into written agreements with Defendant as part of the medical services Defendant provided to Plaintiffs and Class Members. The agreements involved a mutual exchange of consideration whereby Defendant provided these services in exchange for payment from Class Members, Class Members' insurance carriers, and/or government programs remitting payment on Class Members' behalf.

216. Plaintiffs and Class Members and/or their insurance carriers paid Defendant for its services and performed under these agreements.

217. Defendant's disclosure of Plaintiffs and Class Members' Private Health Information without their consent constitutes a material breach of the terms of these agreements by Defendant.

218. As a direct and proximate result of Defendant's breach of contract with Plaintiffs and Class Members, Plaintiffs and Class Members have been irreparably harmed.

219. Accordingly, Plaintiffs, individually and on behalf of the Class, respectfully request this Court award all available damages for Defendant's breach of express contract.

**COUNT V**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

220. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

221. Plaintiffs bring this claim on behalf of herself and all members of the Class

222. Through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, as well as implied contracts for the Defendant to retain and protect the privacy of Plaintiffs' and Class Members' Private Health Information.

223. Specifically, Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendant when they first went for medical treatment at one of Defendant's facilities.

224. The valid and enforceable implied contracts to provide medical healthcare services that Plaintiffs and Class Members entered into with Defendant included Defendant's promise to not disclose nonpublic Private Health Information given to Defendant without their consent. Plaintiffs and Class Members provided this Private Health Information in reliance of that promise.

225. Defendant solicited and invited Plaintiffs and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services.

226. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's complied with relevant laws and regulations, including

HIPAA, and would not allow third parties to collect or exploit their communications with Defendant without their consent.

227. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

228. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' Private Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Private Health Information through the use of Defendant's websites.

229. Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

230. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

231. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiffs and Class Members' Private Health Information without consent.

232. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly

collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

233. A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

234. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

235. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiffs and Class Members' consent.

236. As a result of Defendant's failure to fulfill the data privacy promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare with data privacy they paid for and the healthcare they received.

237. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class

Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

238. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

239. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

240. Plaintiffs and the Class Members are also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

241. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

242. Plaintiffs hereby plead this Count in the alternative to Counts IV and V.

243. Plaintiffs bring this claim on behalf of herself and all members of the Class.

244. Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

245. Plaintiffs and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

246. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

247. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

248. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in her favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiffs as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f. Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiffs and Class Members may be entitled.

**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFFS JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 17, 2022

# Exhibit E

Date Filed 10/27/2022 12:06 PM Docketed on 10/18/2022
Superior Court - Norfolk
Docket Number 2282CV00982



2

# CIVIL ACTION COVER SHEET

DOCKET NUMBER: 2282CV00982

**Trial Court of Massachusetts**
**The Superior Court**

COUNTY

| | |
|---|---|
| **Plaintiff** John and Jane Doe | **Defendant:** Atrius Health Group, Inc. |
| ADDRESS: c/o Sweeney Merrigan Law | ADDRESS: 275 Grove Street, Suite 3-300 |
| 268 Summer St., LL | Newton, MA 02466 |
| Boston, MA 02210 | |
| **Plaintiff Attorney:** Jonathan T. Merrigan | **Defendant Attorney:** |
| ADDRESS: Sweeney Merrigan Law | ADDRESS: |
| 268 Summer Street, LL | |
| Boston, MA 02210 | |
| BBO: 681627 | BBO: |

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B99 | Violation of MA Wiretapping Law | F | ☒ YES ☐ NO |

***If "Other" please describe:**

**Is there a claim under G.L. c. 93A?** ☐ YES ☒ NO

**Is there a class action under Mass. R. Civ. P. 23?** ☒ YES ☐ NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**

A. Documented medical expenses to date
1. Total hospital expenses
2. Total doctor expenses
3. Total chiropractic expenses
4. Total physical therapy expenses
5. Total other expenses (describe below)

Subtotal (1-5): **$0.00**

B. Documented lost wages and compensation to date
C. Documented property damages to date
D. Reasonably anticipated future medical and hospital expenses
E. Reasonably anticipated lost wages
F. Other documented items of damages (describe below) $50,000,000.00+

Plaintiffs and Class Members have suffered damages pursuant to G.L.c.272 Â§99.

TOTAL (A-F): **$50,000,000+**

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

Defendant disclosed Plaintiffs and Class Members' personal health information to third parties in violation of G.L. c. 272 Â§ 99.

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | Defendant breached express and implied contractual duties by disclosing Class Members' personal information. | $14,000,000.00+ |
| | Total | $14,000,000.00+ |

Signature of Attorney/Unrepresented Plaintiff: X /s/ Jonathan T. Merrigan Date: October 17, 2022

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney/Unrepresented Plaintiff: X /s/ Jonathan T. Merrigan Date: October 17, 2022

# CIVIL ACTION COVER SHEET INSTRUCTIONS
# SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

**AC Actions Involving the State/Municipality ***

AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. (A)
AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. (A)
AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. (A)
AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. (A)

**CN Contract/Business Cases**

A01 Services, Labor, and Materials (F)
A02 Goods Sold and Delivered (F)
A03 Commercial Paper (F)
A04 Employment Contract (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1 (F)
A06 Insurance Contract (F)
A08 Sale or Lease of Real Estate (F)
A12 Construction Dispute (A)
A14 Interpleader (F)
BA1 Governance, Conduct, Internal Affairs of Entities (A)
BA3 Liability of Shareholders, Directors, Officers, Partners, etc. (A)
BB1 Shareholder Derivative (A)
BB2 Securities Transactions (A)
BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. (A)
BD1 Intellectual Property (A)
BD2 Proprietary Information or Trade Secrets (A)
BG1 Financial Institutions/Funds (A)
BH1 Violation of Antitrust or Trade Regulation Laws (A)
A99 Other Contract/Business Action - Specify (F)

* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

† Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

D01 Specific Performance of a Contract (A)
D02 Reach and Apply (F)
D03 Injunction (F)
D04 Reform/ Cancel Instrument (F)
D05 Equitable Replevin (F)
D06 Contribution or Indemnification (F)
D07 Imposition of a Trust (A)
D08 Minority Shareholder's Suit (A)
D09 Interference in Contractual Relationship (F)
D10 Accounting (A)
D11 Enforcement of Restrictive Covenant (F)
D12 Dissolution of a Partnership (F)
D13 Declaratory Judgment, G.L. c. 231A (A)
D14 Dissolution of a Corporation (F)
D99 Other Equity Action (F)

**PA Civil Actions Involving Incarcerated Party †**

PA1 Contract Action involving an Incarcerated Party (A)
PB1 Tortious Action involving an Incarcerated Party (A)
PC1 Real Property Action involving an Incarcerated Party (F)
PD1 Equity Action involving an Incarcerated Party (F)
PE1 Administrative Action involving an Incarcerated Party (F)

**TR Torts**

B03 Motor Vehicle Negligence - Personal Injury/Property Damage (F)
B04 Other Negligence - Personal Injury/Property Damage (F)
B05 Products Liability (A)
B06 Malpractice - Medical (A)
B07 Malpractice - Other (A)
B08 Wrongful Death - Non-medical (A)
B15 Defamation (A)
B19 Asbestos (A)
B20 Personal Injury - Slip & Fall (F)
B21 Environmental (F)
B22 Employment Discrimination (F)
BE1 Fraud, Business Torts, etc. (A)
B99 Other Tortious Action (F)

**RP Summary Process (Real Property)**

S01 Summary Process - Residential (X)
S02 Summary Process - Commercial/ Non-residential (F)

**RP Real Property**

C01 Land Taking (F)
C02 Zoning Appeal, G.L. c. 40A (F)
C03 Dispute Concerning Title (F)
C04 Foreclosure of a Mortgage (X)
C05 Condominium Lien & Charges (X)
C99 Other Real Property Action (F)

**MC Miscellaneous Civil Actions**

E18 Foreign Discovery Proceeding (X)
E97 Prisoner Habeas Corpus (X)
E22 Lottery Assignment, G.L. c. 10, § 28 (X)

**AB Abuse/Harassment Prevention**

E15 Abuse Prevention Petition, G.L. c. 209A (X)
E21 Protection from Harassment, G.L. c. 258E (X)

**AA Administrative Civil Actions**

E02 Appeal from Administrative Agency, G.L. c. 30A (X)
E03 Certiorari Action, G.L. c. 249, § 4 (X)
E05 Confirmation of Arbitration Awards (X)
E06 Mass Antitrust Act, G.L. c. 93, § 9 (A)
E07 Mass Antitrust Act, G.L. c. 93, § 8 (X)
E08 Appointment of a Receiver (X)
E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A (A)
E10 Summary Process Appeal (X)
E11 Worker's Compensation (X)
E16 Auto Surcharge Appeal (X)
E17 Civil Rights Act, G.L. c.12, § 11H (A)
E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) (X)
E25 Pleural Registry (Asbestos cases)
E94 Forfeiture, G.L. c. 265, § 56 (X)
E95 Forfeiture, G.L. c. 94C, § 47 (F)
E99 Other Administrative Action (X)
Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B (F)
Z02 Appeal Bond Denial (X)

**SO Sex Offender Review**

E12 SDP Commitment, G.L. c. 123A, § 12 (X)
E14 SDP Petition, G.L. c. 123A, § 9(b) (X)

**RC Restricted Civil Actions**

E19 Sex Offender Registry, G.L. c. 6, § 178M (X)
E27 Minor Seeking Consent, G.L. c.112, § 12S (X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF -** The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT -** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

**A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.**
**FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY MAY RESULT IN DISMISSAL OF THIS ACTION.**

# Exhibit F

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § § § § | C.A. No. 2282CV00982 |
| Plaintiffs | § § § | |
| v. | § § | |
| ATRIUS HEALTH, INC. | § § § | |
| Defendant. | § | |

**PLAINTIFFS' MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION**

Now come the Plaintiffs, John Doe and Jane Doe, individually and on behalf of all others similarly situated, to impound their names and/or other identifying information for the pendency of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule 2[1]. The material sought to be impounded are the plaintiffs' names and/or other identifying information[2] for the pendency of this matter. Impoundment is necessary in this matter because the facts of the underlying action relate directly and specifically to all plaintiffs' sensitive medical information. Specifically, the claim arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent. Therefore, in order to protect the medical

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."

[2] This could include social media handles, IP addresses, etc.

information that will necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect the plaintiff, whose personal medical information has already been improperly used by the Defendant. Plaintiffs recognize that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiffs' full names would have the unwelcome effect of making impoundment a more laborious, tedious and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order (attached at Exhibit B) would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW Plaintiffs' Motion for Impoundment of Personal Identifying Information and request a hearing on the same.

**COUNSEL FOR PLAINTIFFS JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 25, 2022

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2282CV00982 |
| Plaintiffs | § | |
| v. | § | |
| ATRIUS HEALTH, INC. | § | |
| Defendant. | § | |

**AFFIDAVIT OF ATTORNEY J. TUCKER MERRIGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION**

I, J. Tucker Merrigan, hereby state and depose:

1. I am counsel for the Plaintiffs in the above-captioned case.
2. The information inappropriately obtained by the Defendant in this matter is of a highly sensitive, personal and confidential nature.
3. In order to protect the privacy interests of the Plaintiffs in this case, it is necessary to proceed under a pseudonym so as not to cause further harm by additional, repeated disclosure of highly confidential medical information throughout the course of this litigation.
4. Allowing the plaintiffs to file under a pseudonym also allows for the most efficient disclosure of documents and discovery.

Signed under the pains and penalties of perjury this 25th day of October, 2022.

*_/s/ Jonathan T. Merrigan_*
J. Tucker Merrigan, BBO# 681627
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

# Exhibit G

# SWEENEY MERRIGAN LAW, LLP

PETER M. MERRIGAN *
J. TUCKER MERRIGAN
BRADLEY M. HENRY
VICTORIA M. SANTORO MAIR
MATTHIEU J. PARENTEAU **
JESSICA M. GRAY
ERIN E. MCHUGH ***
DYLAN T. HIXSON
KYLE A. CAMILLERI ****
MAGGIE K. O'DONNELL
HON. THOMAS T. MERRIGAN (RET.)

ATTORNEYS AT LAW

268 SUMMER STREET, LL
BOSTON, MA 02210

WWW.SWEENEYMERRIGAN.COM
PHONE: (617) 391-9001
FAX: (617) 357-9001

*IN ADDITION TO MASSACHUSETTS, LICENSED IN:*

*PENNSYLVANIA* *
*MAINE* **
*CONNECTICUT* ***
*NEW HAMPSHIRE* ****

**SENT VIA EFILE**

November 10, 2022

Norfolk Superior Court
Civil Clerk's Office
650 High Street
Dedham, MA 02026

**RE: John Doe and Jane Doe, Individually and On Behalf of All Other Similarly Situated v. Atrius Health, Inc.**
**Norfolk Superior Court, C.A. No.: 2282CV00982**

Dear Sir or Madam,

Relative to the above refenced matter, please forward one summons to our office at your earliest convenience.

Thank you for your time and attention.

Very truly yours,

*/s/ Kristen Field*

Kristen Field, Senior Litigation Paralegal

# Exhibit H

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2282CV00982 |
| Plaintiffs | § | |
| v. | § | |
| ATRIUS HEALTH, INC. | § | |
| Defendant. | § | |

Allowed 11/8/22

**PLAINTIFFS' MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION**

Now come the Plaintiffs, John Doe and Jane Doe, individually and on behalf of all others similarly situated, to impound their names and/or other identifying information for the pendency of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule 2[1]. The material sought to be impounded are the plaintiffs' names and/or other identifying information[2] for the pendency of this matter. Impoundment is necessary in this matter because the facts of the underlying action relate directly and specifically to all plaintiffs' sensitive medical information. Specifically, the claim arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent. Therefore, in order to protect the medical

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."
[2] This could include social media handles, IP addresses, etc.

Date Filed 10/28/2022 10:57 AM
Superior Court - Norfolk
Docket Number 2282CV00982

information that will necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect the plaintiff, whose personal medical information has already been improperly used by the Defendant. Plaintiffs recognize that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiffs' full names would have the unwelcome effect of making impoundment a more laborious, tedious and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order (attached at Exhibit B) would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW Plaintiffs' Motion for Impoundment of Personal Identifying Information and request a hearing on the same.

Date Filed 10/28/2022 10:36 PM
Superior Court - Norfolk
Docket Number 2282CV00982

**COUNSEL FOR PLAINTIFFS JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 25, 2022

# Exhibit I

Docketed 12/15/22 (TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: TORT - MOTOR VEHICLE TORT - CONTRACT - EQUITABLE RELIEF - OTHER)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO. 2282CV00982

John Doe and Jane Doe, Individually and on Behalf of Other Similarly Situated, *Plaintiff(s)*

v.

Atrius Health, Inc., *Defendant(s)*

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon J. Tucker Merrigan, Esq., plaintiff's attorney, whose address is 268 Summer St. LL, Boston, MA 02210, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WITNESS, Heidi E. Brieger Esquire ), at ________ the ________ day of ____________, in the year of our Lord two thousand and ________

Walter F. Timilty, Clerk.

NOTES:
1. This summons is issued pursuant to Rules 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

F-33

# PROOF OF SERVICE OF PROCESS

**Middlesex Sheriff's Office** • 40 Brick Kiln Rd, Chelmsford, MA 01824 • 617-547-1171

**Middlesex, ss.**

December 7, 2022

I hereby certify and return that on 12/6/2022 at 9:35 AM I served a true and attested copy of the SUMMONS AND COMPLAINT & JURY DEMAND in this action in the following manner: To wit, by delivering in hand to JANICE LUISI, agent, person in charge at the time of service for ATRIUS HEALTH INC., at 275 GROVE Street SUITE -300 NEWTON, MA 02459 . Fees: Attest ($5.00) Basic Service Fee ($30.00) Postage and Handling ($3.00) Travel ($5.12) Conveyance ($4.50) Total: $47.62

Laurie Aufiero

Laurie Aufiero

Deputy Sheriff

, 20

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO.

.................................., Plaintiff

v.

.................................., Defendant

SUMMONS

(Mass. R. Civ. P.4)

22013801

Date Filed 12/27/2022 12:46 PM
Superior Court - Norfolk
Docket Number 2282CV00982



JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated

**(b)** County of Residence of First Listed Plaintiff: Norfolk
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Matthew T. Merrigan, Victoria Santoro Mair & Erin E. McHugh, Sweeney Merrigan Law, 268 Summer St. LL, Boston, MA 02210 Tele: (617) 391-9001

## DEFENDANTS

Atrius Health, Inc.

County of Residence of First Listed Defendant: Middlesex
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Maria R. Durant and Kayla H. Ghantous, Hogan Lovells US LLP, 125 High Street, Suite 2010, Boston, MA 02110

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☒ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C.§ 1442

Brief description of cause:
Removal pursuant to federal officer removal statute

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE: December 23, 2022

SIGNATURE OF ATTORNEY OF RECORD: /s/ Kayla H. Ghantous

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) ______________________________

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I. 160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II. 110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

☐ III. 120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

______________________________

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐ NO ☐

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES ☐ NO ☐

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐ NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐ NO ☐

7. Do <u>all</u> of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES ☐ NO ☐

A. If yes, in which division do <u>all</u> of the non-governmental parties reside?

Eastern Division ☐ Central Division ☐ Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☐ Central Division ☐ Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES ☐ NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S OR PRO SE'S NAME ______________________________

ADDRESS ______________________________

TELEPHONE NO. ______________________________

EMAIL ADDRESS ______________________________

Date Filed 10/25/2022 1:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

6

11/8/22

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
10/27/22

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, S.S. SUPERIOR COURT

JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs

v.

ATRIUS HEALTH, INC.

Defendant.

~~C.A. No. 2282CV00982~~
23-2704-BLS1

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

## ORDER

SO ORDERED, that Plaintiff's name and any identifying information shall be impounded for the pendency of this litigation. The Court finds that good cause for impoundment of the plaintiff's name has been shown by the movant to protect the plaintiff's interest in their private, sensitive and confidential medical records. The Court finds that there is no less restrictive measure available to protect this interest and that the degree, duration and manner of impoundment ordered herein are no broader than necessary.

It is ORDERED that the Clerk of this Court shall (publicly filed with the name redacted) impound the Plaintiff's name in this case. Any such materials that identify the plaintiff shall be ~~kept separate and apart from those materials to which the public has access~~. The filer of any document shall ensure that the Plaintiff's name is redacted from all public filings. The Clerk shall redact any individual docket entries as necessary. The docket and case filings shall otherwise remain available to the public.

An unredacted copy shall be filed under seal.

By the Court
11/8/22

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

Date Filed 12/23/2022 3:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Docketed on 12/27/2022

7

**COMMONWEALTH OF MASSACHUSETTS**

Norfolk, S.S. SUPERIOR COURT

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. ~~2282CV00982~~ 23-2704-BLS1 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**NOTICE OF FILING OF NOTICE OF REMOVAL**

PLEASE TAKE NOTICE THAT on December 23, 2022, Defendant Atrius Health, Inc. ("Atrius Health") removed this action to federal court by filing a Notice of Removal pursuant to 28 U.S.C. § 1442(a)(1) in the United States District Court for the District of Massachusetts. A true and correct copy of the Notice of Removal is attached hereto as Exhibit A.

PLEASE TAKE FURTHER NOTICE that, upon the filing of the Notice of Removal with the United States District Court for the District of Massachusetts, and filing copies thereof with the Clerk at the Norfolk County Superior Court, Atrius Health has effected removal and the Superior Court shall proceed no further in this action unless the action is remanded pursuant to 28 U.S.C. § 1146(d).

Date Filed 12/23/2022 3:54 PM
Superior Court - Norfolk
Docket Number 2282CV00982

Dated: December 23, 2022

Respectfully submitted,

**HOGAN LOVELLS LLP US**

*/s/ Kayla H. Ghantous*

By: Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*pro hac vice forthcoming*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Atrius Health, Inc.*

I HEREBY ATTEST AND CERTIFY ON
April 16, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2022, copies of the foregoing Notice of Filing of Notice of Removal were sent via electronic mail and overnight delivery to the addresses listed below:

Sweeney Merrigan Law
J. Tucker Merrigan
Victoria Santoro Mair
Erin E. McHugh
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Ahmad, Zavitsanos, & Mensing, P.C.
Foster C. Johnson
David Warden
Nathan Campbell
1221 McKinney Street, Suite 3460
Houston, Texas 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Keller Postman LLC
Seth Meyer
Alex Dravillas
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Counsel for Plaintiffs John Doe and Jane Doe, Individually and on Behalf of all Others Similarly Situated*

*/s/ Kayla H. Ghantous*
*Counsel for Defendant Atrius Health, Inc.*

8

23-2704-BLS1

RECEIVED & FILED 23 OCT 23 PM CLERK OF THE COURTS NORFOLK COUNTY 10/24/23

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, et al., | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 22-12196-FDS |
| ATRIUS HEALTH, INC., | ) |
| Defendant. | ) |

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

I hereby certify on 10/20/23 that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☑ electronically filed original filed on 10/20/23
☐ original filed in my office on
Robert M. Farrell
Clerk, U.S. District Court
District of Massachusetts
By: [signature]
Deputy Clerk

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
ACTING CLERK MAGISTRATE

MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO REMAND

SAYLOR, C.J.

This is a putative class action against a non-governmental healthcare provider alleging systematic violation of patients' state-law privacy rights. The complaint was originally filed in the Norfolk County Superior Court before being removed to federal court under 28 U.S.C. § 1442(a)(1). Plaintiffs have moved to remand, contending that federal subject-matter jurisdiction is lacking because defendant has failed to meet the requirements of § 1442(a)(1). For the reasons set forth below, the motion to remand will be granted.

## I. Background

### A. Factual Background

Atrius Health, Inc. is the parent company for more than 30 medical practices in Massachusetts. (Compl. ¶ 8). Its principal place of business is in Massachusetts, and it is a Massachusetts corporation. (*Id.*). Atrius operates websites designed for patient communications, scheduling, searching for physicians, paying bills, requesting medical records, learning about medical issues, and joining support groups. (*Id.* ¶¶ 19-20).

The complaint alleges that plaintiffs visited defendant Atrius's websites in 2022 and entered data, including personal health information. (*Id.* ¶¶ 88, 91). The complaint alleges that Atrius's websites utilized Facebook's Meta Pixel tool—a computer code that tracks users' activities on a website, allowing that information to be processed and analyzed by Facebook and shared with third-party advertisers. (*Id.* ¶¶ 54-56, 92).

In its Notice of Removal, Atrius asserts it acted in accordance with a series of federal programs that sought to create a nationwide health-information technology infrastructure. (Notice ¶ 12).

**1. <u>Federal Regulatory Framework</u>**

In 2004, President Bush ordered the Secretary of Health and Human Services to establish the position of National Health Information Technology Coordinator. Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). The Executive Order specified that the Coordinator "shall, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

In 2009, Congress passed the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"). American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009). The Act codified the Office of the National Coordinator for Health Information Technology ("ONC"). 42 U.S.C. § 300jj-11(a). The ONC is headed by a National Coordinator, who is directed to "update the Federal Health IT Strategic Plan . . . to include specific objectives, milestones, and metrics" regarding "[t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "[s]trategies to

enhance the use of health information technology in improving the quality of health care." *Id.* § 300jj-11(c)(3)(A).

In 2010, HHS adopted the Meaningful Use program.[1] *See* Medicare and Medicaid Programs; Electronic Health Record Incentive Program 75 Fed. Reg. 44314-01 (Jul. 28, 2010). HHS stated that the program is aimed at using "[c]ertified [electronic health record] technology" "in a meaningful way" as "one piece of a broader [health information technology] infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.* at 44321. To achieve that goal, payment incentives are provided to certain healthcare providers "who adopt and meaningfully use certified electronic health record (EHR) technology." 42 C.F.R. § 495.2(a).

Over the years, the federal government has incorporated the goals of the Meaningful Use program into a series of other initiatives, including the Merit-Based Incentive Payment System ("MIPS"), and the Primary Care First program. *See, e.g.*, 45 C.F.R. § 170.315(e)(3).

**B. <u>Procedural History</u>**

On October 18, 2022, plaintiffs filed a class action complaint in the Norfolk County Superior Court against Atrius. The complaint alleges six counts: (1) interception of wire communications in violation of Mass. Gen. Laws ch. 272, § 99; (2) invasion of privacy in violation of Mass. Gen. Laws ch. 214, § 1B; (3) breach of fiduciary duty, and/or the common law duty of confidentiality; (4) breach of express contract; (5) breach of implied contract; and (6) unjust enrichment.

On December 23, 2022, the case was removed to this court pursuant to the federal-officer removal statute, 28 U.S.C. § 1442(a)(1). On March 30, 2023, plaintiffs moved to remand for

---

[1] The Meaningful Use Program has since been renamed the Promoting Interoperability Program. However, as the parties use the Program's original name, the Court will do the same.

lack of subject-matter jurisdiction.

## II. Legal Standards

### A. Motion to Remand

A district court must remand a case to state court if "at any time before final judgment it appears that the district court lacks subject[-]matter jurisdiction." 28 U.S.C. § 1447(c). The removing party bears the burden of establishing federal jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

### B. Removal Under § 1442(a)(1)

The federal-officer removal statute provides that a civil action commenced in state court may be removed if it is against or directed to:

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).

The removing party "bears the burden under § 1442(a)(1) to establish: (1) that it was acting under a federal officer's authority; (2) that the charged conduct was carried out for or relating to the asserted official authority; and (3) that it will assert a colorable federal defense to the suit." *Moore v. Electric Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022) (internal citations and quotation marks omitted).

## III. Analysis

To succeed in its contention that removal is proper in this case, Atrius must show that it was "acting under a federal officer's authority." *Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50, 59 (1st Cir. 2020), *summarily vacated on other grounds*, 141 S. Ct. 2666, 210 (2021). "'Acting under' connotes 'subjection, guidance, or control' and involves 'an effort to assist, or to

help carry out, the duties or tasks of the federal superior.'" *Id.* (quoting *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 152 (2007)). "A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official[,]' . . . even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Watson*, 551 U.S. at 153.

Here, Atrius contends that its alleged use of Facebook's Meta Pixel tool is part of its effort to comply voluntarily with regulations that assist the government with its goal of enhancing patient engagement with EHR and supporting the creation of infrastructure to promote adoption of nationwide interoperable health-information technology. Without more, that is insufficient to support federal-officer removal, because even "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." *Id.*

While a contract or formal delegation might sufficiently supplement that regulation to place defendant under a federal officer's authority, neither is alleged to be present here. *See id.* at 153-54; *Moore*, 25 F.4th at 34 n.3. Instead, Atrius relies on the direction and incentive payments it receives through the various federal programs as creating something "akin to a government-contractor relationship." (Notice ¶ 32).

That is also insufficient. The issue of federal-officer removal in cases involving healthcare providers such as Atrius that receive incentive payments for increasing patient access to EHRs is not one of first impression. An overwhelming majority of district courts, including in this district, have remanded similar data-privacy cases to state courts. *See, e.g.*, *Progin v. UMass Mem'l Health Care, Inc.*, 2023 WL 4535129, at *4 (D. Mass. July 13, 2023) ("[T]he fact that incentive payments will, in the future, shift to penalty payments if a provider fails to comply with the Meaningful Use Program further suggests that this is a regulation rather than a government

contract."); *Quinto v. Regents of Univ. of California*, 2023 WL 1448050, at *2 (N.D. Cal. Feb. 1, 2023) ("[R]eceiving incentive payments for acting in a way that promotes a broad federal interest—in an area outside the traditional responsibility of the federal government—is not the same as being contracted to carry out, or assist with, a basic governmental duty."); *Doe v. BJC Health Sys.*, 2023 WL 369427, at *4 (E.D. Mo. Jan. 10, 2023); *Doe v. Cape Cod Healthcare, Inc.*, No. 23-cv-10080, slip op. at ECF No. 10 (D. Mass. Jan. 25, 2023); *Crouch v. Saint Agnes Med. Ctr.*, 2023 WL 3007408, at *4 (E.D. Cal. Apr. 19, 2023); *Mohr v. Trustees of Univ. of Pennsylvania*, 2023 WL 3044594, at *5 (E.D. Pa. Apr. 20, 2023); *Browne v. Cedars-Sinai Health Sys.*, 2023 WL 3095551, at *3 (C.D. Cal. Apr. 26, 2023); *Beltran v. Cedars-Sinai Health Sys.*, 2023 WL 3620740, at *3 (C.D. Cal. May 24, 2023).

The complaint cites to two district-court decisions that agree with its theory of federal-officer jurisdiction. *See Doe v. UPMC*, 2020 WL 4381675 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). However, these opinions are unpersuasive and inapposite given the precedent in this circuit. *See Moore*, 25 F.4th at 34; *Rhode Island*, 979 F.3d at 60.

Atrius's compliance in exchange for incentive payments under the Meaningful Use program, MIPS, or the Primary Care First program does not constitute "assist[ing]" the federal government in the "duties or tasks of the federal superior." Rather, Atrius is a private entity that voluntarily participates in federal incentive programs for its own financial gain. Activity of that sort does not fall within the ambit of the federal-officer removal statute. Accordingly, remand to Massachusetts state court is proper. Because that factor is dispositive, the Court need not consider whether Atrius's actions "relat[e] to the asserted official authority" or whether "it will assert a colorable federal defense to the suit."

**IV. Conclusion**

For the foregoing reasons, the Court finds that it lacks subject-matter jurisdiction over this matter, and the matter is not removable under 28 U.S.C. § 1442(a)(1). Plaintiffs' motion to remand is therefore GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated: October 20, 2023

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

9

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

John Doe et al

23-2704-BLS1

Plaintiff

CIVIL ACTION

V.

NO. 1:22-12196-FDS

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

NOV 28 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

Atrius Health, Inc.

Defendant

10/24/23

**ORDER OF REMAND**

Saylor, C. J.

In accordance with the Court's Memorandum and Order dated October 20, 2023 (Dkt. No. 41), the above-entitled action is hereby REMANDED to Norfolk County Superior Court.

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

10/20/2023
Date

/s/ Flaviana de Oliveira
Deputy Clerk

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

I hereby certify on 10/20/23 that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☑ electronically filed original filed on 10/20/2023
☐ original filed in my office on. ______
Robert M. Farrell
Clerk, U.S. District Court
District of Massachusetts

By: [signature: Flaviana de Oliveira]
Deputy Clerk

10

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. ~~1:22-cv-12196~~<br>23-2704-BLS |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**DEFENDANT ATRIUS HEALTH, INC.'S CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Civil Procedure 7.1, Defendant Atrius Health, Inc. states that it is a non-profit corporation and does not have any parent corporation. As a non-profit corporation, Atrius Health, Inc. does not have stockholders and thus no publicly held corporation owns 10% or more of its stock.

Dated: December 23, 2022

Respectfully submitted,

*/s/ Kayla H. Ghantous*

Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*pro hac vice forthcoming*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______________
Assistant Clerk

Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Atrius Health, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2022 copies of the foregoing corporate disclosure statement were sent via electronic mail and overnight delivery to the addresses listed below:

Sweeney Merrigan Law
J. Tucker Merrigan
Victoria Santoro Mair
Erin E. McHugh
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Ahmad, Zavitsanos, & Mensing, P.C.
Foster C. Johnson
David Warden
Nathan Campbell
1221 McKinney Street, Suite 3460
Houston, Texas 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Keller Postman LLC
Seth Meyer
Alex Dravillas
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Counsel for Plaintiffs John Doe and Jane Doe, Individually and on Behalf of all Others Similarly Situated*

*<u>/s/ Kayla H. Ghantous</u>*
*Counsel for Defendant Atrius Health, Inc.*

11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ATRIUS HEALTH, INC.

Defendant.

Civil Action No. 1:22-cv-12196

23-2704-BLS1

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

10/24/23

**MOTION FOR ADMISSION PRO HAC VICE OF ALLISON RYAN**

Pursuant to Local Rule 83.5.3, Kayla H. Ghantous, a member of the bar of this Court and attorney for Defendant Atrius Health, Inc. in the above-referenced matter, moves to admit attorney Allison Ryan to the bar of this Court *pro hac vice*.

In support of this motion, the movant relies on the Certification of Allison Ryan (attached as Exhibit A), which states the following:

1. She is a member of the bar in good standing in every jurisdiction in which she has been admitted to practice;
2. She is not the subject of disciplinary proceedings pending in any jurisdiction in which she is a member of the bar;
3. She has not previously had a *pro hac vice* admission to this Court (or other admission for a limited purpose under this rule) revoked for misconduct; and
4. She has read and agrees to comply with the Local Rules of the United States District Court for the District of Massachusetts.

WHEREFORE, movant Kayla H. Ghantous, counsel for Atrius Health, Inc., respectfully requests this Court grant this motion to admit attorney Allison Ryan to practice before this Court *pro hac vice*.

**LOCAL RULE 7.1(a)(2) CERTIFICATION**

Pursuant to Rule 7.1(a)(2), undersigned counsel hereby certifies that counsel for Atrius Health, Inc. conferred with counsel for Plaintiffs, who have consented to this motion.

Dated: December 23, 2022

Respectfully Submitted,

By: */s/ Kayla H. Ghantous*

Kayla H. Ghantous (BBO # 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
kayla.ghantous@hoganlovells.com

*Counsel for Defendant Atrius Health, Inc.*

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2022 copies of the foregoing Motion for Admission *Pro Hac Vice* were sent via electronic mail and overnight delivery to the addresses listed below:

Sweeney Merrigan Law
J. Tucker Merrigan
Victoria Santoro Mair
Erin E. McHugh
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Ahmad, Zavitsanos, & Mensing, P.C.
Foster C. Johnson
David Warden
Nathan Campbell
1221 McKinney Street, Suite 3460
Houston, Texas 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Keller Postman LLC
Seth Meyer
Alex Dravillas
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Counsel for Plaintiffs John Doe and Jane Doe, Individually and on Behalf of all Others Similarly Situated*

/s/ Kayla H. Ghantous
*Counsel for Defendant Atrius Health, Inc.*

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. 1:22-cv-12196 |

**CERTIFICATION OF ALLISON RYAN**
**IN SUPPORT OF MOTION TO ADMIT ATTORNEY *PRO HAC VICE***

I, Allison Ryan, Esq., pursuant to 28 U.S.C. § 1746, hereby certify as follows:

1. I am submitting this affidavit in support of a motion to appear *pro hac vice* ("Motion") on behalf of Defendant Atrius Health, Inc. in the above captioned matter.
2. I am a partner in the law firm of Hogan Lovells US LLP, located at 555 Thirteenth Street, NW, Washington, DC 20004.
3. I am a member in good standing in the bar of the District of Columbia and the Supreme Court of Tennessee.
4. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.
5. I have not previously had a *pro hac vice* admission to this Court (or other admission for a limited purpose under this rule) revoked for misconduct.
6. I have read and agree to comply with the Local Rules of the United States District Court for the District of Massachusetts.

Subscribed and sworn on this 23th day of December, 2022.

Respectfully submitted,

*/s/ Allison Ryan*

# EXHIBIT B

DC BAR

*On behalf of JULIO A. CASTILLO, Clerk of the District of Columbia Court of Appeals, the District of Columbia Bar does hereby certify that*

# *Allison Ryan*

*was duly qualified and admitted on September 9, 2011 as an attorney and counselor entitled to practice before this Court; and is, on the date indicated below, an Active member in good standing of this Bar.*

***In Testimony Whereof, I have hereunto subscribed my name and affixed the seal of this Court at the City of Washington, D.C., on September 30, 2022.***

***JULIO A. CASTILLO***
***Clerk of the Court***

*Issued By:*

*David Chu - Director, Membership*
*District of Columbia Bar Membership*

***For questions or concerns, please contact the D.C. Bar Membership Office at 202-626-3475 or email memberservices@dcbar.org.***

 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. ~~1:22-cv-12196~~ ~~22 CV 982~~ 23-2704-BLS1 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

10/31/23

**DEFENDANT'S ASSENTED-TO MOTION TO EXTEND TIME**

Defendant Atrius Health, Inc. ("Defendant") moves to extend the deadline to respond to Plaintiffs John and Jane Doe's ("Plaintiffs") Class Action Complaint to thirty days after Plaintiffs' anticipated motion to remand is decided by the Court.

Plaintiffs filed the Class Action Complaint on October 18, 2022 in Norfolk County Superior Court, Case No. 2282CV00982. Defendant was served on December 6, 2022 and removed the action to this Court on December 23, 2022. The deadline for Defendant to file its responsive pleading is December 30, 2022. Counsel for Plaintiffs intend to file a motion to remand the action back to Superior Court.

To conserve the resources of the Court and the parties and to promote the efficient adjudication of this action, Defendant's response to the Class Action Complaint and associated briefing should be deferred until after the Court decides Plaintiffs' motion to remand. With Plaintiffs' assent, Defendant respectfully requests that the Court extend its deadline to respond to the Class Action Complaint to thirty days after Plaintiffs' motion to remand is decided. The requested extension will not alter any other deadlines set by the Court.

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(2)**

Counsel for Defendant certify that they have conferred with Plaintiffs' counsel of record on this motion and that Plaintiffs' counsel assents to the motion.

Dated: December 29, 2022

Respectfully submitted,

By: */s/ Kayla H. Ghantous*

Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*pro hac vice pending*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON April 16, 2024, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2022, copies of the foregoing Motion to Extend Time were sent via electronic mail, as indicated below, to:

Sweeney Merrigan Law
J. Tucker Merrigan
Victoria Santoro Mair
Erin E. McHugh
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Ahmad, Zavitsanos, & Mensing, P.C.
Foster C. Johnson
1221 McKinney Street, Suite 3460
Houston, Texas 77010
fjohnson@azalaw.com

*Counsel for Plaintiffs John Doe and Jane Doe, Individually and on Behalf of all Others Similarly Situated*

/s/ Kayla H. Ghantous
*Counsel for Defendant*

13

10/24/23

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: ~~1:22-cv-12196~~<br>23-2704-BLS1<br>[Trial Court of Massachusetts, The Superior ~~Court, Norfolk~~ County, Docket No. 2282CV00982] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**MOTION FOR *PRO HAC VICE***
**ADMISSION OF SETH MEYER**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Seth Meyer of Keller Postman LLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Meyer. In support of this motion, the undersigned attorney states as follows:

1. Mr. Meyer is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Meyer has a business address of 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. His telephone number is (312) 741-5220.

3. Mr. Meyer is a member in good standing of Bars of the State of Illinois, the State of Michigan, the State of New York, the State of Texas, the State of Utah, and the State of Wyoming. *See* Declaration of Seth Meyer ("Meyer Decl.") ¶2.

4. Mr. Meyer is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Meyer Decl. ¶4. Mr. Meyer will comply with all applicable rules of court including the Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Meyer in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Meyer will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Seth Meyer be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: January 18, 2023

Respectfully submitted,

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON
April 16, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____
Assistant Clerk

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on January 17, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

## CERTIFICATE OF SERVICE

I hereby certify that on this the 18th day of January 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: ~~1:22-cv-12196~~ 23-2704-BLS1<br><br>[Trial Court of Massachusetts, The Superior Court, Norfolk County, Docket No. 2282CV00982] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

10/24/23

**DECLARATION OF SETH MEYER**

I, SETH MEYER, declare as follows:

1. I am an attorney with Keller Postman LLC, with a business address of 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member in good standing of every bar in which I have been admitted to the practice of law. Specifically, I am a member in good standing of the Bars of the State of Illinois, the State of Michigan, the State of New York, the State of Texas, the State of Utah, and the State of Wyoming.

3. I have never been suspended or disbarred in the jurisdictions listed in Paragraph 2, and there are no disciplinary actions pending against me in any federal or state court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear pro hac vice in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to

all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. There are no disciplinary proceedings pending against me in any jurisdiction.

7. A member of the bar of this Court is advancing the present motion and has filed a notice of appearance in this case.

Dated: January 18, 2023
Chicago, Illinois

Respectfully Submitted,

**KELLER POSTMAN LLC**

By: *s/ Seth Meyer*
Seth Meyer
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com

14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: ~~1:22-cv-12196~~ 23-2704-BLS1<br><br>[Trial Court of Massachusetts, The Superior Court, Norfolk County, Docket No. 2282CV00982] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

10/24/23

**MOTION FOR *PRO HAC VICE* ADMISSION OF NATHAN CAMPBELL**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Nathan Campbell of Ahmad, Zavitsanos & Mensing, PLLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Campbell. In support of this motion, the undersigned attorney states as follows:

1. Mr. Campbell is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Campbell has a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. His telephone number is (713) 655-1101.

3. Mr. Campbell is a member in good standing of Bars of The State of Texas, The Supreme Court of Texas, The US District Court for the Eastern District of Texas, The US District Court for the Southern District of Texas, and the Fifth Circuit Court of Appeals. *See* Declaration of Nathan Campbell ("Campbell Decl.") ¶2.

4. Mr. Campbell is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Campbell Decl. ¶4. Mr. Campbell will comply with all applicable rules of court including the Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Campbell in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Campbell will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Nathan Campbell be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: January 18, 2023

Respectfully submitted,

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on January 17, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

## CERTIFICATE OF SERVICE

I hereby certify that on this the 18th day of January 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

23-2704- BLS1

JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

ATRIUS HEALTH, INC,

Defendant.

Case No.: ~~1:22-cv-12196~~

[Trial Court of Massachusetts, The Superior Court, Norfolk County, Docket No. 2282CV00982]

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

10/23/23
RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
10/24/23

**DECLARATION OF NATHAN CAMPBELL**

I, NATHAN CAMPBELL, declare as follows:

1. I am an attorney with Ahmad, Zavitsanos & Mensing, PLLC, with a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member in good standing of every bar in which I have been admitted to the practice of law. Specifically, I am a member in good standing of the Bars of The State of Texas, The Supreme Court of Texas, The US District Court for the Eastern District of Texas, The US District Court for the Southern District of Texas, and the Fifth Circuit Court of Appeals.

3. I have never been suspended or disbarred in the jurisdictions listed in Paragraph 2, and there are no disciplinary actions pending against me in any federal or state court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear pro hac vice in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to

all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. There are no disciplinary proceedings pending against me in any jurisdiction.

7. A member of the bar of this Court is advancing the present motion and has filed a notice of appearance in this case.

Dated: January 18, 2023
Houston, Texas

Respectfully Submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

By: *s/ Nathan Campbell*
Nathan Campbell
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101
ncampbell@azalaw.com

 16

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: ~~1~~:22-cv-~~12196~~<br><br>~~[Trial~~ Court of Massachusetts, The Superior Court, ~~Norfolk County, Docket No. 2282CV00982]~~ 2384-CV-2704-BLS1<br><br>SUFFOLK SUPERIOR COURT CIVIL CLERK'S OFFICE FILED<br>NOV 28 2023<br>JOHN E. POWERS, III ACTING CLERK MAGISTRATE<br>10/24/23 |

**<u>MOTION FOR *PRO HAC VICE*</u>**
**<u>ADMISSION OF DAVID WARDEN</u>**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney David Warden of Ahmad, Zavitsanos & Mensing, PLLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Warden. In support of this motion, the undersigned attorney states as follows:

1. Mr. Warden is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Warden has a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. His telephone number is (713) 655-1101.

3. Mr. Warden is a member in good standing of Bars of the State of Texas, the US District Court for the Southern District of Texas, the US District Court for the Southern District of New York, the Patent & Trademark Appeal Board, the Federal Circuit Court of Appeals, and the US Court of Appeals for the Fifth Circuit. *See* Declaration of David Warden ("Warden Decl.") ¶2.

4. Mr. Warden is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Warden Decl. ¶4. Mr. Warden will comply with all applicable rules of court including the Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Warden in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Warden will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that David Warden be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: January 18, 2023

Respectfully submitted,

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on January 17, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

## CERTIFICATE OF SERVICE

I hereby certify that on this the 18th day of January 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

10/24/23

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: ~~1:22-cv-12196~~<br><br>[Trial Court of Massachusetts, The Superior Court, Norfolk County, Docket No. ~~2282CV00982]~~ 23-2704-BLS1 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

## MOTION FOR *PRO HAC VICE* ADMISSION OF FOSTER C. JOHNSON

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Foster C. Johnson of Ahmad, Zavitsanos & Mensing, PLLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Johnson. In support of this motion, the undersigned attorney states as follows:

1. Mr. Johnson is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Johnson has a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. His telephone number is (713) 600-4915.

3. Mr. Johnson is a member in good standing of the Bars of The State of Texas, The State of California, The US District Court for the Central District of California, the US District Court for the Eastern District of Texas, the US District Court for the Southern District of Texas, and the US District Court for the Northern District of Texas. *See* Declaration of Foster Johnson ("Johnson Decl.") ¶2.

4. Mr. Johnson is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Johnson Decl. ¶4. Mr. Johnson will comply with all applicable rules of court including the Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Johnson in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Johnson will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Foster C. Johnson be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: January 18, 2023

Respectfully submitted,

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Assistant Clerk

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on January 17, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 18th day of January 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: ~~1:22-cv-12196~~ 23-2704-BLS1<br><br>[Trial Court of Massachusetts, The Superior Court, Norfolk County, Docket No. ~~2282CV00982~~] |

10/23/23
RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**DECLARATION OF FOSTER C. JOHNSON**

I, FOSTER JOHNSON, declare as follows:

1. I am an attorney with Ahmad, Zavitsanos & Mensing, PLLC, with a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member in good standing of every bar in which I have been admitted to the practice of law. Specifically, I am a member in good standing of the Bars of The State of Texas, The State of California, The US District Court for the Central District of California, the US District Court for the Eastern District of Texas, the US District Court for the Southern District of Texas, and the US District Court for the Northern District of Texas.

3. I have never been suspended or disbarred in the jurisdictions listed in Paragraph 2, and there are no disciplinary actions pending against me in any federal or state court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear pro hac vice in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. There are no disciplinary proceedings pending against me in any jurisdiction.

7. A member of the bar of this Court is advancing the present motion and has filed a notice of appearance in this case.

Dated: January 18, 2023
Houston, Texas

Respectfully Submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

By: *s/ Foster C. Johnson*
Foster C. Johnson
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 600-4915
fjohnson@azalaw.com

17

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: 1:22-cv-12196<br><br>[Trial Court of Massachusetts, The Superior Court, Norfolk County, Docket No. 2282CV00982] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

23-2704-BLS1

12/4/23

## MOTION FOR *PRO HAC VICE* ADMISSION OF ALEX DRAVILLAS

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Alex Dravillas of Keller Postman LLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Dravillas. In support of this motion, the undersigned attorney states as follows:

1. Mr. Dravillas is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Dravillas has a business address of 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. His telephone number is (312) 741-5220.

3. Mr. Dravillas is a member in good standing of Bar of The State of Illinois. *See* Declaration of Alex Dravillas ("Dravillas Decl.") ¶2.

4. Mr. Dravillas is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Dravillas Decl. ¶4. Mr. Dravillas will comply with all applicable rules of court including the Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Dravillas in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Dravillas will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Alex Dravillas be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: January 18, 2023

Respectfully submitted,

*/s/ Jonathan T. Merrigan*

J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on January 17, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 18th day of January 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

I HEREBY ATTEST AND CERTIFY ON
April 16, 2024, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

18

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

10/24/23

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: 1:22-cv-12196<br><br>23-2704-BLS1 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**MOTION TO REMAND**

In accordance with 28 U.S.C. § 1447(c), Plaintiffs John Doe and Jane Doe, individually and on behalf of all others similarly situated, respectfully submit this motion to remand this case for lack of subject matter jurisdiction. In support of the motion to remand, Plaintiffs file the accompanying memorandum of law.

Dated: March 30, 2023

Respectfully submitted,

*/s/ Jonathan Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**Sweeney Merrigan Law**
268 Summer St. LL Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**Ahmad, Zavitsanos & Mensing, PLLC**

1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for Plaintiff and Class Members***

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ________
Assistant Clerk

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiffs certifies that they conferred with counsel with counsel for Defendant on March 27, 2023, and March 28, 2023, and attempted in good faith to reach agreement on this motion. Defendant opposes the relief requested in this motion.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 30, 2023, a copy of this Motion to Remand was filed electronically and served on all counsel of record via ECF:

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

19

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC.,<br><br>Defendant. | Case No.: 1:22-cv-12196<br><br>23-2704-BLS1 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION TO REMAND**

10/12/23

## TABLE OF CONTENTS


TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iii

Introduction .......... 1

Factual Background .......... 2

A. Atrius used the Meta Pixel to intercept patients' personal health information and disclose it to Facebook. .......... 2

B. The Massachusetts plaintiffs sued Atrius for violating Massachusetts state law. .......... 3

C. None of the regulatory programs Atrius references instructs Atrius to disclose patients' personal health information to third parties. .......... 3

Legal Standard .......... 6

Argument and Authorities .......... 6

A. Atrius was not "acting under a federal officer's authority" when it installed the Facebook Meta Pixel tool on its websites .......... 6

1. No federal officer ordered Atrius to install Facebook's Meta Pixel tool on its websites. .......... 7

2. Atrius was not "acting under" a federal officer because digitizing, maintaining, and making accessible private medical records is not a "basic governmental task." .......... 10

3. Atrius's compliance with federal regulations does not establish that it was "acting under" a federal officer. .......... 15

B. Atrius cannot show that embedding Meta Pixel into its website "relates to" any "official authority." .......... 16

C. Atrius asserts no colorable federal defense .......... 18

Conclusion .......... 20

## TABLE OF AUTHORITIES

Page(s)

Cases

*Alberts v. Devine*,
395 Mass. 59 (1985) ... 19
*Arness v. Boeing North American, Inc.*,
997 F. Supp. 1268 (C.D. Cal. 1998) ... 11
*Box v. PetroTel, Inc.*,
33 F.4th 195 (5th Cir. 2022) ... 11
*Buljic v. Tyson Foods, Inc.*,
22 F.4th 730 (8th Cir. 2021) ... 13
*Byrne v. Avery Ctr. for Obstetrics & Gynecology*, P.C.,
327 Conn. 540 (2018) ... 20
*Camacho v. Autoridad de Telefonos de Puerto Rico*,
868 F.2d 482 (1st Cir. 1989) ... 7
*Doe I v. UPMC*,
No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020) ... 14
*Doe v. BJC Health System*,
No. 4:22 CV 919 RWS, 2023 WL 369427 (E.D. Mo. Jan 10, 2023) ... 13
*Doe v. ProMedica Health Sys., Inc.*,
No. 3:20-CV-1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020) ... 14
*Exxon Mobil Corp.*,
462 F. Supp. 3d 31 (D. Mass. 2020) ... 17, 18
*Freiberg v. Swinerton & Walberg Property Services, Inc.*,
245 F. Supp. 2d 1144 (D. Colo. 2002) ... 9
*Good v. Armstrong World Industries, Inc.*,
914 F. Supp. 1125 (E.D. Pa. 1996) ... 11
*Heard v. Torrance Mem. Medical Ctr., No. CV 22-09466, 2023 WL 2475544 (C.D. Cal. March 13, 2023)* ... 13
*Hilbert v. Aeroquip, Inc.*,
486 F. Supp. 2d 135 (D. Mass. 2007) ... 6, 9
*Holdren v. Buffalo Pumps, Inc.*,
614 F. Supp. 2d 129 (D. Mass. 2009) ... 7, 8, 14, 18
*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ... 6
*Mesa v. California*,
489 U.S. 121 (1989) ... 18
*Maglioli v. Alliance HC Holdings LLC*,
16 F.4th 393 (3d Cir. 2021) ... 11
*Moore v. Elec. Boat Corp.*,
25 F.4th 30 (1st Cir. 2022) ... passim
*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*,
647 F. App'x 619 (6th Cir. 2016) ... 11, 12, 14
*Quinto v. Regents of University of California*,

No. 22-cv-04429, 2023 WL 1448050 (N.D. Cal. Feb. 1, 2023) .......... 13, 14, 15, 16
*R.K. v. St. Mary's Med. Ctr., Inc.*,
229 W. Va. 712 (2012) .......... 20
*Rhode Island v. Shell Oil Products Co.*,
979 F.3d 50 (1st Cir. 2020) .......... 7, 14, 17, 18
*Stewart Title Guar. Co. v. Kelly*,
97 Mass. App. Ct. 325 (2020) .......... 19
*Sullivan v. O'Connor*,
81 Mass. App. Ct. 200 (2012) .......... 19
*Veneruso v. Mount Vernon Neighborhood Health Ctr.*,
586 F. App'x 604 (2d Cir. 2014) .......... 11
*Watson v. Philip Morris Companies, Inc.*,
551 U.S. 142 (2007) .......... passim

Statutes

28 U.S.C. § 1442(a)(1) .......... 3, 6, 11
28 U.S.C. § 1447(c) .......... 2, 6
42 U.S.C. § 300jj-31 .......... 4
42 U.S.C. § 1315a .......... 5
42 U.S.C. § 1395w-4(q) .......... 4
42 U.S.C. § 1395w-4(q)(1)(A) .......... 5
42 U.S.C. § 1395ww(n) .......... 4
G.L. c. 214 § 1B .......... 3, 19
G.L. c. 272 § 99 .......... 3, 19
PL 111-5 .......... 4
PL 114-10 .......... 4

Rules

FED. R. EVID. 401 .......... 20

Regulations

42 C.F.R. § 414.1300 .......... 5
42 C.F.R. § 414.1375 .......... 5
42 C.F.R. § 414.1375(b)(3)(ii)(B)(4) .......... 5, 9
42 C.F.R. § 495.104(d) .......... 4
42 C.F.R. § 495.2(a) .......... 4
42 C.F.R. § 495.20–.24 .......... 4
42 C.F.R. § 495.20(f)(4)(ii) .......... 4
42 C.F.R. § 495.22(e)(3)(ii)(A)(1) .......... 4
45 C.F.R. § 170.315 .......... 5
45 C.F.R. § 170.315(e)(2) .......... 5, 9

## INTRODUCTION

In this lawsuit, Massachusetts citizens sued a Massachusetts corporation for violating Massachusetts law. There is no diversity of parties. Nor does this case does arise from federal questions. It arises from Defendant Atrius's decision to violate its patients' state law privacy rights by selling or bartering their personal health information to Facebook in exchange for access to Facebook's Meta Pixel tool without those patients' knowledge or consent.

The Massachusetts defendant, Atrius, installed the Meta Pixel tool—computer code for forwarding data entered on websites to Facebook for marketing purpose—on Atrius's webpages visited by its patients. Unbeknownst to the patients, and without their consent, Atrius's Meta Pixel forwarded data about their treatment to Facebook. Plaintiffs sued in Norfolk County Superior Court for violations of Massachusetts law. Atrius seeks to avoid state court practice by arguing that it is entitled to the protections of federal officer jurisdiction. But Atrius is not a federal officer or agency.

Instead, Atrius claims it voluntarily participated with published federal goals to increase patient engagement with electronic medical records. Atrius says that, because the federal government provides monetary incentives and guidance for such voluntary participation, Atrius should enjoy federal officers' privileged access to the federal courts. The breadth of this theory of federal officer jurisdiction is too great to withstand scrutiny.

No federal officer told Atrius to install the Metal Pixel on its website, and Atrius has no contract with the government requiring Atrius to install the Meta Pixel on its website. Nor can Atrius establish that setting up a website for Atrius's patients to access electronic health records is a basic governmental task that the federal government would have performed in Atrius's absence. And to the extent that Atrius set up a website with Meta Pixel because it was voluntarily complying

with (its understanding of) federal regulations, that is insufficient. Mere compliance with the law does not mean a private actor is acting under the color of federal office.

Because the federal government did not delegate authority to Atrius to install Meta Pixel on the Atrius website, it follows that there is no connection between the conduct in dispute and the badge of federal authority. Similarly, none of the Massachusetts statutory or common law claims at issue can be defeated by application of federal law, so there is no colorable federal defense that would grant this Court Article III jurisdiction.

Earlier this year, the District of Massachusetts joined the rising tide of federal courts ordering data privacy cases substantially similar to this one back to where they belong—the states. *Doe v. Cape Cod Healthcare, Inc.*, No. 1:23-CV-10080, Elec. Order at ECF No. 10 (D. Mass. Jan. 25, 2023) ("The removal in this case was improvidently taken."). This Court should do the same.

Accordingly, because this Court lacks subject matter jurisdiction, Plaintiffs John and Jane Doe and the putative plaintiff class of Massachusetts citizens ask this Court to grant their motion to remand. 28 U.S.C. § 1447(c).

## Factual Background

### A. Atrius used the Meta Pixel to intercept patients' personal health information and disclose it to Facebook.

Plaintiffs allege that Atrius systematically violated their medical privacy rights along with Atrius's other patients. ECF No. 1-4 ("Compl.") at ¶ 1. Plaintiffs visited Atrius's website at www.atriushealth.org to look for doctors, research treatments, and investigate insurance options. *Id.* at ¶¶ 88–92. Plaintiffs entered data on Atrius's website, including sensitive personal health information. *Id.* Unbeknownst to Plaintiffs, Atrius had embedded computer code on its website—Meta Pixel—that took every search term entered and every page of the site visited and sent that information to Facebook, the largest and most profitable social media company on the planet. *Id.*

In exchange for disclosing their patients' personal health information, hospitals like Atrius are compensated by Facebook with enhanced online advertising services. *Id.* at ¶ 125. Facebook then used this data to identify the individuals, build its valuable marketing databases, and sell targeted advertisements. *Id.* at ¶¶ 37, 80, 87.

**B. The Massachusetts plaintiffs sued Atrius for violating Massachusetts state law.**

Plaintiffs sued Atrius in Norfolk County Superior Court. *See id.* They have alleged two Massachusetts statutory causes of action against Atrius and four Massachusetts common law claims against Atrius. *See id.* at ¶¶ 166–248. Plaintiffs sued for violation of the Massachusetts Wiretap Act, G.L. c. 272 § 99, and violation of the Massachusetts privacy statute, G.L. c. 214 § 1B. *Id.* at ¶¶ 166–204. Plaintiffs also sued for breach of fiduciary duty, breach of express contract, breach of implied contract, and unjust enrichment. *Id.* at ¶¶ 205–248. There are no federal causes of action. *Id.* at ¶¶ 166–248.

On December 23, 2022, Atrius removed this case to the District of Massachusetts. ECF No. 1 ("Notice"). Atrius alleged only one basis for this Court's subject matter jurisdiction: statutory jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *Id.* at 1.

**C. None of the regulatory programs Atrius references instructs Atrius to disclose patients' personal health information to third parties.**

Atrius relies on published regulations and sub-regulatory guidance to argue that it was "acting under" a federal agency. But none of the regulations commands Atrius to share patient personal health information with third parties like Facebook.

In 2009, as part of the American Recovery and Reinvestment Act of 2009, Congress passed the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"). The stated purpose was "the development of a nationwide health information technology

infrastructure" to improve the quality and cost of healthcare in the United States. AMERICAN RECOVERY AND REINVESTMENT ACT OF 2009, PL 111-5, February 17, 2009, 123 Stat 115.

The HITECH Act also created the Meaningful Use Program, now known as the "Promoting Interoperability Program", to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States." *See* 42 U.S.C. § 300jj-31. Fundamentally, the Program encourages hospitals to migrate away from paper medical records to electronic ones and establish a system where providers can digitally create and maintain records. *See, e.g.*, 42 C.F.R. § 495.2(a) (establishing payment incentives for certain providers "who adopt and meaningfully use certified electronic health record (EHR) technology"); 42 C.F.R. § 495.22(e)(3)(ii)(A)(1) ("More than 60 percent of medication orders . . . are recorded using computerized provider order entry"). Nonqualifying hospitals do not receive incentive payments. 42 C.F.R. § 495.104(d).

The regulations do ***not*** instruct how to achieve each objective. Rather, they provide the measuring stick to assess if the provider achieved that objective. *See, e.g.*, 42 C.F.R. § 495.20(f)(4)(ii) ("more than 40 percent of all permissible prescriptions written by the unique patients seen by the [provider] are transmitted electronically using certified EHR technology.") The Program does ***not*** require that hospitals install a software code that tracks and discloses patient's communications to third parties. *See* 42 C.F.R. § 495.20–.24.

In 2015, Congress passed the Medicare Access and CHIP Reauthorization Act of 2015 and thereby consolidated certain performance programs for physicians with a new Merit-Based Incentive Payment System ("MIPS"). MEDICARE ACCESS AND CHIP REAUTHORIZATION ACT OF 2015, PL 114-10, April 16, 2015, 129 Stat 87; *see also* 42 U.S.C. § 1395w-4(q). Under MIPS, eligible clinicians may receive adjustments on their Medicare claims based on their

demonstrated performance for certain performance categories. *See* 42 U.S.C. § 1395w-4(q)(1)(A); 42 C.F.R. § 414.1300 *et seq*.

One of the MIPS performance categories relates to "[p]romoting [i]nteroperability." 42 C.F.R. § 414.1375. Among other things, MIPS requires an eligible clinician to attest to the Centers for Medicare and Medicaid Services ("CMS") that he or she "implemented technologies, standards, policies, practices, and agreements" that "allowed for the timely, secure, and trusted bi-directional exchange of structured electronic health information." 42 C.F.R. § 1375(b)(3)(ii)(B)(4). Like the Meaningful Use Program, MIPS does not instruct providers how to design their websites or require hospitals to install a software code to disclose patient data to third parties.

Meanwhile, in 2018, Congress established the Center for Medicare and Medicaid Innovation. *See* 42 U.S.C. § 1315a. Under that authority, CMS designed Primary Care First, "a primary care delivery and payment redesign initiative" where participants were "given flexibility under the model to use their own individualized approaches to care delivery as long as they satisfy a minimum threshold of care delivery requirements." CTRS. MEDICARE & MEDICAID SERVS., PRIMARY CARE FIRST REQUEST FOR APPLICATIONS 5 (2019), https://innovation.cms.gov/files/x/pcf-rfa.pdf. Among the minimum thresholds was to use certified EHR technology and support data exchange with other providers and health systems. *See* 45 C.F.R. § 170.315. Such certified EHR technology requires participants, among other things, to "[e]nable a user to send messages to, and receive messages from, a patient in a secure manner." 45 C.F.R. § 170.315(e)(2).

"Primary Care First is a practice-level intervention and each practice interested in Primary Care First participation must submit a separate application." PRIMARY CARE FIRST REQUEST FOR

APPLICATIONS at 54. A "practice is defined as the legal entity that furnishes patient care services at a particular 'bricks and mortar' physical location." *Id.* "Each practice that is a part of a health system, [Accountable Care Organization], or other grouping of practices must submit a separate application." *Id.* In its notice of removal, Atrius does not identify which practices are allegedly participating in Primary Care First. *See* Notice at ¶¶ 12, 19, 23, 30, 32–33. In any event, the Plaintiffs have named only Atrius Health, Inc. as a defendant in this lawsuit. *See* Compl. at ¶ 8.

## LEGAL STANDARD

A district court must remand a case to state court if "at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). The removing party bears the burden of establishing federal jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Hilbert v. Aeroquip, Inc.*, 486 F. Supp. 2d 135, 143 (D. Mass. 2007).

## ARGUMENT AND AUTHORITIES

Atrius is a private party, not a federal agency or officer. It therefore bears the burden under 28 U.S.C. § 1442(a)(1) to establish: (1) that it was "acting under a federal officer's authority"; (2) that the charged conduct was carried out "for or relating to" the asserted official authority; and (3) that it "will assert a colorable federal defense to the suit." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022) (citations and quotation marks omitted). Atrius cannot meet any of these requirements, which means this Court lacks subject matter jurisdiction.

### A. Atrius was not "acting under a federal officer's authority" when it installed the Facebook Meta Pixel tool on its websites.

Atrius was not "acting under" a federal officer's authority when it bartered its patients' health data to Facebook. "'Acting under' connotes 'subjection, guidance, or control' and involves 'an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Rhode Island*

*v. Shell Oil Products Co.*, 979 F.3d 50, 59 (1st Cir. 2020), *cert. granted, judgment vacated on other grounds*, 141 S. Ct. 2666, 210 L. Ed. 2d 830 (2021) (quoting *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 152 (2007)). "Such aid does ***not*** include simply ***complying*** with the law." *Watson*, 551 U.S. at 143 (bold added).

Atrius was not told to embed Facebook's Meta Pixel tool on its website by any federal authority. And Atrius was not helping carry out any duty or task of the federal government, because the federal government is not in the business of digitizing health records for Atrius's patients. The most Atrius can prove is that it was voluntarily complying with regulations applicable to its industry. That, however, is not enough to prove that it was "acting under" a federal officer. Atrius cannot meet its burden to show that the Court has jurisdiction over this case.

**1. No federal officer ordered Atrius to install Facebook's Meta Pixel tool on its websites.**

The paradigmatic example of "acting under a federal officer's authority" is when a federal officer deputizes a private party to assist in the completion of a federal task. In such cases, the private actor is "acting under express orders, control and direction[s] of federal officers." *Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (telephone company directed to cooperate in wiretap); *Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129, 136 (D. Mass. 2009) ("Federal customs officials and tariff collectors, beset by state civil suits and criminal prosecutions in the early eighteenth century, were the original recipients of the[] protections [of federal court access].") (citing *Watson*, 551 U.S. at 147–48).

In limited circumstances, federal contractors subject themselves to federal obligations in a manner that grants them access to the federal courts. Contracting with the federal government, however, does not automatically mean a private party is "acting under" a federal officer. *See Shell Oil,* 979 F. 3d at 59–60 (rejecting that oil companies were acting under a federal officer even

though they had contracts to provide oil to government); *see also Holdren*, 614 F. Supp. 2d at 136 ("Private military contractors sued in state court for design defects have also been brought within the ambit of the federal officer removal statute, but only under certain circumstances.") (citation omitted). When the government provides detailed specifications and instructions to complete a task the federal government would otherwise perform, the contractor may be said to be "acting under" federal authority. *See, e.g.*, *Moore*, 25 F.4th at 35–36 ("The Navy oversaw ***every aspect of the design, construction, maintenance, and modernization*** of the submarine, including the use of asbestos in the construction of the submarine. The undisputed record demonstrates that Moore's claims clearly 'relate to' Electric Boat's contracted work while 'acting under' the Navy.") (emphasis added); *see also Watson*, 551 U.S. at 153 ("[g]overnment contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the government is an unusually close one involving detailed regulation, monitoring, or supervision").

Neither situation is present here. Atrius identifies no officers—or any persons at all—who expressly ordered, controlled, or directed Atrius to embed its website with code that would transfer patient information to third parties such as Facebook. *See generally* Notice. It identifies no specific words—published in statutes or regulations or otherwise—that any officer or agency used to expressly order, control, or direct Atrius on how to design its websites and instead cites to outcome-driven performance targets and aspirational roadmaps that "can provide signals to the private sector on the direction of the federal government." *See, e.g.*, Notice at ¶¶ 20–23 (citations to voluntary incentive payment programs); ¶ 30 (citing Office of the National Coordinator for Health Information Technology's ("ONC") 2020-2025 strategic plan). And while Atrius intimates that it has a written agreement for its voluntary participation in Primary Care First, Notice at ¶ 33, it does

not attach any agreements to its notice of removal or show that any such agreement covers "every aspect of the design, construction, [and] maintenance" of its website.[1] *See Moore*, 25 F.4th at 35–36. Saying that receipt of incentive payments in exchange for improving patients access to electronic health records is "akin to a government-contractor relationship," Notice at ¶ 32, is woefully inadequate proof of "an unusually close" contractor relationship necessary to support the "acting under" prong in the government-contractor context. *Watson*, 551 U.S. at 153. In short, Atrius bears the burden to prove subject matter jurisdiction is present, and it cannot establish that Atrius was acting under the necessary federal officer control to support jurisdiction.

For the same reason, Atrius's argument that it was following the federal government's "model[]" is no more than a concession that that the government ***did not*** tell Atrius how to set up its website.[2] Notice at ¶ 31 ("the government has modeled how best to enhance patient engagement"). "It is not enough to prove only that the 'relevant acts occurred under the general auspices of a federal office or officer' . . . ." *Aeroquip*, 486 F. Supp. 2d at 146 (quoting *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F. Supp. 2d 1144, 1152 (D. Colo. 2002)). Imitating perceived government behavior does not even support an argument that the government knew what Atrius was installing on its website, to say nothing of support for an argument that the

---

[1] It is hard to imagine how Atrius could establish such evidence. First, Primary Care First applies to groups of physicians, none of whom are parties to this lawsuit, even if Atrius has such groups acting under its umbrella. PRIMARY CARE FIRST REQUEST FOR APPLICATIONS 54. Second, Primary Care First requires participating providers to use secured communication protocols, which Atrius has not done here, any certifications to the contrary. *See, e.g.*, 45 C.F.R. § 170.315(e)(2).

[2] None of the Does' causes of action requires any court of competent jurisdiction to decide federal questions. It is still worth pointing out how incredible defendant's position is regarding the installation of Meta Pixel, since it is contrary to both regulations and HHS guidance. HHS, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (telling providers not to "use tracking technologies in a matter that would result in impermissible disclosures of [protected health information]"); 42 C.F.R. § 414.1375(b)(3)(ii)(B)(4) (MIPS participants' implemented technologies must "allow[] for the timely, secure, and trusted bi-directional exchange of structured electronic health information."); 45 C.F.R. § 170.315(e)(2) (requires participants, among other things, to "[e]nable a user to send messages to, and receive messages from, a patient in a secure manner").

government required Atrius to install tracking devices. Atrius simply does not have support for the proposition that a federal officer told Atrius what pixels to use on the Atrius website.

**2. Atrius was not "acting under" a federal officer because digitizing, maintaining, and making accessible private medical records is not a "basic governmental task."**

What is more, being subjected to a federal officer, or guided by a federal officer, or controlled by a federal officer is not enough to support jurisdiction. Such "subjection, guidance, or control" must concern a "basic governmental task" that the federal officer would otherwise have to do himself. *See Watson*, 551 U.S. at 153–54 ("Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform").

Atrius does not identify the "basic governmental task" it completes in lieu of federal officers or agencies. That is because there is none. It says that it is "assist[ing] the federal government in carrying out its goal of creating a nationwide healthcare information technology infrastructure." Notice at ¶ 30. Taking steps to benefit oneself and collaterally advance a regulatory policy or goal is no greater "assistance" than complying with regulation, which is insufficient to support jurisdiction. *Watson*, 551 U.S. at 152 ("the help or assistance necessary to bring a private person within the scope of the statute does ***not*** include simply ***complying*** with the law") (bold added); *see also infra* Part A.3. Airline passengers who pack liquids, aerosols, and gels in travel-size containers before approaching airport security certainly "'help' or 'assist' federal law enforcement authorities in some sense of those words," but these individuals do not "act under" an agency or officer of the federal government in a manner that could support removal. *See Watson*, 551 U.S. at 152 (example of refraining from smoking while flying). Without complying with the Transportation Security Administration's 3-1-1 policy, the putative passenger does not get to enjoy

the privilege of safer commercial flight. In the absence of voluntary compliance, the government is not going to pack the passenger's bags for them. So too here. Atrius can choose to demonstrate certain performance metrics to enjoy the privilege of incentive payments. In the absence of such voluntary compliance, the government is not stuck with the chore of digitizing medical records for Atrius's patients and setting up Atrius's website to permit access to the records.

Federal courts across the country have denied federal officer jurisdiction when the defendant does not show that the government has outsourced fulfillment of fundamental duties. *See Box v. PetroTel, Inc.*, 33 F.4th 195, 199 (5th Cir. 2022) ("PetroTel did not show that it helped the DFC carry out a duty, activity, or task that the DFC otherwise would have had to do itself."); *Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393, 405 (3d Cir. 2021) (rejecting federal officer jurisdiction because nursing homes do not assist or help carry out duties of federal superior); *Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 622–23 (6th Cir. 2016) ("regulation of an activity cannot, no matter how extensive or complex it may be," be a delegation of federal officer authority; instead, it requires that a private actor "takes on a job that the government would otherwise have to do."); *Veneruso v. Mount Vernon Neighborhood Health Ctr.*, 586 F. App'x 604, 607–08 (2d Cir. 2014) (rejecting argument that federal grant recipient was acting under federal officer because of expansive regulations tied to receipt of funds). *Arness v. Boeing North American, Inc.*, 997 F. Supp. 1268, 1273 (C.D. Cal. 1998) ("if the corporation establishes only that the relevant acts occurred under the general auspices of federal direction then it is not entitled to § 1442(a)(1) removal.") (quoting *Good v. Armstrong World Industries, Inc.*, 914 F. Supp. 1125, 1128 (E.D. Pa. 1996)).

The Sixth Circuit's recent denial of Humana's claim to federal officer jurisdiction is particularly instructive. There, Humana was administering private health-insurance benefits to

Medicare-eligible patients under contract with CMS in accordance with the Medicare Advantage program—otherwise known as Medicare Part C. *Humana Health Plan, Inc.*, 647 Fed. App'x at 620–21. In contrast to the fee-for-service model of Medicare Part A and Part B, Medicare Part C has a per-beneficiary compensation structure. *See id.* at 623. This incentivizes the private sector participating in Part C to provide care at a cost lower than the value of government payments, in order to reap the profit. *Id.* And the program gives the provider broad "autonomy" in Medicare Advantage "plan design and implementation." *Id.* When a doctor sued Humana over withheld payments for services provided to a Medicare patient, and Humana sought the privilege of federal court under the federal officer removal statute, the Sixth Circuit found the complained-of conduct was not performed under a federal officer. *Id.* at 624–25. Critical to this holding was the Sixth Circuit's answer to the question, "[D]o [Medicare Advantage Organizations] perform a job that the government would have to perform itself if it did not contract with private firms?" *Id.* at 624.

> We think not. If no health insurer chose to contract with CMS as an MAO, it is doubtful that the government would get into the business of offering its own MA plans. It certainly doesn't ***have*** to. More likely, it would fall back on traditional fee-for-service Medicare—which it must provide regardless.

*Id.* (bold added). Does Atrius perform a job that the government would have to perform itself if it did not provide incentive payments to Atrius? No. If Atrius chose not to submit applications for incentive payments under the Meaningful Use Program, or MIPS, or Primary Care First,[3] it is doubtful that the government would get into the business of creating and maintaining EHR for Atrius's patients.

In recent months, multiple district courts, including this one, have seized on the importance of the basic governmental function when ordering remands of similar lawsuits. In January, the

[3] To the extent the named defendant actually participates in Primary Care First, rather than one of its related practice groups. *See supra* n. 1.

Eastern District of Missouri explained that "[w]hile the federal government may have an interest in ensuring [an interoperable health information technology infrastructure], it is typically not the duty or task of the federal government to provide patients online access to medical information." *Doe v. BJC Health System*, No. 4:22 CV 919 RWS, 2023 WL 369427, at *4 (E.D. Mo. Jan 10, 2023) (quoting *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 740 (8th Cir. 2021) (alterations in original)). Since a hospital "is not assisting or helping a federal officer carry out her duties or tasks by creating a website and patient portal to allow patients online access to medical information," federal officer removal is not appropriate. *Id.*

A few weeks later, Judge Stearns rejected a healthcare defendant's arguments that its challenged conduct related to "efforts under federal programs like the Meaningful Use Program and Merit-Based Incentive Payment System." *Cape Cod*, No. 23-CV-10080, at ECF No. 10. He reasoned that the federal officer jurisdiction "applie[d] only to private parties acting under the direction of or in relation to an assertion of authority by an Officer of the United States or any of its agencies" and that "it does not apply to the voluntary and unilateral adoption of a practice that may be consistent in some respects of a nonbinding federal policy." *Id.*

Just last month, the Northern District of California reasoned that private medical records are "outside the traditional responsibility of the federal government" en route to denying federal officer jurisdiction to a hospital accused of forwarding its health information to Facebook. *Quinto v. Regents of University of California*, No. 22-cv-04429, 2023 WL 1448050, at *2 (N.D. Cal. Feb. 1, 2023); *see also Heard v. Torrance Mem. Medical Ctr.*, No. CV 22-09466, 2023 WL 2475544 (C.D. Cal. March 13, 2023) ("The directions Torrance points to are general regulations and public directives regarding the development of health information technology and [EHR] infrastructure.")

Nonetheless, Atrius asks this Court to follow two unpublished, out-of-Circuit district court

decisions that are inconsistent with First Circuit precedent. *See* Notice at ¶¶ 13, 38 (citing *Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20-CV-1581, 2020 WL 7705627, at *2–3 (N.D. Ohio Oct. 30, 2020)).

In *UPMC*, the Western District of Pennsylvania held that a hospital was entitled to federal officer removal when sued for disclosing personally identifiable health information to third parties for internet marketing purposes because its relationship with the Department of Health and Human Services ("HHS") was "less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in [an asbestos-exposure case against the manufacturer of World War II aircraft]." 2020 WL 4381675, at *6. In *ProMedica*, the Northern District of Ohio simply applied the holding of *UPMC*. 2020 WL 7705627, at *2–3. This Court should not follow *UPMC* because it is wrongly reasoned and conflicts with First Circuit precedent.

The *UPMC* court incorrectly focused on the fact that the defendant hospital received an incentive payment for creating and maintaining electronic health records, rather than focusing on whether the government would undertake that task itself if the hospital system did not. *Compare* 2020 WL 4381675 at *5–6, *with Watson,* 551 U.S. at 156 ("we have found no evidence of any delegation of legal authority from the FTC to the industry association to undertake testing on the Government agency's behalf"). Moreover, in this Circuit, a financial incentive—even when tied to an obligation to the government more forceful than found in this case—does not automatically turn a private actor into a person acting under the authority of a federal officer. *See Shell Oil*, 979 F.3d at 59–60; *see also Holdren*, 614 F. Supp. 2d 129; *accord Humana Health Plan, Inc.*, 647 Fed. App'x at 623 (rejecting that Humana was acting under federal officer as a Medicare Advantage organization). The Northern District of California correctly refused to follow *UPMC* and *ProMedica*, and this Court should disregard it too. *Quinto*, 2023 WL 1448050, at *3 ("These cases

entailed an overly broad interpretation of what it means to assist a federal superior with its tasks or duties, which would permit removal to federal court in circumstances far beyond anything Congress intended.") (citations and quotations omitted).

Atrius is merely a regulated entity that is responding to federal incentives in order to make more money. It is not a substitute completing a basic governmental function that federal agents would perform in Atrius's absence.

**3. Atrius's compliance with federal regulations does not establish that it was "acting under" a federal officer.**

At core, Atrius is saying federal jurisdiction is appropriate because it voluntarily complied with regulation that assists the government with its goal to make the use of medical records more efficient in the healthcare sector. Notice at ¶ 30 ("Through its voluntary participation, Atrius Health has assisted and continues to assist the federal government in carrying out its goal of creating a nationwide healthcare information technology infrastructure."). The problem for Atrius is that mere compliance with regulations is not "acting under" a federal officer.

"A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Watson*, 551 U.S. at 153. Since it is rare to find commercial activity untouched by federal influence, such a construction of the phrase would be absurd. *See, e.g.*, *Quinto*, 2023 WL 1448050, at *3. In the recent words of Judge Stearns,

> If one takes the defendant's reasoning to its logical conclusion, the federal officer removal statute would sweep into the federal courts any case involving an instance in which a third-party voluntarily incorporated in its business model a practice consistent with a policy promoted by the federal government as socially desirable, which given the size of the federal government and the hundreds of agencies and officials issuing pronouncements on its behalf, would apply to nearly the entire gamut of human behavior.

*Cape Cod*, No. 23-cv-10080, at ECF No. 10. This is why "orders, controls, and directions" must

clearly delegate federal authority for a "basic governmental task." *Supra* Parts A.1–2. Otherwise, nearly any private actor could scour legislative and regulatory publications to find language that "guid[es]" them in their private commercial decisions to contrive arguments to gain access to federal courts.

A driver buys an electric vehicle, receives a tax credit of $7,500 after submitting necessary certifications, and gets in a car accident with that vehicle for which he is sued. Should the resulting negligence suit proceed in federal court because the driver assisted the federal government in its stated goals under the Inflation Reduction Act of "accelerat[ing] the deployment of clean energy, [and] clean vehicles"? THE WHITE HOUSE, BUILDING A CLEAN ENERGY ECONOMY 2 (2023), https://www.whitehouse.gov/wp-content/uploads/2022/12/Inflation-Reduction-Act-Guidebook.pdf. Obviously not.

Atrius's argument is no different. It cites broad, precatory language published by regulatory agencies to argue that it is assisting the government. It then says it is closely monitored by the agencies because it submits certifications for usage metrics to get incentive payments, even though Atrius is afforded incredible leeway in how it "promotes interoperability," or improves "patient engagement and access to care," and is never told to install the Meta Pixel on its website. The removal statute's phrase "acting under" does not allow for such an absurdly broad construction. *Watson*, 551 U.S. at 153; *Quinto*, 2023 WL 1448050, at *3; *Cape Cod*, No. 23-cv-10080, at ECF No. 10.

**B. Atrius cannot show that embedding Meta Pixel into its website "relates to" any "official authority."**

To establish federal officer jurisdiction, Atrius must also show that there is a connection between the act in question and the federal office Atrius was "acting under." *See Moore*, 25 F.4th at 35. While this element does not require a causal relationship, it does have substantive limits.

*See Shell Oil*, 979 F.3d at 60 (finding no nexus between government's contracts to buy oil products and companies' misrepresentations about harm to environment); *see also Mass. v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31, 47 (D. Mass. 2020) (rejecting that marketing and sales tactics for oil and products were "related to" drilling and production activities "supposedly done under the direction of the federal government"). Atrius cannot meet this "related to" standard.

The conduct in question here is Atrius's installation of a hidden tool on its website that transmits patients' health data to Facebook so that Facebook can sell advertising—all without patients' knowledge or consent. There is no connection between this conduct and anything that CMS (or any other federal agency) directed Atrius to do. First, nobody told Atrius to install the Meta Pixel. *Supra* Part A. Second, the only connection between installing Meta Pixel and the Meaningful Use Program, MIPS, or the Primary Care First Programs is that all touch website usage. *See* Notice at ¶¶ 35, 37 (identifying "development of Atrius['s] website" as nexus). That is insufficient under the First Circuit's recent opinion in *Shell Oil.*

In *Shell Oil,* Rhode Island sued various oil companies for knowingly misrepresenting the harm their products caused the environment. In seeking to remove to federal court, the oil companies pointed to their contracts with the federal government to claim they acted under the color of federal office in selling oil products to support federal officer jurisdiction. 979 F.3d at 59. The First Circuit compared the scope of those contracts to the plaintiff's allegations and found no nexus existed. *See id.* ("There is simply no nexus between anything for which [plaintiff] seeks damages and anything the oil companies allegedly did at the behest of a federal officer."). Because the contracts with the government "mandate[d] none of [the alleged] activities" (*i.e.*, engaging in a "misinformation campaign" about the harmful effects of their products on the environment), the First Circuit held that there was no nexus between anything the oil companies did under the color

of federal office (sell oil to government) and the act the plaintiff complained of (misrepresentations to the public). *See id.*; *see also Exxon Mobil*, 462 F. Supp. 3d at 47.

The same result follows here. It is undisputed that no federal officer "mandated" that Atrius install software on its website that transmitted its patients' personal health information to Facebook without their knowledge or consent. Rather, like in *Shell Oil,* Atrius made a conscious decision to mislead its customers for its own benefit.

If the First Circuit found no nexus in *Shell*—even though the complained-of act (misrepresentations about oil products) and the federal authority (contracts for oil products) both involved selling oil—then there can similarly be no nexus when the complained-of act and the federal authority both involve website development—an even more expansive and nebulous concept than selling oil. Accordingly, Atrius cannot carry its burden to establish a nexus between the complained-of acts and the supposed delegated federal authority.

**C. Atrius asserts no colorable federal defense.**

"As a constitutional matter, a defendant must aver something more than his status as a federal officer in order to bring this case into a federal forum. It is only the assertion of a colorable federal defense that justifies the federal court's limited Article III jurisdiction in these cases." *Holdren*, 614 F. Supp. 2d at 140 (citing *Mesa v. California*, 489 U.S. 121, 136–38 (1989)). "Because it alone confers Article III jurisdiction, the 'colorable' standard requires that a federal court carefully weigh the plausibility of the proffered defense." *Id.* at 140. The defense must not be "immaterial" or "wholly insubstantial and frivolous." *Moore*, 25 F.4th at 37.

Atrius's only alleged federal defense is immaterial. It is wholly insubstantial and frivolous. Atrius says that the information it disclosed "was not protected health information under HIPAA." Notice at ¶ 40. But this is not a defense to any of the claims plaintiffs have pleaded.

The Massachusetts Wiretap Act protects communications from unauthorized interception. G.L. c. 272, § 99. The touchstone of enforcement is whether there is consent to interception of the communication. *Id.* at § 99(B)(4) (requiring "prior authority by all parties to [the] communication"). The statute is agnostic about the content of such communications. *Id.* (secret interception of "any wire or oral communication" is prohibited). Plaintiffs do not have to prove that the statements it made to its hospital concerned protected health information to prevail on this claim. *See id.*; *see also Doe v. Partners Healthcare Sys., Inc.*, No. 1984CV01651, Decision Allowing in Part and Denying In Part Motion to Dismiss (Mass. Super. Ct. Nov. 20, 2020). And Atrius's claim that the communications concerned protected health information—or not—are no recognized defense to the Massachusetts Wiretap Act. As a result, it does not matter one way or the other if the intercepted communications concern health issues.

The same can be said about the statutory invasion of privacy claim. Plaintiffs need only establish that there was a right of privacy that was violated—not that the reasonable expectation of seclusion concerned health information that the federal government regulates. *See* G.L. c.214, § 1B ("a person shall have a right against unreasonable, substantial or serious interference with his privacy").

There is even less of a serious argument HIPAA has any bearing at all on the common law claims pleaded. The Massachusetts unjust enrichment claim depends only on the presence of inequity and reasonable expectations of value. *See, e.g.*, *Stewart Title Guar. Co. v. Kelly*, 97 Mass. App. Ct. 325, 335 (2020). The fiduciary duty claims turns on a relationship of trust and its violation. *See, e.g.*, *Alberts v. Devine*, 395 Mass. 59, 69 (1985). Breach of contract depends on enforceable promises and the consequences of disregarding them. *See, e.g.*, *Sullivan v. O'Connor*, 81 Mass. App. Ct. 200, 212 (2012). These causes of action, which have existed for hundreds of

years before HIPAA and for decades since, can be complied with independently of a healthcare provider's obligation to comply with federal regulations for records management. *See, e.g.*, *Byrne v. Avery Ctr. for Obstetrics & Gynecology*, P.C., 327 Conn. 540, 557 (2018) ("This court has previously concluded that recognition of a private cause of action for breach of the duty of confidentiality of medical records is not . . . inconsistent with[] HIPAA."); *R.K. v. St. Mary's Med. Ctr., Inc.*, 229 W. Va. 712, 721 (2012) ("state-law [tort] claims compl[e]ment HIPAA by enhancing the penalties for its violation and thereby encouraging HIPAA compliance"). Each of plaintiffs' causes of action seeks relief for the illicit disclosure of private information belonging to the plaintiffs—whether that information is also protected by federal law is immaterial.

A supposed defense that does not have the tendency to make any fact of consequence more or less true is by definition irrelevant. *See* FED. R. EVID. 401. In other words, it is no defense at all. Without a colorable federal defense, there is no Article III jurisdiction for this Court to hear the Does' case. Atrius can meet none of the requirements that would allow this lawsuit to remain in federal court.

## CONCLUSION

Atrius reads the federal officer removal statute so expansively that it becomes limitless: Any private actor that responds to published regulatory goals is a federal deputy. That proposition is unprecedented and contrary to both Supreme Court and First Circuit precedent. Since Atrius has not proved that it acted under federal authority, that it is being sued for acts connected with that federal authority, or that it has a colorable federal defense to acts it took under such federal authority, it has not established federal officer jurisdiction. This case should thus be remanded to state court.

Respectfully submitted,

/s/ J. Tucker Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for Plaintiffs and the Proposed Class***

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

## CERTIFICATE OF SERVICE

I hereby certify that, on March 30, 2023, copies of the foregoing Memorandum of Law in support of Plaintiffs' Motion to Remand were served on the following via ECF:

Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
617-371-1000
617-371-1037 fax
Maria.durant@hoganlovells.com
Kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*pro hac vice pending*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600
202-637-5910 fax
Allison.holt-ryan@hoganlovells.com
Adam.a.cooke@hoganlovells.com

*Attorneys for Defendant Atrius Health Care, Inc.*

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Case No.: 1:22-cv-12196 |

**[PROPOSED] ORDER OF REMAND**

Upon consideration of Plaintiffs' Motion to Remand, Defendant's Response, Plaintiffs' Reply, and the arguments and authorities, the Court finds that the Motion to Remand is **GRANTED**.

Accordingly, **IT IS HEREBY ORDERED THAT** this case is remanded to the Norfolk County Superior Court of the Commonwealth of Massachusetts.

Dated this _________ day of _________________, 2023.

BY THE COURT:

_______________________________
Hon. F. Dennis Saylor, IV
Chief Judge, District of Massachusetts

20

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. ~~1:22-cv-12196~~ 2384CV02584 10/10/23 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**DEFENDANT'S ASSENTED-TO MOTION TO EXTEND TIME**

Defendant Atrius Health, Inc. ("Defendant"), by and through undersigned counsel, moves to extend the deadline to respond to Plaintiffs John and Jane Doe's Motion to Remand ("Remand Motion") by fourteen (14) days to April 27, 2023.

Plaintiffs filed the Class Action Complaint on October 18, 2022 in Norfolk County Superior Court, Case No. 2282CV00982. *See* ECF 1-4. Defendant was served on December 6, 2022 and removed the action to this Court on December 23, 2022.[1] *See* ECF 1 (Notice of Removal); ECF 1-9 at 3 (Proof of Service). Plaintiffs filed the Remand Motion approximately three months later, on March 30, 2023. *See* ECF 23; ECF 24. Defendant's response to the Remand Motion is currently due on April 13, 2023.

With Plaintiffs' assent and pursuant to Fed. R. Civ. P. 6(b)(1)(A), Defendant respectfully requests that its deadline to respond to the Remand Motion be extended by fourteen (14) days to

[1] On December 29, 2022, Defendant moved with Plaintiffs' assent to extend the deadline to respond to the Complaint until thirty days after the Court resolved Plaintiffs' then-forthcoming motion. *See* ECF 10. The Court granted Defendant's motion the following day. *See* ECF 11.

April 27, 2023. This is Defendant's first such request; the additional time sought will not alter any other deadlines set in this case; and this request is not made for undue delay.

WHEREFORE, Defendant respectfully request that the Court extend the deadline for Defendant to respond to the Remand Motion by fourteen (14) days, until April 27, 2023.

Respectfully submitted,

By: */s/ Anthony E. Fuller*
Anthony E. Fuller (BBO #663246)
Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*admitted pro hac vice*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON
April 16, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ________
Assistant Clerk

Dated: April 10, 2023

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(2)

Counsel for Defendant certify that they have conferred with Plaintiffs' counsel of record on this motion and that Plaintiffs' counsel assents to the motion.

Respectfully submitted,

By: */s/ Anthony E. Fuller*

Anthony E. Fuller (BBO #663246)
Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*admitted pro hac vice*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Defendant*

Dated: April 10, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2023, copies of the foregoing Defendant's Assented-To Motion to Extend Time were served via electronic filing through the Court's ECF system to:

Sweeney Merrigan Law
J. Tucker Merrigan
Victoria Santoro Mair
Erin E. McHugh
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Ahmad, Zavitsanos, & Mensing, P.C.
Foster C. Johnson
David Warden
Nathan Campbell
1221 McKinney Street, Suite 3460
Houston, Texas 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Keller Postman LLC
Seth Meyer
Alex Dravillas
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Counsel for Plaintiffs John Doe and Jane Doe, Individually and on Behalf of all Others Similarly Situated*

*<u>/s/ Anthony E. Fuller</u>*
Anthony E. Fuller

21

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. ~~1:22-cv-12196~~<br><br>**DEFENDANT ATRIUS HEALTH, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND**<br><br>23-2704-BLS1 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

NOV 28 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

10/23/23
RECEIVED & ~~FILED~~
CLERK OF THE COURTS
NORFOLK COUNTY
10/24/23

# TABLE OF CONTENTS

I. INTRODUCTION ....................1

II. BACKGROUND ....................2

III. ARGUMENT ....................7

A. Atrius "act[ed] under" Federal Authority ....................8

B. Atrius' Alleged Conduct "relates to" its Work on Behalf of CMS and ONC ....................14

C. Atrius Presents a Colorable Federal Defense to Plaintiffs' Allegations ....................17

IV. CONCLUSION ....................20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003)....24

*Camacho v. Autoridad de Telefonos de Puerto Rico*,
868 F.2d 482 (1st Cir. 1989)....6, 13

*In re Commonwealth's Mot. to Appoint Couns. Against or Directed to Defender Ass'n of Phila.*,
790 F.3d 457 (3d Cir. 2015)....22

*Doe v. BJC Health System*,
No. 22-CV-919, 2023 WL 369427 (E.D. Mo. Jan. 10, 2023), *appeal filed*, No. 23-1107 (8th Cir. Jan. 20, 2023)....18

*Doe v. Cape Cod Healthcare, Inc.*,
No. 23-cv-10080 (D. Mass. Jan. 25, 2023), ECF No. 10, *appeal filed*, No. 23-1149 (1st Cir. Feb. 2, 2023)....18, 19

*Doe v. ProMedica Health Sys., Inc.*,
No. 20-CV-1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020), *appeal denied*, No. 20-CV-1581, 2020 WL 7705713 (N.D. Ohio Dec. 14, 2020)....18

*Doe v. Torrance Mem'l Med. Cntr.*,
No. 23-cv-01237, 2023 WL 2916548 (C.D. Cal. Apr. 12, 2023)....18

*Doe v. UPMC*,
No. 20-cv-359, 2020 WL 4381675 (W.D. Pa. Jul. 31, 2020), *appeal denied*, No. 20-cv-359, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020)....18, 20, 22, 24

*Freiberg v. Swinerton & Wahlberg Prop. Servs., Inc.*,
245 F. Supp. 2d 1144 (D. Colo. 2002)....15

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989)....24

*Heard v. Torrance Mem'l Med. Cntr.*,
No. 22-CV-09466, 2023 WL 2475544 (C.D. Cal. Mar. 13, 2023)....18, 19

*Hilbert v. Aeroquip, Inc.*,
486 F. Supp. 2d 135 (D. Mass. 2007)....15

*Jefferson Cnty. v. Acker*,
527 U.S. 423 (1999)....................13, 20

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020)....................6

*Me. Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020)....................16

*Mesa v. California*,
489 U.S. 121 (1989)....................22

*Moore v. Elec. Boat Corp.*,
25 F.4th 30 (1st Cir. 2022).................... *passim*

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)....................19

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*,
647 F. App'x 619 (6th Cir. 2016)....................16

*Pietrangelo v. Sununu*,
15 F.4th 103 (1st Cir. 2021)....................10

*Quinto v. The Regence of the Univ. of Cal.*,
No. 22-cv-04429, 2023 WL 1448050 (N.D. Cal. Feb. 1, 2023)....................18

*Rhode Island v. Shell Oil Products Co.*,
979 F.3d 50 (1st Cir. 2020), *vacated and remanded*, 141 S. Ct. 2666 (2021)....................21

*Sawyer v. Foster Wheeler, LLC*,
860 F.3d 249 (4th Cir. 2017).................... *passim*

*Shepherd v. Air & Liquid Sys. Corp.*,
No. 12-143L, 2012 WL 5874781 (D.R.I. Nov. 20, 2012)....................13

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018)....................23

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
139 S. Ct. 2449 (2019)....................24

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007)....................24

*Watson v. Philip Morris Companies, Inc.*,
551 U.S. 142 (2007)....................12, 13, 14, 15

*Willingham v. Morgan*,
395 U.S. 402 (1969)....................12, 13

**Statutes**

28 U.S.C. § 1442(a)(1)....................6, 12, 13

42 U.S.C. § 300jj....................8

42 U.S.C. § 300jj-11(a)....................8

42 U.S.C. § 300jj-11(c)(3)(A)....................8

42 U.S.C. § 300jj-31(a)....................8, 16, 17, 19

42 U.S.C. § 300jj-33(a)....................8

42 U.S.C. § 1395w-4(o)....................8

42 U.S.C. § 1395w-4(o)(2)(A)....................9

42 U.S.C. § 1395w-4(o)(2)(B)....................9

**Rules & Regulations**

42 C.F.R. § 495.22(e)(8)(i)....................9

42 C.F.R. § 495.24(d)(5)(i)(B)....................10

45 C.F.R. § 164.520(b)(1)(ii)(A)....................23

45 C.F.R. § 170.315(e)(1)(i)....................9, 21

45 C.F.R. § 170.315(e)(3)....................10

Fed. R. Evid. 201(b)....................10

**Other Authorities**

American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009)....................8

C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, Cong. Res. Serv. (Apr. 27, 2009), https://crsreports.congress.gov/product/pdf/R/R40161/9....................9

Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004)....................7, 15

Medicare and Medicaid Programs; Electronic Health Rec. Incentive Program, 75 Fed. Reg. 44,314 (Jul. 28, 2010) ..........9

Tommy G. Thompson & David J. Brailer, *Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care* (July 21, 2004), https://permanent.fdlp.gov/gpo800/hitframework.pdf ..........8

## I. INTRODUCTION

Defendant Atrius Health, Inc. ("Atrius") demonstrated in its Notice of Removal that this suit belongs in federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Atrius has assisted the federal government to build a healthcare infrastructure centered on patient access to electronic health records ("EHRs") by increasing engagement with its website and patient portal. *See* Notice of Removal ¶¶ 14–25, 29-38, ECF No. 1 ("Notice"). Federal government agencies, including the Centers of Medicare and Medicaid Services ("CMS") and U.S. Department of Health and Human Services ("HHS"), provided non-governmental, non-profit entities like Atrius with models of how to enhance patient engagement through deployment of website analytics tools like the ones at issue here. *See id.* ¶¶ 3, 25. Federal government agencies required Atrius to report on the progress it made against various interoperability and engagement requirements, with receipt of federal funds tied to meeting those requirements. Because Plaintiffs' Complaint challenges the assistance Atrius provided to the federal government, removal is proper under the federal officer removal statute.

In seeking remand, Plaintiffs gloss over this important background. Plaintiffs' Motion to Remand fails to acknowledge the breadth of the federal government's initiatives and incentives to enhance engagement and interoperability and the assistance Atrius has provided to the government. That failure is tied to Plaintiffs' misreading of the requirements of the federal officer removal statute. The statute does not require Atrius to identify an express order from a federal officer directing Atrius to deploy certain website analytics tools on its website. Mem. of Law in Support of Pls.' Mot. to Remand at 6-18, ECF No. 24 ("Mot."). Imposing such a requirement necessitates the type of "crabbed reading of section 1442(a)(1)" that courts have repeatedly rejected. *Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 487 (1st Cir. 1989); *see also Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290 (5th Cir. 2020) (similar). Plaintiffs

also err in asking this Court to ignore the obvious federal legal issue of whether the information allegedly disclosed by Atrius is protected by the Health Information Portability and Accountability Act of 1996 ("HIPAA"). *See* Mot. at 18-20. The Plaintiffs cannot credibly contend that HIPAA has no bearing on their claims when the Complaint is chock full of allegations that the website analytics tools Atrius utilized purportedly violated HIPAA. In attempting to skirt their reliance on HIPAA, *see* Mot. at 19, Plaintiffs advance an interpretation of Massachusetts law that raises another colorable federal defense: the dormant Commerce Clause.

For all these reasons, and as set forth more fully below, Plaintiff's Motion should be denied and this case should proceed in federal court.

## II. BACKGROUND

Plaintiffs' suit challenges actions that Atrius took in connection with the enhancement of its website and patient portal, which Atrius developed to carry out the federal government's goal of creating a unified and interoperable system of patient EHR. As described in Atrius' Notice of Removal, both the Executive Branch and Congress have worked to create a national electronic healthcare infrastructure through the private sector. *See* Notice ¶¶ 14–25. The federal mission began in 2004 when President Bush ordered HHS to create the position of the National Health Information Technology Coordinator ("Coordinator"). Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). This Executive Order specified that the Coordinator "shall, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors[.]" *Id.*

This goal was an important one. Among other things, studies had shown that the universal adoption of EHR could "improve patient health status," "reduce errors and improve use of medical evidence," as well as "induce concomitant changes in workflow, in relationships between

physicians and patients, and in process control that together will trigger subsequent waves of positive change." Tommy G. Thompson & David J. Brailer, *Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care*, at 10 (July 21, 2004), https://permanent.fdlp.gov/gpo800/hitframework.pdf. (citations omitted).

Congress followed President Bush's lead when it enacted the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"). *See* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, 247 (2009), codified as 42 U.S.C. § 300jj *et seq*. In particular, this legislation codified the Office of the National Coordinator for Health Information Technology ("ONC"). *See* 42 U.S.C. § 300jj-11(a). The ONC was charged with "updat[ing] the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" regarding "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(c)(3)(A).

The HITECH Act also directed that the HHS Secretary "shall . . . invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [Coordinator]." 42 U.S.C. § 300jj-31(a). The Secretary was required to "establish a program . . . to facilitate and expand the electronic movement and use of health information among organizations according to nationally recognized standards." 42 U.S.C. § 300jj-33(a).

To that end, Congress authorized the federal government to provide incentive payments to private health care providers, for adopting health information technology, *see* 42 U.S.C. § 1395w-4(o), and authorized the HHS Secretary to administer the health information technology initiatives,

*see*, *e.g.*, 42 U.S.C. §§ 1395w-4(o)(2)(A)–(B). These incentive payments were intended to "encourage doctors and hospitals to adopt and use certified EHRs." C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, at 2, Cong. Res. Serv. (Apr. 27, 2009), https://crsreports.congress.gov/product/pdf/R/R40161/9. The legislation was designed such that over time, "[t]hose incentive payments [were] phased out . . . and replaced by financial penalties for physicians and hospitals that [were] not using certified EHRs." *Id.*

In 2010, HHS adopted the Meaningful Use program. *See* Medicare and Medicaid Programs; Electronic Health Rec. Incentive Program, 75 Fed. Reg. 44,314 (Jul. 28, 2010). HHS has noted that this program is part of the government's overarching project to facilitate the creation of an effective IT infrastructure across the health care industry: "Certified EHR technology used in a meaningful way is one piece of a broader [health information technology] infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.* at 44,321; *see also id.* ("HHS believes this ultimate vision of reforming the health care system and improving health care quality, efficiency and patient safety should drive the definition of meaningful use consistent with the applicable provisions of Medicare and Medicaid law.").

One central aim has been to increase patients' "meaningful use" and engagement with their EHR. For instance, federal regulations specified that, between 2015 and 2018, participating providers were required to "[p]rovide patients the ability to view online, download, and transmit their health information within 4 business days of the information being available to the [provider]." *See* 42 C.F.R. § 495.22(e)(8)(i). These regulations also specified that participating providers must attest to ONC, as well as to CMS, regarding their progress with respect to the required criteria. *See* 45 C.F.R. § 170.315(e)(1)(i) (mandating that these attestations specify, among other things, that "[p]atients (and their authorized representatives) [can] use internet-based

technology to view, download, and transmit their health information"). Since 2019, the regulations have dictated that a provider must show that more than eighty percent of Medicaid patients received access to view, download, and transmit their health information to a third party in order to establish its compliance. 42 C.F.R. § 495.24(d)(5)(i)(B).

To facilitate adoption of these requirements, ONC has issued strategic plans emphasizing that it will achieve its goals by "collaborat[ing] with [other federal agencies] and with state, local, tribal, and private stakeholders to . . . [b]uild a culture of electronic health information access and use." Ex. A, ONC, *Federal Health IT Strategic Plan 2015-2020*, at 7.[1] More recent guidance is to similar effect. *See* Ex. B, ONC, *2020-2025 Federal Health IT Strategic Plan*, at 15-18.

Over the years, the federal government has incorporated the goals of the Meaningful Use program into a series of other initiatives, including the Promoting Interoperability program, the Merit-based Incentive Payment System ("MIPS"), and the Primary Care First program. The Primary Care First program, for example, requires participants to provide patients access to EHR within one business day and that EHR technology enables a patient to "[i]dentify, record, and access information directly and electronically shared by a patient." 45 C.F.R. § 170.315(e)(3). A healthcare provider who meets these specifications qualifies for a payment, which may be adjusted based on the provider's performance. *See* Ex. C, CMS, Primary Care First Model Options. These collective efforts have borne fruit: in 2020, nearly 40 percent of individuals nationwide accessed a patient portal, a thirteen percentage point increase since 2014. Ex. D, ONC, *Individuals' Access and Use of Patient Portals and Smartphone Health Apps, 2020* at 2 (Sept. 2021).

Online portals are critical tools to enhance patient engagement with EHR. *See* Ex. E, Nat'l

[1] The Court may take judicial notice of publicly available facts like these that are not reasonably subject to dispute. *See* Fed. R. Evid. 201(b); *Pietrangelo v. Sununu*, 15 F.4th 103, 106 n.1 (1st Cir. 2021) ("[W]e may take judicial notice of facts which are 'capable of being determined by an assuredly accurate source.'") (citation omitted).

Learning Consortium, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* at 1-2 (May 2013). Indeed, the federal government has recommended that healthcare providers should "[l]earn the benefits of patient portals for patients and providers"; "[u]nderstand how a patient portal helps achieve meaningful use requirements"; "[i]mplement proactive, engaging portal features"; "[i]mplement the portal with a systematic process" as well as "[a]ctively promote and facilitate portal use." *Id.* at 1.

CMS has shown how to promote engagement with its own portal and website via third-party analytics tools. *See* Ex. F, CMS, *Privacy Policy*, at 3-5. Specifically, CMS states that it collects "basic information about visits to CMS.gov," using "third-party web services to conduct outreach and education through the use of digital advertising for CMS.gov." *Id.* at 3-4. These services included "the use of web beacons (also called pixels)" for the purpose of "better target[ing] CMS advertisements." *Id.* at 4. CMS also engaged Facebook to "place[] a cookie or pixel . . . for conversion tracking on certain pages of CMS website" so that Facebook could "measure the performance of CMS advertisements based on consumer activity and to report the ad performance to CMS." Ex. G, HHS, *Third Party Websites and Applications Privacy Impact Assessment—Facebook Ads* at 2 (Sept. 4, 2018).

As a result of these federal directives, Atrius took significant steps towards fulfilling the articulated federal goals. It has developed a patient portal and operates a website through which that portal and EHR can be accessed. *See* Ex. H, Monsen Decl. ¶¶ 4, 7, 9.[2] Notably, "[a]s part of the Meaningful Use program from 2011 to 2015," Atrius "submitted hundreds of reports on behalf

[2] Dr. Craig Monsen is Atrius' Chief Medical Information Officer and Associate Chief Information Officer. *See* Ex. H ¶ 2. In those roles, he has "provide[d] guidance to internal teams developing Atrius' electronic patient portal" and has gained familiarity with Atrius' "participation in and involvement with federal incentive and interoperability initiatives, including the Meaningful Use program, Merit-based Incentive Payment System (MIPS), and the Primary Care First program." *Id.* ¶¶ 4-5.

of its [professionals eligible to participate] attesting to its level of achievement in meeting objectives of the program." *Id.* ¶ 7. It also "updated, modified and implemented new features in its patient portal that patients access through the Atrius Health website." *Id.* In return, Atrius has received incentive payments from the federal government. *Id.* ¶ 8. Likewise, through its participation in the Primary Care First program, Atrius "submitted interoperability attestations for all twenty-five (25) of its primary care area facilities in 2021." *Id.* ¶ 9; Ex. I, Primary Care First Practice Participation Agreement, at 82 (2021). As a result of these efforts, Atrius has received incentive payments from the federal government for the development and operation of its patient portal. Ex. H ¶ 8. Fulfilling this federal task has been facilitated by Atrius' efforts to enhance awareness of and engagement with its website and patient portal. *Id.* ¶ 10.

Plaintiffs challenge these efforts. Their claims center on Atrius' alleged use of prevalent analytics technologies, which Plaintiffs assert are "embedded on millions of websites." *See* Complaint ¶¶ 77-92, ECF No. 1-4 ("Compl."). According to Plaintiffs, these technologies enhances a website owner's ability to "get rich insights into how people use [the] website", "to analyze a user's experience and activity on the website," and "to assess the website's functionality and traffic." *Id.* ¶¶ 57, 74. Plaintiffs assert that Atrius' alleged use of such website technologies violated the Massachusetts Wiretap Act and gives rise to an assortment of other claims. *Id.* ¶¶ 166-248.

## III. ARGUMENT

Removal in this case is proper pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Under that statute removal must be upheld when "any officer (or any person acting under that officer) of the United States," is sued in state court "for or relating to any act under color of such office" and where the defendant "will assert a colorable federal defense." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022). These elements are liberally construed, *Watson v.*

*Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007), and there is no presumption against federal officer removal, *Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969). Indeed, the Supreme Court has cautioned that the policy favoring federal officer removal "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Id.* at 407; *see also Camacho*, 868 F.2d at 487. The Court must therefore "credit [Atrius'] theory of the case," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999), and construe the facts set forth in the Notice of Removal in the light most favorable to Atrius. *See Shepherd v. Air & Liquid Sys. Corp.*, 2012 WL 5874781, at *3 (D.R.I. Nov. 20, 2012).

While Plaintiffs concede that Atrius is a "person" within the meaning of the federal officer removal statute, they contend that (1) Atrius did not act under a federal officer's authority, Mot. at 6-16, (2) the alleged conduct was not carried out in relation to the asserted federal authority, *id.* at 16-18, and (3) Atrius has not asserted a colorable federal defense, *id.* at 18-20. In support of these contentions, Plaintiffs advance a "narrow, grudging" interpretation of the federal officer removal statute that does not credit Atrius' theory of the case and is contrary to a liberal construction of the statute. These arguments should be rejected, and the Court should uphold removal.

**A. Atrius "act[ed] under" Federal Authority**

Atrius has shown that it engaged in "an effort to *assist*, or to help *carry* out, the duties or tasks of [a] federal superior" and thus acted under that federal official. *Watson*, 551 U.S. at 152. Plaintiffs dispute that showing for three reasons. They argue (1) "[n]o federal officer ordered Atrius to install Facebook's Meta Pixel tool on its websites," Mot. at 7, (2) "digitizing, maintaining, and making accessible private medical records is not a 'basic governmental task,'" *id.* at 10, and (3) "Atrius's compliance with federal regulations does not establish that it was 'acting under' a federal officer," *id.* at 15. Each of these assertions is wide of the mark.

Plaintiffs' first argument rests on a distortion of the relevant standard for federal officer removal. The First Circuit has made clear that § 1442(a)(1) "does not 'demand[] a showing of a specific government direction.'" *Moore*, 25 F.4th at 36 (quoting *Sawyer v. Foster Wheeler, LLC*, 860 F.3d 249, 258 (4th Cir. 2017)). Instead, a defendant demonstrates that it acted under a federal officer's authority by showing that it endeavored "to assist," or "help carry out," the "tasks" of the officer. *Watson*, 551 U.S. at 152. This relationship often involves providing assistance subject to federal "'subjection, *guidance*, or control.'" *Id.* at 151 (citation omitted; emphasis added).

Atrius did just that. It expended substantial effort to assist the federal government to create a nationwide healthcare information technology infrastructure. *See* Ex. B at 23-39. And it did so by developing a website and patient portal in line with and subject to federal standards and oversight. *See, e.g.*, Ex. H ¶ 10 ("Atrius Health has developed its website to promote patient engagement and access to electronic health records, including through its patient portal."). Federal guidance has consistently emphasized the importance of developing engaging marketing strategies to "[p]romote and [f]acilitate [p]ortal [u]se." Ex. E at 2. The ONC Patient Engagement Playbook, for instance, provides direction on how to "[m]arket and educate effectively," Ex. J, ONC, *Patient Engagement Playbook*, at 17–22, instructing providers to "[t]ake advantage of every touch point" and "[r]emember that marketing opportunities exist outside of a visit, too—like when patients call the office," *id.* at 19. CMS also provided a model for enhancing patients' engagement with and access to portals, utilizing third-party analytics tools on its own website. *See* Ex. F at 4 (disclosing that CMS uses "third-party web services to conduct outreach and education through the use of digital advertising for CMS.gov). That included engaging Facebook to "place[] a cookie or pixel . . . for conversion tracking on certain pages of CMS website" so that Facebook could "measure the performance of CMS advertisements based on consumer activity and to report the ad

performance to CMS." Ex. G at 6.

Atrius submitted numerous reports and attestations regarding its adherence to federal interoperability standards and guidance, Ex. H ¶¶ 6-7, including with respect to Atrius' participation in the Primary Care First program, *see* Ex. I at 71-72. Atrius was part of the broader project of driving the nationwide implementation of interoperable health information technology, which relied on the "private sector" to work with the government to "help digitize health information and healthcare." Ex. B at 2. In short, Atrius has done more than just show "that the relevant acts occurred under the general auspices of a federal office or officer.'" Mot. at 9 (quoting *Hilbert v. Aeroquip, Inc.*, 486 F. Supp. 2d 135, 146 (D. Mass. 2007)).[3]

Second, Plaintiffs argue that assisting a federal officer is insufficient to support federal jurisdiction unless that assistance "concern[s] a 'basic governmental task' that the federal officer would otherwise have to do himself." Mot. at 10. But that misreads the federal officer removal statute. While providing assistance for a basic governmental task the government otherwise would have to perform helps to show that an entity was acting under a federal officer, nothing in the statute's text requires a defendant to make this exact showing. *See, e.g.*, *Moore*, 25 F.4th at 34 n.3. The Supreme Court said as much in *Watson*, noting that it was looking at these factors to distinguish another case and was not examining "whether and when" other circumstances "may enable private contractors to invoke the statute." 551 U.S. at 154. Regardless, Atrius has shown that it provided assistance for a "basic governmental task."

Pursuant to longstanding directives, the federal government has committed itself to

---

[3] *Hilbert*'s analysis is further distinguishable because it drew on out-of-circuit case law, such as *Freiberg v. Swinerton & Wahlberg Prop. Servs., Inc.*, 245 F. Supp. 2d 1144, 1152 (D. Colo. 2002), and because it examined a prior version of the federal officer removal statute, which was amended in 2011. As multiple courts have noted, the 2011 amendment was designed to broaden the statute. *See, e.g.*, *Sawyer*, 860 F.3d at 258 ("This new language broadened the universe of acts that enable federal removal, such that there need be only a connection or association between the act in question and the federal office.") (cleaned up).

building out a national electronic health infrastructure that provides for patient online access to medical information. *See* Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). In the absence of assistance from private, non-profit entities like Atrius, the federal government would be obligated to identify some other means of directing the construction of this infrastructure. *See* 42 U.S.C. § 300jj-31(a) ("The Secretary *shall* . . . *invest* in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States.") (emphasis added); *see also Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("The first sign that [a] statute imposed an obligation is its mandatory language: 'shall.'") (citation omitted).

Plaintiffs try to sidestep these facts by asserting that that "[i]f Atrius chose not to submit applications for incentive payments under the Meaningful Use program, or MIPS, or Primary Care First[ ], it is doubtful that the government would get into the business of creating and maintaining EHR for Atrius's patients." Mot. at 12. This misstates and improperly narrows the relevant inquiry. The analysis focuses on whether the government would be forced to build out infrastructure needed to support access to EHR, engagement, and interoperability if Atrius, *and entities like it*, refused to do so. The answer is clearly yes.

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619 (6th Cir. 2016), is not to the contrary. In that case, the Sixth Circuit, in an unpublished decision, considered whether Medicare Care Organizations "perform a job that the government would have to perform itself if it did not contract with private firms." *Id.* at 623. The court's analysis was not confined to the specific health insurer at issue. *See also id.* at 624 ("If *no* health insurer chose to contract with CMS as a [Medicare Advantage Organization], it is doubtful that the government would get into the business of offering its own [Medicare Advantage] plans."). And that analysis supports

Atrius's position here. The court reasoned that the government need not "offer[ ] its own [Medicare Advantage] plans," as it could instead "fall back on traditional fee-for-service Medicare—which it must provide regardless." *Id.* In this case, however, there is nothing for the federal government to fall back on to facilitate the construction of a nationwide health infrastructure, as required by statute. *See* 42 U.S.C. § 300jj-31(a). Simply put, the federal government must either build the electronic health infrastructure itself or work with other entities, such as Atrius, to do so. It chose the latter.

Third, Plaintiffs assert that Atrius' "voluntar[y] compli[ance] with regulation that assists the government with its goal to make the use of medical records more efficient in the healthcare sector" does not amount to "'acting under' a federal officer." Mot. at 15. This contention does nothing more than repackage Plaintiffs' prior arguments and is equally unavailing. As explained above, removal here is not predicated upon Atrius' mere compliance with federal regulations. Removal is instead rooted in Atrius' commitment to assisting the federal government to achieve its task of enhancing patient engagement with EHR and supporting the creation of infrastructure to promote adoption of nationwide interoperable health information technology. Atrius has done so by submitting hundreds of reports and attestations about its work in carrying out the federal government's directives, by reviewing the government's guidance as to how private actors can best complete the government's tasks, and by receiving payments for its assistance pursuant to agreements with federal agencies.[4] *See* Ex. H ¶¶ 6-9; Ex. I at 82.

[4] For the same reason, Plaintiffs' attempt to analogize Atrius to an airline passenger who packs "liquids, aerosols, and gels in travel-size containers before approaching airport security," or a driver who "buys an electric vehicle" and "receives a tax credit of $7,500," falls flat. Mot. at 10, 16. Unlike these hypotheticals, Atrius and its providers entered into contractual agreements with CMS, requiring them to carry out the government's tasks. Indeed, that contractual arrangement built upon Atrius' preexisting relationship with the federal government, pursuant to which it has submitted reams of information and through which it has obtained guidance on how to help carry out the federal government's directives.

At bottom, the role Atrius has played bears a closer relationship to a contractor with the federal government than it does to an entity merely complying with federal regulations. Crediting Atrius' theory of the case and viewing the facts in the light most favorable to Atrius, as this Court must do, Atrius should be found to be "acting under" a federal official.

That is the conclusion the courts reached in *Doe v. UPMC*, 2020 WL 4381675 (W.D. Pa. Jul. 31, 2020), *appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020) and *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020), *appeal denied*, 2020 WL 7705713 (N.D. Ohio Dec. 14, 2020).[5] As the *UPMC* court found, "participation in implementing a nationwide EHR network shows the relationship between [the defendant medical provider] and DHHS is less like the regulator-regulated relationship" and "more like the government contractor relationship." *UPMC*, 2020 WL 4381675, at *6. So too here; Atrius has participated in numerous federal incentive programs, submitted voluminous reports and attestations about its satisfaction of federal specifications, and hewed to federal government guidance and examples regarding how to best enhance patient engagement and access to portals.

Although other district courts have reached different conclusions, *see* Mot. at 12-13,[6] none of these decisions is controlling, two have been appealed, and one was issued sua sponte without briefing.[7] Moreover, these decisions fail to acknowledge the extent to which the federal

[5] Plaintiffs argue that *UPMC* and *ProMedica* are unpersuasive because these decisions did not adequately consider "whether the government would undertake [maintaining electronic health records] itself if the hospital system did not." Mot. at 14. That argument fails for the same reason it does when applied to Atrius, as discussed above.

[6] *See Doe v. Torrance Mem'l Med. Cntr.*, 2023 WL 2916548 (C.D. Cal. Apr. 12, 2023); *Heard v. Torrance Mem'l Med. Cntr.*, 2023 WL 2475544 (C.D. Cal. Mar. 13, 2023); *Quinto v. The Regence of the Univ. of Cal.*, 2023 WL 1448050, at *3 (N.D. Cal. Feb. 1, 2023); Slip Op., *Doe v. Cape Cod Healthcare, Inc.*, No. 23-cv-10080 (D. Mass. Jan. 25, 2023), ECF No. 10, *appeal filed*, No. 23-1149 (1st Cir. Feb. 2, 2023); *Doe v. BJC Health System*, 2023 WL 369427, at*4 (E.D. Mo. Jan. 10, 2023), *appeal filed*, No. 23-1107 (8th Cir. Jan. 20, 2023).

[7] *Doe v. BJC Health System* is further distinguishable because it applied a "causal" requirement that the First Circuit has rejected. *Compare* 2023 WL 369427, at *5 *with Moore*, 25 4th at 35.

government is obligated to facilitate construction of infrastructure to support interoperable health information technology. *See, e.g.*, *BJC Health System*, 2023 WL 369427, at *4. The HITECH Act specifies that the federal government "*shall . . . invest* in the infrastructure necessary to allow for and promote the electronic exchange and use of health information." 42 U.S.C. § 300jj-31(a) (emphasis added). Likewise, these decisions overlook the contractual obligations entities like Atrius undertook when they agreed to participate in federal incentive programs like the Primary Care First program, which required Atrius to carry out the federal government's tasks. *See, e.g.*, Ex. H ¶ 9; Ex. I at 82. These decisions also ignore the significant guidance the federal government provided to private entities regarding implementation of infrastructure to facilitate interoperable health information technology. *See, e.g.*, *Heard*, 2023 WL 2475544, at *3. As Atrius has shown, federal guidance has been extensive, and federal agencies have provided models for enhancing patient engagement and access. For all these reasons, Atrius respectfully disagrees with Judge Stearns' margin order issued in *Doe v. Cape Cod Healthcare, Inc.*

**B. Atrius' Alleged Conduct "relates to" its Work on Behalf of CMS and ONC**

In addition to showing that it acted under federal official authority, Atrius has adequately shown that the alleged conduct at issue related to the federal authority. This requirement is given a "broad reading." *Moore*, 25 F.4th at 35. "[N]o causal link is required," and the nexus between Atrius' alleged conduct and the asserted federal authority "is not to be understood as anything more than a 'related to' nexus." *Id.* at 35-36. And "the ordinary meaning of the phrase 'relating to' is 'a broad one.'" *Id.* at 35 n.4 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992)). Thus, "there need be only 'a connection or association between the act in question and the federal office.'" *Sawyer*, 860 F.3d at 258 (citation omitted).

Atrius satisfied this standard. Atrius' alleged use of website analytics tools like the Meta Pixel "relates to" the federal authority outlined above, which directed efforts to enhance website

functionality and patient portal access. *See, e.g.*, Ex. H ¶ 10. It is no surprise that CMS used these same technologies to promote user engagement with its website and portal. *See* Ex. K, Medicare Privacy Policy at 4-5 (noting that Medicare.gov employs "third-party web tools" for the purpose of "collect[ing] basic information about visits to Medicare.gov" by "[m]onitoring website stability," "[m]easuring website traffic," "[o]ptimizing website content," "[h]elping make the website more useful to visitors"); *see also UPMC*, 2020 WL 4381675, at *6 (finding that because the complaint "addresse[d] the design and functionality of UPMC's website and patient portal," the plaintiffs' claims "implicat[ed] UPMC's implementation of the Meaningful Use Program, particularly as the implementation involves patient engagement and usership").

Plaintiffs' overly simplistic argument that "nobody told Atrius to install the Meta Pixel" fares no better with respect to this element of the federal officer removal statute. The statute does not require showing "a specific government direction," which "goes well beyond the 'relating to' requirement." *Moore*, 25 F.4th at 36 (quoting *Sawyer*, 860 F.3d at 258).

Plaintiffs further argue that "the only connection between installing Meta Pixel and the Meaningful Use Program, MIPS, or the Primary Care First Programs is that all touch website usage," and such an "expansive and nebulous concept" cannot serve as the required "nexus." Mot. at 17-18. Plaintiffs, however, misread the basis for removal here. Atrius does not claim that anything having to do with its website triggers federal officer removal. Removal in this case is narrowly tailored to specific conduct "related to" driving engagement with the Atrius website and patient access to EHR aimed at carrying out directions issued by the federal government. *See, e.g.*, Ex. H ¶¶ 6-10. That conduct includes deployment of website analytics tools, as exemplified by multiple federal agencies—including CMS—and adding log-in buttons for the patient portal on different pages of the website. Indeed, Plaintiffs cannot impose their view of the "merits" or insist

on an "airtight" connection. *Acker*, 527 U.S. at 432. The Court must credit Atrius' "theory of the case" and determine only whether Atrius "made an adequate threshold showing" of the required nexus. *Id.* Atrius has made that showing.

Plaintiffs next turn to *Rhode Island v. Shell Oil Products Co.*, 979 F.3d 50 (1st Cir. 2020), *vacated and remanded*, 141 S. Ct. 2666 (2021), to challenge the nexus between Atrius' alleged conduct and federal authority. *See* Mot. at 17-18. Plaintiffs' reliance on *Shell Oil* also is misplaced. The analysis in *Shell Oil* turned on contracts the oil company defendants had that required them to sell oil to the federal government. *See* 979 F.3d at 53-54, 60. As the panel observed, there was little, if any, supervision by the federal government over the manner in which oil companies fulfilled their contractual obligations. *Id.* at 59. Here, by comparison, Atrius has shown significant government supervision, which required the filing of hundreds of reports and attestations concerning interoperability and patient access and engagement requirements in order to receive incentive payments. *See* Ex. H ¶¶ 6-8. *Shell Oil* also focused on the fact that the contracts did not "mandate" the marketing and distribution of oil products. 979 F.3d at 60. The opposite is true in this case: the federal government mandated Atrius' compliance with interoperability standards in the Primary Care First contract, *see* Ex. I at 71-72, and the Meaningful Use program likewise contemplated attestations specifying that patients can easily "view, download, and transmit" their medical records, *see* 45 C.F.R. § 170.315(e)(1)(i). More specifically, use of website analytics technologies serves the federal government's directives by enabling Atrius to "'assess [its] website's functionality and traffic.'" Notice ¶ 35 (quoting Compl. ¶ 74). Improving the functionality and accessibility of Atrius' website in turn enables it to "enhance[ ] patient understanding of and engagement with Atrius Health's patient portal[.]" Ex. H ¶ 10.

**C. Atrius Presents a Colorable Federal Defense to Plaintiffs' Allegations**

Atrius also satisfies the final element of federal officer removal—i.e., presenting a "colorable federal defense." *Moore*, 25 F.4th at 37. That defense "need not be 'clearly sustainable.'" *Id.* (citation omitted). Instead, a "federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" *Id.* (citation omitted). At bottom, this element of the federal officer removal statute asks whether "'it *appears* that a Federal question or a claim to a Federal right is raised in the case, and must be decided.'" *Mesa v. California*, 489 U.S. 121, 127 (1989) (citation omitted; emphasis added). The federal defense "need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case." *Sawyer*, 860 F.3d at 257.

Atrius cleared this low bar. As explained in the Notice of Removal, Atrius "intends to argue that the information allegedly disclosed, including information about website interactions and Facebook IDs, was not protected health information under HIPAA." *See* Notice ¶ 40. HIPAA, in turn, "lies at the center of Plaintiffs' claims and whether the information at issue was HIPAA-protected is a question of federal law." *Id.* ¶ 41. This reflects a "duty-based defense." *UPMC*, 2020 WL 4381675, at *6; *see also In re Commonwealth's Mot. to Appoint Couns. Against or Directed to Defender Ass'n of Phila.*, 790 F.3d 457, 473 (3d Cir. 2015) (defense based on "lack" of a federal duty). And "denying alleged violations of a federal duty" constitutes a colorable federal defense. *UPMC*, 2020 WL 4381675, at *6.

In their Motion, Plaintiffs describe the Complaint differently, asserting that HIPAA is beside the point. As they put it, "federal law is immaterial" to each of their causes of action, and "it does not matter one way or the other" that their claims "concern health issues." Mot. at 19-20. That argument is belied by the allegations in the Complaint, which references HIPAA more than fifteen times and is otherwise replete with claims that individuals' sensitive health information was

disclosed and that such information is protected under HIPAA. *See*, *e.g.*, Compl. ¶¶ 35, 38, 42, 44. Indeed, the very first paragraph alleges: "This case arises from Defendant's systematic violation of the medical privacy rights of its patients[.]" *Id.* ¶ 1. In the next paragraph, Plaintiffs claim that Atrius' purported conduct violated the terms of its "Medical Information Privacy Notice," *id.* ¶ 2, a notice that is mandated under HIPAA. *See* 45 C.F.R. § 164.520(b)(1)(ii)(A) (requiring healthcare providers to "provide a notice" that contains, among other things, "[a] description . . . of the types of uses and disclosures that the [healthcare provider] is permitted"). Further, the putative class also is defined with reference to health information: Plaintiffs seek to represent a proposed class defined as Massachusetts residents who were "patients of Atrius Health, Inc." and whose interactions with Atrius' website "caused disclosures of patient personally identifiable information and communications to third parties[.]" Compl. ¶ 154.

Not surprisingly, HIPAA and health issues also form a central part of Plaintiffs' claims. For example, Plaintiffs' breach of implied contract claim turns on the allegation that Atrius' use of the Meta Pixel purportedly disclosed information that HIPAA protects. The Complaint alleges this explicitly: Plaintiffs assert that they "reasonably believed and expected that Defendant's [sic] complied with relevant laws and regulations, *including HIPAA*, and would not allow third parties to collect or exploit their communications with Defendant without their consent." Compl. ¶ 226 (emphasis added); *accord Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017) (dismissing state law claim on the basis that HIPAA did not apply and thus did not obligate the defendant to protect certain data), *aff'd*, 745 F. App'x 8 (9th Cir. 2018). In a similar vein, the Complaint specifically alleges that HIPAA has a direct bearing on Plaintiffs' invasion of privacy claim: "[g]iven the application of HIPAA and state law to Defendant, Plaintiffs and the Members of the Class had a reasonable expectation of privacy in their protected health information." Compl.

¶ 110. Because Plaintiffs allege that a question of federal law is essential to determine the reasonableness of privacy expectations, and because Atrius denies that allegation, Atrius has presented a colorable federal defense based on HIPAA.

In attempting to minimize the relevance of HIPAA to their Massachusetts Wiretap Act claim, Plaintiffs state that the Act is "agnostic about the content of . . . communications." Mot. at 19. If Plaintiffs are correct, and any individual who has data about their interactions with a website sent to a third party can assert a wiretap claim, Plaintiffs run up against another colorable federal defense: the dormant Commerce Clause, which "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019).[8]

A "state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 332 (1989). A state law that imposes a "burden" on interstate commerce that is clearly excessive in relation to the putative local benefits also violates the dormant Commerce Clause. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007). The regulation of internet-based commerce will often implicate the dormant Commerce Clause, as "it is difficult, if not impossible, for a state to regulate internet activities without 'project[ing] its legislation into other States.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (quoting *Healy*, 491 U.S. at 334).

Here, the putative class is defined in relevant part as any present or former Massachusetts residents whose interactions with Atrius' website were transmitted to a third party, irrespective where the putative class members were located at that time. *See* Compl. ¶ 154. This definition implicates and burdens commercial activity that occurs across state lines. And more generally,

---

[8] Atrius previously reserved the right to "identify additional defenses that involve federal law as it continues to review Plaintiffs' Complaint." Notice ¶ 41. Atrius again reserves this right.

Plaintiffs' sweeping interpretation of the Massachusetts statute would create an undue burden on interstate commerce. *See UPMC*, 2020 WL 4381675, at *7 (finding that a defendant had a colorable federal defense to a state wiretap law under the dormant Commerce Clause where the provider's "website and patient portal 'provide[d] an easily accessible, interstate (and international) platform"). That is especially true when considering that the website technologies at issue are, as Plaintiffs allege, "embedded on millions of websites," Compl. ¶ 77, including Mass.gov and House.gov.[9]

## IV. CONCLUSION

Atrius carried out important work to create a patient portal and promote engagement through its website, which was subject to federal guidance and oversight. Atrius has made the necessary showing under the federal officer removal statute and respectfully requests that the Court deny Plaintiffs' Motion to Remand.

Dated: April 27, 2023

Respectfully submitted,

By: /s/ Anthony E. Fuller

Anthony E. Fuller (BBO #663246)
Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-100
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
maria.durant@hoganlovells.com
kayla.ghantous@hoganlovells.com

[9] *See* Mass.gov® Privacy Policy, https://www.mass.gov/privacypolicy (last visited Apr. 27, 2023); U.S. House of Representatives, Website Privacy Policy, https://www.house.gov/privacy-policy (last visited Apr. 27, 2023).

Allison Holt Ryan (*admitted pro hac vice*)
Adam A. Cooke (BBO # 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2023, copies of the foregoing Defendant's Opposition to Plaintiffs' Motion to Remand were served via electronic filing through the Court's ECF system to:

J. Tucker Merrigan
Victoria Santoro Mair
Erin E. McHugh
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
AHMAD, ZAVITSANOS
& MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
KELLER POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Counsel for Plaintiffs John Doe and Jane Doe, Individually and on Behalf of all Others Similarly Situated*

<u>*/s/ Anthony E. Fuller*</u>
Anthony E. Fuller

*Counsel for Defendant*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. 1:22-cv-12196 |

**[PROPOSED] ORDER ON PLAINTIFFS' MOTION TO REMAND**

Upon consideration of Plaintiffs' Motion to Remand ("Motion"), and Defendant's response thereto, it is hereby ORDERED:

The Motion is **DENIED.**

SO ORDERED.

Dated: ____________________

____________________________
Hon. F. Dennis Saylor, IV
Chief Judge, United States District Court

# Exhibit C

An official website of the United States government Here's how you know

Search

CMS.gov
Centers for Medicare & Medicaid Services

Innovation Center Home > Innovation Models > Primary Care First Model Options

# Primary Care First Model Options

Primary Care First is a voluntary alternative five-year payment model that rewards value and quality by offering an innovative payment structure to support the delivery of advanced primary care. In response to input from primary care clinician stakeholders, Primary Care First is based on the principles underlying the existing Comprehensive Primary Care Plus (CPC+) model design: prioritizing the clinician-patient relationship; enhancing care for patients with complex chronic needs, and focusing financial incentives on improved health outcomes.

Primary Care First is offered in 26 regions: Alaska (statewide), Arkansas (statewide), California (statewide), Colorado (statewide), Delaware (statewide), Florida (statewide), Greater Buffalo region (New York), Greater Kansas City region (Kansas and Missouri), Greater Philadelphia region (Pennsylvania), Hawaii (statewide), Louisiana (statewide), Maine (statewide), Massachusetts (statewide), Michigan (statewide), Montana (statewide), Nebraska (statewide), New Hampshire (statewide), New Jersey (statewide), North Dakota (statewide), North Hudson-Capital region (New York), Ohio and Northern Kentucky region (statewide in Ohio and partial state in Kentucky), Oklahoma (statewide), Oregon (statewide), Rhode Island (statewide), Tennessee (statewide), and Virginia (statewide).

Primary Care First includes two cohorts of participating practices: Cohort 1 began in January 2021 and Cohort 2 will start in January 2022.

There are approximately 2,600 practices participating in Primary Care First across both cohorts, and 21 payer partners. To view an interactive map of this Model, visit the Where Innovation is Happening page, and select this model from the drop-down menu on the left side of the page.

Select anywhere on the map below to view the interactive version




Source: Centers for Medicare & Medicaid Services

PCF Model Participants - April 2023 (XLS)
PCF Payer Partners (PDF)

## Highlights

Patients who do not regularly see a primary care doctor are significantly less likely to get regular health screenings, monitoring for emerging health issues, and other preventive health care. These patients may see their health issues worsen, causing them to seek higher cost care, such as hospitalization, trips to the emergency room, or greater need to use specialty care.
The Primary Care First model is designed to help primary care practices better support their patients in managing their health — especially patients with complex, chronic health conditions — and enables primary care doctors to offer a broader range of health care services that meet the needs of their patients. For example, practices may offer around-the-clock access to a clinician and support for health-related social needs.
Strengthening the primary care doctor–patient relationship and enabling patients to receive more care from their primary care doctor can help improve the quality of patient care and reduce avoidable hospitalizations.

## Background

Primary care is central to a high-functioning healthcare system and thus, there is an urgent need to preserve and strengthen primary care as well as a need for support of serious illness care services for Medicare beneficiaries.

Primary Care First addresses these needs through seamless coordinated care and accommodates a continuum of interested practices and clinicians. The model tests whether delivery of advanced primary care can reduce total cost of care, accommodating practices at multiple stages of readiness to assume accountability for patient outcomes. Primary Care First focuses on advanced primary care practices ready to assume financial risk and receive performance-based payments.

Primary Care First prioritizes patients by emphasizing the clinician-patient relationship. The Centers for Medicare & Medicaid Services (CMS) will prioritize patient choice in the assignment of Medicare beneficiaries to Primary Care First practices.

## Model Design

Primary Care First aims to foster practitioner independence by increasing flexibility for primary care, providing participating practitioners with the freedom to innovate their care delivery approach based on their unique patient population and resources. PCF participants may receive additional revenue based on their performance on easily understood, actionable outcomes.

In Primary Care First, CMS uses a focused set of clinical quality and patient experience measures to assess quality of care delivered at the practice. A PCF practice must meet standards that reflect quality care in order to be eligible for a positive performance-based adjustment to their primary care model payments. These measures were selected to be actionable, clinically meaningful, and aligned with CMS's broader quality measurement strategy. Measures include a patient experience of care survey, controlling high blood pressure, diabetes hemoglobin A1c poor control, colorectal cancer screening, and advance care planning. CMS assesses quality of care based on a separate, focused set of measures that are clinically meaningful for patients with complex, chronic needs, and the serious illness population.

To amplify the impact of the model, Primary Care First is designed as a multi-payer model. Primary Care First payer partners commit to aligning with the model's payment methodology, quality measurement strategy, and data sharing approach in order to align resources and incentives across a participating practice's entire patient population. Payer partners include Medicare Advantage plans, commercial health insurers, State Medicaid agencies, and Medicaid managed care plans (to the extent permitted and consistent with the Medicaid managed care plan's contract with the state).

## Model Goals

Primary Care First aims to improve quality, improve patient experience of care, and reduce expenditures. CMS believes that the model will achieve these aims by increasing patient access to advanced primary care services. PCF has elements specifically designed to support practices caring for patients with complex chronic needs or serious illness. The specific approaches to care delivery are determined by practice priorities. Practices are incentivized to deliver patient-centered care that reduces acute hospital utilization or total per capita cost. PCF is oriented around five comprehensive primary care functions:

1. Access and continuity;
2. Care management;
3. Comprehensiveness and coordination;
4. Patient and caregiver engagement; and
5. Planned care and population health.

Primary Care First aims to be transparent, simple, and hold practitioners accountable by:

- Providing model payments to practices through a simple payment structure, including:
  - A flat payment that encourages patient-centered care, and compensates practices for in-person treatment;
  - A population-based payment to provide more flexibility in the provision of patient care along with a flat primary care visit fee; and
  - A performance-based adjustment providing an upside of up to 50% of model payments as well as a small downside (negative 10% of model payments) incentive to reduce costs and improve quality, assessed and paid to practices on a quarterly basis.
- Providing practice participants with performance transparency, through identifiable information on their own and other practice participants' performance to enable and motivate continuous improvement.

Primary Care First provides the tools and incentives for practices to provide comprehensive and continuous care, with a goal of reducing patients' complications and overutilization of higher cost settings, leading to higher quality of care and reduced spending.

## Cohort 2 Eligibility Requirements

Eligible Primary Care First Cohort 2 applicants are primary care practices that:

- Are located in one of the 26 Primary Care First regions.
- Include primary care practitioners (MD, DO, CNS, NP, and PA) certified in internal medicine, general medicine, geriatric medicine, family medicine, and hospice and palliative medicine.
- Provide primary care health services to a minimum of 125 attributed Medicare beneficiaries at a particular location.
- Have primary care services account for at least 50% of the practice's collective billing based on revenue. In the case of a multi-specialty practice, 50% of the practice's eligible primary care practitioners' combined revenue must come from primary care services.
- Have experience with value-based payment arrangements or payments based on cost, quality, and/or utilization performance such as shared savings, performance-based incentive payments, and episode-based payments, and/or alternative to fee-for-service payments such as full or partial capitation.
- Adopt and maintain, at a minimum, health IT meeting the definition of CEHRT at 42 CFR 414.1305 and the certification criteria found at 45 CFR 170.315(c)(1)-(3) for electronic clinical quality measure (eCQM) reporting, using the most recent update available on January 1 of the Measurement Period, for the eCQMs in the Primary Care First measure set; support data exchange with other providers and health systems via Application Programming Interface (API); and connect to their regional health information exchange (HIE).
- Attest via questions in the Practice Application to a limited set of advanced primary care delivery capabilities, such as 24/7 access to a practitioner or nurse call line and empanelment of patients to a practitioner or care team.
- Are able to meet the requirements of the Primary Care First Participation Agreement.

Eligible practitioners are those in internal medicine, general medicine, geriatric medicine, family medicine, and/or hospice and palliative medicine. Each practice applicant must identify each eligible practitioner by National Provider Identifier (NPI) in its application. CMS will conduct a program integrity screening on the practice and the eligible practitioners that it intends to include in PCF. CMS may reject an application on the basis of the results of a program integrity screening. CMS notes that PCF Cohort 2 participants must meet the eligibility requirements as described in the PCF model participation agreements.

## Timelines

The practice solicitation period for PCF Cohort 2 opened on March 16, 2021 and closed on May 21, 2021. The payer solicitation period for PCF Cohort 2 began on March 16, 2021, and closed on June 18, 2021.

Practice and payer selections will take place in Summer or Fall 2021. Cohort 2 will begin participation in PCF in January 2022. CMS plans to focus on onboarding participating practices and payer partners to the model in Fall and Winter 2021.

Stay up to date on the latest Primary Care First Model Options updates by subscribing to the PCF Model Options listserv.

## Information for Interested Stakeholders

For questions about the model, please email PCF@telligen.com.

## Information for Cohort 2 Applicants (2022 Starters)

- PCF Cohort 2 Application FAQ Supplement (PDF)
- Practice and Payer Application Portal
- Request for Applications (RFA) (PDF)
- Application Portal Access Instructions (PDF)
- Fact Sheet (PDF)
- Payer Rubric (PDF)
- Payer Solicitation Addendum (XLS)
- Get Started Guide (PDF)
- PCF Frequently Asked Questions (FAQs) (PDF)

### Webinars

- "Intro to PCF" | Wednesday, March 24, 2021 at 2:00PM EDT
- "Become a PCF Payer Partner" | Tuesday, March 30, 2021 at 2:00PM EDT
- "Ready, Set, Apply" | Wednesday, March 31, 2021 at 3:00PM EDT
- Office Hour: Primary Care First (PCF) Practices - May 5, 2021 from 2-3:00 pm EDT

### Evaluation

### Latest Evaluation Report

- Two Pager: At-A-Glance Report (PDF)
  - PCF First Evaluation Report (PDF)

## Additional Information

- PCF 2021 Quality and Utilization Performance Results (XLSX)
- PCF Practice Participant List
- Participating Regions and Payer Partners (PDF)
- Payment and Attribution Methodologies PY 2023 (PDF) | Payment and Attribution Methodologies PY 2022 (PDF) | Payment and Attribution Methodologies PY 2021 (PDF)
- PCF Archived Materials (includes Cohort 1)

Related Items

| Primary Care Transformation | Primary Care Transformation | Primary Care Transformation | Primary Care Transformation | Primary Care |
|---|---|---|---|---|
| Comprehensive Primary Care Initiative | Comprehensive Primary Care Plus | FQHC Advanced Primary Care Practice Demonstration | Frontier Extended Stay Clinic Demonstration | Global and F Direct Contr Model |
| Stage:No Longer Active<br>Learn More | Stage:No Longer Active<br>Learn More | Stage:No Longer Active<br>Learn More | Stage:No Longer Active<br>Learn More | Stage:Ongoi<br>Learn More |

*Last updated on: 04/11/2023*

# Exhibit D

Case 1:22-cv-12196-FDS Document 28-3 Filed 04/27/23 Page 2 of 15

The Office of the National Coordinator for
Health Information Technology

ONC Data Brief
No. 57 | September 2021

# Individuals' Access and Use of Patient Portals and Smartphone Health Apps, 2020

Christian Johnson, MPH, Chelsea Richwine, Ph.D., &
Vaishali Patel, Ph.D. MPH

In May 2020, the Office of the National Coordinator for Health IT (ONC) finalized federal rulemaking that aimed to increase the access, exchange, and use of electronic health information by patients and their caregivers (1). This rule implements key provisions of the 21st Century Cures Act that require certain certified health IT developers to adopt secure, standards-based application programming interfaces (APIs) that enable individuals to access and manage their health records using a smartphone health app of their choice (2). This brief analyzes data from the Health Information National Trends Survey (HINTS), a nationally representative survey of U.S. adults which was fielded from January 2020 through April 2020. These findings largely reflect pre-pandemic rates of individuals being offered and subsequently using their online medical record, also known as a patient portal. The brief also examines individuals' use of smartphone health apps to manage health information, and the role of provider encouragement in prompting individuals to use these tools.

## HIGHLIGHTS

- About six in 10 individuals nationwide were offered access to their patient portal and nearly 40 percent accessed their record at least once in 2020.
- Nearly four in 10 patient portal users accessed their portal through a smartphone health app in 2020.
- Individuals encouraged by their health care provider to use their patient portal accessed and used their portal at higher rates compared to those not encouraged.
- About a third of patient portal users downloaded their online medical records in 2020 – this proportion has nearly doubled since 2017.

## About six in 10 individuals nationwide were offered a patient portal in 2020 – this represents a 17 percentage point increase since 2014.

### FINDINGS

- ★ Nearly 40 percent of individuals nationwide accessed a patient portal in 2020 – this represents a 13 percentage point increase since 2014.
- ★ The proportion of individuals who were offered and accessed a patient portal did not increase between 2019 and 2020.




**Figure 1: Percent of individuals nationwide who were offered and accessed a patient portal, 2014-2020.**

Source: HINTS 4 Cycle 4 (2014); HINTS 5, Cycles 1-4 (2017-2020)
Note: *Significantly different from previous year (p<0.05). Denominator represents all individuals. Percentage reflects weighted national estimate for individuals offered a patient portal by a health care provider or insurer. The HINTS survey was not fielded in 2015 and 2016.

## Among individuals offered a patient portal, more than six in 10 accessed it at least once in 2020 – this represents an 11 percentage point increase from 2017.

### FINDINGS

- ★ Among individuals who were offered access to their patient portal, about three in 10 accessed their portal one to two times in 2020.
- ★ Among individuals offered access to their patient portal, about one in five accessed their portal six or more times in 2020.
- ★ The frequency of individuals accessing their patient portal increased in 2019, but did not change in 2020.




**Figure 2: Frequency of individuals accessing their patient portal within the past year, 2017-2020.**

Source: HINTS 5, Cycles 1-4 (2017-2020)
Notes: *Significantly different from previous year (p<0.05). Numbers may not add up due to rounding. Denominator represents individuals who were offered access to their patient portal by a health care provider or insurer for each year.

## Nearly four in 10 patient portal users accessed their health information using a smartphone health app in 2020.

### FINDINGS

- ★ About one in five patient portal users (22%) accessed their health information using both a smartphone health app and a computer in 2020.
- ★ Patient portal users most commonly accessed their health information through a computer (83%) – six in 10 portal users accessed their health information using only this method.




**Figure 3: Methods individuals use to access their patient portal, 2020**

Source: HINTS 5, Cycle 4 (2020)
Notes: Denominator represents individuals who accessed their patient portal at least once within the past year. Individuals who access their portal at least once in the past year are referred to as "patient portal users."

## Patient portal users who access their health information using multiple methods access their portal more frequently than those who use only one method.

### FINDINGS

- ★ Among patient portal users who accessed their portal 6 or more times in 2020, 45 percent used both a computer and a smartphone health app compared to 22 percent who used only a computer and 28 percent who used only a smartphone health app.
- ★ Among patient portal users who accessed their portal 1 to 2 times in 2020, 26 percent used both a computer and a smartphone health app compared to about four in 10 who used a computer or smartphone only.
- ★ Among patient portal users who accessed their portal 3 to 5 times in 2020, there was no significant difference in the methods individuals used to access their portal.




**Figure 4: Methods used by patient portal users in the past year by frequency of access, 2020.**

Source: HINTS 5, Cycles 1-4 (2017-2020)
Notes: *Significantly different from reference group within each frequency category (p<0.05). Numbers may not add up due to rounding. Denominator represents individuals who accessed their patient portal at least once within the past year (referred to as "patient portal users").

## Individuals' use of patient portals to communicate and share health information has increased since 2017.

### FINDINGS

- ★ About six in 10 patient portal users exchanged secure messages with their health care provider in 2020 – this represents a 10 percentage point increase from 2017.
- ★ About a quarter of patient portal users added health information to their portal to share with their health care provider in 2019 – this represents a six percentage point increase from 2017.
- ★ One in 10 patient portal users requested a correction of inaccurate information posted in their portal in 2019.
- ★ More than half of patient portal users viewed clinical notes written by their health care provider in 2020.




**Figure 5: Percent of patient portal users who performed various functionalities in the past year, 2017-2020.**

Source: HINTS 5, Cycles 1-4 (2017-2020)
Notes: *Significantly different from 2017 (p<0.05). Denominator represents individuals who accessed their portal at least once within the last year. Data for "Request correction of inaccurate information" and "Add health information" were not collected in 2020. Individuals who access their portal at least once in the past year are referred to as "patient portal users".

## About a third of patient portal users downloaded their online medical record in 2020 – this proportion has nearly doubled since 2017.

### FINDINGS

- ★ Nearly nine in 10 patient portal users viewed test results in their portal in 2020 – this proportion has remained high since 2017.
- ★ About one in five patient portal users transmitted their health data to an outside party (i.e., another health care provider, caregiver, or app/service) in 2020 – this represents a 7 percentage point increase since 2017.
- ★ Few portal users transmitted their health data to a service or app, however, there has been a significant increase in the transmission of data to another health care provider – a 7 percentage point increase from 2017

| View, Download or Transmit | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| View test results | 85% | NA | 86% | 86% |
| Download online medical record | 17% | 26%* | 27%* | 32%* |
| Transmitted data to at least one outside party | 14% | 17% | 19%* | 21%* |
| Transmit to another health care provider | 10% | 14% | 15%* | 17%* |
| Transmit to caregiver | 4% | 4% | 6% | 5% |
| Transmit to service or app | 3% | 3% | 5% | 5% |

**Table 1: Percent of patient portal users that viewed, downloaded, or transmitted data from their portal in the past year, 2017-2020.**

Source: HINTS 5, Cycles 1-4 (2017-2020)
Notes: *Significantly different from 2017 (p<0.05). Denominator represents individuals who accessed their patient portal at least once within the last year. Data for "View Test Results" was not collected in 2018. Individuals who access their portal at least once in the past year are referred to as "patient portal users".

## The top two reasons for not accessing a patient portal have remained consistent since 2017, with individuals citing their preference to speak to a health care provider directly and perceived lack of need.

### FINDINGS

- ★ About seven in 10 individuals cited their preference to speak with their health care provider directly as a reason for not using their patient portal within the past year.
- ★ About one-quarter of individuals who did not view their patient portal within the past year reported concerns about privacy and security.
- ★ About 20 percent of individuals indicated the reason they did not access their patient portal was because they were uncomfortable with computers.
- ★ About one-quarter cited difficulties logging in as a reason for not accessing their portal

| Reason for Not Using Online Record | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Prefer to speak to health care provider directly | 76% | 73% | 75% | 69% |
| Do not have a way to access the website | 20% | 10%* | 15%* | 13% |
| Did not have a need to use your online medical record | 59% | 65% | 64% | 63% |
| Concerned about the privacy/security of online medical record | 25% | 14%* | 20%* | 24% |
| No longer have an online medical record | 19% | 13% | 14% | 13% |
| Difficult to login | - | - | 22% | 24% |
| Uncomfortable with computers | - | - | 22% | 20% |
| Have more than one online medical record | - | - | 12% | 8%* |

**Table 2: Reasons for not accessing a patient portal among individuals who were offered but did not use their portal within the past year, 2017-2020.**

Source: HINTS 5, Cycles 1-4 (2017-2020)
Notes: *Significantly different from previous year (p<0.05). Denominator represents individuals who were offered a patient portal but did not access their portal within the past year.

## Individuals encouraged by their health care provider access and use their patient portal at higher rates compared to those not encouraged.

### FINDINGS

- ★ Among individuals who were offered a patient portal, about eight in 10 were encouraged by their health care provider to use it.
- ★ Seventy-one percent of individuals encouraged by their health care provider accessed their portal at least once in the past year compared to 48 percent who were not encouraged.
- ★ Individuals encouraged by their health care provider to use their patient portal viewed clinical notes and sent secure messages with their provider at higher rates compared to those not encouraged.




**Figure 6: Percentage of individuals encouraged by their health care provider to use their patient portal, 2020.**




**Figure 7: Rate of individuals accessing and using their patient portal by whether their health care provider encouraged them, 2020.**

Source: HINTS 5, Cycle 4 (2020)
Notes: Analyses were limited to individuals who were offered access to a patient portal by a health care provider. ^Denominator for specific uses of a patient portal is among those who accessed their portal at least once in the past year. *Significantly different from "Not Encouraged by a Health Care Provider" group ($p<0.05$).

## Eighty-five percent of individuals who have a mobile health app reported using it at least once in the past year.

### FINDINGS

- ★ Nearly nine in 10 individuals nationwide (89%) reported owning a tablet or smartphone in 2020.
- ★ Half of individuals nationwide reported having a mobile health app in 2020.




**Figure 8: Percent of individuals who reported owning and using a mobile health app in the past year, 2020.**

Source: HINTS 5, Cycle 4 (2020)
Notes: Figure on the left represents all individuals. Figure on the right represents those who own a mobile health app.

## About seven in 10 individuals with a mobile health app used it to track progress on a health-related goal in 2020.

### FINDINGS

- ★ More than half of individuals used their mobile health app to facilitate discussions with their health care provider in 2020 – this represents an 8 percentage point increase from 2017.
- ★ The proportion of individuals that use their health app to make decisions about how to treat an illness or condition has remained unchanged since 2017.




**Figure 9: Percent of individuals who reported using their health and wellness app to help discuss, track, and/or make decisions regarding their health, 2017-2020.**

Source: HINTS 5, Cycles 1-4 (2017-2020)
Notes: *Significantly different from 2017 (p<0.05). Denominator is among those with a mobile health app on their tablet or smartphone.

## Summary

Individuals' rates of being offered and subsequently accessing their patient portal increased significantly between 2018 and 2019, but did not change in 2020. About 6 in 10 individuals nationwide were offered access to their patient portal by a health care provider or insurer, and nearly 4 in 10 individuals (38 percent) reported that they accessed their portal at least once in 2020.

Consistent with past trends, individuals who did not access their patient portal most commonly cited their preference to communicate directly with their health care provider and lack of need as reasons for not accessing their record (3-5). However, individuals who were encouraged by their health care provider to use their patient portal reported significantly higher rates of accessing their portal, viewing clinical notes, and exchanging secure messages with their provider compared to those who were not encouraged (5-6). This illustrates the influence providers have with respect to educating patients about the benefits of having access and the value proposition for doing so. ONC's Patient Engagement Playbook and Guide to Getting and Using your Health Record are resources for providers and patients, respectively, to learn about the benefits of patients having access to their health records and offer tips for how to request access.

Patient portals enabled individuals to electronically communicate with their providers, view their clinical notes, and electronically share their health information with a health care provider. In 2020, about 6 in 10 patient portal users reported exchanging secure messages with a health care provider through their portal. Half of the portal users reported viewing clinical notes written by a health care provider. The share of individuals who electronically shared their health information with a health care provider increased by seven percentage points (from 10 percent to 17 percent) from 2017. However, rates of individuals electronically transmitting their data to an app or service remain low (5 percent).

Various methods for accessing patient portals have emerged in recent years. While the most common method of accessing a patient portal was by computer (78 percent), nearly 4 in 10 patient portal users accessed their portal using a smartphone health app in 2020. Additionally, portal users who accessed their health information using both a computer and a smartphone health app (22 percent) reported accessing their portal more frequently than those who only used one method. This may indicate that the increased convenience of having access to electronic health information on multiple devices leads to greater use.

Americans also reported using mobile health apps more broadly to manage their health and make decisions about their care. Half of the individuals nationwide had a mobile health app on their tablet or smartphone, and more than 80 percent said they used the app within the past year. In 2020, about 7 in 10 individuals with a health app reported they used it to track progress on a health-related goal, and about half reported that they used their app to facilitate discussions with their health care provider and to make treatment decisions.

Making it easier for individuals to access and use their electronic health information is a national priority. The ONC Cures Act Final Rule seeks to make health information from electronic health records more easily accessible to patients through secure, standards-based APIs that can be leveraged to create applications that can help patients manage their health information. Ultimately, ONC hopes these provisions will enable patients to more easily access and use their health information across patient portals offered by different health care providers. Examining how these trends evolve over time will provide insight regarding the extent to which this vision is realized.

## Data Source and Methods

Data are from the National Cancer Institute's (NCI) Health Information National Trends Survey (HINTS). Since 2003, NCI has sponsored HINTS to assess the impacts of health communication, specifically measuring: how people access and use health information, how people use information technology to manage their health and health information, and the degree to which people are engaged in health behaviors.

ONC staff, working with the National Partnership of Women and Families and NCI, developed the survey content related to health IT use for HINTS 5. HINTS 5, Cycle 4 (2020) data were collected from the end of February through the middle of June 2020. The sample design for HINTS 5, Cycle 4 (2020) consisted of a single-mode mail survey, using the Next Birthday Method for respondent selection.

The sample design for the HINTS 5, Cycle 4 (2020) survey consisted of two stages. In the first stage, a stratified sample of addresses was selected from a file of residential addresses. In the second stage, one adult was selected within each sampled household. The sampling frame consisted of a database of addresses used by Marketing Systems Group (MSG) to provide a random sample of addresses. Complete data were collected from 3,865 respondents. The final response rate was 37%. Results were weighted to account for non-response and generate national estimates.

The analyses conducted in this data brief primarily focused on questions from sections B and D. The questions asked in the HINTS 5, Cycle 4 (2020) survey can be found at https://hints.cancer.gov/docs/Instruments/HINTS5_Cycle4_AnnotatedInstrumentEnglish.pdf.

## References

1) Office of the National Coordinator for Health IT. ONC Cures Act Final Rule. https://www.healthit.gov/sites/default/files/nprm/ONCCuresNPRMMoC.pdf
2) 21st Century Cures Act, section 4006. https://www.gpo.gov/fdsys/pkg/PLAW-114publ255/pdf/PLAW-114publ255.pdf
3) Johnson C, Krakow M, Patel V. (January 2019). Trends in Individuals' Access and Use of Online Medical Records and Technology for Health Needs: 2017-2018. ONC Data Brief, no.50. Office of the National Coordinator for Health Information Technology: Washington DC.
4) Patel V & Johnson C. (April 2018). Individuals' use of online medical records and technology for health needs. ONC Data Brief, no.40. Office of the National Coordinator for Health Information Technology: Washington DC.
5) Patel V & Johnson C. (May 2019). Trends in Individuals' Access and Use of Online Medical Records and Technology for Health Needs: 2017-2018. ONC Data Brief, no.48 Office of the National Coordinator for Health Information Technology: Washington DC.
6) Shimoga SV & Lu YZ. (March 2019). Role of provider encouragement on patient engagement via online portals. Journal of the American Medical Informatics Association, Volume 26, Issue 10.

## References

The authors are with the Office of Technology, within the Office of the National Coordinator for Health Information Technology. The data brief was drafted under the direction of Mera Choi, Director of Technical Strategy and Analysis (TSA), and Talisha Searcy, Deputy Director of TSA.

## Suggested Citation

Johnson C, Richwine C, & Patel V. (September 2021). Individuals' Access and Use of Patient Portals and Smartphone Health Apps, 2020. *ONC Data Brief, no.57.* Office of the National Coordinator for Health Information Technology: Washington DC.

# Exhibit E

HealthIT.gov
National Learning Consortium
Advancing America's Health Care

**FACT SHEET**

**May 2013**

# How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements

You will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively in your practice operations. In addition, stage 3 requirements may require that you use a patient portal to attest successfully.

Just making a portal available to patients will not ensure that they will use it. The portal must be engaging and user-friendly, and must support patient-centered outcomes. The portal also must be integrated into clinical encounters so the care team uses it to convey information, communicate with patients, and support self-care and decision-making as indicated.

Practices have used their portals to successfully serve a wide range of patients, including those who are older, have lower incomes, or are chronically ill. Patients are likely to use a portal when it is recommended by their providers and has functionality that supports patient activation. Portal training and technical support also will help patients to make the most of its tools and services.

## Actions to Take to Make Sure Your Portal Engages Patients

You should understand the elements of an effective portal program and apply them to the specific needs of your practice. As described in more detail in this document, recommended actions include:

1. Learn the benefits of patient portals for patients and providers.
2. Understand how a patient portal helps achieve meaningful use requirements.
3. Implement proactive, engaging portal features.
4. Implement the portal with a systematic process.
5. Actively promote and facilitate portal use.

## Learn the Benefits of Patient Portals

Fears and other negative attitudes about patient portals are often dispelled when providers gain experience with a portal and see its benefits for their patients and their practice. Providers who have used portals successfully recognize positive effects, including:

- Improved patient activation
- More efficient and effective communication
- Better and more timely self-care among patients
- Ability to focus better on high-priority patients
- Improved patient satisfaction

*CONSIDER: Besides learning the general benefits of patient portals, make sure you and your staff know about all the features in the portal you offer patients so you can explain them.*

## Understand the Link between your Patient Portal and Meaningful Use

Effective implementation of a patient portal will help you attest to several patient and family engagement requirements of stage 2 meaningful use:

- Clinical summaries
- Patient-specific education resources
- Secure electronic messaging
- Timely access to health information
- Reminders for preventive and follow-up care

The patient portal also has great potential for meeting emerging requirements in stage 3 meaningful use that are expected to focus on self-management and shared management of health care. A patient portal can be used to assist in self-management tasks, through tools for interactive

monitoring and coaching. A portal also can enable patients to collect data about their health and treatment, and to share that data with their providers.

## Implement Portal Features that Support Engagement

A patient portal that mostly provides administrative functions, such as scheduling appointments and getting lab results, will not be as interesting or useful to patients. Patients will be more likely to use a portal that is designed and configured to address their personal interests and needs.

*CONSIDER: Patients will have different needs and interests regarding a portal tool, depending on their health conditions and level of activation.*

A portal that includes interactive and personalized tools and information will be more relevant to patients' needs. Patients are more likely to register and continue using a portal that has a problem-solving orientation, interactive decision tools, and personalized messages and tools.

## Implement Your Portal Systematically

You should take into account your practice's resources, culture, and priorities when planning the launch and implementation process. This will help build confidence and acceptance of the portal among clinicians, staff, and patients while minimizing disruption in the practice. Federal regional extension centers (RECs) have experience with portal implementation. Ask your local REC to help you plan and launch your patient portal efforts.

Key questions to answer during planning include:

- What are the goals for the portal in terms of potential benefits for patients and the practice?
- Which features and services should be offered?
- Should they be offered all at once, or phased in?
- Will the portal be open initially to all interested patients, or to a select group during early deployment?
- How will you handle marketing, enrollment, training, and support for patients' use of the portal?

When rolling out your patient portal, you can use several strategies:

- Provider-Controlled
  - Begin with a smaller number of patients and interested providers.
  - Achieve a base of experience and comfort with the patient portal before expanding.
- Team-Focused
  - Include patients on the rollout team.
  - Allow several months to assess how to integrate the portal.
  - Gather patient and provider feedback to plan expanded implementation.
- Efficiency-Driven
  - Make enrollment open to all patients.
  - Have staff manage portal workflow and communication before engaging providers directly.
  - Aim to establish efficient workflows and policies, and avoid burdening providers with troubleshooting during initial rollout.

## Promote and Facilitate Portal Use

The whole staff should be involved in promoting the patient portal. The front office can display signs or posters, staff can distribute information brochures, and providers can include standard talking points to introduce the portal during patient visits.

*CONSIDER:Patients are more likely to adopt and use a patient portal if their providers recommend and support portal use.*

To simplify the portal registration process, have staff assist patients with the process, and consider providing a registration kiosk in the office. Staff can educate patients about how to use the portal's features, and can offer guidance about the kinds of communication that are appropriate between providers and patients.

# Exhibit F

# Privacy Policy

cms.gov/privacy

Types of information we collect
How CMS uses information collected on CMS.gov
How CMS uses cookies & other technologies on CMS.gov
Your choices about tracking & data collection on CMS.gov
How CMS uses third-party websites & applications with CMS.gov
How CMS protects your personal information
How long CMS keeps data & how it's accessed
Children & privacy on CMS.gov
Links to other sites
Additional privacy information

## CMS.gov Privacy Policy

Protecting your privacy is very important to us. This privacy policy describes what information we collect, why we collect it, and what we do with it. This privacy notice covers CMS.gov, marketplace.cms.gov, innovation.cms.gov, partnershipforpatients.cms.gov, and hfpp.cms.gov. These websites are referred to as "CMS.gov" throughout the rest of this notice and are maintained and operated by the Centers for Medicare & Medicaid Services (CMS). The privacy notice for other CMS websites not listed above is available at https://www.cms.gov/About-CMS/Agency-Information/Aboutwebsite/Privacy-Policy.html.

CMS.gov doesn't collect name, contact information, or other similar information through these websites unless you choose to provide it. We do collect other, limited, non-personally identifiable information automatically from visitors who read, browse, and/or download information from our website. We do this so we can understand how the website is being used and how we can make it more helpful. For more information, see Types of information we collect.

Personally identifiable information (PII), defined by the Office of Management and Budget (OMB), refers to information that can be used to distinguish or trace an individual's identity, like their name, Medicare Number, biometric records, etc. alone, or when combined with other personal or identifying information which is linked or linkable to a specific individual, like date and place of birth, mother's maiden name, etc. Medicare Fee-for-Service eligibility and enrollment information and claims data are considered protected health information (PHI) under the Health Insurance Portability and Accountability Act (1996) (HIPAA) regulations.

We don't sell any information you provide when you visit CMS.gov. For information on how we share information, see How CMS uses information collected on CMS.gov.

## Types of information we collect

### Information which is automatically collected:

#### When you browse:

Certain information about your visit can be collected when you browse websites. When you browse CMS.gov, we, and in some cases, our third-party service providers, can collect the following types of information about your visit, including:

- Domain from which you accessed the internet (like Verizon.com if you're using a Verizon account).
- IP address (an IP or internet protocol address is a number that's automatically assigned to a device connected to the internet).
- Approximate geographic location based on the IP address of the user's local system.
- Operating system for the device that you're using and information about the browser you used when visiting the site. The operating system is software that directs a computer's basic functions, like executing programs and managing storage.
- Date and time of your visit.
- Pages you visited.
- Address of the website that connected you to CMS.gov (like Google.com or Bing.com).
- Device type (like desktop computer, tablet, or type of mobile device).
- Screen resolution.
- Browser language.
- Geographic location.
- Time spent on page.
- Scroll depth (measures how much of a web page was viewed).
- Your actions on CMS.gov (like clicking a button).

For more information, see How CMS uses third-party websites & applications with CMS.gov.

We use this information to:

- Measure the number of visitors to CMS.gov.
- Help make our website more useful for visitors.
- Improve our public education and outreach through digital advertising.

Also, this information is sometimes used to personalize the content we show you on third-party sites. For more information on our practices, see How CMS uses third-party websites & applications with CMS.gov.

## Information you may provide:

### When you request information:

We collect information, including your email address, to deliver alerts or eNewsletters. We use this information to complete the subscription process and provide you with information. You can opt out of these communications at any time by editing your subscription preferences.

## How CMS uses information collected on CMS.gov

### Sending you CMS messages:

We use the email address you provide us to send emails related to CMS.

### Conducting surveys to improve services:

We use online surveys to collect opinions and feedback. You don't have to answer these questions. If you do answer these questions, don't include any PII/PHI in your answers. We analyze and use the information from these surveys to improve the CMS.gov website. The information is available only to CMS managers, members of the CMS communications and web teams, and other designated federal staff and contractors who require this information to perform their duties.

### Using third-party tools for website analytics

We use a variety of third-party web tools for web analytics. We don't collect any PII/PHI with these tools. We use these tools to collect basic information about visits to CMS.gov. This information is then used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Helping make the website more useful to visitors

CMS staff analyzes the data collected from these tools. Reports are available only to CMS managers, teams who implement programs represented on CMS.gov, members of the CMS communications and web teams, and other designated federal staff and contractors who need this information to perform their jobs.

### Using third-party tools for outreach and education through digital advertising:

We use third-party web services to conduct outreach and education through the use of digital advertising for CMS.gov. These third-party services may collect information through the use of web beacons (also called pixels) that are located on our pages. A web beacon is a see-through graphic image (usually 1 pixel x 1 pixel) that's placed on a web page and, in combination with a cookie, allows us to collect information regarding the use of the web page that contains the web beacon.

We use web beacons to tell when a user is redirected to CMS.gov by clicking or otherwise interacting with a CMS advertisement that we ran on another website. This is known as "click tracking" or "conversion tracking," and we use it to better target CMS advertisements (known as "retargeting") to inform consumers about the services available through CMS.gov. For more information on how these tools work, see How CMS uses third-party websites & applications with CMS.gov.

We also use third-party tools to help deliver advertising. Vendors that operate the third-party tools may also gather information about your visits to third-party sites outside of CMS.gov. While we don't track your internet activity outside of CMS.gov, our vendors may use information collected automatically by visiting CMS.gov, and combine it with data they collect elsewhere for targeted advertising purposes. You can opt out of this type of data collection via Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on CMS.gov.

The outreach and education analytics tools provide reports which aggregate data like the number of clicks on advertisements. The reports are available only to CMS managers, teams who implement programs represented on CMS.gov, members of the CMS.gov communications and web teams, and other designated federal staff and contractors who need this information to perform their duties.

## How CMS uses cookies & other technologies on CMS.gov

The Office of Management and Budget Memo M-10-22, Guidance for Online Use of Web Measurement and Customization Technologies, allows federal agencies to use session and persistent cookies to improve the delivery of services.

When you visit a website, its server may generate a piece of text known as a "cookie" to place on your device. The cookie, which is unique to your browser, allows the server to "remember" specific information about your visit while you're connected. The cookie makes it easier for you to use the dynamic features of web pages. Information that you enter into CMS.gov isn't associated with cookies on CMS.gov. Depending on the third-party tool's business practices, privacy policies, terms of service, and/or the privacy settings you selected, information you've provided to third parties could be used to identify you when you visit CMS.gov. These third parties don't/won't share your identity with CMS or the Department of Health and Human Services (HHS).

There are 2 types of cookies - single session (temporary) and multi-session (persistent). Single session cookies last only as long as your internet browser is open. Once you close your browser, the session cookie disappears. Persistent cookies are stored on your device for longer periods. Both types of cookies create an ID that's unique to your device.

- **Session cookies**: We use session cookies for technical purposes, like to allow better navigation through our website. These cookies let our server know that you're continuing a visit to our website. The OMB Memo M-10-22 Guidance defines our use of session cookies as "Usage Tier 1—Single Session." The policy says, "This tier encompasses any use of single session web measurement and customization technologies."
- **Persistent cookies**: We use persistent cookies to understand the differences between new and returning visitors to CMS.gov. Persistent cookies remain on your device between visits to our website until they expire or are removed by the user. The OMB Memorandum M-10-22 Guidance defines our use of persistent cookies as "Usage Tier 2 —Multi-session without personally identifiable information." The policy says, "This tier encompasses any use of multi-session web measurement and customization technologies when no PII is collected." We don't use persistent cookies to collect PII. We don't identify a user by using cookies.

CMS also uses these technologies on CMS.gov:

- **Persistent cookies for digital advertising**: Similar to persistent cookies identified above, CMS uses persistent cookies for outreach through digital advertising. These cookies can also be created on third-party websites and remain on your device between visits to our website until they expire or you remove them. Consistent with OMB guidance for "Usage Tier 2", we don't use persistent cookies for outreach to collect PII. CMS doesn't identify a user by using such technologies.
- **Web beacons for digital advertising (also called pixels and/or tracking tags)**: See-through images placed on certain pages of CMS.gov are typically used in conjunction with cookies and aren't stored on your device. When you access these pages, web beacons generate a notice of your visit. For information on how we use web beacons, see <u>How CMS uses third-party websites & applications with CMS.gov</u>.
- **Website log files**: These are used as an analysis tool and to tell how visitors use CMS.gov, how often they return, and how they navigate through the website.
- **Flash**: Flash is used to assess the performance of the site and as a player for selected videos depending on the browser a device is using.
- **Local Storage Objects**: We use Flash Local Storage Objects ("LSOs") to store your preferences and to personalize your visit.

## Your choices about tracking & data collection on CMS.gov

CMS.gov offers a Privacy Manager which gives you control over what tracking and data collection takes place during your visit. Third-party tools are enabled by default to provide a quality consumer experience.

The Privacy Manager provides you with the choice to opt in or to opt out of the different categories of third-party tools used by CMS.gov: Advertising, Analytics, or Social Media. The Privacy Manager prevents cookies, web beacons, and Local Storage Objects from being placed on your device. The Privacy Manager also prevents third-party tools from loading regardless of your cookie settings, which provides you with an additional layer of privacy that prevents the tool from loading at all. Because the Privacy Manager creates a cookie in your browser, the opt in and opt out choices you make through the Privacy Manager will only be effective on the device and browser you used to make your choices, and your choices will expire when the cookie expires. Once the cookie is created, the Privacy Manager will retain your settings for 3 years from the date of your most recent visit. You may revisit the Privacy Manager to change or renew your choices at any time.

Modify privacy options

If you disable cookies in your browser, our Privacy Manager won't be able to store your preferences and won't function properly. If you don't wish to use our Privacy Manager to opt out of the tools used by CMS.gov, you can opt out of tools individually, or via the Digital Advertising Alliance ("DAA") AdChoices icon, discussed in the next subsection.

If you opt out of the tools used by CMS.gov via the Privacy Manager or by opting out of the tools directly, you'll still have access to information and resources at CMS.gov.

**AdChoices**: We include the AdChoices icon on all digital advertising that uses "conversion tracking" or "retargeting." To learn about conversion tracking, targeted advertising, and retargeting, see How CMS uses third-party websites & applications with CMS.gov. The AdChoices icon is usually at or near the corner of digital ads. When you click on the AdChoices icon, it will provide information on what company served the ad and information on how to opt out. Learn more about AdChoices.

**Do Not Track**: We automatically observe the "Do Not Track" browser setting for digital advertising that uses "conversion tracking" or "retargeting." If "Do Not Track" is set before a device visits CMS.gov, third-party conversion tracking and retargeting tools won't load on the website. To learn more about conversion tracking and retargeting, see How CMS uses third-party websites & applications with CMS.gov. Learn more about Do Not Track and how to set the Do Not Track setting in your browser.

## How CMS uses third-party websites & applications with CMS.gov

CMS.gov uses a variety of technologies and social media services to communicate and interact with the public. These third-party websites and applications include popular social networking and media websites, open source software communities, and more.

## Third-party websites:

Your activity on the third-party websites that CMS.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites. You should review the privacy policies of all websites before using them so you understand how your information may be used.

## Website analytics tools:

These tools collect basic site usage information, like:

- How many visits CMS.gov gets
- The pages visited
- Time spent on CMS.gov
- The number of return visits to CMS.gov
- The approximate geographic location of the device used to access CMS.gov
- Types of devices used

This information is used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Improving your experience

Use the CMS.gov Privacy Manager to opt out of website analytics tools.

## Digital advertising tools for outreach & education:

We use third-party tools to support our digital advertising outreach and education efforts. These tools enable us to reach new people and provide information to previous visitors. To use these tools, we use these technologies on CMS.gov:

**Click tracking**: We use click tracking to identify the ads that are most helpful to consumers and efficient for outreach. This enables us to improve the performance of ads that consumers click on. When users click on links from ads, data about what ad was viewed is collected. Reports are generated about ad performance – including the total number of views and clicks an ad received.

**Conversion tracking:** We use conversion tracking to identify ads that are helpful to consumers and efficient for outreach. It enables us to improve the performance of ads viewed by consumers. When a CMS.gov ad is viewed on a third-party site (like a banner ad), a cookie is placed in the browser of the device the ad was viewed on. If this device later visits CMS.gov, the visit is linked to the ad viewed on the same device. Use the CMS.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on CMS.gov.

**Retargeting:** We use retargeting to provide information to consumers who have previously visited CMS.gov, like reminders about upcoming enrollment deadlines. Retargeting enables us to improve the performance of ads by delivering them to relevant audiences, like recent visitors to CMS.gov. During a visit to CMS.gov, a cookie is placed in the browser of the devices used to view the website. When that same device is used to visit third-party websites that are displaying CMS.gov ads, ads for CMS.gov may be shown to that device because it had previously visited CMS.gov. Using these cookies, we don't collect information about the third-party websites visited by a device. Reports are generated about ad performance – including the total number of views and clicks an ad received. Use the CMS.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on CMS.gov.

**Targeted advertising:** We use third-party vendors to engage in targeted advertising (also called online behavioral or interest-based advertising) to provide information to consumers across their online activities. Targeted advertising involves the collection of data from a particular computer or device. Data regarding web viewing behaviors or application use is gathered to predict user preferences or interests. We can have ads delivered to computers or devices based on the preferences or interests inferred from the web-viewing behaviors or application use.

Third-party vendors engaged by us may also target advertising based on information automatically collected (not information you provide) when you browse our websites or other websites on the internet. You can opt out of this type of data collection via our Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on CMS.gov.

We may consider new third-party tools or the use of new third-party websites, but we'll first assess the tool or website before it's used in connection with CMS.gov. We'll provide notice to the public before adding any new tool to CMS.gov. These assessments include a description

about how information will be collected, accessed, secured, and stored. See a list of the third-party tools currently being used on CMS.gov. See risk assessments for third-party websites and applications.

## How CMS protects your personal information

You don't have to give us personal information when you visit CMS.gov, but if you want to get alerts or e-newsletters, you'll need to give us your email address to subscribe.

If you choose to give us PII in an email, request for information, paper or electronic form, questionnaire, survey, etc., we'll the information you give us only long enough to respond to your question or to fulfill the stated purpose of the communication.

If we need to contact you, we'll save your personal information in a record system designed to retrieve information about you by personal identifier (name, personal email address, home mailing address, personal or mobile phone number, etc.) and keep the information you give us safe according to the Privacy Act of 1974, as amended (5 U.S.C. Section 552a).

If we have a record system to retrieve information about you so we can carry out our mission, a Privacy Act Notification Statement should be prominently displayed out in the open on the public-facing website or form asking you for PII. The statement has to address these 5 criteria:

1. The legal authorization we have to collect information about you
2. Why we're collecting information
3. Routine ways we disclose information outside of our websites
4. Whether or not you legally have to give us the information we're asking for
5. What happens if you choose to not us the information we're asking for

For more information about CMS.gov's privacy policy, email Privacy@cms.hhs.gov.

Third-party services are web-based technologies that aren't exclusively operated or controlled by a government entity, or that involve significant participation of a nongovernment entity. These services may be separate websites or may be applications embedded within our websites. The list of third-party services includes links to relevant third-party privacy policies.

## How long CMS keeps data & how it's accessed

We'll keep data collected long enough to achieve the specified objective for which they were collected. Once the specified objective is achieved, the data will be retired or destroyed in accordance with published draft records schedules of CMS as approved by the National Archives and Records Administration.

We don't store information from cookies on our systems. The persistent cookies used with third-party tools on CMS.gov can be stored on a user's local system and are set to expire at varying time periods depending upon the cookie. We assess whether the expiration date of a cookie exceeds one year and provides an explanation as to why cookies with a longer life are used on the site in the associated Third-Party Website or Application Privacy Impact Assessment.

## Children & privacy on CMS.gov

We believe it's important to protect the privacy of children online. The Children's Online Privacy Protection Act (COPPA) governs information gathered online from or about children under the age of 13. CMS.gov isn't intended to solicit information of any kind from children under age 13.

## Links to other sites

CMS.gov may link to other HHS websites, other government websites, and/or private organizations (like health care providers). We link to other websites solely for your convenience and education. When you follow a link to an external site, you're leaving CMS.gov and the external site's privacy and security policies will apply. Non-federal websites don't necessarily operate under the same laws, regulations, and policies as federal websites. Other than third-party websites highlighted in this privacy notice, we aren't responsible for the contents of external web pages and a link to a page doesn't constitute an endorsement.

### Social media & other sites that require registration

We use social media websites (listed below) to:

- Increase government transparency
- Improve information sharing
- Promote public participation
- Encourage partnership with CMS

**Social media websites aren't government websites or applications. They're controlled or operated by the social media website.** We don't own, manage, or control social media websites. In addition, we don't collect, maintain, or disseminate information posted by visitors to those social media websites. If you choose to provide information to a social media website through registration or other interaction with the website, the use of any information you provide is controlled by your relationship with the social media website. For example, any information that you provide to register on Facebook is voluntarily contributed and isn't maintained by us. This information may be available to our social media page administrators in whole or part, based on a user's privacy settings on the social media website. However, we won't use PII, if provided by you to a social media

website or other website that requires registration, for targeted advertising or retargeting. Although you may voluntarily contribute to a social media website with the intent to share the information with others on a CMS social media page, to protect your privacy, don't disclose PII about yourself or others.

We don't keep separate records or accounting of any social media website users or their interaction with the CMS.gov pages on social media websites. We don't store or share this information. User information is retained by social media websites in accordance with the website's policies. See each social media website's privacy policy to see how long user information is retained after an account has been deleted. To learn more about how each social media website uses and maintains information visit their privacy policy, as follows:

## Additional privacy information

Get more information about CMS privacy policies.

# Exhibit G

Exhibit G

# Third Party Websites and Applications Privacy Impact Assessment - Facebook Ads



October 18, 2016

Dated Signed: **September 4, 2018**

OPDIV: **CMS**

TPWA Unique Identifier (UID):

Tool(s) covered by this TPWA: **Facebook Ads**

Is this a new TPWA? **No**

If an existing TPWA, please provide the reason for revision:

**Revised to include all CMS web properties that occasionally deliver digital advertising on third-party websites in order to reach new users. These additional CMS web properties include; www.CMS.gov, www.Medicare.gov, www.MyMedicare.gov, www.Medicaid.gov, www.InsureKidsNow.gov, HealthCare.gov, CuidadoDeSalud.gov.**

Will the use of a third party Website or application create a new or modify an existing HHS/OPDIV System of Records Notice (SORN) under the Privacy Act? **No.**

If yes, indicate the SORN number (or identify plans to put one in place.): **NOT APPLICABLE because CMS is not collecting or storing any personally identifiable information (PII).**

Will the use of a third party Website or application create an information collection subject to OMB clearance under the Paperwork Reduction Act (PRA)? **No.**

If yes, indicate the OMB approval number and approval number expiration date (or describe the plans to obtain OMB clearance.)

OMB Approval Number: **NOT APPLICABLE**

Expiration Date: **NOT APPLICABLE**

Does the third party Website or application contain Federal Records? **No.**

Describe the specific purpose for the OPDIV use of the third party Website or application:

**CMS will use Facebook Ads to deploy digital display ads and video ads across the Facebook platform to consumers. Facebook is a free social networking site that allows Facebook registered users to create profiles, upload photos and videos, send messages, and keep in touch with the people in their social network. CMS maintains an educational presence on Facebook in the form of CMS website branded pages. To learn more about privacy related to the social networking uses of Facebook and CMS website branded pages, visit http://www.hhs.gov/pia/index.html#Third-Party.**

**Facebook Ads places a cookie or pixel (also known as a web beacon) for conversion tracking on certain pages of a CMS website. Conversion tracking allows Facebook Ads to measure the performance of CMS advertisements based on consumer activity and to report the ad performance to CMS. Conversion tracking reports inform the advertiser whether consumers who view or interact with an ad later visit a particular site or perform desired actions on that site. Facebook Ads will then provide CMS with summary-level conversion tracking reports that contain no personal information about consumers. These reports will allow CMS to measure how effective Facebook advertisements are to CMS's digital advertising outreach and education efforts.**

**Facebook visitors, even if not registered with Facebook, will see advertising on the Facebook platform, regardless of whether they have "liked", "shared", commented on, or visited any CMS branded Facebook page. However, registered users may see ads that are targeted to them based, in part, on information these users have shared through their Facebook profile. Visitors not registered with Facebook may see ads based on different criteria, such as websites they have previously visited or the specific page they are looking at on Facebook. CMS will also use Facebook Ads for retargeting, an advertising technique used by online advertisers to present ads to users who have previously visited a particular site.**

Have the third-party privacy policies been reviewed to evaluate any risks and to determine whether the Website or application is appropriate for OPDIV use?

**Yes, and the review has determined that the application is appropriate for OPDIV use, taking into account the risks posed by the following: use of cookies, web beacons, and pixels for targeted advertising based on sensitive information; targeting, retargeting and conversion tracking based on Facebook profile information; and Facebook profile information leading to identification of CMS website visitors.**

Describe alternative means by which the public can obtain comparable information or services if they choose not to use the third party Website or application:

**If consumers do not want to interact with advertisements from Facebook Ads, consumers can learn about CMS campaigns through other advertising channels such as TV, radio, CMS websites, and events.**

Does the third party Website or application have appropriate branding to distinguish the OPDIV activities from those of nongovernmental actors?

**Yes. Facebook Ads appear within the Facebook platform and are accompanied by Facebook branding.**

How does the public navigate to the third party Website or application from the OPDIV?

**NOT APPLICABLE**

Please describe how the public navigates to the third party Website or application:

**NOT APPLICABLE**

If the public navigates to the third party Website or application via an external hyperlink, is there an alert to notify the public that they are being directed to a nongovernmental Website?

**NOT APPLICABLE**

Has the OPDIV Privacy Policy been updated to describe the use of a third party Website or application? **Yes.**

Provide a hyperlink to the OPDIV Privacy Policy:

https://www.cms.gov/privacy/

https://www.healthcare.gov/privacy/

Is an OPDIV Privacy Notice posted on the third party Website or application?

**NOT APPLICABLE Facebook Ads does not provide the ability to place a privacy notice within an ad on the Facebook platform.**

Confirm that the Privacy Notice contains all of the following elements: (i) An explanation that the Website or application is not government-owned or government-operated; (ii) An indication of whether and how the OPDIV will maintain, use, or share PII that becomes available; (iii) An explanation that by using the third-party Website or application to communicate with the OPDIV, individuals may be providing nongovernmental third-parties with access to PII; (iv) A link to the official OPDIV Website; and (v) A link to the OPDIV Privacy Policy:

**NOT APPLICABLE**

Is the OPDIV's Privacy Notice prominently displayed at all locations on the third party Website or application where the public might make PII available? NOT APPLICABLE

Is PII collected by the OPDIV from the third party Website or application? **No.**

Will the third party Website or application make PII available to the OPDIV? **No.**

Describe the PII that will be collected by the OPDIV from the third-party Website or application and/or the PII which the public could make available to the OPDIV through the use of the third-party Website or application and the intended or expected use of the PII:

**Not Applicable. CMS does not receive any PII through its use of Facebook Ads.**

Describe the type of PII from the third party Website or application that will be shared, with whom the PII will be shared, and the purpose of the information sharing:

If PII is shared, how are the risks of sharing PII mitigated? **NOT APPLICABLE**

Will the PII from the third party Website or application be maintained by the OPDIV? **NOT APPLICABLE**

If PII will be maintained, indicate how long the PII will be maintained: **NOT APPLICABLE**

Describe how PII that is used or maintained will be secured:

**NOT APPLICABLE CMS does not receive, use, or maintain PII from Facebook Ads.**

What other privacy risks exist and how will they be mitigated?

**CMS employs Facebook Ads solely for the purposes of improving CMS services and activities online.**

**Potential Risk:**
**The use of cookies, pixels (web beacons) generally presents the risk that an application could collect information about a user's activity on the Internet for purposes the user did not intend. The unintended purposes include providing users with behaviorally targeted advertising based on information that a user may consider to be sensitive.**

**Additional Background:**
**Cookies, pixels and web beacons allow Facebook to display advertising to individuals who have previously visited CMS websites. Persistent cookies will be stored on the user's computer for up to 90 days, unless removed by the user.**

**Mitigation:**
**CMS websites and Facebook provide users information about the use of persistent cookies and related technologies, what data is collected, and the data gathering choices, including choices related to behaviorally targeted advertising.**

**Tealium iQ Privacy Manager offers the ability to opt out of persistent cookies. Tealium settings can be accessed via the CMS privacy policy on CMS websites. CMS will not implement Facebook Ad pixels or web beacons, which enable behavioral targeting and place persistent cookies on a browser, if Tealium iQ is not available on a CMS website.**

**CMS includes the Digital Advertising Alliance AdChoices icon on all targeted digital advertising. The AdChoices icon is an industry standard tool that allows users to opt out of being tracked for advertising purposes. Users may also disable cookies through their web browser.**

**Facebook also offers users the ability to opt-out of having Facebook advertising cookies related to CMS websites on its own website.**

**Potential Risk:**

**Facebook Ads targets consumers based on information voluntarily provided within the user's registered profiles. Facebook Ads uses data derived from user profile information, aggregated by Facebook, combined with information about a user's behavior across multiple sites and over time. The resulting combined information could be viewed by some consumers as revealing patterns in behavior that the user may consider to be sensitive. These patterns in behavior could enable and/or improve targeting by other advertisers who may wish to target customers within the health care sector, including targeting based on the type of data that some consumers may consider to be sensitive.**

**Additional Information:**
**Third party data targeting allows for the deployment of ads to consumers whose profiles or on-site actions (e.g., "likes" of specific pages or brand posts) match specific attributes an online advertiser is looking to target. CMS will engage Facebook Ads to use third party advertising techniques to deliver CMS digital advertising to persons who are more likely to be interested in CMS advertising content.**

**Mitigation:**
**Facebook Ads does not allow for the targeting of only consumers who have specifically interacted with an ad from CMS. CMS receives an aggregated performance report from Facebook Ads to optimize its ads.**

**Potential Risk:**
**Facebook's access to PII and non-PII data about registered Facebook users presents the risk that CMS site visitors who are also registered Facebook users could be identified, and Facebook could misuse that data about these users.**

**Mitigation:**
**CMS does not receive any personally identifiable information from Facebook Ads. CMS receives aggregated performance data in the form of statistical reports, including reports on clicks, views, and impressions of CMS digital advertising.**

Content last reviewed September 5, 2018

# Exhibit H

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. 1:22-cv-12196<br><br>**DECLARATION OF DR. CRAIG MONSEN IN SUPPORT OF ATRIUS HEALTH, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND** |

I, Craig Monsen, M.D., declare and state as follows:

1. I am over the age of 21 and competent to make this declaration. I have personal knowledge of the information set forth in this declaration and could testify to these matters if asked to do so.

2. I currently serve as Chief Medical Information Officer and Associate Chief Information Officer at Atrius Health, Inc. ("Atrius Health"). I am a graduate of Harvard University and Johns Hopkins School of Medicine and have practiced medicine and/or worked in healthcare since 2013.

3. Atrius Health is a non-profit multi-specialty, multi-site medical group practice. It operates thirty (30) clinical facilities—twenty-five (25) of which provide adult primary care services—where Atrius Health physicians and providers work in close collaboration others to care for patients.

4. The responsibilities of my position include providing guidance to internal teams developing Atrius Health's electronic patient portal.

5. Through my work with those teams, and my other responsibilities as Chief Medical Information Officer and Associate Chief Information Officer at Atrius Health, I am familiar with

Atrius Health's participation in and involvement with federal incentive and interoperability initiatives, including the Meaningful Use program, Merit-based Incentive Payment System (MIPS), and the Primary Care First program.

6. Atrius Health's participation in these programs began in 2011 when, on behalf of each of its professionals eligible to participate (EPs), it submitted an annual report under the Meaningful Use program to the Centers of Medicare and Medicaid Services (CMS). As part of the reports, Atrius Health attested that the EPs met the program's requirements and benchmarks for maintaining and promoting the interoperability of patients' electronic health records and patients' access to their electronic health records through Atrius Health's patient portal, which patients accessed through the Atrius Health website.

7. Since 2011, Atrius Health has continued to facilitate patient access to electronic health records to meet the evolving federal standards in the Meaningful Use program, MIPS, and the Primary Care First program. As part of the Meaningful Use program from 2011 to 2015, for example, Atrius Health submitted hundreds of reports on behalf of its EPs attesting to its level of achievement in meeting objectives of the program. To facilitate achievement of certain of these objectives, Atrius Health has continuously updated, modified and implemented new features in its patient portal that patients access through the Atrius Health website. Atrius Health has submitted similar attestations under MIPS regarding patient access and interoperability objectives of this program.

8. In exchange for that reporting and facilitating patient access to its patient portal, Atrius Health has received incentive payments from the federal government.

9. As part of the Primary Care First program, Atrius Health submitted interoperability attestations for all twenty-five (25) of its primary care facilities in 2021. The Primary Care First

program is based on an agreement between a facility and CMS, and in each agreement, the facility attests to meeting federal interoperability standards. An example of one such agreement is attached as Exhibit I.

10. Atrius Health has developed its website to promote patient engagement and access to electronic health records, including through its patient portal. Atrius Health has also raised awareness and increased usability of its website and patient portal, which is accessible through numerous prominent links on Atrius Health's website. Enhanced patient understanding of and engagement with Atrius Health's patient portal and website has helped Atrius Health to satisfy criteria set forth by the aforementioned federal programs.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on April 27, 2023 in Newton, Massachusetts.

Craig Monsen, M.D.

# Exhibit I

Centers for Medicare & Medicaid Services
Center for Medicare & Medicaid Innovation
Seamless Care Models Group
7500 Security Blvd. WB-06-05
Baltimore, MD 21244

**Primary Care First (PCF) Model**
**PCF Component**
**Amended and Restated PCF Practice Participation Agreement**
First Amended and Restated Participation Agreement for Cohort 1

Last Modified: August 31, 2021

# Table of Contents

Article 1. Agreement Term ....... 7
Section 1.01 Effective Date ....... 7
Section 1.02 Implementation Period and Model Performance Period ....... 7
Section 1.03 Agreement Term ....... 7
Section 1.04 Amendments ....... 8
Article 2. Definitions ....... 8
Article 3. General PCF Practice Requirements ....... 15
Section 3.01 PCF Practice Requirements ....... 15
Section 3.02 Requirements for PCF Practices with Multiple Physical Locations ....... 16
Section 3.03 Agreements with PCF Practitioners ....... 17
Section 3.04 Rosters ....... 18
Section 3.05 Changes to PCF Practice ....... 20
Section 3.06 Program Overlap ....... 21
Section 3.07 Health Information Technology Requirements / Interoperability ....... 23
Article 4. Beneficiary Attribution ....... 23
Section 4.01 Beneficiary Attribution to the PCF Practice ....... 23
Section 4.02 Voluntary Alignment ....... 25
Article 5. Payment ....... 26
Section 5.01 General Payment Policies ....... 26
Section 5.02 Total Primary Care Payment ....... 27
Section 5.03 Performance Based Adjustment (PBA) ....... 30
Section 5.04 Reconciliation and Settlement ....... 36
Article 6. PCF Care Delivery Interventions ....... 38
Section 6.01 General ....... 38
Section 6.02 PCF Care Delivery Interventions ....... 38
Article 7. Quality Reporting Requirements ....... 39
Section 7.01 General ....... 39
Section 7.02 Electronic Clinical Quality Measures (eCQMs) ....... 39
Section 7.03 Clinical Quality Measure (CQM) ....... 40

Section 7.04 Patient Experience of Care Measure ....................................................40

Article 8. Participation in Learning Activities ....................................................41

Section 8.01 General ....................................................41

Article 9. Beneficiary Notification and Protections ....................................................42

Section 9.01 Beneficiary Notifications ....................................................42

Section 9.02 Descriptive PCF Practice Materials and Activities ....................................................42

Section 9.03 Availability of Services ....................................................43

Section 9.04 Beneficiary Freedom of Choice ....................................................43

Section 9.05 Beneficiary Engagement Incentives ....................................................44

Section 9.06 HIPAA Requirements ....................................................45

Article 10. Data Sharing and Reports ....................................................45

Section 10.01 General ....................................................45

Section 10.02 Provision of Certain Beneficiary-Identifiable Claims Data ....................................................46

Section 10.03 Beneficiary Rights to Opt Out of Data Sharing ....................................................50

Section 10.04 Beneficiary Substance Use Disorder Data Opt-In ....................................................51

Article 11. Participation in Evaluation ....................................................52

Section 11.01 General ....................................................52

Section 11.02 Primary Data ....................................................52

Section 11.03 Secondary Data ....................................................53

Article 12. PCF Reporting and Certification Requirements ....................................................53

Section 12.01 Reporting Requirements ....................................................53

Section 12.02 Certification of Data and Information ....................................................54

Article 13. Monitoring and Compliance ....................................................54

Section 13.01 CMS Monitoring Activities ....................................................54

Section 13.02 Compliance with Monitoring Activities ....................................................55

Section 13.03 Compliance with Laws ....................................................56

Article 14. Audits and Record Retention ....................................................57

Section 14.01 Right to Audit and Inspection ....................................................57

Section 14.02 Access to Records ....................................................57

Section 14.03 Record Retention ....................................................58

Article 15. Remedial Action and Termination ....................................................58

Section 15.01 Grounds for Remedial Action ....................................................58

Section 15.02 Types of Remedial Action ....60
Section 15.03 Termination by CMS ....61
Section 15.04 Termination by the PCF Practice ....61
Section 15.05 Additional Requirements upon Termination....62

Article 16. Limitation on Review and Dispute Resolution ....63
Section 16.01 Limitations on Review ....63
Section 16.02 Dispute Resolution....63
Section 16.03 Standards for Reconsideration ....64
Section 16.04 Reconsideration Determination ....64
Section 16.05 Effect of the Reconsideration Determination....65

Article 17. Miscellaneous ....65
Section 17.01 Agency Notifications and Submission of Reports....65
Section 17.02 Notice of Bankruptcy ....66
Section 17.03 Severability ....66
Section 17.04 Entire Agreement; Amendment....66
Section 17.05 Survival ....67
Section 17.06 Precedence....67
Section 17.07 Certification....67
Section 17.08 Execution in Counterpart ....67

**Appendices**

A: Care Delivery Interventions....70
B: PCF Health IT Requirements....71
C: PCF Regions ....73
D: [Reserved] ....74
E: Cost Sharing Support for Face-to-Face Visits ....75
F: Telehealth Benefit Enhancement....78
G: Medicare Waivers....81

# FIRST AMENDED AND RESTATED PARTICIPATION AGREEMENT

This amended and restated participation agreement is between the Centers for Medicare & Medicaid Services ("**CMS**") and

______________________________________________

[*insert full legal name (including any d/b/a/ name) of the entity whose Medicare billing Tax Identification Number (TIN) is used to bill Primary Care Services on behalf of a group of one or more physicians, non-physician practitioners, or a combination thereof*] (the "**PCF Practice**").

CMS is the agency within the U.S. Department of Health and Human Services ("**HHS**") that is charged with administering the Medicare and Medicaid programs.

The PCF Practice is a group of one or more physicians, non-physician practitioners, or combination thereof that bills for Primary Care Services under a single Medicare-enrolled TIN associated with

______________________________________________

(the "**Practice Site**") and is assigned the following designation by CMS: ______("**PCF ID**").

Under Section 1115A of the Social Security Act ("**Act**"), the CMS Center for Medicare & Medicaid Innovation ("**Innovation Center**") is authorized to test innovative payment and service delivery models to reduce Medicare, Medicaid, or Children's Health Insurance Program expenditures while preserving or enhancing the quality of care provided to beneficiaries under those programs.

Through the Primary Care First Component ("PCF Component") of the Primary Care First Model ("**PCF**" or "**Model**"), the Innovation Center will test a payment model for primary care that imposes financial risk through payment adjustments for model outcomes including improvements in quality and patient satisfaction, and reductions in acute hospital utilization and cost of care.

The PCF Practice submitted an application to participate in PCF, and CMS selected the PCF Practice for participation in the PCF Component of the Model. In addition to the PCF Component, the PCF Model also includes the Seriously Ill Population ("SIP") Component ("SIP Component"). Through the SIP Component of the Model, CMS will test a time-limited payment and service delivery methodology designed to engage and stabilize seriously ill Medicare Beneficiaries, provide them with comprehensive, person-centered care management, and then transition them to a longer-term comprehensive care setting.

In October 2020, CMS and the PCF Practice executed a participation agreement governing their rights and obligations under the PCF Component (the "**Participation Agreement**").

The parties wish to amend the terms of the Participation Agreement to:

- Correct the names of certain guidance documents and remove references to the "Implementation Guides";
- Modify Staff Roster requirements;
- Clarify the actions CMS and the PCF Practice must take if the PCF Practice updates its legal business name;
- Update the list of CMMI models, demonstrations, or other initiatives in which the PCF Practice can or cannot simultaneously participate;
- Modify the attribution methodology;
- Add a new Model payment called the "Shortage Area Bonus";
- Change the period of time during which CMS must complete Quality Gateway calculations;
- Amend how the PCF Practice may report one PCF quality measure;
- Amend how CMS scores one Performance Year 1 PCF quality measure for purposes of the Quality Gateway;
- Amend the reporting requirements for the existing beneficiary engagement incentives;
- Remove the HIPAA-Covered Data Disclosure Form as an appendix to this Participation Agreement;
- Modify the data retention and destruction provisions;
- Amend a provision regarding voluntary termination of the Participation Agreement by the PCF Practice;
- Add a telehealth benefit enhancement;
- Fix typographic errors; and
- Make other small technical changes to improve clarity of this Participation Agreement.

The parties therefore agree as follows:

# Article 1. Agreement Term

## *Section 1.01 Effective Date*

This Participation Agreement became effective when it was signed by the last party to sign it (as indicated by the date associated with that party's signature) (the "**Effective Date**"). Unless otherwise expressly stated, the amendments hereby made to the Participation Agreement will be effective as of January 1, 2022.

## *Section 1.02 Implementation Period and Model Performance Period*

a. Implementation Period

1. The Implementation Period began on the Effective Date and ended on December 31, 2020.
2. During the Implementation Period, CMS provided the PCF Practice with the following:
   i. Information about and assistance with onboarding onto the PCF Practice Portal;
   ii. An opportunity to request data on the PCF Practice's PCF Beneficiaries pursuant to Article 10; and
   iii. Access to learning activities as described in Article 8.

b. Model Performance Period

The Model Performance Period began on January 1, 2021, and ends on December 31, 2025, unless sooner terminated in accordance with Section 1.04 or Article 15 of this Participation Agreement. The Model Performance Period consists of the following five Performance Years:

1. Performance Year 1: January 1, 2021 – December 31, 2021
2. Performance Year 2: January 1, 2022 – December 31, 2022
3. Performance Year 3: January 1, 2023 – December 31, 2023
4. Performance Year 4: January 1, 2024 – December 31, 2024
5. Performance Year 5: January 1, 2025 – December 31, 2025

## *Section 1.03 Agreement Term*

The term of this Participation Agreement (the "**Agreement Term**") began on the Effective Date and expires two years after the last Day of the Model Performance Period, unless the Participation Agreement is sooner terminated by either party in accordance with Article 15, in which case the Agreement Term expires two years after the last Day of the PCF Practice's final

Performance Year in the Model except for the obligations that survive the expiration or termination of this Participation Agreement pursuant to Section 17.05, which will remain in effect for the length of time described therein notwithstanding this Section 1.03.

### *Section 1.04 Amendments*

a. CMS offered the PCF Practice an opportunity to sign, and the PCF Practice signed, this amended and restated version of the Participation Agreement prior to the start of Performance Year 2 of the Model Performance Period.

b. No later than 30 Days prior to the start of Performance Year 3 of the Model Performance Period or any subsequent Performance Year, CMS may offer the PCF Practice the opportunity to sign an amendment to this Participation Agreement, which may be in the form of an amended and restated version of this Participation Agreement to take effect on the first Day of such Performance Year.

c. If by a date specified by CMS, the PCF Practice fails to sign an amendment offered by CMS pursuant to Section 1.04(b), the Model Performance Period will expire at 11:59pm EST on December 31 of the year in which CMS offered such amendment.

## Article 2. Definitions

**"Affiliated PCF Practices"** means the group of practices participating in PCF that are directly or indirectly owned, operated, or controlled by the Practice Owner.

**"AHU"** stands for **"Acute Hospital Utilization"** and means a measure included in the Healthcare Effectiveness Data and Information Set (HEDIS) that is calculated based on the risk-adjusted ratio of observed-to-expected inpatient admission and observation stay discharges reported among members 18 years of age and older.

**"Beneficiary"** means an individual who is enrolled in Medicare.

**"Care Delivery Interventions"** means the care activities as described in Appendix A of this Participation Agreement.

**"Care Delivery Intervention Report"** means the report submitted by the PCF Practice to CMS detailing the PCF Practice's PCF Care Delivery Interventions and how the PCF Practice has complied with Appendix A of this Participant Agreement.

**"Care Delivery Reporting Guide"** means the guidance document issued annually by CMS at least 30 Days prior to the start of a Performance Year that describes the reporting requirements and deadlines for submission of the Care Delivery Intervention Report for the forthcoming Performance Year.

**"Care Team"** means the team of people at the PCF Practice, including but not limited to individuals on the PCF Practice's Practitioner Roster or Staff Roster, who ensure the PCF Practice's patients receive comprehensive primary care.

**"CCM Related Services"** stands for **"Chronic Care Management Related Services"** and means the services covered under the codes, as modified from time to time, pertaining to Chronic Care Management (CCM) and related services in the Medicare Physician Fee Schedule and as determined by CMS in the PCF Payment and Attribution Methodologies Paper.

**"CEHRT"** stands for **"Certified Electronic Health Record Technology"** and means the health IT technology meeting the CEHRT definition required by the Quality Payment Program at 42 CFR § 414.1305. Starting in 2019, this definition can be met by 2015 Edition technology only. The definition can be met using one certified health IT or a combination of certified health IT.

**"Change in Control"** means any of the following:

1. The acquisition by any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934) of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Securities Exchange Act of 1934), directly or indirectly, of voting securities of the PCF Practice representing more than 50% of the PCF Practice's outstanding voting securities or rights to acquire such securities;

2. The acquisition of the PCF Practice by any other individual or entity;

3. Any merger, division, dissolution, or expansion of the PCF Practice;

4. Any sale, lease, exchange or other transfer (in one transaction or a series of transactions) of all or substantially all the assets of the PCF Practice; or

5. The approval and completion of a plan of sale or liquidation of the PCF Practice or an agreement for the sale or liquidation of the PCF Practice.

**"Clinical Measure Reporting and Health IT Requirements Summary"** means the guidance document that CMS will issue annually at least 30 Days prior to the start of a Performance Year that describes the reporting requirements and deadlines for submitting eCQM reporting in accordance with Section 7.02 and meeting Health IT requirements in accordance with Appendix B for the forthcoming Performance Year.

**"CQM"** stands for "clinical quality measure."

**"Cost Sharing Support"** has the meaning set forth in Appendix E of this Participation Agreement.

**"Covered Services"** means items or services described in Section 1832 of the Act for which payment is available under Part B of Title XVIII of the Act.

**"Data Aggregation"** means combining data, including claims, utilization, cost, and quality, from multiple payers into a single reporting platform.

**"Days"** means calendar days unless otherwise specified.

**"Descriptive PCF Practice Materials and Activities"** include, but are not limited to, general audience materials such as brochures, advertisements, outreach events, letters to Beneficiaries, web pages, mailings, social media, or other activities conducted by or on behalf of the PCF Practice, when used to educate, notify, or contact Beneficiaries regarding the Model. The following communications are not Descriptive PCF Practice Materials and Activities:

1. Communications that do not directly or indirectly reference the Model (for example, information about care coordination generally would not be considered Descriptive PCF Practice Materials and Activities);
2. Materials that cover Beneficiary-specific billing and claims issues;
3. Educational information on specific medical conditions;
4. Referrals for health care items and services; and
5. Any other materials that are excepted from the definition of "marketing" under the HIPAA Privacy Rule (45 CFR Part 160 & Part 164, subparts A & E).

**"eCQM"** stands for "electronic clinical quality measure."

**"Face-to-Face Visit"** means a clinical encounter in which a PCF Practitioner furnishes Covered Services to a PCF Beneficiary, including via telehealth, for which the PCF Practice properly bills under the PCF Practice's TIN using any of the HCPCS codes that correspond to the Flat Visit Fee as described in the PCF Payment and Attribution Methodologies Paper.

**"Flat Visit Fee"** means the fee paid by CMS to the PCF Practice for Face-to-Face Visits upon CMS's receipt of a claim for that Face-to-Face Visit.

**"FFS"** stands for fee-for-service.

**"HCC"** stands for **"Hierarchical Condition Category"** and means a normalized number used for risk adjustment which quantifies the relative estimated future health care costs for a particular Beneficiary.

**"HCPCS"** stands for **"Healthcare Common Procedural Coding System."**

**"Leakage Adjustment"** means the amount the Professional PBP is adjusted to account for the subset of Primary Care Services that correspond to the Leakage Adjustment as further described in the PCF Payment and Attribution Methodologies Paper that are provided to the PCF Practice's PCF Beneficiaries by individuals who are not on the PCF Practice's Practitioner Roster.

**"Measurement Period"** means the time period outlined in the Measure Specifications for each Performance Year's quality measures for which quality data must be reported in accordance with Article 7 of this Participation Agreement.

**"Measure Specification"** means quality measure instructions that address:

1. Data elements;
2. Data sources;
3. Point of data collection;
4. Time and frequency of data collection and reporting;
5. Specific instruments to be used, if appropriate; and
6. Implementation strategies.

**"National AHU Benchmark"** means the 50th percentile of an AHU performance benchmark constructed by CMS using FFS claims from Medicare primary care clinicians in the United States.

**"National TPCC Benchmark"** means the 50th percentile of a Total Per Capita Cost benchmark constructed by CMS using FFS claims from Medicare primary care clinicians in the United States.

**"NPI"** stands for "National Provider Identifier."

**"Participating PCF Practice"** means a practice that is participating in the PCF Component and is not the PCF Practice.

**"PBA"** stands for **"Performance Based Adjustment"** and means an adjustment to the PCF Practice's TPCP, ranging from negative 10 percent to a positive 50 percent adjustment, based on the PCF Practice's performance on certain quality and utilization metrics.

**"PBPM"** stands for "per Beneficiary per month."

**"PCF Beneficiary"** means an Eligible Beneficiary who is attributed to the PCF Practice during the Model Performance Period for the purposes of computing PCF Payments and evaluating quality performance.

**"PCF Payer Partner"** means a third-party payer that has signed a memorandum of understanding with CMS to further the goals of the Model by developing an aligned approach for its own members who are cared for by the PCF Practice.

**"PCF Payment and Attribution Methodologies Paper"** means the paper published annually by CMS that describes in greater detail the PCF attribution methodology and the methods used to calculate and send the PCF Payments to the PCF Practice.

**"PCF Payment"** means the Total Primary Care Payment (TPCP), Professional Population Based Payment (PBP), Flat Visit Fee, Performance Based Adjustment (PBA), the Shortage Area Bonus, or any combination thereof.

**"PCF Practice Activities"** means activities, including but not limited to, the Care Delivery Interventions in accordance with Article 6 of this Participation Agreement and Appendix A, quality reporting requirements in accordance with Article 7 of this Participation Agreement, and participation in learning activities in accordance with Article 8 of this Participation Agreement, conducted by the PCF Practice under the Model.

**"PCF Practice Management Guide"** means the guidance document issued by CMS at least 30 Days prior to the start of Performance Year 1, and re-issued as needed in subsequent Performance Years to make corrections or add clarification, that describes the reporting requirements and deadlines for the PCF Practice to submit notifications and updates to CMS as required by Article 3.

**"PCF Practice Portal"** means the secure online platform that CMS and the PCF Practice use to exchange PCF data and that the PCF Practice uses to submit certain reports to CMS in accordance with Articles 6 and 12.

**"PCF Practitioner"** means a Medicare-enrolled Practitioner identified by an individual NPI that bills under the TIN of the PCF Practice and who:

1. In the case of a Practitioner that is a physician, has an NPI associated with a primary taxonomy/specialty designation in internal medicine, general medicine, geriatric medicine, family medicine, or hospice and palliative medicine;
2. In accordance with Section 3.03(b), is required by the PCF Practice to accept PCF Payments for the Professional PBP subset of Primary Care Services and the HCPCS codes for which CMS will pay the Flat Visit Fee under the terms of the Model;
3. Is identified by the PCF Practice on the Practitioner Roster; and
4. Not precluded by CMS to participate in the Model.

**"PCF Region"** means a geographic area listed in Appendix C of this Participation Agreement.

**"Peer Region AHU Benchmark"** means an AHU benchmark that compares the PCF Practice's AHU performance to the AHU performance of a group of Medicare FFS primary care clinicians in a Peer Region Group, as further described in the PCF Payment and Attribution Methodologies Paper.

**"Peer Region Group"** means a grouping of PCF Regions and non-PCF Regions that CMS has created for the purpose of calculating the Peer Region AHU Benchmark and Peer Region TPCC Benchmark. Peer Region Groups are based on commonalities in geographic location and historical AHU or TPCC performance. The Peer Region AHU Benchmark and Peer Region TPCC Benchmark are then calculated for each Peer Region Group. Peer Region Group assignments for each PCF Region are provided in the PCF Payment and Attribution Methodologies Paper.

**"Peer Region TPCC Benchmark"** means a TPCC benchmark used to compare the PCF Practice's TPCC performance to the TPCC performance of a group of Medicare FFS primary care clinicians in a Peer Region Group, as further described in the PCF Payment and Attribution Methodologies Paper.

**"Practice Owner"** means an individual or entity that directly or indirectly owns, operates, or controls the PCF Practice.

**"Practice Reporting"** means the periodic reporting which documents PCF Practice Activities that the PCF Practice submits to CMS via the PCF Practice Portal.

**"Practice Risk Group"** means a group of practices participating in the Model that receive the same base Professional PBP based on each practice's Practice Risk Score.

**"Practice Risk Score"** means the average HCC score of all the PCF Practice's PCF Beneficiaries, calculated annually.

**"Practice Site"** means the "bricks and mortar" physical location(s) that share health information technology, CEHRT, and a certain percentage of PCF Practitioners who bill under the same TIN, as described in Section 3.02, and where the PCF Practice operates and where patients are seen by the PCF Practice; or, if the PCF Practice delivers primary care in patient residencies exclusively, the billing address the PCF Practice uses for TIN purposes.

**"Practitioner"** means any of the following:

1. A physician (as defined in Section 1861(r) of the Social Security Act);
2. A clinical nurse specialist (CNS) who satisfies the qualifications set forth at 42 CFR § 410.76(b);

3. A nurse practitioner (NP) who satisfies the qualifications set forth at 42 CFR § 410.75(b); or

4. A physician assistant (PA) who satisfies the qualifications set forth at 42 CFR § 410.74(c).

**"Practitioner Roster"** means the list submitted by the PCF Practice to CMS pursuant to Section 3.04(a) that identifies the Practitioners who provide Primary Care Services to Beneficiaries and bill under the PCF Practice's TIN, and whose NPIs are used for PCF Beneficiary attribution.

**"Primary Care Services"** means the Covered Services that correspond to the HCPCS codes identified in the PCF Payment and Attribution Methodologies Paper as those that CMS uses to determine attribution, the services that the Professional PBP is intended to cover, and the services considered in the Leakage Adjustment calculation.

**"Professional PBP"** stands for **"Professional Population Based Payment"** and means the quarterly prospective PBPM payment made for a subset of Primary Care Services, as further described in the PCF Payment and Attribution Methodologies Paper, furnished by the PCF Practice to its PCF Beneficiaries.

**"Quality Gateway"** means the minimum threshold the PCF Practice must meet or exceed on each PCF quality measure to be eligible for a positive PBA or to earn a CI Bonus.

**"Quarterly Payment Report"** means a report given by CMS to the PCF Practice each calendar quarter setting forth the PCF Payments made for that calendar quarter and all associated data and scoring.

**"Reporting Period"** means the period during which the quality data must be submitted to CMS in accordance with Article 7.

**"Retainer Fee"** or **"Concierge Fee"** means a monthly, quarterly, or annual fee paid by a patient to a Practitioner or PCF Practice for health care services.

**"Seriously Ill Population Assignment List"** means the monthly list that CMS sends to practices participating in the SIP Component of the Model that includes Beneficiaries who have given their consent to CMS to share relevant data with those practices.

**"Staff Roster"** means the list developed and updated in accordance with Section 3.04(b) that identifies each individual or entity that is not a PCF Practitioner but who performs functions or services related to PCF Practice Activities on behalf of the PCF Practice.

**"Telehealth Benefit Enhancement"** has the meaning set forth in Appendix F of this Participation Agreement.

**"TIN"** stands for a federal "taxpayer identification number."

**"TPCC"** stands for **"Total Per Capita Cost"** and means a payment-standardized, annualized, risk-adjusted, and specialty-adjusted measure that evaluates the overall cost of care provided to PCF Beneficiaries.

**"TPCP"** stands for **"Total Primary Care Payment"** and means the sum of the Professional PBP and all Flat Visit Fees owed to the PCF Practice for a given calendar quarter.

**"Voluntary Alignment"** means the process by which an Eligible Beneficiary may identify a clinician as their primary clinician on Medicare.gov, or, if allowed by CMS in the given Performance Year, on a paper-based form.

## Article 3. General PCF Practice Requirements

### *Section 3.01 PCF Practice Requirements*

a. For the period beginning on the Effective Date and ending on the last Day of the PCF Practice's final Performance Year, the PCF Practice shall:

1. Be a legal entity formed under applicable state, federal, or tribal law, that operates primarily as a medical practice and is authorized to conduct business in each state in which it operates;

2. Operate at the Practice Site or deliver home-based primary care in one of the PCF Regions described in Appendix C of this Participation Agreement, unless the PCF Practice participated in the Independence at Home Demonstration immediately prior to participating in PCF;

3. If the PCF Practice established its TIN before January 1, 2019, maintain a cumulative count of at least 100 unique PCF Beneficiaries until September 30, 2021. As of October 1, 2021, and at all times thereafter, the PCF Practice shall maintain a cumulative count of at least 125 unique PCF Beneficiaries;

4. If the PCF Practice established its TIN on or after January 1, 2019, maintain a cumulative count of at least 125 unique PCF Beneficiaries as of October 1, 2021, and at all times thereafter;

5. Use a single TIN for billing all Primary Care Services furnished to PCF Beneficiaries by PCF Practitioners, and for receiving all PCF Payments from CMS;

6. For Performance Year 1, the PCF Practice must be able to demonstrate, through claims data, that at least 50% of all collective billings by the PCF Practitioners during the 2019 calendar year were for Primary Care Services; and

7. Use 2015 Edition CEHRT, support data exchange with other practitioners and health systems via standards-based Application Programming Interface (API), and demonstrate a connection to a health information exchange (HIE).

b. For the period beginning on the Effective Date and ending on the last Day the PCF Practice's final Performance Year, the PCF Practice shall not:

1. Be enrolled in Medicare as a Federally Qualified Health Center (FQHC) or a Rural Health Clinic (RHC);

2. Participate in the Global and Professional Direct Contracting ("GPDC") Model, the Independence at Home ("IAH") Demonstration, the Opioid Use Disorder Treatment Demonstration Program ("Value in Treatment Demonstration"), the Financial Alignment Initiative ("FAI") for Medicare-Medicaid Enrollees, the Kidney Care Choices ("KCC") Model, the Community Health Access and Rural Transformation ("CHART") Model; or

3. Join an Innovation Center model that precludes participation in PCF.

c. The PCF Practice shall provide written notice to CMS if the PCF Practice fails to satisfy any of the provisions set forth in Section 3.01(a) or (b). The PCF Practice shall provide such written notice to CMS at least 30 Days before failing to satisfy Section 3.01(a) or (b), or within 5 Days of becoming aware that the PCF Practice fails to satisfy Section 3.01(a) or (b).

d. The PCF Practice shall submit an Electronic Funds Transfer Authorization Agreement (Form CMS-588) or the equivalent thereof to CMS in a manner and by a deadline specified by CMS.

1. The PCF Practice shall promptly update its Form CMS-588 or the equivalent thereof if there are account or bank changes, a Change in Control, or a change in the Practice Site.

2. If the PCF Practice fails to submit the Form CMS-588 or complete the equivalent thereof, or if the submitted information is incorrect, CMS will withhold PCF Payments owed to the PCF Practice until the PCF Practice has submitted and CMS has processed a Form CMS-588 or the equivalent thereof with the correct information.

*Section 3.02 Requirements for PCF Practices with Multiple Physical Locations*

a. The PCF Practice may furnish Primary Care Services and Face-to-Face Visits to PCF Beneficiaries at one or more physical locations, provided that:

1. All physical locations at which PCF Practitioners furnish Primary Care Services for which CMS will make PCF Payments use the same CEHRT platform(s);

2. All PCF Practitioners furnish Primary Care Services at all of the physical locations;

3. All Face-to-Face Visits furnished at each physical location are billed under the same TIN;

4. The PCF Practice is able to submit a report for the Care Delivery Intervention Report that describes the Care Delivery Interventions across all physical locations, as described in Section 6.02(b);

5. The PCF Practice is able to submit a report that describes the eCQMs across all physical locations in accordance with the quality reporting requirements described in Section 7.02(b);

6. For the PCF Practice's performance in Performance Year 1, the PCF Practice is able to submit a report that describes the CQMs across all physical locations in accordance with Section 7.03(b); and

7. The PCF Practice is able to submit a report that describes the Patient Experience of Care Survey (**"PECS"**) results across all physical locations in accordance with Section 7.04.

b. The parties acknowledge that, before the start of Performance Year 1, the PCF Practice submitted a list identifying each physical location that meets the criteria and reporting capabilities described in Section 3.02(a).

c. During the Model Performance Period and in a form and manner to be specified by CMS, the PCF Practice may add or remove such physical locations from the list.

d. CMS will determine whether each identified physical location meets the criteria described in Section 3.02(a).

### *Section 3.03 Agreements with PCF Practitioners*

a. The PCF Practice shall issue written notice to every PCF Practitioner, within 10 Days of the PCF Practice adding the individual to the Practitioner Roster, indicating that the individual has been added to the Practitioner Roster. Such notice must include a copy of this Participation Agreement.

b. The PCF Practice shall require each of its PCF Practitioners to take the following actions before furnishing services for which PCF Payments are made under this Participation Agreement:

1. Submit a completed Form CMS-460 to CMS;

2. Reassign his or her right to receive Medicare payment to the PCF Practice and agree to bill Medicare using the TIN of the PCF Practice;

3. Agree to accept the Flat Visit Fee instead of Medicare FFS payments for Face-to-Face Visits;

4. Agree to accept compensation from the PCF Practice that may be positively or negatively adjusted in a manner that corresponds to the PBA that CMS makes to the PCF Practice's TPCP in accordance with Section 5.03; and

5. Agree to comply with the applicable terms of this Participation Agreement.

*Section 3.04 Rosters*

a. Practitioner Roster

1. The PCF Practice shall include on the Practitioner Roster all Practitioners who furnish Primary Care Services under the PCF Practice's TIN, except that the PCF Practice may choose to exclude:

   i. Practitioners furnishing Primary Care Services under the PCF Practice's TIN temporarily;

   ii. Practitioners who also furnish Primary Care Services at a location other than the Practice Site; and

   iii. Medical trainees, including but not limited to interns, residents, and fellows.

2. The parties acknowledge that the PCF Practice submitted to CMS a proposed list of Practitioners as part of its application to participate in the PCF Model. The parties further acknowledge that CMS reviewed the proposed list and issued an initial list of PCF Practitioners to the PCF Practice prior to the start of Performance Year 1.

3. The parties acknowledge that CMS used the initial list of PCF Practitioners issued pursuant to Section 3.04(a)(2) for the purposes of conducting Beneficiary attribution as described in Article 4 for the first calendar quarter of Performance Year 1, and for determining the Practice Risk Group for the PCF Practice for Performance Year 1.

4. The parties acknowledge that, for the purpose of financial and care delivery accountability in the first calendar quarter of Performance Year 1, the initial list of PCF Practitioners became effective on November 13, 2020.

5. The PCF Practice shall keep its Practitioner Roster up to date, by adding PCF Practitioners when appropriate pursuant to Section 3.04(a)(1) and Section 3.04(a)(5)(i), and removing PCF Practitioners when appropriate pursuant to Section 3.04(a)(5)(iii).

   i. The PCF Practice shall submit to CMS through the PCF Practice Portal all required information with respect to one or more Practitioner(s) whom it wishes to add to the Practitioner Roster.

   ii. Changes to the Practitioner Roster that were submitted by the PCF Practice to CMS at least 45 Days before the end of a calendar quarter shall become effective, if not rejected by CMS, on the first Day of the next calendar quarter. Changes that were submitted by the PCF Practice to CMS less than 45 Days before the end of

the calendar quarter will become effective, if not rejected by CMS, on the first Day of the second calendar quarter following the submission.

iii. The PCF Practice shall remove a PCF Practitioner from the Practitioner Roster no later than 30 Days after a PCF Practitioner ceases to furnish Primary Care Services under the PCF Practice's TIN.

iv. CMS may retroactively reject the removal of a PCF Practitioner from the Practitioner Roster, or may adjust the effective date of the individual's removal from the Practitioner Roster, if CMS determines that the PCF Practitioner must still be included on the Practitioner Roster pursuant to Section 3.04(a)(1).

6. CMS will conduct a program integrity screening of each proposed addition to the Practitioner Roster. CMS may reject a proposed addition to the Practitioner Roster on the basis of the results of the screening or because the individual is not eligible to be a PCF Practitioner. The PCF Practice will be able to view in the PCF Practice Portal whether CMS has approved or rejected each proposed addition.

7. CMS may periodically monitor the program integrity history of the PCF Practice and its PCF Practitioners. CMS may remove one or more PCF Practitioners from the Practitioner Roster on the basis of the results of a periodic program integrity screening or information obtained regarding the individual's history of program integrity issues. CMS will specify the effective date of such removal.

b. Staff Roster

1. The PCF Practice shall include on the Staff Roster any individual or entity that is not a PCF Practitioner, who performs functions or services related to PCF Practice Activities on behalf of the PCF Practice, and who the PCF Practice intends for CMS to send ongoing communications regarding PCF Model requirements and announcements. Such individuals or entities may include but are not limited to non-billing clinicians (e.g., RNs, medical assistants, care managers), and administrative staff (e.g., office managers, data analysts). The PCF Practice shall include on the Staff Roster the name, title, phone number, and email address of at least one point of contact for CMS to send ongoing communications regarding PCF Model requirements and announcements.

2. The PCF Practice shall include on the Staff Roster any consultants contracted by or on behalf of the PCF Practice, and health information technology vendors directly contracted by or on behalf of the PCF Practice. For any such consultants or health information technology vendors, the PCF Practice must provide CMS with the name, phone number, and email address of an individual from the consulting entity or health information technology vendor who will serve as point of contact for the consultant or health information technology vendor in communications to and from CMS.

3. The parties acknowledge that the PCF Practice provided CMS a Staff Roster before the start of Performance Year 1. The PCF Practice shall complete, update, and review the Staff Roster in the PCF Practice Portal at least quarterly to ensure accuracy.

*Section 3.05 Changes to PCF Practice*

a. Notwithstanding the provisions in this Section 3.05, all applicable notification requirements in 42 CFR § 424.516 continue to apply to the PCF Practice during the Agreement Term.

b. Change in Name. The PCF Practice shall provide written notice to CMS of any change in its legal name. Such notice must be furnished at least 60 Days before the change in legal name becomes effective and must include a copy of any legal document effecting the name change, authenticated by the appropriate state official (if applicable). The parties shall execute an agreement reflecting the change of the PCF Practice's legal name.

c. Change in TIN. The PCF Practice shall provide at least 60 Days' advance written notice to CMS of any change in the TIN under which the PCF Practice bills Primary Care Services. To provide such notice, the PCF Practice shall complete and submit to CMS a change of TIN form, which CMS will make available in a form and manner to be determined by CMS. In response to a change in the PCF Practice's TIN, CMS may terminate this Participation Agreement, demand immediate re-payment of PCF Payments, or take any other actions consistent with the terms of this Participation Agreement.

d. Change in Control

1. The PCF Practice shall provide written notice to CMS at least 60 Days before the effective date of any Change in Control. This obligation remains in effect until final payment by or to the PCF Practice has been made in accordance with Section 5.04(e).

2. Upon learning of a Change in Control, CMS may take appropriate action to ensure compliance with Model terms by the new controlling entity, including requiring the new controlling entity to execute a novation agreement with CMS or requiring the new controlling entity to execute a new Participation Agreement with CMS. CMS may also terminate the Participation Agreement between the old controlling entity and CMS.

3. CMS may terminate this Participation Agreement or require immediate payment of any amounts owed by the PCF Practice to CMS under this Model, or both, if the Change in Control will render the PCF Practice ineligible for participation in PCF or present a program integrity risk. Examples of a Change in Control that would render the PCF Practice ineligible for participation in PCF include, but are not limited to:

i. Changes that result in the PCF Practice no longer providing Primary Care Services;

ii. Designation as a Rural Health Clinic or Federally Qualified Health Center; or

iii. Changes that result in the PCF Practice's participation in a CMS program that precludes participation in PCF.

e. Change in Practice Site. The PCF Practice shall provide written notice to CMS at least 60 Days before any change to the Practice Site used for TIN purposes. This obligation remains in effect until final payment by or to the PCF Practice has been made in accordance with Section 5.04(e).

f. Change in Primary Point of Contact. The PCF Practice shall report to CMS through the PCF Practice Portal any changes to the contact information for the PCF Practice's primary point of contact no later than 15 Days after the change.

g. Prohibition on Assignment

1. Except with the prior written consent of CMS, the PCF Practice shall not transfer, including by merger (whether the PCF Practice is the surviving or disappearing entity), consolidation, dissolution, or otherwise any:

    i. Discretion granted it under this Participation Agreement;

    ii. Right that it has to satisfy a condition under this Participation Agreement;

    iii. Remedy that it has under this Participation Agreement; or

    iv. Obligation imposed on it under this Participation Agreement..

2. The PCF Practice shall provide written notice to CMS at least 30 Days before the effective date of any such proposed transfer. This obligation remains in effect until final payment by or to the PCF Practice has been made in accordance with Section 5.04(e). CMS may condition its consent to such transfer on full payment of any amounts owed by the PCF Practice under this Model or owed to CMS by the proposed assignee. Any purported transfer in violation of this Section is voidable at the discretion of CMS.

### *Section 3.06 Program Overlap*

a. The PCF Practice shall not simultaneously participate in PCF and any CMS Accountable Care Organization ("ACO") initiative except in accordance with Section 3.06(d).

b. The PCF Practice shall not simultaneously participate in PCF and the GPDC Model, the IAH Demonstration, the Value in Treatment Demonstration, the FAI for Medicare-Medicaid Enrollees, the KCC Model, the CHART Model, or any future Innovation Center model, demonstration, or other initiative that precludes participation in PCF.

c. The PCF Practice may simultaneously participate in, and the PCF Beneficiaries may simultaneously be attributed to participants in:

1. The Million Hearts®: Cardiovascular Disease Risk Reduction Model;

2. Oncology Care Model;

3. Radiation Oncology Model, if finalized;

4. Bundled Payments for Care Improvement ("BPCI") Advanced Initiative;

5. The Comprehensive Care for Joint Replacement Model;

6. Emergency Triage, Treat, and Transport Model ("ET3");

7. The Accountable Health Communities ("AHC") Model; and

8. The Shared Savings Program, in accordance with Section 3.06(d).

d. Participation in the Shared Savings Program

1. The PCF Practice may participate as an ACO Participant in an ACO participating under any Track in the Shared Savings Program.

2. If the PCF Practice was approved to be an ACO Participant in the Shared Savings Program before the Effective Date, and the PCF Practice intended to simultaneously participate in PCF and the Shared Savings Program:

i. The parties acknowledge that the PCF Practice was required to submit to CMS by October 1, 2020, a written statement signed by a representative of the leadership of the Shared Savings Program ACO.

ii. The statement was required to include:

A. An acknowledgement by such representative that the PCF Practice's participation in PCF may impact the ACO's total expenditures; and

B. An attestation by such representative that any PCF Payments will be segregated from funds of the ACO and will be used solely by the PCF Practice.

3. If the PCF Practice is approved to be an ACO Participant in the Shared Savings Program after the Effective Date of this Participation Agreement, and the PCF Practice intends to simultaneously participate in PCF and the Shared Savings Program:

i. The PCF Practice shall, no later than 30 Days after the PCF Practice is approved to be an ACO Participant, submit to CMS a written statement signed by a representative of the leadership of the Shared Savings Program ACO.

ii. This statement must include:

A. An acknowledgement by such representative that the PCF Practice's participation in PCF may impact the ACO's total expenditures; and

B. An attestation by such representative that any PCF Payments will be segregated from funds of the ACO and will be used solely by the PCF Practice.

4. If at any time during the term of this Participation Agreement the PCF Practice's participation in a Shared Savings Program ACO is terminated, the PCF Practice shall notify CMS no later than 30 Days after the effective date of such termination.

5. Payment

   i. The PCF Practice shall be eligible for PCF Payments during any calendar quarter, in whole or in part, in which the PCF Practice participates as an ACO Participant in an ACO participating under any Track of the Shared Savings Program.

   ii. The PCF Practice acknowledges that any beneficiary-identifiable PCF Payments to the PCF Practice for PCF Beneficiaries who are also assigned under the Shared Savings Program to the ACO in which the PCF Practice is an ACO Participant will be treated as expenditures for purposes of financial calculations under the Shared Savings Program.

e. CMS will annually publish, in a form and manner to be specified by CMS, a list in which CMS will specify the Innovation Center models, programs, initiatives, and demonstrations in which the PCF Practice may simultaneously participate during the Model Performance Period. CMS may update the list unilaterally and without the consent of the PCF Practice.

*Section 3.07 Health Information Technology Requirements / Interoperability*

a. The PCF Practice shall comply with the PCF health information technology requirements as described in Appendix B of this Participation Agreement.

b. Before the start of each Performance Year, the PCF Practice shall, in a form and manner to be determined by CMS, attest that it has complied with the PCF health information technology requirements as described in Appendix B of this Participation Agreement.

c. If CMS makes any changes to Appendix B during a Performance Year, the PCF Practice shall attest, at a time and in a manner to be determined by CMS, that the PCF Practice has complied with the updated Appendix B.

## Article 4. <u>Beneficiary Attribution</u>

*Section 4.01 Beneficiary Attribution to the PCF Practice*

a. For a Beneficiary to be eligible for attribution ("Eligible Beneficiary") to the PCF Practice or a Participating PCF Practice, the Beneficiary must meet the following requirements:

   1. Is enrolled in both Medicare Parts A and B;

   2. Has Medicare as their primary payer;

   3. Does not have end stage renal disease (ESRD) at time of initial attribution;

4. Is not enrolled in hospice at the time of initial attribution;

5. Is not covered under a Medicare Advantage or other Medicare health plan;

6. Is not institutionalized;

7. Is not incarcerated;

8. Is not on a Seriously Ill Population Assignment List;

9. Is alive;

10. Is not enrolled in, assigned to, or aligned to a participant in any other model that includes a Medicare FFS shared savings opportunity, except that an Eligible Beneficiary may be assigned to a Medicare Shared Savings Program ACO in which the PCF Practice is an ACO participant (as defined at 42 CFR § 425.20); and

11. Is not a Medicare–Medicaid enrollee (dual eligible individual) that is enrolled in a demonstration under the Financial Alignment Initiative (FAI).

b. CMS will attribute an Eligible Beneficiary to the PCF Practice pursuant to the following rules:

1. CMS will attribute an Eligible Beneficiary to the PCF Practice if, at the time CMS conducts Beneficiary attribution under this Model, the Eligible Beneficiary has identified a PCF Practitioner as their primary clinician through Voluntary Alignment. If the PCF Practitioner to whom the PCF Beneficiary identified as their primary clinician through Voluntary Alignment is subsequently removed from the Practitioner Roster, CMS will de-attribute the PCF Beneficiary from the PCF Practice.

2. Except as set forth in accordance with Sections 4.01(b)(4), (5), and (6), for Performance Year 1, CMS will attribute an Eligible Beneficiary to the PCF Practice if, during the most recently available 24-month look-back period, the PCF Practice billed for the following:

   i. The Eligible Beneficiary's most recent CCM Related Service;

   ii. The Eligible Beneficiary's most recent Annual Wellness Visit or Welcome to Medicare Visit; or

   iii. The plurality of certain Primary Care Services identified as eligible for attribution in the PCF Payment and Attribution Methodologies Paper (**"Attribution Eligible Primary Care Services"**) for the Eligible Beneficiary.

3. Except as set forth in accordance with Sections 4.01(b)(4), (5), and (6), for Performance Year 2 and each subsequent Performance Year, CMS will attribute an Eligible Beneficiary to the PCF Practice if, during the most recently available 24-month look-back period, the PCF Practice billed for the following:

i. The Eligible Beneficiary's most recent Annual Wellness Visit or Welcome to Medicare Visit; or

ii. The plurality of Attribution Eligible Primary Care Services for the Eligible Beneficiary.

4. If one or more Participating PCF Practices or non-PCF Practitioners have billed an equal number of claims compared to the PCF Practice for Attribution Eligible Primary Care Services furnished to an Eligible Beneficiary, and no such individual or entity has billed a greater number of claims compared to the PCF Practice for Attribution Eligible Primary Care Services furnished to the same Eligible Beneficiary, CMS will deem the PCF Practice to have billed for the plurality of the Attribution Eligible Primary Care Services furnished to that Eligible Beneficiary if the PCF Practice billed the most recent claim for an Attribution Eligible Primary Care Service furnished to the Eligible Beneficiary.

5. An Eligible Beneficiary will not be attributed to the PCF Practice if, at the time CMS conducts attribution for this Model, the Eligible Beneficiary has identified as their primary clinician in Medicare.gov a clinician who is not a PCF Practitioner.

6. An Eligible Beneficiary shall not be attributed to the PCF Practice if, at the time CMS conducts attribution for this Model, CMS has aligned, assigned, or attributed the Eligible Beneficiary to another model, demonstration, or program, including, but not limited to, the Next Generation Accountable Care Organization Model, the GPDC Model or the Medicare Shared Savings Program, except that an Eligible Beneficiary assigned to an ACO participating in the Medicare Shared Savings Program will be attributed to both the PCF Practice and the ACO if the PCF Practice is an "ACO participant" (as defined at 42 CFR § 425.20) in the ACO and all other conditions for attribution to the PCF Practice are satisfied.

c. CMS will run attribution and provide the PCF Practice with a list of its PCF Beneficiaries quarterly.

d. At all times, PCF Beneficiaries remain free to select the Practitioners and services of their choice and will continue to be responsible for all applicable Beneficiary cost-sharing. PCF does not include any restrictions on or changes to Medicare FFS benefits, nor does it include provisions for Eligible Beneficiaries to opt out of attribution to the PCF Practice for purposes of the Model.

*Section 4.02 Voluntary Alignment*

a. Subject to the prohibitions in Sections 9.02(b) and 9.05(a), the PCF Practice may notify Eligible Beneficiaries of the opportunity to participate in Voluntary Alignment. If the PCF Practice chooses to provide such a notification, the PCF Practice must notify all Eligible Beneficiaries in a form and manner specified by CMS, which may include distributing an official CMS Voluntary Alignment Fact Sheet to each Eligible Beneficiary.

1. The PCF Practice shall accurately respond to questions from Eligible Beneficiaries regarding Voluntary Alignment.

2. The PCF Practice shall not enter an Eligible Beneficiary's choice of primary clinician on Medicare.gov, or, if offered by CMS under PCF, the paper-based form on behalf of the Eligible Beneficiary.

3. The PCF Practice shall not make changes to the official Voluntary Alignment Fact Sheet provided by CMS.

b. Prohibition on Influencing or Attempting to Influence the Beneficiary

1. The PCF Practice and other individuals or entities performing functions or services related to PCF Practice Activities shall not provide gifts or other remuneration to Beneficiaries as inducements to influence a Beneficiary's decision to identify a specific practitioner as his or her primary clinician in Medicare.gov or, if offered by CMS under PCF, on the paper-based form.

2. The PCF Practice and other individuals or entities performing functions or services related to PCF Practice Activities shall not, directly or indirectly, commit any act or omission, nor adopt any policy that coerces or otherwise influences a Beneficiary's decision to identify a specific practitioner as his or her primary clinician in Medicare.gov, or, if offered by CMS under PCF, the paper-based form, including but not limited to the following:

i. Offering of anything of value to the Beneficiary; and

ii. Withholding or threatening to withhold medical services or limiting or threatening to limit access to care.

## Article 5. Payment

### *Section 5.01 General Payment Policies*

a. CMS will make PCF Payments to the PCF Practice during the Model Performance Period.

b. CMS will pay a Professional PBP to the PCF Practice based on the number of PCF Beneficiaries attributed to the PCF Practice. CMS will also pay the PCF Practice a Flat Visit Fee for each Face-to-Face Visit furnished by the PCF Practitioners to a PCF Beneficiary under the PCF Practice's TIN, rather than the payment amounts set forth under the Physician Fee Schedule during the Model Performance Period.

c. The PCF Practice shall compensate PCF Practitioners in a manner that reflects their individual performance on the measures that CMS uses to determine the PCF Practice's PBA, as described in Section 5.03.

d. CMS will not reimburse the PCF Practice for the provision of duplicative services (including but not limited to CCM Related Services) by a PCF Practitioner to a PCF Beneficiary. CMS will deem a service to be duplicative if the service is included in the subset of Primary Care Services that the Professional PBP is intended to cover, but excluded from the services that the PCF Practice may bill for as a Face-to-Face Visit. If CMS receives a claim for a duplicative service from the PCF Practice, CMS will deny the claim.

e. Additional details about the payment methodology and the quality measures are described in the PCF Payment and Attribution Methodologies Paper. The PCF Practice represents that it received the PCF Payment and Attribution Methodologies Paper for Performance Year 1 prior to signing this Participation Agreement. CMS will publish an annual PCF Payment and Attribution Methodologies Paper for each of Performance Years 2-5, and will make it available to the PCF Practice no later than 30 Days before the start of each such Performance Year.

### *Section 5.02 Total Primary Care Payment*

a. CMS will pay to the PCF Practice a TPCP that consists of the quarterly Professional PBP and the Flat Visit Fee.

b. The TPCP is subject to the 2% Medicare sequestration and to the Merit-based Incentive Payment System ("MIPS") adjustment which will be applied as described in the PCF Payment and Attribution Methodologies Paper and in accordance with applicable laws and regulations.

c. Professional PBP

1. CMS will pay the PCF Practice a Professional PBP during each calendar quarter of a Performance Year.

2. For a given Performance Year, CMS will publish, in the PCF Payment and Attribution Methodologies Paper, the HCPCS Codes for the subset of Primary Care Services that the Professional PBP is intended to cover.

3. Practice Risk Adjustment and Grouping

i. To determine the amount of the PCF Practice's Professional PBP, CMS will calculate a Practice Risk Score for the PCF Practice based on the average risk score of its attributed beneficiaries in one or more preceding calendar years, as described in greater detail in the PCF Payment and Attribution Methodologies Paper. The PCF Practice will be assigned to one of four Practice Risk Groups, based on its Practice Risk Score.

ii. CMS will determine the Practice Risk Score and Practice Risk Group annually. CMS will notify the PCF Practice of its Practice Risk Group before the beginning of each Performance Year through the PCF Practice Portal.

iii. CMS will not change the Practice Risk Score or Practice Risk Group during the Performance Year, except in the following circumstances:

A. To correct a calculation error; or

B. If CMS determines that significant, unexpected, or irregular changes in coding have occurred.

iv. If CMS determines that either circumstance described in Section 5.02(c)(3)(iii) has occurred, CMS will change the Practice Risk Score or Practice Risk Group, or both, if appropriate. If CMS determines that the circumstance described in Section 5.02(c)(3)(iii)(B) has occurred, CMS may change the Practice Risk Score or Practice Risk Group, or adjust the methodology used to calculate the Practice Risk Score or Practice Risk Group, or both.

4. Amount of Professional PBP

i. The Professional PBP base amounts, before the adjustments described in Section 5.02(b) and Section 5.02(c)(4)(ii)-(iv), for each Practice Risk Group are as follows:

A. Practice Risk Group 1: $28 PBPM

B. Practice Risk Group 2: $45 PBPM

C. Practice Risk Group 3: $100 PBPM

D. Practice Risk Group 4: $175 PBPM

ii. CMS will geographically adjust the Professional PBP base amounts using the geographic adjustment factor. The geographic adjustment methodology for the Professional PBP is described in the PCF Payment and Attribution Methodologies Paper.

iii. CMS may adjust the Professional PBP base amounts annually to reflect updates to relevant Physician Fee Schedule payment rates for the services included in the Professional PBP base rate calculation, including but not limited to HCPCS coding changes, changes in relative value unit assignments, and updated adjustment factors.

iv. Starting in the third calendar quarter of Performance Year 2, CMS will apply a Leakage Adjustment to the Professional PBP on a quarterly basis. The Leakage

Adjustment calculation methodology is described in the PCF Payment and Attribution Methodologies Paper.

d. Flat Visit Fee

1. CMS will pay the PCF Practice a Flat Visit Fee at a base rate (before the adjustments described in Section 5.02(b) and Section 5.02(d)(1)(i)-(ii)) of $40.82 for each Face-to-Face Visit the PCF Practice has with a PCF Beneficiary.

   i. The Flat Visit Fee base rate is geographically adjusted in accordance with the methodology as described in the PCF Payment and Attribution Methodologies Paper.

   ii. CMS may adjust the Flat Visit Fee base rate to reflect updates to relevant Physician Fee Schedule payment rates for the services included in the Flat Visit Fee base rate calculation, including but not limited to HCPCS coding changes, changes in relative value unit assignments, and updated adjustment factors.

2. CMS will pay the PCF Practice a Flat Visit Fee when the PCF Practice submits a Medicare Part B claim for a Face-to-Face Visit furnished to a PCF Beneficiary. CMS will not pay to the PCF Practice more than one Flat Visit Fee per PCF Beneficiary per Day.

3. CMS will publish the list of HCPCS codes for which it pays the Flat Visit Fee in the PCF Payment and Attribution Methodologies Paper.

4. <u>Shortage Area Bonus</u>. For services furnished in Performance Year 2 and each subsequent Performance Year, if the PCF Practice furnishes a service to a PCF Beneficiary in an area that is designated (under Section 332(a)(1)(A) of the Public Health Service Act) as a "health professional shortage area," as identified by the Secretary prior to the beginning of Performance Year 2 or a subsequent Performance Year, and that service qualifies as both a Face-to-Face Visit and a physician's service for which CMS would, under Medicare FFS, make a 10 percent payment to a physician (or to an employer or facility in the cases described in clause (A) of Section 1842(b)(6) of the Act) under Section 1833(m)(1) of the Act ("Shortage Area Bonus Eligible Services"), CMS will pay to the PCF Practice a bonus payment ("Shortage Area Bonus").

   i. CMS will compute the Shortage Area Bonus as follows:

      A. CMS will receive from the appropriate regional Medicare Administrative Contractors claims data, payment data, and administrative data (e.g., TINs, NPIs), and the zip code of the site of service of claims, for each Performance Year.

      B. CMS will use this data to determine whether the PCF Practice has furnished Shortage Area Bonus Eligible Services in a Performance Year.

C. CMS will determine the actual amount paid by CMS as Flat Visit Fees to the PCF Practice for all Shortage Area Bonus Eligible Services furnished to PCF Beneficiaries, and the amount that CMS would have paid to the PCF Practice for furnishing those Shortage Area Bonus Eligible Services to PCF Beneficiaries if the PCF Practice were paid under FFS Medicare. CMS will then determine the difference between these two numbers.

D. CMS will compute the Shortage Area Bonus by multiplying the difference between these two numbers by 10%.

ii. CMS will calculate and pay the Shortage Area Bonus to the PCF Practice on an annual basis.

iii. CMS will pay the Shortage Area Bonus to the PCF Practice in the third calendar quarter after the end of the Performance Year in which the PCF Practice furnished Shortage Area Bonus Eligible Services to PCF Beneficiaries.

iv. The Shortage Area Bonus paid by CMS to the PCF Practice will not be included in the TPCP, and CMS will not apply the PBA to the Shortage Area Bonus.

5. Except when the PCF Practice is permitted by CMS to provide Cost-Sharing Support to a PCF Beneficiary pursuant to Section 9.05(b), CMS will calculate all applicable cost-sharing amounts based on the full FFS allowed amount of the Face-to-Face Visit claim according to the Physician Fee Schedule.

*Section 5.03 Performance Based Adjustment (PBA)*

a. General

1. CMS will apply the PBA to the PCF Practice's TPCP every calendar quarter starting in the second calendar quarter of Performance Year 2. A calendar quarter in which a PBA is applied to the PCF Practice's TPCP is a **"PBA Quarter."**

2. When calculating the PCF Practice's PBA for a PBA Quarter, CMS will consider the PCF Practice's performance on the PBA measures during a rolling four calendar quarter look-back period that ends three months before the PBA Quarter (**"PBA Performance Period"**). The first PBA Performance Period begins in the first calendar quarter of Performance Year 1.

3. To determine whether the PCF Practice is eligible for a positive or neutral PBA, CMS will assess the PCF Practice's performance on the Quality Gateway on an annual basis; against the National AHU Benchmark or National TPCC Benchmark on a quarterly basis (**"National PBA Measure Thresholds"**), as described in Section 5.03(b); and against the Peer Region AHU Benchmark or the Peer Region TPCC Benchmark on a quarterly basis, as described in Section 5.03(c).

4. CMS will determine the PCF Practice's PBA by applying two adjustments:

i. Regional Performance Adjustment. The Regional Performance Adjustment is based on performance on the Peer Region AHU Benchmark or the Peer Region TPCC Benchmark, depending on the PCF Practice's assigned Practice Risk Group. The Regional Performance Adjustment is calculated and applied as set forth in Section 5.03(c).

ii. Continuous Improvement (CI) Bonus. The CI Bonus is based on AHU or TPCC performance, as applicable, relative to the PCF Practice's own previous AHU and TPCC performance. The CI Bonus is calculated and applied as set forth in Section 5.03(d).

5. CMS will calculate and apply the PBA differently than as described in Section 5.03(a)(1) through (4) during the final two calendar quarters of Model Performance Period. CMS will describe the methodology it will use to calculate and apply the PBA during those quarters in an amendment to this Participation Agreement and the PCF Payment and Attribution Methodologies Paper published for Performance Year 5.

b. PBA Measure Thresholds

1. Quality Gateway

i. General

A. CMS will assess the PCF Practice's Quality Gateway performance on an annual basis, beginning in Performance Year 1.

B. The PCF Practice's performance on the Quality Gateway during a Performance Year will impact the magnitude of the PBA that CMS applies to the PCF Practice's TPCP in each PBA Quarter of the following Performance Year.

C. CMS will determine whether the PCF Practice met or exceeded the Quality Gateway for the preceding Performance Year no later than the end of each Performance Year. If CMS makes PCF Payments to the PCF Practice during a Performance Year that, after CMS calculates the Quality Gateway for the preceding Performance Year, are determined to be inaccurate, CMS will adjust PCF Payments in future calendar quarters as described in Section 5.04(a).

D. The Quality Gateway will depend on the Performance Year and the PCF Practice's Practice Risk Group.

E. For each quality measure included in the Quality Gateway, CMS will set a threshold based on national benchmarks. To meet or exceed the Quality Gateway for a Performance Year, the PCF Practice must meet the national benchmark thresholds for all measures included in the applicable Quality Gateway.

F. Except as provided in Section 5.03(b)(1)(i)(G) and (H), the quality measures included in the Quality Gateway for a given Performance Year, and the national benchmark thresholds established by CMS for those measures, will be described in the PCF Payment and Attribution Methodologies Paper for each Performance Year.

G. If the PCF Practice reports the Advance Care Plan CQM as described in Section 7.03(b), the PCF Practice will satisfy the Advance Care Plan CQM threshold for Quality Gateway purposes, notwithstanding the national benchmark threshold provided in the PCF Payment and Attribution Methodologies Paper for Performance Year 1.

H. If the PCF Practice does not report the Advance Care Plan CQM, the PCF Practice will not meet the Performance Year 1 Quality Gateway.

ii. The PCF Practice must meet or exceed the Quality Gateway during Performance Year 1 to be eligible to receive a positive PBA in any PBA Quarter of Performance Year 2.

iii. If the PCF Practice does not meet the applicable Quality Gateway during Performance Year 1, CMS will apply to the PCF Practice's TPCP, for each PBA Quarter of Performance Year 2, either:

A. A 0% PBA for a PBA Quarter if, during the applicable PBA Performance Period, the PCF Practice's AHU or TPCC performance met or exceeded the 25th percentile of the Peer Region AHU Benchmark or Peer Region TPCC Benchmark, regardless of the PCF Practice's performance against the National AHU Benchmark or National TPCC Benchmark; or

B. A negative 10% PBA for a PBA Quarter if, during the applicable PBA Performance Period, the PCF Practice's AHU or TPCC performance did not meet the 25th percentile of the Peer Region AHU Benchmark or the Peer Region TPCC Benchmark, regardless of the PCF Practice's performance against the National AHU Benchmark or National TPCC Benchmark.

iv. Starting in Performance Year 3, and for each subsequent Performance Year, if the PCF Practice does not meet or exceed the Quality Gateway in the preceding Performance Year:

A. CMS will apply a negative 10% PBA for each PBA Quarter during the Performance Year that follows the Performance Year in which the PCF Practice did not meet or exceed the Quality Gateway, regardless of the PCF Practice's performance against the National AHU Benchmark or National TPCC Benchmark or against the Peer Region AHU Benchmark or Peer Region TPCC Benchmark; and

B. The PCF Practice will not be eligible for a CI Bonus in any PBA Quarter in the Performance Year that follows the Performance Year in which the PCF Practice did not meet or exceed the Quality Gateway.

2. National AHU or TPCC Benchmark

i. General

A. CMS will consider the PCF Practice's AHU or TPCC performance against the National AHU Benchmark or National TPCC Benchmark in determining the PCF Practice's PBA for a given PBA Quarter only if the PCF Practice meets or exceeds the applicable Quality Gateway.

B. If the PCF Practice meets or exceeds the applicable Quality Gateway, CMS will calculate the PCF Practice's AHU or TPCC performance against the National AHU Benchmark or National TPCC Benchmark on a quarterly basis during each PBA Performance Period.

C. If the PCF Practice is in Practice Risk Group 1 or 2, CMS will compare the PCF Practice's AHU performance against the National AHU Benchmark during each PBA Performance Period in determining the PCF Practice's PBA for any given PBA Quarter.

D. If the PCF Practice is in Practice Risk Group 3 or 4, CMS will compare the PCF Practice's TPCC performance against the National TPCC Benchmark during each PBA Performance Period in determining the PCF Practice's PBA for any given PBA Quarter.

ii. The PCF Practice's AHU or TPCC performance must meet or exceed the National AHU Benchmark or National TPCC Benchmark in a PBA Performance Period for the PCF Practice to be eligible to receive a positive Regional Performance Adjustment for the corresponding PBA Quarter.

c. Regional Performance Adjustment

1. CMS will calculate the Regional Performance Adjustment for the PCF Practice on a quarterly basis based on the PCF Practice's performance relative to the Peer Region AHU Benchmark or the Peer Region TPCC Benchmark during each PBA Performance Period.

2. If the PCF Practice's AHU or TPCC performance meets or exceeds the National AHU Benchmark or National TPCC Benchmark, the PCF Practice will receive a Regional Performance Adjustment during a given PBA Quarter based on the following Peer Region AHU Benchmark or Peer Region TPCC Benchmark performance levels:

i. For performance level 1 (at or above the 90th percentile), the Regional Performance Adjustment is 34% of the TPCP;

ii. For performance level 2 (in the 80th to 89th percentile), the Regional Performance Adjustment is 27% of TPCP;

iii. For performance level 3 (in the 70th to 79th percentile), the Regional Performance Adjustment is 20% of TPCP;

iv. For performance level 4 (in the 60th to 69th percentile), the Regional Performance Adjustment is 13% of TPCP;

v. For performance level 5 (in the 50th to 59th percentile), the Regional Performance Adjustment is 6.5% of TPCP;

vi. For performance level 6 (in the 25th to 49th percentile), the Regional Performance Adjustment is 0% of the TPCP; and

vii. For performance level 7 (below the 25th percentile), the Regional Performance Adjustment is a negative 10% of the TPCP.

3. If the PCF Practice's AHU or TPCC performance does not meet or exceed the National AHU Benchmark or National TPCC Benchmark, the PCF Practice will receive a Regional Performance Adjustment during a given PBA Quarter based on the following Peer Region AHU Benchmark or Peer Region TPCC Benchmark performance levels:

i. For performance level 1 through 6 (at or above the 25th percentile), the Regional Performance Adjustment is 0%; and

ii. For performance level 7 (below the 25th percentile), the Regional Performance Adjustment is negative 10%.

d. Continuous Improvement (CI) Bonus

1. General

i. The PCF Practice is eligible to begin receiving the CI Bonus as part of the PBA starting in the second calendar quarter of Performance Year 2.

ii. The PCF Practice must meet or exceed the Quality Gateway for a Performance Year to be eligible to receive the CI Bonus for any PBA Quarter in the subsequent Performance Year.

iii. If the PCF Practice is eligible for a CI Bonus, CMS will determine whether the PCF Practice will receive a CI Bonus in a PBA Quarter by comparing the PCF Practice's AHU or TPCC performance during the PBA Performance Period to the PCF Practice's performance during the 12-month period immediately preceding the PBA Performance Period (**"Base Performance Period"**).

iv. If CMS determines that the ratio of AHU or TPCC performance in the PBA Performance Period to AHU or TPCC performance in the Base Performance Period is less than 0.95 or greater than 1.05 for non-participating practices in a

Peer Region Group, CMS may adjust the Base Performance Period to ensure that assessment of the CI Bonus is based on PCF practice performance improvements rather than broader national or regional changes in healthcare utilization.

v. For CMS to pay to the PCF Practice a CI Bonus, the PCF Practice must have improved its AHU or TPCC performance between the time periods described in Section 5.03(d)(1)(iii) by a statistically reliable percentage threshold (**"Improvement Target"**). Improvement Targets will range from 3% to 5%. The Improvement Target for each Performance Year will be specified in the PCF Payment and Attribution Methodologies Paper.

vi. If the PCF Practice achieves the Improvement Target for a given calendar quarter, the amount of the CI Bonus will correspond to the PCF Practice's Regional Performance Adjustment performance level as described in Section 5.03(d)(2).

2. If the PCF Practice's AHU or TPCC performance meets or exceeds the National AHU Benchmark or National TPCC Benchmark, and the PCF Practice achieves the Improvement Target during a PBA Performance Period as described in Section 5.03(d)(1)(iii), CMS will adjust the PCF Practice's TPCP in the applicable PBA Quarter by the CI Bonus. The CI Bonus that CMS will apply to the PCF Practice's TPCP will correspond to the PCF Practice's Peer Region AHU Benchmark or Peer Region TPCC Benchmark performance level, as follows:

   i. For performance level 1 (at or above the 90th percentile), the CI Bonus is 16% of TPCP;

   ii. For performance level 2 (in the 80th to 89th percentile), the CI Bonus is 13% of TPCP;

   iii. For performance level 3 (in the 70th to 79th percentile) the CI Bonus is 10% of TPCP;

   iv. For performance level 4 (in the 60th to 69th percentile), the CI Bonus is 7% of TPCP; and

   v. For performance levels 5 through 7 (at or below the 59th percentile), the CI Bonus is 3.5% of TPCP.

3. If the PCF Practice's AHU or TPCC performance does not meet or exceed the National AHU Benchmark or National TPCC Benchmark, and the PCF Practice achieves the Improvement Target during a PBA Performance Period as described in Section 5.03(d)(1)(iii), CMS will adjust the PCF Practice's TPCP by a CI Bonus of 3.5% of the TPCP during a given PBA Quarter, regardless of the PCF Practice's Peer Region AHU Benchmark or Peer Region TPCC Benchmark performance level.

*Section 5.04 Reconciliation and Settlement*

a. Periodic PCF Payment Adjustments. If CMS determines during a Performance Year that the amount of a PCF Payment made to the PCF Practice by CMS during that Performance Year has been calculated in error, including because CMS determines subsequent to making a PCF Payment to the PCF Practice that any PCF Beneficiaries became ineligible for attribution to the PCF Practice, or the PCF Practice failed to meet or exceed the applicable Quality Gateway, CMS will calculate the difference between the amount of the PCF Payment that was paid to the PCF Practice and the amount of the PCF Payment that should have been paid to the PCF Practice. CMS will adjust the amount of a subsequent PCF Payment made by CMS to the PCF Practice by the amount of the difference (each adjustment, a "**PCF Payment Adjustment**").

1. If the amount of the PCF Payment actually made to the PCF Practice exceeds the correct PCF Payment amount, CMS will make a PCF Payment Adjustment by subtracting the excess amount from a subsequent quarterly PCF Payment amount in the manner described in the PCF Payment and Attribution Methodologies Paper.

2. If the amount of the PCF Payment actually made to the PCF Practice is less than the correct PCF Payment amount, CMS will make a PCF Payment Adjustment by increasing the PCF Payment to the PCF Practice during a subsequent calendar quarter in the amount of the payment deficiency in the manner described in the PCF Payment and Attribution Methodologies Paper.

b. If the PCF Practice is no longer receiving a TPCP either as a result of termination from the Model in accordance with Article 15 of this Participation Agreement, or because the Model Performance Period has ended, CMS will collect from the PCF Practice any amount owed to CMS.

c. If the PCF Practice has earned a negative PBA during the final Performance Year of the Model, CMS will collect from the PCF Practice an amount determined in accordance with this Participation Agreement.

d. CMS will issue a Quarterly Payment Report to the PCF Practice setting forth the amount of the quarterly PBA and all associated data and scoring.

e. Final Financial Settlement Report

1. Upon expiration or termination of the Model Performance Period, CMS will issue to the PCF Practice a final financial settlement report setting forth the type and amount of any PCF Payments that the PCF Practice must repay to CMS, or that CMS must make to the PCF Practice, in accordance with this Participation Agreement ("**Final Financial Settlement Report**").

2. If the Final Financial Settlement Report indicates that CMS owes the PCF Practice additional payment, CMS will make such payment within 30 Days after the Final Financial Settlement Report is deemed final in accordance with Section 5.04(f).

3. If the Final Financial Settlement Report indicates that the PCF Practice owes CMS repayment, CMS will issue the PCF Practice a demand letter for any amounts determined to be owed to CMS. The PCF Practice shall pay CMS any final monies owed within 30 Days of the date of the demand letter. If CMS does not timely receive payment in full, the remaining monies owed shall be considered a delinquent debt subject to the provisions of Section 5.04(h) of this Participation Agreement below.

f. Error Notice

1. CMS will deem any settlement report, including the Quarterly Payment Report and the Final Financial Settlement Report, final 30 Days after the date it is issued, unless the PCF Practice submits to CMS written notice of an error in the mathematical calculations in the Final Financial Settlement Report within 30 Days after CMS issues it to the PCF Practice (**"Timely Error Notice"**).

2. Upon receipt of a Timely Error Notice, CMS will review the calculations in question and any mathematical issues raised by the PCF Practice in its written notice.

3. CMS will issue to the PCF Practice either a written determination that the settlement report is correct, or a revised settlement report. Such written determination or revised Final Financial Settlement Report is final on the date it is issued by CMS.

4. There shall be no further administrative or judicial review of the Final Financial Settlement Report, written determination, or revised Final Financial Settlement Report.

g. Settlement Reopening

1. If as a result of any inspection, evaluation, investigation, or audit conducted by CMS or HHS, it is determined that the amount due to the PCF Practice from CMS or due to CMS from the PCF Practice has been calculated in error, CMS may, for a period of six years following the expiration or termination of this Participation Agreement, reopen any Final Financial Settlement Report or Revised Final Financial Settlement Report to recalculate the monies owed, issue a revised Final Financial Settlement Report, and make or demand payment of any monies owed to or by the PCF Practice.

2. CMS may reopen and revise any Financial Settlement Report or revised Financial Settlement Report at any time in the event of fraud or similar fault by the PCF Practice.

3. The parties shall pay any amounts determined to be owed as a result of a reopening under this Section.

h. Delinquent Debt

1. If the PCF Practice fails to pay amounts due CMS in full by the date specified in any demand letter, CMS may assess simple interest on the unpaid balance at the rate applicable to other Medicare debts under 42 CFR § 405.378. Interest shall be calculated in 30-Day periods and shall be assessed for each 30-Day period that payment is not made in full.

2. If the PCF Practice fails to pay amounts due CMS in full by the date specified in any demand letter, CMS will recoup the unpaid balance from the PCF Practice's present and future Medicare payments otherwise owed to the PCF Practice in accordance with standard Medicare recoupment procedures and regulations. If CMS is unable to recoup the full amount via Medicare payments, CMS may use any applicable debt collection tools available and invoke all legal means necessary to collect the debt, including referral of the remaining monies owed to the U.S. Department of the Treasury.

## Article 6. PCF Care Delivery Interventions

### *Section 6.01 General*

The PCF Practice shall require and ensure that its PCF Practitioners and staff implement the PCF Care Delivery Interventions in accordance with the five comprehensive primary care functions as described in Appendix A of this Participation Agreement:

a. Access and Continuity

b. Care Management

c. Comprehensiveness and Coordination

d. Patient and Caregiver Engagement

e. Planned Care and Population Health

### *Section 6.02 PCF Care Delivery Interventions*

a. The PCF Practice shall use PCF Care Delivery Interventions as described in Appendix A of this Participation Agreement as guidelines for delivery of care to PCF Beneficiaries, and shall report on the PCF Care Delivery Interventions in accordance with Section 6.02(b).

b. Practice Reporting

1. The PCF Practice shall submit a Care Delivery Intervention Report to CMS at least once per Performance Year, by the date(s) specified in each Performance Year in the Care Delivery Reporting Guide, regarding its implementation of the PCF Care Delivery Interventions. The PCF Practice shall submit the Care Delivery Intervention Report to CMS through the PCF Practice Portal by the date and in the form and manner specified by CMS in the Care Delivery Reporting Guide.

2. The PCF Practice may request an extension for submitting its Care Delivery Intervention Report at a time and in a manner to be specified by CMS in the PCF Care Delivery Reporting Guide.

3. The PCF Practice shall not include any PHI in its Care Delivery Intervention Report.

## Article 7. Quality Reporting Requirements

### *Section 7.01 General*

a. The PCF Practice shall complete reporting for all patients, regardless of payer or insurance status, who received a service billed for under the PCF Practice's TIN one or more times by one or more of the PCF Practitioners at any point during the Performance Year, and who meet the inclusion criteria as specified in the Measure Specification for all quality measures described in Article 7 and in the PCF Payment and Attribution Methodologies Paper.

b. CMS will publish, at least annually, a Clinical Measure Reporting and Health IT Requirements Summary that will provide details about the PCF quality reporting requirements.

### *Section 7.02 Electronic Clinical Quality Measures (eCQMs)*

a. eCQM Measure Set

1. The PCF Practice shall report all eCQMs to CMS that are listed in the eCQM Measure Set as described in the PCF Payment and Attribution Methodologies Paper.

2. At any time, CMS may make changes to the eCQM Measure Set, or to the number of eCQMs that the PCF Practice must report, or both. To the extent practicable, CMS will notify the PCF Practice in writing of any changes to the eCQM Measure Set at least 30 Days prior to the effective date of the change.

3. CMS will determine what version of each measure will be included in the eCQM Measure Set for the applicable Performance Year. CMS will notify the PCF Practice of the version of each measure that will be included in the eCQM Measure Set as early as possible after such information becomes available during the Performance Year.

b. eCQM Reporting

1. The PCF Practice must submit all eCQMs that are listed on the eCQM Measure Set in the PCF Payment and Attribution Methodologies Paper to CMS during the Reporting Period via Quality Reporting Document Architecture ("QRDA") III (https://ecqi.healthit.gov/qrda) file to CMS electronically either via direct EHR or through a third-party data submission vendor (DSV). CMS reserves the right to require submission via any other format, including the Fast Healthcare Interoperability Resources (FHIR®) standard, at any time during the Agreement Term without the consent of the PCF Practice. To the extent practicable, CMS will notify the PCF

Practice in writing of any changes to the reporting of eCQMs at least 30 Days prior to the effective date of the change.

2. The PCF Practice shall report eCQM data from all months of each Measurement Period during the Agreement Term.

3. The PCF Practice shall report required eCQMs using the eCQM versions for the applicable Performance Year, as determined by CMS pursuant to Section 7.02(a)(3). The version Measure Specifications for the eCQMs for each Performance Year can be found on the eCQI Resource Center at https://ecqi.healthit.gov/ep-ec-ecqms.

4. The PCF Practice shall comply with the requirements described in Appendix B of this Participation Agreement.

### *Section 7.03 Clinical Quality Measure (CQM)*

a. The PCF Practice shall report CQM(s) related to the PCF Practice's performance during Performance Year 1 as described in Appendix B of this Participation Agreement and in the PCF Payment and Attribution Methodologies Paper.

b. CQM Reporting

1. The PCF Practice must submit the CQM(s) to CMS during the Reporting Period.

2. The PCF Practice shall report the CQM(s) from all months of the Performance Year 1 Measurement Period.

3. The PCF Practice shall submit CQM(s) via a qualified registry or qualified clinical data registry (QCDR) that is included on the Merit-based Incentive Payment System (MIPS) Final approved list of qualified registries or the MIPS Final approved list of QCDRs, respectively, for Performance Year 1, or via an alternative method identified by CMS for the PCF Practice to report the CQM data. If CMS identifies such an alternative method, CMS will notify the PCF Practice, in a manner to be determined by CMS, at least 30 Days prior to the Reporting Period.

4. The PCF Practice shall report the CQM(s) in accordance with their respective Measure Specifications for Performance Year 1.

### *Section 7.04 Patient Experience of Care Measure*

a. The PCF Practice shall procure a CMS-approved vendor to conduct the Consumer Assessment of Healthcare Providers & Systems (CAHPS®), also known as the Patient Experience of Care Surveys ("PECS") ("PECS" hereafter). CMS will notify the PCF Practice at least 120 Days in advance of when the PCF Practice must begin conducting PECS, and CMS will make available to the PCF Practice a list of approved PECS vendors on the same date or sooner, in a form and manner to be determined by CMS.

b. The PCF Practice shall:

1. Contract with a CMS-approved PECS vendor by a date to be determined by CMS, and authorize such vendor to submit information, including the PCF Practice's PECS results, to CMS on behalf of the PCF Practice;

2. Submit a patient roster for all patients to CMS by a date and in a manner to be specified by CMS. CMS will validate the roster and provide the roster to the survey vendor directly;

3. Pay for the surveys and ensure that the survey results are transmitted to CMS by a date and in a manner to be specified by CMS; and

4. Ensure that the vendor adheres to the questionnaire, survey protocol, and format for submitting PECS results to CMS.

c. If the vendor does not timely submit the PCF Practice's PECS results, or if the vendor submits inaccurate, unusable, or otherwise compromised data, CMS will assign the PCF Practice a 0 for its yearly PECS score, and the PCF Practice will not meet the Quality Gateway for that Performance Year, pursuant to Section 5.03(b)(1), and CMS may take remedial action against the PCF Practice pursuant to Article 15.

## Article 8. Participation in Learning Activities

### *Section 8.01 General*

a. The PCF Practice may participate in periodic CMS-sponsored PCF or other learning activities.

b. The PCF Practice may participate in periodic conference calls, site visits, and virtual or in-person meetings, webinars, and actively share resources, tools, and ideas with other PCF participants to improve the PCF Practice's and other PCF participants' performance in the Model.

c. CMS or its designees may initiate learning-related site visits during the Model Performance Period. CMS will provide at least 3 Days' advanced notice to the PCF Practice prior to such a site visit. The PCF Practice shall ensure that at least one PCF Practitioner is present at any site visit initiated by CMS or one of its designees.

d. The PCF Practice shall designate at least one staff member who will maintain access to the PCF Connect virtual platform, which is a model-specific Salesforce platform accessible only by participating practices, CMS designees, and CMS. The PCF Practice shall identify this individual to CMS in a form and manner to be determined by CMS.

e. The PCF Practice shall designate at least one staff member to serve as point of contact to receive newsletters and communications from CMS related to PCF. The PCF Practice shall identify this individual to CMS in a form and manner to be determined by CMS.

f. The PCF Practice shall participate in periodic assessments administered by the CMS PCF learning contractors. To the extent practicable, CMS will provide the PCF Practice with at least 10 Days' advanced notice of the distribution of any such assessments and shall affirmatively work to minimize any associated reporting burden.

## Article 9. Beneficiary Notification and Protections

### *Section 9.01 Beneficiary Notifications*

a. Except as provided in Section 9.01(b), CMS will provide the PCF Practice with a Beneficiary notification letter that the PCF Practice shall post at its Practice Site in a public place viewable by all patients, explaining that the PCF Practice is participating in PCF. This letter will also include language notifying Beneficiaries that they may decline to have CMS share their personally identifiable information with the PCF Practice.

b. If the PCF Practice is a home-based practice that provides Face-to-Face Visits exclusively in a Beneficiary's residence, CMS will provide the PCF Practice with a Beneficiary notification letter that the PCF Practice shall give to each Beneficiary in a manner and by a deadline specified by CMS. The notification letter will explain that the PCF Practice is participating in PCF and that the Beneficiary may decline to have CMS share their personally identifiable information with the PCF Practice.

### *Section 9.02 Descriptive PCF Practice Materials and Activities*

a. The PCF Practice may create Descriptive PCF Practice Materials and Activities for the sole and explicit purposes of educating, notifying, or contacting the PCF Practice's patients.

b. The PCF Practice, including any other individuals or entities performing functions or services related to PCF Practice Activities, as applicable, shall not use the logo, seal, identity mark, or symbols of the Department of Health and Human Services (HHS) or the Centers for Medicare and Medicaid Services (CMS) in the creation of any Descriptive PCF Practice Materials and Activities.

c. The PCF Practice, including any other individuals or entities performing functions or services on behalf of the PCF Practice, as applicable, shall provide any Descriptive PCF Practice Materials and Activities to CMS upon request.

d. The PCF Practice, including any other individuals or entities performing functions or services on behalf of the PCF Practice, as applicable, shall cease use of any Descriptive PCF

Practice Materials or Activities no later than 5 Days after receiving written notice of disapproval from CMS.

e. The PCF Practice shall retain copies of all current and historical written and electronic Descriptive PCF Practice Materials and Activities and appropriate records for all other Descriptive PCF Practice Materials and Activities provided to Eligible Beneficiaries who are the PCF Practice's patients in accordance with Article 14.

*Section 9.03 Availability of Services*

a. The PCF Practice shall make preventive and reasonable and necessary covered professional services, as defined in Section 1848(k)(3)(A) of the Act, available to all patients in accordance with applicable laws, regulations and guidance. PCF Beneficiaries and their assignees retain their right to appeal claims determinations in accordance with 42 CFR § 405, Subpart I.

b. The PCF Practice and the PCF Practitioners shall not charge any Beneficiary a Retainer Fee or Concierge Fee.

c. The PCF Practice shall notify CMS, in a form and manner to be determined by CMS, no later than 15 Days after a PCF Practitioner enters into an agreement to charge a Retainer or Concierge Fee for any Beneficiary. The PCF Practice shall remove from the Practitioner Roster any PCF Practitioner who enters into an agreement to charge Retainer Fee or Concierge Fee for Beneficiaries.

d. The PCF Practice shall not take any action to select or avoid treating certain Beneficiaries based on their diagnoses, care needs, income levels or other factors that would render the PCF Beneficiary an "at risk beneficiary" as defined at 42 CFR § 425.20.

*Section 9.04 Beneficiary Freedom of Choice*

a. Consistent with Section 1802(a) of the Act, the PCF Practice shall not commit any act or omission, nor adopt any policy, that inhibits Beneficiaries from exercising their freedom to obtain health services from any provider or supplier. This prohibition shall not apply to referrals made by employees, contractors, or designees who are operating within the scope of their employment or contractual arrangement with the employer or contracting entity, provided that the employees, contractors, and designees remain free to make referrals without restriction or limitation if a Beneficiary expresses a preference for a different practitioner or supplier, or the referral is not in the Beneficiary's best medical interests in the judgment of the referring party.

b. Notwithstanding the foregoing, the PCF Practice may communicate to Eligible Beneficiaries the benefits of receiving care with the PCF Practice. All such communications shall be made

in accordance with Section 9.04(a). CMS may provide the PCF Practice with scripts, talking points, or other materials explaining these benefits.

*Section 9.05 Beneficiary Engagement Incentives*

a. General Prohibition. Except as permitted by applicable law and in accordance with Section 9.05(b) and (c) and Appendix E, the PCF Practice shall not provide gifts or other remuneration, and shall not instruct other individuals or entities to provide gifts or other remuneration, to PCF Beneficiaries to influence them to order or receive items or services from the PCF Practice, its PCF Practitioners, or individuals on its Staff Roster.

b. Exception for Cost Sharing Support. Consistent with the provisions of Section 9.05(a) and subject to compliance with Appendix E and all other applicable laws and regulations, the PCF Practice may provide Cost Sharing Support to PCF Beneficiaries.

c. Exception for In-Kind Incentives

1. Consistent with the provisions of Section 9.05(a), and subject to compliance with all other applicable laws and regulations, the PCF Practice and its PCF Practitioners may provide in-kind items or services to PCF Beneficiaries if the following conditions are satisfied:

   i. There is a direct connection between the items and services and the medical care of the PCF Beneficiary;

   ii. The items and services are preventive care items and services or advance a clinical goal for the PCF Beneficiary, including adherence to a treatment regime, adherence to a drug regime, adherence to a follow-up care plan, or management of a chronic disease or condition; and

   iii. The in-kind item or service is not a Medicare-covered item or service for the PCF Beneficiary on the date the in-kind item or service is furnished to that PCF Beneficiary.

2. The PCF Practice shall maintain records of the following for each in-kind item or service that has a retail value of more than $25 and is furnished under this Section 9.05(c):

   i. The nature of the in-kind item or service, including the retail value of the in-kind item or service furnished;

   ii. The identity of each PCF Beneficiary that received the in-kind item or service;

   iii. The identity of the individual or entity that furnished the in-kind item or service; and

   iv. The date the in-kind service was furnished.

3. The PCF Practice must maintain the records described in Section 9.05(c)(2) in accordance with Article 14.

*Section 9.06 HIPAA Requirements*

a. The PCF Practice acknowledges that it is a HIPAA covered entity (CE) as defined in 45 CFR § 160.103.

b. The PCF Practice shall have all appropriate administrative, technical, and physical safeguards in place before the Effective Date to protect the privacy and security of protected health information ("PHI") in accordance with all applicable laws, including 45 CFR § 160.530(c).

c. The PCF Practice shall maintain the privacy and security of all Model-related information that identifies individual Beneficiaries in accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy and Security Rules and all relevant HIPAA Privacy and Security guidance applicable to the use and disclosure of PHI by CEs and business associates ("BAs"), as well as other applicable federal, state, tribal, and local laws and regulations.

## Article 10. <u>Data Sharing and Reports</u>

*Section 10.01 General*

a. Subject to the limitations discussed in this Participation Agreement, and in accordance with applicable law, at any time deemed necessary by CMS, CMS will offer the PCF Practice an opportunity to request certain Beneficiary-identifiable data, which are described in Section 10.02 of this Participation Agreement, using a data request form which CMS will provide and maintain (the "**HIPAA-Covered Data Disclosure Request Form**").

b. Except for the data described in Section 10.02(c)(1), the data provided to the PCF Practice will not include Beneficiary-identifiable data for PCF Beneficiaries who have opted out of data sharing with the PCF Practice under the Model, as described in Section 10.03. Data provided to the PCF Practice will also not include substance use disorder data for any PCF Beneficiaries who have not opted into substance use disorder data sharing, as described in Section 10.04.

c. CMS may share practitioner-level and practice-level data with other PCF practices and PCF Payer Partners that identifies the PCF Practice's performance, for the purpose of improving other PCF practices' quality outcomes and healthcare operations. This may include information gathered through Practice Reporting, quality scores, utilization scores, or other relevant data. Such data will not include PHI, in accordance with this Model's policies and the HIPAA Privacy and Security Rule requirements, including those in 45 CFR §

164.514(b), and will incorporate de-identified data from PCF Beneficiaries who have opted out of data sharing in accordance with Section 10.03.

d. CMS may publish, on the CMS website, practitioner-level and practice-level data that identifies the PCF Practice's performance. This may include information gathered through Practice Reporting, quality scores, utilization scores, or other relevant data. Such data will not include individually identifiable health information, in accordance with this model's policies and the HIPAA Privacy and Security Rule requirements, including those in 45 CFR § 164.514(b), and will incorporate de-identified data from PCF Beneficiaries who have opted out of data sharing in accordance with Section 10.03.

e. CMS may share practitioner-level data with each PCF Practitioner listed on the Practitioner Roster that identifies the PCF Practitioner's performance, for the purposes of quality improvement, care coordination, and healthcare operations. This may include information gathered through Practice Reporting, quality scores, utilization scores, or other relevant data. Such data will not include individually identifiable health information, in accordance with this model's policies and the HIPAA Privacy and Security Rule requirements, including those in 45 CFR § 164.514(b), and will incorporate de-identified data from PCF Beneficiaries who have opted out of data sharing in accordance with Section 10.03.

f. The parties acknowledge that data sharing for Performance Year 1 of the Model Performance Period is governed by Article 10 of the Participation Agreement that was in effect on January 1, 2021.

### *Section 10.02 Provision of Certain Beneficiary-Identifiable Claims Data*

a. CMS will offer to the PCF Practice an opportunity to request certain Beneficiary-identifiable data by completing the HIPAA-Covered Data Disclosure Request Form. All requests for Beneficiary-identifiable data will be granted or denied at CMS' sole discretion based on CMS' available resources and technological capabilities, the limitations in this Participation Agreement, and applicable law.

b. In offering the PCF Practice an opportunity to request Beneficiary-identifiable claims data, CMS does not represent that the PCF Practice has met all applicable HIPAA requirements for requesting data under 45 CFR § 164.506(c)(4). The PCF Practice should consult with its own counsel to make those determinations prior to requesting this data from CMS.

c. The Beneficiary-identifiable data that will be made available for request by the PCF Practice is the data specified in the HIPAA-Covered Data Disclosure Request Form, including:

1. Payment and Attribution Reports: These data would include quarterly lists of the PCF Practice's PCF Beneficiaries as well as an accounting of the PCF Practice's PCF Payments.

2. Beneficiary Data: These data would include individually identifiable demographic and Medicare eligibility status information for the PCF Practice's PCF Beneficiaries. The PCF Practice may request to receive these data at least quarterly.

3. Detailed Claims Data: These data would include individual Beneficiary-identifiable Medicare FFS claims data for services provided to PCF Beneficiaries. This includes data specified in the HIPAA-Covered Data Disclosure Request Form, including but not limited to data on Medicare FFS expenditures and utilization. The parties must follow all applicable SAMHSA regulations when sharing substance use disorder data.

4. Feedback Reports: These data would include practitioner-level information for all PCF Practitioners as well as summary data aggregated to the PCF practice-level, region-level, or system-level, on data relevant to PCF Practice Activities and performance in the Model, including the demographic and claims-based data described above. When aggregated at the region level or system level, this aggregate information will not include individually identifiable information and will incorporate de-identified data from PCF Beneficiaries who have opted out of data sharing. These reports are provided for informational purposes.

5. Data Aggregation: If a system for common Data Aggregation that the PCF Practice wishes to utilize exists or can be created in the PCF Region where the PCF Practice is located, CMS may release detailed PCF Beneficiary-identifiable claims data in accordance with Sections 10.02(c)(2) and 10.02(c)(3) to a common data aggregator, as that term is understood under the HIPAA Privacy Rule, and in accordance with HIPAA requirements and other applicable laws. If utilized by Participating PCF Practices, such a common data aggregator would be able to perform analyses linking Medicare FFS claims data to other sources of individually identifiable health information on behalf of those Participating PCF Practices, including but not limited to data from other PCF Payer Partners in the market or the PCF Practice's own medical records, and distribute patient de-identified results from such multi-party analyses.

d. The parties mutually agree that, except for data covered in accordance with Section 10.02(n), CMS retains all ownership rights to the data specified in the HIPAA-Covered Data Disclosure Request Form, and the PCF Practice does not obtain any right, title, or interest in any of the data furnished by CMS.

e. The PCF Practice represents, and in furnishing the data specified in the HIPAA-Covered Data Disclosure Request Form, CMS relies upon such representation, that such data will be used solely for the purposes described in this Participation Agreement. The PCF Practice agrees not to disclose, use, or reuse the data except as specified in this Participation Agreement or except as CMS will authorize in writing or as otherwise required by law. The PCF Practice further agrees not to sell, rent, lease, loan, or otherwise grant access to the data covered by this Participation Agreement.

f. The PCF Practice represents, and in furnishing the data specified in the HIPAA-Covered Data Disclosure Request Form CMS relies upon such representation, that it intends to use the requested information for one or more purposes of quality improvement, care coordination, or health care operations so as to deliver comprehensive primary care to PCF Beneficiaries to promote better care, better health, and lower growth in expenditures. Information derived from the data specified in the HIPAA-Covered Data Disclosure Request Form may be shared and used within the legal confines of the PCF Practice and its PCF Practitioners in accordance with Section 10.02(e), (g), and (h).

g. The PCF Practice may reuse original or derivative data without prior written authorization from CMS for clinical treatment, care management and coordination, and quality improvement activities but shall not disseminate individually identifiable original or derived information from the data specified in the HIPAA-Covered Data Disclosure Request Form to anyone, unless the recipient is a HIPAA CE directly involved in treating PCF Beneficiary(ies); a HIPAA BA, as defined in 45 CFR § 160.103, of that HIPAA CE; the PCF Practice's own BA; or a subcontractor BA hired by the PCF Practice's BA to perform functions or services related to PCF Practice Activities. When using or disclosing PHI or personally identifiable information ("PII"), obtained from data specified in the HIPAA-Covered Data Disclosure Request Form, the PCF Practice must make "reasonable efforts to limit" the information to the "minimum necessary" to accomplish the intended purpose of the use, disclosure, or request. The PCF Practice shall further limit its disclosure of such information to the types of disclosures that CMS itself would be permitted make under the "routine uses" in the applicable systems of records listed in the HIPAA-Covered Data Disclosure Request Form.

h. Subject to the limits specified above in Section 10.02(g) and elsewhere in this Participation Agreement and applicable law, the PCF Practice may link individually identifiable information specified in the HIPAA-Covered Data Disclosure Request Form (including directly or indirectly identifiable data) or derivative data to other sources of individually-identifiable health information, such as other medical records available to the PCF Practice. The PCF Practice may disseminate such data that has been linked to other sources of individual identifiable health information provided such data has been de-identified in accordance with HIPAA requirements in 45 CFR § 164.514(b).

i. The PCF Practice shall establish appropriate administrative, technical, and physical safeguards to protect the confidentiality of the CMS data and to prevent unauthorized use or access to it. The safeguards shall provide a level and scope of security that is not less than the level and scope of security requirements established for federal agencies by the Office of Management and Budget (OMB) in OMB Circular No. A-130, Appendix I—Responsibilities for Protecting and Managing Federal Information Resources (https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A130/a130revised.pd

f), the Federal Information Processing Standard 200: "Minimum Security Requirements for Federal Information and Information Systems" (https://nvlpubs.nist.gov/nistpubs/FIPS/NIST.FIPS.200.pdf), and the NIST Special Publication 800-53: "Recommended Security Controls for Federal Information Systems" (https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r4.pdf).

j. The PCF Practice shall not use unsecured telecommunications, including the Internet, to transmit directly or indirectly identifiable information from the data specified in the HIPAA-Covered Data Disclosure Request Form or any such derivative data is strictly prohibited. Further, the PCF Practice shall not physically move, transmit, or disclose in any way the data specified in the HIPAA-Covered Data Disclosure Request Form from the site of the data custodian(s) indicated in the HIPAA-Covered Data Disclosure Request Form, other than as provided in this Participation Agreement, without written approval from CMS, unless such movement, transmission, or disclosure is required by a law.

k. The PCF Practice shall grant access to the CMS data or the facility(ies) in which the CMS data are maintained to the authorized representatives of CMS or HHS Office of the Inspector General, including at the site of the data custodian(s) indicated in the HIPAA-Covered Data Disclosure Request Form, for the purpose of inspecting to confirm compliance with the terms of this Participation Agreement.

l. The PCF Practice shall adhere to CMS' current cell size suppression policy during any use of CMS data in the creation of any document concerning the purposes specified in the Participation Agreement or the HIPAA-Covered Data Disclosure Request Form. This policy stipulates that no cell (e.g., admittances, discharges, patients, services) representing 10 or fewer Beneficiaries may be displayed. Also, no use of percentages or other mathematical formulas may be used if it results in the display of a cell representing 10 or fewer Beneficiaries.

m. The PCF Practice shall report any breach of PHI or PII from or derived from the CMS data, loss of these data, or improper use or disclosure of these data to the CMS Action Desk by telephone at (410) 786-2850 or by email notification at cms_it_service_desk@cms.hhs.gov within one hour. The PCF Practice shall cooperate fully in the federal incident security process that results from such improper use or disclosure.

n. The parties mutually agree that the individual(s) named in the HIPAA-Covered Data Disclosure Request Form is designated as the data custodian(s) of the CMS data on behalf of the PCF Practice and shall be responsible for the observance of all conditions of use and disclosure of such data and any derivative data, as well as for the establishment and maintenance of security arrangements as specified in this Participation Agreement, to prevent unauthorized use or disclosure. Furthermore, such data custodian(s) is responsible for contractually binding any downstream recipients of such CMS data to the terms and

conditions in this Participation Agreement as a condition of receiving such CMS data. The PCF Practice shall notify CMS within 15 Days of any change of data custodianship. CMS may disapprove the appointment of a data custodian or may require the appointment of a new data custodian at any time.

o. Data disclosed to the PCF Practice pursuant to the HIPAA-Covered Data Disclosure Request Form may be retained by the PCF Practice until final payment by or to the PCF Practice has been made in accordance with Section 5.04(e). The PCF Practice is permitted to retain any individually identifiable health information from such CMS data or derivative data after the termination of the Participation Agreement if the PCF Practice remains a HIPAA CE, and the data has been incorporated into the subject Beneficiaries' medical records that are part of a designated record set under HIPAA. Furthermore, any HIPAA CE to whom the PCF Practice provides such CMS data in the course of carrying out the Model may also retain such data if the recipient entity is a HIPAA CE or BA as defined in 45 CFR § 160.103, and the data is incorporated into the subject Beneficiaries' medical records that are part of a designated record set under HIPAA.

p. The PCF Practice shall destroy all other data and send written certification of the destruction of the data and any derivative data to CMS within 30 Days after final payment by or to the PCF Practice has been made in accordance with Section 5.04(e), except as CMS shall authorize in writing or as otherwise required by law. Except for disclosures for treatment purposes, the PCF Practice shall bind any downstream recipients to these terms and conditions as a condition of disclosing such data to downstream entities and permitting them to retain such records under this paragraph. These retention provisions survive the expiration or termination of the Participation Agreement.

### *Section 10.03 Beneficiary Rights to Opt Out of Data Sharing*

a. The PCF Practice shall provide PCF Beneficiaries who inquire about and wish to modify their preferences regarding data sharing for care coordination and quality improvement purposes with information about how to modify their data sharing preferences by calling 1-800-MEDICARE. Such communications shall note that, even if a PCF Beneficiary has elected to decline data sharing, CMS may still engage in certain limited data sharing for quality improvement purposes.

b. The PCF Practice shall allow PCF Beneficiaries to reverse a data sharing preference at any time by calling 1-800-MEDICARE.

c. CMS will maintain the data sharing preferences of PCF Beneficiaries who elect to decline data sharing in this Model.

d. The PCF Practice may affirmatively contact a PCF Beneficiary who has elected to decline data sharing no more than one time in a given Performance Year to provide information

regarding data sharing. Such contact includes mailings, phone calls, electronic communications, or other methods of communicating with PCF Beneficiaries outside of a clinical setting.

e. In the event that a PCF Practitioner is terminated from the PCF Practice for any reason, if that departing PCF Practitioner is the sole PCF Practitioner in the PCF Practice to have submitted claims for a particular PCF Beneficiary during the 12-month period prior to the effective date of the termination, CMS will administratively opt the PCF Beneficiary out of all data sharing in accordance with Article 10 of this Participation Agreement within 30 Days of the effective date of the termination, unless:

1. The PCF Beneficiary affirmatively consents to continued sharing of such data with the PCF Practice through an authorization that meets the requirements under 45 CFR § 164.508(b); or

2. The PCF Beneficiary subsequently becomes the patient of another PCF Practitioner within the PCF Practice in accordance with Section 10.03(f).

f. If the PCF Beneficiary is subsequently re-attributed to the same PCF Practice due to becoming a patient of another current PCF Practitioner, CMS will administratively opt the PCF Beneficiary back into such data sharing, unless the PCF Beneficiary affirmatively opts out of data sharing in accordance with Section 10.03.

g. Notwithstanding the foregoing, CMS will provide the PCF Practice data regarding substance use disorder treatment only if the PCF Beneficiary has submitted a CMS-approved form electing to share such data in accordance with Section 10.04 and has not elected to decline data sharing or otherwise been opted out of data sharing.

### *Section 10.04 Beneficiary Substance Use Disorder Data Opt-In*

a. The PCF Practice may inform each newly attributed PCF Beneficiary, in compliance with applicable law:

1. That they may elect to allow the PCF Practice to receive Beneficiary-level claims data regarding their utilization of substance use disorder services;

2. Of the mechanism by which the PCF Beneficiary can make this election; and

3. That 1-800-MEDICARE will answer any questions regarding claims data sharing of substance use disorder services.

b. A PCF Beneficiary may opt-in to substance use disorder data sharing only by submitting a CMS-approved substance use disorder opt-in form to the PCF Practice. The PCF Practice shall promptly send the opt-in form to CMS in a form and manner to be specified by CMS.

## Article 11. <u>Participation in Evaluation</u>

### *Section 11.01 General*

a. The PCF Practice shall participate in and cooperate with any independent evaluation activities conducted by CMS or its designees aimed at assessing the impact of the PCF Model on the goals of better health, better health care, and lower Medicare per capita costs for Beneficiaries.

b. The PCF Practice shall ensure that all PCF Practitioners and individuals on the Staff Roster cooperate with all evaluation activities carried out by CMS.

c. The PCF Practice shall ensure that it has written agreements or legal relationships with any individuals and entities performing functions and services related to PCF Practice Activities that are necessary to ensure that CMS or its designees can carry out evaluation activities.

d. The rights and obligations under this Section shall survive termination or expiration of this Participation Agreement and shall apply for the Agreement Term.

### *Section 11.02 Primary Data*

In its evaluation activities, CMS may collect qualitative and quantitative data from the following sources:

a. Site visits;

b. Interviews with Beneficiaries who are patients of the PCF Practice and their caregivers;

c. Focus groups of Beneficiaries who are patients of the PCF Practice and their caregivers;

d. Interviews with PCF Practitioners and individuals on the PCF Practice's Staff Roster;

e. Focus groups with individuals on the PCF Practice's Staff Roster and individuals otherwise performing functions or services related to PCF Practice Activities;

f. Direct observation of Beneficiaries' interactions with the PCF Practitioners and individuals on the PCF Practice's Staff Roster, care management meetings among the PCF Practitioners and individuals performing functions and services related to PCF Practice Activities, and other activities performed by PCF Practitioners and individuals performing functions or services related to the PCF Practice's participation in PCF or another CMS initiative;

g. Surveys; and

h. Other activities or sources that CMS determines are necessary to conduct a comprehensive formative and summative evaluation.

*Section 11.03 Secondary Data*

In its evaluation activities, CMS or its designees may use data or information submitted by the PCF Practice as well as claims submitted to CMS for items and services furnished to Beneficiaries. This data may include, but is not limited to:

a. Survey data from PECS;

b. Clinical data such as lab values; and

c. Medical records.

## Article 12. PCF Reporting and Certification Requirements

*Section 12.01 Reporting Requirements*

a. The PCF Practice shall complete all reporting required under this Participation Agreement. Prior to each Performance Year, CMS will issue a list of data that the PCF Practice must report to CMS and the specific dates by which it must do so. These reporting requirements will be specified in the PCF Practice Management Guide, Care Delivery Reporting Guide, and Clinical Measure Reporting and Health IT Requirements Summary and this Participation Agreement in accordance with:

1. Article 3 (General PCF Practice Requirements);
2. Article 6 (PCF Care Delivery Interventions);
3. Article 7 (Quality Reporting Requirements); and
4. Article 11 (Participation in Evaluation).

b. CMS may unilaterally amend reporting requirements or deadlines in accordance with this Participation Agreement and shall issue any changes in writing no less than 30 Days in advance.

c. CMS will include with the PCF Practice Management Guide, Care Delivery Reporting Guide, and Clinical Measure Reporting and Health IT Requirements Summary instructions on how and when the PCF Practice may request a reporting deadline extension for the reporting described in each resource. CMS reserves the right to reject an extension request for any reason.

d. If the PCF Practice consists of multiple physical locations pursuant to Section 3.02, the PCF Practice must submit aggregated reports that describe the following:

1. The Care Delivery Interventions, as described in Section 6.02(b), across all physical locations;

2. eCQMs, as described in Section 7.02(b), across all physical locations;

3. For Performance Year 1 performance, CQMs, as described in Section 7.03(b), across all physical locations; and

4. PECS results, as described in Section 7.04, across all physical locations.

e. If this Participation Agreement is terminated pursuant to Article 15, the PCF Practice shall complete all reporting requirements and meet all reporting deadlines for the entire duration of the calendar quarter in which this Participation Agreement is terminated, even if such quarter ends after the effective date of termination. The PCF Practice is not required to comply with reporting requirements beginning the calendar quarter following the calendar quarter that includes the effective date of termination, notwithstanding Section 17.05.

f. The rights and obligations under this Section shall survive expiration of this Participation Agreement and shall apply until all reporting requirements in accordance with Section 12.01(a) and all Articles cited therein are complete.

### *Section 12.02 Certification of Data and Information*

The PCF Practice shall certify that all data reported by the PCF Practice as required in accordance with Section 12.01 with respect to that calendar quarter or Performance Year is accurate, complete, and truthful to the best of the PCF Practice's knowledge. The PCF Practice shall certify that any PCF Practitioners, individuals on the Staff Roster, and any individuals or entities otherwise contracted to perform functions or services related to PCF Practice Activities or furnish services to PCF Beneficiaries are in compliance with the terms of this Participation Agreement. This certification shall be performed and documented in the PCF Practice Portal.

## Article 13. Monitoring and Compliance

### *Section 13.01 CMS Monitoring Activities*

a. CMS will conduct monitoring activities to assess the PCF Practice's compliance with the terms of this Participation Agreement, to ensure the integrity of the Model, and to evaluate whether the PCF Practice is treating Beneficiaries in an equitable manner and has not taken any action that threatens the health or safety of a Beneficiary or other patient.

b. In conducting monitoring activities, CMS may use any relevant data or information including, without limitation, all Medicare claims submitted for items or services provided

to PCF Beneficiaries, quality data, data reported in accordance with Section 12.01, information submitted in the Care Delivery Intervention Reports, any documentation that CMS requires the PCF Practice to maintain in accordance with Article 14, and other information related to compliance with the terms of this Participation Agreement.

c. The monitoring activities may include, without limitation:

1. Review of any and all data submitted to CMS by the PCF Practice via the PCF Practice Portal;
2. Review of utilization and quality data collected by CMS or reported to CMS by the PCF Practice in accordance with Articles 7 and 12;
3. Review of claims data for the PCF Practice;
4. Review of documentation related to the PCF Practice's eligibility;
5. Review of documentation related to a change in the PCF Practice's ownership, operations, or billing;
6. Review and analysis of changes to the PCF Practice's Practitioner Roster and associated changes in attribution;
7. Review of agreements with PCF Practitioners;
8. Interviews with the PCF Practice's PCF Practitioners and staff;
9. Interviews with PCF Beneficiaries and their caregivers;
10. Review of any of the PCF Practice's records and documentation, including but not limited to charts, medical records, health IT reports, labor contracts related to PCF Practice Activities, and other data from the PCF Practice;
11. Site visits to the Practice Site; and
12. Documentation sent to the PCF Practice, including surveys and questionnaires.

d. Nothing in this Participation Agreement shall be construed to limit or otherwise prevent CMS from monitoring for purposes unrelated to the PCF Model as permitted by applicable law or regulations.

e. CMS may monitor the PCF Practice using, without limitation, any of the monitoring activities outlined above, for up to one calendar year after the End Date of this Participation Agreement.

*Section 13.02 Compliance with Monitoring Activities*

a. The PCF Practice shall cooperate with all CMS monitoring requests and activities.

b. The PCF Practice shall ensure it has sufficient access to all records, data, and information necessary to comply with the monitoring activities described herein. As necessary, the PCF Practice shall request this information from any individuals or entities performing functions or services related to PCF Practice Activities, including but not limited to individuals on the Practitioner Roster and Staff Roster.

### *Section 13.03 Compliance with Laws*

a. Agreement to Comply

1. The PCF Practice shall comply with all applicable statutes, regulations, and guidance, including without limitation: (a) federal criminal laws; (b) the federal False Claims Act (31 U.S.C. § 3729 et seq.); (c) the federal Anti-Kickback statute (42 U.S.C. § 1320a-7b(b)); (d) the civil monetary penalties law (42 U.S.C. § 1320a-7a); (e) the physician self-referral law (42 U.S.C. § 1395nn); and (f) State laws and regulations.

2. The PCF Practice shall notify CMS within 15 Days after becoming aware that the PCF Practice or any PCF Practitioner employed or contracted by the PCF Practice is under investigation, being prosecuted or sanctioned by, or is in settlement with, the U.S. Department of Health and Human Services Office of the Inspector General (HHS-OIG), the U.S. Department of Justice (the DOJ), or any other federal or state law enforcement agency relating to allegations of failure to comply with any of the laws identified in accordance with this Section 13.03(a), including, without limitation, the imposition of program exclusion, debarment, civil monetary penalties, corrective action plans, and revocation of Medicare billing privileges, or by state licensing agencies relating to licensure sanctions.

b. No laws or regulations are being waived for purposes of the Model, except as explicitly set forth in Appendices F and G of this Participation Agreement or in any separately documented waiver issued pursuant to Section 1115A(d)(1) of the Act specifically for this Model. CMS may, at CMS's sole discretion, amend this Participation Agreement without the consent of the PCF Practice to amend or withdraw the waivers in Appendices F and G, or any combination thereof. CMS will use its best efforts to notify the PCF Practice of any such amendment or withdrawal at least 30 Days before the effective date of such amendment or withdrawal.

c. This Participation Agreement does not waive any obligation of the PCF Practice to comply with the terms of any other CMS contract, agreement, model, or demonstration.

d. Reservation of Rights

1. Nothing contained in this Participation Agreement or in the application process for the Model is intended or shall be construed as a waiver by the DOJ, the Internal Revenue Service, the Federal Trade Commission, the HHS-OIG, or CMS of any right to institute any proceeding or action against defendants for violations of any statutes, rules or

regulations administered by the federal government, or to prevent or limit the rights of the federal government to obtain relief under any other federal statutes or regulations, or on account of any violation of this Participation Agreement or any other provision of law. This Participation Agreement shall not be construed to bind any federal government agency except CMS, and this Participation Agreement binds CMS only to the extent provided herein.

2. The submission of any information, business plans or documents during the PCF application process does not imply that CMS has reviewed or approved the information, business plans or documents, and does not in any way imply or constitute a determination that the PCF Practice's plans, processes or documents comply with federal statutes or regulations.

3. The failure by CMS to require performance of any provision of this Participation Agreement shall not affect CMS's right to require performance at any time thereafter, nor shall a waiver of any breach or default of this Participation Agreement constitute a waiver of any subsequent breach or default or a waiver of the provision itself.

e. None of the provisions of this Participation Agreement limit or restrict the authority of the HHS-OIG or another federal agency to audit, evaluate, investigate, or inspect the PCF Practice, including PCF Practitioners and other individuals or entities performing functions or services on behalf of the PCF Practice.

## Article 14. <u>Audits and Record Retention</u>

### *Section 14.01 Right to Audit and Inspection*

The federal Government, including CMS, HHS, and the Comptroller General or their designees, may audit, evaluate, inspect, and investigate any documents and other evidence of the PCF Practice and other individuals or entities performing functions or services related to PCF Practice Activities and that pertain to the implementation of the Model.

### *Section 14.02 Access to Records*

The PCF Practice shall provide the federal government, including CMS, HHS, and the Comptroller General or their designees, access to, and shall require that its PCF Practitioners and other contracted individuals and entities performing functions or services on behalf of the PCF Practice provide the federal government access to, all documents and other evidence sufficient to enable the audit, evaluation, inspection, or investigation of the implementation of the Model, including without limitation, documents and other evidence regarding all of the following:

a. The PCF Practice's compliance with this Participation Agreement;

b. Whether PCF Practitioners and other contracted individuals or entities performing functions or services related to PCF Practice Activities complied with requirements imposed on them by the PCF Practice pursuant to this Participation Agreement;

c. Quality measure information and the quality of the services furnished under this Participation Agreement;

d. The accuracy of payments made under the Model;

e. The payment of amounts owed to CMS by the PCF Practice;

f. Utilization of items and services furnished under the Model, including but not limited to in-kind items and services provided to PCF Beneficiaries in accordance with Section 9.05(b) and Face-to-Face Visits furnished to PCF Beneficiaries pursuant to Section 5.02(d); and

g. Patient safety.

### *Section 14.03 Record Retention*

The PCF Practice shall maintain, and shall require that all PCF Practitioners and other contracted individuals and entities performing functions or services on behalf of the PCF Practice maintain, the documents and other evidence described in Section 14.02 for a period of 6 years from the last payment determination under this Participation Agreement or from the date of completion of any audit, evaluation, inspection, or investigation, whichever is later, unless:

a. CMS determines there is a special need to retain a particular record or group of records for a longer period and notifies the PCF Practice at least 30 Days before the normal disposition date set forth above; or

b. There has been a termination, dispute, or allegation of fraud or similar fault against the PCF Practice, or other contracted individuals or entities performing functions or services related to PCF Practice Activities, in which case the records shall be maintained for an additional six years from the date of any resulting final resolution of the termination, dispute, or allegation of fraud or similar fault.

## Article 15. <u>Remedial Action and Termination</u>

### *Section 15.01 Grounds for Remedial Action*

CMS may take remedial action against the PCF Practice if CMS determines that the PCF Practice or any of its PCF Practitioners:

a. Has failed to comply with any term of this Participation Agreement or any other Medicare program law or regulation;

b. Has failed to comply with a monitoring or auditing plan or monitoring request or activity;

c. Has failed to submit, obtain approval for, implement, or fully comply with the terms of a Corrective Action Plan ("CAP");

d. Has failed to respond to a notice from CMS regarding remedial action;

e. Has failed to rectify deficiencies following any remedial action and demonstrate compliance with all terms of this Participation Agreement;

f. Has failed to update banking information, has a stop payment order against it from the CMS Office of Financial Management, or is otherwise unable to receive Model payments;

g. Has taken any action that threatens the health or safety of a Beneficiary or other patient;

h. Has undergone a Change in Control that renders it ineligible for participation in the Model or presents a program integrity risk;

i. Has submitted false data or made false representations, warranties, or certifications in connection with any aspect of the Model or any requirement of the Medicare program;

j. Is subject to sanctions or other actions of an accrediting organization or a federal, state or local government agency, including revocation of Medicare billing privileges, Medicare or Medicaid program exclusion, debarment, or suspension, probation, revocation, or other administrative action pertaining to a professional individual or organizational license;

k. Is subject to investigation or action by HHS (including HHS-OIG and CMS) or the Department of Justice due to an allegation of fraud or significant misconduct, including being subject to the filing of a complaint, filing of a criminal charge, being subject to an indictment, being named as a defendant in a False Claims Act qui tam matter in which the federal government has intervened, or similar action;

l. Assigns or purports to assign any of the rights or obligations under this Participation Agreement, voluntarily or involuntarily, whether by merger, consolidation, dissolution, operation of law, or any other manner, without the written consent of CMS;

m. Has implemented Cost Sharing Support in a manner that CMS determines has compromised the integrity of the Model;

n. Has engaged in inappropriate reductions in utilization or access to care; composition changes or practice terminations among Affiliated PCF Practices indicating an attempt of the Practice Owner to remove lower performing practices; inappropriate billing practices including significant increases in Flat Visit Fee billing; or inappropriate exclusions or

removals of Practitioners or PCF Practitioners from the Practitioner Roster to adversely influence attribution; or

o. Has any past or present program integrity issues.

*Section 15.02 Types of Remedial Action*

a. If CMS determines that remedial action is warranted in accordance with Section 15.01, CMS may take one or more of the following actions:

1. Notify the PCF Practice of the grounds for remedial action;

2. Require the PCF Practice to provide additional information to CMS;

3. Conduct site visits, interview PCF Beneficiaries, or take other actions to gather information;

4. Place the PCF Practice on a monitoring plan, auditing plan, or both;

5. Remove a PCF Practitioner from the Practitioner Roster;

6. Deny PCF Payments in one or more of the following manners:

   i. Withhold PCF Payments until the PCF Practice comes into compliance with this Participation Agreement, at which point CMS will resume making positive PBAs and will distribute to the PCF Practice all amounts withheld during the period of noncompliance;

   ii. Suspend PCF Payments until the PCF Practice comes into compliance with this Participation Agreement, at which point CMS will resume making positive PBAs but will not distribute to the PCF Practice any amounts suspended during the period of noncompliance; or

   iii. Recoup PCF Payments already distributed to the PCF Practice, dating back to the date, as specified by CMS, on which CMS determined the PCF Practice failed to comply with a term of this Participation Agreement.

7. Require the PCF Practice to implement a CAP. If CMS requires a CAP, the following requirements apply:

   i. The PCF Practice shall submit a CAP to CMS by a deadline established by CMS;

   ii. The CAP shall address the actions the PCF Practice will take within a specified time period to ensure that all deficiencies will be corrected and that the PCF Practice will be in compliance with the terms of this Participation Agreement; and

Case 1:22-cv-12196-FDS Document 28-8 Filed 04/27/23 Page 62 of 84

iii. If the PCF Practice does not comply with the CAP within the specified time period, CMS may take additional remedial action or terminate this Participation Agreement.

8. Suspend or terminate the PCF Practice's ability to furnish Cost-sharing Support pursuant to Section 9.05(b);

9. Suspend or terminate the PCF Practice's ability to furnish in-kind items and services pursuant to Section 9.05(c);

10. Suspend or terminate the PCF Practice's ability to use the Telehealth Benefit Enhancement pursuant to Appendix F;

11. Amend this Participation Agreement without the consent of the PCF Practice to limit or deny any or all waivers of existing law made pursuant to Section 1115A(d)(1) of the Act; or

12. Discontinue the provision of data sharing and reports to the PCF Practice under Article 10.

b. If CMS determines that any of the grounds for remedial action outlined in Section 15.01(a) have not been addressed after CMS has taken remedial action, CMS may take additional remedial actions or terminate this Participation Agreement or the Model Performance Period.

### *Section 15.03 Termination by CMS*

CMS may terminate this Participation Agreement or the Model Performance Period immediately or with advanced notice if:

a. CMS determines that it no longer has the funds to support the Model or the Model should be terminated for other reasons;

b. CMS terminates or modifies the Model pursuant to Section 1115A(b)(3)(B) of the Act;

c. The state in which the Practice Site is located enters into an arrangement with CMS that is based on a statewide global or per-capita Medicare payment;

d. The PCF Practice has failed to sign an amended and restated version of this Participation Agreement offered by CMS pursuant to Article 1.04; or

e. CMS determines any of the grounds for remedial action described in Section 15.01(a) exist.

### *Section 15.04 Termination by the PCF Practice*

a. The PCF Practice may terminate this Participation Agreement upon advance written notice to CMS as follows:

1. If the PCF Practice sends the written notice of termination to CMS before March 1 of a Performance Year, the PCF Practice must specify an effective date of termination that is at least 30 Days after the date of the notice.

2. If the PCF Practice sends the written notice of termination to CMS on or after March 1 of a Performance Year, the following terms will apply:

   i. The effective date of termination will be the last Day of the Performance Year, unless CMS requires a different effective date of termination due to a determination by CMS that a different date is more appropriate due to one or more instances of the PCF Practice's failure to comply with this Participation Agreement, or due to unusual circumstances beyond the control of the PCF Practice;

   ii. The PCF Practice may withdraw its notice of termination in writing at any time, provided that the notice is received by CMS no later than 30 Days before the last Day of the Performance Year; and

   iii. CMS may prohibit the PCF Practice from participating in another CMS alternative payment model for the calendar year beginning after the effective date of the termination of the Participation Agreement.

b. If the PCF Practice terminates this Participation Agreement, the effective date of termination is also the effective date of termination of the Model Performance Period.

### *Section 15.05 Additional Requirements upon Termination*

a. Notice of Termination

1. If this Participation Agreement is terminated by CMS, CMS will provide a written notice to the PCF Practice that sets forth the effective date of such termination, including the effective date of the termination of the Model Performance Period.

2. If this Participation Agreement is terminated by either CMS or the PCF Practice, the PCF Practice shall provide written notice of the termination to all PCF Practitioners, all individuals identified on the Staff Roster, and all PCF Beneficiaries. The PCF Practice shall provide this notice as soon as practicable in a manner determined by CMS. The notices must include the effective date of termination and any additional content specified by CMS, including but not limited to information regarding data destruction.

b. If this Participation Agreement is terminated, CMS will conduct a financial settlement in accordance with Section 5.04.

c. The PCF Practice shall comply with requests for documents and other information needed by CMS or its designees after termination of this Participation Agreement, including without limitation, documentation of reason for withdrawal, if applicable, exit interview, and required data notifications.

# Article 16. Limitation on Review and Dispute Resolution

## *Section 16.01 Limitations on Review*

There is no administrative or judicial review under Sections 1869 or 1878 of the Act or otherwise for the following:

a. The selection of organizations, sites, or participants to test the Model;

b. The elements, parameters, scope, and duration of such models for testing or dissemination;

c. Determinations regarding budget neutrality under subsection 1115A(b)(3);

d. The termination or modification of the design and implementation of a model under subsection 1115A(b)(3)(B);

e. Decisions about expansion of the duration and scope of PCF under subsection 1115A(c) of the Act, including the determination that the Model is not expected to meet criteria described in paragraph 1115A(c)(1) or 1115A(c)(2) of the Act;

f. The selection of performance standards;

g. The selection of quality measures used to assess the quality of care provided by the PCF Practice; and

h. The methodology for attributing Beneficiaries to the PCF Practice.

## *Section 16.02 Dispute Resolution*

a. The PCF Practice may request reconsideration of a determination made by CMS pursuant to this Participation Agreement only if such reconsideration is not precluded by Section 1115A(d)(2) of the Act or by this Participation Agreement.

b. The procedures for reconsideration of initial determinations as described in Section 1869(b)(D) and Section 1869(c) of the Act are waived as necessary for the purpose of testing PCF to the extent applicable. The PCF Practice may request reconsideration of a determination made by CMS pursuant to this Participation Agreement in accordance with Section 16.02(c).

c. Such a request for reconsideration by the PCF Practice shall satisfy the following criteria:

   1. The request must be submitted to a designee of CMS (**"Reconsideration Official"**) who:

      i. Is authorized to receive such requests; and

ii. Did not participate in the determination that is the subject of the reconsideration request.

2. The request must contain a detailed, written explanation of the determination that is the subject of the reconsideration request, including the basis for why the PCF Practice believes that the determination is in error. All applicable supporting documentation shall be included with the request; and

3. The request must be made within 30 Days of the date of the determination for which reconsideration is being requested via email to CMS at PCF@telligen.com.

d. The Reconsideration Official shall deny any and all requests that do not meet the requirements in accordance with Section 16.02(c).

e. Within 30 business Days of receiving a request for reconsideration, the Reconsideration Official shall send to the PCF Practice and to CMS a written acknowledgement of receipt of the reconsideration request. Such an acknowledgement shall set forth:

1. The review procedures; and

2. A briefing schedule that permits both the PCF Practice and CMS to submit to the Reconsideration Official one written brief, to which must be appended any supporting documentation or other evidence, that supports the party's position. The Reconsideration Official shall have sole discretion to determine whether to allow the PCF Practice, CMS, or both to submit one or more additional written briefs, supplemental documentation, or other evidence.

f. The Reconsideration Official may be, but is not required to be, an Inferior Officer.

### *Section 16.03 Standards for Reconsideration*

a. The reconsideration shall consist of a review of documentation that is submitted timely and in accordance with the standards specified by the Reconsideration Official.

b. The burden of proof shall be on the PCF Practice to demonstrate to the Reconsideration Official with clear and convincing evidence that the determination is inconsistent with the terms of this Participation Agreement.

### *Section 16.04 Reconsideration Determination*

a. The reconsideration determination shall be based only upon:

1. Position papers and supporting documentation that are submitted timely to the Reconsideration Official and meet the standards for submission; and

2. Documents and data that were submitted timely to CMS in the required format before the agency made the determination that is the subject of the reconsideration request.

b. The Reconsideration Official shall issue to CMS and to the PCF Practice written notification of the reconsideration determination. Absent unusual circumstances, such written notification shall be issued within 60 Days of the reconsideration official's receipt of timely filed position papers and supporting documentation.

*Section 16.05 Effect of the Reconsideration Determination*

a. The reconsideration determination issued by the Reconsideration Official shall be final and binding on both the PCF Practice and CMS.

b. The reconsideration review process under this Participation Agreement shall not be construed to negate, diminish, or otherwise alter the applicability of existing laws, rules, and regulations or determinations made by other government agencies.

## Article 17. Miscellaneous

*Section 17.01 Agency Notifications and Submission of Reports*

a. Unless otherwise stated in writing after the Effective Date, all notifications and reports required under this Participation Agreement shall be submitted to the parties at the addresses set forth below.

**CMS:** Primary Care First Model
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Mailstop: WB-08-41
Baltimore, MD 21224
Email: PCF@telligen.com

**PCF Practice:** Address: ______________________

______________________

______________________

Email: ______________________

______________________

### *Section 17.02 Notice of Bankruptcy*

If the PCF Practice has filed a bankruptcy petition, whether voluntary or involuntary, the PCF Practice must provide written notice of the bankruptcy to CMS and to the U.S. Attorney's Office in the district where the bankruptcy was filed, unless final payment has been made by either CMS or the PCF Practice under the terms of this Participation Agreement and all administrative or judicial review proceedings relating to any payments under such models have been fully and finally resolved. The notice of bankruptcy must be sent by certified mail no later than 5 Days after the petition has been filed and must contain a copy of the filed bankruptcy petition (including its docket number), and a list of all models tested under Section 1115A of the Act in which the PCF Practice is participating or has participated. This list need not identify a model tested under Section 1115A of the Act in which the PCF Practice participated if final payment has been made under the terms of the model and all administrative or judicial review proceedings regarding model-specific payments between the PCF Practice and CMS have been fully and finally resolved with respect to that model. The notice to CMS must be addressed to the CMS Office of Financial Management at 7500 Security Boulevard, Mailstop C3-01-24, Baltimore, MD 21244 or such other address as may be specified on the CMS website for purposes of receiving such notices.

### *Section 17.03 Severability*

In the event that any one or more of the provisions of this Participation Agreement is, for any reason, held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Participation Agreement, and this Participation Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been included in this Participation Agreement, unless the deletion of such provision or provisions would result in such a material change to this Participation Agreement so as to cause continued participation under the terms of this Participation Agreement to be unreasonable.

### *Section 17.04 Entire Agreement; Amendment*

a. This Participation Agreement, including all appendices, constitutes the entire agreement between the parties with respect to PCF Practice Activities at the Practice Site, in PCF Beneficiaries' residences, and via telehealth. The parties may amend this Participation Agreement or any appendix hereto at any time by mutual written agreement.

b. At any time during the Model Performance Period, CMS may unilaterally amend this Participation Agreement and the related appendices without the consent of the PCF Practice to conform to changes in applicable laws or regulations, or for good cause, and without the necessity of a signature by the PCF Practice. To the extent practicable, CMS will provide the PCF Practice with 30 Days' advance written notice of any such amendment and such notice shall specify the amendment's effective date.

### *Section 17.05 Survival*

Expiration or termination of this Participation Agreement by either party shall not affect the rights and obligations of the parties accrued prior to the Expiration Date or effective date of termination of this Participation Agreement, except as provided in this Participation Agreement. The rights and obligations under the following Sections of this Participation Agreement shall survive expiration or termination of this Participation Agreement and apply for the lengths of time indicated therein:

a. Section 3.05 (Changes to PCF Practice);

b. Section 5.04 (Reconciliation and Settlement);

c. Article 10 (Data Sharing and Reports);

d. Article 11 (Participation in Evaluation);

e. Article 12 (PCF Reporting and Certification Requirements);

f. Article 13 (Monitoring and Compliance);

g. Article 14 (Audits and Record Retention); and

h. Section 15.05(c) (Additional Requests Upon Termination).

### *Section 17.06 Precedence*

If any provision of this Participation Agreement conflicts with a provision of any document described herein, the provision of this Participation Agreement shall prevail.

### *Section 17.07 Certification*

The individual signing this Participation Agreement on behalf of the PCF Practice certifies that he or she is legally authorized to bind the PCF Practice. Such individual certifies to the best of his or her knowledge, information, and belief that the information submitted to CMS, including the representations made to CMS on the signature page of this Participation Agreement (inclusive of all appendices), is true, accurate, and complete. Such individual further certifies that all PCF Practitioners have received a copy of this Participation Agreement.

### *Section 17.08 Execution in Counterpart*

This Participation Agreement and any amendments hereto may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement. This Participation Agreement and any amendments hereto may be signed by autopen or electronic signature (e.g., DocuSign or similar electronic signature

technology) and may be transmitted by electronic means. Copies of this Participation Agreement and any amendments hereto that are so executed and delivered have the same force and effect as if executed with handwritten signatures and physically delivered.

[SIGNATURE PAGE FOLLOWS]

Each party is signing this Participation Agreement on the date stated opposite that party's signature. If a party signs but fails to date a signature, the date that the other party receives the signing party's signature will be deemed to be the date that the signing party signed this Participation Agreement.

**PCF Practice Name:**

______________________________________________

By: ______________________ Date: ______________________

______________________ ______________________
Name of authorized signatory Title of authorized signatory

**PCF Practice ID:** ______________

**CMS:**

By: ______________________ Date: ______________________

______________________ ______________________
Name of authorized signatory Title of authorized signatory

**Appendices**

**A.** Care Delivery Interventions

**B.** Certified EHR Technology (CEHRT) Requirements

**C.** PCF Regions

**D.** [RESERVED]

**E.** Cost Sharing Support for Part B Services

**F.** Telehealth Benefit Enhancement

**G.** Medicare Payment Waivers

# Appendix A: Care Delivery Interventions

| Comprehensive Primary Care Interventions | PCF Care Requirements |
|---|---|
| Access and Continuity<br>Access and Continuity builds on the patient-Practitioner relationship to ensure patients receive the right care at the right time from the right care team member. The PCF Practice must provide 24/7 access to a Care Team Practitioner with real-time access to the EHR. If in Practice Risk Group 3 or 4, the PCF Practice must deepen this work by also providing timely callbacks to PCF Beneficiaries. | • Provide 24/7 access to a care team Practitioner with real-time access to EHR.<br>• Additional Requirement for Practice Risk Groups 3 & 4:<br>• Ensure timely callbacks for high-risk PCF Beneficiaries with complex care needs. |
| Care Management<br>Care Management supports the optimal management of complex care targeted to those most likely to benefit. The PCF Practice must provide risk-stratified care management. If in Practice Risk Group 3 or 4, the PCF Practice must deepen this work by engaging high-risk PCF Beneficiaries in health care planning and ensuring that PCF Beneficiaries receive appropriate services from other health care providers (e.g., DME items and services). | • Provide risk-stratified care management for all empaneled patients.<br>• Ensure all PCF Beneficiaries receive timely follow-up contact from the PCF Practice after ED visits and hospitalizations.<br>• Additional Requirement for Practice Risk Groups 3 & 4:<br>• Collaborate with all high-risk PCF Beneficiaries to develop and maintain documented personalized care plans addressing their goals, preferences, and values. |
| Comprehensiveness and Coordination<br>Comprehensiveness and Coordination increases the breadth and depth of primary care, while facilitating care for PCF Beneficiaries as it occurs outside of the PCF Practice. The PCF Practice must integrate behavioral health care, and assess PCF Beneficiaries' psychosocial needs. If in Practice Risk Group 3 or 4, the PCF Practice must deepen this work by creating an inventory of services and supports in the community to address its PCF Beneficiaries' complex psychosocial needs. | • Integrate behavioral health into primary care services.<br>• Assess and support patients' psychosocial needs.<br>• Additional Requirements for Practice Risk Groups 3 & 4:<br>• Ensure coordinated referral management through formal relationships or agreements with specialty groups and other care organizations for your high risk PCF Beneficiary population.<br>• Create and maintain an inventory of services and supports in the community to meet PCF Beneficiaries' health related social needs. |
| Patient and Caregiver Engagement<br>Patient and Caregiver Engagement involves PCF Beneficiaries in their own care decisions and ensures that PCF Beneficiaries guide PCF Practice improvements. The PCF Practice must implement a regular process for patients and caregivers to advise practice improvement. | • Implement a regular process for PCF Beneficiaries and caregivers to advise PCF Practice improvement. |
| Planned Care and Population Health<br>Planned Care and Population Health capabilities enable the PCF Practice to meet the preventive and chronic care needs of the entire PCF Beneficiary population. The PCF Practice must set goals and continuously improve upon key outcome measures. | • Set goals and continuously improve upon key outcome measures. |

# Appendix B: PCF Health IT Requirements

| Requirement | Date | Notes |
|---|---|---|
| **Overall CEHRT Adoption** | | |
| Adopt and maintain, at a minimum, health IT needed to meet the CEHRT definition required by the Quality Payment Program (QPP) at 42 CFR § 414.1305.* | By the start of Performance Year 1, ongoing. | The PCF Practice must adopt relevant health IT for the entire Performance Year. For instance, if a change to a new Edition is required to meet the CEHRT definition for a given year, the upgrade must be completed by January 1 of the following year.<br>**Since the beginning of 2019, the CEHRT definition at 42 CFR § 414.1305 has required the use of 2015 Edition technology only.* |
| **Health IT for eCQM Reporting** | | |
| Adopt and maintain, at a minimum, health IT meeting the definition of CEHRT for QPP at 42 CFR § 414.1305 and the certification criteria found at 45 CFR § 170.315(c)(1) - (3) for electronic clinical quality measure (eCQM) reporting, for the eCQMs in the Primary Care First measure set as provided in the PCF Payment and Attribution Methodologies Paper. | By the start of Performance Year 1, ongoing.<br>No later than January 1 for each subsequent Performance Year. | For each Measurement Period, the PCF Practice must use the eCQM specifications listed in the eCQI Resource Center as of January 1 of the Performance Year.<br>*For each of these sections, (c)(1) is the certification criterion for "Record and Export," (c)(2) is the certification criterion for "Import and Calculate," and (c)(3) is the certification criterion for "Report."*<br>*The Primary Care First quality reporting requirements for each Performance Year will be made available in the Clinical Measure Reporting and Health IT Requirements Summary in advance of that Performance Year.* |
| eCQM reporting submission in Quality Reporting Document Architecture Category III (QRDA III) format via qpp.cms.gov. | The first expected Reporting Period is tentatively scheduled from January 2 to February 28, 2023.<br>Reporting Period dates will be communicated yearly. | For the 2022 Measurement Period, the PCF Practice must report eCQMs electronically in the QRDA III format via the qpp.cms.gov website during the applicable Reporting Period.<br>The PCF Practice must complete measure reporting in the QRDA III format via the qpp.cms.gov website until such time as CMS offers measure reporting via the Fast Healthcare Interoperability Resources (FHIR®) standard. |
| Adopt and maintain health IT with the capability to filter eCQM data for reporting at the Practice Site level [Practice Site location, TIN(s)/NPI(s)]. | By the first expected Reporting Period, tentatively scheduled from January 2 to February 28, 2023.<br>Reporting Period dates will be communicated yearly. | eCQM data must be filtered at the Practice Site level [Practice Site location, TIN(s)/NPI(s)] and may not be filtered at the individual PCF Practitioner level.*<br>**The PCF Practice may adopt and maintain the 2015 Edition certification criterion found at 45 CFR § 170.315(c)(4) in order to filter eCQMs for reporting at the Practice Site level [Practice Site location, TIN(s), NPI(s)], but this is not required.* |
| **Health IT for Advance Care Plan Reporting** | | |

| Requirement | Date | Notes |
|---|---|---|
| For Performance Year 1 only, adopt and maintain a qualified registry or a qualified clinical data registry (QCDR) from the Merit-based Incentive Payment System (MIPS) Final approved list to report MIPS CQM.<br><br>There are no health IT requirements associated with the Advanced Care Plan measure for Performance Year 2 and beyond. | By the expected Reporting Period, tentatively scheduled from January 3 to February 28, 2022. | The MIPS 047 Advance Care Plan CQM submission format specifications for PCF will be made available in advance of the Reporting Period. |
| **Interoperability** | | |
| Give patients and their designated representative access to electronic health information within 1 business day. | By the start of Performance Year 1, ongoing. | In alignment with the ONC 21st Century Cures Act final rule (85 FR 25642) implementation compliance timeline, the PCF Practice must provide patients access to electronic health information.<br><br>By the start of Performance Year 3, the PCF Practice must provide patients access to electronic health information (as defined in 45 CFR § 171.102) via a standards-based API.<br><br>CMS, in partnership with ONC, has identified HL7 FHIR Release 4.0.1 as the foundational standard to support data exchange via secure application programming interfaces (APIs) as defined at 45 § CFR 170.215. |
| Refrain from information blocking as defined at 45 § CFR 171.103. | By the start of Performance Year 1, ongoing. | The PCF Practice must attest to refraining from information blocking in the Health IT Details tab in the PCF Practice Portal. |
| Adopt and maintain participation in a health information exchange (HIE). | By the start of Performance Year 1, ongoing. | The PCF Practice must connect to a regional, national, or vendor-mediated health information exchange (HIE) to send and receive electronic health information for all patients.<br><br>The PCF Practice must attest to connecting to an HIE in the Health IT Details tab in the PCF Practice Portal |
| **Model Reporting** | | |
| Maintain Health IT Details Tab in PCF Practice Portal. | Beginning within 30 Days of the Effective Date, then ongoing. | The PCF Practice must maintain up-to-date health IT information in the PCF Practice Portal. This includes, but is not limited to, changes in primary or quality reporting health IT vendor(s), product information and attestations to health IT requirements. |

# Appendix C: PCF Regions

| Region | Participating Counties |
|---|---|
| Alaska | Statewide |
| Arkansas | Statewide |
| California | Statewide |
| Colorado | Statewide |
| Delaware | Statewide |
| Florida | Statewide |
| Greater Buffalo region (NY) | Erie County, Niagara County |
| Greater Kansas City region (KS/MO) | Johnson County, KS; Wyandotte County, KS; Clay County, MO; Jackson County, MO; Platte County, MO |
| Greater Philadelphia region (PA) | Bucks County; Chester County; Delaware County; Montgomery County; Philadelphia County |
| Hawaii | Statewide |
| Louisiana | Statewide |
| Maine | Statewide |
| Massachusetts | Statewide |
| Michigan | Statewide |
| Montana | Statewide |
| Nebraska | Statewide |
| New Jersey | Statewide |
| New Hampshire | Statewide |
| North Dakota | Statewide |
| North Hudson-Capital region | Albany County; Columbia County; Dutchess County; Greene County; Montgomery County; Orange County; Rensselaer County; Saratoga County; Schenectady County; Schoharie County; Sullivan County; Ulster County; Warren County; Washington County |
| Ohio and Northern Kentucky region | Ohio: Statewide<br>Kentucky: Boone County; Campbell County; Grant County; Kenton County |
| Oklahoma | Statewide |
| Oregon | Statewide |
| Rhode Island | Statewide |
| Tennessee | Statewide |
| Virginia | Statewide |

# Appendix D: [Reserved]

# Appendix E: Cost Sharing Support for Face-to-Face Visits

The PCF Practice may offer cost sharing support in the form of reduced or eliminated cost sharing for medically necessary Face-to-Face Visits furnished by the PCF Practice under the Model ("**Cost Sharing Support**"), subject to certain conditions and safeguards. The PCF Practice shall implement the Cost Sharing Support in accordance with the terms of Section 9.05(b) of the Participation Agreement and this Appendix.

a. General

1. The Cost Sharing Support must be provided to the PCF Beneficiary by the PCF Practice in accordance with the CMS-approved Cost Sharing Support Implementation Plan in accordance with Section B of this Appendix.

2. The PCF Practice shall not offer Cost Sharing Support to any PCF Beneficiary unless the PCF Beneficiary does not have a MediGap supplemental plan that covers all of the cost sharing amount for Face-to-Face Visits, and satisfies one or more of the following conditions:

    i. The PCF Beneficiary is experiencing documented financial hardship;

    ii. The PCF Beneficiary has documented evidence of high disease burden and, in the reasonable medical opinion of the PCF Practitioner, medically necessary Face-to-Face Visits may avoid hospitalization of the PCF Beneficiary or otherwise facilitate a reduction in Medicare expenditures for the PCF Beneficiary; or

    iii. Documented evidence of a recent hospitalization or ED visit.

3. The availability of the Cost Sharing Support must not be advertised or promoted except that a PCF Beneficiary may be made aware of the availability of the benefit at the time the PCF Beneficiary could reasonably benefit from it.

4. The cost of providing the Cost Sharing Support must not be shifted to Medicare or another federal health care program, as defined at Section 1128B(f) of the Act.

b. Implementation Plan

1. If the PCF Practice wishes to offer the Cost Sharing Support during a Performance Year, it must develop a Cost Sharing Support Implementation Plan which the PCF Practice must apply uniformly and consistently. The Implementation Plan must be submitted to CMS in a form and manner and by a deadline specified by CMS. The Implementation Plan must include:

    i. An affirmative statement that the PCF Practice elects to offer the Cost Sharing Support;

Case 1:22-cv-12196-FDS Document 28-8 Filed 04/27/23 Page 77 of 84

ii. The conditions in accordance with Section A of this Appendix under which the PCF Practice elects to provide the Cost Sharing Benefit;

iii. The procedures to be employed to determine whether a PCF Beneficiary is eligible to receive the Cost Sharing Benefit;

iv. The procedures to be employed to meet the documentation requirements in accordance with Section C of this Appendix; and

2. The Cost Sharing Support Implementation Plan must be reviewed and modified by the PCF Practice, as necessary and at least annually. Any modification to the Cost Sharing Support Implementation Plan must be submitted to CMS at least 30 Days before the modification becomes effective, unless a different deadline is specified by CMS.

3. CMS may reject a Cost Sharing Support Implementation Plan if it does not comply with the terms of Section 9.05 of the Participation Agreement and this Appendix. A Cost Sharing Support Implementation Plan is deemed approved if CMS has not rejected it within 30 Days after its submission to CMS. CMS may reject a Cost Sharing Support Implementation Plan after it has been deemed approved, but such rejection shall not be effective retroactively.

c. Documentation and Record Retention

1. The PCF Practice must maintain documentation of all instances in which Cost Sharing Support has been provided to a PCF Beneficiary.

2. The documentation must be contemporaneous with the provision of the Cost Sharing Support and must include at least the following:

i. The date the benefit is provided;

ii. The identity of the PCF Beneficiary to whom the benefit was provided;

iii. The condition under which the PCF Beneficiary qualified for the benefit and evidence that the condition was satisfied; and

iv. Starting in Performance Year 2 and for each subsequent Performance Year, the dollar amount of the benefit provided to the PCF Beneficiary.

3. The PCF Practice must maintain in accordance with Article 14 copies of the Cost Sharing Support Implementation Plan and the documentation required pursuant to this Section.

d. Compliance and Enforcement

1. CMS may take remedial action, including the suspension or termination of the PCF Practice's ability to offer Cost Sharing Support, if CMS determines that:

a. The PCF Practice has failed to comply with this Appendix or Section 9.05 of the Participation Agreement; or
b. The PCF Practice's implementation of Cost Sharing Support might compromise the integrity of the Model.

2. The PCF Practice shall submit annual reports to CMS, in a form and manner specified by CMS, regarding its implementation and use of the Cost Sharing Support as a beneficiary engagement incentive. The PCF Practice shall provide CMS with supplemental information upon request regarding its implementation and use of Cost Sharing Support.

# Appendix F: Telehealth Benefit Enhancement

Beginning in Performance Year 2 and in subsequent Performance Years, the PCF Practice may furnish certain Primary Care Services that are also Medicare telehealth services (**"Telehealth Eligible Face-to-Face Visits"**), as identified in the PCF Payment and Attribution Methodologies Paper, via telehealth, regardless of the geographic or site of service of the PCF Beneficiary, including in the PCF Beneficiary's home, for medically necessary Face-to-Face Visits furnished by the PCF Practice to PCF Beneficiaries under the Model (**"Telehealth Benefit Enhancement"**), subject to certain conditions and safeguards. The PCF Practice shall implement the Telehealth Benefit Enhancement in accordance with the terms of this Appendix.

a. Waiver

1. Waivers of Originating Site Requirements: CMS waives the following requirements with respect to Face-to-Face Visits that are otherwise covered telehealth services furnished by a PCF Practitioner to a PCF Beneficiary in accordance with the terms and conditions set forth in this Appendix:

    i. Waiver of Originating Site Requirements: CMS waives the requirements in Section 1834(m)(4)(C) of the Act and 42 CFR § 410.78(b)(3) and (4) with respect telehealth services furnished in accordance with this Appendix.

    ii. Waiver of Originating Site Requirement in the Eligible Telehealth Individual Provision: CMS waives the requirement in Section 1834(m)(4)(B) of the Act that telehealth services be "furnished at an originating site" when the services are furnished in accordance with this Appendix.

    iii. Waiver of Originating Site Facility Fee Provision: CMS waives the requirement in Section 1834(m)(2)(B) of the Act and 42 CFR § 414.65(b) with respect to telehealth services furnished to a PCF Beneficiary at his or her home or place of residence when furnished in accordance with this Appendix.

b. Eligibility Requirements

1. For telehealth services to be eligible for reimbursement under this Participation Agreement and this Appendix, the PCF Beneficiary must be:

    i. A PCF Beneficiary at the time the telehealth services are furnished; and

    ii. Located at an originating site that is either:

        A. One of the sites listed in Section 1834(m)(4)(C)(ii) of the Act; or

        B. The PCF Beneficiary's home or place of residence.

iii. For telehealth services to be eligible for reimbursement under this Participation Agreement and this Appendix, the PCF Practice must bill for the telehealth services using a HCPCS code identified as a Telehealth Eligible Face-to-Face Visit.

iv. All telehealth services furnished in accordance with the Telehealth Benefit Enhancement under this Appendix must be furnished in accordance with all other applicable state and Federal laws and all other Medicare coverage and payment criteria, including the remaining requirements of Section 1834(m) of the Act and 42 CFR §§ 410.78 and 414.65.

c. Responsibility for Denied Claims

1. If a claim for any Telehealth Eligible Face-to-Face Visits furnished by a PCF Practitioner under this Appendix is denied as a result of a CMS error and the PCF Practice and PCF Practitioner did not know, and could not reasonably have been expected to know, as determined by CMS, that the claim would be denied, a Flat Visit Fee shall, notwithstanding such denial, be paid to the PCF Practice by CMS for such Telehealth Eligible Face-to-Face Visits under the terms of this Appendix as though the coverage denial had not occurred.

2. If a claim for any Telehealth Eligible Face-to-Face Visits furnished by a PCF Practitioner under this Appendix is denied for any reason other than a CMS error and CMS determines that the PCF Practice and PCF Practitioner did not know, and could not reasonably have been expected to know, as determined by CMS, that a Flat Visit Fee would not be paid for such items or services under Part B of Title XVIII of the Act or the PCF Payment and Attribution Methodologies Paper:

   i. CMS shall, notwithstanding such denial, pay the Flat Visit Fee to the PCF Practice under the terms of this Appendix as though the coverage denial had not occurred, but CMS may seek re-payment of this Flat Visit Fee in a manner like that described in Section 5.04(a) of this Participation Agreement;

   ii. The PCF Practice shall ensure that the PCF Practitioner that provided the Telehealth Eligible Face-to-Face Visits does not charge the PCF Beneficiary for the expenses incurred for such services; and

   iii. The PCF Practice shall ensure that the PCF Practitioner that provided the Telehealth Eligible Face-to-Face Visits returns to the PCF Beneficiary any monies collected from the PCF Beneficiary related to such services.

3. If a claim for any Telehealth Eligible Face-to-Face Visits furnished by a PCF Practitioner is denied and the PCF Practice or PCF Practitioner knew, or reasonably could be expected to have known, as determined by CMS, that a Flat Visit Fee payment would not be made for such items or services under Part B of Title XVIII of the Act or the PCF Payment and Attribution Methodologies Paper:

i. CMS will not pay a Flat Visit Fee to the PCF Practice for such services;

ii. The PCF Practice shall ensure that the PCF Practitioner that provided the Telehealth Eligible Face-to-Face Visits does not charge the PCF Beneficiary for the expenses incurred for such services; and

iii. The PCF Practice shall ensure that the PCF Practitioner that provided the Telehealth Eligible Face-to-Face Visits returns to the PCF Beneficiary any monies collected from the PCF Beneficiary related to such services.

d. Compliance and Enforcement

1. CMS may disallow a PCF Practitioner from furnishing, or the PCF Practice from billing for, Telehealth Eligible Face-to-Face Visits under the terms of the Appendix at any time, or take other remedial action pursuant to Article 15 of the Participation Agreement, if CMS determines that a PCF Practitioner's participation in the Telehealth Benefit Enhancement might compromise the integrity of the Model.

2. The PCF Practice must have appropriate procedures in place to ensure that PCF Practitioners have access to the most up-to-date information regarding PCF Beneficiary attribution to the PCF Practice.

3. CMS will monitor the PCF Practice's use of the Telehealth Benefit Enhancement to ensure that the Telehealth Eligible Face-to-Face Visits furnished under this Appendix are consistent with the terms of this Appendix and the Participation Agreement.

# Appendix G: Medicare Waivers

a. Beneficiary Cost Sharing. In accordance with Section 1115A(d)(1) of the Act, CMS finds that it is necessary for purposes of testing PCF to waive the requirements for beneficiary cost-sharing under Section 1833(a)(1)(N) and Section 1833(b) of the A to the extent otherwise applicable for purposes of the Professional PBP and PBA. The PCF Practice shall not subject PCF Beneficiaries to any cost-sharing for the Professional PBP.

b. Physician Fee Schedule.

1. In accordance with Section 1115A of the Act, CMS finds that it is necessary for purposes of testing PCF to waive the requirements under Section 1848(a)(1) of the Act that payment amounts for physician services be determined under the Physician Fee Schedule (PFS) to allow the TPCPs and PBAs to be made as set forth in this Participation Agreement.

2. Section 1848(a)(1) of the Act requires that payment amounts for physicians' services be determined under the Physician Fee Schedule (PFS). Section 1833(a)(1)(O)(i) through (ii) of the Act specify certain payment adjustments with respect to services described in Section 1861(s)(2)(K). CMS finds that it is necessary for purposes of testing PCF to waive all of these requirements to allow the Flat Visit Fee to be made as set forth in this Participation Agreement.

3. In accordance with Section 1115A of the Act, CMS finds that it is necessary for purposes of testing PCF to waive the requirements under Section 1833(m)(1) and (2) of the Act and 42 CFR § 414.67(a) to allow the Shortage Area Bonus to be made as set forth in this Participation Agreement.

c. Certification for Diabetic Shoes by a Nurse Practitioner. In accordance with Section 1115A(d)(1) of the Act, CMS finds that it is necessary for purposes of testing PCF to waive Section 1861(s)(12)(A) of the Act and the implementing regulations at 42 CFR § 410.12 only insofar as necessary for the purposes of testing this Model and only insofar as the PCF Practice remains in compliance with the terms of this Participation Agreement.

d. At any time and for any reason, CMS may withdraw or amend one or more waivers described herein. CMS will use its best efforts to provide the PCF Practice with 30 Days' advance written notice of any changes to a waiver and the notice shall specify the effective date of such changes.

# PARTICIPATION AGREEMENT

This participation agreement ("**Participation Agreement**") is between the Centers for Medicare & Medicaid Services ("**CMS**") and PMG Physician Associates-Bourne , (the "**PCF Practice**").

CMS is the agency within the U.S. Department of Health and Human Services ("**HHS**") that is charged with administering the Medicare and Medicaid programs.

The PCF Practice is a group of one or more physicians, non-physician practitioners, or combination thereof that bills for Primary Care Services under a single Medicare-enrolled TIN associated with PMG Physician Associates-Bourne (the "**Practice Site**") and is assigned the following designation by CMS: PMA2525 ("**PCF ID**").

Under Section 1115A of the Social Security Act ("**Act**"), the CMS Center for Medicare & Medicaid Innovation ("**Innovation Center**") is authorized to test innovative payment and service delivery models to reduce Medicare, Medicaid, or Childrenâ€™s Health Insurance Program expenditures while preserving or enhancing the quality of care provided to beneficiaries under those programs.

Through the Primary Care First Component ("PCF Component") of the Primary Care First Model ("**PCF**" or "**Model**"), the Innovation Center will test a payment model for primary care that imposes financial risk through payment adjustments for model outcomes including improvements in quality and patient satisfaction, and reductions in acute hospital utilization and cost of care.

The PCF Practice submitted an application to participate in PCF, and CMS selected the PCF Practice for participation in the PCF Component of the Model. In addition to the PCF Component, the PCF Model also includes the Seriously Ill Population ("SIP") Component ("SIP Component"). Through the SIP Component of the Model, CMS will test a time-limited payment and service delivery methodology designed to engage and stabilize seriously ill Medicare Beneficiaries, provide them with comprehensive, person-centered care management, and then transition them to a longer-term comprehensive care setting

The parties therefore agree as follows:

## Article 17. Miscellaneous

### Section 17.01 Agency Notifications and Submission of Reports

Unless otherwise stated in writing after the Effective Date, all notifications and reports required under this Participation Agreement shall be submitted to the parties at the addresses set forth below.

CMS: Primary Care First Model
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Mailstop: WB-08-41
Baltimore, MD 21244
Email: PCF@telligen.com

PCF Practice:
PMG Physician Associates-Bourne

Address:
2 Technology Park Drive null Bourne , M

Email:
patrick_holland@atriushealth.org

Each party is signing this Participation Agreement on the date stated opposite that party's signature. If a party signs but fails to date a signature, the date that the other party receives the signing party's signature will be deemed to be the date that the signing party signed this Participation Agreement

PCF Practice Name:
PMG Physician Associates-Bourne

Date:
11/15/2021

By:
Patrick Holland

Name of authorized signatory:
Patrick Holland

Title of authorized signatory:
Practice Primary Contact

PCF Practice ID:
PMA2525

CMS:

Date:
12/14/2021

By:
Arrah Tabe-Bedward

Name of authorized signatory:
Arrah Tabe-Bedward

Title of authorized signatory:
CMS Executive User

# Exhibit J

The Office of the National Coordinator for Health Information Technology
Patient Engagement Playbook

# Introduction

## About this playbook

The Patient Engagement Playbook is a tool for clinicians, health care practice staff, hospital administrators, and others who want to leverage health IT — particularly electronic health record (EHR) patient portals — to engage patients in their health and care.

Why the focus on patient engagement? Because engaged patients have the knowledge, skills, ability, and willingness to manage their health and care and to act on clinicians' recommendations. Practices that invest in health IT for patient engagement can expect returns in the form of better outcomes and lower costs.

### When selecting an EHR vendor, keep patients in mind.

Before you contract with an EHR vendor, be sure to research the EHR market (including competing vendors, products, and services) and make a priority list of features you want in your EHR.

Keep in mind that features supporting patient engagement, like self-scheduling, are the most effective ways to encourage portal adoption.[1] Many patients — especially those under 40 — specifically seek out health care practices that use advanced health IT for communication and data management.[2]




- For more tips on selecting an appropriate EHR for your practice, **check out the Health IT Playbook (https://www.healthit.gov/playbook/electronic-health-records/)**.
- Use ONC's **Electronic Health Records Contract Guide [PDF - 798 KB] (https://www.healthit.gov/sites/default/files/playbook/pdf/ehr-contract-guide.pdf)** to get familiar with EHR contract details.

Health care practices across the country are already seeing the benefits of EHR patient portal implementation on patient engagement and beyond. The rewards are real: more informed, involved patients; more effective delivery of care; and reduced burden on office staff. But the barriers are real, too: cumbersome enrollment; clunky interfaces; reluctant patients and office staff; and questions of privacy and security. It will take years to address all of the pain points, but transformation is underway.

## How to use the Playbook

In this playbook, we demystify patient portals and describe how you can make them work for you and your patients.

**If your practice is just getting started with a patient portal, use the Playbook to** learn how to promote it and establish processes that drive adoption — including how to:

- Make enrollment easier on your practice (**1.1 (/playbook/pe/chapter-1/#section-1)**, **1.2 (/playbook/pe/chapter-1/#section-2)**)

- Promote the portal and register patients in the office (**Chapter 1 graphic (/playbook/pe/chapter-1/#infographic-1)**, **1.3 (/playbook/pe/chapter-1/#section-3)**)
- Educate patients about the portal and include it in visit summaries (**1.4 (/playbook/pe/chapter-1/#section-4)**)

**If your practice has already established a patient portal,** use the Playbook to get ideas and tips for establishing features and policies that streamline and improve care — such as:

- Communicate with patients by email and share notes through the portal (**2.2 (/playbook/pe/chapter-2/#section-2)**, **2.3 (/playbook/pe/chapter-2/#section-3)**)
- Navigate proxy access with patients and their caregivers (**4.1 (/playbook/pe/chapter-4/#section-1)**)
- Create a plan for integrating patient-generated health data into your practice (**5.1 (/playbook/pe/chapter-5/#section-1)**)
- Build goodwill for the portal among clinicians and staff (**1.4 (/playbook/pe/chapter-1/#section-4)**)
- Activate features like online booking (**2.1 (/playbook/pe/chapter-2/#section-1)**)
- Set up an efficient workflow for collecting family health histories (**5.2 (/playbook/pe/chapter-5/#section-2)**)

# How to use the Playbook

**In this playbook, we demystify patient portals and describe how you can make them work for you and your patients.**




**If your practice is just getting started with a patient portal,** use the Playbook to learn how to promote it and establish processes that drive adoption — including how to:

- **Make enrollment easier on your practice**
- **Promote the portal and register patients in the office**
- **Educate patients about the portal and include it in visit summaries**



**If your practice has already established a patient portal,** use the Playbook to get ideas and tips for establishing features and policies that streamline and improve care — such as:

- **Communicate with patients by email and share notes through the portal**
- **Navigate proxy access with patients and their caregivers**

(/playbook/public/img/pep-intro-graphic-2019.png)

Read text description

Create a plan for integrating patient-generated health data into your practice

Build goodwill for the portal among clinicians and staff

Activate features like online scheduling

Set up an efficient workflow for collecting family health histories

We've compiled best practices and home-grown solutions from innovative clinicians, practice administrators, and health systems around the country.

We've also told their stories in "From the field" examples scattered throughout the Playbook. The highlighted organizations stand out as pioneers — they've piloted unique programs that leverage health IT, shown how using health IT strategically can produce results, and earned national attention from the press and fellow industry leaders.

Each "From the field" example sheds light on what it means to put the Playbook into practice. There's much to learn from analyzing these bright spots and scaling their success. Even a few small changes in your practice and patient portal implementation can lead to meaningful improvements in portal adoption, care delivery, and health outcomes.

Every day, clinicians and practices embrace new technologies, discover ways to improve care, and find opportunities for meaningful patient connection. As health IT and health care delivery evolve, the Playbook will evolve too. Over time, we'll update it to include a broader range of tried-and-true strategies for involving patients in their health and care.

## Why a playbook?

Playbooks aren't static instruction manuals — they're always-evolving sets of strategies and approaches. Good coaches update their playbooks constantly, and each iteration reflects new, innovative solutions to shifting circumstances.

This playbook is an important tool for our mission to help clinicians and their patients adopt and adapt to patient portals and patient-generated health data. We hope you'll use it in a way that works for you and your practice.

For example, you may want to:

- Review patient portal benefits with office staff, so they can share them with patients
- Focus on one chapter at a time — discuss lessons during team meetings, apply best practices in the workplace, and have ongoing conversations about what works and what can be improved
- Use Playbook language on your website or Facebook page to let patients know how they can use the patient portal to participate in their care

## About patient portals

**Patients like portals.**
In 2017, half of Americans were offered access to an online medical record. **8 in 10** individuals who accessed their record reported it was both easy to understand and useful. [3]

---

The Centers for Medicare & Medicaid Services (CMS) launched **Meaningful Use objectives (https://www.healthit.gov/providers-professionals/meaningful-use-definition-objectives)** to encourage clinicians and practices to use EHR technology effectively — to improve patient care and outcomes. [4], [5] For office-based Medicare clinicians, Meaningful Use will soon be replaced by **Advancing Care Information under the proposed Quality Payment Program (https://www.hhs.gov/about/news/2016/10/14/hhs-finalizes-streamlined-medicare-payment-system-rewards-clinicians-quality-patient-care.html)**.

Clinicians and practices must meet Meaningful Use objectives to qualify for CMS's EHR Incentive Programs and the upcoming Quality Payment Program. For example, Meaningful Use sets goals for clinicians and practices to:

- **Enable patients to view online, download, and transmit (https://www.healthit.gov/providers-professionals/achieve-meaningful-use/core-measures-2/patient-ability-electronically-view-download-transmit-vdt-health-information)** their health information within 4 business days of the information being available
- **Exchange secure messages (https://www.healthit.gov/providers-professionals/achieve-meaningful-use/core-measures-2/use-secure-electronic-messaging)** with more than 5% of patients
- **Provide clinical summaries (https://www.healthit.gov/providers-professionals/achieve-meaningful-use/core-measures-2/clinical-summaries)** to patients or caregivers within 1 business day for more than half of office visits

In addition to financial incentives, portals can add up to big benefits in patient care. For patients with chronic diseases, engagement in patient portals has been **associated with improvements in disease management.** [6] Portals can also improve preventive care. Patients with portal access to screening recommendations — like when to get their next mammogram or colonoscopy — are **more likely to follow through on these recommendations.** [7]

Ultimately, patient portals can contribute to:

- Reduced call volume

- Improved responsiveness to patients' needs
- Lower utilization of health services
- More effective care
- Cost savings [8]

**Patient portals hold enormous potential to improve patient care and practice workflow. We've created this playbook to help you realize it — and build an effective digital strategy for patient engagement.**

### Terms to know

**Use this glossary (/playbook/glossary/)**, adapted from the Center for Healthcare Quality and Payment, to help establish a common language with all stakeholders.

**Electronic health record (EHR).** An EHR — also known as an electronic medical record or EMR — is an electronic system that clinicians use to document patients' medical and health information. A patient's EHR may include demographic data, progress notes, medications, vital signs, medical history, immunizations, lab results, and radiology reports. Patients don't access their own EHR.

**Patient portal.** A patient portal is a secure website where patients can access their medical history and other health information stored in the EHR. Using the portal, patients can typically complete forms online, communicate with clinicians, request prescription refills, pay bills, review lab results, and schedule appointments.

## Help us improve this Playbook

Best practices start with clinicians and administrators like you. We want to learn more about your experiences and hear your suggestions. Tell us what's working and what isn't. Have you successfully boosted portal adoption in your practice? Do you have a promising product solution?

As you discover new ways to navigate patient portals, EHRs, and other health IT solutions, **let us know (/playbook/pe/feedback/)**. We update the Playbook regularly with new patient engagement strategies and real-world examples. A good playbook is never complete: it evolves and keeps getting better — but it's only as good as the people who use it. Please send us your suggestions, questions, and strategies so we can add to this tool and improve the patient experience.

### Disclaimer

References or links in this website to any specific non-federal entity, commercial product, process, service, or company do not constitute their endorsement or recommendation by the U.S. Government or HHS. HHS is not responsible for the contents of any "off-site" website linked to in this website, nor is HHS responsible for such other website's compliance with Section 508 (accessibility).

**Content last updated on:** May 31, 2019

Chapter 1

# Facilitate easy enrollment

## In this chapter

Learn how to:

- Make the process easier for everyone by providing a **simple, secure signup process (/playbook/pe/chapter-1/#section-1)**
- Save patients a step and facilitate sign-ups with **automatic portal enrollment (/playbook/pe/chapter-1/#section-2)**
- Build **in-office portal registration (/playbook/pe/chapter-1/#section-3)** into your care delivery workflow
- Get staff buy-in and **communicate benefits of the portal (/playbook/pe/chapter-1/#section-4)** to patients

Enrollment is the first step to engagement. In signing up for the portal, becoming familiar with it, and committing to using it, patients take an active step in managing their health and care. But patients can be slow or reluctant to enroll in their EHR patient portals — and many never enroll at all.

Patients report not enrolling because they:

- **Don't remember discussing it with their clinicians**
- **Lack information or motivation** — for example, they don't have signup instructions or they feel too busy
- **Question the value of digital communication** — for example, they think it won't be useful or they prefer phone over email
- **Need computer help** — for example, they don't have computer access or skills [9]

This reluctance may seem overwhelming or out of your control, but there's a lot that clinicians and practices can do to overcome these barriers and boost registration.

In this chapter, we'll identify best practices for getting patients enrolled in — and on board with — patient portals. You can then **tailor this approach to fit your practice**. For instance, clinicians in small practices who have lifelong relationships with their patients can use the portal as a tool to deepen their communication. Large health systems might train patient greeters to become portal enrollment staff. One thing is certain: whether you're a practice of 1 or 1,000, you can achieve high portal adoption. [10]

## 1.1 Provide simple, secure portal signup

The amount of time and effort it takes to register for a patient portal can affect whether your patients successfully enroll or give up halfway through.

Make the process easier on them and you by choosing a portal with a quick, secure signup process. Ideally, the patient has to enter only a few pieces of information — and the portal confirms the patient's identity on the back end.

### Mana Health [11, 12] | From the field

Mana Health, a health IT developer, enables patients to sign up in a few simple steps. When a patient registers, Mana's system uses data (like demographics and the patient's medical record number) to match up the patient with her EHR. This automated verification system means an

efficient, successful enrollment process for practices and patients.




The patient selects "New user."



They type in the clinician invite code and their date of birth.




They enter their email address and decide on a username and password.



The patient chooses security questions and types in their answers. (If they ever forget their password, they can use these questions to access the account.)




They read and agree to the Terms and Conditions.



Registration complete!

## 1.2 Develop an automatic enrollment policy

**Facilitate enrollment!**
**Automatically enroll your patients in a portal account, instead of waiting for patients to sign up themselves.**

To facilitate enrollment, automatically enroll your patients in a portal account, instead of waiting for patients to sign up themselves. Keep enrollment numbers up by encouraging new patients to stay registered and offering tips for patients with limited computer access or skills.

You can also increase the number of patients who enroll and use the portal by integrating portal use into patients' care plans. For example, encourage patients to use the portal to make follow-up appointments, stay on top of recommended screenings, or request refills. Some portals even enable clinicians to create task lists for patients that include activities related to taking medications, eating a healthy diet, and staying physically active. By taking this approach, you can set the expectation that using the patient portal is part of following their recommendations — just like getting regular physical activity or taking medicine as prescribed.

# The Patient Portal "Prescription"

**Take every opportunity to help patients see value in using their portal. It's an important tool for their health care plan — just like getting regular physical activity or taking medicine as prescribed.**

**Patients are almost**

**2x more likely**

**to access their online health record when encouraged by their health care provider.**

Source: ONC Data Brief 40



## What's in it for them? Benefits for patients include being able to:

- Easily request or schedule appointments
- Request prescription refills anytime, day or night
- View labs or other test results
- Quickly ask a question via secure message

**Note:** To keep portal use up, remind patients at every visit — and offer tips for those with limited computer access or skills.

[redacted]

athenahealth [13] | From the field

athenahealth, an EHR vendor, recommends an automatic enrollment policy. Many of athenahealth's top 100 practices have benefited from this strategy.

> "...The front office staff and physicians communicate that part of what it means to be a patient in a particular practice is using the portal. A slight shift of attitude can go a long way.
>
> It is the difference between asking whether a patient would like to register for the portal versus communicating that portal registration is expected and is integral to the care process."
>
> — Josh Gray, Vice President, athenaResearch

## 1.3 Register patients in the office

Treat patients' office visits as a prime opportunity for portal registration.

Patients are more likely to register in the office, where they can get support from practice staff and engage in a personal conversation about benefits of the portal. If patients are asked to sign up once they've returned home, they may forget, have competing priorities, or struggle to navigate the technology on their own.

Make in-office registration the default by building it into your care delivery workflow and offering several registration touch points during a visit. For example, at check-in and check-out the receptionist, medical assistant, or nurse can teach patients about the portal and offer to sign them up on the spot using a kiosk, tablet, or registrar computer.

athenahealth [14] | From the field

athenahealth analyzed portal registration methods among 973,000 patients who visited practices that offer their patient portal, athenaCommunicator. athenahealth found in-office registration much more effective than at-home registration.

**In-office registration**

Among patients given the opportunity to sign up...




Using a kiosk or tablet, **57%** signed up




On the registrar computer, **53%** signed up




After receiving a text message, **23%** signed up

**At-home registration**

Among patients who received...




An email at check-in, **12%** signed up




An automated monthly email, **4%** signed up




A marketing campaign invitation, **less than 1%** signed up

## 1.4 Market and educate effectively

Use positive, encouraging language — with both staff and patients — and leverage every educational opportunity.

### Get staff buy-in

Strong leadership and staff buy-in to the patient portal can set the stage for effective marketing and lead to higher enrollment.

### Tips for Practice Administrators [15]

Practice leaders can take several steps to create an environment that encourages portal adoption.

- ☐ Provide opportunities for practice staff to discuss portal adoption, so that you can address fears and identify solutions
- ☐ Encourage staff to set up their own patient portal accounts, so that they can better understand the tool and its potential value to patients
- ☐ Offer staff incentives for portal adoption — for example, via practice-wide contests
- ☐ Promote the portal internally as a critical offering to patients, so that all staff view portal use as an opportunity for high-quality customer service
- ☐ Explain that it's important for all clinicians to adopt the portal so that the practice can market consistently to all patients and avoid sending mixed messages
- ☐ Foster enthusiasm for the portal among staff, so that they can relay that enthusiasm to patients

**Clinicians are key.**
Individuals encouraged by their health care clinician to use their online medical record are almost twice as likely to access it compared to those who are not encouraged. In 2017, 63% of individuals who were encouraged by their doctor to use their online medical record accessed it within the past year compared to only 38% of those who were not encouraged. [16]

## Tell patients how they can benefit.

Ensure that all members of the care team can relay the benefits of the portal and show patients how to do basic tasks like view lab results, send messages, pay bills, and request or schedule an appointment. See Chapter 2 of this playbook for more information on portal benefits.

Give clinicians and staff talking points so that everyone reinforces the same key messages.

Consider jumping on board with the **Blue Button Initiative (https://www.healthit.gov/topic/health-it-initiatives/blue-button)**, a public-private partnership to provide consumers with easy access to their health records in a format they can use.[17] The Blue Button symbol indicates to patients that they can download a personal medical summary that includes medications, conditions, and more. You can customize the Blue Button symbol to your practice.

### The Blue Button Initiative is having an impact

Between 2011 and 2014, the number of organizations participating in the campaign rose from 30 to 650. And in 2014, over half of patients offered access to their medical record online took advantage of the offer.

For more information on how patients' access to their own data has grown, check out these ONC Data Briefs:



(https://www.healthit.gov/sites/default/files/page/2019-04/AHApatientengagement.pdf)
**Electronic Capabilities for Patient Engagement among U.S. Non-Federal Acute Care Hospitals: 2013-2017 (https://www.healthit.gov/sites/default/files/page/2019-04/AHApatientengagement.pdf)**[18]



(http://dashboard.healthit.gov/evaluations/data-briefs/hospitals-patient-engagement-electronic-capabilities-2015.php)
**Electronic Capabilities for Patient Engagement among U.S. Non-Federal Acute Care Hospitals: 2012-2015 (http://dashboard.healthit.gov/evaluations/data-briefs/hospitals-patient-engagement-electronic-capabilities-2015.php)**[19]



(https://www.healthit.gov/sites/default/files/briefs/oncdatabrief30_accesstrends_.pdf)
**Trends in Consumer Access and Use of Electronic Health Information (https://www.healthit.gov/sites/default/files/briefs/oncdatabrief30_accesstrends_.pdf)**[20]

(https://www.healthit.gov/sites/default/files/briefs/oncdatabrief29_patientengagement.pdf)



[Electronic Capabilities for Patient Engagement among U.S. Non-Federal Acute Care Hospitals: 2012-2014 (https://www.healthit.gov/sites/default/files/briefs/oncdatabrief29_patientengagement.pdf](https://www.healthit.gov/sites/default/files/briefs/oncdatabrief29_patientengagement.pdf) [21]

## Take advantage of every touchpoint. [22]

Take every opportunity to promote patient portal enrollment. Over the course of a visit, a patient may talk to several practice staff including a receptionist, nurse, and doctor. Treat each conversation with a patient as an opportunity to explain the portal's value and highlight the simple steps patients can take to activate their account.

**Use clear action steps!**
**Adding clear action steps to your after-visit summaries — with images in an appealing layout — may inspire patients to enroll in online portals.**

---

You can also add portal enrollment steps to paperwork, such as after-visit summaries. Make the instructions actionable and easy for patients to understand — choose clear, direct language and use illustrations, bullets, and numbering where possible. Encourage them to take immediate action.

Adding clear action steps to your after-visit summaries — with images in an appealing layout — may inspire patients to enroll in online portals. It's an affordable, scalable way to encourage patient participation.

Remember that marketing opportunities exist outside of a visit, too — like when patients call the office.

## Tips for Practice Staff

Practice staff can take steps to make the most of each patient touch point.

- ☐ Teach patients about the portal while they're waiting to see their doctors
- ☐ In the waiting room, have posters, brochures, and videos that highlight portal features. Ask your EHR vendor what materials they offer — many have developed portal marketing materials so that you don't have to
- ☐ Give patients instructions for logging into the portal on a smartphone while they wait
- ☐ Set up a pre-recorded hold message or a message that plays at the end of a call that reminds patients to register

☐ Show patients the simple portal enrollment steps listed on their after-visit summary and encourage them to sign up

**Make patient portal communication the norm.**

Move away from traditional methods of patient communication, like phone and mail. Frame the patient portal as the best way to reach clinicians and see important medical information.

Inova Health | From the field

Inova Health partnered with ONC, the Office of Evaluation Sciences, and the Centers for Medicare and Medicaid Services to identify a solution to encourage patients to enroll in the health system's EHR patient portal. Working closely with its partners, **Inova Health revised the after-visit summary (AVS) (https://oes.gsa.gov/projects/patient-health-it/)** to make the benefits of EHRs salient, highlight clear action steps, and encourage immediate action. Analysis suggests that the revised instructions led to a 10% increase in the probability of online patient portal activation.

There are promising signs that clear action steps presented using images, and in an appealing layout, may encourage patients to access the online patient portal component of their health care system's EHR. Read more about this low-cost and scalable solution to encourage patients to enroll and use portals.

Sign Up for MyChart

**What is MyChart**

MyChart is intended as a secure online source of confidential medical information. For persons who choose to use MyChart it allows you to obtain secure and immediate access to information in your medical record in the Hospital's electronic medical records system. This access to MyChart is provided by Inova Health System as a convenience to its patients

**What is available in MyChart**

Hospital's MyChart application allows you to:

- View your health summary and test results
- Pay your hospital bills
- Renew your prescriptions
- Make Appointment and messaging your primary care physician is possible if he or she uses the same medical record that is used at Inova

**Proxy access**

Proxy access allows approved persons to access the medical record of patients whose health they will be monitoring. To obtain proxy access, please speak to a Hospital staff member for specific legal requirements. Per Inova policy proxy access is only granted for children 0-12 years of age.

**Copy of Medical Record**

MyChart contains selected, limited medical information from a patient's medical record. MyChart does not reflect the complete contents of the medical record. To request a paper copy of a medical record contact Medical Records by calling the hospital you were discharged from or by going to www.inova.org > patients&visitors > medical records request

**Sign up**

1. log on to inova.org/mychart
2. click on the Activate Your Account link and you will access the new member signup page
3. Enter your MyChart Access Code exactly as it appears below to complete the sign-up process. If you do not sign-up before the expiration date, you must request a new code

**MyChart Access Code: SQ32B-JWTG9-T6JZE**
**Expires: 6/29/2015 4:49 PM**

**Questions**

If you have questions, please refer to the FAQs located on the MyChart home page. You can also email customer service@inova.org or call 1-855-MY-INOVA (1-855-694-6682) to talk to our MyChart staff. MyChart is available in English only. Remember MyChart is NOT to be used for urgent needs.
For medical emergencies, dial 911

The "before" version of Inova Health's after-visit summary had small text and the patient portal sign-up link was hard to find.

**Simplify your life: Sign in to Your MyChart Account Today!**

**MyChart – Take control of your medical records**
**MyChart allows you immediate, secure and confidential access to your medical records. You can even access your lab results and images (x-rays, MRIs, etc.) at any time.**



**Sign in using three easy steps: We've started for you!**



1. Log on to inova.org/mychart
2. Click on Activate Your Account to access the new member sign up page
3. Enter your unique MyChart Access Code exactly as it appears below to complete the sign-up process.

**MyChart Access Code: SQ32B-JWTG9-T6JZE**
**Expires: 6/29/2015 4:49 PM (If your code has expired, please contact us to receive a new one)**

**Remember, MyChart is NOT to be used for urgent needs.**
**For medical emergencies, dial 911.**

**Questions**
If you have questions please refer to the FAQs located on the MyChart home page. You can also email customerservice@inova.org or call 1-855-MY-INOVA (1-855-694-6682) to talk to our MyChart staff.

**Proxy access for children 0-12 years old**
Proxy access allows approved persons to access the medical record of children 0-12 years of age. To obtain proxy access, please speak to a Hospital staff member for specific legal requirements.

The "after" version of Inova Health's after-visit summary has large text, clear portal sign-up steps, and easy-to-understand instructions.

## ✓ Chapter 1 Recap

Take the first step toward patient engagement by facilitating easy portal enrollment.

- ☐ Choose a portal with a simple, secure signup
- ☐ Develop an automatic enrollment policy
- ☐ Register patients in the office
- ☐ Market and educate effectively

**Content last updated on:** May 31, 2019

Chapter 2

# Activate portal features that meet patient needs

## In this chapter

Learn how to:

- Save time for patients and staff by enabling **online booking and prescription refills (/playbook/pe/chapter-2/#section-1)**
- **Set up secure messaging (/playbook/pe/chapter-2/#section-2)** to streamline patient-clinician communication
- **Share notes (/playbook/pe/chapter-2/#section-3)** to help patients understand and act on their clinician's advice
- Add value to the portal by including **educational and community resources (/playbook/pe/chapter-2/#section-4)**
- Create a user-friendly **electronic records request (/playbook/pe/chapter-2/#section-5)** process

Patient portals have the potential to streamline clinician workflow and improve patient engagement.

But at first, clinicians may be overwhelmed by the number of features that portals offer or fear that using the portal will be cumbersome and ineffective.

You can take small steps to overcome these barriers and get the most out of your patient portal. Although patient portals vary from vendor to vendor, most include a basic set of features that offer value to patients. These features can improve the way clinicians and patients:

- Handle administrative tasks, like booking appointments
- Communicate with each other
- Manage care

Use these features to engage your patients in their care and make care coordination and communication more convenient, efficient, and effective — for them and for you.

Keep in mind that other features may also be available — but make sure you've determined their value before adding them. If you clog the portal with unnecessary information and tools, patients may get overwhelmed and find the portal more difficult to navigate and use.

## 2.1 Enable online booking and prescription refills

Booking medical appointments and refilling prescriptions over the phone can be time-consuming for both patients and clinicians. On average, it takes a little more than 8 minutes to make an appointment over the phone.[23]

In 2017, over half of non-federal acute care hospitals reported that they allow patients to schedule appointments and refill prescriptions through their portal.[24] Allowing patients to book medical appointments and refill prescriptions online will free up staff to support your practice in more valuable ways.[25] And research shows that patients use these features — in 2017, 39% of people with access to a portal used it to make appointments and 37% requested medication refills.[26]

### Kaiser Permanente | From the field

As of 2014, about half of Kaiser Permanente's nearly 10 million members were using Kaiser's online health management platform. In 2014, Kaiser members made more than 4 million online appointment requests and refilled more than 17 million prescriptions online.[27]

Kaiser tells patients upfront when they can expect to get an appointment if they book online.[28]

## Schedule an appointment

?

Back

We care about your health and helping you make wise care decisions. Understanding what kind of care you need is important.

**Important:** If you think you or your family member have a medical or psychiatric emergency, call 911 or go to the nearest hospital. Do not attempt to access emergency care through this website.

If you have an urgent symptom, or you want to speak with a nurse, do not use this website. Instead, please call 1-800-677-1112.

**Step 1: Choose appointment reason**

**Please select a reason for the appointment**

Non-urgent Appointment with Personal Provider - New Condition

Continue | Start over

**Do you have a symptom that may be treated without an appointment?** If you have symptoms of pinkeye (conjunctivitis), seasonal allergies, flu (influenza), back pain, swimmer's ear, pinworms, sore throat, or urinary tract infection, you may wish to call 1-800-777-7904 (toll free) and ask to speak with an advice nurse about treatment options.

To book online, Kaiser patients go to the "Schedule an appointment" page.

**Step 1: Choose appointment reason**

- Non-urgent Appointment with Personal Provider - New Condition
- Follow-up with Personal Provider - Existing Condition
- Routine Physical / Health Assessment
- Well Woman Exam in OB/GYN
- Return Visit With Your GYN
- Return Pregnancy Care visit in OB/GYN
- Routine Eye Exam in Optometry
- Routine Follow up for Therapy in Psychotherapy
- Routine Follow up for Medication Management in Psychiatry
- Online Meeting for Smoking Cessation
- Online Meeting for Weight Control
- Online Meeting for Hypertension
- Online Meeting for Pre Diabetes
- Prenatal 2 Class
- Prenatal 3 Class
- Breastfeeding Class
- Routine Blood Pressure Check in Primary Care
- Online Meeting for Cholesterol Control
- Routine Blood Pressure Check in Urgent Care
- Diabetes in Step 1 Class
- Diabetes in Step 2 Class
- In-Person Smoking Cessation Class
- Chronic Disease Self-Management Workshop 1

**...thout an appointment?** If you have symptoms of ...nza), back pain, swimmer's ear, pinworms, sore ...ll 1-800-777-7904 (toll free) and ask to speak with an

...uest an appointment by calling 1-800-777-7904 (toll ...lay Service (711) first and ask to be connected to 1- ...avioral Health, call 1-866-530-8778 (toll free).

...stems Corporation, © 1999 to 2014, patents pending.

They then choose a reason for the appointment — like a routine blood pressure check or eye exam.

**Step 2 of 5: Choose physician**

Reason for visit: Follow-up with Personal Provider - Existing Condition

Infertility evaluations may have a significantly higher co-payment. You may want to check with Member Services if concerned about how much this may cost.

Please select a practitioner and click "Continue." You can choose up to 10 practitioners by holding down the "Ctrl" key and clicking the practitioner names.

If you wish to view information about a provider (such as gender, or education), you can view our medical staff directory and choose a physician online.

Schedule with:
[redacted]

Preferred dates: From: 4/27/2016 To: 5/11/2016

Limit times to:

| | Mon | Tues | Wed | Thur | Fri |
|---|---|---|---|---|---|
| AM | ☑ | ☐ | ☑ | ☐ | ☐ |
| PM | ☑ | ☑ | ☐ | ☐ | ☐ |

Patients select a clinician for the appointment — like their primary care doctor or a nurse practitioner.

**Step 3 of 5: Choose appointment date/time**

Reason for visit: Follow-up with Personal Provider - Existing Condition

Please select an appointment from the list below, then click "Continue."

| | Date/Time | Provider | Department | Location |
|---|---|---|---|---|
| ○ | Monday May 02, 2016 1:30 PM | Smith, Anne (M.D.) | - | NORTHWEST DC |
| ○ | Monday May 02, 2016 1:50 PM | Smith, Anne (M.D.) | - | NORTHWEST DC |
| ○ | Monday May 02, 2016 2:10 PM | Smith, Anne (M.D.) | - | NORTHWEST DC |
| ○ | Tuesday May 03, 2016 1:30 PM | Smith, Anne (M.D.) | - | NORTHWEST DC |
| ○ | Tuesday May 03, 2016 1:50 PM | Smith, Anne (M.D.) | - | NORTHWEST DC |

They pick the date and time for the appointment.



**Step 4 of 5: Review appointment details**

Reason for visit: Follow-up with Personal Provider - Existing Condition

**To schedule this appointment, click the "Schedule appointment" button below.**

Click the "Back" button if you want to change your selection.

**Appointment Information**

| | |
|---|---|
| Date: | Monday May 02, 2016 |
| Time: | 1:50 PM |
| Visit with: | Smith, Anne (M.D.) |
| Location: | INTERNAL MED NW DC (NORTHWEST DC) |

**Appointment Instructions**

Finally, they confirm the details and book the appointment.

Through the portal, Kaiser also gives patients clear instructions for:

- Filling a prescription for the first time
- Refilling prescriptions online
- Transferring prescriptions from another health system
- Checking which medications are covered by their plan
- Reading up on medication instructions and side effects [29]

## 2.2 Set up secure messaging

Between 2015 and 2017, the number of non-federal acute care hospitals that offered secure messaging through their patient portal increased by nearly 10%.[30] By setting up secure messaging, your practice will take a big step toward achieving a Meaningful Use objective: "Use secure electronic messaging to communicate with patients on relevant health information." [31]

There are many scenarios in which patients and clinicians need to communicate between visits. Patients may have follow-up questions about a clinician's guidance or a medication.[32] Clinicians may need to share test results or explain a recommendation in more detail.

MYTH

**Clinicians worry that activating email in the patient portal will lead to an email deluge that burdens their practice and impedes efficiency.**

REALITY

**When practices integrate email into their workflow, clinicians often find communicating with patients more convenient and less time-consuming.**

Using the portal, patients and clinicians can:

- Share brief messages and updates
- Clarify issues and advice
- Correct misunderstandings before they become significant problems
- Record details, like a referral name or post-operative instructions
- Link to educational materials and other online resources[33]

Patient portals offer an opportunity to improve and streamline patient-clinician communication and practice workflow. The portal's secure email can reduce the need for face-to-face visits and phone calls by giving patients and clinicians a quick, convenient way to exchange information.

With secure email through the portal, your practice can:

- Avoid telephone tag, which can lead to both miscommunication and communication delays
- Address routine health issues more efficiently, so you can dedicate more time to patients who need in-person care
- Have support staff to triage messages, so that clinicians only need to weigh in as necessary[34]
- Share lab results — a best practice identified by some EHRs, like athenahealth — or other post-visit follow-up with patients

To maximize efficiency, practices must integrate reading and responding to email into their workflow. For example, assign a staff member to acknowledge all patient messages within 1 business day. Clinicians can then respond to the patient's question or issue at their convenience.[35]

## Tips for Practice Administrators[36]

If your practice uses the portal's email feature, consider establishing policies that address:

- ☐ Turnaround time for responding to patient emails. Don't use email for urgent issues.
- ☐ The types of communication allowed over email. Decide which requests (like prescription refills and appointment scheduling) clinicians will fulfill and which sensitive topics (like HIV and mental health) they'll discuss.

Check out ONC's Fact Sheet: **Using Secure Electronic Messaging to Support Patient and Family Engagement (https://www.healthit.gov/resource/fact-sheet-using-secure-electronic-messaging-support-patient-and-family-engagement).**

---

## Tips for Clinicians

Follow these guidelines for communicating with patients by email.[37]

### Address privacy issues

- ☐ Let patients know which other clinicians or practice staff may read and respond to their emails — for example, outside usual business hours or when you're on vacation. Include this privacy disclaimer in each patient's medical record.
- ☐ Keep a mailing list of patients, but only send group emails using the blind copy feature. Never send group emails where patients can see each other's names.

### Give patients clear guidance

Make sure to explain the policies and procedures for using portal email, like typical response time and types of communication allowed over email (see Tips for Practice Administrators above).

Also, ask patients to:

- ☐ Write a subject line that describes the nature of their email, like "Billing question" or "Medical advice"
- ☐ Call 911 or your office about urgent issues

For more information and guidance, check out ONC's **Fact Sheet: Using Secure Electronic Messaging to Support Patient and Family Engagement (https://www.healthit.gov/resource/fact-sheet-using-secure-electronic-messaging-support-patient-and-family-engagement).** [38]

## Kaiser Permanente | From the field

In 2014, Kaiser members used the portal to:

★ View **4 million** lab test results

★ Exchange **20 million** secure emails

Lab test results and secure patient-clinician email became widely available to Kaiser Permanente members in 2006. Over the next year, the numbers of lab results viewed online and email messages sent to clinicians grew steadily. Between 2006 and 2007, lab test results viewed online increased 157% and email messages to clinicians increased 152%. Viewing test results soon became the most-used portal feature. [39]

Kaiser members primarily emailed their clinicians to discuss:

- A change in health condition
- Lab results
- New condition
- Prescription dose
- The need for a new prescription

These emails can prompt necessary care that may have otherwise been overlooked. Six out of 10 patient-initiated emails led to new clinical assessments or decisions, and 1 in 4 required clinical action (like a lab test). [40]




To streamline email communication, each Kaiser patient has 2 inboxes: 1 for emails from their doctor and another for emails from other departments.

Primary Health Medical Group [41] | From the field

Primary Health Medical Group clinicians can send lab results to patients using secure messaging. Clinicians can include a brief message explaining the results (for example, "Your results are normal") and any needed follow-up instructions (for example, "Come back in 3 months for a recheck"). For serious lab results, clinicians use the phone to discuss results with the patient. Clinicians encourage patients to review their medical information and report inaccuracies.

## 2.3 Share notes

Patients immediately forget up to 80% of the clinical information they receive during a visit. [42] Clinician notes can give patients a snapshot of a visit so they can better remember, understand, and act on their clinician's advice after the visit has ended. Patients have always had a right to see these notes — but until

recently there hasn't been a simple, straightforward way to access them.[43]

By offering patients access to notes through a portal, you can promote transparency and change the way people engage with their health and care.[44] Since patients are the best source of information about their health, they can also act as a second pair of eyes on the record. With patients checking for accuracy, clinicians can improve the quality of a medical record and make more informed clinical decisions.[45]

## Tips for Clinicians

When sharing notes with patients, it's important to:

- ☐ Explain to patients what they can expect to see in the notes
- ☐ Use plain language instead of medical jargon or abbreviations
- ☐ Soften language and add context, when necessary (for example, instead of labeling a patient as "obese," include their BMI and link to patient education about BMI)
- ☐ Keep notes focused on specific issues
- ☐ Discuss lab or study results, if applicable
- ☐ Reference educational materials, whenever possible[46]

An Evaluation of OpenNotes[47] | From the field

---

A study across 3 sites — Beth Israel Deaconess Medical Center (BIDMC) in Massachusetts, Geisinger Health System (GHS) in Pennsylvania, and Harborview Medical Center (HMC) in Washington — found that most clinicians had positive or neutral experiences with OpenNotes (a national initiative that promotes sharing notes with patients[48]). When asked about the most difficult aspect of OpenNotes, 3 out of 4 clinicians commented that nothing was difficult and that they experienced no changes in their practice. Several doctors acknowledged fears about an additional time burden and offending or worrying patients — but said that these concerns didn't materialize.

The majority of patients who participated in the study used OpenNotes. Out of roughly 13,500 patients with access to clinician notes, more than 11,000 had opened at least 1 note.

MYTH

---

Clinicians fear that patients may misinterpret or misunderstand their notes — causing more worry for patients and more work for clinicians.

REALITY

For most clinicians, sharing notes doesn't affect their workload — and using OpenNotes improves patients' engagement and sense of ownership over their care.

**Patients across all health systems reported experiencing benefits from seeing notes. Specifically:**

**77% to 87%** across the 3 sites reported that OpenNotes helped them feel more in control of their care.

**60% to 78%** of those taking medications reported increased medication adherence.

**20% to 42%** reported sharing notes with others.

"Making visit notes available online is a **good idea**."

— 85% to 88% of clinicians in the study agreed

## Adopting OpenNotes: Partnering with Patients

OpenNotes isn't software or a product — it's an approach to giving patients access to notes from their health care visits. OpenNotes can benefit health care practices and patients by increasing transparency and patient engagement. Complete this module to learn 6 steps for

adopting OpenNotes in your practice.

**Go to the AMA STEPS Forward™ Adopting OpenNotes: Partnering with Patients module. (https://edhub.ama-assn.org/steps-forward/module/2702602?resultClick=1&bypassSolrId=J_2702602)**

## OpenNotes at Kaiser Permanente [49] | From the field

Kaiser has found that most patients with access to visit notes read them, and many discuss them with clinicians or loved ones. The majority of Kaiser patients who used OpenNotes reported improved self-care:




70-72% of patients reported taking better care of themselves.




77-85% reported better understanding of their health and medical conditions.




76-84% reported remembering to plan for their care better.




69-80% felt better prepared for visits.




77-87% felt more in control of their care.




60-78% of patients taking medications reported improvements in taking medications as prescribed.

This increased patient involvement in health and medical care can lead to more efficient care, better patient-clinician communication and, ultimately, healthier outcomes.

Access to OpenNotes is important to the majority of Kaiser members: Roughly 6 of 10 members who logged onto KP.org after a recent visit said that OpenNotes would be a "very important" factor in future health plan decisions. About 4 of 10 who hadn't logged on said the same.

> "Reviewing the notes I SEE why I need to lose weight…It feels like my [d]octor really cares about my health, I never knew that."
>
> — Patient in study

## 2.4 Connect your patients to educational and community resources

Research shows that adding educational resources to patient portals can make them more useful and effective [50] — and help you increase patient engagement. Portals and electronic health records can also help your staff provide tailored information and community resources to patients who may benefit from them.

**Try this tool!**
Add the **myhealthfinder tool (https://healthfinder.gov/FreeContent/PreventiveServices/)** to your portal or website.

When choosing educational resources to add your patient portal, it's important to select trusted sources. For example, **healthfinder.gov (https://healthfinder.gov/)** offers actionable, evidence-based, plain language health and wellness information, as well as free interactive tools like myhealthfinder, which provides personalized preventive health care services recommendations.

Because healthfinder.gov manages the content, you can add the tool to a portal or website without having to worry about keeping the information relevant and up-to-date.




This web badge allows users to enter their information and see the results on healthfinder.gov, in a new browser window.




This option provides visitors to your website with the whole myhealthfinder experience — including personalized recommendations on your own URL — without sending them off your website.




If you have web or app development capabilities, you can use the API for developers to create a customized experience, app, or online tool that matches the look and feel of your site.

You can also use your EHR to track **social determinants of health (https://www.healthypeople.gov/2020/topics-objectives/topic/social-determinants-of-health)**: the social, economic, and environmental conditions that can affect health and health outcomes. Including this information in your EHR can help your staff identify and address factors that may contribute to health complications, such as unsafe housing or lack of access to safe opportunities for physical activity.

See the **PRAPARE Implementation and Action Toolkit (http://www.nachc.org/research-and-data/prapare/toolkit/)** for resources on how to set up your EHR to gather data on social determinants of health, and how to assess and respond to that data once it's collected.

CommunityRx | From the field

To address key social determinants of health on Chicago's South Side — like food access, employment, and social support — **CommunityRx (https://www.ncbi.nlm.nih.gov/pubmed/27834242)** developed a real-time automated system called Health*eRx*. The system connects patients to community-based services and resources that can help them stay healthy and manage chronic conditions.

Health*eRx* is embedded in EHR systems and seamlessly integrates with clinic workflow, matching patient health information with relevant wellness programs and services located near their home. Patients can also talk to dedicated Information Specialists to get help navigating and understanding the resources available to them.

## 2.5 Support electronic records requests

More and more patient health information is available electronically — but patients and caregivers still face challenges in accessing, using, and sharing their data. Patient portals may not include all the information patients need — and what's there may be inaccurate or incomplete. And often, health data can't be requested or shared electronically, or transferred to other health care clinicians without a cumbersome, multi-step request process.

To learn more about the challenges patients face in the records request process, check out ONC's report **Improving the Health Records Request Process for Patients: Insights from User Experience Research [PDF - 2.6 MB] (https://www.healthit.gov/sites/default/files/playbook/pdf/ONC-Records-Request-Research-Report.pdf)**. The report includes personas and journey maps illustrating these challenges, as well as tips on creating a better records request process.

We know that patients and caregivers who **do** have access to their data can better coordinate their health care, prevent repeat or unnecessary tests and procedures, and have greater control over their health and well-being.

That's why ONC is committed to addressing large-scale access and portability issues — to help in creating a medical records request process that works for everyone.

# A user-friendly medical records request process

**Here is one example of what a more streamlined records request process could look like in the not-too-distant future. See how this patient requests a copy of his record — online.**



## Patient




**Requests records using their patient portal.** The electronic request form is quick and easy to fill out. It has required fields with helpful tips and terms defined to ensure each request is complete.



**Gets updates at each step of request process.** Can also log in at any time for an update.

## Health care provider



**Gets digital notification of new request.**



**Verifies patient's information automatically since it's linked to the EHR.**

(/playbook/public/img/ideal-records-process-large.png)

Read text description

There's a lot that health care practices can do **today** to improve the records request process and reduce the burden on consumers, clinicians, and care teams. **Integrating records requests into your patient portal is a win-win** — it increases patient satisfaction, saves time, and reduces hassle for clinicians, administrators, and other practice staff.

**Gathers the records and uploads them to the patient portal.**

**Gets an automatic alert when the records are added to their portal. Can choose to share the records with a new provider at any time — with the click of a button.**

## Health Records Request Wizard | From the field

**Process complete!**

**HIPAA allows up to 30 days for this process, but faster is better.**

The Health Records Request Wizard (https://www.healthrecordwizard.com/) is a new tool designed to make it easier for patients to request their health records. The wizard was created by a group of health care organizations, including X4Health and Swellbox. It's currently in the prototype phase.

**This process benefits both patients and health care providers.**

The Request Wizard asks the patient a series of q... compliant digital PDF request form. By asking abo... ...records... or a full...

This innovative tool is designed to make the record... offers patients a simple, streamlined experience w... practices save time and resources that would othe...

Benefits for patients:

- Making requests is quick and painless
- Patients get to choose format and delivery method
- Patients can track the status of their request

Benefits for health care providers:

- Records request forms are filled out correctly — the first time
- Patient's identity is quickly e-verified
- Staff can easily track and fulfill requests electronically

## Novant Health | From the field

Novant Health, a network of clinics and hospitals headquartered in North Carolina, makes it easy for patients to request health records electronically. The Novant Health website (https://www.novanthealth.org/home/patients--visitors/medical-records/patients-

**requesting-medical-records.aspx)** offers clear instructions for submitting a medical records request, including answers to frequently asked questions about the process.

Novant Health patients can request medical records:

- By fax
- By email
- Via their patient portal

Allowing patients to submit a record request electronically is a great way to increase patient access. With both email and patient portal submission as options, patients can submit their request at a time that's convenient for them — instead of having to locate a fax machine or hand-deliver a request form during office hours.

Using the patient portal as a tool to access medical records also enables patients to request and view their health data on their own time. The portal verifies patients' identity through the login, and the electronic request form is easy to fill out and secure to submit.

## ✓ Chapter 2 Recap

Take advantage of patient portal features to improve communication and create value for patients and clinicians.

- ☐ Allow online booking and prescription refills
- ☐ Set up secure messaging
- ☐ Share notes
- ☐ Connect your patients to educational and community resources
- ☐ Support electronic records requests

**Content last updated on:** May 31, 2019

Chapter 3

# Ensure all patients can access and understand information

## In this chapter

Learn how to:

- Take steps to **ensure your portal is accessible (/playbook/pe/chapter-3/#section-1)** for all patients
- Address privacy concerns related to **adolescents' health information (/playbook/pe/chapter-3/#section-2)**
- Create materials to **support non-English-speaking patients (/playbook/pe/chapter-3/#section-3)**

Patient portals can be a powerful force in patient engagement — but it's important for them to be inclusive and accessible. In 2017, nearly 1 in 5 individuals who were offered access to their online medical record but didn't view it said they didn't have a way to access the website.[51]

Depending on your patient population, trouble accessing or using the patient portal can contribute to **health disparities (https://www.healthypeople.gov/2020/about/foundation-health-measures/Disparities)** — preventable differences in health outcomes between groups of people that are closely linked with social, economic, or environmental disadvantages. For example, if a portal's medication refill reminders are only available in English, patients with limited English proficiency may be less likely to get the medications they need to manage chronic conditions.

When setting up your portal, take steps to ensure that it meets the needs of all your patients.

## 3.1 Ensure portal access for all patients

To support all patients in accessing their health information, you can:

- Offer your patient portal in multiple languages

- Make sure your portal is mobile-friendly, and that the pages load quickly, so that users with limited data or slow connections can still access it
- Check that your portal is easy to navigate for patients who use screen readers or other assistive technology

You can also include information that helps your staff provide culturally and linguistically appropriate care — for example, data fields indicating patients' gender pronouns and whether they prefer to be addressed by first or last name.

### Make your patient portal accessible to caregivers, too.

For patients who are unable to access or use their portal (due to factors like limited cognitive function, lack of education, or inexperience with technology), family members or friends are essential members of the care team.[52]

Take steps to **allow portal access for caregivers (/playbook/pe/chapter-4)** while accounting for the diverse roles caregivers can play and patients' varied needs and desires.

The NewYork-Presbyterian Portal Help Desk | From the field

---

NewYork-Presbyterian (NYP), a health care delivery system in New York City, has implemented a support service to help patients overcome common challenges to using their patient portal. After launching the MyNYP patient portal in 2009, NYP looked for ways to help patients make the most of it. In 2012, the organization launched a **portal Help Desk [PDF - 414 KB] (https://www.healthit.gov/sites/default/files/playbook/pdf/brightspot-nyp-portal-help-desk.pdf)** to provide added support for portal users.

Four full-time staff who speak English, Spanish, and Chinese run the Help Desk, fielding 120 to 160 requests each week. They solve technological issues and also help patients who struggle with finding information on the portal. They are able to track and respond to requests online, and they can address common errors in a patient's information.

To ensure the Help Desk's efficiency, NYP established clear standards for responding to requests. Staff members typically respond to patients' online requests in 1 to 2 business days — and they make every effort to resolve the issue at first contact by working with other hospital departments and facilities as needed, rather than referring patients elsewhere. For example, if a patient is looking

for information that typically isn't available on the portal (like certain sensitive health information), the Help Desk works with the Medical Records department to upload that data to the patient's record free of charge.

After NYP updated some features of their portal, the Help Desk saw the complexity of requests increase while the total number of requests went down. This indicates that NYP has increased patient engagement by offering additional, comprehensive portal services.

## 3.2 Address adolescent health and privacy concerns

For adolescent patients (ages 12 to 17), setting up varied levels of access can be particularly tricky. Adolescents may want to keep their health care decisions and medical information private, but laws vary from state to state.

Some state laws allow minors to receive specific kinds of health care, like mental or sexual health services, without their parents knowing or consenting. Others say that minors can make decisions on their own if they have an "adult status," like being married or in the military.[53]

Parents may also want to keep certain information, like a family history of disease, between only themselves and their adolescent's provider.

### Boston Children's Hospital[54] | From the field

Boston Children's Hospital (BCH) advocates for patient portals with flexible access that providers can tailor to meet patients' and parents' needs and to comply with relevant federal and state law.

Specifically, BCH recommends a portal that gives adolescents and parents access to different types of information. Following this model:

- Adolescents can see nearly all of their medical information, including anything sensitive — like a birth control pill prescription or chlamydia test results. They can't see any information that their parents have asked to keep private.

- Parents can see information they've shared with their adolescent's provider and general information about their adolescent's health.

## Adolescent MyChart[55] | From the field

The University of California at San Francisco (UCSF) has customized MyChart — the patient portal offered through their EHR vendor, Epic — to offer appropriate patient and representative access that meets Meaningful Use requirements. The result is Adolescent MyChart.

Adolescent MyChart gives each audience access to distinct portal information.

| **Content** | **Parent Proxy 0-11 years** | **Parent Proxy 12-17 years** | **Adolescent 12-17 years** |
|---|---|---|---|
| Labs | YES | SELECTED | SELECTED |
| Immunizations | YES | YES | YES |
| Allergies | YES | YES | YES |
| Growth Chart | YES | YES | YES |
| Messaging to and from provider * | YES | YES | YES |
| Appointment Request | YES | YES | YES |
| Appointment View | YES | NO | YES |
| Problem List/Summary | YES | NO | YES |
| Medications/refill request | YES | NO | YES |

* Parent and teen can send private messages to the provider.

At UCSF, parents have limited portal access to potentially sensitive information about their teen children. This lines up with California law, which allows teens between ages 12 and 17 years to keep care for medical needs like sexually transmitted disease testing, contraception, and pregnancy care private. For example, parents can't access lab results from a pregnancy test or OB ultrasound.

Through Adolescent MyChart, UCSF can more successfully engage teens in their care while also protecting their privacy.

"We made the decision to give teens their own access, and to make them able to see their full record, because we think it's the right thing to do and it's where we see patient-centered health information technology going."

— Dr. Carolyn Jasik, Assistant Professor of Pediatrics, UCSF

## 3.3 Engage non-English-speaking patients

As you're developing and improving your patient portal, it's important to be inclusive and accessible to non-English-speaking patients as much as possible.

Options for supporting non-English-speaking individuals in your patient population include:[56]

- Use the portal landing page to make materials available in languages spoken by your patients
- Enable your system to send text messages to patients in languages spoken by your patients, either as part of the portal or as a stand-alone functionality
- Let patients know they may send secure messages to their provider in their native language — if you have workflows developed to translate and respond to these messages

### Charles B. Wang Community Health Center (CBWCHC) | From the field

Since December 2013, the **CBWCHC (http://www.cbwchc.org/index.asp)** Chinese language patient portal (CLPP) has provided services in Traditional and Simplified Chinese in addition to the Center's original English platform.

CHARLES B. WANG COMMUNITY HEALTH CENTER
王嘉廉社區醫療中心

Home

CBWCHC Home Page
Click here

中文用戶網頁
繁體中文版
簡体中文版

## Welcome to the Patient Portal

**Our online services include:**

- View your inbox
- Refill your medication
- Request appointment
- Request referral
- Request test results
- Send a message to your provider
- View your medical summary
- View Health Education materials



Log In
User ID or Email
Password
Log In
I forgot my password.

Before launching the CLPP, an interdisciplinary project team (http://www.himss.org/ask-expert-how-can-i-increase-patient-engagement-through-non-english-patient-portal) collaborated to develop and review the portal, ensuring that it was easily accessible, culturally sensitive, and supportive of positive health outcomes.

> "Promoting patient engagement through tools such as linguistically-appropriate patient portals is a key step for maintaining the importance of individual patient needs in receiving care services."
>
> — Lynn Sherman, MBA, Chief Financial Officer at the Charles B. Wang Community Health Center

## ✓ Chapter 3 Recap

Look for opportunities to make your patient portal accessible and secure for all users.

- ☐ Take steps to ensure your portal is accessible for all patients
- ☐ Address adolescent health and privacy concerns in the context of relevant state laws
- ☐ Create materials to support non-English-speaking patients

**Content last updated on:** April 17, 2019

Chapter 4

# Allow portal access for caregivers

## In this chapter

Learn how to:

- **Set up levels of access (/playbook/pe/chapter-4/#section-1)** so patients and caregivers can see different information
- Help patients engage in **advance care planning (ACP) (/playbook/pe/chapter-4/#section-2)**

Allowing family members and caregivers to access patient health information through a portal is becoming much more common. In 2017, 86% of non-federal acute care hospitals reported offering this access to patients and their loved ones.[57]

Despite this, clinicians and practice administrators often struggle to navigate federal and state laws related to proxy access (allowing someone other than the patient to see a patient's health information). Laws like the Health Insurance Portability and Accountability Act (HIPAA) are designed to keep patients' medical records and personal health information private and secure.

However, in some situations it is appropriate or necessary for a family member, friend, or other caregiver to have access to a patient's health information so that they may coordinate, deliver, or oversee care.




(/playbook/public/img/pep-ch4-caregiver-graphic.png)

Read text description

Other examples of people who may need to access patient information include:

- A home health aide to a chronically ill patient
- A health care power of attorney responsible for an incapacitated patient's medical decisions and care [59]

Under HIPAA, a patient's personal representative (someone authorized under state or other applicable law to act on behalf of the patient) has a right to access the patient's personal health information. The patient also has a right to allow their personal representative to share this information with someone else, like a doctor or hospital. [60]

The opportunities created by caregiver access to patient portals include: [61]

**Patient Success Story**

**Suzanne Mintz, caretaker**

"Portals make you feel like you are a member of your own care team."

Read Suzanne's story (/playbook/pe/patient-story-3/)

---

- Enabling providers to differentiate with whom they are exchanging secure messages: the patient or someone else involved in their care
- The ability to respect patient preferences for including others in their care
- Improved transitional care by providing family caregivers with timely, accurate, and comprehensive information after patients have been discharged from the hospital
- Greater collaboration between clinicians and family caregivers
- More impactful involvement of caregivers in patients' self-management plans
- Greater information transparency, which enables family caregivers to alert clinicians to missing or inaccurate information in patients' health records

Increasing shared access to patient portals by caregivers is the next step in patient engagement. It has the potential to increase clinical quality and patient safety, add to the convenience and timeliness of health system interactions, and strengthen partnerships between patients, caregivers, and clinicians.

## Tips for Practice Administrators [62]

Practice administrators can take steps to enable caregivers' access.

- ☐ See if your EHR vendor allows providers to set varying levels of access to a patient's portal information
- ☐ Work with your EHR vendor to make sure you can give each personal representative a unique, secure login to access the patient's portal
- ☐ Make sure that staff and clinicians understand registration processes for granting shared/proxy access — and identify practice workflows for implementation
- ☐ Consider strategies to promote awareness about the availability of shared/proxy access among your patients, staff, and clinicians

### Tips for Clinicians

Clinicians play an important role in managing caregivers' access.

- ☐ Talk with your patient to find out who is involved in their care
- ☐ Ask about your patient's preferences for giving caregivers access to their health information (HIPAA generally allows a provider to share health information with family members or friends involved in the patient's care unless the patient objects) [63]
- ☐ Customize caregivers' access to your patient's portal information, if possible

## 4.1 Set up varying levels of access

Many patient portals still offer a one-size-fits-all approach to information access where anyone with the right login can see the full medical record. Some patients share their own login credentials with their caregivers, but this gives caregivers unlimited access to the patient's information — including being able to view private messages to or from clinicians.

An environmental scan of 20 large and geographically diverse health systems found that the majority of them give caregivers full access to patient portal information and features, yet the researchers also reported that patients' preferences for sharing their health information with others involved in their care vary widely. The study indicates there's still much to be done in both promoting awareness and differentiating levels of access that respect patients' choice and control of their health information. [64]

Establishing different levels of access can help you balance the competing needs of patient privacy and caregiver access. Giving caregivers their own unique login to your portal has other advantages beyond respecting patient privacy. It can also:

- Increase security by tracking the portal use of each individual, instead of a caregiver using a patient's credentials [65]
- Increase the amount of meaningful data available to **learning health systems (https://www.ahrq.gov/professionals/systems/learning-health-systems/index.html)** by capturing both patient-reported and caregiver-reported data [66]

### Tip for Practice Administrators

Allow patients and their representatives to see different information and access different features, depending on a patient's needs and characteristics as well as relevant laws.

# 4.2 Integrate advance care planning documents

**Try this tool!**
Share the **PREPARE website** (https://prepareforyourcare.org/welcome) with your patients to help them with end-of-life planning.

End-of-life planning, or advance care planning (ACP), has been shown to increase patients' satisfaction with their health care and improve quality of life for people with a terminal illness.[67] But completing and documenting this process can be challenging for both patients and clinicians.

Patient portals can help with advance care planning discussions and boost patient satisfaction.[68] If your portal includes an ACP feature, consider promoting it to your patients. In lieu of that, some systems include the ability for patients to securely upload documents. If that's an option, invite patients to add a PDF copy of their plan to their electronic record.

## Planning for End-of-Life Decisions with Your Patients

Patients and their families can benefit from making end-of-life decisions ahead of time. Training health practice staff on how to approach this sensitive topic can help patients feel more comfortable making these decisions. Complete this module to learn the 4 steps to helping patients prepare their end-of-life letter.

**Go to the AMA STEPS Forward™ Planning for End-of-Life Decisions with Your Patients module. (https://edhub.ama-assn.org/steps-forward/module/2702695?resultClick=1&bypassSolrId=J_2702695)**

## ✓ Chapter 4 Recap

To help meet patient and caregiver needs:

- ☐ Set up varying levels of portal access
- ☐ Help patients engage in advance care planning

**Content last updated on:** May 31, 2019

Chapter 5

# Integrate patient-generated health data and EHRs

## In this chapter

Learn how to:

- Take steps to **track patient-generated health data (/playbook/pe/chapter-5/#section-1)**
- Improve preventive care by efficiently **collecting family histories (/playbook/pe/chapter-5/#section-2)**

Historically, clinicians have had limited access to data on patients' health and well-being. They've made do with information collected during patient visits, like self-reported lifestyle habits and family health histories.

Technology is transforming our ability to collect accurate, reliable patient data.

In 2017,

More than
**4** in **10**

smartphone or tablet owners used their device to **track progress on a health-related goal.**[69]



Adults with chronic conditions are most likely to track health indicators, like blood pressure or symptoms, than those without.[70]

Using technology, patients can also share information that's critical for health care decision-making but often too time-consuming or cumbersome for clinicians to gather — like family medical histories. What's more, patients can provide this data from home, so that clinicians can maximize precious office visit time.

This chapter describes how you can use the patient portal to systematically collect patient-generated data and harness them to improve clinical care and patient health.

## 5.1 Track patient-generated health data

Across the nation, patients' phones and computers are teeming with patient-generated health data: health-related data that patients create, record, or gather to help address a health concern. They include:

- Health history
- Treatment history
- Biometric data, like blood pressure readings
- Symptoms
- Lifestyle choices, like diet and exercise habits[71, 72]

As the amount of available data has grown, so too has our ability to collect, organize, and make sense of it all. More and more health systems are aggregating patient-generated health data in their EHRs and relying on these data to conduct remote monitoring — that is, to track patients' wellness outside the clinic.

Clinicians can take advantage of these patient-generated health data to fill information gaps — and, ultimately, improve clinical decision-making, care delivery, and health outcomes.

The results are real for practices as well as patients:

- Fewer hospital readmissions, which can help avoid penalties for excessive readmission imposed by Centers for Medicare & Medicaid Services[73]
- Efficient diagnosis of illnesses, which saves practice resources
- Enhanced patient-centered care, so that clinicians can identify treatments and health behaviors that patients will follow through with
- Effective management of complex chronic conditions, so that patients can control their own health with less clinician intervention

> **"Using these tools — a wireless scale and bracelet-style activity tracker — my doctors and I have been able to assess intervention effectiveness, adjust dosages, unearth side effects, and clarify decision points.**
>
> **Without the objective measure provided by my activity tracker, we would be basing our decision on my subjective assessments of getting worse… By putting my data to work for me, we can now do better."**
>
> — Donna Cryer, liver transplant survivor[74]

## Tips for Clinicians

Clinicians can use patient-generated health data to:

- ☐ Show how a patient is doing between visits
- ☐ Illustrate a patient's health and behavior over time
- ☐ Inform strategies for preventive care and chronic disease management
- ☐ Improve patient safety by providing insight into medication adherence and allergies[75]
- ☐ Spark and support conversations with patients that result in shared decision making[76]
- ☐ Predict hospital readmission risk

Portals can streamline data collection by giving patients a platform for securely sharing information and completing online questionnaires. Clinicians can use the portal to send patients reminders to submit data and to follow up with patients as needed.

## Tips for Practice Administrators

Consider taking steps to integrate patient-generated health data into your practice:

- ☐ Talk to staff about how patient-generated health data can improve care and efficiency

- ☐ Assess what data you're already gathering and what additional data would be valuable
- ☐ Develop policies and procedures, like when to accept data and who will review them
- ☐ Educate patients and families about the value of and expectations for sharing patient-generated health data
- ☐ Start small — for example, by launching a pilot to collect symptoms for patients managing a chronic disease — and make changes as needed[77]

**See HealthIT.gov for more information on patient-generated health data. (https://www.healthit.gov/policy-researchers-implementers/patient-generated-health-data)**

# Patient-Generated Health Data: A Growing Opportunity

**Patient-generated health data can help clinicians track progress on treatment plans — and catch problems early, when they're easier to address.**



More than

**4 in 10** smartphone or tablet owners used their devices **to track progress on a health-related goal.**



About

**3 in 10** people **own a monitoring device** such as a Fitbit, blood glucose meter, or blood pressure monitor.



**2 in 10** tablet, smartphone, and monitoring device owners **already share and discuss data** from these devices with their health care providers.

**Source: ONC Data Brief 40**

Start setting up your practice now to work with patient-generated health data. There's a lot to consider, but the possibilities are great.



For more information, see ONC's Practical Guide, "Conceptualizing a Data Infrastructure for the Capture, Use, and Sharing of Patient-Generated Health Data in Care Delivery and Research through 2024."

## Patient-Generated Health Data Practical Guide

**Overview**

Document detailing best practices identified from 2 pilot demonstrations that tested concepts for the use of patient-generated health data in clinical care and research settings

**Who it's for**

Clinicians, researchers, health IT professionals, and health care administrators

**When it's used**

To learn suggested practices and questions to consider when implementing the capture, use, and sharing of patient-generated health data

**Download the Patient-Generated Health Data Practical Guide [PDF - 392 KB] (https://www.healthit.gov/sites/default/files/onc_pghd_practical_guide.pdf)**

## Ochsner Health System[78] | From the field

"In the past, we relied on patients to log information, bring it to us, and then we would input the data and decide a course of action. Now we can share information seamlessly between patient and physician to allow real-time, accurate analysis of a patient's health status."

— Robert Bober, MD, Director of Cardiac Molecular Imaging, Ochsner Medical Center

Ochsner Health System (OHS) is advancing the use of patient-generated health data through partnerships with Apple and its EHR developer.

Since October 2014, OHS has leveraged Apple HealthKit to create a more comprehensive picture of ongoing patient health. HealthKit, an iOS app, acts as a health dashboard by capturing health and activity data from other apps and wearable devices, like FitBit and Withings wireless blood pressure monitor.[79, 80] Healthkit also has an open API (application programming interface), which enables other web applications to access its data. Using the API, OHS connected HealthKit to its EHR. As a result, OHS patients can automatically import HealthKit data into their EHRs and share it with clinicians.[81]

OHS piloted this integration in its Digital Medicine Program. The Digital Medicine Program, which focuses on patients with hypertension, uses remote monitoring to collect data including body weights and blood pressure measurements — all without patients leaving their homes. Clinicians and pharmacists see the data and follow up with patients in real time by, for example, adjusting their medications or tailoring lifestyle recommendations.[82] One year in, OHS patients reported improved outcomes, engagement, and satisfaction with their care.

Among patients with uncontrolled blood pressure, 2 out of 3 had their blood pressure in control within 90 days of enrolling in the program.[83] For patients, lower blood pressure means a lower likelihood of heart attack, stroke, and kidney failure — and greater peace of mind.

> **"For the first time in my life, I feel a sense of peace and comfort knowing that I'm under constant supervision and receiving high-quality care with little effort throughout my daily routine. This is the way health care should be."**
>
> — Andres Rubiano, 54 year-old Digital Medicine Program patient who suffers from hypertension

## Carolinas HealthCare System[84, 85] | From the field

Carolinas HealthCare System (CHS) launched a new mobile application for patients, called MyCarolinas Tracker, that uses an open API. That means CHS's app can easily talk to other apps — allowing it to pull in health and fitness data from more than 100 devices and clinical data from clinicians. Patients can then use the app to track their wellness and clinical progress.

Patient-generated health data aren't necessarily limited to patients' phones. Patients can also use sensing devices, like blood pressure cuffs and pulse oximeters, to wirelessly share clinical information with clinicians.

## Partners Healthcare Center for Connected Health[86, 87] | From the field

The Center for Connected Health (CCH) implements programs rooted in connected health, a care model that uses information and communications technology — like mobile phones, computers, and wearable devices — to support patients' health without disrupting their day-to-day lives.

**CCCP cut heart failure-related hospital readmissions in half.**

CCH's Connected Cardiac Care Program (CCCP) showcases this approach. CCCP aims to improve self-management in heart failure patients at risk for hospitalization by combining:

- Regular clinical care
- Patient education
- Remote monitoring of indicators like blood pressure, heart rate, and weight
- Timely care and clinical feedback[88]

Clinicians used a central database to track all patient data. Data were also captured in patients' EHRs.[89]

CCH conducted a retrospective study that evaluated the 4-month program[90]. At the outset, patients in the intervention and control groups had similar hospitalization rates. But for the duration of the program and up to 3 months after, hospitalization dropped significantly for patients enrolled in CCCP compared to those receiving typical care. CCCP patients also experienced significantly lower mortality rates during the program and for up to 4 months after discharge.[91, 92]

In addition to clinical outcomes, CCCP improved patients' understanding of heart failure and self-management skills.[93] These skills suggest a long-term payoff — even if patients have limited time in the program, they can still expect benefits down the line.

Clinicians come out on top, too. Even though CCCP costs $1,500 per patient, clinicians ultimately save $8,155 per patient from reductions in hospitalizations.[94]

"With our hospitals liable for thirty-day readmissions through CMS penalties, such interventions are becoming mainstay in the management of high risk patients.

As health technologies become more accessible and commoditized, programs like Connected Cardiac Care will be more affordable, and achieve an obvious return on investment."

— Joseph C. Kvedar, MD, Vice President, Connected Health, Partners HealthCare

## 5.2 Collect family histories

"My goal over the past year has been to have the family history for most of my patients completed at least involving all first degree relatives. I did not find that this caused extra work or took much extra time – in fact it saved time and provided me valuable information for my practice."

— Dr. Bruce Peyser, Medical Director, Pickett Road Clinic

Family health history can help predict a patient's disease risk — essentially, it's the simplest and least expensive form of genetic assessment.[25] Traditionally, collecting and analyzing this information hasn't been a routine part of primary care because of challenges like patients' lack of knowledge about family history and clinicians' limited time.

Now, technology-driven tools are changing the standard of risk assessments. These tools enable patients to systematically collect family health histories and report back to their clinicians. Clinicians can then ensure high-risk patients get necessary screenings and specialist care.[26]

### Tips for Practice Administrators

To collect family histories efficiently and effectively, consider taking these steps:

- ☐ Encourage patients to enter pertinent family history through the patient portal — so they don't have to recall family details during the visit
- ☐ Ask medical assistants to review family history before a visit — so clinicians don't waste valuable visit time collecting that information

☐ Conduct clinical training about how to recognize genetic diseases and manage high-risk patients[97]

MeTree[98] | From the field

The Genomedical Connection — a consortium between Duke University, the University of North Carolina at Greensboro, and the Moses Cone Health System in Greensboro, North Carolina — developed MeTree, a computerized self-administered family health history collection tool.

MeTree helps individuals have challenging conversations with loved ones about family health histories. It supports patients in collecting 3 generations of information on 48 conditions, including 20 cancers. The tool also generates a report for clinicians and patient-clinician talking points.

Clinicians can assess MeTree effectiveness by tracking appropriate screenings (like those for breast, colon, and ovarian cancers), testing for hereditary thrombophilia, and referrals to genetic counseling.[99]

By leveraging Fast Health Interoperability Resources (FHIR) — a new standard for exchanging health care information electronically[100] — MeTree will soon connect to patients' EHRs and allow patients and clinicians to seamlessly access this information.[101]

## ✓ Chapter 5 Recap

Improve clinical decision-making by leveraging technologies to:

☐ Track patient-generated health data
☐ Collect family histories

**Content last updated on:** May 30, 2018

**Chapter 6**

# Leverage APIs and other health IT

## In this chapter

Learn how to:

- Use APIs to help patients access their data (/playbook/pe/chapter-6/#section-1) and take an active role in their health
- Evaluate health apps (/playbook/pe/chapter-6/#section-2) to use as tools for patient engagement

mHealth — the use of mobile and wireless technologies to promote health — is an ever-changing field with great potential for patient engagement.

There are a growing number of patient-facing mobile applications and online tools designed to give patients access to their health information. These tools and apps can help people:

- Effectively manage chronic conditions
- Participate in research
- Share data with clinicians in real time
- Take a more active role in their health care

There are also numerous apps to help patients manage specific health conditions like diabetes or epilepsy.

## 6.1 Use APIs to help patients control their data

One way for patients to access their EHR data is through an Application Programming Interface (API). The availability of APIs enables third-party app developers to connect patients' EHR data to new types of applications and online tools.

By enabling third-party API access to data from your EHR when patients request it, you can help empower your patients to use these innovative tools to support their health goals.

## Yale Center for Clinical Investigation/Hugo | From the field

Yale Center for Clinical Investigation (YCCI) is collaborating with **HUGO (http://hugophr.com/)**, a health data platform which gives patients seamless access to their electronic medical record — as well as data from other health systems and wearables or other devices — through the use of APIs.




Hugo app

Patients in the YCCI studies can use the Hugo app to aggregate their data from many types of EHRs. This puts patients in control of their data, allowing them to easily review their medical history, become partners in clinical research, and engage with researchers by responding to simple surveys via secure transmissions.

> "We are just now scratching the surface of what will be possible with Hugo and this kind of patient empowerment. By enabling people to be active partners in research, we are accelerating progress towards a new generation of breakthroughs and a 21st century learning health system."

— Allen L. Hsiao, MD, Chief Medical Information Officer, Yale School of Medicine & Yale New Haven Health

## 6.2 Use apps to support patient engagement

It's no secret that mobile phones are everywhere these days, since 95% of Americans now own a cellphone of some kind — and 77% own a smartphone.[102] The options for health apps are numerous, ranging from activity trackers to medication reminders and chronic condition self-management tools.

A 2013 study found that 9 in 10 patients would use an app if their doctor prescribed it.[103] It also found that people who use mHealth tools are more likely to follow their clinicians' advice and to be proactive about their health care.[104]

However, we still have a lot to learn about which "prescribable" apps are most effective.[105] As more health professionals try out these new tools, the amount of information about the best ways to develop and use apps for patient engagement is sure to grow.

### Evaluate and pilot test apps before recommending them

If you're thinking of recommending an app for patient engagement — whether related to general wellness or for managing a specific health challenge — it's important to do your homework. The following steps will help you evaluate whether an app is user friendly and appropriate for your patients.[106]

1. **Review the literature:** Search the scientific literature for app reviews and clinical trials
2. **Search app clearinghouses:** Websites that review apps can help you identify pros and cons of specific apps
3. **Search app stores:** Be sure to use specific key words, including terms related to the health condition or target behavior
4. **Read user ratings and reviews:** Look for positive comments about how the app works, how easy it is to use, and how effective it is
5. **Read the privacy notice:** Make sure that the app will protect your patients' health information by checking out the app's privacy notice
6. **Ask your professional and patient networks:** Use social media to find out what apps people like or are interested in
7. **Pilot test the app:** Try it out yourself — or enlist a helper — to assess the app's functionality, accuracy, and usability

8. **Get patient input:** Once your patients have tried the app, don't just talk about their health data — ask them how they like the app, too

There's a lot to consider when researching and pilot testing an app! Of course, ease of use is key — but quality and safety are also essential.

- Usability is the "effectiveness, efficiency, and satisfaction with which specific users can achieve a specific set of tasks in a particular environment." To learn more, check out **Selecting a Mobile App: Evaluating the Usability of Medical Applications (https://www.himss.org/selecting-mobile-app-evaluating-usability-medical-applications-0?ItemNumber=28900)**.
- Some factors that affect the quality and safety of a health app depend on the type of information or health condition the app addresses. **Developing a Framework for Evaluating the Patient Engagement, Quality, and Safety of Mobile Health Applications (https://www.commonwealthfund.org/publications/issue-briefs/2016/feb/developing-framework-evaluating-patient-engagement-quality-and?redirect_source=/publications/issue-briefs/2016/feb/evaluating-mobile-health-apps)** lists some of the factors to consider.

## ✓ Chapter 6 Recap

Improve clinical decision-making by leveraging technologies to:

- ☐ Use APIs to help patients access their data and take an active role in their health
- ☐ Use apps to support patient engagement

**Content last updated on:** May 31, 2019

Chapter 7

# Improve appointments with health IT

## In this chapter

Learn how to:

- **Engage patients with their notes (/playbook/pe/chapter-7/#section-1)** during visits
- **Keep visits patient-centered (/playbook/pe/chapter-7/#section-2)** while using EHRs
- Set up for **live video appointments (/playbook/pe/chapter-7/#section-3)**

A good relationship between patients and their health care team is a key part of successful care — and it's influenced by many factors. As health IT continues to evolve, new opportunities and evidence are emerging about how EHRs and other health IT can strengthen patient-clinician interactions.

## 7.1 Build trust with patients through visit notes

There are many benefits to allowing patients to **access visit notes through their patient portal (/playbook/pe/chapter-2/#section-3)**. One benefit is a better, more trusting relationship between patients and clinicians. Sharing notes has been shown to improve the patient-doctor relationship, especially for patients of color, patients with poorer self-reported health, and patients with less education.[107]




An innovative way to engage patients with their EHR is to have a dual-screen setup where the patient can see what the clinician is typing during the appointment. A preliminary study found 100% patient satisfaction with this approach.[108]

Another option — especially for patients who may have barriers to accessing their portal from home — is to print notes out for them at the office.

## 7.2 Balance technology with interpersonal communication

As we've established, the potential upside of health IT is huge — that's what this playbook is all about! But it's also hard to overstate the value of good, old fashioned eye contact and other nonverbal cues for building trust and rapport with patients during their time in your office.

While evidence shows that EHRs can make patient visits more complicated, there are also opportunities to make visits more patient-centered.[109] When you're seeing patients, be sure to spend a portion of the appointment looking at them instead of your computer as you talk — and tell them what you're doing as you use their EHR.

You can also take the opportunity to confirm that the information in your patient's EHR is correct. Asking patients to validate their information with you in the room is another way to foster the patient-clinician relationship.

## Optimizing Space in Medical Practices

The design and arrangement of clinic space affects how physicians and patients interact. Simple changes can enhance workflows, patient safety, and patient and team satisfaction. Complete this module to learn quick, cost-effective ways to improve your practice's exam rooms and team areas.

[Go to the AMA STEPS Forward™ Optimizing Space in Medical Practices module. (https://edhub.ama-assn.org/steps-forward/module/2702559)](https://edhub.ama-assn.org/steps-forward/module/2702559)

## Listening with Empathy

When clinicians practice empathetic listening, patients report higher levels of satisfaction. Complete this module to learn the 8 steps to listening with empathy. You'll also learn about tools and resources that can help you and your team master empathetic listening.

[Go to the AMA STEPS Forward™ Listening with Empathy module. (https://edhub.ama-assn.org/steps-forward/module/2702561?resultClick=1&bypassSolrId=J_2702561)](https://edhub.ama-assn.org/steps-forward/module/2702561?resultClick=1&bypassSolrId=J_2702561)

# 7.3 Offer video appointments

With telemedicine, technology lets clinicians provide some types of care to patients remotely.[110] Telemedicine — specifically, video appointments — offers several advantages. These include:

- Improved access to care for patients, especially those in rural areas[111]
- Higher patient satisfaction[112]
- Lower out-of-pocket costs for patients[113]
- Improved management of chronic conditions[114]

If your practice plans to offer telemedicine, **learn more about it in the Health IT Playbook (/playbook/patient-engagement/#section-5-3)**.

## Take steps to optimize video appointments

For clinicians who provide live video appointments with patients, these basic pieces of set-up and etiquette can make the interaction smoother and more engaging for your patients:[115]

- Make sure you have good lighting and aren't lit from behind
- Know how to quickly mute yourself in case there's background noise
- Be careful doing things like shuffling paper or typing when your microphone is on
- Have a simple background without doors, windows, or other distractions
- Angle the camera so you can make eye contact with your patients

Keep in mind that telemedicine may be a new experience for your patients, and walk them through the process so they know what to expect. For example, if you have to look away to write down notes, say what you're doing.

# ✓ Chapter 7 Recap

Use health IT to improve care and engage patients in innovative ways.

☐ Allow patients to see their notes during appointments

- [ ] Make sure technology supports — but doesn't take over — in-person appointments
- [ ] Follow best practices for video appointments

**Content last updated on:** April 17, 2019

# References

## Introduction


1 Gruessner, V. (n.d.) Three Vendors are Driving Patient Engagement and Portal Use. *EHR Intelligence*. Retrieved from **https://ehrintelligence.com/news/three-vendors-are-driving-patient-engagement-and-portal-use**

2 Black Book Research (2018, April 20). Hospital Technology is the New Determiner of Patient Satisfaction, 2018 Black Book EHR User Survey Results. *PR Newswire*. Retrieved from **https://www.prnewswire.com/news-releases/hospital-technology-is-the-new-determiner-of-patient-satisfaction-2018-black-book-ehr-user-survey-results-300633556.html**

3 Patel V & Johnson C. (February 2018). Consumers' use of online medical records and devices for health needs. ONC Data Brief, no.40. Office of the National Coordinator for Health Information Technology: Washington DC. Retrieved from **https://www.healthit.gov/sites/default/files/page/2018-03/HINTS-2017-Consumer-Data-Brief-3.21.18.pdf [PDF - 1.7 MB]**

4 The long awaited end of meaningful use. Definitive Healthcare. (2016, January 19). Retrieved from **http://www.definitivehc.com/hospital-information-technology/medicare-meaningful-use-program?source=newsltr-blog&utm_source=newsletter&utm_medium=email&utm_campaign=02-02-16**

5 EHR Incentives & Certification: Meaningful use definition & objectives. (2015, February 6). Retrieved from **https://www.healthit.gov/providers-professionals/meaningful-use-definition-objectives**

6 Emont, S. (2011, May). Measuring the impact of patient portals: what the literature tells us. Retrieved from **https://www.chcf.org/wp-content/uploads/2017/12/PDF-MeasuringImpactPatientPortals.pdf [PDF - 610KB]**

7 Patient access to online health action plans enhances rate of preventive care. (2016, February 9). Retrieved from **http://share.kaiserpermanente.org/article/patient-access-to-online-health-action-plans-enhances-rate-of-preventive-care/**; **http://www.ajpmonline.org/article/S0749-**

3797%2815%2900780-1/abstract

8 Emont, S. (2011, May). Measuring the impact of patient portals: what the literature tells us. Retrieved from https://www.chcf.org/wp-content/uploads/2017/12/PDF-MeasuringImpactPatientPortals.pdf [PDF - 610KB]

## Chapter 1

9 Goel, M.S.; Brown, T.L.; Williams, A.; Cooper, A.J.; Baker, D.W. (2011). Patient-reported barriers to enrolling in a patient portal. *Journal of the American Medical Informatics Association, 18*(1), i8-i12. doi: 10.1136. Retrieved from https://academic.oup.com/jamia/article/18/Supplement_1/i8/798747?searchresult=1

10 Clain, D. (2015, July 30). athenaResearch Study: the current state of patient portal adoption. Retrieved from http://www.athenahealth.com/blog/2015/07/30/athenaresearch-study-the-current-state-of-patient-portal-adoption

11 Siddhanti, R. Mana Health. (Personal communication, 2016, February 11).

12 ManaPortal signup process and screenshots: Siddhanti, R. Mana Health. (Personal communication, 2016, February 19).

13 Friedman, R. (2015, August 3). How practices get patients to use their portals. Call-out box Retrieved from https://www.advisory.com/research/medical-group-strategy-council/practice-notes/2015/august/what-we-know-about-portal-adoption-part-2

14 Clain, D. (2015, July 30). athenaResearch Study: the current state of patient portal adoption. Retrieved from http://www.athenahealth.com/blog/2015/07/30/athenaresearch-study-the-current-state-of-patient-portal-adoption

15 http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3041333/

16 Patel V & Johnson C. (February 2018). Consumers' use of online medical records and devices for health needs. ONC Data Brief, no.40. Office of the National Coordinator for Health Information Technology: Washington DC. Retrieved from https://www.healthit.gov/sites/default/files/page/2018-03/HINTS-2017-Consumer-Data-Brief-3.21.18.pdf [PDF - 1.7 MB]

17 About Blue Button. Retrieved from https://www.healthit.gov/patients-families/blue-button/about-blue-button

18 Henry, J.; Barker, W.; Kachay, L. Electronic Capabilities for Patient Engagement among U.S. Non-Federal Acute Care Hospitals: 2013-2017. (No. 45, April 2019). Retrieved from: **https://www.healthit.gov/sites/default/files/page/2019-04/AHApatientengagement.pdf** [443 KB]

19 Henry, J.; Pylypchuk, Y.; Patel, V. **Electronic Capabilities for Patient Engagement among U.S. Non-Federal Acute Care Hospitals: 2012-2015**. (No. 38, September 2016). Retrieved from **http://dashboard.healthit.gov/evaluations/data-briefs/hospitals-patient-engagement-electronic-capabilities-2015.php**

20 Patel, V.; Barker, W.; Siminerio, E. Trends in Consumer Access and Use of Electronic Health Information. (No. 30, October 2015). Retrieved from **https://www.healthit.gov/sites/default/files/briefs/oncdatabrief30_accesstrends_.pdf [PDF - 2.1 MB]**

21 Charles, D.; Gabriel, M.; Henry, J. **Electronic Capabilities for Patient Engagement among U.S. Non-Federal Acute Care Hospitals: 2012-2014** (No. 29, October 2015). Retrieved from **https://www.healthit.gov/sites/default/files/briefs/oncdatabrief29_patientengagement.pdf [PDF - 1.9 MB]**

22 Strategies for improving patient engagement through health IT. Retrieved from **https://www.healthit.gov/sites/default/files/final_vdt_sect_508_tested.pdf [PDF - 2.6MB]**

## Chapter 2

23 DelVecchio, A. (2014, December 16). Expansion of online appointment scheduling could lead to cost savings. Retrieved from **https://www.healthit.gov/sites/default/files/page/2019-04/AHApatientengagement.pdf**.

24 Henry J, Barker W, & Kachay L. (April 2019). Electronic capabilities for patient engagement among U.S. non-federal cute care hospitals: 2013-2017. ONC Data Brief, no.45. Office of the National Coordinator for Health Information Technology: Washington DC. Retrieved from **http://searchhealthit.techtarget.com/blog/Health-IT-Pulse/Expansion-of-online-appointment-scheduling-could-lead-to-cost-savings**

25 Patient Engagement: Digital self-scheduling set to explode. Retrieved from **https://www.accenture.com/us-en/insight-patient-engagement-digital-self-scheduling-explode**

26 Patel V & Johnson C. (February 2018). Consumers' use of online medical records and devices for health needs. ONC Data Brief, no.40. Office of the National Coordinator for Health Information Technology: Washington DC. Retrieved from **https://www.healthit.gov/sites/default/files/page/2018-03/HINTS-2017-Consumer-Data-Brief-3.21.18.pdf [PDF - 1.7 MB]**

27 Kaiser Permanente 2014 Annual Report. Retrieved from **http://share.kaiserpermanente.org/static/kp_annualreport_2014/**

28 Timely access to scheduled appointments. *Journal of the American Medical Informatics Association,* 5(1), 104-111. Retrieved from **https://healthy.kaiserpermanente.org/health/care/consumer/.../d5/L2dBISEvZ0FBIS9nQSEh/**

29 Timely access to scheduled appointments. *Journal of the American Medical Informatics Association,* 5(1), 104-111. Retrieved from **https://healthy.kaiserpermanente.org/health/care/consumer/.../d5/L2dBISEvZ0FBIS9nQSEh/**

30 Henry J, Barker W, & Kachay L. (April 2019). Electronic capabilities for patient engagement among U.S. non-federal cute care hospitals: 2013-2017. ONC Data Brief, no.45. Office of the National Coordinator for Health Information Technology: Washington DC. Retrieved from **http://searchhealthit.techtarget.com/blog/Health-IT-Pulse/Expansion-of-online-appointment-scheduling-could-lead-to-cost-savings**

31 Use Secure Electronic Messaging. Retrieved from **https://www.healthit.gov/providers-professionals/achieve-meaningful-use/core-measures-2/use-secure-electronic-messaging**

32 Kane, B., Sands, D.Z. (1998, January 1). Guidelines for the clinical use of electronic mail with patients. Retrieved from **http://jamia.oxfordjournals.org/content/5/1/104**

33 Kane, B., Sands, D.Z. (1998, January 1). Guidelines for the clinical use of electronic mail with patients. Retrieved from **http://jamia.oxfordjournals.org/content/5/1/104**

34 Fact Sheet: Using Secure Electronic Messaging to Support Patient and Family Engagement. Retrieved from **https://www.healthit.gov/providers-professionals/implementation-resources/fact-sheet-using-secure-electronic-messaging**

35 Meaningful Use Case Studies: Patient portal increases communication between patients and providers. (2011, Spring). Retrieved from **https://www.healthit.gov/providers-professionals/blackstone-valley-community-health-care-case-study**

36 Kane, B., Sands, D.Z. (1998, January 1). Guidelines for the clinical use of electronic mail with patients. Retrieved from **http://jamia.oxfordjournals.org/content/5/1/104**

37 Kane, B., Sands, D.Z. (1998, January 1). Guidelines for the clinical use of electronic mail with patients. Retrieved from **http://jamia.oxfordjournals.org/content/5/1/104**

38 Fact Sheet: Using Secure Electronic Messaging to Support Patient and Family Engagement. Retrieved from **https://www.healthit.gov/providers-professionals/implementation-resources/fact-sheet-using-secure-electronic-messaging**

39 Silvestre, A.-L.; Sue, V.M.; Allen, J.Y. (2009, March/April). If you build it, will they come? The Kaiser Permanente model of online health care. *Health Affairs, 28*(2), 334-344. doi 10.1377/hithaff.28.2.334. Retrieved from **http://content.healthaffairs.org/content/28/2/334.full**

40 Emont, S. (2011, May). Measuring the impact of patient portals: what the literature tells us. Retrieved from **https://www.chcf.org/wp-content/uploads/2017/12/PDF-MeasuringImpactPatientPortals.pdf [PDF - 610KB]**

41 Meaningful Use Case Studies: Patient portal benefits patient care and provider workflow. (2011, Winter). Retrieved from **https://www.healthit.gov/case-study/patient-portal-benefits-patient-care-and-provider-workflow**

42 Kessels, R.P.C. (2003, May). Patients' memory for medical information. *Journal of the Royal Society of Medicine, 96*(5), 219-222. Retrieved from **http://www.ncbi.nlm.nih.gov/pmc/articles/PMC539473/**

43 OpenNotes: Inviting patients to read their doctors' visit notes. Retrieved from **https://www.opennotes.org/research/inviting-patients-to-read-their-doctors-notes-patients-and-doctors-look-ahead-patient-and-physician-surveys/**

44 OpenNotes: Inviting patients to read their doctors' visit notes. Retrieved from **https://www.opennotes.org/research/inviting-patients-to-read-their-doctors-notes-patients-and-doctors-look-ahead-patient-and-physician-surveys/**

45 Siminerio, E.; Daniel, J.G. (2014, June 24). Patients play a vital role in improving the quality of information in their medical records. Retrieved from **https://www.healthit.gov/buzz-blog/consumer/blue-button-helps-patients-improve-care-quality/**

46 Delbanco, T.; Walker, J.; Bell, S.K.; Darer, J.D.; Elmore, J.G.; Farag, N.; Feldman, H.J.; Mejilla, R.; Ngo, L.; Ralston, J.D.; Ross, S.E.; Trivedi, N.; Vodicka, E.; Leveille, S.G. (2012, October 2). *Annals of Internal Medicine, 157*(7), 461-470. Retrieved from **http://annals.org/article.aspx?articleid=1363511**

47 What is OpenNotes? Retrieved from **http://www.opennotes.org/about-opennotes/**

48 Unitan, R. and Seidel, M. Sharing Visit Notes Online: Kaiser Permanente Northwest's Big Bang Implementation of OpenNotes. (PowerPoint presentation, 2015, September 2). Retrieved from Kaiser Permanente Northwest.

49 Unitan, R. and Seidel, M. Sharing Visit Notes Online: Kaiser Permanente Northwest's Big Bang Implementation of OpenNotes. (PowerPoint presentation, 2015, September 2). Retrieved from Kaiser Permanente Northwest.

50 Alpert J.M., Krist A.H., Aycock R.A., Kreps G.L. (2016, May 17). Applying Multiple Methods to Comprehensively Evaluate a Patient Portal's Effectiveness to Convey Information to Patients. Retrieved from **http://www.jmir.org**

## Chapter 3

51 Patel V & Johnson C. (February 2018). Consumers' use of online medical records and devices for health needs. ONC Data Brief, no.40. Office of the National Coordinator for Health Information Technology: Washington DC. Retrieved from **https://www.healthit.gov/sites/default/files/page/2018-03/HINTS-2017-Consumer-Data-Brief-3.21.18.pdf [PDF - 1.7 MB]**

52 Wolff J.L., Darer J.D., Larsen K.L. Family Caregivers and Consumer Health Information Technology. *J Gen Intern Med.* 2016 Jan;31(1):117-21. doi: **10.1007/s11606-015-3494-0**

53 Bourgeois, F.C.; Taylor, P.L.; Emans, J.; Nigrin, D.J.; Mandl, K.D. (2008, December). Whose personal control? Creating private, personally controlled health records for pediatric and adolescent patients. *Journal of the American Medical Informatics Association, 15*(6), 737–743. doi 10:1197/jamia.M2865. Retrieved from **http://www.hl7.org/documentcenter/public_temp_7CA39230-1C23-BA17-0CBCDEB8D0B8876C/wg/pedsdata/Fabienne%20JAMIA%20paper%20(2).pdf [PDF - 78KB]**

54 Bourgeois, F.C.; Nigrin, D.J.; Harper, M.B. (2015, May). Pediatrics perspectives. Preserving patient privacy and confidentiality in the era of personal health records. *Journal of Adolescent Health, 135*(5), e1125-e1127. Retrieved from **http://pediatrics.aappublications.org/content/135/5/e1125**

55 Jasik, C. (2005, February). UCSF goes live with teen patient portal. Retrieved from **https://www.ucsfhealth.org/ucsfmychart/**

56 Retrieved from **https://www.coloradohealth.org/portal-support-non-english-speaking-patients**

## Chapter 4


57 Henry J, Barker W, & Kachay L. (April 2019). Electronic capabilities for patient engagement among U.S. non-federal cute care hospitals: 2013-2017. ONC Data Brief, no.45. Office of the National Coordinator for Health Information Technology: Washington DC. Retrieved from **http://searchhealthit.techtarget.com/blog/Health-IT-Pulse/Expansion-of-online-appointment-scheduling-could-lead-to-cost-savings**

58 Patel V & Johnson C. (February 2018). Consumers' use of online medical records and devices for health needs. ONC Data Brief, no.40. Office of the National Coordinator for Health Information Technology: Washington DC. Retrieved from **https://www.healthit.gov/sites/default/files/page/2018-03/HINTS-2017-Consumer-Data-Brief-3.21.18.pdf [PDF - 1.7 MB]**

59 HIM Body of Knowledge™. Retrieved from **http://bok.ahima.org/**

60 45 Code of Federal Regulations 164.502(g). Cornell University Legal Information Institute. Uses and disclosures of protected health information: general rules. Retrieved from **https://www.law.cornell.edu/cfr/text/45/164.502**

61 Wolff J.L., Darer J.D., Larsen K.L. Family Caregivers and Consumer Health Information Technology. *J Gen Intern Med.* 2016 Jan;31(1):117-21. doi: **10.1007/s11606-015-3494-0**

62 45 Code of Federal Regulations 164.510(b). Cornell University Legal Information Institute. Uses and disclosures requiring an opportunity for the individual to agree or to object. Retrieved from **https://www.law.cornell.edu/cfr/text/45/164.510**

63 45 Code of Federal Regulations 164.510(b). Cornell University Legal Information Institute. Uses and disclosures requiring an opportunity for the individual to agree or to object. Retrieved from **https://www.law.cornell.edu/cfr/text/45/164.510**

64 Wolff J.L., Kim V.S., Mintz S., Stametz R., Griffin J.M. An environmental scan of shared access to patient portals. *J Am Med Inform Assoc.* 2017 Aug 25. doi: **10.1093/jamia/ocx088**

65 Wolff J.L., Darer J.D., Larsen K.L. Family Caregivers and Consumer Health Information Technology. *J Gen Intern Med.* 2016 Jan;31(1):117-21. doi: **10.1007/s11606-015-3494-0**

66 Wolff J.L., Kim V.S., Mintz S., Stametz R., Griffin J.M. An environmental scan of shared access to patient portals. *J Am Med Inform Assoc.* 2017 Aug 25. doi: **10.1093/jamia/ocx088**

67 Retrieved from **http://www.ajmc.com/journals/issue/2016/2016-vol22-n6/development-of-a-tethered-personal-health-record-framework-for-early-end-of-life-discussions**

68 Retrieved from https://patientengagementhit.com/news/how-patient-portals-can-improve-advance-care-planning-talks

## Chapter 5

69 Patel V & Johnson C. (February 2018). Consumers' use of online medical records and devices for health needs. ONC Data Brief, no.40. Office of the National Coordinator for Health Information Technology: Washington DC. Retrieved from https://www.healthit.gov/sites/default/files/page/2018-03/HINTS-2017-Consumer-Data-Brief-3.21.18.pdf [PDF - 1.7 MB]

70 Patel V & Johnson C. (February 2018). Consumers' use of online medical records and devices for health needs. ONC Data Brief, no.40. Office of the National Coordinator for Health Information Technology: Washington DC. Retrieved from https://www.healthit.gov/sites/default/files/page/2018-03/HINTS-2017-Consumer-Data-Brief-3.21.18.pdf [PDF - 1.7 MB]

71 Patient-Generated Health Data. (2015, September 30). Retrieved from https://www.healthit.gov/policy-researchers-implementers/patient-generated-health-data

72 National Learning Consortium. (2014, March). Patient-Generated Health Data Fact Sheet. Retrieved from https://www.healthit.gov/sites/default/files/patient_generated_data_factsheet.pdf [PDF - 1.6MB]

73 Centers for Medicare & Medicaid Services. (2016, April). Readmissions Reduction Program. Retrieved from https://www.cms.gov/medicare/medicare-fee-for-service-payment/acuteinpatientpps/readmissions-reduction-program.html

74 The Digital Consumer: How Patient Generated Health Data and Health IT Can Help Improve Care. Retrieved from https://www.healthit.gov/buzz-blog/consumer/digital-consumer-patient-generated-health-data-improve-care/

75 National Learning Consortium. (2014, March). Patient-Generated Health Data Fact Sheet. Retrieved from https://www.healthit.gov/sites/default/files/patient_generated_data_factsheet.pdf [PDF - 1.6MB]

76 Lavallee, D.; Chenok, K.; Love, R.; Petersen, C.; Holve, E.; Segal, C.; and Franklin, P. (2016). Incorporating Patient-Reported Outcomes Into Health Care to Engage Patients and Enhance Care. *Health Affairs, 35(4)*, doi: 10.1377/hlthaff.2015.1362. Retrieved from

http://content.healthaffairs.org/content/35/4/575.full?ijkey=6C1y7.jalT7qU&keytype=ref&siteid=healthaff#aff-1

77 National Learning Consortium. (2014, March). Patient-Generated Health Data Fact Sheet. Retrieved from https://www.healthit.gov/sites/default/files/patient_generated_data_factsheet.pdf [PDF - 1.6MB]

78 Ochsner Health System first epic client to fully integrate with Apple HealthKit Call-out box: Retrieved from https://news.ochsner.org/news-releases/ochsner-health-system-first-epic-client-to-fully-integrate-with-apple-healt

79 Develop health and fitness apps that work together. Retrieved from https://developer.apple.com/healthkit/

80 Nield, D. (2016, April 27). 25 essential fitness apps that work with Apple Health: updated Apple Health compatible apps and devices for complete health tracking. Retrieved from http://www.wareable.com/sport/apps-that-work-with-apple-health-kit-compatible

81 Ochsner Health System first epic client to fully integrate with Apple HealthKit Call-out box: Retrieved from https://news.ochsner.org/news-releases/ochsner-health-system-first-epic-client-to-fully-integrate-with-apple-healt

82 Ochsner Health system first in nation to manage chronic diseases with Apple Watch. (2014). Retrieved from https://news.ochsner.org/news-releases/ochsner-health-system-first-in-nation-to-manage-chronic-diseases-with-apple

83 Ochsner Health System continues to transform healthcare with "Optimal Hospital": innovative program uses Apple Watch, iPad and iPhone to introduce a new model for care as a way to manage efficiencies in hospital care. (2016, February 24). Retrieved from https://news.ochsner.org/news-releases/ochsner-health-system-continues-to-transform-healthcare-with-optimal-hospit

84 Access to MyCarolinas is easy. (2016) Retrieved from https://my.carolinashealthcare.org/login.aspx?ReturnUrl=%2fdefault.aspx

85 Carolinas HealthCare System. Retrieved from https://www.healthit.gov/sites/default/files/carolinas_healthcare_commitment.pdf [PDF - 153KB]

86 Broderick, A. (2013, January). Case Studies in Telehealth Adoption. Partners HealthCare: connecting heart failure patients to providers through remote monitoring. *Commonwealth Fund Publication 1656, 3*. Retrieved from http://www.commonwealthfund.org/~/media/files/publications/case-study/2013/jan/1656_broderick_telehealth_adoption_partners_case_study.pdf [PDF - 610KB]

87 Remote monitoring program for heart failure patients significantly lowers hospital admissions: less intensive remote monitoring follow-up may improve long-term outcomes. (2015, May 13). Retrieved from **http://connectedhealth.partners.org/news-and-events/media-center/announcements/heart-failure-remote-monitoring-program-significantly-lowers-hospital-admissions.aspx**

88 Agboola, S.; Jethwani, K.; Khateeb, K.; Moore, S.; Kvedar, J. (2015). Heart failure remote monitoring: Evidence from the retrospective evaluation of a real-world remote monitoring program. *Journal of Medical Internet Research*, *17*(4), e101. doi:10.2196/jmir.4417. Retrieved from **http://www.jmir.org/2015/4/e101**

89 Broderick, A. (2013, January). Case Studies in Telehealth Adoption. Partners HealthCare: connecting heart failure patients to providers through remote monitoring. *Commonwealth Fund Publication 1656, 3*. Retrieved from **http://www.commonwealthfund.org/~/media/files/publications/case-study/2013/jan/1656_broderick_telehealth_adoption_partners_case_study.pdf [PDF - 610KB]**

90 Agboola, S.; Jethwani, K.; Khateeb, K.; Moore, S.; Kvedar, J. (2015). Heart failure remote monitoring: Evidence from the retrospective evaluation of a real-world remote monitoring program. *Journal of Medical Internet Research*, *17*(4), e101. doi:10.2196/jmir.4417. Retrieved from **http://www.jmir.org/2015/4/e101**

91 Remote monitoring program for heart failure patients significantly lowers hospital admissions: less intensive remote monitoring follow-up may improve long-term outcomes. (2015, May 13). Retrieved from **http://connectedhealth.partners.org/news-and-events/media-center/announcements/heart-failure-remote-monitoring-program-significantly-lowers-hospital-admissions.aspx**

92 Broderick, A. (2013, January). Case Studies in Telehealth Adoption. Partners HealthCare: connecting heart failure patients to providers through remote monitoring. *Commonwealth Fund Publication 1656, 3*. Retrieved from **http://www.commonwealthfund.org/~/media/files/publications/case-study/2013/jan/1656_broderick_telehealth_adoption_partners_case_study.pdf [PDF - 610KB]**

93 Broderick, A. (2013, January). Case Studies in Telehealth Adoption. Partners HealthCare: connecting heart failure patients to providers through remote monitoring. *Commonwealth Fund Publication 1656, 3*. Retrieved from **http://www.commonwealthfund.org/~/media/files/publications/case-study/2013/jan/1656_broderick_telehealth_adoption_partners_case_study.pdf [PDF - 610KB]**

94 Broderick, A. (2013, January). Case Studies in Telehealth Adoption. Partners HealthCare: connecting heart failure patients to providers through remote monitoring. *Commonwealth Fund Publication 1656, 3*. Retrieved from **http://www.commonwealthfund.org/~/media/files/publications/case-study/2013/jan/1656_broderick_telehealth_adoption_partners_case_study.pdf [PDF - 610KB]**

95 Orlando, L.A.; Hauser, E.R.; Christianson, C.; Powell, K.P.; Buchanan, A.H.; Chesnut, B.; Agbaje, A.B.; Henrich, V.C.; Ginsburg, G. (2011, October 11). Protocol for implementation of family health history collection and decision support into primary care using a computerized family health history system. *BMC Health Services Research 11*, 264. doi: 10.1186/1472-6963-11-264. Retrieved from **http://bmchealthservres.biomedcentral.com/articles/10.1186/1472-6963-11-264**

96 Orlando, L.A.; Hauser, E.R.; Christianson, C.; Powell, K.P.; Buchanan, A.H.; Chesnut, B.; Agbaje, A.B.; Henrich, V.C.; Ginsburg, G. (2011, October 11). Protocol for implementation of family health history collection and decision support into primary care using a computerized family health history system. *BMC Health Services Research 11*, 264. doi: 10.1186/1472-6963-11-264. Retrieved from **http://bmchealthservres.biomedcentral.com/articles/10.1186/1472-6963-11-264**

97 Orlando, L.A.; Hauser, E.R.; Christianson, C.; Powell, K.P.; Buchanan, A.H.; Chesnut, B.; Agbaje, A.B.; Henrich, V.C.; Ginsburg, G. (2011, October 11). Protocol for implementation of family health history collection and decision support into primary care using a computerized family health history system. *BMC Health Services Research 11*, 264. doi: 10.1186/1472-6963-11-264. Retrieved from **http://bmchealthservres.biomedcentral.com/articles/10.1186/1472-6963-11-264**

98 Wu, R.R.; Himmel, T.L.; Buchanan, A.H.; Powell, K.P.; Hauser, E.R.; Ginsburg, G.S.; Henrich, V.C.; Orlando, L.A. (2014, February 13). Quality of family history collection with use of a patient facing family history assessment tool. doi: 10.1186/1471-2296-15-31. Retrieved from **https://bmcfampract.biomedcentral.com/articles/10.1186/1471-2296-15-31**

99 Orlando, L.A.; Hauser, E.R.; Christianson, C.; Powell, K.P.; Buchanan, A.H.; Chesnut, B.; Agbaje, A.B.; Henrich, V.C.; Ginsburg, G. (2011, October 11). Protocol for implementation of family health history collection and decision support into primary care using a computerized family health history system. *BMC Health Services Research 11*, 264. doi: 10.1186/1472-6963-11-264. Retrieved from **http://bmchealthservres.biomedcentral.com/articles/10.1186/1472-6963-11-264**

100 Fast Healthcare Interoperability Resources overview. Retrieved from **https://www.hl7.org/fhir/overview.html**

101 Time to focus on your family tree. (2015, December 15). Call-out box: Retrieved from **https://today.duke.edu/2015/12/metree**

## Chapter 6

102 Pew Research Center (February 2018). Mobile Fact Sheet. Retrieved from **http://www.pewinternet.org/fact-sheet/mobile/**

103 Comstock, Jonah (2013, October 24). Digitas Health: Patients whose doctors use apps use more apps themselves. *MobiHealthNews*. Retrieved from **https://www.mobihealthnews.com/26642/digitas-patients-whose-doctors-use-apps-use-more-apps-themselves**

104 Groshek, M. R., Oldenburg, J., Sarasohn-Kahn, J., & Sitler, B. (2015, February 20). mHealth App Essentials: Patient Engagement, Considerations, and Implementation. Retrieved from **https://www.himss.org/mhealth-app-essentials-patient-engagement-considerations-and-implementation**

105 Byambasuren, O., Sanders, S., Beller, E., & Glasziou, P., (2018, May 9). Prescribable mHealth apps identified from an overview of systematic reviews. npj *Digital Medicine*. Retrieved from **https://www.nature.com/articles/s41746-018-0021-9**

106 Boudreaux, E. D., Waring, M. E., Hayes, R. B., Sadasivan, R. S., Mullen, S., & Pagoto, S. (2014, September 24). Evaluating and selecting mobile health apps: strategies for healthcare providers and healthcare organizations. *Translational Behavioral Medicine*. Retrieved from **https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4286553/**

107 Bell, S.K., Mejilla, R., Anselmo, M., *et al.* When doctors share visit notes with patients: a study of patient and doctor perceptions of documentation errors, safety opportunities and the patient–doctor relationship. *BMJ Qual Saf* 2017;26:262-270. Retrieved from: **https://qualitysafety.bmj.com/content/26/4/262.abstract**

108 Asan, O., Tyszka, J., Crotty, B. (2018, 1 July). The electronic health record as a patient engagement tool: mirroring clinicians' screen to create a shared mental model. *JAMIA Open*, Volume 1, Issue 1, Pages 42–48. Retrieved from: **https://doi.org/10.1093/jamiaopen/ooy006**

109 Asan, O., Tyszka, J., Crotty, B. (2018, 1 July). The electronic health record as a patient engagement tool: mirroring clinicians' screen to create a shared mental model. *JAMIA Open*, Volume 1, Issue 1, Pages 42–48. Retrieved from: **https://doi.org/10.1093/jamiaopen/ooy006**

110 The Office of the National Coordinator for Health Information Technology. (2017, September 28). Telemedicine and telehealth. Retrieved from: **https://www.healthit.gov/topic/health-it-initiatives/telemedicine-and-telehealth**

111 Abrams, K., Burrill, S., & Elsner, N. (2018, July 18). What can health systems do to encourage physicans to embrace virtual care? *Deloitte Insights*. Retrieved from: **https://www2.deloitte.com/insights/us/en/industry/health-care/virtual-health-care-health-consumer-and-physician-surveys.html**

112 Abrams, K., Burrill, S., & Elsner, N. (2018, July 18). What can health systems do to encourage physicans to embrace virtual care? *Deloitte Insights*. Retrieved from: **https://www2.deloitte.com/insights/us/en/industry/health-care/virtual-health-care-health-consumer-and-physician-surveys.html**

113 Findlay, S. (2018, May 6). Virtual doctor visits are getting more popular, but questions remain about who pays. *Washington Post*. Retrieved from: **https://www.washingtonpost.com/national/health-science/virtual-doctor-visits-are-getting-more-popular-but-questions-remain-about-who-pays/2018/05/04/cbe262f6-4c85-11e8-b725-92c89fe3ca4c_story.html?utm_term=.77c7cee0782b**

114 Findlay, S. (2018, May 6). Virtual doctor visits are getting more popular, but questions remain about who pays. *Washington Post*. Retrieved from: **https://www.washingtonpost.com/national/health-science/virtual-doctor-visits-are-getting-more-popular-but-questions-remain-about-who-pays/2018/05/04/cbe262f6-4c85-11e8-b725-92c89fe3ca4c_story.html?utm_term=.77c7cee0782b**

115 Major, J. (2016, November 17). Using Telemediquette to Make Your Telemedicine Encounters Effective. *The Arizona Telemedicine Program Blog*. Retrieved from: **https://telemedicine.arizona.edu/blog/using-telemediquette-make-your-telemedicine-encounters-effective**

# Exhibit K

An official website of the United States government
Here's how you know

Menu

Search Medicare

# Privacy policy

- Types of information we collect
- How CMS uses information collected on Medicare.gov
- How CMS uses cookies & other technologies on Medicare.gov
- Your choices about tracking & data collection on Medicare.gov
- How CMS uses third-party websites & applications with Medicare.gov
- How CMS protects your personal information
- How long CMS keeps data & how it's accessed
- Children & privacy on Medicare.gov
- Links to other sites
- Additional privacy information

## Medicare.gov privacy policy

Protecting your privacy is very important to us. This privacy policy describes what information we collect, why we collect it, and what we do with it. This privacy notice is for Medicare.gov, es.Medicare.gov, and other Medicare.gov subdirectories, like Medicare.gov/physiciancompare. These websites are referred to as "Medicare.gov" throughout the rest of this notice and are maintained and operated by the Centers for Medicare & Medicaid Services (CMS). This notice of privacy policy aligns with the CMS Website Privacy Policy.

Medicare.gov doesn't collect name, contact information, Medicare Number, or other similar information through these websites unless you choose to provide it. We do collect other, limited, non-personally identifiable information automatically from visitors who read, browse, and/or download information from our website. We do this so we can understand how the website is being used and how we can make it more helpful. For more information, see Types of information we collect.

Personally identifiable information (PII), defined by the Office of Management and Budget (OMB), refers to information that can be used to distinguish or trace an individual's identity, like their name, Medicare Number, biometric records, etc. alone, or when combined with other

personal or identifying information which is linked or linkable to a specific individual, like date and place of birth, mother's maiden name, etc. Medicare Fee-for-Service eligibility and enrollment information and claims data are considered protected health information (PHI) under the Health Insurance Portability and Accountability Act (1996) (HIPAA) regulations. Read more about our privacy practices regarding PHI.

For example, we collect PII/PHI if you elect to create a user account on Medicare.gov, use Medicare.gov to apply for Medicare coverage, enroll in a plan, or use other tools that provide personalized services or information through Medicare.gov. We collect this information to be able to provide you access to the personalized information and services that Medicare.gov is designed to offer you. We don't sell any information you provide when you visit Medicare.gov. For information on how we share information, see How CMS uses information collected on Medicare.gov.

## Types of information we collect

### Information which is automatically collected:

**When you browse:**

Certain information about your visit can be collected when you browse websites. When you browse Medicare.gov, we, and in some cases, our third-party service providers, can collect the following types of information about your visit, including:

- Domain from which you accessed the internet (like Verizon.com if you're using a Verizon account).
- IP address (an IP or internet protocol address is a number that's automatically assigned to a device connected to the internet).
- Approximate geographic location based on the IP address of the user's local system.
- Operating system for the device that you're using and information about the browser you used when visiting the site. The operating system is software that directs a computer's basic functions, like executing programs and managing storage.
- Date and time of your visit.
- Pages you visited.
- Address of the website that connected you to Medicare.gov (like Google.com or Bing.com).
- Device type (like desktop computer, tablet, or type of mobile device).
- Screen resolution.
- Browser language.
- Geographic location.

- Time spent on page.
- Scroll depth (measures how much of a web page was viewed).
- Your actions on Medicare.gov (like clicking a button).

For more information, see How CMS uses third-party websites & applications with Medicare.gov.

We use this information to:

- Measure the number of visitors to Medicare.gov
- Help make our website more useful for visitors
- Improve our public education and outreach through digital advertising

Also, this information is sometimes used to personalize the content we show you on third-party sites. For more information on our practices, see How CMS uses third-party websites & applications with Medicare.gov.

## Information you may provide:

**When you request information:**

We collect information, including your email address or mobile phone number, to deliver alerts or eNewsletters. We use this information to complete the subscription process and provide you with information. You can opt out of these communications at any time by editing your subscription preferences.

**When you submit forms:**

We collect PII/PHI on paper or electronic forms, like Medicare coverage enrollment, authorizations to disclose personal health information, medical payment requests or appeals. When you specifically and knowingly provide us PII/PHI, like your name, email address, Social Security Number, or other unique identifier, we only use this information to fulfill the stated purpose on the form. If you choose to provide us with PII/PHI through a paper or electronic form, we'll maintain the information you provide only as long as needed to respond to your question or to fulfill the stated purpose of the communication.

**When you enroll in Medicare:**

When you apply for Medicare, you can sign up for Medicare Part A (Hospital Insurance) and Medicare Part B (Medical Insurance) through the Social Security Administration (SSA) website. All PII you provide to the SSA is subject to the SSA's privacy policies. Any PII that you supply to SSA that qualifies as PHI will also be subject to the HIPAA regulations.

For specific details on the data collected by the systems that make up Medicare.gov, visit the Privacy Impact Assessments (PIAs).

# How CMS uses information collected on Medicare.gov

If we maintain your PII/PHI in a system designed to retrieve information about you by personal identifier (name, personal email address, home mailing address, personal or mobile phone number, etc.), we'll protect it in accordance with the Privacy Act of 1974 (5 U.S.C. Section 552a).

Prior to requesting PII/PHI on a form on Medicare.gov, we'll provide you with a Privacy Act Statement.

## Sending you Medicare messages:

We use the email address or the mobile phone number you provide us to send emails or Short Message Service (SMS) messages (text messages) related to Medicare. If you give us permission, we'll send you emails and text messages. We also may use the phone number you provide to call you about Medicare services.

## Responding to you through Live Chat:

We use web chat to collect name, email, phone number, and description of the request from Medicare.gov users who choose to provide this information to request a Medicare Call Center representative contact them.

## Conducting surveys to improve services:

We also use online surveys to collect opinions and feedback. You don't have to answer these questions. If you do answer these questions, don't include any PII/PHI in your answers. We analyze and use the information from these surveys to improve the Medicare.gov websites. The information is available only to CMS managers, members of the CMS communications and web teams, and other designated federal staff and contractors who require this information to perform their duties.

## Using third-party tools for website analytics:

We use a variety of third-party web tools for web analytics. We use these tools to collect basic information about visits to Medicare.gov. This information is then used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Helping make the website more useful to visitors

CMS staff analyzes the data collected from these tools. Reports are available only to CMS managers, teams who implement programs represented on Medicare.gov, members of the CMS communications and web teams, and other designated federal staff and contractors who need this information to perform their jobs.

## Using third-party tools for outreach and education through digital advertising:

We use third-party web services to conduct outreach and education through the use of digital advertising for Medicare.gov. These third-party services may collect information through the use of web beacons (also called pixels) that are located on our pages. A web beacon is a see-through graphic image (usually 1 pixel x 1 pixel) that's placed on a web page and, in combination with a cookie, allows us to collect information regarding the use of the web page that contains the web beacon.

We use web beacons to tell when a user is redirected to Medicare.gov by clicking or otherwise interacting with a Medicare advertisement that we ran on another website. This is known as "click tracking" or "conversion tracking," and we use it to better target Medicare advertisements (known as "retargeting") to inform consumers or people with Medicare about Medicare deadlines and the services available through Medicare.gov. For more information on how these tools work, see How CMS uses third-party websites & applications with Medicare.gov.

We also use third-party tools to help deliver advertising. Vendors that operate the third-party tools may also gather information about your visits to third-party sites outside of Medicare.gov. While we don't track your internet activity outside of Medicare.gov, our vendors may use information collected automatically by visiting Medicare.gov, and combine it with data they collect elsewhere for targeted advertising purposes. You can opt out of this type of data collection via Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on Medicare.gov.

The outreach and education analytics tools provide reports which aggregate data like the number of clicks on advertisements. The reports are available only to CMS managers, teams who implement programs represented on Medicare.gov, members of the Medicare.gov communications and web teams, and other designated federal staff and contractors who need this information to perform their duties.

# How CMS uses cookies & other technologies on Medicare.gov

The Office of Management and Budget Memo M-10-22, Guidance for Online Use of Web Measurement and Customization Technologies, allows federal agencies to use session and persistent cookies to improve the delivery of services.

When you visit a website, its server may generate a piece of text known as a "cookie" to place on your device. The cookie, which is unique to your browser, allows the server to "remember" specific information about your visit while you're connected. The cookie makes it easier for you to use the dynamic features of web pages. Information that you enter into Medicare.gov isn't associated with cookies on Medicare.gov. Depending on the third-party tool's business practices, privacy policies, terms of service, and/or the privacy settings you selected, information you've provided to third parties could be used to identify you when you visit Medicare.gov. These third parties don't/won't share your identity with CMS or the Department of Health and Human Services (HHS).

There are 2 types of cookies - single session (temporary) and multi-session (persistent). Single session cookies last only as long as your internet browser is open. Once you close your browser, the session cookie disappears. Persistent cookies are stored on your device for longer periods. Both types of cookies create an ID that's unique to your device.

- **Session cookies:** We use session cookies for technical purposes, like to allow better navigation through our website. These cookies let our server know that you're continuing a visit to our website. The OMB Memo M-10-22 Guidance defines our use of session cookies as "Usage Tier 1—Single Session." The policy says, "This tier encompasses any use of single session web measurement and customization technologies."
- **Persistent cookies:** We use persistent cookies to understand the differences between new and returning visitors to Medicare.gov. Persistent cookies remain on your device between visits to our website until they expire or are removed by the user. The OMB Memorandum M-10-22 Guidance defines our use of persistent cookies as "Usage Tier 2—Multi-session without personally identifiable information." The policy says, "This tier encompasses any use of multi-session web measurement and customization technologies when no PII is collected." We don't use persistent cookies to collect PII. We don't identify a user by using cookies.

CMS also uses these technologies on Medicare.gov:

- **Persistent cookies for digital advertising:** Similar to persistent cookies identified above, CMS uses persistent cookies for outreach through digital advertising. These cookies can also be created on third-party websites and remain on your device between

visits to our website until they expire or you remove them. Consistent with OMB guidance for "Usage Tier 2", we don't use persistent cookies for outreach to collect PII. CMS doesn't identify a user by using such technologies.

- **Web beacons for digital advertising** (also called pixels and/or tracking tags): See-through images placed on certain pages of Medicare.gov are typically used in conjunction with cookies and aren't stored on your device. When you access these pages, web beacons generate a notice of your visit. For information on how we use web beacons, see How CMS uses third-party websites & applications with Medicare.gov.
- **Website log files:** These are used as an analysis tool and to tell how visitors use Medicare.gov, how often they return, and how they navigate through the website.
- **Flash:** Flash is used to assess the performance of the site and as a player for selected videos depending on the browser a device is using.
- **Local Storage Objects:** We use Flash Local Storage Objects ("LSOs") to store your preferences and to personalize your visit.

## Your choices about tracking & data collection on Medicare.gov

Medicare.gov offers a Privacy Manager which gives you control over what tracking and data collection takes place during your visit. Third-party tools are enabled by default to provide a quality consumer experience.

The Privacy Manager provides you with the choice to opt in or to opt out of the different categories of third-party tools used by Medicare.gov: Advertising, Analytics, or Social Media. The Privacy Manager prevents cookies, web beacons, and Local Storage Objects from being placed on your device. The Privacy Manager also prevents third-party tools from loading regardless of your cookie settings, which provides you with an additional layer of privacy that prevents the tool from loading at all. Because the Privacy Manager creates a cookie in your browser, the opt in and opt out choices you make through the Privacy Manager will only be effective on the device and browser you used to make your choices, and your choices will expire when the cookie expires. Once the cookie is created, the Privacy Manager will retain your settings for 3 years from the date of your most recent visit. You may revisit the Privacy Manager to change or renew your choices at any time.

Modify privacy options

If you disable cookies in your browser, our Privacy Manager won't be able to store your preferences and won't function properly. If you don't wish to use our Privacy Manager to opt

out of the tools used by Medicare.gov, you can opt out of tools individually, or via the Digital Advertising Alliance ("DAA") AdChoices icon, discussed in the next subsection.

If you opt out of the tools used by Medicare.gov via the Privacy Manager or by opting out of the tools directly, you'll still have access to information and resources at Medicare.gov. Or, if you don't want to use the website, you can get Medicare information by calling us at 1-800-MEDICARE (1-800-633-4227). TTY users can call 1-877-486-2048.

**AdChoices:** We include the AdChoices icon on all digital advertising that uses "conversion tracking" or "retargeting." To learn about conversion tracking, targeted advertising, and retargeting, see How CMS uses third-party websites & applications with Medicare.gov. The AdChoices icon is usually at or near the corner of digital ads. When you click on the AdChoices icon, it will provide information on what company served the ad and information on how to opt out. Learn more about AdChoices.

**Do Not Track:** We automatically observe the "Do Not Track" browser setting for digital advertising that uses "conversion tracking" or "retargeting." If "Do Not Track" is set before a device visits Medicare.gov, third-party conversion tracking and retargeting tools won't load on the website. To learn more about conversion tracking and retargeting, see How CMS uses third-party websites & applications with Medicare.gov. Learn more about Do Not Track and how to set the Do Not Track setting in your browser.

## How CMS uses third-party websites & applications with Medicare.gov

Medicare.gov uses a variety of technologies and social media services to communicate and interact with the public. These third-party websites and applications include popular social networking and media websites, open source software communities, and more.

### Third-party websites:

Your activity on the third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites. You should review the privacy policies of all websites before using them so you understand how your information may be used. You may want to adjust your account privacy settings on any third-party website to match your preferences on Medicare.gov.

### Website analytics tools:

These tools collect basic site usage information, like:

- How many visits Medicare.gov gets
- The pages visited by consumers
- Time spent on Medicare.gov
- The number of return visits to Medicare.gov
- The approximate geographic location of the device used to access Medicare.gov
- Types of devices used

This information is used to maintain the website, including:

- Monitoring website stability
- Measuring website traffic
- Optimizing website content
- Improving your experience

Use the Medicare.gov Privacy Manager to opt out of website analytics tools.

## Digital advertising tools for outreach & education:

We use third-party tools to support our digital advertising outreach and education efforts. These tools enable us to reach new people and provide information to previous visitors. To use these tools, we use these technologies on Medicare.gov:

**Click tracking:** We use click tracking to identify the ads that are most helpful to consumers and efficient for outreach. This enables us to improve the performance of ads that consumers click on. When users click on links from ads, data about what ad was viewed is collected. Reports are generated about ad performance – including the total number of views and clicks an ad received.

**Conversion tracking:** We use conversion tracking to identify ads that are helpful to consumers and efficient for outreach. It enables us to improve the performance of ads viewed by consumers. When a Medicare.gov ad is viewed on a third-party site (like a banner ad), a cookie is placed in the browser of the device the ad was viewed on. If this device later visits Medicare.gov, the visit is linked to the ad viewed on the same device. Use the Medicare.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on Medicare.gov.

**Retargeting:** We use retargeting to provide information to consumers who have previously visited Medicare.gov, like reminders about upcoming enrollment deadlines. Retargeting enables us to improve the performance of ads by delivering them to relevant audiences, like recent visitors to Medicare.gov. During a visit to Medicare.gov, a cookie is placed in the browser of the devices used to view the website. When that same device is used to visit third-party websites that are displaying Medicare.gov ads, ads for Medicare.gov may be shown to that device because it had previously visited Medicare.gov. Using these cookies, we don't collect information about the third-party websites visited by a device. Reports are generated about ad performance – including the total number of views and clicks an ad received. Use the Medicare.gov Privacy Manager to opt out of advertising tools. Users can click on the "AdChoices" icon in the corner of our ads to opt out of this Ad Targeting. Users who have set their browser to "Do Not Track" will automatically be opted out of conversion tracking. For more information about AdChoices and Do Not Track, see Your choices about tracking & data collection on Medicare.gov.

**Targeted advertising:** We use third-party vendors to engage in targeted advertising (also called online behavioral or interest-based advertising) to provide information to consumers across their online activities. Targeted advertising involves the collection of data from a particular computer or device. Data regarding web viewing behaviors or application use is gathered to predict user preferences or interests. We can have ads delivered to computers or devices based on the preferences or interests inferred from the web-viewing behaviors or application use.

Third-party vendors engaged by us may also target advertising based on information automatically collected (not information you provide) when you browse our websites or other websites on the internet. You can opt out of this type of data collection via our Privacy Manager, Ad Choices, and Do Not Track. For methods to opt out of this type of collection, see Your choices about tracking & data collection on Medicare.gov.

We may consider new third-party tools or the use of new third-party websites, but we'll first assess the tool or website before it's used in connection with Medicare.gov. We'll provide notice to the public before adding any new tool to Medicare.gov. These assessments include a description about how information will be collected, accessed, secured, and stored. See a list of the third-party tools currently being used on Medicare.gov. See risk assessments for third-party websites and applications.

## How CMS protects your personal information

We're committed to protecting information entrusted with us at Medicare.gov. If you visit Medicare.gov and choose to provide us with PII/PHI, we store your PII/PHI in a record system that can retrieve information about you by personal identifier (like name, personal email

address, home mailing address, or personal or mobile phone number, etc.). We'll protect the information you provide in accordance with applicable law, including the requirements of the Privacy Act of 1974 (5 U.S.C. Section 552a) and the regulations promulgated under HIPAA as amended (45 CFR 160-164). Privacy Act protections include the publication of Privacy Act System of Record Notices (SORN) in the Federal Register, which provide public notice about how we'll use and disclose PII. SORN are also available on CMS.gov.

The original system of records notice entitled, "1-800 Medicare Choice (HELPLINE)" was published in the Federal Register on February 26, 2008. View the system of records and modifications.

For more information about Medicare.gov's privacy policy, email Privacy@cms.hhs.gov.

Third-party services are web-based technologies that aren't exclusively operated or controlled by a government entity, or that involve significant participation of a nongovernment entity. These services may be separate websites or may be applications embedded within our websites. The list of third-party services includes links to relevant third-party privacy policies.

## How long CMS keeps data & how it's accessed

We'll keep data collected long enough to achieve the specified objective for which they were collected. Once the specified objective is achieved, the data will be retired or destroyed in accordance with published draft records schedules of CMS as approved by the National Archives and Records Administration.

We don't store information from cookies on our systems. The persistent cookies used with third-party tools on Medicare.gov can be stored on a user's local system and are set to expire at varying time periods depending upon the cookie. We assess whether the expiration date of a cookie exceeds one year and provides an explanation as to why cookies with a longer life are used on the site in the associated Third-Party Website or Application Privacy Impact Assessment.

## Children & privacy on Medicare.gov

We believe it's important to protect the privacy of children online. The Children's Online Privacy Protection Act (COPPA) governs information gathered online from or about children under the age of 13. Medicare.gov isn't intended to solicit information of any kind from children under age 13. If you believe that we've received information from a child under age 13, call us at 1-800-MEDICARE (1-800-633-4227). TTY users can call 1-877-486-2048.

## Links to other sites

Medicare.gov may link to other HHS websites, other government websites, and/or private organizations (like health care providers). We link to other websites solely for your convenience and education. When you follow a link to an external site, you're leaving Medicare.gov and the external site's privacy and security policies will apply. Non-federal websites don't necessarily operate under the same laws, regulations, and policies as federal websites. Other than third-party websites highlighted in this privacy notice, we aren't responsible for the contents of external web pages and a link to a page doesn't constitute an endorsement.

### Social media & other sites that require registration

We use social media websites (listed below) to:

- Increase government transparency
- Improve information sharing
- Promote public participation
- Encourage partnership with CMS

**Social media websites aren't government websites or applications. They're controlled or operated by the social media website.** We don't own, manage, or control social media websites. In addition, we don't collect, maintain, or disseminate information posted by visitors to those social media websites. If you choose to provide information to a social media website through registration or other interaction with the website, the use of any information you provide is controlled by your relationship with the social media website. For example, any information that you provide to register on Facebook is voluntarily contributed and isn't maintained by us. This information may be available to our social media page administrators in whole or part, based on a user's privacy settings on the social media website. However, we won't use PII, if provided by you to a social media website or other website that requires registration, for targeted advertising or retargeting. Although you may voluntarily contribute to a social media website with the intent to share the information with others on a CMS social media page, to protect your privacy, don't disclose PII about yourself or others.

We don't keep separate records or accounting of any social media website users or their interaction with the Medicare.gov pages on social media websites. We don't store or share this information. User information is retained by social media websites in accordance with the website's policies. See each social media website's privacy policy to see how long user information is retained after an account has been deleted. To learn more about how each social media website uses and maintains information visit their privacy policy, as follows:

- Google Plus
- Facebook
- Twitter
- YouTube

## Additional privacy information

Get more information about CMS privacy policies.

Updated: April 25, 2018

### Site Menu

### Take Action

### CMS & HHS Websites

### Helpful Links

## Signup for email updates

ENTER YOUR EMAIL ADDRESS

name@example.com

☐ By checking this box, you consent to our data privacy policy.

Next

About Medicare | Medicare Glossary

Nondiscrimination / Accessibility | Privacy Policy | Privacy Setting | Linking Policy |
Using this site | Plain Writing

A federal government website managed and paid for by the
U.S. Centers for Medicare and Medicaid Services.
7500 Security Boulevard, Baltimore, MD 21244

Medicare.gov

# Exhibit A

# FEDERAL HEALTH IT STRATEGIC PLAN

# 2015 – 2020




**Prepared by:**

The Office of the National Coordinator for Health Information Technology (ONC)
Office of the Secretary, United States Department of Health and Human Services
http://healthit.gov

# LETTER FROM THE NATIONAL COORDINATOR

Over the past five years, our nation has experienced a remarkable transformation in the collection, sharing, and use of electronic health information. Updating the *Federal Health IT Strategic Plan 2015-2020* (Plan) has given us a chance to reflect on our health IT journey. When we released the prior Plan in 2011, adoption of health IT among hospitals and health care providers was in its nascent stages, Affordable Care Act implementation was commencing, and the use of mobile health applications, especially by consumers, were far from ubiquitous.

Implementation of the prior Plan created a strong foundation for achieving this Plan's goals and objectives. Over 400,000 eligible hospitals and professionals participate in the Medicare and Medicaid Electronic Health Record (EHR) Incentive Programs. This incredible achievement was not easy. Hospitals and health care providers have invested capital, time, and hard work to digitize their patient medical records. This has created a strong demand for the seamless sharing of information across technology systems, information platforms, location, provider, or other boundaries. There is also a strong interest among providers not participating in the EHR Incentive Programs to collect, share, and use interoperable health information.

With this updated Plan, the federal government signals that, while we will continue to work towards more widespread adoption of health IT, efforts will begin to include new sources of information and ways to disseminate knowledge quickly, securely, and efficiently. The first two goals of this Plan prioritize increasing the electronic collection and sharing of health information while protecting individual privacy. The final three goals focus on federal efforts to create an environment where interoperable information is used by health care providers, public health entities, researchers, and individuals to improve health, health care, and reduce costs.

This Plan aims to remain flexible to our evolving definitions of health and health care. We recognize that both traditional and nontraditional sources will engender valuable health information. Expectations for our information systems and users of these systems will increase. During the information age, innovation and technological advancements have been difficult to predict. This Plan accounts for how the federal government views our nation's current landscape and articulates our values and priorities in shaping tomorrow's landscape.

I am incredibly grateful for the participation of over thirty-five federal entities who worked in concert to develop this Plan, demonstrating the widespread interest across the government to digitize the health experience for every American. Federal authorities and investments will seek to achieve this Plan's strategies. However, this is a shared undertaking. Efforts of state, local, and tribal governments, and private stakeholders are vital to ensure that health information is accessible when and where it is needed to improve and protect people's health and well-being.



Karen DeSalvo, MD, MPH, MSc
National Coordinator for Health Information Technology

# FEDERAL HEALTH IT VISION AND MISSION

## Vision

Health information is accessible when and where it is needed to improve and protect people's health and well-being

## Mission

Improve health, health care, and reduce costs through the use of information and technology

# INTRODUCTION

## Overview

Improving the secure availability and use of health information allows individuals to take ownership over their health, partner with their health care providers, and improve their quality of life and health. It strengthens the delivery of health care and long-term services and supports, and allows public health agencies to detect, track, manage, and prevent disease outbreaks. Information also fuels research and innovation, spurring advancements in scientific discovery.

Health information technology (health IT) allows individuals and health care entities and providers, home- and community-based supports, and public health entities to electronically collect, share, and use health information. The term "health IT" includes a wide range of products, technologies, and services, such as electronic health records (EHRs), mobile and telehealth technology, cloud-based services, medical devices, and remote monitoring devices, assistive technologies, and sensors.

Federal agencies provide direct care and health insurance, protect public health, fund health and human services for certain populations, invest in infrastructure, develop and implement policies and regulations, and advance groundbreaking research. Given this range of activities, the federal government is also positioned to improve health, health care, and reduce costs through the secure use of information and technology.

The *Federal Health IT Strategic Plan 2015-2020* (Plan) identifies the federal government's health IT priorities. While this Plan focuses on federal strategies, achieving the vision and goals requires collaboration from state, local, and tribal governments. Efforts by health care entities and providers, public health entities, payers, technology developers, community-based nonprofit organizations, home-based supports, and academic institutions are also essential.

## Background

The Health Information Technology for Economic and Clinical Health (HITECH) Act, passed as part of the American Recovery and Reinvestment Act of 2009, requires the National Coordinator for Health Information Technology (National Coordinator), in consultation with other appropriate federal agencies, to update and republish the Plan. The Office of the National Coordinator for Health Information Technology (ONC) released the *Federal Health IT Strategic Plan 2011-2015* when the Centers for Medicare & Medicaid Services (CMS) was launching its EHR Incentive Programs and the document was closely aligned with the HITECH Act implementation.

Since 2011, the health IT ecosystem has changed. As of June 2014, 75 percent (403,000+) of the nation's eligible professionals and 92 percent (4,500+) of eligible hospitals received incentive payments from the EHR Incentive Programs. Innovation also occurred in mobile health applications and other health technologies. HHS' *2014 Report to Congress on Health IT Adoption and Exchange* highlights federal

Case 1:22-cv-12196-FDS Document 20 Filed 04/28/23 Page 6 of 29

efforts across the government to advance health IT adoption and exchange. Additionally, passage of the Affordable Care Act (ACA) has also directed federal efforts toward ensuring health IT can support higher quality, more affordable care, delivered in efficient ways.

## Strategic Goals, Objectives, and Strategies

The *Federal Health IT Strategic Plan 2015-2020* describes the government's strategies to achieve five goals:




Objectives, outcomes, and strategies further define each goal. Outcomes are broken into 3-year and 6-year timeframes to achieve results. Federal departments and agencies listed under each outcome have a role in achieving that respective outcome. That role can include using their authorities and programs to advance progress towards that desired outcome, but may also include the department or agency using health IT while providing direct care or support services. Federal entities will concurrently implement the goals, objectives, and strategies across the Plan, not sequentially working to achieve each goal.

For this Plan, "providers" is meant to be a broadly inclusive term for health care workers and service providers in all settings – including, for example, acute and ambulatory care, long-term services and supports, post-acute care, behavioral health, emergency medical services, home health, oral health, and end-stage renal disease dialysis facilities, pharmacies, laboratories, and public health entities.

Successful implementation of the Plan will also mean that health IT is culturally and linguistically sensitive, safe, accessible for everyone (including those with limited English proficiency or with disabilities), intuitive, functional, and provides a rewarding user experience.

## Strategic Plan Development & Update

To update the federal health IT goals and objectives, ONC convened the Federal Health IT Advisory Council, an internal forum to discuss program alignments for existing and emerging health and health IT matters, to prioritize strategies and define implementation accountabilities within the Plan, and to coordinate federal health IT policy decisions. ONC drafted the Plan in consultation with over thirty-five participating agencies comprising the Federal Health IT Advisory Council. These federal partners encompass broad departmental missions with regulatory, health care provider, payer, human services, and privacy and security responsibilities. Collectively, the Council conveyed a diverse understanding of the unique needs and concerns of their stakeholders to ensure the Plan's direction would allow for varied approaches and methods to improve individuals' well-being and advance health IT's capacity to achieve broad health and care goals. Representative entities comprising the Federal Health IT Advisory Council are included at the conclusion of this Plan.

Through a framework established for ONC's federal advisory groups, particularly the Health IT Policy Committee and its Strategy and Innovation Workgroup, ONC will obtain public input and request stakeholder engagement to continue development of the Plan's content. Additionally, ONC will accept formal public comments on the Plan through February 2015. Based on this feedback, the federal government will release a final version of the updated Plan in 2015.

Federal partners, in coordination with federal advisory committees, including the Health IT Policy and Standards Committees, interagency groups, and ONC, will implement the Plan and review progress for each goal, including identifying milestones, measurement and reporting tools, and risk mitigation. Each department and agency listed under an outcome will report on progress measures or milestones annually through the Federal Health IT Advisory Council. The participating agencies are committed to continually assessing and maintaining the Plan as a living document that will serve as a basis for future health IT initiatives.

ONC is also developing a shared *Nationwide Interoperability Roadmap* to advance the use of interoperable health information. Interoperability is a crosscutting component of this Plan, and implementation of the Roadmap will be necessary to advance the Plan's goals.

Furthermore, continued outreach to stakeholders for all the federal partners involved in the Plan's development and implementation will allow the Plan to evolve as the health IT marketplace matures, subsequently requiring new or modified approaches to policies and federal activities. This engagement will also seek to provide the public with a better understanding of the federal government's direction to improve health care, individual and community health, and research through the collection, sharing, and use of interoperable health information.

# FEDERAL HEALTH IT PRINCIPLES

**Federal agencies will collaborate with one another and with state, local, tribal, and private stakeholders to:**

- **Focus on value.** Federal health IT policy will continuously target solutions that improve health and care quality, efficiency, safety, affordability, and access.
- **Respect individual preferences.** Person-centered care embraces the value of the individual inside and outside the health system, where all entities honor individuals' privacy, needs, values, and choices regarding their information, health, and care.
- **Build a culture of electronic health information access and use.** Federal actions will help establish an environment where secure universal health information exchange and use are expected and accepted so that everyone benefits from simple, timely, equitable, efficient, and appropriate electronic access to and sharing of health information.
- **Create an environment of continuous learning and improvement.** Federal policies and actions seek to strengthen feedback loops between scientific and health care communities to translate evidence into clinical practice and other settings, and learn how to perform better.
- **Encourage innovation and competition.** The government's policies, guidance, and programs will support continued innovation and competition in the health IT marketplace to foster highly useful health IT solutions that lead to better health and care.
- **Be a worthy steward of the country's money and trust.** The government seeks to use its resources judiciously. This means relying to the extent possible on private markets to accomplish important societal objectives, and acting to correct market failures when necessary. It also means developing governmental policies through open and transparent processes.

Case 1:23-cv-12106-FDS Document 29 Filed 04/28/23 Page 9 of 29

# FEDERAL HEALTH IT GOALS

| | Goal | Objective |
|---|---|---|
| Collect | **Goal 1:** Expand Adoption of Health IT | • **Objective A:** Increase the adoption and effective use of health IT products, systems, and services<br>• **Objective B:** Increase user and market confidence in the safety and safe use of health IT products, systems, and services<br>• **Objective C:** Advance a national communications infrastructure that supports health, safety, and care delivery |
| Share | **Goal 2:** Advance Secure and Interoperable Health Information | • **Objective A:** Enable individuals, providers, and public health entities to securely send, receive, find, and use electronic health information<br>• **Objective B:** Identify, prioritize, and advance technical standards to support secure and interoperable health information<br>• **Objective C:** Protect the privacy and security of health information |
| Use | **Goal 3:** Strengthen Health Care Delivery | • **Objective A:** Improve health care quality, access, and experience through safe, timely, effective, efficient, equitable, and person-centered care<br>• **Objective B:** Support the delivery of high-value health care<br>• **Objective C:** Improve clinical and community services and population health |
| Use | **Goal 4:** Advance the Health and Well-Being of Individuals and Communities | • **Objective A:** Empower individual, family, and caregiver health management and engagement<br>• **Objective B:** Protect and promote public health and healthy, resilient communities |
| Use | **Goal 5:** Advance Research, Scientific Knowledge, and Innovation | • **Objective A:** Increase access to and usability of high-quality electronic health information and services<br>• **Objective B:** Accelerate the development and commercialization of innovative technologies and solutions<br>• **Objective C:** Invest, disseminate, and translate research on how health IT can improve health and care delivery |

# Goal 1: Expand Adoption of Health IT

The HITECH Act intended to accelerate the adoption and use of health IT. The HITECH Act authorized CMS to provide financial incentives to eligible hospitals, Critical Access Hospitals, and eligible professionals to adopt and meaningfully use certified EHR technology to improve patient care.

Incentive payments dramatically accelerated broad use of EHRs by hospitals and providers. However, gaps and challenges remain for nationwide health IT use.

This goal aims to expand health IT adoption and use efforts across the care continuum, emphasizing assistance for health care providers serving long-term and post-acute care, behavioral health, community-based, and other populations ineligible to participate in the Medicare and Medicaid EHR Incentives Programs. In addition, this goal aims to expand the adoption and use of a broader set of technologies, including telehealth and mobile health.

Digitizing health information collection allows for easier, appropriate sharing of that high-quality, accurate, and relevant information to connect care and empower individuals to manage their health and well-being.

## Objective 1A: Increase the adoption and effective use of health IT products, systems, and services

To realize information-fueled health and well-being, federal efforts aim to encourage broad adoption and use of health IT solutions across all provider and care settings.

EHR adoption among hospitals and physicians has dramatically increased since the passage of the HITECH Act, but health IT use remains low among providers practicing in long-term services and supports, post-acute care, and behavioral health settings. It is important to capture electronic health information from all sources in order to obtain a more complete picture of overall health. The use of telehealth and mobile health technologies also remains low. Greater use of these technologies has the potential to significantly impact the quality and cost of care.

| 3-Year Outcome | 3-Year Outcome | 6-Year Outcome |
|---|---|---|
| Increase the percentage of hospitals and professionals who successfully demonstrate Meaningful Use | Increase opportunities for provider and individual use of appropriate telehealth and mobile health technologies and services | Increase the number of providers across the care continuum who use interoperable health IT products, systems, and services |
| ACL, CDC, CMS, DOD, HRSA, IHS, NASA, ONC, OPM, SAMHSA, VA | CDC, CMS, DOD, FCC, FDA, FTC, HRSA, IHS, SAMHSA, VA | ACL, CDC, CMS, DOD, DOJ, DOL, HRSA, IHS, NASA, ONC, OPM, SAMHSA, VA |

**Strategies**

1. Encourage the use of certified health IT products through federal payment policies, contracts, and public and private programs that fund or provide health care and long-term supports and services
2. Expand the capacity of the workforce to support use of health IT
3. Establish technical guidance and standards, provide technical assistance, and identify and promote proven practices in the development, design, purchase, tailoring, and deployment of health IT
4. Encourage the adoption of telehealth and mobile technologies among providers and individuals, focusing on federal programs funding and/or providing health care, in care and payment innovation model initiatives, and those encouraging broadband adoption
5. Expand the ONC HIT Certification Program to certify products useful for providers across the care continuum

## Objective 1B: Increase user and market confidence in the safety and safe use of health IT products, systems, and services

For the nation to collectively move to an electronic health environment, individuals, health care providers, and organizations need confidence that health IT solutions are secure, safe, and useful.

Evidence suggests health IT improves patient safety; however, health IT products can also lead to medication errors and other adverse outcomes. Additionally, poor implementation or improper use of otherwise safe systems can also lead to adverse outcomes. Clinical and other health providers and individuals must be able to rely on health IT systems to perform safely.

Individuals and providers must also have the ability to change health IT products, systems, or services without undue financial burden or the loss of valuable information. The implementation of this Plan, as well as the 2013 *HHS Health IT Patient Safety Action and Surveillance Plan* and the 2014 *FDASIA Health IT Report*, will build and maintain confidence in the safety of the health IT solutions, as well as support a competitive and innovative market.

| 3-Year Outcome | 3-Year Outcome | 6-Year Outcome |
|---|---|---|
| Increase the quantity and quality of data and knowledge on the safe use of health IT | Refine and implement frameworks for health IT safety and innovation | Increase the ability of health IT to manage information flow and adjust for context, environment, and user preferences |
| AHRQ, FDA, NIST, ONC, VA | FCC, FDA, FTC, ONC, VA | NIST, ONC, VA |

**Strategies**

1. Support the identification, monitoring, and reporting of complete, precise, and accurate challenges and hazards of health IT design and use
2. Integrate evidence on safe use of health IT into health IT certification
3. Encourage the application of human factors, health literacy, and user-centered design in the development and use of health IT products, systems, and services
4. Implement a balanced, transparent, and risk-based approach to health IT oversight
5. Develop, select, promote, and implement health IT standards in transparent ways that promote competition, foster innovation, and minimize barriers to market entry for developers and users
6. Promote data portability and interoperability to encourage competition, foster innovation, improve individuals' and providers' choices, and reduce barriers to change health IT products, systems, and services

## Objective 1C: Advance a national communications infrastructure that supports health, safety, and care delivery

A strong national communications infrastructure is a prerequisite for sharing electronic health information among providers and individuals, delivering telehealth solutions, and using mobile health applications.

While efforts are underway to bring broadband to all Americans, in rural areas, nearly one-fourth of the population, and in tribal areas, nearly one-third of the population lack access to broadband services. Even in areas where broadband is available, approximately 100 million Americans still do not subscribe. This inhibits the sharing of high-quality data and graphics, such as medical images, and the ability to leverage video telecommunications needed for telehealth.

Expanded high-speed wireless and broadband services will support health information sharing and use, support the communication needs required for care delivery, and support the continuity of health care and public health services during public health emergencies and natural disasters.

| 3-Year Outcome | 6-Year Outcome |
|---|---|
| Increase access to broadband connectivity for health IT applications, such as high-resolution imaging, telehealth, and mobile health | High-speed networks are broadly available to support rural and other underserved communities |
| ASPR, FCC, FDA, USDA, VA | FCC, USDA, VA |

**Strategies**

1. Use federal authorities and investments to improve access to and choice of broadband and wireless networks
2. Encourage comparable upload and download speeds for consumers and providers in rural and other underserved communities
3. Ensure that the national health IT and telecommunications infrastructure are secure, resilient, and operational during public health emergencies and disasters

## Goal 2: Advance Secure and Interoperable Health Information

The significant progress in digitizing the collection of health information has increased the demand to securely share health information electronically and use it to improve health and health care.

Aligning closely with the *Nationwide Interoperability Roadmap*, this goal aims to stimulate secure and seamless health information sharing and use, advancing the five core building blocks for a nationwide interoperable[1] health information infrastructure: core technical and vocabulary standards and functions; certification to support the adoption and effective use of health IT products and services; privacy and security protections for health information; supportive business, clinical, cultural, and regulatory environments; and rules of engagement and governance.

The ONC HIT Certification Program serves as a valuable mechanism for promoting the use of common standards for interoperability; however, significant work remains. In order to promote consistent standards implementation and reduce implementation variability, the federal government will continue to work with standards development organizations (SDOs) and industry stakeholders to assure that newer versions of standards and implementation specifications more clearly and more often describe discrete requirements. We will also identify and collaborate on the development and deployment of more modular technical standards and specifications for nationwide interoperability that can allow for more seamless transitions to new technology systems in the future. Initially, federal efforts will focus on efficiently addressing prioritized standards that enable sending, receiving, finding, and using a basic set of essential health information.

Interoperable health information and health IT solutions will lead to more efficient and effective health systems, better clinical decision support, scientific advancement, and a continuously learning health system.

[1] "the ability of two or more systems or components to exchange information and to use the information that has been exchanged" IEEE Standard Computer Dictionary: A Compilation of IEEE Standard Computer Glossaries (New York, NY: 1990)

## Objective 2A: Enable individuals, providers, and public health entities to securely send, receive, find, and use electronic health information

Since the passage of the HITECH Act, certain types of health information exchange and use among providers have increased; however, gaps and challenges remain for widespread secure and interoperable health information across health care and long-term supports and services providers, settings of care, individuals, health IT platforms, and payers.

Interoperable exchange of health information allows individuals, providers, public health departments, and payers to find, securely exchange, and use vital health information, enhancing care delivery, public health, and research, and empowering individuals to make informed choices regarding their health.

| 3-Year Outcome | 3-Year Outcome | 6-Year Outcome |
|---|---|---|
| Increase the percentage of individuals, providers, and public health entities that electronically and securely send, receive, find, and use a basic set of essential health information across the health care continuum | Trusted entities that exchange health information follow common rules of engagement to ensure information is securely shared through supportive and non-obstructive business practices | Increase the percentage of individuals, providers, and public health entities that electronically and securely send, receive, find, and use an expanded set of health information across the care continuum |
| ACL, ASPR, CDC, CMS, DOD, DOJ, FDA, HRSA, IHS, OCR, ONC, SAMHSA, SSA, VA | ACL, CDC, CMS, DOD, DOJ, FTC, IHS, OCR, ONC, SSA, VA | ACL, ASPR, CDC, CMS, DOD, DOJ, FDA, HRSA, IHS, OCR, ONC, SAMHSA, SSA, VA |

### Strategies

1. Establish rules of engagement and a governance mechanism related to standards, data policy, and operations, for electronic health information exchange to facilitate security and interoperability across all types of entities and networks that provide exchange services and safeguards for appropriate levels of information access
2. Work with partners to reduce regulatory and business challenges that impact health information exchange
3. Promote the coordination of care for individuals across the care continuum through innovative care and payment models, shared care plans, and value-based purchasing
4. Ensure health IT products and services support the privacy, technical, and vocabulary standards necessary for capturing, finding, exchanging, and using standard health information across the health care and long-term services and supports continuum, and with individuals and public health entities
5. Encourage electronic information sharing between public and private health providers and payers to promote care continuity

## Objective 2B: Identify, prioritize, and advance technical standards to support secure and interoperable health information

Health information is only useful if the end user can access and understand the information. Standards are the medium for individuals, health IT solutions, and medical devices to find, organize, exchange, secure, and share information. They must be maintained and enhanced based on feedback from real use and to accommodate emerging requirements, including use of genomic data to achieve precision medicine.

Use of common technical standards and specifications are necessary for health information to move seamlessly and securely. While not all information can be standardized, recognizing that valuable provider and patient observations and other notations may be more helpful as free text, health IT should aim to identify methods to capture and present this nonstandard information in more uniform ways. Using data elements consistently and reliably will allow for collecting information for individual health needs as well as for reuse of that information to drive decision support, quality measurement and reporting, population health management, public health, and research. Focusing on the highest priority standards can help accelerate their widespread adoption more quickly.

| 3-Year Outcome | 6-Year Outcome |
|---|---|
| Increase use of common standards among federal agencies, private industry, and the biomedical research community | Improve the capability of health IT to manage information from varied sources in both structured and unstructured formats |
| ASPR, CDC, CMS, DOD, DOJ, FDA, HRSA, IHS, NIH, NIST, ONC, SAMHSA, SSA, VA | ASPR, DOD, FCC, FDA, NIH, NIST, ONC, VA |

**Strategies**

1. Encourage consistent standards implementation, reduce implementation variability, and improve modularity in health data standards for terminology and vocabulary, coding, data content and format, transport, and security
2. Require that certified health IT products and services have functions that facilitate users' compliance with requirements related to privacy and security
3. Advance technical and electronic methods to accurately identify, proof, match, and authenticate information across data sources
4. Advance standards that support interoperability between medical devices and certified health IT products and systems, including standards for documentation of medical device use by unique device identifier and methods for adverse event reporting
5. Advance standards for common data elements to enable capture and use for clinical decision support, clinical quality measures, and reporting
6. Encourage the adoption and use of prioritized sets of common standards through health IT certification, federal regulations and programs, and research funding mechanisms

## Objective 2C: Protect the privacy and security of health information

As more health information becomes digitized and shared, it is important that all stakeholders recognize their responsibility in protecting health information. The government will provide oversight and guidance to ensure that stakeholders adhere to laws that protect the privacy and security of health information. Aligning with the HHS' Secretary's Strategic Initiative highlighted in the *HHS Strategic Plan 2014-2018* federal actions seek to protect patients' health information, as it is electronically stored and shared and their privacy rights. The federal government is committed to encouraging the development and use of policy and technology to advance patients' rights to access, amend, and make choices for the disclosure of their electronic health information. The federal government also supports the development of policy, standards, and technology to facilitate patients' ability to control the disclosure of specific information that is considered by many to be sensitive in nature (such as information related to substance abuse treatment, reproductive health, mental health, or HIV) in an electronic environment.

The privacy and security of protected health information is a top priority of the federal government, and the government will continue to pursue efforts that ensure confidence and trust for individuals and their families, caregivers, providers, and others.

| 3-Year Outcome | 3-Year Outcome | 6-Year Outcome |
|---|---|---|
| Increase the reach of education and training information and tools for health IT privacy, security, and cybersecurity | Improve providers' and other stakeholders' compliance with federal privacy and security requirements in managing electronic health information | Establish and implement federal policies and technical solutions related to emerging uses of individual electronic health information |
| ASPR, DHS, DOD, FDA, FTC,HHS CIO, IHS, NIST, OCR, ONC, OASH, VA | CMS, DOD, FDA, FTC, NIST, OCR, ONC, VA | CDC, DOD, FDA, FTC, HHS CIO, NIST, NSF, OCR, ONC, VA |

**Strategies**

1. Support the development and implementation of policies, practices, and education that protect health information from breach, and address cybersecurity risks and developing technologies
2. Continue development, administration, and enforcement of federal privacy and security regulations and standards for HIPAA-covered entities and business associates
3. Support the development of policies, standards, technology, guidance, and solutions to facilitate individuals' ability to manage, control, and authorize the disclosure of specific electronic health information
4. Require and test that certified health IT products incorporate privacy and security safeguards
5. Support, promote, and enhance the establishment of a single health and public health Information Sharing and Analysis Center (ISAC) for bi-directional information sharing about cyber threats and vulnerabilities between the private health care industry and the federal government
6. Continue enforcement of applicable federal privacy and security requirements for entities not covered by HIPAA

Case 1:22-cv-12196-FDS Document 29 Filed 04/28/23 Page 18 of 29

# Goal 3: Strengthen Health Care Delivery

The U.S. health care and long-term supports and services delivery system is often fragmented, leaving individuals and their families to seek care from multiple providers who often have little access to essential information on that person, or cutting edge therapeutic findings, and who have limited financial incentives to carefully coordinate care, including across care settings. In this environment, fee-for-service payment, which reimburses for each service provided rather than by the quality or value of care and the outcome, may not incentivize practices that emphasize quality of care. New care models based on value and quality exist, but transitioning takes time, investment, and behavioral shifts from all stakeholders.

The intent of new care models is to provide the care that each individual desires as they establish and achieve their health goals. Health IT is essential for a health care system based on value and quality improvement.

This goal and respective objectives aligns with multiple national strategies to improve specific components of health and health care, including quality, prevention, disparities reduction, health security, and safety. The Plan aims to remain flexible in its strategic actions and tactics to allow agencies engaged in achieving these aims to test and experiment various approaches so the public can derive the most benefit from federal policy and programs and align with state, local and private efforts.

Expanded use of health IT that combines decision supports and quality measures will allow the nation to achieve continuous quality improvement and important health outcomes, including aiding in the prevention of chronic and debilitating disease, making care safer and more person-centered, and assisting communities in promoting wellness and continuity of care, particularly for their most vulnerable individuals.

## Objective 3A: Improve health care quality, access, and experience through safe, timely, effective, efficient, equitable, and person-centered care

Health IT enhances health care and long-term supports and services delivery. Information exchanged and used electronically improves the ability of providers to make well-informed and coordinated care decisions quickly and safely.

Implementation of the HITECH Act's provisions has led to widespread adoption and use of health IT, developing the infrastructure necessary to accomplish a central intent of the Affordable Care Act: affordability, access, and quality. Health IT can also help equip individuals and their families with information to engage with their providers and care teams to actively participate in their own care, both by working efficiently in making informed care decisions, and in managing their health outside of the formal health care and long-term supports and services system.

Expanded use of health IT will allow the nation to achieve important health outcomes, including aiding in the prevention of chronic and debilitating disease, ensuring accessible care, making care safer and more person-centered, and advancing a culture of continuous quality improvement.

| 3-Year Outcome | 3-Year Outcome | 6-Year Outcome |
|---|---|---|
| Increase individuals' access to health care through health IT products and services | Increase use of electronic quality improvement tools and measurements that support provider adherence to evidence-based guidelines and improve outcomes | Increase use of health IT integrated with primary and specialty care that facilitates informed individual engagement and shared decision-making |
| ACL, CMS, DOD, HRSA, IHS, OCR, SAMHSA, VA | ACL, CMS, DOD, FDA, HRSA, IHS, OCR, ONC, SAMHSA, VA | ACL, CMS, DOD, FDA, HRSA, IHS,OCR, ONC, SAMHSA, VA |

**Strategies**

1. Incorporate telehealth and mobile health technologies and services within federal programs funding or providing health care and innovation model initiatives to improve access to and quality of health care services
2. Promote the well-designed incorporation of usable electronic information, clinical quality measurement, safety and adverse event information, and clinical decision support into clinical workflow
3. Develop and encourage the use of automated tools for testing and validating information used in capturing and reporting quality measures
4. Develop health IT solutions that allow federal regulatory agencies to receive and evaluate pharmaceutical, biologic, and medical product risks more efficiently and promote the safe use of these products
5. Encourage health IT use to collect and integrate person-reported outcomes, accommodations, and preferences as part of routine health care and long-term supports and services delivery
6. Address the health literacy issues for different individual and caregiver populations so that the technology matches and improves their health management skills

## Objective 3B: Support the delivery of high-value health care

Health IT will play a crucial role in supporting new care models that are person-centered and value-driven. Seamless interoperability will facilitate better tracking of provider- and person-focused outcomes, efficient resource use and cost analyses, particularly for care provided across multiple systems and settings.

Federal efforts include creation of evidence-based tools, persuasive health care provider incentives, alignment of payment reforms that reward coordinated care, and an emphasis on achieving improved health and care for all Americans. The federal government will work to help align quality and other reporting requirements, which will reduce administrative burden among all health care providers, and give them more time to focus on care and services.

Interoperable health information provides a foundation to measure, report, and provide feedback on care quality for a number of purposes. For example, these efforts will help support clinicians in practice transformation efforts by making essential health information available for care decisions and patient health management.

| 3-Year Outcome | 3-Year Outcome | 6-Year Outcome |
|---|---|---|
| Identify and increase administrative efficiencies that reduce cost and improve provider and patient experiences | Increase the number of providers receiving technical assistance for using electronic health information as part of practice design and management of their patient population | Standardize and expand regional multi-payer claims and clinical data infrastructure to facilitate clinical performance reporting and feedback to providers |
| CMS, DOD, FDA, HHS CTO, HRSA, IHS, OPM, VA | CMS, DOD, HRSA, IHS, ONC, SAMHSA, VA | AHRQ, ASPE, CMS, DOD, FDA, HHS CTO, ONC, VA |

**Strategies**

1. Leverage health IT to improve the accuracy and consistency of documentation and coding
2. Use health IT to simplify participation and reporting requirements across programs for quality and claims information
3. Improve the capacity of electronic information sources to support providers' ability to accurately and efficiently report and receive feedback on health care quality measures for public and private programs
4. Provide health IT implementation and usability support to health care and long-term supports and services providers to help them succeed in innovation models and use IT solutions to evaluate and manage cost, complexity, and outcomes to aid their organizational and clinical processes and practices
5. Advance multi-source data integration, innovative data use agreements, open data sources, and reliable connectivity and computational power to connect care across time, geography, and appropriate users of health information

## Objective 3C: Improve clinical and community services and population health

High-quality, accurate, and relevant electronic health information improves the ability of providers to manage and advance population health.

Having complete information about the person is critical to achieving population health goals. This requires health IT capable of receiving and integrating individual health information from multiple sources to enable providers to aggregate and trend information within and across groups. This allows providers to easily identify and close care gaps, recognize and analyze patterns and anomalies, and to perform localized research that can contribute to broader knowledge advancements.

For example, health IT enhances routine medical care by delivering quality improvement services and prompts that are relevant to the providers' areas of expertise and specialty, reminding providers about the timing of appropriate preventive services for their patient's general well-being, coordinate care among providers, and begin to help connect individuals with community resources and social services to support their goals, their health and well-being, and improve their quality of life.

| 3-Year Outcome | 6-Year Outcome |
|---|---|
| Increase use of health IT systems to provide evidence-based guidance on appropriate use of screening and prevention services | Identify innovative uses of health IT to connect individuals and providers to community resources, social services, and health education programs |
| ACF, ACL, AHRQ, CDC, CMS, DOD, DOE, HRSA, IHS, OASH, ONC, OPM, SAMHSA, VA | ACF, ACL, AHRQ, CDC, CMS, DOD, HRSA, IHS, OASH, ONC, OPM, SAMHSA, VA |

**Strategies**

1. Promote data collection, clinical decision support, and analytic capabilities to allow for precision medicine and to identify individuals and communities that are underserved or at risk to target timely health interventions
2. Facilitate the interoperable exchange of common data elements and quality improvement documents and tools
3. Encourage and partner with communities to find ways for using health IT to streamline eligibility requirements and expedite enrollment processes to facilitate individuals' access to preventive and social services
4. Encourage and partner with communities to explore ways for using health IT to facilitate coordination and implementation of complementary health strategies among clinical, behavioral, preventive services and social services
5. Encourage collaboration between public and private providers and payers to facilitate comprehensive care delivery

Case 1:22-cv-12186-FDS Document 29 Filed 04/28/23 Page 22 of 39

## Goal 4: Advance the Health and Well-Being of Individuals and Communities

In many settings, an individual is often more of a recipient of health care and long-term supports and services than an active partner with their providers and care team. This dynamic limits the opportunities for individuals to manage their own health and to share in care management.

Changing to a more person-centered vision is vital to improving health and health care outcomes, particularly since the individuals' motives and actions have a great impact on their health outcomes. Individuals should be able to access wellness and health care services enabled by user-centered technology that reflects their individual needs, values, and choices, that is well-designed, and supports both self-care and meaningful interactions with their care providers. Equally important as advances in technology, settings, such as home- and community-based organizations, will redefine how we view how individuals interact with their health care.

Public health entities need interoperable health information to detect, track, and manage disease outbreaks. Improved access to health information among public health entities and home- and community-based supports increases their ability to conduct and contribute to medical product safety surveillance, analyze population health trends, address local social and health determinants, protect communities during public health emergencies, and promote healthy choices for all populations and communities.

This goal aims to advance exchange and use of electronic health information among individuals, home- and community-based supports, and public health entities to improve the health of individuals and communities.

Case 1:22-cv-12196-FDS Document 29 Filed 04/28/22 Page 23 of 29

## Objective 4A: Empower individual, family, and caregiver health management and engagement

Changing how health and care is both discussed and provided toward a person-centered vision is vital to improve individuals' health and quality of life. Existing and emerging technologies provide a path to make information and resources for health and health care management universal, integrated, accessible to all, and personally relevant.

Empowering and supporting individuals and their families to manage their health and be a partner in their care can be a complex and time-consuming undertaking. Providers and individuals must learn new ways to communicate, collaborate, assume changing roles as part of the health team, understand new responsibilities, and learn how best to take advantage of improved health IT and care options.

Health IT can help empower individuals, their families, and other caregivers to engage in shared decision-making with their providers on their wellness and quality of life goals, manage their health in convenient and meaningful ways, and result in better individual outcomes.

| 3-Year Outcome | 6-Year Outcome | 6-Year Outcome |
|---|---|---|
| Increase individuals' access to their electronic health information, and improve their ability to share and authorize its use, or incorporate this information into their health IT tools | Expand ability for individuals to safely contribute relevant and usable electronic health information to their clinicians for engaging in shared decision making on their care and wellness goals | Increase the number of federal care delivery systems and programs incorporating the use of innovative technologies (sensors, medical devices, assistive technologies) to improve the health of the populations they serve |
| ACL, CDC, CMS, DOD, HRSA, IHS, OCR, ONC, OPM, SAMHSA, VA | ACL, CMS, DOD, FDA, FTC, ONC, OCR, VA | ACL, CMS, DOD, HHS CTO, HRSA, FDA, IHS, ONC, SAMHSA, VA |

**Strategies**

1. Advance individuals' ability to securely access, control, amend, and make other choices regarding the use and disclosure of their electronic individually identifiable health information and their self-generated health information in formats they can use and reuse
2. Disseminate health IT tools and educational resources for individuals that are designed to enable them to understand their health information, costs, and care options, and to become advocates for their own health
3. Support health IT policies that enable products that integrate self-generated health information, self-reported outcomes, and genomic information into an individual's longitudinal care records and self-care and wellness technologies
4. Work with partners to support providers' and individuals' understanding of risks and responsibilities of care options that lead to informed shared decision-making
5. Promote health IT that incorporates the provision of evidence-based health information resources, logistical support, decision aids, and risk calculators to providers

## Objective 4B: Protect and promote public health and healthy, resilient communities

Interoperable health information can improve public health entities' and community-based organizations' ability to protect and promote healthy and resilient communities.

Public health entities and human services organizations need to build the technical and administrative infrastructure to receive and make use of the increasing volume of health-related information that they receive. Health IT solutions support public health entities' use of this information to improve and protect the health of the communities they serve. A more robust data infrastructure also promotes resource management and planning for emergency preparedness in the case of public health emergencies or medical and other disasters.

Health IT can lead to faster, more efficient methods for public health departments and human services providers to protect and support community health and perform more effective needs assessments.

| 3-Year Outcome | 6-Year Outcome | 6-Year Outcome |
|---|---|---|
| Increase public health entities' ability to use, benefit from, and manage advances in real-time electronic health information for public health surveillance and targeted alerting | Increase use of health IT systems to assist national, state, and community efforts to support the early detection and mediation of emerging hazards | Increase use of health IT in enhancing public health situational awareness by incorporating environmental, psychosocial, and other non-medical information into providers' workflow and health care records |
| ASPR, CDC, DOD, IHS, FDA, OASH, OCR, ONC, VA | ASPR, CDC, DOD, FDA, ONC, VA | ACF, ACL, ASPR, CDC, DOD, FDA, HRSA, OASH, ONC, SAMHSA, VA |

**Strategies**

1. Support the use of health IT that can help communities conduct needs assessments and protect high-risk individuals
2. Expand the capacity for health IT and predictive analytics to assist communities in managing and preventing chronic health conditions, health care-associated infections, urgent threats, and other nationally notifiable diseases, and to promote community well-being and resilience
3. Use health IT and integrated platforms to support resilience and mitigation of emerging hazards and public health threats
4. Prepare public health systems and leverage health IT, communications, and integrated platforms to inform decision making to ensure continuity of appropriate care during disasters and health emergencies
5. Enhance or, if necessary, develop and maintain standards for the unique health IT needs associated with emergency care, public health emergencies, and disasters to include rapid transfers of care, unidentified individuals, and individual movement

Case 1:22-cv-12196-FDS Document 28 Filed 04/28/23 Page 25 of 29

## Goal 5: Advance Research, Scientific Knowledge, and Innovation

Research drives innovation and scientific discovery. As health IT use increases among individuals, providers, and public health entities, it creates a rich source of data and exciting new opportunities to enhance clinical decision support, support quality improvement, improve post-market surveillance of the effects of biopharmacologic drugs and medical devices, enhance care transitions, and enable research on prevention, diagnosis, and treatment of disease and disability.

Interoperable information collected as a byproduct of care can allow care teams to develop solutions to improve the health of the individuals receiving care and services and measure the effectiveness of their actions. This can create a continuous feedback loop that not only leads to quality improvement, but also supports more rapid translation of research findings into better care.

Information from care encounters provides a partial picture of an individual's health. Increasingly, individuals will have the ability to contribute information through mobile apps, sensors, social media, and medical devices. Care teams and researchers can leverage this information to provide person-centered care and design research studies likely to produce more useful results.

Learning how to best use or develop new health IT to improve health and health care can help identify which kinds of electronic health tools and their applications are most effective in reaching personal, population, and public health needs.

Electronic health data can be used to substantially improve the efficiency, effectiveness, and reach of clinical trials. Researchers can use data to identify target populations, make informed sample size estimations, recruit potential trial participants, collect more baseline data, and, within the framework of integrated health care systems or payer programs, streamline follow-up. Furthermore, conducting clinical trials within the context of existing electronic health data makes it possible to enroll a much greater proportion of potentially eligible individuals increasing the likelihood that trial results are generalizable.

## Objective 5A: Increase access to and usability of high-quality electronic health information and services

While protecting privacy, security, and confidentiality, the federal government is publishing new open data sources, digitizing existing data, requiring public access to data resulting from federally-funded research, and making data easier to use via downloading, application programming interfaces, and access in the cloud. The federal government aims to encourage private-sector innovators and entrepreneurs, as well as researchers, to use government and government-funded data to create useful applications, products, services, and features that help improve health and health care.

The federal efforts will also focus on accessibility, technical standards, services, policies, federal data, and governance structures that support person-centered outcomes research. This work will facilitate a learning health system that allows providers, communities, and researchers to continuously learn and advance the goal of improved health and health care.

New capabilities will emerge that increasingly enhance research, allowing researchers to search data in new ways.

| 3-Year Outcome | 6-Year Outcome |
|---|---|
| Increase the number, timeliness, quality, and usability of federal health and other relevant data sets available for public use while protecting privacy | Expand the capacity and design of health IT infrastructure to support coordinated person-centered outcomes research development and findings dissemination |
| ASPE, ASPR, CDC, CMS, DOD, FDA, HHS CIO, HHS CTO, NIH, NIST, NSF, VA | AHRQ, ASPE, CDC, CMS, FDA, HRSA, NIH, NSF, ONC, VA |

**Strategies**

1. Support additional, expanded open data releases of federal and federally-funded data that relates to health, consistent with HIPAA and the Privacy Act
2. Collaborate with private and academic research activities on strategic dataset releases, appropriate data dissemination, data discovery and location mechanisms, and education to support innovative data use
3. Fund collaborative research data networks and infrastructure so researchers can generate and disseminate person-centered outcomes and health services research
4. Enable and validate the electronic sharing and use of relevant EHR data in clinical trials
5. Encourage electronic access to clinical trial data from domestic and international sources to expand person-centered outcomes
6. Promote innovation in clinical trials through strategic leveraging of health data and health IT systems in trial design and execution

## Objective 5B: Accelerate the development and commercialization of innovative technologies and solutions

Open data helps create a decentralized environment for innovators across America to leverage the information to build, deploy, and scale solutions that help individuals and providers improve health and care.

Beyond releasing datasets, the federal government funds innovative research for health IT products and solutions. The government also collaborates with standards-setting organizations to ensure that health IT products and solutions can use standards necessary to integrate and share person-generated health data across platforms and resources. Further, federal health systems can contribute organizational learning that leads to innovations in health IT usability and improved care delivery.

Individuals should have control over the kinds of data collected about them and a full understanding of how those data may be used. The federal government plays a key role in protecting personal health information and promoting transparency in how organizations and data companies collect, use, share, and retain health information.

| 3-Year Outcome | 6-Year Outcome | 6-Year Outcome |
|---|---|---|
| Advance science and knowledge in creating and using sensors, mobile technology, medical devices, and assistive technologies that enable users to quantify and use personal health information while protecting their privacy | Advance science in using health IT for precision medicine and patient-centered care | Advance science in using health IT to support distributed analytics and evidence sharing |
| AHRQ, FDA, FTC, NIH, NIST, NSF, OCR | AHRQ, NIH, NSF | AHRQ, HHS CTO, NIH, NSF |

**Strategies**

1. Fund organizational learning and research, and promote innovation for new health IT products and solutions, including mobile applications, that incorporate privacy protections, wearable technologies, advances in big data, computation and analytic methods, and other scientific discoveries that use health IT securely to help resolve challenging health problems
2. Identify methods to integrate health information securely into mobile health technologies and related social networking platforms to more effectively reach health care professionals, individuals and families while protecting the privacy of the information
3. Develop solutions and guides for incorporating precision medicine and predictive modeling into care delivery
4. Promote transparency in communication about what information devices are collecting and how it is being used, shared, or retained
5. Invest in methods and approaches that support distributed analytics and evidence sharing while protecting personal health information

## Objective 5C: Invest, disseminate, and translate research on how health IT can improve health and care delivery

Many health IT studies focus on *whether* health IT improves health care and health outcomes; however, not as many studies focus on *how* to implement health IT solutions in ways that ensure that health IT meets its full potential.

Additionally, it may take as long as one or two decades for the integration of original research results into the delivery of care and services. Thus, the translation of research findings into sustainable improvements in care provision and health outcomes remains a substantial obstacle to improving the quality of health care. Health IT can serve as a vehicle for incorporating timely, personally-relevant, evidence-based practices into care.

Federal science and research play an important role in advancing evidence on *how* health IT can improve health outcomes, reduce health disparities, and improve care delivery, as well as how to make these systems easier and safer for people of all abilities to use. Health IT solutions can help rapidly integrate the latest evidence into care practices, leading to a more effective care delivery system.

| 3-Year Outcome | 6-Year Outcome | 6-Year Outcome |
|---|---|---|
| Increase evidence and tools available on proven practices of using health IT | Translate evidence into clinical practice more quickly and effectively through health IT technologies and infrastructure | Improve adherence to evidence-based medicine by increasing implementation of supportive health IT technologies and applications |
| AHRQ, DOD, FDA, NIH, NIST, NSF, VA | AHRQ, DOD, FDA, NIH, NSF, VA | AHRQ, DOD, FDA, NIH, NSF, VA |

**Strategies**

1. Collect, analyze, and interpret data to assess the impact of health IT use and value-based purchasing incentives on improving health outcomes
2. Collect, analyze, and interpret data to assess the impact of health IT use to reduce disparities in the quality, accessibility, and safety of health care and long-term supports and services
3. Fund health services research to identify the most effective ways health IT can support organization, management, and delivery of health care and long-term supports and services
4. Fund research to provide evidence and proven practices on use of health IT to improve the quality, safety, and value of care in care settings, among populations, and among human services organizations
5. Promote rapid translation of evidence from health services research and organizational learning into health IT products and practice transformation efforts

Case 1:22-cv-12196-FDS Document 23 Filed 04/28/23 Page 29 of 29

# Participating Federal Departments and Agencies

- Administration for Children & Families (ACF)
- Administration for Community Living (ACL)
- Agency for Healthcare Research and Quality (AHRQ)
- Centers for Disease Control and Prevention (CDC)
- Centers for Medicare & Medicaid Services (CMS)
- Department of Agriculture (USDA)
- Department of Defense (DOD)
- Department of Education (DOE)
- Department of Justice (DOJ) and Bureau of Prisons (BOP)
- Department of Labor (DOL)
- Department of Veterans Affairs (VA)
- Federal Communications Commission (FCC)
- Federal Health Architecture (FHA)
- Federal Trade Commission (FTC)
- Food and Drug Administration (FDA)
- Health Resources and Services Administration (HRSA)
- HHS Assistant Secretary for Financial Resources (ASFR)
- HHS Assistant Secretary for Health (OASH)
- HHS Assistant Secretary for Legislation (ASL)
- HHS Assistant Secretary for Planning and Evaluation (ASPE)
- HHS Assistant Secretary for Preparedness and Response (ASPR)
- HHS Office of the National Coordinator for Health Information Technology (ONC)
- HHS Office for Civil Rights (OCR)
- HHS Office of the Chief Information Officer (OCIO)
- HHS Office of the Chief Technology Officer (CTO)
- HHS Office of the General Counsel (OGC)
- HHS Office of Minority Health (OMH)
- HHS Office of the Secretary (OS)
- Indian Health Service (IHS)
- National Aeronautics and Space Administration (NASA)
- National Institutes of Health (NIH)
- National Institute of Standards and Technology (NIST)
- National Science Foundation (NSF)
- Networking and Information Technology Research and Development (NITRD)
- Office of Personnel Management (OPM)
- Social Security Administration (SSA)
- Substance Abuse and Mental Health Services Administration (SAMHSA)

# Exhibit B

Exhibit B

The Office of the National Coordinator for
Health Information Technology

**Prepared by:**
The Office of the National Coordinator for Health Information Technology
Office of the Secretary, United States Department of Health and Human Services
HealthIT.gov

# 2020-2025 Federal Health IT Strategic Plan

**October 2020**

# Table of Contents

**Letter from the National Coordinator** 1

**Federal Health IT Vision and Mission** 3

**Federal Health Principles** 4

**Strategic Plan Framework** 5

**Introduction** 6

- How Health IT is Used 6
- The Federal Government's Role in Health IT 8

**Challenges in Healthcare** 9

- Increasing Healthcare Spending 10
- Poor Health Outcomes 10
- Increasing Rates of Mental Illness and Substance Use Disorders 10
- Access to Care 11
- Access to Technology 11
- Access to Electronic Health Information 12

**Opportunities in a Digital Health System** 13
Empowering Patients 14
Moving to Value-Based Care 15
Advancing Interoperability 15
Promoting New Technologies 17
Reducing Regulatory and Administrative Burden 18
Protecting Privacy of Health Information 19
Securing Health Information 19

**Goals, Objectives, and Strategies** 20
Goal 1: Promote Health and Wellness 21
Goal 2: Enhance the Delivery and Experience of Care 24
Goal 3: Build a Secure, Data-Driven Ecosystem to Accelerate Research and Innovation 29
Goal 4: Connect Healthcare with Health Data 32

**Appendix A. About this Strategic Plan** 37

**Appendix B. Measuring and Communicating Progress** 39

**Appendix C. Federal Contributors** 41

**Appendix D. List of Acronyms** 42

**References** 43

The Office of the National Coordinator for Health Information Technology



LETTER FROM THE

# National Coordinator

In our everyday routines, we rely on technology to do a lot for us. Many of us have access to an abundance of data and technologies that allow us to interact with information in many ways. From shopping for groceries, to requesting transportation, to managing our finances, we have come a long way since the dawn of the internet and mobile devices. However, when it comes to accessing our information when and where we need it, healthcare has just not quite caught up. In today's digital world, the right to control our health must include the right to access and control our health information. While most healthcare providers now use electronic health record (EHR) systems, information captured in these systems is often difficult to access by patients, caregivers, and healthcare providers across different settings of care. All healthcare stakeholders will benefit from a fully connected healthcare system that empowers patients, caregivers, and their healthcare providers to access, exchange, and use electronic health information (EHI).

**In today's digital world, patients' right to control their health must include the right to access and control their health information.**

The digitization of the nation's healthcare system has resulted in greater electronic documentation of health information for patients. Yet, the system's transformation is hindered by status quo bias that tends to limit information sharing. Thanks to provisions passed by Congress, the United States government is working to bring more robust health information to patients and ensure that technology and mobile applications (apps) will help them better manage their health and enable them to shop for care. We in the Office of the National Coordinator for Health Information Technology (ONC), with our partners across the federal government, strive to increase transparency, competition, and consumer choice in healthcare and seek to protect the privacy and security of individuals' EHI.

The aim of this *2020-2025 Federal Health IT Strategic Plan* (Plan) is to outline concrete steps federal partners can take to improve health through health IT. The goals, objectives, and strategies within this Plan highlight the importance not only of EHI,




This Plan is outcomes-driven, with goals focused on meeting the needs of individuals, populations, caregivers, healthcare providers, payers, public health professionals, researchers, developers, and innovators.

but also of the capabilities enabled by health IT, including public health surveillance, telehealth, and remote monitoring. The coronavirus disease 2019 (COVID-19) pandemic caused by the novel coronavirus (SARS-CoV-2) has highlighted the importance of IT-enabled tools in supporting our healthcare infrastructure.

Federal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare. Yet, much work remains to ensure patients and caregivers have access to valuable, usable information. With this Plan, the federal government demonstrates its ongoing coordinated focus on the interoperability of EHI and the reduction of provider burden. It emphasizes product and price transparency, allowing individuals to select the technology they wish to use to access and control their information, while opening up entirely new business models for the health app economy. This Plan is outcomes-driven, with goals focused on meeting the needs of individuals, populations, caregivers, healthcare providers, payers, public health professionals, researchers, developers, and innovators. We would like to thank our federal partners, committees, and members of the public who helped shape the goals, objectives, and strategies in this Plan. ONC, the Department of Health and Human Services (HHS), and our federal partners will continue to take major strides to make healthcare more transparent, accountable, and accessible, while strengthening the patient-provider relationship.

From mobile apps to automation to machine learning—the future of healthcare is promising.

Donald W. Rucker, M.D.
***National Coordinator for Health Information Technology***

AT THE FOREFRONT OF

# Health IT

## Federal Health IT Vision and Mission

**FEDERAL HEALTH IT**

### VISION

A health system that uses information to engage individuals, lower costs, deliver high quality care, and improve individual and population health.

**FEDERAL HEALTH IT**

### MISSION

Improve the health and well-being of individuals and communities using technology and health information that is accessible when and where it matters most.

## Federal Health Principles

Through this Federal Health IT Strategic Plan, the government will work collaboratively to:

| | |
|---|---|
| **Put individuals first.** | Embrace person-centered care that values the whole individual, including their goals, values, culture, and privacy. |
| **Focus on value.** | Promote and pursue activities that improve health and care quality, efficiency, safety, affordability, equity, effectiveness, and access. |
| **Build a culture of secure access to health information.** | Support secure health information access, exchange, and use by individuals, caregivers, healthcare providers, public health professionals, and other stakeholders. |
| **Put research into action.** | Strengthen feedback loops between scientific, public health, and healthcare communities to efficiently translate evidence into clinical practice and improvement. |
| **Encourage innovation and competition.** | Support and protect innovation and competition in health IT that result in new solutions and business models for better care and improved outcomes. |
| **Be a responsible steward.** | Develop health IT policies through open, transparent, and accountable processes; use federal resources judiciously; and leverage the expertise of the private sector to provide technology and services to execute on these policies, as appropriate. |

## Strategic Plan Framework

This Plan includes four goals, each of which includes specific objectives and strategies. Taken together, these should not be viewed as sequential, but as interdependent with the collective purpose of improving the health of individuals, families, and communities.

### GOAL 1 Promote Health and Wellness

**Objective 1a:** Improve individual access to usable health information

**Objective 1b:** Advance healthy and safe practices through health IT

**Objective 1c:** Integrate health and human services information

### GOAL 2 Enhance the Delivery and Experience of Care

**Objective 2a:** Leverage health IT to improve clinical practice and promote safe, high-quality care

**Objective 2b:** Use health IT to expand access and connect patients to care

**Objective 2c:** Foster competition, transparency, and affordability in healthcare

**Objective 2d:** Reduce regulatory and administrative burden on providers

**Objective 2e:** Enable efficient management of health IT resources and a nationwide workforce confidently using health IT

### GOAL 3 Build a Secure, Data-Driven Ecosystem to Accelerate Research and Innovation

**Objective 3a:** Advance individual- and population-level transfer of health data

**Objective 3b:** Support research and analysis using health IT and data at the individual and population levels

### GOAL 4 Connect Healthcare with Health Data

**Objective 4a:** Advance the development and use of health IT capabilities

**Objective 4b:** Establish expectations for data sharing

**Objective 4c:** Enhance technology and communications infrastructure

**Objective 4d:** Promote secure health information practices that protect individual privacy

# Introduction

Health information technology (health IT) refers to the use of information and communication technologies in caring for patients, tracking diseases, protecting public health, conducting research, and improving the health of individuals and populations.[1] Health IT has evolved from being one tool in the healthcare toolbox to being an integral component of healthcare delivery, and it is critical to improving our nation's health system. As of 2017, 80 percent of physician offices and 96 percent of acute care hospitals use ONC-certified health IT.[2] Information exchange among healthcare providers, patients, and public health and research organizations is increasing rapidly.

## How Health IT is Used



Health IT is used in a variety of ways. Not only does it help to deliver care, treat illness, and improve health outcomes, but it also helps to address the social, economic, and environmental factors that influence the health of individuals and communities.

Individual patients—as well as their caregivers—use information technologies such as patient portals and patient-facing apps, and communication technologies like secure messaging and email, to access their health information, manage treatment of their

health conditions, and interact with healthcare providers. When it is available, patients can assess quality and cost information through health IT to make informed decisions about where to seek care. In addition to accessing information, patients and caregivers can use remote services (e.g., telehealth) to remain connected to care when they are unable to physically travel to an office or clinic, such as during a national public health emergency, when they are unable to use transportation, or if they live in an area with limited access to certain health services.

Healthcare providers[i] and healthcare organizations use health IT to input and reference patients' health information, make or adjust a diagnosis, make clinical decisions, and create care plans. In addition, providers use health IT to better engage (virtually or in person) with their patients and patients' caregivers to address patients' needs more quickly and enhance their experience of care.

Public health professionals, researchers, and community-based organizations increasingly use health IT outside of the traditional care setting to collect and assess health and human services data across individuals and populations. This includes using technology to exchange information and track public health[ii] activities (e.g., collecting data on reportable conditions) to address health and related social disparities, lower costs, and improve outcomes, particularly for racial and ethnic minorities, individuals of less privileged socioeconomic status, underserved

i Throughout this document, we use the terms "healthcare providers" and "providers" to mean "health care provider" as defined in section 3000(3) of the Public Health Service Act (42 U.S.C. 300jj): a hospital, skilled nursing facility, nursing facility, home health entity or other long term care facility, health care clinic, community mental health center (as defined in section 300x–2(b) (1) of this title), renal dialysis facility, blood center, ambulatory surgical center described in section 1395l(i) of this title, emergency medical services provider, Federally qualified health center, group practice, a pharmacist, a pharmacy, a laboratory, a physician (as defined in section 1395x(r) of this title), a practitioner (as described in section 1395u(b)(18)(C) of this title), a provider operated by, or under contract with, the Indian Health Service or by an Indian tribe (as defined in the Indian Self-Determination and Education Assistance Act [25 U.S.C. 450 et seq.]), Tribal organization, or urban Indian organization (as defined in section 1603 of title 25), a rural health clinic, a covered entity under section 256b of this title, an ambulatory surgical center described in section 1395l(i) of this title, a therapist (as defined in section 1395w–4(k)(3)(B)(iii) of this title), and any other category of health care facility, entity, practitioner, or clinician determined appropriate by the Secretary.

ii Throughout this Plan, "population health" refers to "the health outcomes of a group of individuals, including the distribution of such outcomes within the group" (Kindig and Stoddard, 2003; American Journal of Public Health). "Public health" refers to "the science and art of preventing disease, prolonging life, and promoting health through the organized efforts and informed choices of society, organizations, public and private, communities, and individuals" (Winslow, 1920).

rural populations, and sexual and gender minorities. Health IT also supports these stakeholders' roles in performing disease surveillance, case reporting and management, laboratory testing, and clinical data collection, as well as reporting outcomes during public health emergencies.

While also engaging in the above activities, payers use health IT to understand member health status, analyze cost data, and engage in care management activities. Life sciences and medical device companies use health IT to support research on new therapies and technologies, engage consumers, and coordinate the safe use of their products.

## The Federal Government's Role in Health IT



The federal government plays a far-reaching role in supporting the advancement of health IT and interoperability. Federal agencies are purchasers, developers, and regulators of health IT. They fund and contribute to health IT research, health IT development, and health IT deployment at the local, Tribal, state, and national levels. Federal agencies also facilitate coordination across the public and private sectors to align standards, encourage innovation, share best practices, and promote competition. In addition, they have the responsibility of developing regulations that impact health IT and providing oversight for its use.

Beyond actions aimed at strengthening the health IT infrastructure and lowering barriers to access, exchange, and use of EHI, federal agencies use health IT to achieve their missions and serve the nation every day. For example, agencies use EHRs, data systems, and other health IT to conduct public health surveillance and research, provide healthcare services to patients, and administer government benefit programs such as Medicare and Medicaid. The federal government, through implementing the strategies outlined in this Plan, will continue to play an essential role in the advancement of health IT in the U.S.

# Challenges in Healthcare

The goals, objectives, and strategies detailed in this Plan support the federal government's broader aim to mitigate many of the healthcare challenges that exist in the U.S. These challenges include increased healthcare spending, poor health outcomes, increased rates of mental illness and substance use disorders, and inconsistent access to care, technology, and information. Social determinants of health (SDOH)—the conditions in which people live, learn, work, and play[3] – can contribute to disparities. As federal agencies and other partners work together toward a more interoperable healthcare system, they should consider the ways in which health IT can address these challenges equitably and in ways that do not exacerbate existing disparities associated with SDOH.



## Increasing Healthcare Spending

National health expenditures were about $3.6 trillion in 2018 and are projected to reach nearly $6.0 trillion by 2027, with annual increases averaging about 5.5 percent.[4] As in previous years, this increase is projected to significantly outpace growth in the overall economy, and healthcare will continue to account for a larger and larger portion of gross domestic product.[5]

Population growth, an aging population, changing disease prevalence and incidence, increasing utilization of health services, and increases in prices and intensity of services all contribute to increased healthcare spending.[6] Notably, treatment of chronic disease and mental health conditions account for 90 percent of the nation's annual healthcare expenditures.[7]

## Poor Health Outcomes

The U.S. health system can improve in managing chronic disease and assuring equity in access and health outcomes. The country's high disease burden and mortality rates are due in part to a greater prevalence of chronic conditions such as diabetes and heart disease.[8] Further, the U.S. continues to have racial and ethnic disparities in health outcomes and in access to and use of preventative care.[9]

## Increasing Rates of Mental Illness and Substance Use Disorders

Increasing rates of mental illness and substance use disorders are major contributors to decreased life expectancy in the U.S. Rates of depression and suicide are increasing, and overdoses from opioids and other drugs and alcohol-related deaths continue to rise.[10] Rural communities, which lack access to services due to fewer resources (including mental/behavioral health and other specialty providers) or means of transportation, are especially affected by mental illness and substance use.[11]

## Access to Care

Health insurance coverage is a significant determinant of access to healthcare.[12] As health insurance premiums rise, the number of uninsured also rises. [13,14] Being uninsured or underinsured increases the likelihood that people will avoid care and face financial hardships when care is received.[15] Being uninsured can also lead to higher uncompensated spending as healthcare providers take on costs to treat uninsured patients who are unable to pay for their care.[16]

The high cost of health services can hinder access to care, even among Americans with health insurance.[17] The insured may face significant out-of-pocket spending from deductibles, co-pays, and inadvertent use of out-of-network healthcare providers. Access to care can be limited by a lack of available healthcare providers within an insurer's network or within geographic reach of individuals and their families. Barriers to entry and competition in healthcare can exacerbate issues of access by increasing prices associated with products and services.[18,19]

## Access to Technology

The U.S. has made significant strides to increase broadband access in recent years. More than 94 percent of the population now live in an area with access to both high-speed internet and Long Term Evolution (LTE) mobile service, and 90 percent of Americans use the internet. However, access to technology remains a challenge across the U.S., as more than one-quarter of Americans do not use broadband internet access at home.[20]

Low income, Tribal, and rural populations are less likely to have access to broadband internet service, and these groups, along with racial and ethnic minority populations, are therefore less likely to use broadband internet service than other demographic groups.[21] Lack of access to broadband can exacerbate existing health disparities by creating a barrier to the range of technologies that support cost-effective and high-quality care.[22]

Furthermore, people without access to smartphones cannot experience the

benefits of personalized health apps that can enable users to manage their health. Available technology may not be made in ways that are accessible for people with disabilities.

## Access to Electronic Health Information

Application programming interfaces (APIs) enable phones, computers, and other technologies to connect and share information in real-time. Industries like banking, retail, and education use APIs to allow individuals to manage their finances, track packages, and even complete online courses from the convenience of their smartphones. Healthcare is one of the only industries where many individuals do not have easy access to their electronic information using mobile apps.

In addition, while most hospitals and provider practices use technology that would allow patients and caregivers to view and download health information, a nationally representative survey indicated that only 51 percent of individuals were offered access to their online medical records by their providers or payers in 2018. This percentage is even lower among people who have no insurance and lower-income and education levels.[23]

Even when patients have electronic access to their EHI, they are not always able to use it effectively—a critical barrier to improving health through increased access to information is poor health literacy. Too often, patients and caregivers are unable to realize the full benefits of access to EHI because they may not understand what the information means or have the tools to display information in a way that enables them to make informed decisions. This issue is especially important as individuals are increasingly expected to take a larger role in managing their own health and care. As health IT expands, individuals must be empowered with new health literacy competencies, including an understanding of data sharing, consent, and how privacy, security, and access standards apply to an individual's EHI.

# Opportunities in a Digital Health System

The healthcare system is rapidly advancing in a direction that amplifies patient voices, improves value, drives interconnectedness of EHI and new technologies, reduces provider burden, and protects patient privacy and data security. The strategies in this Plan reflect the ways in which federal partners and collaborators can leverage health IT to bolster efforts across each of these areas of opportunity, which are detailed below.

## Opportunities in a Digital Health System

- Empowering Patients
- Moving to Value-Based Care
- Advancing Interoperability
- Promoting New Technologies
- Reducing Regulatory and Administrative Burden
- Protecting Privacy of Health Information
- Securing Health Information

## Empowering Patients

Healthcare continues to move toward person-centered care. Individuals can take a more active role in their care by improving their health behaviors, self-managing chronic conditions, engaging in shared decision-making, and using bi-directional exchange of data to communicate with healthcare providers. Providing patients and caregivers with more robust health information, including quality and cost information, can further help them manage their health and exercise control and choice in their care.

Policies promoting use of secure, standards-based APIs,[iii] including regulations established to implement the 21st Century Cures Act, will encourage the development of health apps that provide access to and use of data in EHRs to better support person-centered care and patient empowerment. Additional examples of federal activities to encourage these efforts include:

- HHS encouraging payers and healthcare organizations to make price information available through regulations and policies;
- The Federal Trade Commission ensuring that health IT companies comply with antitrust and consumer protection laws to promote and protect competition and safeguard the privacy and security of consumers' EHI; and
- The HHS Office for Civil Rights (OCR) announcing that it has settled its eighth enforcement action in its Health Insurance Portability and Accountability Act (HIPAA) Right of Access Initiative (OCR announced this initiative as an enforcement priority in 2019 to support individuals' right to timely access to their health records at a reasonable cost under the HIPAA Privacy Rule).[24]

---

iii Published to the Federal Register on May 1, 2020, the API certification criterion in ONC's 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program final rule will require the use of the Health Level 7 (HL7®) Fast Healthcare Interoperability Resources (FHIR®) standard Release 4 and references several standards and implementation specifications adopted in § 170.213 and § 170.215 to support standardization and interoperability. This certification criterion will help align industry efforts around FHIR Release 4 and advance interoperability of API-enabled "read" services for single and multiple patients. Also published to the Federal Register on May 1, 2020, the CMS Interoperability and Patient Access final rule requires CMS-regulated payers to implement and maintain a secure, standards-based (HL7 FHIR®) Patient Access API.

## Moving to Value-Based Care

In addition to patient empowerment, the U.S. healthcare system is continuing progress toward value-based care, in which payment is linked to measures of provider performance and patient outcomes and is based on evidence-based practices and guidelines. In 2018, approximately 61 percent of public and private healthcare spending was part of a value-based payment or pay-for-performance model, up from 23 percent in 2015.[25,26] This movement is likely to continue and perhaps accelerate due to projected increases in healthcare spending.

The shift to value-based care has created new incentives for providers in a variety of settings to improve quality and patient outcomes. These incentives place greater importance on addressing SDOH and patient health behaviors and engaging in preventive care, population health management, and disease management.

Success in value-based payment models is contingent in part on healthcare provider and payer access to and exchange of robust population-level data that allows them to better understand the needs of their patients, stratify patients by risk, engage in patient outreach, and track outcomes over time. Health IT — such as registries and other data systems—plays a fundamental role in the collection, reporting, and analysis of data needed to support value-based care.

## Advancing Interoperability

EHRs are widely used in physician practices, hospitals, and health systems across the U.S. As a result, the federal government and the private sector have increased their focus on improving interoperability—the secure exchange of EHI with, and use of EHI from, other health IT without special effort on the part of the user.[27]

The federal government promotes interoperability of EHI through several programs and policies. For example, the Centers for Medicare & Medicaid Services (CMS) includes health IT-focused incentives in programs like Medicare's

Promoting Interoperability Program (formerly the Medicare and Medicaid EHR Incentive Programs, or Meaningful Use) and the Merit-Based Incentive Payment System. In 2020, CMS finalized a rule to advance interoperability by increasing the seamless flow of EHI; reducing burden on patients, caregivers, and healthcare providers; and fostering innovation by unleashing data for researchers and innovators.[28]

Also, in 2020, ONC finalized a regulation (Cures Act Final Rule) designed to drive interoperability of EHI by supporting the use of Health Level Seven's (HL7®) Fast Healthcare Interoperability Resources (FHIR®) standard for APIs.[29] The use of FHIR®, which was also encouraged by federal agencies like the Agency for Healthcare Research and Quality, ONC, CMS, Centers for Disease Control and Prevention, and the National Institutes of Health, fosters increased data sharing between patients, healthcare providers, payers, researchers, and other healthcare entities. As required in the 21st Century Cures Act, ONC's Cures Act Final Rule addresses information blocking, which is generally described as a practice that is likely to interfere with the access, exchange, or use of EHI.[30]

While programs like Promoting Interoperability focus on a subset of the healthcare community, the federal government recognizes the need for investment in and adoption of interoperable health IT by researchers and providers in all care settings (e.g., primary care, long-term and post-acute care, physical therapy, behavioral health, emergency medical services, and hospitals) so they can fully participate in robust EHI exchange.

The private sector recognizes the value of interoperable EHI. Spurred by ONC and CMS regulations, private entities are increasingly using standards-based APIs to develop tools that provide patients, caregivers, and providers with data to promote information sharing. Additionally, participation in health information exchanges (HIEs) and health information networks (HINs) continues to grow. This signifies continued investment in information sharing and collaboration among stakeholders in this sector.

The public and private sectors play a key role in refining existing IT functionalities and creating entirely new kinds of data exchange strengthened by interoperability. While much progress has been made, the ongoing process of improving interoperability will demand continued investigation and advancements in the ways health IT systems interact, and how they access, exchange, and use data.

## Promoting New Technologies

The public and private sectors are continuously developing new technologies to improve access to care and health information. Increased computing power and innovation are propelling new algorithms, analytic capabilities, and machine learning (ML) capabilities from what were once limited, conceptual uses to more everyday uses. Remote monitoring technologies such as wearables and web-enabled medical devices also continue to advance as healthcare providers and patients become more comfortable using such technologies.

Improved broadband access is another driver of adoption and use of new technologies in healthcare. Telehealth, for example, expands services to populations, such as those in rural areas with a shortage of healthcare providers, or to urban residents who lack the transportation or job flexibility needed to visit providers during the traditional workday.

In response to the COVID-19 pandemic, efforts to remotely deliver care and perform research accelerated. Clinical researchers collecting data for studies and providers caring for patients adapted to the pandemic through health IT-enabled telehealth and remote engagement tools. The trend toward greater virtualization in healthcare is likely to continue beyond the pandemic, and this demand will likely heighten the call for greater infrastructural changes to support health IT use and for continued care innovation.

These new technologies, along with existing claims and EHR data, mean the volume of health-related data being generated has never been greater. Volumes of data can now be processed, analyzed, and exchanged almost

instantaneously, and live, high-resolution video can be sent and received without interruption. Where appropriate, the ability to leverage this "big data" for research, discovery, and clinical validation at the point of care through collection, organization, analysis, and interpretation represents both a challenge and a significant opportunity for healthcare.

## Reducing Regulatory and Administrative Burden

Congress emphasized in the 21st Century Cures Act the importance of easing regulatory and administrative burden associated with the use of health IT and directed ONC and CMS to develop strategies for reducing this burden. While interoperable health IT has the potential to improve patient care and outcomes, current system designs can be burdensome to users—including both providers and administrative staff—in healthcare settings. Much of the burden on healthcare providers is a result of EHRs being originally designed primarily to support reimbursement and financial processes, rather than patient care. For example, activities such as prior authorization and clinical documentation, which in many instances have not been built into EHR workflows, can cost providers time that could otherwise be spent with patients.[31]

Health IT has the potential to help minimize burden on healthcare practices by increasing automation of administrative transactions (e.g., prior authorizations) and easing quality measure reporting and other data submission requirements. Providers' return on investment in health IT can be maximized when it is adequately incorporated into workflows and when it automates manual administrative processes. The return on investment can incentivize providers to make the necessary resource allocations to adopt and sustain these systems.[32]

## Protecting Privacy of Health Information

The most sensitive information about a person is often their health information. Government agencies, healthcare providers, health IT developers, researchers, and other stakeholders have been working together to implement mechanisms for strengthening health information privacy as more data are generated and exchanged through interoperable health IT.

Despite implementation and use of robust privacy practices in healthcare as required by federal and state regulations, EHI can still be misused or inappropriately disclosed in ways that may harm consumers. Federal partners and providers play an important role in educating individuals and their caregivers on data practices and safety risks associated with uses of electronic data. They can also educate patients on how to meaningfully consent to the use of their data[iv].

## Securing Health Information

The confidentiality, integrity, and security of EHI that is created, transmitted, and stored using health IT is a priority for all stakeholders. This is especially true considering the healthcare industry's move toward cloud-based storage, where data on large populations of patients is held in one place. The strategies included throughout this Plan are predicated on implementation of robust mechanisms for securing information from ransomware and other cybersecurity risks, while ensuring that information is accessible and usable when and where it is needed.

iv Meaningful consent, or consent, in this document is defined as an informed decision made by a patient (or caregiver as a proxy) that allows them to determine if their health information will be released, under what circumstances the release will take place, and by whom. More information on what defines consent can be found here: https://www.healthit.gov/topic/meaningful-consent-overview

# Goals, Objectives, and Strategies

This section describes the 2020-2025 strategic goals and objectives, and lists strategies for meeting each objective. Appendix B describes how federal agencies can benchmark progress and measure success over time.

| | |
|---|---|
| GOAL 1 | Promote Health and Wellness |
| GOAL 2 | Enhance the Delivery and Experience of Care |
| GOAL 3 | Build a Secure, Data-Driven Ecosystem to Accelerate Research and Innovation |
| GOAL 4 | Connect Healthcare with Health Data |

GOAL 1:

# Promote Health and Wellness

The use of health IT must go beyond the sharing of EHI between healthcare providers and the enabling of administrative tasks. Health IT should be leveraged to empower individuals, address patients' full range of health needs, promote healthy behaviors, and facilitate better health outcomes for individuals, families, and communities.

## Objective 1a: Improve individual access to usable health information

A key aspect of person-centered care is empowering individuals by providing them access to their health information. Health information access allows patients to become more engaged in their care and management of their conditions, and it alleviates strain on caregivers who manage the care of their loved ones.[33] Improving access to EHI—especially for populations in rural areas, persons with disabilities, racial and ethnic minorities, and those with low socioeconomic status—should be prioritized if we are to achieve equitable care outcomes for all. In addition, patients and caregivers should have access to resources that allow for improved health IT literacy so they understand how their health data may be used, how to choose safe and secure health apps, and how to set their privacy preferences.

**Strategies**

- **Enable individuals to access their health information** by ensuring that they can view and interact with their data via secure mobile apps, patient portals, and other technologies.
- **Promote greater portability of EHI** through standards-based APIs and other interoperable health IT that permit individuals to readily send and receive their EHI across various platforms.

- **Improve access to smartphones and other technologies** needed to attain and use EHI, especially among at-risk, minority, rural, disabled, and Tribal populations.
- **Build the evidence base on the use of EHI,** including the types of information that will benefit individuals most and the best ways to present information to patients and caregivers.
- **Improve consumer health IT literacy** by developing educational resources related to choosing and using secure available technologies that incorporate privacy protections.

## Objective 1b: Advance healthy and safe practices through health IT

A new ecosystem of wearable technologies, patient-facing applications, and other digital tools promises to expand access to services and infuse the care of individuals and populations with new health insights.[34] When successfully integrated into clinician workflows, these tools can help providers address the needs of individual patients during the course of care, as well as the needs of populations during public health emergencies and other disasters.

**Strategies**

- **Promote healthy behaviors and self-management** through patient-facing apps and wearable technology to allow individuals to track physical activity, share and compare health and fitness data, collaborate with care team members, adhere to care plans, and make informed lifestyle choices.
- **Leverage individual- and population-level data** to prepare for, respond to, and recover from disasters; inform and monitor public health activities; improve quality of life; and address disease occurrence and preventable deaths.
- **Advance the use of validated evidence-based digital therapeutics**[v] to help prevent, manage, and treat conditions through the help of smartphones, tablets, and other personal devices.

---

v Digital therapeutics are a subset of digital health tools that deliver evidence-based therapeutic interventions to patients that are driven by high quality software programs.

## Objective 1c:
## Integrate health and human services information

Integrated health and human services data are necessary for providing person-centered healthcare and human services, and for understanding and addressing SDOH at the individual and population levels. Moreover, a health IT infrastructure that can facilitate secure, bi-directional exchange of data at the population level is key to improving outcomes and effectively administering social programs. Today, there is a lack of standardization of human services data, making integration of health and human services data between the various federal, state, territorial, regional, and local agencies and tribes a challenge.[35] Standardization and integration of data will enable agencies to more efficiently collaborate and implement community programs.

**Strategies**

- **Advance standardization and interoperability of SDOH and social service data** across federal programs through the use of standard health IT terminologies, definitions, and methods for data collection and exchange.
- **Capture and integrate SDOH data into EHRs and clinical decision support** to inform care delivery (including referrals and integration of medical and social care) and to address health disparities in a manner that is ethical and consistent with routine patient care.
- **Promote engagement between providers** across the care continuum, state, Tribal, territorial, and local agencies, and community-based programs to leverage existing health IT infrastructure and develop communities' data and health IT capacity.
- **Modernize and strengthen communities' health IT infrastructure** to improve care and effectively administer social programs by facilitating bi-directional communication and secure exchange of data across healthcare, public health, and human services settings.
- **Foster greater understanding of how to use health IT**, and assess available health IT solutions, to address unmet health and social needs for individuals and communities.

GOAL 2:

# Enhance the Delivery and Experience of Care

Federal partners and other stakeholders should continue to leverage innovative health IT solutions to enhance the delivery and experience of care for patients and providers. Programs and activities should be designed in ways that ensure organizations are exchanging interoperable data in a useful way, that data is available in real-time and is valuable to the requestor (e.g., data is accurate, usable by the recipient, and sent with context), and that health IT appropriately aids in the overall patient healthcare experience.

## Objective 2a:
## Leverage health IT to improve clinical practice and promote safe, high-quality care

When built on a broad definition of patient safety—one that includes privacy, security, and equity—and on data that is accurate and connected across the care journey of each individual, health IT tools can support high-quality care. For example, such technologies can be leveraged to improve safety by reducing unintended care variability between patients. They can also support care transformation at the population level through quality measurement and value-based care. Effectively leveraging data to transform clinical practice involves integration between important data systems (e.g., prescription drug monitoring programs) and continued development of advanced capabilities for patient matching.

**Strategies**

- **Promote interoperability and data sharing through widely-accepted standards** to ensure health information is available across care settings for use in patient care,

public health, research, and emergency and disaster preparedness, response, and recovery.

- **Continue efforts to establish identity solutions** within and across data systems that improve patient matching.
- **Optimize care delivery by developing and applying advanced capabilities that leverage modern computing tools to support** evidence-based practices and principles of safe software development and use.
- **Support expanded use of health IT for safer clinical practices** to prevent and address adverse events by building automated patient safety and rapid reporting features into the health IT infrastructure.
- **Reduce diagnostic error and tailor care through precision medicine** to assist in the diagnosis of disease and targeting of treatment to individual patients using real-time data.
- **Use electronic clinical quality measure (eCQM) data** to optimize healthcare providers' and researchers' abilities to assess quality and outcomes.

## Objective 2b:
## Use health IT to expand access and connect patients to care

Leveraging existing standards and developing new health IT capabilities, methods, and approaches to improve usability and understandability of health information to expand access to care and real-time health information are important to ensuring all patients can be connected to care when and where they need it. This access can help reduce health disparities that are currently exacerbated due, in part, to resource shortages and inequitable access to services, and can also support public health preparedness. The recent COVID-19 pandemic highlighted the importance of real-time surveillance and a strong health IT infrastructure for connecting researchers, providers, and patients in times of emergency.[vi]

vi Public health emergencies or natural disasters can potentially harm health IT infrastructure, though this risk can be mitigated through the use of emergency preparedness tools.

### Strategies

- **Expand care beyond traditional clinical settings** by bolstering access to remote monitoring, surveillance software, telehealth, and other IT-enabled mobile services.
- **Use digital engagement technologies beyond portals** to connect patients more easily with their providers, enabling real-time collaboration and self-scheduling.
- **Sustain collaborative activities** necessary to ensure public health surveillance, preparedness, and response.

## Objective 2c: Foster competition, transparency, and affordability in healthcare

Affordability of healthcare services and treatment remains a key barrier to accessing high-quality care for many individuals. Price and quality transparency—including the availability of this information to patients and providers in real-time—improves patient decision-making, reduces barriers to entry for health IT developers, encourages competition in healthcare, and helps drive down costs.[36] Furthermore, competition promotes consumers' ability to choose from a variety of health products and services based on which best meet their needs.

### Strategies

- **Encourage pro-competitive business practices** that allow individuals to easily choose from and use health apps and other health IT tools without special effort.
- **Support efforts to merge administrative and clinical data streams** to enable access to real-time financial data at the point of care.
- **Make care quality and price information available** to individuals in an accessible, easily understandable format.
- **Educate consumers on the availability of quality and price information** and how to use this information to shop for care based on value.

## Objective 2d:
## Reduce regulatory and administrative burden on providers

Clinicians spend a significant amount of time entering patient data and other documentation in EHRs for the purposes of reimbursement; quality measure, public health, and clinical registry reporting; and prior authorization and referral submission. The paperwork and box-checking that can be associated with these activities is a hindrance to the delivery of high-quality care; it leaves healthcare providers feeling burned out and reduces the amount of time they have to interact with patients.[37] Health IT developers play an important role in reducing health IT-related burdens on providers and administrative and IT staff.

**Strategies**

- **Simplify and streamline documentation** required of healthcare providers using health IT at the point of care while ensuring that quality standards are upheld.
- **Promote the use of evidence-based automated tools** to streamline provider workflows, encourage electronic provider-to-provider data exchange, and improve efficiency.
- **Monitor and seek to optimize the impact of health IT on provider workflows** to better understand the role of health IT in the provision of care and the minimization of unnecessary data entry and other administrative steps.
- **Promote greater understanding of applicable regulations and practices** to improve compliance by providing educational resources and tools to healthcare providers and health IT developers.
- **Harmonize provider data collection and reporting requirements** across federal agencies.
- **Streamline processes to reduce the effort required by healthcare providers and health systems** to generate, input, and share EHI.

## Objective 2e:
## Enable efficient management of health IT resources and a nationwide workforce confidently using health IT

Health IT requires a significant amount of resources to adopt and maintain, which can place an extra burden on providers and other healthcare staff.[38] As health IT systems evolve, stakeholders should focus on expanding current—or creating new—training programs to develop a capable health IT workforce (e.g., information technology professionals, providers, public health professionals, informaticians, researchers, and others) with knowledge of EHRs, data sharing, informatics, and other health IT topics.

**Strategies**

- **Implement education and training programs** to build a strong, cross-functional health IT workforce that can support IT across healthcare settings, especially in rural areas.
- **Continue to invest in the health IT workforce** by allocating greater resources to train, recruit, and retain workers and to support adequate job opportunities.
- **Engage clinicians and staff in development and usability testing** of health IT products to ensure products and tools support clinical workflow and care delivery.
- **Leverage health IT expertise** across professionals and care settings by promoting use of collaborative models and networks.

GOAL 3:

# Build a Secure, Data-Driven Ecosystem to Accelerate Research and Innovation

An integrated ecosystem that respects individual privacy and securely collects information from multiple sources is critical to unlocking the power of data. With access to data, technology and analytic advancements like ML and forecasting have the potential to transform care and improve health. Further, by providing access to data stored in EHRs and apps, secure, standards-based APIs can empower individuals, healthcare providers, payers, public health professionals, researchers, and technology companies working together to advance research and management of health for patients and populations.

## Objective 3a: Advance individual- and population-level transfer of health data

Vast amounts of individual- and population-level health and human services data are collected every day. Examples include individuals using mobile phones and wearable devices to track their personal health data; public health professionals and government agencies collecting data about SDOH to inform public programs; and researchers collecting study data to better understand how to treat disease. Enabling researchers, individuals, providers, and payers to safely provide data for the purpose of research and healthcare improvement through secure, standards-based APIs will spur collaboration and innovative uses of data and technology.

**Strategies**

- **Improve harmonization of data elements and standards** in collaboration with nationally-recognized standard setting organizations by leveraging existing—or creating new—common vocabulary sets and by improving the consistency, integrity, and quality of data.
- **Bolster secure access to large datasets** containing health information for use in research.
- **Enable individuals to securely provide data via apps and other health IT for research** using a consent process that is consistent with individuals' preferences to participate in research.
- **Assess availability of health and human services data and streamline the appropriate collection, submission, and sharing of this data** between federal, state, Tribal, and local systems to enable population health planning; analysis of quality and patient outcomes across settings and programs; and clinical research.
- **Foster data governance that reinforces privacy protections and a secure, unified platform** supporting innovative uses of shared data.

## Objective 3b:
## Support research and analysis using health IT and data at the individual and population levels

EHI can be leveraged to support research and innovation for disease prevention and quality improvement. Partners should continue to work together to support research and innovations like artificial intelligence (AI)/ML, which can advance value and care delivery across the care continuum. Developers, health researchers, public health professionals, and informaticians should collaborate with the security research community to ensure innovations in health IT align with standards of individual privacy, safety, efficacy, and equity.

**Strategies**

- **Investigate the impact of use of health IT,** including ML and other non-EHR technologies, on patient care, safety, and outcomes.
- **Broaden use of new technologies and analytic approaches** like ML and predictive modeling to harness the power of integrated data for improving quality and decision making.
- **Increase use of health IT capabilities** to conduct research and integrate into other data sources remotely or virtually, as appropriate.
- **Advance research into targeted therapies** through real-time data and ML intelligence informed through public health principles, data, and research.
- **Identify and implement health IT capabilities** that support rapid sharing of disease surveillance data.
- **Ensure that research conducted reflects the diversity of the U.S.** so that findings can be applied across populations.

GOAL 4:

# Connect Healthcare with Health Data

Health IT that connects healthcare with health data using standards-based APIs will support strategies to meet the goals and objectives in this Plan. The federal government and other stakeholders can advance interoperability and support transparent, trusted, and seamless connectivity of EHI by continuing to champion the use of standards-based APIs, fostering partnerships to align standards and activities, and reducing burden on providers. Moreover, by supporting and streamlining policies, the government can establish greater consistency across the federal regulatory landscape and improve how the private sector can share in advancing the country's interoperability goals.

## Objective 4a:
## Advance the development and use of health IT capabilities

One of the ways federal agencies can support the advancement of health IT capabilities is by reducing barriers to entry for health IT developers. With rapid innovation and as more products become available, healthcare providers need clear and easy ways to stay abreast of the continually evolving digital health landscape. Similarly, wider use of new capabilities among all stakeholders depends on their confidence and trust in health IT.

**Strategies**

- **Promote a digital economy** that leverages research and development and that can lead to the development of new business models in healthcare while protecting individual privacy.

- **Reduce financial and regulatory barriers** that prevent new health IT developers from entering and competing in the health IT marketplace.
- **Promote trustworthiness of health IT** by enforcing information blocking, privacy, and security laws when applicable.
- **Encourage transparency on health IT product usability** via industry reporting programs, consumer reviews, and other reports.
- **Promote provider adoption and use of health IT** by encouraging its use in federal programs, increasing investments in health IT, and making resources available to support health IT adoption and use.
- **Enable portability of EHI and competition in the health IT sector** to help reduce costs associated with transitioning to new EHR systems and other health IT.
- **Continue collaboration across public and private sectors** to adopt and advance nationally-supported standards, implementation specifications, and certification criteria, including the United States Core Data for Interoperability (USCDI), Interoperability Standards Advisory (ISA), and FHIR®.
- **Follow safety and user-centered design principles in the development of health IT** to help ensure tools are safe, accessible, usable, and that solutions address the needs of the users for whom they are developed.
- **Implement mechanisms of data governance and provenance** to promote individual privacy, safety, security, and accountability for patient records, and to improve data quality through all stages of care and uses of health IT.

## Objective 4b:
## Establish expectations for data sharing

The information blocking provision in the 21st Century Cures Act, as well as the information blocking section in ONC's Cures Act Final Rule, have provided a means for addressing anti-competitive practices that could impact the access, exchange, or use of EHI. The combination of the current state of health IT and the structure and conditions of healthcare markets creates incentives to limit access to EHI in ways that significantly limit its value to patients and providers. The federal government, through implementation of this Plan, seeks to continue enabling individuals to have seamless

and secure access to their EHI, which will allow them to more fully participate in the mobile app economy.

Healthcare providers, administrative and IT staff, researchers, and health IT developers may not understand what is required for compliance with federal and state privacy laws. Federal agencies can support transparency and a better understanding of health IT regulations by sharing user-friendly compliance resources, and by collaborating with experts to implement existing best practices to assure privacy and security.

**Strategies**

- **Address information blocking practices** taken by healthcare providers, developers of certified health IT, and HIEs/HINs.
- **Develop educational resources** for providers and others to improve understanding of complex topics regarding information exchange (e.g., information blocking and patient consent management) and how to comply with regulations.
- **Support a common agreement for nationwide exchange of health information** that drives interoperability, supports federal agencies' strategies, and promotes effective governance.
- **Eliminate unnecessarily restrictive data sharing practices** and use nationally-supported standards, implementation specifications, and certification criteria to promote data liquidity.

## Objective 4c:
## Enhance technology and communications infrastructure

The health IT and communications infrastructures in the U.S. vary by location. While access to smartphones and broadband is increasing overall, gaps remain for some populations and regions. Disparities in health IT capabilities and access separate rural and underserved areas from those with greater connectivity and service options. Small practices and rural healthcare providers are often unable to adopt the advanced health IT used by larger health systems, due to constrained resources. To address these disparities, stakeholders should continue to improve the health IT and communications infrastructure across the U.S.

**Strategies**

- **Assess current and expected health IT and broadband infrastructure** needs and gaps.
- **Harmonize and streamline federal activities to enhance and expand broadband access and communication infrastructure** for all providers, especially those in rural and underserved areas that are less likely to have access to high speed internet.
- **Deploy secure, cloud-based services** that comply with federal standards to modernize and streamline the way EHI is stored and exchanged when held by a federal agency.
- **Support adoption of infrastructure needed for telehealth** to reach patients outside traditional care settings.
- **Advance equitable access to technology and broadband** for individuals, families, and communities.

## Objective 4d:
## Promote secure health information practices that protect individual privacy

As capabilities for EHI access, exchange, and use continue to expand, federal partners should prioritize protecting individuals' health data from misuse and threats like cybersecurity attacks and fraud. Patients and caregivers must understand how health data may be used and how to specify their privacy preferences. Keeping EHI secure, preventing breaches and fraud, and curtailing other harms is crucial for maintaining patients' trust of their healthcare providers and in health IT.

**Strategies**

- **Integrate privacy and security considerations into the design and use of health IT, including AI/ML,** to promote a culture of privacy and security and protect individual- and population-level data from cybersecurity attacks, fraud, misuse, and other harms.
- **Mitigate patient data security risks by developing guidance** for API and app developers on securely sharing patient data via standards-based APIs.
- **Implement privacy and security mechanisms as appropriate to the sensitivity of the information** to protect individuals' health data, including multi-factor authentication and encryption embedded in APIs, tools that enhance patient matching accuracy, and other technologies that enhance privacy and security.
- **Provide guidance and technical assistance on policies and regulations** at the federal, state, and Tribal level that pertain to the security and privacy of EHI and enforce such rules.
- **Promote equitable access to tools and resources** that protect patients from discrimination, stigma, and exploitation based on their health information.
- **Increase patient understanding of and control over their data** including building awareness of potential secondary uses of data and how to safely and effectively access and use their EHI and make informed decisions concerning consent and data exchange.

APPENDIX A.

# About this Strategic Plan

In developing this Plan, ONC collaborated with more than 25 federal organizations involved in health IT. ONC also conducted research and considered feedback from its Health IT Advisory Committee. Following a public comment period, ONC, in collaboration with its federal partners, considered all comments received and incorporated this input into the final version of this Plan.

This Plan considers the current state of health IT and the ideal future state for individuals, populations, caregivers, healthcare providers, public health professionals, payers, researchers, developers, and innovators. It also considers challenges in defining and implementing strategies. The broad scope of this Plan reflects the diverse roles federal government agencies play in health IT.

**This Plan is motivated by:**

- the constant evolution of healthcare technologies such as mobile and web apps and medical devices;
- the movement toward improved access, exchange, and use of health information to inform healthcare decisions at the individual and population levels and to advance patient-centered care;
- the public and private sectors' increasing reliance on interoperable health IT and EHI;
- the progress and lessons learned from investments in health IT and its use by federal agencies and federally-run care delivery organizations; and
- the need to improve health IT equity and to reduce disparities in access and use of health IT.

**This Plan is intended to serve as a roadmap for federal health IT initiatives and activities, and as a catalyst for activities in the private sector.**

## The Plan may be used to:

| | |
|---|---|
| Prioritize Resources | Within an agency, the Plan is a valuable tool to assess and prioritize potential initiatives, programs, and investments. Using the Plan to prioritize activities can help ensure efficient use of agency resources. |
| Align and Coordinate Efforts | The Plan is intended to drive alignment and organization of priorities and activities across different agencies. It may help agencies identify opportunities to coordinate and collaborate with public and private partners. |
| Signal Priorities to the Private Sector | Though the Plan only applies to the actions of federal agencies, the Plan can provide signals to the private sector on the direction of the federal government, which may guide coordination and investment decisions. |
| Benchmark and Assess Progress | The Plan includes indicators of success that can be used to benchmark and assess progress towards meeting the Plan's mission. These indicators may be used to provide the public with a better understanding of the federal government's efforts to improve healthcare using interoperable EHI. |

Case 1:25-cv-10670-FDS Document 13 Filed 04/17/25 Page 619 of 894



APPENDIX B.

# Measuring and Communicating Progress

By design, this Plan is broad in scope. It includes strategies that span many federal departments, agencies, and offices. Federal organizations' actions to implement the *2020-2025 Federal Health IT Strategic Plan* will focus on meeting the EHI needs of individuals, populations, caregivers, healthcare providers, public health professionals, payers, researchers, developers, and innovators.

ONC, in collaboration with federal partners, will measure progress in the following areas. These cross-cutting areas aim to promote modern health IT for all stakeholders and to address barriers to the access, exchange, and use of EHI.

## Areas Measured for Federal and Industry-Wide Progress

- Use secure, standards-based APIs to provide electronic access to health information
- Promote Fast Healthcare Interoperability Resources (FHIR®) across federal organizations and the populations they serve for a variety of use cases
- Implement and expand United States Core Data for Interoperability (USCDI) data classes and elements for a variety of federal use cases and the populations they serve
- Deter information blocking practices through federal authorities and investments
- Encourage data exchange across networks at national and community levels

Work in these areas will occur primarily at an organizational level, whereby agency actions align to this federal health IT strategy. Federal actions can include, but are not limited to, standards alignment, regulations, oversight, health IT deployment, and industry coordination.

During the implementation of this Plan, ONC will report on health IT progress measures, actions taken, and describe barriers to connect healthcare with health data. ONC will communicate federal and industry-wide progress in its annual report to Congress on health IT adoption and use.

Individuals, populations, caregivers, healthcare providers, payers, public health professionals, researchers, developers, and innovators increasingly rely on the access, exchange, and use of EHI to connect healthcare with health data. They can use health IT as a catalyst to further support:

- Health and wellness;
- The delivery and experience of care; and
- A secure, data-driven ecosystem to accelerate research and innovation.

Collaboration across federal organizations, private industry, and other stakeholders can accelerate progress in support of the Plan's goals and objectives. Federal partners, in collaboration with other stakeholders, will work to operationalize the Plan's strategies and related activities through an equitable and sustainable lens.

# Appendix C. Federal Contributors

ONC collaborated with the federal organizations below, which included various components within federal departments and agencies. More than 25 federal organizations contributed to the development of this Plan.

## Appendix D. List of Acronyms

| Acronym | Description |
|---|---|
| AI | Artificial intelligence |
| API | Application programming interface |
| CMS | Centers for Medicare & Medicaid Services |
| EHI | Electronic health information |
| EHR | Electronic health record |
| FHIR® | Fast Healthcare Interoperability Resources |
| HHS | Department of Health and Human Services |
| HIEs | Health information exchanges |
| HINs | Health information networks |
| Health IT | Health Information Technology |
| HIPAA | Health Insurance Portability and Accountability Act of 1996 |
| HL7 | Health Level Seven International |
| ISA | Interoperability Standards Advisory |
| ML | Machine learning |
| OCR | Office for Civil Rights |
| ONC | Office of the National Coordinator for Health Information Technology |
| SDOH | Social determinants of health |
| USCDI | United States Core Data for Interoperability |

# References


1 "WHO Fact Sheet." *WHO.int*, World Health Organization, Jun. 2015, https://www.who.int/tb/publications/ehealth_TB.pdf?ua=1.

2 "Health IT Quick Stats." *HealthIT.gov*, The Office of the National Coordinator for Health Information Technology. June 17, 2019. dashboard.healthit.gov/quickstats/quickstats.php.

3 "Social Determinants of Health: Know What Affects Health." *CDC.gov*, Centers for Disease Control and Prevention. Jan. 2019. https://www.cdc.gov/socialdeterminants/index.htm.

4 Keehan SP, Cuckler GA, et al. "National Health Expenditure Projections, 2019-28: Expected Rebound In Prices Drives Rising Spending Growth." Health Affairs. March 24, 2020. https://doi.org/10.1377/hlthaff.2020.00094.

5 "NHE Fact Sheet." *CMS.gov*, Centers for Medicare & Medicaid Services. April 26, 2019. www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html.

6 Dieleman JL, Squires E, Bui AL, et al. "Factors Associated With Increases in US Healthcare Spending, 1996-2013." JAMA. 2017;318(17):1668–1678. doi:10.1001/jama.2017.15927. https://jamanetwork.com/journals/jama/fullarticle/2661579.

7 Buttorff C, Ruder T, & Bauman M, "Multiple Chronic Conditions in the United States." https://www.rand.org/pubs/tools/TL221.html.

8 Sawyer B & McDermott D. "How Does the Quality of the U.S. Healthcare System Compare to Other Countries?" *Peterson-Kaiser Health System Tracker*, Kaiser Family Foundation. March 28, 2019. www.healthsystemtracker.org/chart-collection/quality-u-s-healthcare-system-compare-countries/.

9 Thorpe KE, et al. "The United States Can Reduce Socioeconomic Disparities by Focusing on Chronic Diseases." Health Affairs Blog. Aug 17, 2017. https://www.healthaffairs.org/do/10.1377/hblog20170817.061561/full/.

10 Arias E, et al. "United States Life Tables, 2017." National Vital Statistics Report Volume 68, Number 7. June 2019. https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_07-508.pdf.

11 "Families in Crisis: The Human Service Implications of Rural Opioid Misuse." Policy Brief by the National Advisory Committee on Rural Health and Human Services. July 2016. https://www.hrsa.gov/sites/default/files/hrsa/advisory-committees/rural/publications/2016-opioid-abuse.pdf.

12 Garfield R, et al. "The Uninsured and the ACA: A Primer - Key Facts about Health Insurance and the Uninsured amidst Changes to the Affordable Care Act." *The Henry J. Kaiser Family Foundation*. Jan. 25, 2019. https://www.kff.org/report-section/the-uninsured-and-the-aca-a-primer-key-facts-about-health-insurance-and-the-uninsured-amidst-changes-to-the-affordable-care-act-how-does-lack-of-insurance-affect-access-to-care/.

13 Claxton G, et al. "2018 Employer Health Benefits Survey." *The Henry J. Kaiser Family Foundation.* March 18, 2019. www.kff.org/health-costs/report/2018-employer-health-benefits-survey/.

14 Witters D. "U.S. Uninsured Rate Rises to Four-Year High." *Gallup.com*, Gallup. Jan. 23, 2019. news.gallup.com/poll/246134/uninsured-rate-rises-four-year-high.aspx.

15 Garfield R, et al. "The Uninsured and the ACA: A Primer - Key Facts about Health Insurance and the Uninsured amidst Changes to the Affordable Care Act." *The Henry J. Kaiser Family Foundation*. Jan. 25, 2019. https://www.kff.org/report-section/the-uninsured-and-the-aca-a-primer-key-facts-about-health-insurance-and-the-uninsured-amidst-changes-to-the-affordable-care-act-how-does-lack-of-insurance-affect-access-to-care/.

16 Coughlin T, et al. "Uncompensated Care for the Uninsured in 2013: A Detailed Examination." *The Henry J. Kaiser Family Foundation*. May 2014. https://www.kff.org/uninsured/report/uncompensated-care-for-the-uninsured-in-2013-a-detailed-examination/.

17 Collins SR, et al. "Americans' Confidence in Their Ability to Pay for Healthcare Is Falling." *To the Point*. The Commonwealth Fund. May 10, 2018. www.commonwealthfund.org/blog/2018/americans-confidence-their-ability-pay-health-care-falling.

18 Baker, L., et al. "Physician Practice Competition and Prices Paid by Private Insurers for Office Visits." JAMA. Oct. 2014. https://jamanetwork.com/journals/jama/fullarticle/1917436.

19 U.S. Department of Health and Human Services, U.S. Department of the Treasury, U.S. Department of Labor. "Reforming America's Healthcare System Through Choice and Competition." 2018. https://www.hhs.gov/sites/default/files/Reforming-Americas-Healthcare-System-Through-Choice-and-Competition.pdf.

20 "2020 Broadband Deployment Report." Federal Communications Commission. April 24, 2020. https://docs.fcc.gov/public/attachments/FCC-20-50A1.pdf.

21 2020 Broadband Deployment Report." Federal Communications Commission. April 24, 2020. https://docs.fcc.gov/public/attachments/FCC-20-50A1.pdf.

22 Closing the Rural Health Connectivity Gap: How Broadband Funding Can Better Improve Care." Health Affairs Blog. April 1, 2015. doi: 10.1377/hblog20150401.045856. https://www.healthaffairs.org/do/10.1377/hblog20150401.045856/full/.

23 Patel V & Johnson C. "Trends in Individuals' Access, Viewing and Use of Online Medical Records and Other Technology for Health Needs: 2017-2018." ONC Data Brief, no. 48. Office of the National Coordinator for Health Information Technology: Washington DC. May 2019. https://www.healthit.gov/sites/default/files/page/2019-05/Trends-in-Individuals-Access-Viewing-and-Use-of-Online-Medical-Records-and-Other-Technology-for-Health-Needs-2017-2018.pdf.

24 HHS Press Office. "OCR Settles Eighth Investigation in HIPAA Right of Access Initiative." October 7, 2020. https://www.hhs.gov/about/news/2020/10/07/ocr-settles-eighth-investigation-hipaa-right-access-initiative.html.

25 Healthcare Payment Learning & Action Network. "APM Measurement: Progress of Alternative Payment Models 2019 Methodology and Results Report," 2019. http://hcp-lan.org/workproducts/apm-methodology-2019.pdf.

26 Healthcare Payment Learning & Action Network. "Measuring Progress: Adoption of Alternative Payment Models in Commercial, Medicare Advantage, and State Medicaid Programs," 2016. https://hcp-lan.org/workproducts/apm-measurement-final.pdf.

27 Public Law 114-255, 21st Century Cures Act. Enacted: December 13, 2016. https://www.congress.gov/114/bills/hr34/BILLS-114hr34enr.pdf.

28 Centers for Medicare & Medicaid Services. "CMS Interoperability and Patient Access final rule." May 1, 2020. https://www.cms.gov/Regulations-and-Guidance/Guidance/Interoperability/index.

29 U.S. Department of Health and Human Services, Office of the National Coordinator for Health IT. "ONC's Cures Act Final Rule." May 1, 2020. https://www.healthit.gov/curesrule/.

30 Information Blocking, 45 CFR § 171.103 (2020). https://www.law.cornell.edu/cfr/text/45/171.103.

31 "Strategy on Reducing Regulatory and Administrative Burden Relating to the Use of Health IT and EHRs". ONC.gov. ONC HIT Report. Feb. 2020. https://www.healthit.gov/sites/default/files/page/2020-02/BurdenReport_0.pdf.

32 "Strategy on Reducing Regulatory and Administrative Burden Relating to the Use of Health IT and EHRs". ONC.gov. ONC HIT Report. Feb. 2020. https://www.healthit.gov/sites/default/files/page/2020-02/BurdenReport_0.pdf.

33 "Understanding the Patient Experience to Improve Patient Access to Medical Records." *Health IT Buzz Blog*. Office of the National Coordinator for Health Information Technology. https://www.healthit.gov/buzz-blog/consumer/understanding-patient-experience-improvepatient-access-medical-records.

34 "Conceptualizing a Data Infrastructure for the Capture, Use, and Sharing of Patient-Generated Health Data in Care Delivery and Research through 2024". Draft White Paper for a PGHD Policy Framework. HealthIT.gov. 2017. https://www.healthit.gov/sites/default/files/Draft_White_Paper_PGHD_Policy_Framework.pdf.

35 U.S. Department of Health and Human Services, Office of the Chief Technology Officer. "The State of Data Sharing at the U.S. Department of Health and Human Services." Sep. 2018. https://www.hhs.gov/sites/default/files/HHS_StateofDataSharing_0915.pdf.

36 U.S. Department of Health and Human Services, U.S. Department of the Treasury, U.S. Department of Labor. "Reforming America's Healthcare System Through Choice and Competition." 2018. https://www.hhs.gov/sites/default/files/Reforming-Americas-Healthcare-System-Through-Choice-and-Competition.pdf.

37 "Regulatory Overload: Assessing the Regulatory Burden on Health Systems, Hospitals and Post-acute Care Providers". AHA. 2017. https://www.aha.org/sites/default/files/regulatory-overload-report.pdf.

38 "Strategy on Reducing Regulatory and Administrative Burden Relating to the Use of Health IT and EHRs" ONC.gov. ONC HIT Report. Feb. 2020. https://www.healthit.gov/sites/default/files/page/2020-02/BurdenReport_0.pdf.

The Office of the National Coordinator for
Health Information Technology

HealthIT.gov

22

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | 23-2704-BLS 1<br>Case No.: ~~1:22-cv-12196~~<br><br>10/23/23<br>RECEIVED & FILED<br>CLERK OF THE COURTS<br>NORFOLK COUNTY<br>10/24/23 |

**UNOPPOSED MOTION FOR LEAVE TO FILE REPLY**

In accordance with Local Rule 7.1(b)(3), plaintiffs John Doe and Jane Doe ask the Court for leave to file a reply no more than 10 pages in length in support of their motion to remand. ECF No. 23. Defendant Atrius does not oppose the requested relief.

John Doe and Jane Doe ask for this relief in large part because the opposition filed by Atrius: (1) raises a new alleged federal defense that was not included in Atrius's notice of removal; (2) relies on new documentary support that was not included in Atrius's notice of removal; and (3) is inconsistent with authority directly on point published after plaintiffs filed their motion for remand but before Atrius filed its opposition.[1]

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

Dated: May 4, 2023

Respectfully submitted,

/s/
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO # 343480
Erin E. McHugh, BBO# 703701
**Sweeney Merrigan Law**
268 Summer St. LL Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001

[1] When conferring about filing a reply, counsel merely asked if Atrius opposed a request for leave to file a reply and opposing counsel graciously did not object, subject to a limit of 10 pages. Nothing about that interaction should suggest that Atrius agrees with the Does' motivations for seeking this leave.

tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**Ahmad, Zavitsanos & Mensing, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for Plaintiff and Class Members***

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)

Counsel for Plaintiffs certifies that they conferred with counsel for Defendant on April 28, 2023, May 1, 2023, and May 3, 2023. Defendant does not oppose Plaintiffs' motion to seek leave, subject to a 10-page limit on any reply.

/s/
J. Tucker Merrigan

## CERTIFICATE OF SERVICE

I hereby certify that, on May 4, 2023, a copy of this motion was filed electronically and served on all counsel of record via ECF.

/s/
J. Tucker Merrigan

Case 1:22-cv-12196-FDS Document 33 Filed 05/16/23 Page 1 of 3

23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: ~~1:22-cv-12196~~<br><br>[Trial Court of Massachusetts, The Superior Court, ~~Norfolk~~ County, Docket No. 2282CV00982] 23-2704-BLS1 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**MOTION FOR ADMISSION PRO HAC VICE OF SARA AGUINIGA**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Sara Aguiniga of Keller Postman LLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Ms. Aguiniga. In support of this motion, the undersigned attorney states as follows:

1. Ms. Aguiniga is a reputable member in good standing for the jurisdiction in which she has been admitted to practice.
2. Ms. Aguiniga has a business address of 1100 Vermont Avenue, N.W., 12th Floor, Washington, District of Columbia, 20005. Her telephone number is (202) 918-1123.
3. Ms. Aguiniga is a member in good standing of the Bar of the District of Columbia. *See* Declaration of Sara Aguiniga.
4. Ms. Aguiniga is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Aguiniga Decl. Ms. Aguiniga will comply with all applicable rules of this Court including Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Ms. Aguiniga in the representation of Plaintiffs, and it is anticipated that upon her admission *pro hac vice*, Ms. Aguiniga will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Sara Aguiniga be admitted to practice before this Court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: May 15, 2023

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on May 15, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of May 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

10/23/23
RECEIVED & FILED
CLERK OF THE COURT
NORFOLK COUNTY
10/24/23

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: ~~1:22-cv-12196~~<br><br>[Trial Court of Massachusetts, The Superior Court, Norfolk County, Docket No. 2282CV00982]<br><br>23-2704-BLS1 |

## DECLARATION OF SARA AGUINIGA

I, Sara Aguiniga declare as follows:

1. I am an attorney at Keller Postman, 1100 Vermont Avenue, N.W., 12th Floor, Washington, District of Columbia 20005. My telephone number is (202) 918-1123. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member of good standing of the Bar of the District of Columbia.

3. I have never been suspended or disbarred in the Bar of the District of Columbia, and there are no disciplinary actions pending against me in any court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear *pro hac vice* in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. A member of the bar in this Court is advancing the present motion and has filed a notice of appearance in this case.

Respectfully Submitted:

Sara Aguiniga
**Keller Postman LLC**
1100 Vermont Avenue, N.W., 12th Floor
Washington, District of Columbia, 20005
Tel.: (202) 918-1123

Dated: May 9, 2023

24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

10/24/23

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br>Plaintiffs,<br>v.<br>ATRIUS HEALTH, INC,<br>Defendant. | Case No.: 1:22-cv-12196<br>23-2704-BLS1<br>[Leave for Reply Granted on May 5, 2023] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**PLAINTIFFS' REPLY IN SUPPORT OF ITS MOTION TO REMAND**

Defendant Atrius does not deny sharing its patients' sensitive medical information with Facebook, Google, or other third party vendors.[1] ECF No. 28 ("Resp."). Rather, it argues that it did so only to somehow "assist" the federal government. That simply is not true.

Atrius essentially concedes that nobody in the federal government commanded Atrius to install software that discloses patient health information to Facebook and Google. No such direction appears in any legislation or regulation cited in Atrius's motion. Nor can such a command be found in the provider agreement Atrius attaches to its response. To the contrary, the Department of Health and Human Services has specifically warned healthcare providers they may not "use tracking technologies in a manner that would result in impermissible disclosures of [protected health information] to tracking technology vendors."[2] Atrius is not assisting the federal government when it is performing acts the federal government has specifically said

[1] For simplicity, Plaintiffs refer to the secret interceptions enabled by the Meta Pixel, but that does not change the discussion or analysis of the removal issues for Google Analytics and other tracking technologies implicated by Plaintiffs' complaint.

[2] *See* U.S. DEP'T HEALTH & HUMAN SERVS., *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html ("HHS Publication").

regulated entities should not do.

Likewise, Atrius fails to articulate how installing surreptitious tracking tools on its website improves user engagement with digital medical records, which Atrius claims is the "task" it is assisting the federal government with. The Meta Pixel is invisible to patients using Atrius's website. It secretly gathers information patients input in the Atrius website, forwards it to vendors such as Facebook, and the vendors in turn provide analytics for Atrius. The Meta Pixel benefits Atrius—it does not improve patient engagement with digital health records.

Just as Atrius fails to cite any evidence that the federal government required Atrius to install tracking pixels, it fails to cite any evidence that the federal government would digitize medical records in Atrius's absence. The best Atrius can provide is authority that HHS must regulate private parties to facilitate the use of electronic health records. That is insufficient.

In short, Atrius cannot establish that it was acting under federal authority when it installed surreptitious tracking tools on its website in any way that the Supreme Court or the First Circuit recognize as "acting under" a federal officer. Since no federal officer delegated authority to Atrius to set up a website for Atrius's patients, it follows that the misconduct Plaintiffs allege does not "relate to" any official authority. And it should come as little surprise that there is no colorable federal defense to such misconduct—whether timely alleged or untimely injected into Atrius's response (the newly alleged dormant Commerce Clause argument).

Instead of addressing these crucial points, Atrius continues to advance arguments found in two unpublished, out-of-circuit cases that no court has followed in nearly three years. Both before and after Atrius filed its response, multiple district courts have denied the federal officer jurisdiction theory that Atrius advances. This Court should do the same and grant remand.

**1. Atrius effectively concedes that the federal government did not direct its alleged conduct.**

In its notice of removal, Atrius said it has gathered data to demonstrate expanded patient access and improved patient engagement "[u]nder federal direction." ECF No. 1 ("Not.") ¶ 12. Now, relying on *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022), Atrius changes its tune and says it does not need to show specific government direction to establish it acted under a federal officer.

Atrius misreads *Moore*. In that case, there was no dispute that Electric Boat was acting under a federal officer's authority when designing, constructing, and maintaining ships for the U.S. Navy. 25 F.4th at 34. The parties disputed how closely the Navy's directions had to tie to the allegations of its contractor's misconduct—that is, whether premises liability claims were caused by "specific government direction" or were "related to" Electric Boat's construction of the USS *Francis Scott Key*. *Id.* at 36. The First Circuit merely clarified that it recognizes a "related to" standard rather than a "causal link" standard. *Id.* The First Circuit ***did not*** say that a private party is free to be treated as a federal officer, even if no federal officer delegated authority to that private party and subjected, guided, or controlled the private party consistent with such authority.

To the contrary, the absence of any evidence of relevant direction or control makes Atrius nothing like the contractor in *Moore*. In *Moore*, the "Navy supervised Electric Boat's operations, had designated officials present at the Electric Boat shipyard to oversee Electric Boat's employees, and maintained a substantial presence at the shipyard, including offices, sleeping quarters, training centers, and other facilities." 25 F.4th at 33. What is more, the defendant there supported removal with the affidavit of a retired Rear Admiral who attested that the Navy "directed, controlled and approved any warnings relating to health or safety to its servicepersons

such as [the plaintiff]." *Id.* Here, in contrast, Atrius attaches over 200 pages of voluminous exhibits that nowhere identify legislation, regulation, or other command that instructs Atrius to set up and operate a website, to say nothing of secretly installing the Meta Pixel. A glaring omission is any competent evidence of a contract between Atrius and the U.S. government. In its notice of removal, Atrius says it "entered into Primary Care First participation agreements for almost all of its clinical facilities." Not. at 33. In its motion, Atrius attaches for the first time a participation agreement for this voluntary program in which Atrius is not a party. *See* Resp. Ex. I at 83 (PMG Physician Associates-Bourne party to participation agreement). Atrius nowhere establishes that any of the terms of the participation agreement for a subordinate practice group obligate Atrius, the named party, in any way to the federal government. Atrius concedes as much when it backtracks from its notice of removal and now says it "bears a closer relationship to a contractor with the federal government that it does to an entity merely complying with federal regulations" rather than affirmatively and unequivocally proving that Atrius ***is*** a contractor (like Electric Boat) and performing relevant contractual obligations. *See* Resp. 13.[3]

Simply put, engaging in an effort to "assist" or "help carry out" a federal duty is necessary but ***not sufficient*** to establish that a private entity is acting under a federal officer. *See, e.g.*, *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 151 (2007) ("[T]he removal statute applies to private persons 'who lawfully assist' the federal officer 'in the performance of his official duty.' . . . And in *City of Greenwood v. Peacock*, 384 U.S. 808, 824, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966), in interpreting a related removal provision, the Court repeated that the statute authorized removal by private parties ***'only' if*** they were 'authorized to act with or for [federal officers or agents] in affirmatively executing duties under ... federal law.'") (internal

[3] Atrius confusingly says in a footnote "Atrius and its providers entered into contractual agreements with CMS." Resp. 12 n. 4. If it is talking about PMG Physician Associate-Bourne's agreement, this statement is inaccurate. If Atrius is referring to another contract, it has inexplicably failed to include it in its response.

citation omitted) (emphasis added).

**2. Even under the lowered standard that it attempts to set for itself, Atrius falls short of showing that it "assisted" in any "tasks" of federal officers.**

After spending a quarter of its brief discussing the irrelevant point that federal policy favors electronic health records, Resp. 2–6, Atrius ignores that its decision to violate patient privacy by sending private health information to ***third parties*** has nothing to do with the federal government's goal of making electronic records available ***to patients***. Resp. 10. It is obvious that Atrius could "[p]romote and [f]acilitate [p]ortal [u]se," "[m]arket and educate effectively," "[t]ake advantage of every touch point" and "[r]emember that marketing opportunities exist outside of a visit, too—like when patients call the office," without compromising patient privacy. *Id.* at 9–10. Nothing in Atrius's brief explains how the misconduct alleged here is necessary or helpful to make patients' electronic health records available.

In fact, Atrius is doing the exact opposite of what HHS has advised private healthcare providers to do. HHS has warned, "regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of [protected health information] with such vendors," and told such regulated entities—with no shortage of emphasis—not to do this: "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of [protected health information] to tracking technology vendors . . . .**" HHS Publication (emphasis in original). Atrius cannot be assisting the government with its tasks, if it is doing what the federal government has said not to do.

Nor are vague references to "model" websites from the government enough to establish Atrius is assisting the federal government. Resp. 9–10. In the absence of proof that the Centers for Medicare & Medicaid Services collect and transmit protected health information to third-

party vendors and directs private parties to do the same, it is a complete non sequitur to spend time talking about pixels on the CMS website. *Id.* Atrius points to no such proof.

**3. In any event, Atrius fails to establish that digitizing medical records for private patients is a federal task.**

Contending that it meets the "basic governmental task" requirement, Atrius attempts to elevate the ordinary private business activity of keeping medical records for private practices—which has never been performed by the federal government in the history of the United States—into a "basic governmental task." *Id.* at 10–11. The authority Atrius attempts to rely on, however, fails to offer any support for this implausible conclusion. The Executive Order Atrius cites regarding incentives for the use of health information technology does not authorize the United States government to create or store medical records. Rather, it authorizes the government only to "guide" private entities in doing so. *See* Exec. Order No. 13,335 § 6, 69 Fed. Reg. 24,059 (Apr. 7, 2004). Likewise, Under 42 U.S.C. § 300jj-31(a), the Secretary of Health & Human Services is obligated to invest funds "through [] different agencies" to "allow for and promote the electronic exchange and use of health information"—it is not obligated to digitize medical records. Indeed, everything in the over 200 pages of exhibits Atrius attaches confirms that the Meaningful Use Program, MIPS, and Primary Care First do not federalize the private activity of keeping medical records, but only set up regulations and incentives for private parties to follow.

**4. Submitting attestations and receiving payments do not mean Atrius was "acting under" a federal officer.**

Rather than focus on anything material, Atrius spends much of its response highlighting irrelevant aspects of its choice to comply with voluntary regulatory programs. Atrius repeats how it must submit "numerous" reports and attestations in order to get incentive payments as if this mattered. Resp. 10, 12–13, 16.

The Supreme Court could not be clearer that even burdensome regulatory requirements

do not mean that a regulated entity is "acting under" federal authority. *Watson*, 551 U.S. at 153 ("A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.").

Meanwhile, the focus on payment stretches dicta from *Watson* much too far. *See id.* at 156 ("[W]e have found no evidence of any delegation of legal authority from the FTC to the industry association to undertake testing on the Government agency's behalf. Nor is there evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement"). The receipt of a payment does not make a regulated entity a contractor or even comparable to a contractor. Regulations often incentivize compliance with a monetary penalty or a monetary payment. If the government were allowed to regulate only through penalties, any party that applies for and receives an incentive payment would be a federal agent permitted access to the federal courts—a logical conclusion to which Atrius has no meaningful response. *See* Resp. 12 n. 4 (inventing an inapposite distinction to the electric vehicle tax credit example), 13–14 (failing to engage with the reasoning of the District of Massachusetts in *Doe v. Cape Cod Healthcare, Inc.*, No. 23-cv-10080 (D. Mass. Jan. 25, 2023), or the Northern District of California in *Quinto v. The Regence of the Univ. of Cal.*, 2023 WL 1448050, at *3 (N.D. Cal. Feb. 1, 2023)).

**5. Since no federal officer delegated authority to set up a website for Atrius's patients, the misconduct Plaintiffs allege does not "relate to" any official authority.**

No federal official authorized Atrius to set up a website and secretly install the Meta Pixel. *Supra* Parts 1–4. Since Atrius did not perform this actionable conduct under color of ***any*** federal office, no matter how "broad[ly]" one reads the words "relating to," this lawsuit is not

"for or relating to any act under color of ***such*** office." 28 U.S.C. 1442(a)(1) (emphasis added).

**6. Atrius has no colorable defense, whether timely alleged or newly introduced.**

Atrius claims there are two federal defenses—but only one of them has been timely disclosed. Atrius's notice of removal included only an allegation that HIPAA provides a federal defense. It said nothing about the dormant Commerce Clause. ECF No. 1 at ¶¶ 39–41. The deadline for the notice of removal has long-since passed. 28 U.S.C. § 1446(b)(1) (30 days from receipt of the complaint). The dormant Commerce Clause is therefore not properly before the Court and should not be considered. Ultimately, neither alleged defense is meritorious.

As for the alleged HIPAA defense, Atrius does not cite to a single case that holds that HIPAA provides a defense to any of the Massachusetts causes of action here. *See* Resp. 18–19. The reference to *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017)—which is in any event not about any Massachusetts cause of action—is unavailing. Resp. 18. In *Smith*, the plaintiffs argued that Facebook had to meet a stricter disclosure standard under HIPAA. 262 F. Supp. 3d at 954–56. Plaintiffs have not made that argument in this case.

As for the dormant Commerce Clause, none of Plaintiffs' causes of actions turn on a Massachusetts law that discriminates against non-residents. *See Tenn. Spirits Retailer Ass'n v. Thomas*, 139 S. Ct. 2449, 2460 (2019) (Commerce Clause "restricts state protectionism" and remedies interstate "trade barriers."). The concern about an excessive burden on non-Massachusetts residents is not germane here. The putative class members are all Massachusetts residents. ECF No. 1 Ex. D ¶ 154.

**7. No court has endorsed Atrius's theory of federal officer jurisdiction since 2020, despite many unsuccessful attempts.**

Every court that has confronted Atrius's theory of federal officer jurisdiction has rejected it since *Doe v. ProMedica Health Sys., Inc.*, No. 20-CV-1581, 2020 WL 7705627 (N.D. Ohio

Oct. 30, 2020) was issued in 2020. The growing consensus across the country is that this jurisdictional theory is meritless. In addition to the cases cited in Plaintiffs' motion, there have been a wave of recent decisions affirming that conclusion.

On April 19, 2023, the Eastern District of California ordered remand despite the defendant medical center making the same arguments for federal officer jurisdiction that were made here—namely, (1) the defendant allegedly "was assisting the Government to 'fulfill a federal goal.'"; (2) "the Government [allegedly] monitored its compliance with the Meaningful Use Program, with Defendant 'submitting detailed reports on patient portal activities'"; and (3) "if not for Defendant, the Government would [allegedly] have had to build the electronic records system." *Crouch v. St. Agnes Med. Ctr.*, No. 1:22-cv-01527, 2023 WL 3007408, at *2 (E.D. Cal. April 19, 2023). The district court there concluded that "Defendant's participation in the Meaningful Use Program does not give rise to the type of circumstances necessary to conclude that Defendant acted under a federal officer so as to confer jurisdiction under the federal officer removal statute." *Id.* at *7 (reasoning from caselaw relied on by Plaintiffs).

On April 20, 2023, the Eastern District of Pennsylvania remanded a tracking pixel case against the trustees of a health system. *Mohr v. Trustees of Univ. of Pennsylvania*, No. 23-CV-731, 2023 WL 3044594, at *4 (E.D. Pa. Apr. 20, 2023), *appeal filed* (May 24, 2023). There, the defendant argued that it was acting under the United States vis-à-vis the Department of Health and Human Services and the Centers for Medicare and Medicaid Services to fulfill the federal policy of promoting wider availability of electronic health records. Denying federal officer jurisdiction, the court reasoned, that, while "CMS may thoroughly describe and fund its EHR goals, [and] develop directives and guidelines," such directives "do not, without more, bootstrap

private persons who *choose* to adhere to non-binding directives for financial gain into the category of persons 'acting under' the United States." *Id.* at *4 (emphasis in original).

On April 26, 2023, the Central District of California did the same against another health system that argued that it had assisted and followed the federal government's direction as part of a public-private initiative to develop a nationwide infrastructure for health information technology. *Browne v. Cedars-Sinai Health Sys.*, No. CV2301551DSFJPRX, 2023 WL 3095551, at *1 (C.D. Cal. Apr. 26, 2023).

Then on May 2, 2023, the Central District of California entered an order once again remanding a healthcare privacy lawsuit and rejecting federal officer jurisdiction. *Jane Doe v. Hoag Mem. Presby. Hosp.*, No. 8:23-CV-00444, Order (C.D. Cal. May 2, 2023). The court there found the reasoning of both *Crouch* and *Quinto* persuasive. Order at 7 ("receiving incentive payments for acting in a way that promotes a broad federal interest . . . is not the same as being contracted to carry out, or assist with, a basic governmental duty").

Just two weeks ago, the Central District of California yet again found a healthcare system's attempts to gain access to the federal courts was unwarranted on a theory that it "acted within the penumbra of federal action and office" when it "attest[ed] to the National Coordinator and to the Centers for Medicare and Medicaid Services on their progress with respect to [] criteria" for patients to access their healthcare records online, among other similar arguments. *Beltran and Reingold et al., v. Cedars-Sinai Med. Ctr.*, No. CV2302626DSFJPRX, 2023 WL 3620740, at *2 (C.D. Cal. May 24, 2023). Plaintiffs respectfully suggest that the same result applies here.

Dated: June 7, 2023

Respectfully submitted,

/s/ Jonathan Tucker Merrigan
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
**Sweeney Merrigan Law**
268 Summer St. LL Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**Ahmad, Zavitsanos & Mensing, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for Plaintiffs and Class Members***

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

## CERTIFICATE OF SERVICE

I hereby certify that, on June 7, 2023, a copy of this Reply in support of its Motion to Remand was filed electronically and served on all counsel of record via ECF:

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

10/24/23

23-2704-BLS1

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: 1:22-cv-12196<br><br>[Trial Court of Massachusetts, The Superior Court, Norfolk County, Docket No. 2282CV00982] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

NOV 28 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**MOTION FOR *PRO HAC VICE***
**ADMISSION OF CARL J. GUSTAFSON**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Carl J. Gustafson of Ahmad, Zavitsanos & Mensing, PLLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Gustafson. In support of this motion, the undersigned attorney states as follows:

1. Mr. Gustafson is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Gustafson has a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. His telephone number is (713) 600-4924.

3. Mr. Gustafson is a member in good standing of the Bars of the State of Texas and the US District Court for the Southern District of Texas. *See* Declaration of Mr. Gustafson ("Gustafson Decl.") ¶2.

4. Mr. Gustafson is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Gustafson Decl. ¶4. Mr. Gustafson will comply with all applicable rules of court including the Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Gustafson in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Gustafson will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Carl J. Gustafson be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: September 11, 2023

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on September 15, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 15th day of September, 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ATRIUS HEALTH, INC,<br><br>Defendant. | Case No.: 1:22-cv-12196<br><br>[Trial Court of Massachusetts, The Superior Court, Norfolk County, Docket No. 2282CV00982] |

23-2704-BLS1

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III

10/24/23

**DECLARATION OF CARL J. GUSTAFSON**

I, CARL J. GUSTAFSON, declare as follows:

1. I am an attorney with Ahmad, Zavitsanos & Mensing, PLLC, with a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member in good standing of every bar in which I have been admitted to the practice of law. Specifically, I am a member in good standing of the Bars of the State of Texas, and the US District Court for the Southern District of Texas.

3. I have never been suspended or disbarred in the jurisdictions listed in Paragraph 2, and there are no disciplinary actions pending against me in any federal or state court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear pro hac vice in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the

disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. There are no disciplinary proceedings pending against me in any jurisdiction.

7. A member of the bar of this Court is advancing the present motion and has filed a notice of appearance in this case.

Dated: September 11, 2023
Houston, Texas

Respectfully Submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

By: *s/ Carl J. Gustafson*
Carl J. Gustafson
1221 McKinney, Suite 2500
Houston, Texas 77010
(979) 575-5847
cgustafson@azalaw.com

CLOSED

26

23-2704-BL

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:22-cv-12196-FDS

RECEIVED & FILED 2023 OCT 25 CLERK OF THE COURTS NORFOLK COUNTY 10/24/23

Doe et al v. Atrius Health, Inc.
Assigned to: Chief Judge F. Dennis Saylor, IV
related Case: 1:23-cv-10923-FDS
Case in other court: Massachusetts Superior Court, Norfolk County, 2282-cv-00982
Cause: 28:1442 Notice of Removal

Date Filed: 12/23/2022
Date Terminated: 10/20/2023
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**John Doe**
*individually and on behalf of all others similarly situated*

represented by **Jonathan Tucker Merrigan**
Sweeney Merrigan Law
268 Summer Street, LL
Boston, MA 02210
617-391-9001
Email: tucker@sweeneymerrigan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth A. Meyer**
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
312-741-5220
Email: sam@kellerlenkner.com
*TERMINATED: 08/09/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Santoro**
Sweeney Merrigan Law, LLP
268 Summer Street, LL
Boston, MA 02210
617-391-9001
Email: victoria@sweeneymerrigan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carl Jon Gustafson**
Ahmad, Zavitsanos & Mensing
1221 McKinney St.
Suite 2500

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

I hereby certify on 10/26/23 that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☑ electronically filed original filed on 10/20/2023
☐ original filed in my office on. ______
Robert M. Farrell
Clerk, U.S. District Court
District of Massachusetts
By: [signature]
Deputy Clerk

Houston, TX 77010
713-655-1101
Fax: 713-655-0062
Email: cgustafson@azalaw.com
*ATTORNEY TO BE NOTICED*

**David Edward Warden**
Ahmad Zavitsanos & Mensing, PLLC
1221 McKinney St.
Suite 2500
Houston, Suite 2500
Houston, TX 77010
713-655-1101
Fax: 713-655-0062
Email: dwarden@azalaw.com
*ATTORNEY TO BE NOTICED*

**Foster Calhoun Johnson**
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney St.
Suite 2500
Houston, TX 77010
713-655-1101
Fax: 713-655-0062
Email: fjohnson@azalaw.com
*ATTORNEY TO BE NOTICED*

**Nathan Campbell**
Ahmad, Zavitsanos & Mensing PLLC
1221 McKinney
Ste 2500
Houston, TX 77010
713-655-1101
Fax: 713-655-0062
Email: ncampbell@azalaw.com
*ATTORNEY TO BE NOTICED*

**Sara Aguiniga**
Keller Postman
1100 Vermont Avenue, N.W.
Ste 12th Floor
Washington, DC 20005
202-918-1123
Email: sara.aguiniga@kellerpostman.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe**
*individually and on behalf of all others similarly situated*

represented by **Jonathan Tucker Merrigan**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Seth A. Meyer**
(See above for address)
*TERMINATED: 08/09/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Santoro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carl Jon Gustafson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Edward Warden**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Foster Calhoun Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan Campbell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara Aguiniga**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Atrius Health, Inc.**

represented by **Adam A. Cooke**
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
202-637-5479
Email: adam.a.cooke@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Allison M. Holt-Ryan**
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
202-637-5600

Email: allison.holt@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Anthony E. Fuller**
Hogan Lovells US LLP
125 High Street
Suite 2010
Boston, MA 02110
617-371-1000
Fax: 617-371-1037
Email: anthony.fuller@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Kayla Ghantous**
Hogan Lovells US LLP
125 High Street
Suite 2010
Boston, MA 02110
781-308-8610
Email: kayla.ghantous@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Maria R. Durant**
Hogan Lovells US LLP
125 High Street
Suite 2010
Boston, MA 02110
617-371-1000/617-371-1024
Fax: 617-371-1037
Email: maria.durant@hoganlovells.com
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 12/23/2022 | 1 | NOTICE OF REMOVAL by Atrius Health, Inc. ( Filing fee: $ 402, receipt number AMADC-9643877 Fee Status: Filing Fee paid) (Attachments: # 1 Exhibit Privacy Policy - Medicare, # 2 Exhibit Privacy Policy - CMS, # 3 Exhibit Privacy Policy - HHS, # 4 Exhibit State Court Complaint, # 5 Exhibit State Court Civil Action Cover Sheet, # 6 Exhibit Motion for Impoundment, # 7 Exhibit Request for Summons, # 8 Exhibit Impoundment Order, # 9 Exhibit Proof of Service, # 10 Civil Cover Sheet Civil Action Cover Sheet, # 11 Category Form Civil Category Sheet)(Ghantous, Kayla) (Entered: 12/23/2022) |
| 12/23/2022 | 2 10.1 | CORPORATE DISCLOSURE STATEMENT by Atrius Health, Inc.. (Ghantous, Kayla) (Entered: 12/23/2022) |
| 12/23/2022 | 3 | NOTICE of Appearance by Adam A. Cooke on behalf of Atrius Health, Inc. (Cooke, Adam) (Entered: 12/23/2022) |

| | | |
|---|---|---|
| 12/23/2022 | 4 | NOTICE of Appearance by Maria R. Durant on behalf of Atrius Health, Inc. (Durant, Maria) (Entered: 12/23/2022) |
| 12/23/2022 | 5 11.0 | MOTION for Leave to Appear Pro Hac Vice for admission of Allison Ryan Filing fee: $ 100, receipt number AMADC-9643946 by Atrius Health, Inc.. (Attachments: # 1 Exhibit Certification of A. Ryan, # 2 Exhibit Certificate of Good Standing)(Ghantous, Kayla) (Entered: 12/23/2022) |
| 12/23/2022 | 6 | NOTICE of Appearance by Kayla Ghantous on behalf of Atrius Health, Inc. (Ghantous, Kayla) (Entered: 12/23/2022) |
| 12/27/2022 | 7 | ELECTRONIC NOTICE of Case Assignment. Chief Judge F. Dennis Saylor, IV assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Judith G. Dein. (Finn, Mary) (Entered: 12/27/2022) |
| 12/27/2022 | 8 | Certified Copy of Notice of Removal Provided to Defense Counsel by Email (McManus, Caetlin) (Entered: 12/27/2022) |
| 12/27/2022 | 9 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 5 Motion for Leave to Appear Pro Hac Vice Added Allison Ryan.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(de Oliveira, Flaviana) (Entered: 12/27/2022) |
| 12/29/2022 | 10 12. | Assented to MOTION for Extension of Time to File Answer by Atrius Health, Inc..(Ghantous, Kayla) (Entered: 12/29/2022) |
| 12/30/2022 | 11 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 10 Assented to MOTION for Extension of Time to File Answer . Answer due 30 days after motion to remand is decided. (McKillop, Matthew) (Entered: 12/30/2022) |
| 01/03/2023 | 12 | STATE COURT Record. (Ghantous, Kayla) (Main Document 12 replaced on 1/4/2023 with corrected document per counsel's request) (de Oliveira, Flaviana). (Entered: 01/03/2023) |
| 01/04/2023 | 13 13.0 | NOTICE of Appearance by Allison M. Holt-Ryan on behalf of Atrius Health, Inc. (Holt-Ryan, Allison) (Entered: 01/04/2023) |
| 01/18/2023 | 14 14.0 | First MOTION for Leave to Appear Pro Hac Vice for admission of Seth Meyer Filing fee: $ 125, receipt number AMADC-9673766 by John Doe. (Attachments: # 1 Affidavit Declaration of Seth Meyer)(Merrigan, Jonathan) (Entered: 01/18/2023) |

14.1 Declaration of Seth Meyer

| | | |
|---|---|---|
| 01/18/2023 | 15 | First MOTION for Leave to Appear Pro Hac Vice for admission of Nathan Campbell Filing fee: $ 125, receipt number AMADC-9673834 by Jane Doe, John Doe. (Attachments: # 1 Affidavit Declaration of Nathan Campbell) (Merrigan, Jonathan) (Entered: 01/18/2023) 15.1 Declaration of Nathan Campbell |
| 01/18/2023 | 16 | First MOTION for Leave to Appear Pro Hac Vice for admission of Foster C. Johnson Filing fee: $ 125, receipt number AMADC-9673847 by Jane Doe, John Doe. (Attachments: # 1 Affidavit Declaration of Foster C. Johnson) (Merrigan, Jonathan) (Entered: 01/18/2023) 16.1 Declaration of Foster C. Johnson |
| 01/18/2023 | 17 | First MOTION for Leave to Appear Pro Hac Vice for admission of David Warden Filing fee: $ 125, receipt number AMADC-9673851 by Jane Doe, John Doe. (Attachments: # 1 Affidavit Declaration of David Warden) (Merrigan, Jonathan) (Entered: 01/18/2023) 17.1 Declaration of David Warden |
| 01/18/2023 | 18 | First MOTION for Leave to Appear Pro Hac Vice for admission of Alex Dravillas Filing fee: $ 125, receipt number AMADC-9673857 by Jane Doe, John Doe. (Attachments: # 1 Affidavit Declaration of Alex Dravillas) (Merrigan, Jonathan) (Entered: 01/18/2023) Pt 18.1 Declaration of Alex Dravillas |
| 01/18/2023 | 19 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 14 Motion for Leave to Appear Pro Hac Vice Added Seth Meyer.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>; GRANTING 15 , 16 , 17 , 18 Motion for Leave to Appear Pro Hac Vice Added Nathan Campbell, Foster C. Johnson, David Warden, Alex Dravillas.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>; (de Oliveira, Flaviana) (Entered: 01/18/2023) |
| 01/24/2023 | ~~20~~ 19 | NOTICE of Appearance by Nathan Campbell on behalf of Jane Doe, John Doe (Campbell, Nathan) (Entered: 01/24/2023) |
| 01/24/2023 | ~~21~~ 20 | NOTICE of Appearance by Foster Calhoun Johnson on behalf of Jane Doe, John Doe (Johnson, Foster) (Entered: 01/24/2023) |

| | | |
|---|---|---|
| 02/16/2023 | 22 21 | NOTICE of Appearance by David Edward Warden on behalf of Jane Doe, John Doe (Warden, David) (Entered: 02/16/2023) |
| 03/30/2023 | 23 22.0 | MOTION to Remand by Jane Doe, John Doe.(Merrigan, Jonathan) (Entered: 03/30/2023) |
| 03/30/2023 | 24 22.1 | MEMORANDUM in Support re 23 MOTION to Remand filed by Jane Doe, John Doe. (Attachments: # 1 Proposed Order)(Merrigan, Jonathan) (Entered: 03/30/2023) |
| 04/10/2023 | 25 | NOTICE of Appearance by Anthony E. Fuller on behalf of Atrius Health, Inc. (Fuller, Anthony) (Entered: 04/10/2023) |
| 04/10/2023 | 26 23 | Assented to MOTION for Extension of Time to April 27, 2023 to Respond to Motion to Remand by Atrius Health, Inc..(Fuller, Anthony) (Entered: 04/10/2023) |
| 04/10/2023 | 27 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 26 Assented to MOTION for Extension of Time to April 27, 2023 to Respond to Motion to Remand. (McKillop, Matthew) (Entered: 04/10/2023) |
| 04/27/2023 | 28 24.0 | MEMORANDUM in Opposition re 23 MOTION to Remand filed by Atrius Health, Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F, # 6 Exhibit G, # 7 Exhibit H, # 8 Exhibit I, # 9 Exhibit J, # 10 Exhibit K)(Fuller, Anthony) (Entered: 04/27/2023) |
| 04/28/2023 | 29 | EXHIBIT re 28 Memorandum in Opposition to Motion, *(EXHIBIT A)* by Atrius Health, Inc.. (Fuller, Anthony) (Entered: 04/28/2023) |
| 04/28/2023 | 30 | EXHIBIT re 28 Memorandum in Opposition to Motion, *(EXHIBIT B)* by Atrius Health, Inc.. (Fuller, Anthony) (Entered: 04/28/2023) |
| 05/04/2023 | 31 25 | MOTION for Leave to File *Reply* by Jane Doe, John Doe. (Attachments: # 1 Text of Proposed Order)(Merrigan, Jonathan) (Entered: 05/04/2023) |
| 05/05/2023 | 32 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 31 MOTION for Leave to File Reply ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (McKillop, Matthew) (Entered: 05/05/2023) |
| 05/16/2023 | 33 26.0 | First MOTION for Leave to Appear Pro Hac Vice for admission of Sara Aguiniga Filing fee: $ 125, receipt number AMADC-9856676 by Jane Doe, John Doe. (Attachments: # 1 Affidavit Declaration of Sara Aguiniga) (Merrigan, Jonathan) (Entered: 05/16/2023) 26.1 Declaration of Sara Aguiniga |
| 05/16/2023 | 34 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 33 Motion for Leave to Appear Pro Hac Vice Added Sara Aguiniga.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket** |

| | | |
|---|---|---|
| | | **number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(de Oliveira, Flaviana) (Entered: 05/16/2023) |
| 05/19/2023 | 35 27.0 | NOTICE of Appearance by Sara Aguiniga on behalf of Jane Doe, John Doe (Aguiniga, Sara) (Entered: 05/19/2023) |
| 06/07/2023 | 36 28 | First REPLY to Response to 31 MOTION for Leave to File *Reply In Support of Motion to Remand* filed by Jane Doe, John Doe. (Merrigan, Jonathan) (Entered: 06/07/2023) |
| 08/09/2023 | 37 29.0 | NOTICE by Jane Doe, John Doe *OF WITHDRAWAL OF APPEARANCE* (Meyer, Seth) (Entered: 08/09/2023) |
| 09/15/2023 | 38 30.0 | MOTION for Leave to Appear Pro Hac Vice for admission of Carl J. Gustafson Filing fee: $ 125, receipt number AMADC-10039024 by Jane Doe, John Doe. (Attachments: # 1 Declaration of Carl Gustafson)(Merrigan, Jonathan) (Entered: 09/15/2023)<br>30.1 Declaration of Carl J Gustafson |
| 09/15/2023 | 39 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 38 Motion for Leave to Appear Pro Hac Vice Added Carl J. Gustafson.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(de Oliveira, Flaviana) (Entered: 09/15/2023) |
| 09/18/2023 | 40 31 | NOTICE of Appearance by Carl Jon Gustafson on behalf of Jane Doe, John Doe (Gustafson, Carl) (Entered: 09/18/2023) |
| 10/20/2023 | 41 8.0 | Chief Judge F. Dennis Saylor, IV: ORDER entered. MEMORANDUM AND ORDER.<br><br>For the foregoing reasons, the Court finds that it lacks subject-matter jurisdiction over this matter, and the matter is not removable under 28 U.S.C. § 1442(a)(1). Plaintiffs' motion to remand (Dkt. No. 23 ) is therefore GRANTED.<br><br>**So Ordered.** (de Oliveira, Flaviana) (Entered: 10/20/2023) |

| | | |
|---|---|---|
| 10/20/2023 | 42 | Chief Judge F. Dennis Saylor, IV: ORDER entered. ORDER OF REMAND to Norfolk County Superior Court. (de Oliveira, Flaviana) (Entered: 10/20/2023) |
| 10/20/2023 | 43 | Case file sent to Norfolk County Superior Court. (de Oliveira, Flaviana) (Entered: 10/20/2023) |

I HEREBY ATTEST AND CERTIFY ON
April 16, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

Superior Court - Norfolk
Docket Number 2282CV00982
Docketed 11/16/23

27

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss. SUPERIOR COURT

11/29/2023 23-2704-BL Allowed subject to acceptance by the BLS administrative justice. The deadline for response to the suit by Atrius is stayed until further order of the Court. Leighton, J.

JOHN DOE AND JANE DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ATRIUS HEALTH, INC.,

Defendant.

Civil Action No. 2282-cv-00982

SUFFOLK SUPERIOR COURT CIVIL CLERK'S OFFICE FILED NOV 28 2023 JOHN E. POWERS, III ACTING CLERK MAGISTRATE

**ATRIUS HEALTH, INC.'S ASSENTED-~~TO MOTION~~ TO TRANSFER**
**TO THE BUSINESS LITIGATION SESSION AND STAY RESPONSE DEADLINE**

Pursuant to Superior Court Administrative Directive No. 17-1, Defendant Atrius Health, Inc. ("Atrius") moves with the assent of Plaintiffs John and Jane Doe ("Plaintiffs") (collectively, with Atrius, the "Parties"), to transfer this action to Suffolk County Superior Court for consideration by the Business Litigation Session Administrative Justice for acceptance into the Business Litigation Session ("BLS"). The Parties further move to stay Atrius's deadline to respond to this suit until 30 days after the case is accepted into the BLS and docketed, subject to any schedule entered by the BLS and without prejudice to the parties' positions as to how the case should proceed. In support, Atrius states the following and relies on the accompanying Memorandum in Support of Motion to Transfer to the Business Litigation Session and Stay Response Deadline.

This putative class action regarding alleged use of website technologies is precisely the kind of complex matter that would benefit from the structure and procedures afforded by the BLS. Indeed, the BLS is already hearing numerous other putative class actions regarding healthcare

institutions' alleged use of website technologies. Among these suits is another putative class action filed against Atrius, *Doe v. Atrius Health, Inc.*, Civil Action No. 2384-cv-00597-BLS1. If the BLS accepts this transfer, Atrius understands that Plaintiffs intend to move to consolidate the two actions against Atrius, which will promote judicial economy.

For the reasons set forth above and in the accompanying Memorandum, Atrius requests that the Court (1) transfer this case to Suffolk County Superior Court for consideration for acceptance into the BLS and (2) stay Atrius' deadline to respond until 30 days after the case is accepted into the BLS and docketed, subject to any schedule entered by the BLS and without prejudice to the parties' positions as to how the case should proceed.

November 16, 2023

Respectfully submitted,

ATRIUS HEALTH, INC.

By their attorneys,

/s/ *Anthony E. Fuller*
Anthony E. Fuller (BBO No. 633246)
Kayla H. Ghantous (BBO No. 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
(617) 371-1000
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (admitted *pro hac vice*)
Adam A. Cooke (BBO No. 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

I HEREBY ATTEST AND CERTIFY ON
April 16, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

**CERTICATE PURSUANT TO LOCAL RULE 7.1**

On October 30, 2023, counsel for Atrius conferred with counsel for Plaintiffs, who do not oppose this Motion.

/s/ *Adam A. Cooke*
Adam A. Cooke

**CERTIFICATE OF SERVICE**

I, Anthony E. Fuller, hereby certify that on November 16, 2023, a copy of the foregoing was filed electronically and served on all counsel of record by email.

/s/ *Anthony E. Fuller*
Anthony E. Fuller

perior Court - Norfolk
cket Number 2282CV00982
Docketed 11/16/23



COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss. SUPERIOR COURT

23-2704-BLS1

| | |
|---|---|
| JOHN DOE AND JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.,<br><br>Defendant. | Civil Action No. 2282-cv-00982 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**ATRIUS HEALTH, INC.'S MEMORANDUM IN SUPPORT OF**
**ASSENTED-TO MOTION TO TRANSFER TO THE BUSINESS LITIGATION SESSION AND STAY RESPONSE DEADLINE**

Pursuant to Superior Court Administrative Directive No. 17-1, Defendant Atrius Health, Inc. ("Atrius") moves with the assent of Plaintiffs John and Jane Doe ("Plaintiffs") (collectively, with Atrius, the "Parties"), to (1) transfer this action to Suffolk County Superior Court for consideration by the Business Litigation Session Administrative Justice for acceptance into the Business Litigation Session ("BLS"), and (2) stay Atrius's deadline to respond to this suit until 30 days after the case is accepted into the BLS and docketed, subject to any schedule entered by the BLS and without prejudice to the parties' positions as to how the case should proceed.

**BACKGROUND**

On October 17, 2022, Plaintiffs filed their Class Action Complaint ("Complaint") in this Court. Plaintiffs allege in the Complaint that through use of a technology called the Meta Pixel (the "Pixel") on Atrius' website, information about visitors' interactions with the website was sent to third parties without their knowledge or consent. Based on these allegations, Plaintiffs assert a

claim under the Massachusetts Wiretap Act as well as claims for invasion of privacy, breach of fiduciary duty and/or the common law duty of confidentiality, breach of express contract, breach of implied contract, and unjust enrichment. Atrius denies these allegations and maintains that Plaintiffs' claims fail as a matter of law.

On December 23, 2023, Atrius removed this action to the United States District Court for the District of Massachusetts. On March 10, 2023, another putative class action with similar allegations against Atrius, *Doe v. Atrius Health, Inc.*, Civil Action No. 2384-cv-00597-BLS1 ("Second Action"), was filed in the BLS. Atrius removed the Second Action on April 27, 2023. The United States District Court for the District of Massachusetts issued orders remanding this action on October 20, 2023 and the Second Action on October 25, 2023.

## ARGUMENT

This putative class action is precisely the kind of complex matter that would benefit from the structure and procedures afforded by the BLS. Where a plaintiff files an action outside of Suffolk County, any party may request that the case be transferred to the BLS. Super. Ct. Admin. Directive 17-1. Superior Court Administrative Directive 17-1 identifies certain categories of cases that "may be accepted into the BLS in the sound discretion of the BLS Administrative Justice." *Id.* This case falls squarely within the ambit of at least three of these categories:

> e.1 claims involving breaches of contract or fiduciary duties, fraud, misrepresentation, business torts or other violations involving business relationships
>
> . . .
>
> h.2 claims of unfair trade practices involving complex issues, including class actions that do not involve personal injury
>
> . . .

> k.l other claims involving complex issues or that require close case management, including but not limited to insurance coverage or reinsurance, construction, commercial lease disputes, real estate and consumer matters.

*Id.*

The Complaint rests on technical allegations regarding alleged use of the Pixel on Atrius' website and asserts claims that fall within the categories contemplated by the BLS. Additionally, this a putative class action in which Plaintiffs purport to represent class comprised of every Massachusetts resident who "exchanged communications at Atrius Health, Inc[.]'s websites . . . that caused disclosures of patient personally identifiable information and communications to third parties." Doc. No. 1 ¶ 154. Indeed, the BLS is already overseeing ***more than ten*** other putative class actions—including the Second Action—regarding alleged use of the Pixel on healthcare institutions' websites. The BLS's acceptance of the Second Action underscores that the BLS is an appropriate venue for this suit.

The requested transfer also will promote judicial economy. If the BLS accepts this action, Atrius understands that Plaintiffs intend to move to consolidate this action with the Second Action. Thus, it will conserve the resources of the Court and the parties for Atrius' deadline to respond to the Complaint to be stayed until 30 days after the case is accepted into the BLS and docketed, subject to any subsequent schedule entered by the BLS, to allow for consolidation.

Given these considerations, it is no surprise that the Worcester County Superior Court granted a similar request for actions pending against UMass Memorial Health Care, Inc. ("UMass") related to alleged use of website technologies. Those actions were transferred subject to acceptance by the BLS, and the BLS subsequently accepted the cases. *Doe v. UMass Memorial Health Care Inc. et. al,*, Case No. 2285CV01293 (Mass. Super. Ct., Worcester Cnty., Sept. 6, 2023) (endorsement on motion to transfer case conditioned on its acceptance into the BLS); *Doe*

*v. UMass Memorial Health Care, Inc.*, Case No. 2285CV01293, Doc. No. 21 (Mass. Super. Ct., Worcester Cnty., Oct. 23, 2023) (notice of acceptance into BLS).

For the reasons set forth above, Atrius requests that the Court (1) transfer this case to Suffolk County Superior Court for consideration for acceptance into the BLS and (2) stay Atrius's deadline to respond until 30 days after the case is accepted into the BLS and docketed, subject to any schedule entered by the BLS and without prejudice to the parties' positions as to how the case should proceed.

November 16, 2023

Respectfully submitted,

ATRIUS HEALTH, INC.

By their attorneys,

/s/ *Anthony E. Fuller*
Anthony E. Fuller (BBO No. 633246)
Kayla H. Ghantous (BBO No. 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
(617) 371-1000
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (admitted *pro hac vice*)
Adam A. Cooke (BBO No. 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

**CERTICATE PURSUANT TO LOCAL RULE 7.1**

On October 30, 2023, counsel for Atrius conferred with counsel for Plaintiffs, who do not oppose this Motion.

/s/ *Adam A. Cooke*
Adam A. Cooke

**CERTIFICATE OF SERVICE**

I, Anthony E. Fuller, hereby certify that on November 16, 2023, a copy of the foregoing was filed electronically and served on all counsel of record by email.

/s/ *Anthony E. Fuller*
Anthony E. Fuller

11/21/23 RECEIVED & FILED CLERK OF THE COURTS NORFOLK COUNTY 11/22/23 29

Commonwealth of Massachusetts
County of Suffolk
The Superior Court – Business Litigation Session

CIVIL DOCKET#: **2282CV00982**
23-2704-BLS1

Case: Doe et al. v. Atrius Health, Inc.

**NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION**

The court (Leighton, J.) has previously allowed a Motion to Transfer this case to the Business Litigation Session in Suffolk County. After review of that Motion and the relevant pleadings, this case has been accepted into the Suffolk Business Litigation Session and will be assigned to **BLS1**. As soon as the original papers are received from the Clerk's Office in the county that is transferring the case (Norfolk), this case will be given a new Suffolk County docket number. The parties will be notified accordingly.

Counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Discovery Project (counsel are directed to www.mass.gov/superior-court-business-litigation-session for more information on the Project). Counsel may indicate their respective client's participation by completing, filing and serving the attached form.

Dated: November 21, 2023

/s/ Kenneth W. Salinger

Kenneth W. Salinger
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

SUFFOLK SUPERIOR COURT CIVIL CLERK'S OFFICE FILED
NOV 28 2023
JOHN E. POWERS, III ATTY CLERK MAGISTRATE

I ATTEST THAT THIS DOCUMENT IS A CERTIFIED PHOTOCOPY OF AN ORIGINAL ON FILE.
Deputy Assistant Clerk
11/22/23

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: ____________________________

Case: ________________________________________________________

As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: www.mass.gov/superior-court-business-litigation-session)

If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

___ (Check) **Yes,**_________________ is willing to participate in the Discovery Project.
(Party's Name)

Case Name ____________________________________________________________

Docket Number CIVIL DOCKET#: ___________________________________

Counsel For________________________ Date__________________

Firm Name and Address:

____________________________________

____________________________________

____________________________________

Please complete this form and return it to:

| | | |
|---|---|---|
| Assistant Clerk - BLS1<br>BLS1, Room 1309<br>3 Pemberton Square<br>Boston, MA 02108 | **OR** | Assistant Clerk - BLS2<br>BLS2, Room 1017<br>3 Pemberton Square<br>Boston, MA 02108 |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**NORFOLK COUNTY**
**Public Docket Report**

30

23-2704-BLS1

**2282CV00982 Doe, Ind. And ON Behalf Of All Others, John et al vs. Atrius Health, Inc.**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Torts | **FILE DATE:** | 10/17/2022 |
| **ACTION CODE:** | B99 | **CASE TRACK:** | F - Fast Track |
| **DESCRIPTION:** | Other Tortious Action | | |
| **CASE DISPOSITION DATE:** | 11/22/2023 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 10/24/2023 |
| **CASE JUDGE:** | | **CASE SESSION:** | Civil C |

**DCM TRACK**

| Tickler Description | Due Date | Completion Date |
|---|---|---|
| Service | 01/17/2023 | 12/27/2022 |
| Answer | 02/15/2023 | 12/27/2022 |
| Rule 15 Served By | 02/15/2023 | 12/27/2022 |
| Rule 12/19/20 Served By | 02/15/2023 | 12/27/2022 |
| Rule 15 Filed By | 03/17/2023 | 12/27/2022 |
| Rule 12/19/20 Filed By | 03/17/2023 | 12/27/2022 |
| Rule 15 Heard By | 04/18/2023 | 12/27/2022 |
| Rule 12/19/20 Heard By | 04/18/2023 | 12/27/2022 |
| Discovery | 08/14/2023 | 12/27/2022 |
| Rule 56 Served By | 09/13/2023 | 12/27/2022 |
| Rule 56 Filed By | 10/13/2023 | 12/27/2022 |
| Final Pre-Trial Conference | 02/12/2024 | 12/27/2022 |
| Judgment | 10/17/2024 | 12/27/2022 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
NOV 28 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**PARTIES**

**Plaintiff**
Doe, Ind. And ON Behalf Of All Others, Jane

**Attorney** 681627
Jonathan Tucker Merrigan
Sweeney Merrigan Law, LLP
Sweeney Merrigan Law, LLP
268 Summer St
Boston, MA 02210
Work Phone (617) 391-9001
Added Date: 10/17/2022

**Plaintiff**
Doe, Ind. And ON Behalf Of All Others, John

**Attorney** 681627
Jonathan Tucker Merrigan
Sweeney Merrigan Law, LLP
Sweeney Merrigan Law, LLP
268 Summer St
Boston, MA 02210
Work Phone (617) 391-9001
Added Date: 10/17/2022

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**NORFOLK COUNTY**
**Public Docket Report**

| Party | Counsel |
| --- | --- |
| **Defendant**<br>Atrius Health, Inc.<br>275 Grove Street, Suite 3-300<br>Newton, MA 02466 | **Private Counsel** 633246<br>Anthony E Fuller<br>Hogan Lovells LLP<br>Hogan Lovells LLP<br>125 High St<br>20th Floor<br>Boston, MA 02110<br>Work Phone (617) 371-1000<br>Added Date: 10/24/2023<br><br>**Private Counsel** 558906<br>Maria R Durant<br>Hogan Lovells US LLP<br>Hogan Lovells US LLP<br>125 High St<br>Suite 2010<br>Boston, MA 02110<br>Work Phone (617) 371-1024<br>Added Date: 10/24/2023<br><br>**Private Counsel** 679637<br>Adam Cooke<br>Hogan Lovells US LLP<br>Hogan Lovells US LLP<br>555 Thirteenth St NW<br>Columbia Square<br>Washington, DC 20004<br>Work Phone (202) 637-5479<br>Added Date: 10/24/2023<br><br>**Attorney** 709197<br>Kayla H Ghantous<br>Hogan Lovells US LLP<br>Hogan Lovells US LLP<br>125 High St<br>Suite 2010<br>Boston, MA 02110<br>Work Phone (617) 702-7749<br>Added Date: 12/27/2022 |
| **Other interested party**<br>Aguiniga, Esq., Sara<br>Keller Postman LLC<br>150 N.Riverside Plaza, Suite 4100<br>Chicago, IL 60606<br><br>**Other interested party**<br>Campbell, Esq., Nathan<br>Ahmad, Zavitsanos & Mensing PLLC<br>1221 McKinney, suite 2500<br>Houston, TX 77010<br><br>**Other interested party**<br>Dravillas, Esq., Alex<br>Keller Postman LLC<br>150 N. Riverside Plaza, suite 4100<br>Chicago, IL 60606 | |

CRTR2709-CR

COMMONWEALTH OF MASSACHUSETTS
NORFOLK COUNTY
Public Docket Report

**Other interested party**
Gustafson, Esq., Carl J
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney, Suite 2500
Houston, TX 77010

**Other interested party**
Johnson, Esq., Foster C.
Ahmad, Zavitsanos & Mensing PLLC
1221 McKinney, suite 2500
Houston, TX 77010

**Other interested party**
Meyer, Esq., Seth
Keller Postman LLC
150 N. Riverside Plaza, suite 4100
Chicago, IL 60606

**Other interested party**
Ryan, Esq., Allison
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004

**Other interested party**
Warden, Esq., David
Ahmad, Zavitsanos & Mensing PLLC
1221 McKinney, Suite 2500
Houston, TX 77010

**FINANCIAL SUMMARY**

| | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| | Total | 285.00 | 285.00 | 0.00 | 0.00 |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**NORFOLK COUNTY**
**Public Docket Report**

## INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|---|---|---|---|
| 10/18/2022 | 1 | Complaint electronically filed. (E-Filed on 10/17/2022). | |
| 10/18/2022 | 2 | Civil action cover sheet filed.<br><br>(E-Filed on 10/17/2022). | |
| 10/18/2022 | | Case assigned to:<br>DCM Track F - Fast Track was added on 10/18/2022 | |
| 10/18/2022 | | EDocument sent:<br>A Tracking Order was generated and sent to:<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq.<br>tucker@sweeneymerrigan.com | |
| 10/18/2022 | | Docket Note: On this date one summon sent | |
| 10/28/2022 | 3 | Plaintiff Atrius Health, Inc.'s Motion for<br>impoundment of personal identifying information (E-filed 10/25/2022) | |
| 10/28/2022 | 3.1 | Affidavit of attorney J. Tucker Merrigan in support of plaintiffs motion for<br>impoundment of personal identifying information (E-filed 10/25/2022) | |
| 11/10/2022 | | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Request for<br>a (1) blank summon. | |
| 11/10/2022 | | Docket Note: On this date one summon sent request sent by email. | |
| 11/16/2022 | | Endorsement on Motion for impoundment of personal identifying information.<br>(#3.0): ALLOWED<br>(dated 11/8/2022) ns ni<br><br>Judge: Sanders, Hon. Janet L | Sanders |
| 11/16/2022 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq.<br>tucker@sweeneymerrigan.com<br>Defendant: Atrius Health, Inc. 275 Grove Street, Suite 3-300, Newton, MA<br>02466 | |
| 11/27/2022 | | One Trial case reviewed by Clerk, case to remain in the Superior Court.<br><br>Judge: Hickey, Mary K | Hickey |
| 12/15/2022 | 4 | Service Returned for Atrius Health by delivering in hand to Janice Luisi, agent,<br>person in charge at the time of service at 275 Grove Street Suite 300 Newton<br>Ma 02459 on 12/6/22<br><br>(Rec'd on E File 12/14/22 | |
| 12/27/2022 | | Attorney appearance<br>On this date Kayla H Ghantous, Esq. added for Defendant Atrius Health, Inc. | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**NORFOLK COUNTY**
**Public Docket Report**

| | | | |
|---|---|---|---|
| 12/27/2022 | 5 | Defendant Atrius Health, Inc.'s Notice of Removal<br><br>Applies To: Ghantous, Esq., Kayla H (Attorney) on behalf of Atrius Health, Inc. (Defendant) | |
| 12/27/2022 | | Case transferred to another court. | |
| 12/27/2022 | 6 | ORDER: ORDER(Sanders, J)(dated; 11/8/22) certified copy sent pl<br><br>Judge: Sanders, Hon. Janet L | Sanders |
| 12/27/2022 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Defendant: Atrius Health, Inc. 275 Grove Street, Suite 3-300, Newton, MA 02466<br>Defendant, Attorney: Kayla H Ghantous, Esq. kayla.ghantous@hoganlovells.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com | |
| 12/27/2022 | | Docket Note: On this date Certified copy of the case was mailed to Attorney Kayla Ghantous, Esq. | |
| 12/27/2022 | 7 | Plaintiff's Notice of intent to file motion of Removal<br><br>Applies To: Ghantous, Esq., Kayla H (Attorney) on behalf of Atrius Health, Inc. (Defendant) | |
| 01/25/2023 | | Docket Note: Received & Rejected via efile Motions for Pro Hoc Vice - Advised Attorney Merrigan via email that case was transferred to the US District Court 12/27/22 | |
| 10/24/2023 | | Remanded to the Superior Court from the U.S. District Court. | |
| 10/24/2023 | 8 | MEMORANDUM & ORDER:<br><br>on PLAINTIFFS' MOTION TO REMAND(dated:10/20/23)(F.Dennis Saylor IV, Chief Judge United States District Court) (rec'd 10/23/23)<br><br>Judge: Unassigned | Unassigned |
| 10/24/2023 | 9 | ORDER: ORDER OF REMAND: In accordance with the Court's Memorandum and Order dated October 20,2023 (dkt.No41.)the above-entitled action to hereby REMANDED to Norfolk County Superior Court (Saylor,C J)(USDC) (dated; 10/20/23)(rec'd 10/23/23)<br><br>Judge: Unassigned | Unassigned |
| 10/24/2023 | 10 | Corporate Disclosure Statement filed by Defendant Atrius Health Inc(dated;12/23/23)(rec'd 10/23/23)<br><br>Applies To: Atrius Health, Inc. (Defendant) | |

CRTR2709-GR

**COMMONWEALTH OF MASSACHUSETTS**
**NORFOLK COUNTY**
**Public Docket Report**

| | | |
|---|---|---|
| 10/24/2023 | | Attorney appearance<br>On this date Adam Cooke, Esq. added as Private Counsel for Defendant Atrius Health, Inc.(rec'd 10/23/23) |
| 10/24/2023 | | Attorney appearance<br>On this date Maria R Durant, Esq. added as Private Counsel for Defendant Atrius Health, Inc.(dated; 12/23/22)(rec'd 10/23/23) |
| 10/24/2023 | 11 | Kayla H Ghantous, Esq.'s MOTION to admit counsel pro hac vice: Allison Ryam,Esq of Hogan Lovells US LLP 555 Thirteenth Street, NW, Washington DC 20004 with Certification of Allison Ryan in support of Motion to admit Attorney Pro Hac Vice (attached as exhibit) (dated; 12/22/23)<br>(rec'd 10/23/23) |
| 10/24/2023 | | Docket Note: See United States District Court Docket for Allowance of Motion for Pro Hac Vice for Allison Ryan, Esq |
| 10/24/2023 | 12 | Defendant Atrius Health, Inc.'s Assented to Motion to extend time for (USDC: dated; 12/29/22)(rec'd 10/23/23) |
| 10/24/2023 | | Docket Note: See USDC Docket Sheet: granting Motion for extension of time to file answer. Answer due 30 days after motion to remand is decided(McKillop,USDC)(dated;12/30/22)(rec'd 10/23/23) |
| 10/24/2023 | 13 | General correspondence regarding Notice of Appearance of Pro Hac Vice Allison Ryan, Esq Hogan Lovells US LLP 555 Thirteenth Street NW Washington DC 20004(dated;1/4/23)(rec'd 10/23/23) |
| 10/24/2023 | 14 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Seth Meyer, Esq Keller Postman LLC<br>(USDC dated; 1/18/23)(rec'd 10/23/23) |
| 10/24/2023 | 14.1 | Declaration of Seth Meyer(USDC dated;1/18/23)(rec'd 10/23/23) |
| 10/24/2023 | 15 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Nathan Campbell, Esq of Ahmad, Zavitsanos & Mensing PLLC<br>(USDC dated;1/18/23)(rec'd 10/23/23) |
| 10/24/2023 | 15.1 | Declaration of Nathan Campbell, Esq(USDC 1/18/23)(rec'd 10/23/23) |
| 10/24/2023 | 16 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Foster C. Johnson, Esq Ahmad, Zavitsanos & Mensing PLLC<br>(USDC dated;1/18/23)(rec'd 10/23/23) |
| 10/24/2023 | 16.1 | Declaration of Foster C. Johnson (USDC dated; 1/18/23)(rec'd 10/23/23) |
| 10/24/2023 | 17 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: David Warden Esq of Ahmad, Zavitsanos & Mensing<br>(USDC dated;1/18/23)(rec'd 10/23/23) |
| 10/24/2023 | 17.1 | Declaration of David Warden (USDC dated; 1/18/23)(rec'd 10/23/23) |
| 10/24/2023 | 18 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Alex Dravillas Esq of Keller Postman LLC<br>(USDC dated; 1/18/23) (rec'd 1/18/23) |
| 10/24/2023 | 18.1 | Declaration of Alex Dravillas (USDC dated; 1/18/23)(rec'd 10/23/23) |
| 10/24/2023 | | Docket Note: See USDC Docket Sheet for GRANTING of Motions for Pro Hac Vice for Seth Meyer,Esq; Nathan Campbell Esq; Foster C. Johnson,Esq; David Warden Esq; Alex Dravillas, Esq |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**NORFOLK COUNTY**
**Public Docket Report**

| | | |
|---|---|---|
| 10/24/2023 | 19 | General correspondence regarding Notice of Appearance of Pro Hac Vice attorney Foster C. Johnson,Esq for Plaintiffs John Doe and Jane Doe indiv. and on behalf of all others similarly situated (USDC dated; 1/24/23)(rec'd 10/23/23) |
| 10/24/2023 | 20 | General correspondence regarding Notice of Appearance of Pro Hac Vice attorney Foster C. Johnson,Esq of Ahmad, Zavitsanos& Mensing PLLC (USDC dated;1/24/23) (rec'd10/23/23) |
| 10/24/2023 | 21 | General correspondence regarding Notice of Appearance of Pro Hac Vice attorney David Warden of Ahmad, Zavitsanos & Mensing, PLLC for plaintiffs John Doe and Jane Doe indiv. and on behalf of all other similarly situated (USDC; dated; 2/16/23)(rec'd 10/23/23) |
| 10/24/2023 | 22 | Plaintiffs John Doe, Ind. And ON Behalf Of All Others, Jane Doe, Ind. And ON Behalf Of All Others's Motion to remand(USDC dated;3/30/23)(rec'd 10/23/23) |
| 10/24/2023 | 22.1 | John Doe, Ind. And ON Behalf Of All Others, Jane Doe, Ind. And ON Behalf Of All Others's Memorandum in support of Motion to Remand(USDC dated; 3/30/23)(rec'd 10/23/23) |
| 10/24/2023 | | Attorney appearance<br>On this date Anthony E Fuller, Esq. added as Private Counsel for Defendant Atrius Health, Inc.(USDC dated;4/10/23)(rec'd 10/23/23) |
| 10/24/2023 | 23 | Defendant Atrius Health, Inc.'s Assented to Motion to extend time for to respond to motion to remand (USDC dated;4/10/23)(rec'd 10/23/23) |
| 10/24/2023 | | Docket Note: See USDC Docket Sheet Granting Motion for extension of time to respond to motion to remand(allowed by McKillop.)(USDC dated; 4/10/23) |
| 10/24/2023 | 24 | Opposition to p#22.0 Motion to Remand -Opposition filed by Atrius Health, Inc. (USDC dated; 4/27/23)(rec'd 10/23/23) |
| 10/24/2023 | 25 | Plaintiffs John Doe, Ind. And ON Behalf Of All Others, Jane Doe, Ind. And ON Behalf Of All Others's Motion for to file reply to motion to remand(USDC dated;5/4/23) (rec'd 10/23/23) |
| 10/24/2023 | | Docket Note: See USDC Docket Sheet indicating: Granting Motion for leave to file reply (McKillop)(USDC dated; 5/5/23) |
| 10/24/2023 | 26 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Sara Aguiniga Esq of Keller Postman LLC (USDC dated; 5/16/23)(rec'd 10/23/23) |
| 10/24/2023 | 26.1 | Declaration of Sara Aguiniga,Esq |
| 10/24/2023 | | Docket Note: See USDC Docket Sheet for Electronic Order: GRANTING Motion to appear Pro Hac Vice of Sara Aguiniga of Keller Postman LLC (USDC dated;5/16/23) |
| 10/24/2023 | 27 | General correspondence regarding Notice of Appearance of Sara Aguiniga of Keller Posman LLC 150 N. Riverside Plaza, Suite 4100 Chicago, IL 60606 for plaintiffs John Doe and Jane Doe Indiv. and on behalf of all others similay situated (USDC dated;5/19/23)(rec'd 10/23/23) |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**NORFOLK COUNTY**
**Public Docket Report**

| | | | |
|---|---|---|---|
| 10/24/2023 | 28 | Reply/Sur-reply<br><br>Plaintiffs Reply in support of its motion to remand(USDC dated;6/7/23)(rec'd 10/23/23) | |
| 10/24/2023 | 29 | General correspondence regarding Notice of Withdrawal of Pro Hac Vice Attorney Seth Meyer,Esq of Keller Postman LLC as to Plaintiffs John Doe and Jane Doe indiv. and on behalf of All Others Similarly Situated | |
| 10/24/2023 | | Party status:<br>Other interested party Meyer, Esq., Seth: Inactive;SEE NOTICE OF WITHDRAWAL p#29.0 | |
| 10/24/2023 | 30 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Carl J. Gustafson, Esq of Ahmad, Zavitsanos & Mensing (USDC dated 9/15/23)(rec'd 10/23/24) | |
| 10/24/2023 | 30.1 | Declaration of Carl J. Gustafson (USDC dated;9/15/23)(rec'd 10/23/23) | |
| 10/24/2023 | 31 | General correspondence regarding Notice of Appearance of Pro Hac Vice Attorney Carl J. Gustafson, Esq of Ahmad, Zavitsanos & Mensing, PLLC on behalf of plaintiffs John Doe and Jane Doe indiv. and on behalf of All Others Similarly Situated | |
| 10/24/2023 | 32 | General correspondence regarding Certified Copy of United States District Court Docket Sheet(rec'd 10/23/23) | |
| 10/24/2023 | | Case transferred to another court. | |
| 11/16/2023 | 33 | Plaintiff, Defendant John Doe, Ind. And ON Behalf Of All Others, Jane Doe, Ind. And ON Behalf Of All Others, Atrius Health, Inc.'s Motion to transfer to the business litigation session ad stay response deadline | |
| 11/16/2023 | 33.1 | Atrius Health, Inc.'s Memorandum in support of transfer to the business litigation session ad stay response deadline | |
| 11/21/2023 | | Endorsement on Motion to Transfer to the Business Litigation Session and Stay Response Deadline (#33.0): ALLOWED<br>subject to acceptance by the BLS Administrative Justice. The deadline for response to the suit by Atrius is stayed until further order of the Court (Leighton, J)(dated; 11/20/2023) ns pl<br><br>Judge: Leighton, Hon. Joseph | Leighton |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**NORFOLK COUNTY**
**Public Docket Report**

| | | | |
|---|---|---|---|
| 11/21/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 11/21/2023 09:36:16<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Anthony E Fuller, Esq. anthony.fuller@hoganlovells.com<br>Notice Sent To: Maria R Durant, Esq. maria.durant@hoganlovells.com<br>Notice Sent To: Adam Cooke, Esq. adam.a.cooke@hoganlovells.com<br>Notice Sent To: Kayla H Ghantous, Esq. kayla.ghantous@hoganlovells.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Allison Ryan, Esq. Hogan Lovells US LLP 555 Thirteenth Street NW, Washington, DC 20004<br>Notice Sent To: Nathan Campbell, Esq. Ahmad, Zavitsanos & Mensing PLLC 1221 McKinney, suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C. Johnson, Esq. Ahmad, Zavitsanos & Mensing PLLC 1221 McKinney, suite 2500, Houston, TX 77010<br>Notice Sent To: David Warden, Esq. Ahmad, Zavitsanos & Mensing PLLC 1221 McKinney, Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex Dravillas, Esq. Keller Postman LLC 150 N. Riverside Plaza, suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. Keller Postman LLC 150 N.Riverside Plaza, Suite 4100, Chicago, IL 60606<br>Notice Sent To: Carl J Gustafson, Esq. Ahmad, Zavitsanos & Mensing, PLLC 1221 McKinney, Suite 2500, Houston, TX 77010 | |
| 11/21/2023 | | Docket Note: Emailed Judge Salinger, Shanika Riddock, Karl Chig and Beatriz Van Meek copy of p#33.0 Motion to transfer case to BLS | |
| 11/22/2023 | 34 | NOTICE OF ACCEPTANCE INTO THE BUSINESS LITIGATION SESSION :<br>On the assented to motions of the parties and the order of the judge, this matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to the Business Litigation Session 1 (Suffolk). Notice to participate in the BLS Discovery Pilot Project attached to notice. Also the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel. Copies mailed 11/22/2023.<br>(Rec' 11/21/23) | Salinger |
| 11/22/2023 | | Docket Note: Case mailed to Suffolk Business Litigation Session to BLS1 | |

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Date Filed 12/12/2023 4:19 PM
Superior Court - Suffolk
Docket Number 2384CV02704
LW



COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, S.S. BUSINESS LITIGATION SESSION

| | | |
|---|---|---|
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | 2384CV02704-BLS1 |
| *Plaintiffs,* | § | |
| v. | § | |
| ATRIUS HEALTH, INC, | § | |
| *Defendant.* | § | |

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs John Doe and Jane Doe ("Plaintiffs"), individually and on behalf of all other persons similarly situated, bring suit against Defendant Atrius Health, Inc. ("Defendant"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

**NATURE OF ACTION AND ALLEGATIONS**

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. As Defendant's Medical Information Privacy Notice explains to patients, Defendant is prohibited by law from "selling your health information to others" or "using or disclosing your health information" for "promotional communications" without patients' "written authorization."[1] Defendant's Privacy Notice further notes that Defendant is "required by law to protect the privacy of your health information."[2]

[1] https://www.atriushealth.org/patient-information/privacy-practices. Defendant's current Privacy Notice went into effect on September 30, 2022. Defendant's prior "Notice of Privacy Practices" may be found at

3. Contrary to these assurances, Defendant did not follow this policy, nor the law prohibiting such disclosures.

4. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook, Google, and other third parties without their patients' knowledge, authorization, or consent.

5. Defendant disclosed this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these tools caused its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

6. Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences including, but certainly not limited to, discrimination in the workplace or denial of insurance coverage.

7. Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to

https://web.archive.org/web/20220713190254/https://www.atriushealth.org/patient-information/privacy-practices. That Privacy Notice informed patients that "Access" to patients' medical records and other information maintained by Atrius Health "is restricted to clinicians and staff who need the information for treatment, payment, or health care operations purposes." Defendant's prior Privacy Notice further promised patients that "We will not use or share your information other than as described here unless you tell us we can in writing." Defendant's prior Privacy Notice also promised that Defendant would "never share your information" for "Marketing Purposes" or "Sale of your information" unless "you give written permission."

[2] https://www.atriushealth.org/patient-information/privacy-practices

much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

8. Protected and highly sensitive medical information collected by healthcare entities includes many categories, from intimate details of an individual's treatment to any unique identifying code which can connect the individual to the collecting entity.

9. Recognizing this, and in order to implement the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") in 2001, which require that healthcare providers safeguard and protect their patients' health data and associated individually identifying information ("Personal Health Information") from unauthorized disclosure to third parties.[3] Under HIPAA, healthcare providers are prohibited from disclosing patients and prospective patients' Personal Health Information without express written authorization.

10. In violation of HIPAA and Massachusetts law, Defendant disclosed its patients' personal health information to Facebook, Google, and other third parties to improve its return on marketing dollars and, ultimately, increase its profits.

11. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

[3]https://aspe.hhs.gov/standards-privacy-individually-identifiable-health-information#:~:text=The%20Privacy%20Rule%20establishes%20a%20federal%20requirement%20that%20most%20doctors,health%20care%20operations%20(TPO).

12. On behalf of themselves and all similarly situated persons, Plaintiffs seek an order enjoining Defendant from further unauthorized disclosures of their personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES TO THE ACTION

13. Defendant Atrius Health, Inc. is a Massachusetts corporation with its principal office at 275 Grove St., Suite 3-300, Newton, Massachusetts, 02466. Defendant is the parent company for more than 30 medical practice locations in Massachusetts, including Harvard Vanguard Copley, Harvard Vanguard Chestnut-Hill Roxbury, Harvard Vanguard Beverly, Harvard Vanguard Braintree, Harvard Vanguard Burlington, Harvard Vanguard Cambridge, Harvard Vanguard Chelmsford, Harvard Vanguard Quincy, Harvard Vanguard Concord, Duxbury-PMG, Bourne-PMG, and Dedham Medical Associates.[4]

14. Plaintiff, Jane Doe, is an individual living in Norfolk County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at Harvard Vanguard Quincy, one of Defendant's facilities,[5] and thus also a patient of Defendant.

15. Plaintiff, John Doe, is an individual living in Middlesex County, Massachusetts, has been treated by Defendant's physicians, a patient at Harvard Vanguard Chelmsford, one of Defendant's facilities,[6] and thus also a patient of Defendant.

## JURISDICTION AND VENUE

16. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 363 Highland Avenue, Fall River, Massachusetts, 02720. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

---

[4] https://www.atriushealth.org/locations; *see also* https://www.atriushealth.org/about-us
[5] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[6] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

17. Venue is appropriate in this Court because Plaintiff, Jane Doe, resides in Norfolk County and the acts or conduct giving rise to the cause of action took place in Norfolk. G.L. c. 223, § 8(4).

## FACTUAL BACKGROUND

**A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

18. Plaintiff Jane Doe is a patient of Defendant who receives treatment at Harvard Vanguard Quincy.[7]

19. Plaintiff John Doe is a patient of Defendant who receives treatment at, among other of Defendant's facilities, Harvard Vanguard Chelmsford.[8]

20. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

21. Medical patients in Massachusetts such as John Doe and Jane Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

22. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

23. Patients are aware of the promises of confidentiality contained within the Hippocratic Oath and are protected against unauthorized disclosures of their private medical information by statutory, regulatory, and common law protections afforded them under the law.

[7] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[8] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

24. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

25. Patients rely on these promises, obligations, and protections when seeking medical care.

26. Patients also have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

27. Defendant operates websites for patients, including www.atriushealth.org.

28. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

29. Defendant encourages patients to use digital tools on its website to seek and receive health services. The home page of Defendant's website is designed for use by patients, and provides patients with tools to seek treatment, such as buttons that patients can click to find a doctor, research treatments, and learn about Defendant's services.

30. Defendant also maintains a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers. Collectively herein, Defendant's website and patient portal are defined as Defendant's "Web Properties."

31. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications and protected healthcare information via automatic re-

routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

32. While Defendant intentionally incorporated the Meta Pixel into its website, Defendant never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications with Facebook, Google, and others. As a result, Plaintiffs and Class Members were unaware that their private information was being surreptitiously transmitted to third parties when they visited Defendant's website.

33. By design, none of the tracking mechanisms employed by Defendant are visible to patients visiting Defendant's website.

34. Defendant did not warn or otherwise disclose to Plaintiffs and Class Members that Defendant bartered their confidential medical communications to Facebook, Google, and other third parties for marketing purposes.

35. Plaintiffs and Class Members never consented, agreed, or otherwise authorized Defendant to disclose their confidential medical communications, particularly not beyond the limits of Defendant's express promises to protect the confidentiality of Plaintiffs' and Class Members' private information from disclosure to third parties.

36. Simply put, by installing tracking pixels on its Web Properties, Defendant effectively planted a bug on Plaintiff and Class Member's web browsers and compelled them to unknowingly disclose their confidential and extremely sensitive communications to Facebook.

37. The information sent to third parties as a result of Defendant's use of tracking technologies included the Personal Health Information that Plaintiff and Class Members submitted to Defendant's Web Properties related to their past, present, or future health conditions, including, for example, the type and date of a medical appointment and physician.

38. Such Personal Health Information would allow the third party (*e.g.*, Facebook or Google) to know that a specific patient was seeking confidential medical care and the type of medical care being sought. This disclosure would also allow a third party to reasonably infer that a specific patient was being treated for a specific type of medical condition such as cancer, pregnancy, or HIV.

39. In addition to tracking pixels, Defendant, on information and belief, also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Web Properties' servers.

40. Unlike the Meta Pixel, which coopts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to automatically transmit information to Facebook. Instead, CAPI tracks the user's website interaction, including Personal Health Information, records and stores that information on the website owner's servers and then transmits the data to Facebook from the website owner's servers.

41. Indeed, Facebook markets CAPI as a better measure of ad performance, which helps website owners to better understand how digital advertising impacts both online and offline results.

42. Despite the clear and unequivocal prohibition on the disclosure of PHI without consent, Defendant chose to use the Pixel and CAPI data for marketing purposes to bolster its profits. In other words, Defendant put its desires for profit over their patients' privacy rights.

43. The Meta Pixel and CAPI are routinely used to target specific customers by utilizing data to build robust profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiff's and Class Members' Personal Health Information to create

targeted advertisements based on the medical conditions and other information disclosed to Defendant.

44. The information that Defendant's tracking pixels and CAPI sent to Facebook included the Personal Health Information that Plaintiff and Class Members submitted to Defendant's Website, including for example, the type of medical treatment sought, the individual's particular health condition and the fact that the individual attempted to or did book a medical appointment.

45. Such information allows a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiff's and Class Members' Personal Health Information to third-party marketers who geo-target Plaintiff's and Class Members' Facebook pages based on communications obtained via the Meta Pixel and CAPI.

46. Healthcare patients simply do not anticipate that their trusted healthcare provider will send PHI or other confidential medical information to an unauthorized third party—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without patients' informed consent.

47. Neither Plaintiffs nor any other Class Member signed a written authorization permitting Defendant to send their Personal Health Information to Facebook or Google.

48. Plaintiffs and Class Members exchanged numerous communications with Defendant. Plaintiffs' and Class Members' communications included logging in and out of patient portals, exchanging communications about doctors and health conditions, and using button functionality from Defendant's websites.

49. Notwithstanding prospective and current patients' reasonable expectations of privacy and Defendant's legal duties of confidentiality, Defendant disclosed—and continues to disclose—the contents of Plaintiffs' and Class Members' communications and protected healthcare information via automatic mechanisms embedded in the websites operated by Defendant without users' knowledge, authorization, or consent.

50. In doing so, Defendant systematically violated the medical privacy rights of Plaintiffs and Class Members by causing the unauthorized disclosure of their communications to be transmitted to Facebook, Google, and other third-party marketing companies.

51. The private information provided by Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties.

52. While Defendant intentionally incorporated the Meta Pixel into its website, Defendant never disclosed to Plaintiffs or Class Members that it shared patients' sensitive and confidential communications with Facebook and other third parties.

53. As a result, Plaintiffs and Class Members were unaware that their private information was being surreptitiously transmitted to Facebook and other when they visited Defendant's website.

54. Upon information and belief, Defendant intercepted and disclosed the following non-public private information to Facebook and Google:

a. Plaintiffs' and Class Members' status as patients;

b. Plaintiffs' and Class Member's communications with Defendant via its website;

c. Plaintiffs' and Class Members' use of Defendant's patient portal;

d. Plaintiffs' and Class Member's searches for information regarding specific medical conditions and treatments, their medical providers, and their physical location.

55. Defendant interfered with Plaintiffs' and Class Members' privacy rights when it implemented technology (including the Meta Pixel) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential information to Facebook, Google, and other third parties.

56. Defendant also breached its obligations to Plaintiffs and Class Members in multiple other ways, including (1) failing to obtain their consent to disclose their private information to Facebook and other third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its website was safe and secure, (3) failing to remove or disengage software code that was known and designed to share patients' private information with third parties, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' private information to Facebook and other third-party advertising companies, (5) failing to warn Plaintiffs and Class Members that Defendant was routinely bartering their private information to Facebook via the Meta Pixel, and (6) otherwise ignoring Defendant's common and statutory obligations to protect the confidentiality of patient's protected health information.

57. Plaintiffs and Class Members have suffered injury because of Defendant's conduct. Their injuries include invasion of privacy and the continued and ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

58. Defendant's disclosures of patients' personal healthcare information occurs because Defendant intentionally deploys source code on the websites it operates, that causes patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

59. By design, third parties receive and record the exact contents of a patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

60. While the information captured and disclosed without permission may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, not just the name of a physician and field of medicine, but also the first name, the last name, email address, phone number and zip code and city of residence entered into the booking form. In addition, that data is linked to a specific internet protocol ("IP") address.

61. The Meta Pixel, for example, sends information to Facebook via scripts running in a person's internet browser so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.

62. In addition, if the person is (or recently has) logged into Facebook when they visit a particular website when a Meta Pixel is installed, some browsers will attach third-party cookies—another tracking mechanism—that allow Meta to link pixel data to specific Facebook accounts.

63. With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Personal Health Information, like Facebook, implement workarounds that cannot be evaded by savvy users. Facebook's workaround, for example, is called Conversions API (CAPI).

64. CAPI is an effective workaround because it does not intercept data communicated from the user's browser. Instead, Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]."

65. Thus, the communications between patients and Defendants, which are necessary to use Defendants' website, are actually received by Defendants and stored on its server before CAPI collects and sends the Personal Health Information contained in those communications directly from Defendants to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

66. While there is no way to confirm with certainty that a Web host like Defendant has implemented workarounds like CAPI without access to the host server, companies like Facebook instruct companies to use the CAPI in addition to the Pixel and share the same events using both tools because such a redundant event setup allows website owners to share website events with Facebook that the pixel may lose. Thus, it is reasonable to infer that Facebook's customers who implement the Meta Pixel in accordance with Facebook's documentation will also implement the CAPI workaround.

67. The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner.

68. Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer a user's computing device, causing the device to contemporaneously and invisibly share the users' communications to third parties.

69. For example, when Plaintiffs or a Class Member accessed Defendant's website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers. The information that Defendant sent to Facebook included the private information that Plaintiffs and Class Members communicated to Defendant's website, such as

the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing. Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

70. Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer.

71. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

72. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

73. Web browsers are software applications that allow users to exchange electronic communications over the internet.

74. Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

75. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

76. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

77. A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

78. For example, typing https://www.atriushealth.org/ into a browser sends an HTTP request to Defendant's website, which returns a HTTP response in the form of the home page of Defendant's website:



79. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendant's website, to third parties via pixels.

80. In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions and can command a website visitor's browser to send data transmissions to third parties via pixels or web bugs,[9] effectively open a spying window through which the webpage can funnel the visitor's data, actions, and communications to third parties, along with patients' personally identifiable information like their Facebook IDs.

81. For example, Defendant's website includes software code that transmits patients' HTTP requests to Facebook, including patients' private health information, every time a patient interacts with a page on its website.

82. In essence, Defendants encourage their patients to use a tapped device, and once the Webpage is loaded into a patient's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for Defendants and transmits those communications to third parties, including Facebook and Google.

83. The basic command that web browsers use to exchange data and user communications is called a GET request.[10] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web

[9] These pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.
[10] https://www.w3schools.com/tags/ref_httpmethods.asp

browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

84. When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

85. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

86. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

87. Once the initial connection is made between a user and a website, the communications commence and continue between the parties in a bilateral fashion until the user leaves the website.

88. Unbeknownst to users, however, the website's server may also transmit the user's communications to third parties via third party tracking tools. Indeed, Google warns website

developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[11]

89. Worse, the Personal Health Information that Defendants' Meta Pixel sent to Facebook was sent alongside Plaintiff's and Class Members' Facebook IDs (c_user cookie or "FID") thereby allowing individual patients' communications with Defendants, and the Personal Health Information contained in those communications, to be linked to their unique Facebook accounts.

90. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

91. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

92. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

93. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more efficiently and to further obscure the third parties to whom users' personally identifiable data and communications are transmitted without their knowledge or consent.

[11] https://support.google.com/platformspolicy/answer/6156630?hl=en

94. Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web-properties with just the click of a few buttons.

95. Defendant deploys Google Tag Manager on its website through an "iframe," a nested "frame" that exists within the Defendant's website that is, in reality, an invisible window through which Defendant funnels tracking pixels for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

96. Defendant's Google Tag Manager source code is designed to be invisible. The source code employed by Defendant specifies an "iframe" with a height of 0, width of 0, display of none, and visibility hidden.

97. Defendant then funnels invisible 1x1 tracking pixels or web-bugs through this purposely invisible iframe to help third parties track, acquire, and record patient data and communications.

98. By design, none of the tracking is visible to patients visiting Defendant's website.

99. These tracking pixels can collect dozens of data points about individual website users who interact with a website. For example, when a patient clicked through Defendant's website to the page describing Defendant's "Fertility and Reproductive Health" services at https://www.atriushealth.org/services/fertility-and-reproductive-health, the source code deployed on Defendant's website caused personally identifiable data and the content of patient communications to be transmitted to third parties like Facebook and Google:




100. By design, the transmission of patient data to third parties occurs before Defendant's responsive communications about "Fertility & Reproductive Health" have been delivered in full to the patient.

101. In addition to the Google Tag Manager, other source code is also placed on Defendant's website, resulting in the interception and transmission of patient personal health information to multiple third parties.

102. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

103. For example, one of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook. Tracking pixels such as the Meta Pixel tool allow Defendant and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendant's website. When patients visit Defendant's website, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Defendant's website. This code is triggered when a patient or visitor interacts with the web page. Each time the Meta Pixel is triggered, the software code is executed and results in the transmission of patients' private information to Facebook.

104. The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they surreptitiously installed. Instead, these pixels like in wait until they are triggered by an event, at which time they effectively open a channel through the website funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

105. For example, a patient can trigger an HTTP request by interacting with the search bar on Defendant's website by typing a term such as "breast cancer" into the search bar and then hitting enter. Defendant's server in turn sends an HTTP response, which results in the search results being displayed.

106. This is not the only HTTP request, however, that is created by a patient's interaction with Defendant's website. In fact, at the very same time the web page is instructed to send an HTTP request to Defendant requesting search results, the embedded Meta Pixel, acting as a tap, is triggered, such that the patient's HTTP request is shared with Facebook and Google, informing them of the patient's exact search and the patient's personally identifiable information.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

107. Tracking pixels are especially pernicious because they result in the disclosure of a variety of personally identifiable information.

108. For example, an IP address is a numerical identifier that identifies each computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[12]

109. Because of their uniquely identifying characteristics, IP addresses are considered personally identifiable information. 45 CFR § 164.514. Tracking pixels can (and typically do) collect website visitors' IP addresses.

110. HIPAA further provides that information is personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

111. Consequently, Defendants' disclosure of Plaintiff's and Class Members' IP addresses violated HIPAA and industry-wide privacy standards.

112. Likewise, internet cookies also provide personally identifiable information. 45 CFR § 164.514.

113. In the early years of the internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports

[12] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed.

114. Computer programmers eventually developed 'cookies'—small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Eventually some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

115. Cookies are designed to operate as a means of identification for internet users. Advertising compánies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

116. Cookies are considered personal identifiers. 45 CFR § 164.514. Tracking pixels can collect cookies from website visitors.

117. In general, cookies are categorized by (1) duration and (2) party.

118. There are two types of cookies classified by duration.

119. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

120. "Persistent cookies" are designed to survive beyond a single internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent

cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites. Persistent cookies are also called "tracking cookies."

121. Cookies are also classified by the party that uses the collected data.

122. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

123. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits Defendant's website will also have cookies on their device from third parties, such as Facebook and Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

124. Data companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits. To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

125. Traditionally, first-party and third-party cookies were kept separate. An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendant can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendant is not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the

values associated with first-party cookies set by companies like Defendant. But Big Data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

126. JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Defendant can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

127. In effect, cookie synching is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

128. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

129. The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

130. Defendant requires patients using its patient portal to have enabled first-party cookies to gain access to its patient portal.

131. The _fbp cookie is used as a unique identifier for patients by Facebook.

132. If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendant with Facebook users.

133. Defendant engages in cookie synching with Facebook, Google, and other third parties.

134. Defendant's cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of the first-party cookie values that Defendant assigns to patients to also be made to third parties.

135. Defendant uses and causes the disclosure of patient cookie identifiers with each communication described herein, including patient communications concerning individual providers, conditions, and treatments.

136. A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

137. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have

installed to generate a unique identifier which can then be used to match a user across websites."[13] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[14] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[15]

138. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[16]

139. Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

140. Defendant uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each intercepted communication described herein, including patient communications concerning individual providers, conditions, and treatments.

141. A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is an identifiable number string that is connected to a user's Facebook profile. Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[17]

142. Unique personally identifiable information such as a person's Facebook ID are likewise capable of collection through pixel trackers.

---

[13] https://www.blog.google/products/chrome/building-a-more-private-web/
[14] https://pixelprivacy.com/resources/browser-fingerprinting/
[15] https://www.blog.google/products/chrome/building-a-more-private-web/
[16] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[17] https://smallseotools.com/find-facebook-id/

143. Each of the individual data elements described above is personally identifiable on their own. However, Defendant's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**D. Facebook's Business Model: Exploiting Users' Personal Data to Sell Advertising.**

144. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

145. Facebook describes itself as a "real identity" platform.[18] This means that users are permitted only one account and must share "the name they go by in everyday life." To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.

146. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[19] Facebook has since evolved into one of the largest advertising companies in the world.[20] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels. This allows Facebook to make inferences about users based on their interests, behavior, and connections.

147. Today, Facebook provides advertising on its own social media platforms, as well

[18] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[19] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[20] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[21]

148. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs algorithms, powered by machine learning tools, to determine what advertisements to show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

149. Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers. Facebook uses plug-ins and cookies to track users' browsing histories when they visit third-party websites. Facebook then compiles these browsing histories into personal profiles which are sold to advertisers to generate profits.

150. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

[21] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

151. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[22] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

152. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

153. One of Facebook's most powerful tools is called the "Meta Pixel." Once a third-party like Defendant installs the Meta Pixel on its website, by default it begins sending user information to Facebook automatically.[23]

154. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[24] Once activated, the Meta Pixel tracks the people and type of actions they take. Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website. The Meta Pixel

---

[22] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html
[23] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[24] https://developers.facebook.com/docs/meta-pixel/

code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website.[25] The analytics provided by the Meta Pixel tool allow website developers to improve "website operability" by giving developers insight into how customers use and interact with companies' websites.[26]

155. When a patient uses their healthcare provider's website or application where the Meta Pixel is present, the Meta Pixel transmits the content of their communications to Facebook, including but not limited to (1) signing up for a patient portal, (2) signing-in and -out of a patient portal, (3) taking actions inside a patient portal, (4) making or scheduling appointments, (5) exchanging communications related to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions, (6) conduct a search on a Facebook partner website, and (7) other information that qualifies as personal health information under state and federal laws.

156. In many circumstances, Facebook also obtains information from health care providers that identify a Facebook user's status as a patient and other health information that is protected by state and federal law. This occurs through tools that Facebook encourages health care providers to use to upload customer (i.e., patient) lists for use in its advertising systems.

157. The information Meta Pixel captures and disclose to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well

[25] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[26] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

as the name of the web page and the search terms used to find it.[27] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

158. When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[28] This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

159. The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

160. The transmission is invisible.

161. The transmission is made without any affirmative action taken by the patient.

162. The transmission occurs without any notice to the patient that it is occurring.

163. Facebook collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing Facebook to target ads to a person who, for example, has used a patient portal and has exchanged communications about a specific condition, such as cancer.

---

[27] *In re Facebook*, 956 F.3d at 596.

[28] *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

164. The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[29] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

165. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[30]

166. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information such as IP addresses, Facebook IDs, user agent information, device identifiers, and other data. All this personally identifiable data is available to be included each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then

[29] *In re Facebook*, 956 F.3d at 596.
[30] *In re Facebook*, 956 F.3d at 596.

sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

167. These communications with Facebook happen silently, without users' knowledge or consent. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[31]

168. In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[32] The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[33]

169. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

170. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[34] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[35]

171. Facebook warns web developers that its Pixel enables Facebook "to match your

[31] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[32] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[33] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[34] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[35] https://www.oviond.com/understanding-the-facebook-pixel

website visitors to their respective Facebook User accounts."[36]

172. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.

173. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website. Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

174. Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[37]

175. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifiable data.

176. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data." HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the

[36] https://developers.facebook.com/docs/meta-pixel/get-started
[37] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/

website."[38] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."

177. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[39]

178. Facebook has a number of ways to gather personally identifiable information from individuals whose data is being forwarded from third-party websites through the Meta Pixel.

179. If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

180. Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[40] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[41]

181. Facebook can also link user data to Facebook accounts through information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching. Manual matching

[38] https://developers.facebook.com/docs/meta-pixel/
[39] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[40] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[41] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

182. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data. In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[42]

183. Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

184. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

185. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in

[42]https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

186. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[43] The fbp cookie, for example, is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Tracking Pixel program. The fbp cookie emanates from Defendant's web properties but is transmitted to Facebook through cookie synching technology that Facebook employs. These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[44]

187. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites, and target users with advertising based on their web activity.

---

[43] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[44] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

188. Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website. This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections." Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising. Indeed, Facebook utilizes precisely the type of Personal Health Information that Defendant bartered to Facebook so that Facebook can identify, target, and market products and services to individuals.

**F. Defendant embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

189. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

190. Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites. Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

191. Facebook provides websites using Meta Pixel with the data it captures in the

"Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads. For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria. Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

192. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[45] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[46]

193. For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

194. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, logout, or to create an appointment—Facebook code embedded on that page transmits the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

195. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. Via its use of the Meta Pixel, Defendant intercepted and disclosed the contents of

[45] https://instapage.com/blog/meta-pixel
[46] https://instapage.com/blog/meta-pixel

Plaintiffs' and Class Members' communications with Defendant, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, and buttons clicked to Search, Find a Provider, connect, Login, Logout, or Enroll in Defendant's patient portal, summaries of Defendant's responsive communications, the parties to the communications, and the existence of communications at Defendant's websites.

196. When patients like Plaintiffs and the Class Members visited the homepage of Defendant's website, the source code employed by Defendant caused their personally identifiable information (such as their Facebook ID, their IP address, and their browser fingerprint) to be transmitted to Facebook along information identifying the specific pages on Defendant's website that they viewed. In other words, *every time* that Defendant's patients like Plaintiffs visited its website, Defendant disclosed not only *who* those patients were, but also *what* medical treatments they reviewed on the website, *what* doctors they reviewed on the website, *what* search terms they typed into online forms, and whether they had logged into the Defendant patient portal.

197. For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides:




198. All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

199. Defendant discloses such Personal Health Information even when patients are searching for doctors to assist with them conditions such as HIV:




200. Unbeknownst to patients, even their searches across Defendant's website for information about the most sensitive medical conditions imaginable, including HIV, psychotherapy, and addiction treatment are automatically sent to Facebook, along with patients' personally identifying information:

Date Filed 12/12/2023 4:19 PM
Superior Court - Suffolk
Docket Number 2384CV02704




201. All this data about patients' interactions with Defendant's website is disclosed to Facebook simultaneously in real time as visitors transmit their information, including information such as the doctor they choose for treatment, the doctor's specialty, the patient's location, the patient's language and gender preferences, and the full-string URLs generated by patient's searches. Along with other data, Defendant also discloses patients' unique Facebook IDs, which are captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient and user IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

202. Likewise, Defendant allows patients to search for information about "Services" such as "Cardiology," "Fertility and Reproductive Health," "Neurology," and "Gastroenterology." A patient searching for information about cancer treatment or pregnancy, however, not only shares their Personal Health Information with Defendant, but also unknowingly shares their Personal Health Information with Facebook and Google, such as the fact that the patient is pregnant:




203. All these communications were acquired by Defendant and forwarded to third parties like Facebook and Google via tracking technologies that Defendant installed on its website.

204. In other words, Facebook and Google learned not just that patients were seeking treatment, but where and typically when they were seeking treatment, along with other information that patients would reasonably assume that Defendant was not sharing with third

party marketing companies.

205. Defendant discloses patient information from across its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, communications made when patients access Defendant's patient portal, and communications made when patients are researching specific medical conditions such as COVID-19.

206. As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendant's website allows Meta Pixel to capture that search term and tell Facebook that the patient is likely pregnant. Indeed, Facebook might learn that the patient is pregnant before the patient's close family and friends. But there is nothing visible on Defendant's website that would indicate to patients that, when they use Defendant's search function, their personally identifiable data and the precise content of their communications with Defendant are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

207. The amount of data collected is significant. Via the Meta Pixel, when patients interact with its website, Defendant discloses a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested. For example, when a patient types a search term into the search bar on Defendant's website, the website returns links to information relevant to the search term. When

patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

208. Facebook's Meta Pixel collects and forwards this data to Facebook, including the full-string referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

209. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's website. The path identifies where a file can be found on a website. For example, take https://www.atriushealth.org/clinicians/Harmony-Abejuela-11995. Here, the "path" is clinicians/Harmony-Abejuela-11995. Similarly, a patient reviewing information about "Services" that Defendant offers patients such as "Pediatrics" will generate a URL with the path https://www.atriushealth.org/services/dermatology.

210. Likewise, a query string provides a list of parameters. A query string includes fields added to a base URL by a user's web browser or other client application. To illustrate, an example of a full-string URL that provides a query string is https://www.atriushealth.org/search?q=cancer. The query string parameters in this search indicate that a search was done at Defendant's website for information about cancer. In other words, the Meta Pixel captures information that connects a particular user with a particular health condition to a particular healthcare provider.

211. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) both the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website and the provision of health care to those patients. Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the full-string URL generated by patient searches is acquired by Facebook along with personally identifiable information.

212. Defendant also provides Facebook and Google with details about online forms that patients fill out in the form of POST requests, including forms such as the online "Prescription Refill" form that Defendant offered. This results in information that patients provide when filling out these forms also being disclosed to Facebook and Google. For example, when Plaintiffs filled out the online forms that Defendant provides to assist patients in finding treating physicians, Defendant shared every detail that Plaintiffs entered into those forms, including the kind of doctor they searched for, their preferred treatment location, and their preferred gender of the treating physician. All those details from Plaintiffs' communications with Defendant were simultaneously shared with Facebook and Google without Plaintiffs' knowledge or consent, via source code that Defendant had installed on its website.

213. The nature of the collected data is also important. Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

214. Defendant also disclosed the same kind of patient data described above to other third parties, including Google, Twitter, New Relic, Acquia, and ShareThis.com via tracking software that Defendant installed on its website. As with the Facebook Meta Pixel, Defendant provides patients and prospective patients with no notice that Defendant is disclosing the contents of their communications to these third parties. Likewise, Defendant does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

215. These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[47] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely discloses patients' personal health information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

216. Google cookies provide personally identifiable data about patients who visit Defendant's website to Google. Defendant transmits personally identifiable Google cookie data to Google.

217. Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

218. Defendant deploys Google tracking tools on nearly every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to

[47] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

Google. These transmissions occur simultaneously with patients' communications with Defendant and include communications that Plaintiff and Class Members made about specific medical providers, treatments, conditions, appointments, bill payments, and registrations and logins to Defendant's patient portal.

219. By compelling visitors to its websites to disclose personally identifiable data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' personal health information to their private identities and target them with advertising. Defendant intentionally shares the personal health information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

220. Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the website that Defendant maintains at www.atriushealth.org. Plaintiff continued to have his privacy violated when Defendant permitted Facebook and other companies to send him targeted advertising related to his medical condition.

221. For example, Plaintiff Jane Doe is an individual with a Facebook account who is also a longtime Atrius patient. Plaintiff Jane Doe has received treatment from Defendant for a variety of medical conditions over the past decade, including spine issues, degenerative disk disease, pain care, high blood pressure, yearly skin checks, primary care, and routine gynecological care.

222. Plaintiff Jane Doe began using Defendant's website in 2011, and has regularly used both Defendant's website and patient portal over the last decade. Plaintiff Jane Doe has

used Defendant's website and patient portal to search for information bout doctors, pay for medical services, make appointments, view test results, message with her doctors and nurses, upload insurance information, and search for information related to her medical treatment. This has resulted in the disclosure of her Personal Health Information to third parties without her consent, including her specific search queries about "HPV" and "Cervical."

223. For example, Defendant installed tracking pixels on the search bar that it encouraged patients like Jane Doe to use when searching for information on its website:




224. While searching for information about her medical treatment, Plaintiff Jane Doe typed queries such as "HPV" and "Cervical" into the search box and then hit enter. When she did so, Defendant's website generated a full-string URL containing the exact search term that she used of the form: https://www.atriushealth.org/search?q=HPV.

225. Unbeknownst to Plaintiff Jane Doe, Defendant shared the contents of this full-string URL containing Plaintiff's specific search terms with Facebook and Google. In other words, Defendant disclosed the specific contents of the communications that Plaintiff Jane Doe sent Defendant when se requested that Defendant provider her with information about "HPV."

226. Indeed, the source code that Defendant installed on its website resulted in Defendant transmitting to Facebook and Google the full-string URLs of every search for medical information that Plaintiff Jane Doe ran using Defendant's website search function, including the contents of her specific searches for information regarding such things as her search for information about "Cervical" issues. Along with the full-string URLs containing the search terms that Plaintiff Jane Doe communicated to Defendant, Defendant also shared Plaintiff Jane Doe's personally identifying information for every search she conducted with Facebook and Google, including her Facebook ID, her device identifiers, her IP address, and her browser fingerprint, which allowed Facebook and Google to personally identify her and learn about her medical conditions.

227. Plaintiff Jane Doe also used Defendant's website to search for information regarding locating doctors and specialty for her spine issues, degenerative disk issues, high blood pressure, and pain management issues. Unbeknownst to Plaintiff Jane Doe, every time that she sent an HTTP request to Defendant requesting to view a specific page on Defendant's website about a potential treating physician, Defendant shared the contents of those communications with Facebook and Google, including the exact page Plaintiff Jane Doe was requesting to view from Defendant's website, such as the page on Defendant's website giving details about her treating physicians.

228. When interacting with Defendant's website and patient portal, Plaintiff Jane Doe also communicated such specific details as her name, her patient status, her treating physician, her browsing history, and the specific medical conditions (such as spine issues) that she was seeking treatment for and information about. All this information was also shared with Facebook and Google by Defendant as a result of tracking pixels that Defendant installed, along with other

personally identifying information such as her Facebook ID, device identifiers, IP address, and browser fingerprint.

229. Plaintiff Jane Doe also regularly used Defendant's patient portal to view test results, make appointments, pay medical bills, read after visit summaries, and communicate with doctors.

230. Unbeknownst to Plaintiff Jane Doe, Defendant had installed tracking pixels on the "MYHEALTH ONLINE" navigation button on its home page that allowed patients to click through to Defendant's patient portal:




231. Plaintiff Jane Doe clicked on this button every time that she used Defendant's website to navigate to the patient portal. When she did, Defendant surreptitiously sent information to Facebook and Google confirming Plaintiff Jane Doe's patient status and her navigation to Defendant's patient portal, along with additional information—such as her IP address, Facebook ID, and browser fingerprint—that allowed Facebook and Google to identify her.

Date Filed 12/12/2023 4:19 PM
Superior Court - Suffolk
Docket Number 2384CV02704

232. Defendant also installed tracking pixels on the landing page and login button for its patient portal:




233. Plaintiff Jane Doe visited this page and clicked on the login button every time that she accessed Defendant's patient portal.

234. Every time that she visited the patient portal page, Defendant surreptitiously transmitted information about Plaintiff Jane Doe to Facebook and Google, including personally identifying information. Every time that Plaintiff clicked on the login button to the patient portal, Defendant surreptitiously confirmed for Google and Facebook that Plaintiff Jane Doe had logged into the patient portal, along with her personally identifying information, such as her IP address and browser fingerprint, that allowed Google to identify her, confirm her patient status, and learn

that she was being provided medical treatment by Defendant.

235. Likewise, Plaintiff John Doe is also a Facebook user who has received care at Defendant's medical facilities.

236. Plaintiff John Doe visited Defendant's website and patient portal in 2022 at www.atriushealth.org and entered data, including sensitive medical information, such as details about his medical condition and doctor. The information that Plaintiff John Doe transmitted included queries about treatment for shoulder injuries.

237. Unbeknownst to Plaintiff John Doe, Defendant's use of tracking pixels resulted in details about his every communication with Defendant's website and patient portal being shared with third parties, including such information as the search terms he used, the doctors and medical treatments that he reviewed, his patient status, his Facebook ID, his IP address, and his browser fingerprint.

238. Likewise, Plaintiff John Doe also used Defendant's patient portal to view medical records and test results, including for example, medical records related to his shoulder injury. During his interactions with the Defendant's patient portal, Plaintiff John Doe entered personal medical information, including information related to his medical conditions, into Defendant's patient portal.

239. Unbeknownst to Plaintiff John Doe, Defendant had installed tracking pixels on the "MYHEALTH ONLINE" button on its webpage that patients like John Doe used to navigate to the patient portal. Plaintiff clicked on this button every time that he used the website to navigate to the patient portal. When he did, Defendant surreptitiously sent information to Facebook and Google confirming Plaintiff John Doe's patient status, including additional

information—such as his IP address, Facebook ID, and browser fingerprint—that allowed Facebook and Google to identify him, learn his patient status, and learn that he was being provided medical treatment by Defendant.

240. Defendant also installed tracking pixels on the landing page and login button for its patient portal. Plaintiff John Doe visited this page and clicked on the login button every time that he accessed Defendant's patient portal. Every time that he visited the patient portal page, Defendant surreptitiously transmitted information about Plaintiff John Doe to Facebook and Google, including personally identifying information. Every time that Plaintiff clicked on the login button to the patient portal, Defendant surreptitiously sent information to Google confirming that Plaintiff John Doe had logged into the patient portal, along with additional information—such as his IP address, Facebook ID, and browser fingerprint—that allowed Google to identify him, learn his patient status, and learn that he was being provided medical treatment by Defendant.

241. After entering his medical information on Defendant's website, Plaintiff John Doe began receiving ads on his Facebook page related to his medical condition, including advertisements for shoulder braces.

242. As a result of Defendant's compliance and aid in the illegal interception and disclosure of John Doe's Personal Health Information, Plaintiff received advertisements that were specifically tailored to his Personal Health Information, including sensitive medical information, that Plaintiff entered on Defendant's website.

243. The kind of information that Defendant shared about Plaintiffs' interactions with its website and patient portal could be combined with other information in Facebook's possession, like Plaintiffs' name, date of birth, and phone numbers, to target Plaintiffs more

effectively with advertisements or sell Plaintiffs' data to third parties. For example, After entering his medical information on Defendant's website, Plaintiff John Doe began receiving ads on his Facebook page related to his medical condition, including advertisements for shoulder braces.

244. Because Defendant embedded the Meta Pixel on its website, Defendant disclosed intimate details about Plaintiffs' interactions with its website. Each time the Meta Pixel was triggered, it caused Plaintiffs' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' identity. For example, when Plaintiff and Class Members visited Defendant's website, their personal health information was transmitted to Facebook, including such engagement as using the website's search bar, using the website's Find a Doctor function, and typing content into online forms. During these same transmissions, Defendant's website would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiff and Class Members provided. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

245. Defendant affirmatively made the decision to intrude on Plaintiffs' privacy by installing source code on its website designed to secretly share patients' Personal Health Information with third parties. For example, Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' personal health information, including sensitive medical information and personally identifiable data. Defendant was also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Defendant was also

aware that installing the Meta Pixel tool would result in dozens (if not hundreds) of unauthorized persons at Facebook and Google viewing the Personal Health Information of Defendant's patients, including the Personal Health Information of Plaintiffs and Class Members. Defendant's decision to affirmatively communicate and share their patients' Personal Health Information with Facebook, Google, and those companies' employees violates the numerous protections afforded by Massachusetts law.

246. Defendant also knew that installing tracking pixels would result in Plaintiffs' and Class Members' Personal Health Information being improperly accessed by Facebook and Google employees so that those companies could sell advertising. Moreover, Defendant was also aware that once it shared Plaintiffs' health information with Facebook that it would no longer have any control over what Facebook did with that information or who Facebook would share that information with. On information and belief, it is likely that the third parties with whom Defendant shared Plaintiffs' Personal Health Information further disseminated that information to additional third parties, including potential advertisers. Indeed, after visiting Defendant's website and patient portal, Plaintiff John Doe began receiving targeted advertising on his Facebook page related to his cardiovascular issues and back pain—the very conditions that he sought treatment from Defendant for. On information and belief, Plaintiffs' Personal Health Information was viewed by one or more employees at Facebook for the purpose targeting them with advertising.

247. Defendant made the decision to barter its patients' personal health information to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendant and Facebook, it also betrayed the privacy rights of Plaintiff and Class Members.

### G. Defendant's interception and disclosure of patient communications permits Facebook, Google, and other third-party advertising companies to engage in cross-device marketing across multiple devices.

248. In addition to enabling Defendant to advertise to patients and potential patients on non-Defendant websites, Defendant's misuse and exploitation of patient data and communications also facilitates third parties' ability to target advertisements on other computing devices that a patient uses. This is called cross-device targeting.

249. Third parties including Facebook and Google have established a unique ID for individuals that tie together their desktop, laptop, and smartphone computing devices. For example, even if a patient has never visited Defendant's website on their smartphone, cross-device tracking and marketing allows Defendant and other third parties to target patients on that device. In other words, a patient or potential patient who visited Defendant's website on his desktop, but never on his smartphone, can nevertheless be targeted with advertisements by both Defendant and other third parties on his smartphone.

250. Defendant's and other third parties' use of cross-device targeting demonstrates that the data Defendant discloses to third parties is personally identifiable because it enables patients to be tracked across multiple devices that patients own—even if a patient has never communicated with Defendant on one or more of their devices.

251. Defendant has made the decision that access to the targeted advertising (including retargeting and cross-device tracking) that is enabled by its disclosure of patient data and communications is of commercial benefit to Defendant.

252. Defendant obtains additional revenue from its deployment of third-party tracking tools through which it discloses personally identifying patient data and communications to third parties, including Google and Facebook.

253. Any additional revenue that that Defendant obtained from its unauthorized misuse

of its own patients' Personal Health Information is unearned and is the rightful property of the patients (including Plaintiff and Class Members) from whom it was obtained.

254. Defendant's unauthorized disclosure and misuse of Plaintiff's and Class Members' Personal Health Information is a form of theft, for which the victims are entitled to recover anything acquired with the stolen assets, even if the items acquired have a value that exceeds the value of that which was stolen.

**H. Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

255. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

256. For example, when Plaintiff Jane Doe visited Defendant's website in 2022, there was no indication that Meta Pixel was embedded on that website or that it would collect and transmit her sensitive medical data to Facebook.

257. Plaintiffs and their fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

258. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




259. Defendant's current "Notice of Privacy Practices," which went into effect on September 30, 2022, gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express written authorization from patients:

> [W]e will use and disclose your health information only with a written authorization from you. This includes, except for limited circumstances allowed by federal privacy law, not using or disclosing psychotherapy notes about you, selling your health information to others, or using or disclosing your health information for certain promotional communications that are prohibited marketing communications under federal law, without your written authorization.[48]

260. Defendant's prior "Notice of Privacy Practices" likewise not only assured patients that Atrius would protect their Personal Health Information, but also expressly promised that Defendant would *never* sell or share patients' health information for marketing purposes without patients' written consent:

> Protecting patient privacy is an important element of the trust between our caregivers and their patients, and an important legal and ethical obligation. Atrius Health is deeply committed to

[48] https://www.atriushealth.org/patient-information/privacy-practices

> protecting our patients' rights to privacy, and to safeguarding patient information....[49]
>
> In these cases we never share your information unless you give us written permission:
>
> - Marketing purposes
> - Sale of your information

261. These statements are false, deceptive, and misleading in light of Defendant's secret disclosure of patient information to numerous third parties, including Facebook and Google. Defendant's privacy policy is also false, deceptive, and misleading because Defendant in fact routinely sells and/or barter its patients' personal health information to Facebook and Google without patients' knowledge or consent in return for access to the Meta Pixel tool and other significant advertising benefits. This included personally identifiable information protected against disclosure by law, including Plaintiffs' (and Class Members') Facebook IDs, IP addresses, device identifiers, and browser fingerprints that Facebook and Google used to personally identify Defendant's patients and target them with advertising.

262. What's more, even if a patient had stumbled upon Defendant's carefully concealed "Notice of Privacy Practices," nothing in Defendant's various privacy notices would have been understood by any reasonable patient to mean that Defendant is routinely allowing Facebook and Google to capture and exploit patients' Personal Health Information.

263. Indeed, the very term "Privacy Policy" is deceptive. Research has consistently shown that a majority of Americans who see that a website has a "Privacy Policy" falsely believe that the company with the policy cannot (and will not) disclose information about them to third parties without their consent.

---

[49] https://web.archive.org/web/20220517025937/https://www.atriushealth.org/patient-information/privacy-practices

264. Defendant does not have a legal right to share Plaintiffs and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by laws by the Health Insurance Portability and Accountability Act of 1996's ("HIPAA") privacy rules, which protect all electronically protected health information a covered entity like Defendant "creates, receives, maintains, or transmits" in electronic form. 45 C.F.R. § 160.103. HIPAA's privacy rules do not permit Defendant to sell patient information to Facebook in return for access to Meta Pixel. Further, HIPAA does not permit Defendant to disclose patients' Protected Health Information to an advertising and marketing company like Facebook without express written authorization from patients. 45 C.F.R. § 164.508.

265. In 2001, pursuant to HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule"), which require that healthcare providers safeguard and protect their patients' Personal Health Information.[50] Under HIPAA, healthcare providers are prohibited from disclosing individuals' Personal Health Information without express written authorization.

266. In December 2022, the HHS issued a bulletin reminding healthcare providers that hospitals are prohibited from transmitting individually identifiable health information via tracking technology like the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the patient data:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing***

[50]https://aspe.hhs.gov/standards-privacy-individually-identifiable-health-information#:~:text=The%20Privacy%20Rule%20establishes%20a%20federal%20requirement%20that%20most%20doctors,health%20care%20operations%20(TPO).

> ***purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[51]

267. As the bulletin makes clear, the disclosure of Plaintiff's and Class Members' Personal Health Information via the tracking pixels contravenes both the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Personal Health Information.

268. The bulletin also discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or other. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, **discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to other identified in the individual's PHI.** Such disclosures can reveal incredibly sensitive information about an individual, **including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[52]

269. Plaintiff and Class Members face the same risks the government is warning about. Defendants have shared Plaintiff's and Class Members' search terms about health conditions for which they seek doctors; their contacts with doctors to make appointments; the names of their

---

[51] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, HHS.GOV (emphasis added) (last visited June 12, 2023).

[52] *Id.* (emphasis added).

doctors; the frequency with which they take steps to obtain healthcare for certain conditions; and where they seek medical treatment. This information is, as described by the OCR bulletin, "highly sensitive." The Bulletin goes on to make clear how broad the government's view of protected information is.

270. This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, ***or any unique identifying code.***[53]

271. Crucially, that paragraph in the government's Bulletin continues:

> All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[54]

272. Likewise, after it became public knowledge that healthcare companies had been sharing their customers' medical information with Facebook and Google via tracking technologies, the FTC instituted a series of enforcement actions, including lawsuits against BetterHelp, GoodRx, Premom, and Vitagene. These lawsuits, which resulted healthcare companies paying millions of dollars in fines, underscore that healthcare companies violate

---

[53] *Id.* (emphasis added).

[54] *Id.*

federal law by failing "to get consumers' affirmative express consent for the disclosure of sensitive health information."[55]

273. In July 2023, the HHS and the FTC issued a joint letter to approximately 130 hospitals to emphasize the risks and concerns about the use of technologies, such as the Facebook Meta Pixel, which can track a user's online activities. The joint letter emphasized the HHS and the FTC's concerns about the "serious privacy and security risks related to the use of online tracking technologies" on websites that "impermissibly disclos[e] consumers' sensitive personal healthy information to third parties."[56] As the agencies noted in an accompanying press release, "When consumers visit a hospital's website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties."[57]

274. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing uses. Moreover, no *additional* privacy breach by Facebook is necessary for harm to have accrued to Plaintiffs and Class Members; the secret disclosure by Defendant of its patients' Personal Health Information to Facebook means that a significant privacy injury has *already occurred.*

275. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

---

[55] https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases
[56] July 20, 2023 Office of Civil Rights Memo re "Use of Online Tracking Technologies."
[57] https://www.hhs.gov/about/news/2023/07/20/hhs-office-civil-rights-federal-trade-commission-warn-hospital-systems-telehealth-providers-privacy-security-risks-online-tracking-technologies.html

276. Likewise, a patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Further, Defendant expressly promised its patients that it would never sell or use their personal health information without express authorization.

277. Neither Plaintiffs nor Class Members knowingly consented to Defendant's disclosure of their Personal Health Information to Facebook and Google. Nowhere on its website does Defendant tell patients that it routinely shares their Personal Health Information with Facebook and Google. Without disclosing such practices, Defendant cannot have secured consent from Plaintiff and Class Members for the disclosure of their Personal Health Information to Facebook, Google, and other third-party advertising companies.

278. Accordingly, Defendant lacked authorization to intercept, disclose to Facebook, or use Plaintiff and Class Members' personal health information, or to procure others (such as Facebook) to intercept, disclose, or use such personal health information.

**I. Defendant's disclosures of patient Personal Health Information to Facebook, Google, and other third parties are unnecessary.**

279. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient personal health information to Facebook necessary for Defendant to maintain its healthcare website or provide medical services to patients.

280. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without

allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendant to provide medical services to patients without sharing their personal health information with Facebook so that this information can be exploited for advertising purposes.

281. Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**J. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

282. Patient personal health information is specifically protected by law. *See* G.L. c.214, § 1B (Right to Privacy); G.L. c. 111, § 70E (Patients' and Residents' Rights). The prohibitions against disclosing patient personal health information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes. 45 C.F.R. § 164.514. Both state and federal law also restrict the use of patients' Personal Health information, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

283. HIPAA sets national standards for safeguarding protected health information. For example, HIPAA limits the permissible uses of health information and prohibits disclosure of this information without express written authorization from patients. 45 C.F.R. § 164.502. These prohibitions include prohibitions against disclosing personally identifying data such patient names, IP addresses, and other unique characteristics or codes. 45 C.F.R. § 164.514(b)(2)(i). HIPAA also requires that covered entities like Defendant implement appropriate safeguards to protect this information. 45 C.F.R. § 164.530(c)(1). And both HIPAA

and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. 42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

284. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information ("Personal Health Information"). Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiffs and Class Member's privacy interests.

285. As patients, Plaintiffs had a reasonable expectation of privacy that their health care provider and its associates would not disclose their personal health information to third parties without their express authorization.

286. The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding such things shameful to be spoken about."[58]

287. The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[59] Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

288. For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an

[58] *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 n.1 (Mo. 1993).
[59] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html

expression of respect for patient autonomy and a prerequisite for trust....Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should ... [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[60]

289. The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [61]

290. Plaintiffs' and Class Members' reasonable expectations of privacy in their personal health information are grounded in, among other things, Defendant's status as a health care provider, Defendant's common law obligation to maintain the confidentiality of patients' personal health information, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendant's express and implied promises of confidentiality.

291. It was reasonable for Plaintiffs and Class Members to assume that Defendant's privacy policies were consistent with Defendant's duties to protect the confidentiality of patients' personal health information.

292. Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information

[60] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).
[61] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

violates expectations of privacy that have been established as general social norms.

293. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

294. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[62]

295. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[63]

296. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

297. Likewise, a study released in 2021 confirmed that three-quarters of Americans

[62] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[63] https://www.wired.co.uk/article/apple-ios14-facebook

don't want companies selling their private data.[64] The study found that eighty-three percent of Americans expect to have control over how their data is used by a business, and eight in 10 Americans think that there should be laws to protect their personal data.[65] Likewise, over three in four Americans would stop shopping at their business if they found out that the business didn't keep personal data safe (77%) or sold their data to a third-party (78%).[66]

298. These concerns are not hypothetical. For example, in 2021, the FTC brought charges against Flo Health, a company who, despite its express privacy claims, took control of users' sensitive fertility data and shared it with third parties—a broken promise that, as the FTC described it, "left consumers feeling 'outraged, victimized, and violated.'"[67]

299. Unsurprisingly, Plaintiffs John Doe and Jan Doe felt similarly outraged and violated when they learned that their trusted medical provider had bartered their Personal Health Information to Facebook and Google without their knowledge or consent.

300. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[68]

301. Many privacy law experts have expressed serious concerns about patients'

---

[64] https://swnsdigital.com/us/2020/01/study-three-quarters-of-americans-dont-want-companies-selling-their-private-data/
[65] *Id.*
[66] *Id.*
[67] https://www.ftc.gov/business-guidance/blog/2021/01/health-app-broke-its-privacy-promises-disclosing-intimate-details-about-users
[68] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**K. Plaintiffs' Personal Health Data that Defendant collected, disclosed, and used is Plaintiffs' property, has economic value, and its illicit disclosure has caused Plaintiffs harm.**

302. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

303. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[69]

304. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[70] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[71]

305. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[72] This price is only increasing. According to Facebook's own financial

[69] https://ig.ft.com/how-much-is-your-personal-data-worth/
[70] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[71] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[72] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[73]

306. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[74]

307. Further demonstrating the financial value of Class Members' medical data, CNBC has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said via phone. "Often, once a day or more."
>
> * * *
>
> [H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other data to identify individuals at higher risk of diseases and then raise their health premiums, or to target advertising to individuals.[75]

---

[73] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[74] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

[75] Christina Farr, *Hospital execs say they are getting flooded with requests for your health data* (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html, CNBC.COM (last visited April 30, 2023).

308. The CNBC article also explained:

> [D]e-identified patient data has become its own small economy: Thise's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers. Just one company alone, IQVIA, said on its website that it has access to more than 600 million patient records globally that are nonidentified, much of which it accesses through provider organizations. The buyers, which include pharma marketers, will often use it for things like clinical trial recruiting But hospital execs worry that this data may be used in unintended ways, and not always in the patient's best interest.

309. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[76] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[77]

310. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[78]

311. Plaintiffs were aware that their Personal Health Information had commercial value and expected that they would be *substantially* compensated by any third party who wanted to exploit their health information for advertising purposes.

312. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiff and the Class Member's property.

---

[76] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounciations-app
[77] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[78] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* *https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

Date Filed 12/12/2023 4:19 PM
Superior Court - Suffolk
Docket Number 2384CV02704

**L. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

313. In exchange for disclosing personal health information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions. The access to these advertising benefits results in enormous financial savings to companies like Defendant because it reduces their advertising costs. Defendant has run numerous advertising campaigns on Facebook, utilizing the advantages it gained by installing the Meta Pixel on its website.

314. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

315. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

316. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

317. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**M. Facebook's history of egregious privacy violations.**

318. Defendant knew or should have known that Facebook could not be trusted with its

patients' sensitive medical information.

319. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

320. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

321. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[79]

322. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful

[79] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter

act for $650 million.[80]

323. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

324. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[81] Some companies were even able to read users' private messages.

325. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[82] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

326. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the

[80] A similar case is pending in Texas.
[81] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html
[82] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/

receipt of sensitive data."[83]

327. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[84] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[85]

328. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[86]

329. These revelations were confirmed by an article published by the Markup on June 16, 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites

[83] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[84] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[85] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[86] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes

not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[87]

330. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' personal health information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

**N. Defendant's failure to inform its patients that their Personal Health Information has been disclosed to Facebook or to take steps to halt the continued disclosure of such information was malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights.**

331. Hospital systems, like other businesses, have a legal obligation to disclose data breaches to their customers.

332. After publication of the Markup's investigative article in June 2022, hospital systems around the United States began self-reporting data breaches arising from their installation of pixel technology on their websites.[88]

333. For example, in August 2022, Novant Health informed approximately 1.3 million patients that their medical data was disclosed to Facebook due to the installation of the Facebook Meta Pixel on the hospital system's websites.[89] Novant Health's data breach announcement conceded that the Meta Pixel tool installed on its websites "allowed certain private information to be transmitted to Meta from the Novant Health website."[90] Novant Health further admitted

[87] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[88] https://www.scmagazine.com/analysis/breach/pixel-fallout-expands-community-health-informs-1-5m-of-unauthorized-disclosure
[89] https://www.scmagazine.com/analysis/breach/1-3m-novant-health-patients-notified-of-unintended-disclosure-via-facebook-pixel
[90] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx

that the information about its patients that was disclosed to Facebook included "an impacted patient's: demographic information such as email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes."[91]

334. Likewise, in October 2022, Advocate Aurora Health informed approximately 3 million patients that their personal health information had been disclosed to Facebook via the Meta Pixel installed on Advocate Aurora Health's website.[92]

335. Advocate Aurora Health's data breach notification conceded that patient information had been transmitted to third parties including Facebook and Google when patients used the hospital system's website.[93]

336. Advocate Aurora Health further admitted that a substantial amount of its patients' personal health information has been shared with Facebook and Google including patients' "IP address; dates, times, and/or locations of scheduled appointments; your proximity to an Advocate Aurora Health location; information about your provider; [and] type of appointment or procedure."[94] Even more troubling, Advocate Aurora Health admitted that "[w]e cannot confirm how vendors used the data they collected."[95]

337. Advocate Aurora Health claimed that, in conjunction with its data breach notice, the hospital system had "disabled and/or removed the pixels from our platforms and launched an internal investigation to better understand what patient information was transmitted to our

---

[91] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx
[92] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3
[93] https://www.advocateaurorahealth.org/
[94] https://www.advocateaurorahealth.org/pixel-notification/faq
[95] https://www.advocateaurorahealth.org/pixel-notification/faq

Date Filed 12/12/2023 4:19 PM
Superior Court - Suffolk
Docket Number 2384CV02704

vendors."[96] Advocate Aurora Health also promised its 3 million patients that the company had instituted an "enhanced, robust technology vetting process" to prevent such disclosures of its patients' personal health information in the future.[97]

338. Similarly, in October 2022, WakeMed notified more than 495,000 patients that their personal health information had been transmitted to Facebook through the use of tracking pixels installed on its websites.[98] In announcing this data breach, WakeMed admitted that the Facebook Meta Pixel tool had been installed on its website resulting in the transmission of patient information to Facebook.[99] WakeMed further admitted that "[d]epending on the user's activity, the data that may have been transmitted to Facebook could have included information such as: email address, phone number, and other contact information; computer IP address; emergency contact information; information provided during online check-in, such as allergy or medication information; COVID vaccine status; and information about an upcoming appointment, such as appointment type and date, physician selected, and button/menu selections."[100]

339. WakeMed also conceded that it had no idea what Facebook had done with the personal health information that WakeMed had disclosed about its patients.[101] Like the other hospital systems who have come clean about their use of the Meta Pixel tool, WakeMed promised its patients that it had "proactively disabled Facebook's pixel" and had "no plans to use

---

[96] https://www.advocateaurorahealth.org/pixel-notification/faq
[97] https://www.advocateaurorahealth.org/pixel-notification/faq
[98] https://healthitsecurity.com/news/wakemed-faces-data-breach-lawsuit-over-meta-pixel-use
[99] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident
[100] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident
[101] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

it in the future without confirmation that the pixel no longer has the capacity to transmit potentially sensitive or identifiable information."[102]

340. In November 2022, the fallout from hospital systems' use of the Meta Pixel tool expanded when Community Health Network informed 1.5 million of its patients that their personal health information had been routinely transmitted and disclosed to Facebook since at least April 2017.[103]

341. In its data breach notice, Community Health admitted that it had "discovered through our investigation that the configuration of certain technologies allowed for a broader scope of information to be collected and transmitted to each corresponding third-party tracking technology vendor (e.g., Facebook and Google) than Community had ever intended." Community Health further conceded that its use of the Meta Pixel and related third-party tracking technologies had resulted in surreptitiously recording and transmitting a wide range of patient engagements with its websites, including "includes scheduling an appointment online or directly with a provider" and "seeking treatment at a Community or affiliated provider location."[104]

342. Community Health, like WakeMed, Novant, and Advocate Aurora Health, also promised its patients that it had disabled or removed the third-party tracking technologies that it had installed on its website and had instituted new "evaluation and management processes for all website technologies moving forward."[105] Community Health, however, also conceded that it

---

[102] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident
[103] https://healthitsecurity.com/news/community-health-network-notifies-1.5m-of-data-breach-stemming-from-tracking-tech; *see also* https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach
[104] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach
[105] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

had no idea how Facebook or other third parties had exploited the patient personal health information that had been disclosed to them via the pixel technology.

343. Unlike Community Health, WakeMed, Novant, Advocate Aurora Health, and other responsible hospital systems who have informed their patients of the serious privacy violations resulting from the installation of Facebook's Meta Pixel tool on their websites, Defendant has done nothing. Indeed, not only has Defendant hidden these privacy violations from its patients, but Defendant continues to collect, transmit, and disclose its patients' personal health information to Facebook despite widespread knowledge in the health care community that such collection and disclosure of patient personal health information is patently illegal and in violation of patient's fundamental privacy rights.

344. As these data breach announcements demonstrate, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' personal health information Facebook. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

345. Defendant's decision to hide its use of the Meta Pixel tool from its own patients and its refusal to remove such technologies from its websites even after learning that its patients' personal health information was being routinely collected, transmitted, and exploited by Facebook is malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights.

## TOLLING, CONCEALMENT, AND ESTOPPEL

346. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

347. Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

348. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

349. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

350. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiffs' Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

351. Defendant's conduct violates the law and breaches its express and implied privacy promises.

352. Defendant's unlawful conduct has injured Plaintiffs and Class Members.

353. Defendant's conduct is ongoing.

354. Plaintiffs bring this action individually and as a class action against Defendant.

355. Plaintiffs seek class certification for the following proposed Class:

> **The Atrius Health Class:** During the fullest period allowed by law, all Massachusetts citizens who are, or were, patients of Atrius Health, Inc. or any of its affiliates and who exchanged communications at Atrius Health, Inc's website(s) and patient portal(s), including www.atriushealth.org, and any other Atrius Health, Inc. affiliated website.

356. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

357. Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

358. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

359. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

360. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate G.L. c. 272, § 99;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' Personal Health Information to Facebook;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

361. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

362. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

363. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

364. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

365. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

Date Filed 12/12/2023 4:19 PM
Superior Court - Suffolk
Docket Number 2384CV02704

366. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiffs and the Class)

367. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

368. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

369. All conditions precedent to this action have been performed or have occurred.

370. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

371. Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

372. Defendant qualifies as a person under the statute.

373. All alleged communications between Plaintiffs or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

374. An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire ... communication

through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

375. Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

376. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire … communication." G.L. c. 272, § 99B(3).

377. The "intercepting devices" used in this case include, but are not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

h. Computer servers of third parties (including Facebook) to which Plaintiffs and Class Members' communications were disclosed.

378. Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

379. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant

that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

380. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

k. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

l. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

381. Plaintiffs and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

382. Neither Plaintiffs nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiffs or Class Members' consent.

383. Plaintiffs and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

384. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

385. In addition to statutory damages, Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiffs and the Class)**

386. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

387. Plaintiffs bring this claim on behalf of herself and all members of the Class.

388. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

389. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

390. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

391. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

392. Plaintiffs and Class Members are patients of Defendant.

393. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

394. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

395. The information disclosed included personally identifiable information, Plaintiffs and Class Members' statues as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

396. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

397. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

398. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

399. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been

established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

400. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

401. Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

402. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

403. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

404. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

405. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

406. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Class)**

407. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

408. Plaintiffs bring this claim on behalf of themselves and all members of the Class

409. All conditions precedent to this action have been performed or occurred.

410. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

411. As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs or Class Members.

412. Defendant solicited and invited Plaintiffs and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Defendant required and obtained Plaintiff's and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiff's and Class Members' Personal Health Information.

413. Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiff and Class Members.

414. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices.

415. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant

failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

416. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

417. Defendant also materially breached its obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants' website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information

to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook.

418. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

419. Defendant's conduct in sharing Plaintiffs' and Class Members' Personal Health Information with Facebook also diminished the sales value of that information. There is a robust market for the type of information that Plaintiff and Class Members shared with Defendant (which Defendant then shared with Facebook). Indeed, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

420. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the diminution in value of their Personal Health Information.

421. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

422. Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Implied in Fact Contract**
**(On Behalf of Plaintiffs and the Class)**

423. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

424. Plaintiffs bring this claim on behalf of herself and all members of the Class.

425. Defendant solicited and invited Plaintiffs and Class Members to provide their Personal Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Personal Health Information, which included personally identifiable information such as their names, telephone

numbers, IP addresses, Facebook IDs, browser fingerprints, and device identifiers to Defendant as part of acquiring Defendant's medical services and using its Web Properties. Per its contractual, legal, ethical, and fiduciary duties, Defendant was obligated to take adequate measures to protect Plaintiffs' and Class Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook and Google. These facts give rise to the inference that Defendant took on obligations outside the plain terms of any express contracts that they may have had with Plaintiffs and Class Members.

426. Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendant when they sought medical treatment from Defendant. Specifically, through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendant to retain and protect the privacy of Plaintiff's and Class Members' Personal Health Information.

427. Defendant required and obtained Plaintiff's and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiff's and Class Members' Personal Health Information. Defendant, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly that it would safeguard Plaintiff's and Class Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiff and Class Members.

428. Implied in the exchange was a promise by Defendant to ensure that the Personal Health Information of Plaintiff and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without

the knowledge or consent of Plaintiff and Class Members. By asking for and obtaining Plaintiff's and Class Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the confidentiality of Plaintiff's and Class Members' Personal Health Information was necessary to effectuate the contract between the parties.

429. Plaintiff and Class Members provided their Personal Health Information in reliance on Defendant's implied promise that this information would not be shared with third parties without their consent.

430. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiff and Class Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendant (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiff and the Class Members made to Defendant for medical services was intended to ensure the confidentiality of their Personal Health Information.

431. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendant would not allow third parties to collect or exploit their communications with Defendant without their consent.

432. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiff and Class Members would not have disclosed their Personal Health Information to Defendant but for the prospect of Defendant's promise of medical treatment and other benefits. Conversely, Defendant presumably would not have taken

Plaintiff and Class Members' Personal Health Information if it did not intend to provide them with medical treatment and other benefits.

433. Defendant was therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiff and Class Members from unauthorized disclosure and/or use by third parties.

434. Plaintiff and Class Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their Personal Health Information to Defendant among other obligations. Plaintiff and Class Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant.

435. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and the Class Members provided their Personal Health Information and compensation for their medical care.

436. Plaintiff and Class Members relied on Defendant's implied promises to safeguard their Personal Health Information to their detriment. Defendant breached the implied contracts with Plaintiff and Class Members by failing to reasonably safeguard and protect Plaintiff's and Class Members' Personal Health Information from disclosure to Facebook and other third parties.

437. Defendant's failure to implement adequate measures to protect the Personal Health Information of Plaintiff and Class Members and Defendant's intentional disclosure of the same to Facebook violated the purpose of the agreement between the parties: Plaintiff's and

Class Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

438. Instead of safeguarding Plaintiff's and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiff and Class Members.

439. Plaintiff and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiff and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

440. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members; and (b) protect Plaintiff and the Class Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiff and Class Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's websites.

441. Both the provision of medical services healthcare and the protection of Plaintiff and Class Members' Private Health Information were material aspects of these implied contracts.

442. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

443. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiff and Class Members' Private Health Information without consent. By soliciting and acquiring Plaintiff's and Class Members' Personal Health Information Defendant assumed an independent duty to handle Plaintiff's and Class Members' Personal Health Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

444. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiff and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiff and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

445. Plaintiff and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

446. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiff's and Class Members' consent.

447. Defendant also materially breached its contractual obligation to protect Plaintiff's and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants' website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook and Google.

448. As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an

amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

449. As a result of Defendant's material breaches, Plaintiff and Class Members were deprived of the benefit of their bargain with Defendant because they spent more on medical services with Defendant than they would have if they had known that Defendant was not providing the reasonable data security and confidentiality of patient communications that Defendant represented that it was providing in its privacy policies. Defendant's failure to honor its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiff and Class Members overpaying Defendant for the services they received.

450. The services that Plaintiff and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

451. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff and Class Members' Private Health Information without consent, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

452. Defendant's conduct in sharing Plaintiffs' and Class Members' Personal Health Information with third parties also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with

Defendant (which Defendant then disclosed to third parties. For example, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

453. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Personal Health Information, the loss of control of their Personal Health Information, the diminution in value of their Personal Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

454. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

455. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health Information both because such information remains within Defendant's control and because anytime that Plaintiffs and/or Class Members interact with Defendant's websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information. Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Personal Health Information.

456. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose their Personal Health Information without their consent.

457. Plaintiffs and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

458. Defendant deliberately and consciously breached these implied contracts by disclosing Plaintiffs' and Class Members' Personal Health Information without consent to third parties like Facebook and Google.

459. Defendant consciously took advantage of Plaintiffs and Class Members, making the opportunistic calculation that it could engage in an intentional and profitable interference with Plaintiffs' and Class Members' legally protected property rights by secretly sharing their Personal Health Information with Facebook and Google, despite its express promises (1) that it would never share "personally identifiable information" collected from its website "with any organization or business and (2) that "Defendant does not sell personal information to third parties." Defendant consciously decided not to inform its patients that it was routinely sharing their Personal Health Information with third parties with the hope that its misconduct in intentionally breaching its implied contracts with Plaintiffs and Class Members would never come to light.

460. By deliberately breaching its implied contracts with Plaintiffs and Class Members, Defendant was knowingly enriched by the savings in costs that should reasonably have been expended to protect the Personal Health Information of Plaintiffs and Class Members. Defendant was further knowingly enriched by the financial benefits that it received for bartering

Plaintiffs' and Class Members' Personal Health Information to third parties like Facebook and Google, including analytics and advertising benefits that Defendant received in exchange for Plaintiffs' and Class Members' health data.

461. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of their Personal Health Information.

462. Plaintiffs and Class Members are entitled to compensatory and consequential damages, including attorney's fees and actual damages, as a result of Defendant's breach of implied contract. Alternatively, because Defendant's deliberate breach of contract resulted in profit to Defendant where the available damages remedy potentially affords inadequate protection to Plaintiffs' and Class Members' contractual entitlement, Plaintiffs and Class Members are entitled to restitution measured by the profits realized by Defendant from its deliberate breach of contract.

463. Plaintiff and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendant's control and because anytime that Plaintiff and/or Class Members interact with Defendant's websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information. Plaintiff and the Class Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

Date Filed 12/12/2023 4:19 PM
Superior Court - Suffolk
Docket Number 2384CV02704

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

464. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

465. Plaintiffs hereby plead this Count in the alternative to Count IV.

466. Plaintiffs bring this claim on behalf of herself and all members of the Class.

467. Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private, and Defendant appreciated this benefit.

468. Defendant gained access to the Personal Health Information provided by Plaintiffs and Class Members by (1) knowingly concealing its use of pixel tracking technologies from the public; (2) lying to the public in its privacy policies about protecting personally identifying information disclosed via the website from unauthorized disclosure to third parties; (3) failing to institute warnings on its website home page that it had installed pixel tracking technologies; (4) failing to provide industry standard privacy safeguards for its patients' health information; (5) intentionally disregarding years of warnings from the United States Department of Health and Human Services that it was obligated to protect its patients' Personal Health Information from unauthorized disclosures to third parties; (6) intentionally violating its own internal privacy policies by making unauthorized disclosures of patients' Personal Health Information; and (7) intentionally violating both state and federal law, including HIPAA and the Massachusetts' law.

469. Defendant benefitted from the use of Plaintiffs' and Class Members' Personal Health Information and unjustly retained those benefits at their expense.

470. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Specifically, Defendant bartered Plaintiffs' and Class Members' Personal Health Information to Facebook and Google in return for both advertising benefits and "free" website analytics information. What's more, by sharing its patients' Personal Health Information with Facebook, Defendant gained the ability to utilize Facebook's customize audiences and targeted advertising features, which saved Defendant substantial revenues by making advertising far less expensive than it would have been otherwise. Defendant also gained access to free website analytics data, which it otherwise would have had to spend substantial amounts of money to provide for itself.

471. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

472. Defendant unjustly retained the monies that Plaintiffs and Class Members paid with the expectation that Defendant would spend a percentage of those funds to implement adequate data security and privacy training to protect their Personal Health Information against unauthorized disclosure to third parties.

473. Plaintiffs and the Class Members would not have used Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties like Facebook and Google.

474. Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

475. Facebook and Google are not charities. Facebook and Google were willing to provide Defendant with "free" analytics benefits only because the patient health data that

Defendant surreptitiously shared with those companies has an economic value many times in excess of the analytics services that Facebook and Google provided Defendant.

476. Defendant wrongfully secured the benefits it obtained from Plaintiffs and Class Members by intentionally misleading them about how it would use and exploit their Personal Health Information.

477. Defendant's decision to intentionally mislead Plaintiffs and Class Members about its use of pixel tracking technologies for its own financial benefit is a text-book example of an "unjust" enrichment.

478. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

479. Plaintiffs were aware of the economic value of their Personal Health Information and reasonably expected to be *substantially* compensated by any party who shared or accessed their Personal Health Information to sell advertising. Plaintiffs and Class Members did not consent to Defendant giving their health information away for free.

480. By engaging in the acts and failures to act described in this Complaint, Defendant has been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PII and PHI of the Plaintiffs and the Class. Defendant was on notice that its patients' Personal Health Information was protected by law; that its patients' Personal Health Information had substantial monetary value; that cyber criminals and advertising companies were highly desirous of obtaining access to its patients' Personal Health Information, yet failed to take reasonable steps to pay for the level of data security and privacy training that would have

presented the unauthorized disclosure of its patients' Personal Health Information to Facebook, Google, and other third parties.

481. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

482. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in her favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiffs as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f. Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiffs and Class Members may be entitled.

**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFFS JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Warren Postman (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
wpd@kellerpostman.com
adj@kellerpostman.com

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

Dated: December 12, 2023

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, counsel of record for the Plaintiff in this action, do hereby certify that on December 12, 2023, I have served the following:

- First Amended Class Action Complaint and Demand for Jury Trial;

via email, to the following counsel of record:

Maria R. Durant (BBO # 558906)
Kayla H. Ghantous (BBO # 709197)
Anthony Fuller (BBO# 709197)
125 High Street, Suite 2010
Boston, MA 02110
617-371-1000
617-371-1037 fax
Maria.durant@hoganlovells.com
Kayla.ghantous@hoganlovells.com
Anthony.fuller@hoganlovells.com

Allison Holt Ryan (*pro hac vice pending*)
Adam A. Cooke (BBO # 679637)
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600
202-637-5910 fax
Allison.holt-ryan@hoganlovells.com
Adam.a.cooke@hoganlovells.com

*Attorneys for Defendant Atrius Health Care, Inc.*

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

\i13 32

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.** **SUPERIOR COURT**
**Civil No. 23-2704-BLS1**

**JOHN DOE, & another[1]**
**Plaintiffs**

Notice Sent (6) 1/3/24 (CMHD)

**vs.**

**ATRIUS HEALTH, INC.**
**Defendant**

**ORDER RE: RULE 16 CONFERENCE**

This case was filed in late 2022, was recently remanded by the federal court, and has been accepted into this Business Litigation Session. Other cases presenting similar issues are pending or have been decided in this session. See, e.g., Vita v. Beth Israel Deaconess Med. Ctr., Inc., 2384CV00480-BLS1, Memorandum of Decision and Order on Defendant's Motion to Dismiss and Report to the Appeals Court (Oct. 31, 2023) (Kazanjian, J.); Vita v. New England Baptist Hosp., 2384CV00857-BLS1, Memorandum of Decision and Order on Defendant's Motion to Dismiss and Report to the Appeals Court (Oct. 31, 2023) (Kazanjian, J.); Doe v. Boston Med. Ctr. Corp., 2023 WL 71056628 (Mass. Super. Sept. 14, 2023) (Kazanjian, J.); Doe v. Children's Hosp. Corp., 2023 WL 6462578 (Mass. Super. Sept. 14, 2023) (Kazanjian, J.); Alves v. BJ's Wholesale Club, Inc., 2023 WL 4456956 (Mass. Super. June 21, 2023) (Krupp, J.). At least two of those cases are before the Appeals Court. See Vita v. New England Baptist Hosp., 2023-P-1308 (entered Nov. 13, 2023), and Vita v. Beth Israel Deaconess Medical Center, Inc., 2023-P-1310 (entered Nov. 13, 2023) (together, "the Vita Appeals"). Many similar cases

[1] Jane Doe. Both plaintiffs bring this action individually and on behalf of all others similarly situated.

have been stayed pending the Vita Appeals. See, e.g., Doe v. Baystate Health System Inc., 2384CV01949-BLS11.

Accordingly, it is hereby ORDERED as follows:

The court will conduct a Rule 16 conference in this case on January 31, 2024, at 2 p.m. At that hearing, the parties shall show cause why this matter should not be stayed pending a decision in the Vita Appeals. If, prior to January 31, 2024, the parties agree that the case should be stayed, the parties may file a joint motion to that effect and, if granted, the hearing on January 31, 2024, shall be cancelled.

Dated: January 2, 2024

Peter B. Krupp
Justice of the Superior Court

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Assistant Clerk

Date Filed 1/30/2024 10:54 AM
Superior Court - Suffolk
Docket Number 2384CV02704

33

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT

Notice sent (6)
2/1/24
(MH)

| | |
|---|---|
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.,<br><br>Defendant. | Civil Action No. 2384-cv-02704-BLS1<br><br>kg |

**DEFENDANT'S ASSENTED-TO MOTION TO STAY PROCEEDINGS PENDING COMPLETION OF INTERLOCUTORY APPEALS AND CONSOLIDATION**

Defendant Atrius Health, Inc. ("Atrius") moves, with the assent of Plaintiffs John Doe and Jane Doe ("Plaintiffs") (collectively, with Atrius, the "Parties"), to stay all proceedings in this case pending completion of interlocutory appeals in two substantially similar lawsuits, *Vita v. Beth Israel Deaconess Med. Cntr., Inc.*, No. 2384CV00480-BLS1 and *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 (collectively, the "BIDMC and NEBH Cases"), and consolidation of this action with the related action, *Doe v. Atrius Health, Inc.*, No. 2384CV00597-BLS1 (the "Related Action").

On October 17, 2022, Plaintiffs initiated this action on behalf of themselves and a putative class of similarly situated persons, challenging Atrius' alleged use of analytics technologies on its website. *See* Dkt. 1 ¶¶ 1-7. Plaintiffs amended their suit on December 12, 2023. *See* Dkt. 31. They assert that Atrius' alleged actions give rise to, *inter alia*, a claim under the Massachusetts Wiretap Act, Mass. Gen. Laws ch. 272, § 99 (the "Wiretap Statute"). *Id.* ¶¶ 367-85. At least 15

1/30/24 ALLOWED. This case is stayed pending a decision in the Vita appeals. The hearing scheduled for 1/31/24 is CANCELED. Within 14 days after a decision in the Vita appeals, the parties shall notify the court and propose three dates, mutually agreeable to the parties for the court to conduct a Rule 16 conference. (within 60 days thereafter that are)

similar cases, including the Related Action as well as the BIDMC and NEBH Cases, are currently pending in Massachusetts courts.

All proceedings in this case should be stayed during the pendency of the appeals in the BIDMC and NEBH Cases. On October 31, 2023, this Court denied motions to dismiss in both these suits, but reported for interlocutory review its decisions to the Massachusetts Appeals Court, pursuant to Mass. R. Civ. P. 64(a). Shortly thereafter, the Court also stayed all further proceedings in the BIDMC and NEBH Cases. Five similar cases pending in this Court have since been stayed: *Doe v. Boston Med. Cntr. Corp.*, No. 2384CV00326-BLS1; *Doe v. The Children's Hosp. Corp.*, No. 2384CV00411-BLS1; *Nova v. Boston Med. Cntr. Corp.*, No. 2384CV01086-BLS1; and *Doe v. Cape Cod Healthcare, Inc.*, No. 2384CV01236-BLS1; and *Doe v. Baystate Health System, Inc.*, No. 2384CV01949-BLS1. The interlocutory appeals in the BIDMC and NEBH Cases present a question that is also central to this litigation: whether the alleged use of analytics technologies on a public website can amount to a violation of the Wiretap Statute. Therefore, a stay is warranted here as well.

Further, Plaintiffs in this case and the plaintiff in the Related Action intend to consolidate their suits. Accordingly, on November 16, 2023, Atrius requested a stay of its deadline to respond to Plaintiffs' suit, which was then pending in the Norfolk County Superior Court, until the case could be transferred to the Business Litigation Session ("BLS") for consolidation with the Related Action. *See* Dkt. 27; Dkt. 28. On November 20, 2023, the court granted that request and stayed Atrius' response deadline pending a further order from the court. Plaintiffs' suit was accepted into the BLS on November 21, 2023, *see* Dkt. 29, and its transfer to this Court was effectuated one week later, on November 28, 2023. *See* Dkt. 30.

For the reasons set forth above, Atrius, with Plaintiffs' assent, requests that the Court issue an order granting the following relief:

1. All Superior Court proceedings, time standards, and deadlines in this matter be stayed during the pendency of the interlocutory appeals in the BIDMC and NEBH Cases;
2. No discovery requests or responses, including but not limited to, interrogatories, requests for production of documents, or deposition notices, will be exchanged between the Parties while the stay is in place;
3. After the interlocutory appeals in the BIDMC and NEBH Cases are completed (including the exhaustion or expiration of the Parties' rights to rehearing, reconsideration, or further appellate review), and to the extent consistent with the outcome of the appeals, the stay will be automatically lifted for the limited purpose of consolidation of this case with the Related Action; and
4. Fourteen days after this case is consolidated with the Related Action, or the Court denies such consolidation, the stay will be lifted fully and the case will be subject to the schedule entered by the Court.

Date: January 30, 2024

Respectfully submitted,

ATRIUS HEALTH, INC.

By its attorneys,

*/s/ Anthony E. Fuller*
Anthony E. Fuller (BBO No. 633246)
Kayla H. Ghantous (BBO No. 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
(617) 371-1000
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (admitted *pro hac vice*)
Adam A. Cooke (BBO No. 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

**CERTIFICATE OF SERVICE**

I, Anthony E. Fuller, hereby certify that on January 30, 2024, a copy of the foregoing was filed electronically and served on all counsel of record by email.

*/s/ Anthony E. Fuller*
Anthony E. Fuller

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Date Filed 12/5/2024 10:48 AM
Superior Court - Suffolk
Docket Number 2384CV02704

BC

NOTIFY

34

1/18

1/6/25 ALLOWED insofar as the Court will conduct a Rule 16 conference on 1/15/25 at 11 a.m. over Zoom on this docket and the other 15 dockets listed. The court requests the parties to confer in advance about a workable schedule to bring these matters to resolution.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT

Notice Sent (8)
1/8/25
(CMH)

| | |
|---|---|
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.,<br><br>Defendant. | Civil Action No. 2384-cv-02704-BLS1 |

**JOINT NOTICE REGARDING RULE 16 CONFERENCE**

Plaintiffs John Doe and Jane Doe as well as Defendant Atrius Health, Inc. ("Atrius" or "Defendant") (collectively, the "Parties") submit this joint notice pursuant to the Court's Order of January 30, 2024 (Dkt. No. 33-1, the "Stay Order"), allowing Defendant's assented-to motion to stay proceedings pending disposition of the appeals in *Vita v. Beth Israel Deaconess Med. Cntr., Inc.*, No. 2384CV00480-BLS1 and *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 (collectively, the "*Vita* Appeals").

On October 24, 2024, the Massachusetts Supreme Judicial Court issued an opinion resolving the *Vita* Appeals. *See Vita v. New England Baptist Hosp.*, 243 N.E.3d 1185 (Mass. 2024). No party in the *Vita* appeals sought reconsideration of the Supreme Judicial Court's decision, which became final on November 7, 2024. *See* Mass. R. App. 27(a). The rescript and decision of the Supreme Judicial Court issued to the Superior Court on or about November 21, 2024. *See* Mass. R. App. 23(b). Accordingly, and pursuant to the Stay Order, the Parties have identified the following potential dates for a Rule 16 Conference: January 7, 2025, January 8, 2025,

Date Filed 12/5/2024 10:48 AM
Superior Court - Suffolk
Docket Number 2384CV02704

| *John Doe et al., v. Atrius Health, Inc.* | No. 2384CV02704-BLS1 |
|---|---|

The Parties ask that a Rule 16 Conference be a joint Conference to address next steps across all these pending actions. Atrius has consulted with counsel for Defendants in the actions and understands that counsel for Defendants are currently available for such a Conference on the dates above.

Date: December 5, 2024

Respectfully submitted,

/s/ *Anthony E. Fuller*
Anthony E. Fuller (BBO No. 633246)
Kayla H. Ghantous (BBO No. 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
(617) 371-1000
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (admitted *pro hac vice*)
Adam A. Cooke (BBO No. 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

*Counsel for Atrius Health, Inc.*

*/s/ Foster Johnson (with permission)*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Ryan M. Hawkins, BBO# 686289
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ________
Assistant Clerk

**CERTIFICATE OF SERVICE**

I, Anthony E. Fuller, hereby certify that on December 5, 2024, a copy of the foregoing was filed electronically and served on all counsel of record by email.

/s/ *Anthony E. Fuller*
Anthony E. Fuller

NOTIFY

1/31 35

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.** **SUPERIOR COURT**

**Doe v. Boston Medical Center Corp.,** 33 Notice sent (6) 2/3/25 (CMH)
**Case No. 2384CV000326-BLS1**

**Doe v. Children's Hospital Corp.,** 34
**Case No. 2384CV00411-BLS1**

**Vita v. Blue Cross and Blue Shield of Massachusetts, Inc.,** 18
**Case No. 2384CV00542-BLS1**

**Nova v. Boston Medical Center Corp.,** 12
**Case No. 2384CV01086-BLS1**[1]

**Doe v. Cape Cod Healthcare, Inc.,** 33
**Case No. 2384CV01236-BLS1**

**Doe v. Baystate Health Systems,** 11
**Case No. 2384CV1949-BLS1**

**Doe v. UMass Memorial Health Care, Inc.,** 56
**Case No. 2384CV02448-BLS1**

**Colleton v. UMass Memorial Health Care, Inc.,** 34
**Case No. 2384CV02450-BLS1**

**Doe v. Atrius Health Inc.,**
**Case No. 2384CV02704-BLS1** 35

## SCHEDULING ORDER

At a consolidated scheduling conference today, the parties indicated that many of the plaintiffs in the above-referenced cases sought to amend their complaint in light of the recent decision in Vita v. New England Baptist Hospital, 494 Mass. 824 (2024), if they had done so already; and that many of the defendants intend to try to remove their case to the United States

---

[1] At the hearing this date, the parties indicated that this case had been removed to federal court. No notice of removal appears on the docket.

District Court, as defendants in other similar cases have done. After conferring with counsel, it is hereby ORDERED as follows:

Plaintiffs in each of the above-referenced cases are granted leave to file an amended complaint, without prejudice to any defendant raising in a Rule 12 filing any issues that could have been presented in opposition to a motion under Rule 15. Any such amended complaint shall be filed by January 31, 2025.

On March 19, 2025, at 2 p.m., the court will conduct a Rule 16 conference in each of the above-referenced cases that has not been removed. The Rule 16 conference shall be held over Zoom (Mtg ID: 161 888 7367).

Dated: January 15, 2025

Peter B. Krupp
Justice of the Superior Court

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

Date Filed 3/14/2025 12:25 PM
Superior Court - Suffolk
Docket Number 2384CV02704

MS

36

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, S.S. BUSINESS LITIGATION SESSION

| | | |
|---|---|---|
| JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § § § § | 2384CV02704-BLS1 |
| *Plaintiffs,* | § § | |
| v. | § | |
| ATRIUS HEALTH, INC, | § § | |
| *Defendant.* | § | |

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs John Doe and Jane Doe ("Plaintiffs"), individually and on behalf of all other persons similarly situated ("Class Members"), bring suit against Defendant Atrius Health, Inc. ("Defendant" or "Atrius Health"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

**NATURE OF ACTION AND ALLEGATIONS**

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendant's Medical Information Privacy Notice ("Privacy Notice") assures patients that Defendant is prohibited by law from "selling your health information to others" or "using or disclosing your health information" for "promotional communications" without

patients' "written authorization."[1] Defendant's Privacy Notice further notes that Defendant is "required by law to protect the privacy of your health information."[2] Contrary to these assurances, Defendant does not follow these policies, nor the law prohibiting such disclosures.

3. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook, Google, and other third parties without their patients' knowledge, authorization, or consent.

4. Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these tools caused its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, and both the express and implied promises of Defendant.

5. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates both Massachusetts and Federal law.

---

[1] https://www.atriushealth.org/patient-information/privacy-practices. Defendant's current Privacy Notice went into effect on September 30, 2022. Defendant's prior "Notice of Privacy Practices" may be found at https://web.archive.org/web/20220713190254/https://www.atriushealth.org/patient-information/privacy-practices. That Privacy Notice informed patients that "Access" to patients' medical records and other information maintained by Atrius Health "is restricted to clinicians and staff who need the information for treatment, payment, or health care operations purposes." Defendant's prior Privacy Notice further promised patients that "We will not use or share your information other than as described here unless you tell us we can in writing." Defendant's prior Privacy Notice also promised that Defendant would "never share your information" for "Marketing Purposes" or "Sale of your information" unless "you give written permission."

[2] https://www.atriushealth.org/patient-information/privacy-practices

## PARTIES TO THE ACTION

6. Defendant Atrius Health, Inc. is a Massachusetts corporation with its principal office at 275 Grove St., Suite 3-300, Newton, Massachusetts, 02466. Defendant is the parent company for more than 30 medical practice locations in Massachusetts, including Harvard Vanguard Copley, Harvard Vanguard Chestnut-Hill Roxbury, Harvard Vanguard Beverly, Harvard Vanguard Braintree, Harvard Vanguard Burlington, Harvard Vanguard Cambridge, Harvard Vanguard Chelmsford, Harvard Vanguard Quincy, Harvard Vanguard Concord, Duxbury-PMG, Bourne-PMG, and Dedham Medical Associates.[3]

7. Plaintiff, Jane Doe, is an individual living in Norfolk County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at Harvard Vanguard Quincy, one of Defendant's facilities,[4] and thus also a patient of Defendant.

8. Plaintiff, John Doe, is an individual living in Middlesex County, Massachusetts, has been treated by Defendant's physicians, a patient at Harvard Vanguard Chelmsford, one of Defendant's facilities,[5] and thus also a patient of Defendant.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 363 Highland Avenue, Fall River, Massachusetts, 02720. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

10. Venue is appropriate in this Court because Plaintiff, Jane Doe, resides in Norfolk County and the acts or conduct giving rise to the cause of action took place in Norfolk. G.L. c. 223, § 1.

---

[3] https://www.atriushealth.org/locations; *see also* https://www.atriushealth.org/about-us
[4] https://www.atriushealth.org/locations/quincy-harvard-vanguard
[5] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard

## FACTUAL BACKGROUND

**A. Plaintiffs' experience with Defendant.**

11. Plaintiff John Doe is a patient of Defendant who receives treatment at, among other of Defendant's facilities, Harvard Vanguard Chelmsford.[6] Since at least 2022, Plaintiff John Doe visited Defendant's website and patient portal at www.atriushealth.org regularly. When doing so, he entered identifying information and information related to his medical condition and doctor, including queries about treatment for shoulder injuries. He did not consent to Defendant sharing information about such use to Facebook, Google, or any other third party.

12. Plaintiff Jane Doe is a patient of Defendant who receives treatment at Harvard Vanguard Quincy.[7] Plaintiff Jane Doe also has been using Defendant's website and accessing Defendant's patient portal since 2011. Plaintiff Jane Doe has used Defendant's website and patient portal to search for information about doctors, pay for medical services, make appointments, view test results, message with her doctors and nurses, upload insurance information, and search for information related to her medical treatment. Specifically, she has used the website for a variety of medical conditions over the past decade, including spine issues, degenerative disk disease, pain care, high blood pressure, yearly skin checks, primary care, and routine gynecological care. This has resulted in the disclosure of her Personal Health Information to third parties without her consent, including her specific search queries about "HPV" and "Cervical."

13. Unbeknownst to Plaintiffs, Defendant installed tracking technologies across its webpages that caused the medical information Plaintiffs entered on those webpages, their personally identifiable information including their IP Addresses and Brower Fingerprints, and

[6] https://www.atriushealth.org/locations/chelmsford-harvard-vanguard
[7] https://www.atriushealth.org/locations/quincy-harvard-vanguard

Plaintiffs' interactions with Defendant's webpages, to be transmitted to third party advertisers without their consent. John Doe, Defendant's use of tracking pixels resulted in details about his every communication with Defendant's website and patient portal being shared with third parties, including such information as the search terms he used, the doctors and medical treatments that he reviewed, his patient status, his Facebook ID, his IP address, and his browser fingerprint.

**B. Defendant routinely discloses the protected health information of its patients to third parties including Facebook and Google.**

14. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

15. Medical patients such as John Doe and Jane Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

16. Patients also have reasonable expectations of privacy that their personal identifiable information and protected health information (together "PII/PHI") and communications will not be disclosed to third parties without their express written consent and authorization.

17. As a health care provider, Defendant has ethical, fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

18. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of PII/PHI and communications.

19. Defendant operates websites for patients, including www.atriushealth.org.

20. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

21. Defendant encourages patients to use digital tools on its website to seek and receive health services.

22. The home page of Defendant's website is designed for use by patients. The homepage provides patients with tools to seek treatment, such as finding a doctor, researching services and treatments, paying bills, and learning about Defendant's services.

23. Defendant also maintains a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers. Collectively herein, Defendant's website and patient portal are defined as Defendant's "Web Properties."

24. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**C. Defendant misuses sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook.**

25. Defendant's disclosures of patients' personal healthcare information occur because Defendant intentionally deploys source code on the websites it operates, including www.atriushealth.org, that causes patients' personally identifiable information (including the exact contents of their communications) to be transmitted to third parties.

26. By design, third parties receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

27. For example, when Plaintiffs or a Class Member accessed Defendant's website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers. The information that Defendant sent to Facebook included the private information that Plaintiffs and Class Members communicated to Defendant's website, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing. Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

28. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

29. Web browsers are software applications that allow users to exchange electronic communications over the internet.

30. Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to display in the client device's web browser.

31. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

32. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes. A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. A web page's source code is a set of instructions that commands browsers to take certain actions, either when the web page loads or when a specified event triggers the code.

33. For example, typing https://www.atriushealth.org/ into a browser sends an HTTP request to Defendant's website, which returns a HTTP response in the form of the home page of Defendant's website:



34. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendant's website, to third parties via pixels.

35. For example, Atrius Health's website has included software code that transmits HTTP requests directly to Facebook, including patients' PII/PHI, every time a patient interacts with a page on its website.

36. The basic command that web browsers use to exchange data and user communications is called a GET request.[8] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

37. When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

38. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

[8] https://www.w3schools.com/tags/ref_httpmethods.asp

39. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

40. Unbeknownst to users, however, the website's server may also redirect the user's communications to third parties, like Facebook and Google. Indeed, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[9] Typically, users are provided no notice that these disclosures are being made.

41. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

42. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

43. These tracking pixels can collect dozens of data points about individual website users who interact with a website.

44. For example, one of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

45. Tracking pixels such as the Meta Pixel tool allow Defendant and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendant's websites. When patients visit Defendant's websites, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not

[9] https://support.google.com/platformspolicy/answer/6156630?hl=en

visible to patients or other visitors to Defendant's websites. This code is triggered when a patient or visitor interacts with the web page. Each time the Meta Pixel is triggered, the software code is executed and sends patient's PII/PHI directly to Facebook.

46. The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they surreptitiously installed. Instead, these pixels lie in wait until they are triggered by an event, at which time they effectively open a channel through the website to funnel data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

47. For example, a patient can trigger an HTTP request by interacting with the search bar on Defendants' websites by typing a term such as "breast cancer" into the search bar and then hitting enter. Defendants' servers in turn send an HTTP response, which results in the search results being displayed.

48. This is not the only HTTP request, however, that is created by a patient's interaction with Defendant's website. In fact, at the very same time the web page is instructed to send an HTTP request to Defendant requesting search results, the embedded source code, acting as a tap, is triggered, such that Defendant's websites are also instructed to send an HTTP request directly to Facebook, Google, and other third parties informing them of the patient's exact search and the patient's identifiable information.

49. In addition to employing the Meta Pixel to track patients, Defendant's web properties and patient portal used Google Analytics, to track and disclose patient activity—including Plaintiffs'—without their consent. Unbeknownst, the installation of this code inside patient portal resulted in disclosures of patients' personal health information, including their

patient status, whenever they logged into the patient portal for routine purposes such as reviewing medical records, checking lab results, and communicating with their doctors. The Google Analytics pixel within the patient portal also disclosed when patients viewed specific pages within the patient portal, including prescription information and test results.

50. In addition, through Google Analytics, Defendant disclosed Plaintiffs' activity by tracking and disclosing their IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely disclosed patients' PII/PHI to Google using this technology.

51. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications.

52. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

53. Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web-properties with just the click of a few buttons.

54. Defendant deployed Google Tag Manager on its websites through an "iframe," a nested "frame" that exists within the Defendant's website that is, in reality, an invisible window through which Defendant funneled tracking pixels for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

55. By design, none of the tracking was visible to patients visiting Defendant's websites.

**D. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

56. Tracking pixels are especially pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal data of website vistors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

57. For example, an IP address is a numerical identifier that identifies each computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[10]

58. Because of their uniquely identifying characteristics, IP addresses are considered protected personally identifiable information by HIPAA. *See* 45 CFR § 164.514(b)(2)(i)(O). Tracking pixels can (and typically do) collect website visitors' IP addresses.

59. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

60. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and

[10] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

61. Cookies fall within the personal identifiers protected by HIPAA. *See* 45 CFR § 164.514(b)(2)(i)(H), (J), (M), and (R). Tracking pixels can collect cookies from website visitors.

62. In general, cookies are categorized by (1) duration and (2) party.

63. There are two types of cookies classified by duration.

64. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

65. "Persistent cookies" are designed to survive beyond a single internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites. Persistent cookies are also called "tracking cookies."

66. Cookies are also classified by the party that uses the collected data.

67. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

68. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits Defendant's website will also have cookies on their device from third parties,

such as Facebook and Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

69. Data companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits. To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

70. Traditionally, first-party and third-party cookies were kept separate. An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendant can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendant is not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendant. But data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

71. JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Defendant can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information that they have collected and recorded about a user

that is associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

72. In effect, cookie synching is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

73. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

74. The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

75. Defendant requires patients using its patient portal to have enabled first-party cookies to gain access to its patient portal.

76. The _fbp cookie is used as a unique identifier for patients by Facebook.

77. If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendant with Facebook users.

78. Defendant engages in cookie synching with Facebook, Google, and other third parties.

79. Defendant's cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of the first-party cookie values that Defendant assigns to patients to also be made to third parties.

80. Defendant uses and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

81. A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

82. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[11] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[12] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[13]

83. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[14]

[11] https://www.blog.google/products/chrome/building-a-more-private-web/
[12] https://pixelprivacy.com/resources/browser-fingerprinting/
[13] https://www.blog.google/products/chrome/building-a-more-private-web/
[14] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

84. Browser-fingerprints are considered protected personal identifiers under HIPAA (*see* 45 C.F.R. § 164.514(b)(2)(i)(M), (R)),, and tracking pixels can collect browser-fingerprints from website visitors.

85. Defendant uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

86. A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is an identifiable number string that is connected to a user's Facebook profile. Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[15]

87. Unique personally identifiable information such as a person's Facebook ID are protected by HIPAA (*see* 45 C.F.R. § 164.514(b)(2)(i)(M), (R)) and are likewise capable of collection through pixel trackers.

88. Each of the individual data elements described above is personally identifiable on their own. However, Defendant's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**E. Facebook's Business Model: Exploiting Users' Personal Information for Profit.**

89. Facebook, a social media platform founded in 2004 and today operated by Meta

[15] https://smallseotools.com/find-facebook-id/

Platforms, Inc., was originally designed as a social networking website for college students.

90. Facebook describes itself as a "real identity" platform.[16] This means that users are permitted only one account and must share "the name they go by in everyday life." [17] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account. [18]

91. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[19] Facebook has since evolved into one of the largest advertising companies in the world.[20] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels. [21] This allows Facebook to make inferences about users based on their interests, behavior, and connections. [22]

92. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[23]

93. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook

---

[16] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[17] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[18] https://www.facebook.com/help/406644739431633
[19] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[20] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[21] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[22] https://www.facebook.com/business/ads/ad-targeting
[23] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

employs algorithms, powered by machine learning tools, to determine what advertisements to show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

94. Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers. Facebook uses plug-ins and cookies to track users' browsing histories when they visit third-party websites. Facebook then compiles these browsing histories into personal profiles which are sold to advertisers to generate profits.

95. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

96. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[24] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful

[24] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

business unit, with millions of companies and individuals utilizing Facebook's advertising services.

97. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information given its history of violating consumers' privacy through unauthorized use of their personal information in general, and for marketing purposes, specifically.

98. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' PII/PHI to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

99. Additionally, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' PII/PHI to Facebook, as evidenced by multiple data breaches experienced by hospitals where data gathered by the Meta Pixel code was stolen by cybercriminals. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

**F. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

100. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

101. One of Facebook's most powerful tools is called the "Meta Pixel." Once a third-party like Defendant installs the Meta Pixel on its website, by default it begins sending user information to Facebook automatically.[25]

102. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[26] Once activated, the Meta Pixel "tracks the people and type of actions they take."[27] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[28] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[29]

103. When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[30]

104. The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

105. The transmission is invisible.

106. The transmission is made without any affirmative action taken by the patient.

107. The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history,

---

[25] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[26] https://developers.facebook.com/docs/meta-pixel/
[27] https://www.facebook.com/business/goals/retargeting
[28] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[29] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[30] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[31] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

108. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[32]

109. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. All this personally identifying data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

110. These communications with Facebook happen silently, without users' knowledge.

[31] *In re Facebook*, 956 F.3d at 596.
[32] *In re Facebook*, 956 F.3d at 596.

By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[33]

111. The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[34]

112. In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[35] The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[36]

113. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

114. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[37] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[38]

115. Facebook warns web developers that its Pixel is a personal identifier because it

---

[33] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[34] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[35] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[36] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[37] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[38] https://www.oviond.com/understanding-the-facebook-pixel

enables Facebook "to match your website visitors to their respective Facebook User accounts."[39]

116. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[40]

117. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including PII/PHI), as well as "optional values" set by the business website.[41] Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[42]

118. Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[43]

119. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.

120. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[44] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the

---

[39] https://developers.facebook.com/docs/meta-pixel/get-started
[40] https://developers.facebook.com/docs/meta-pixel/get-started
[41] https://developers.facebook.com/docs/meta-pixel/
[42] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients
[43] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/
[44] https://developers.facebook.com/docs/meta-pixel/

website."[45] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[46]

121. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[47]

122. Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

123. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

124. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the

---

[45] https://developers.facebook.com/docs/meta-pixel/
[46] https://developers.facebook.com/docs/meta-pixel/
[47] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

125. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[48] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[49]

126. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.emersonhospital.org and target users with advertising based on their web activity.

127. Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website. This allows Facebook to make inferences about users far beyond what they

---

[48] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[49] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

explicitly disclose, like their "interests," "behavior," and "connections."[50] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising. Indeed, Facebook utilizes precisely the type of PII/PHI that Defendant bartered to Facebook so that Facebook can identify, target, and market products and services to individuals.

**G. Defendant has discretely embedded the Meta Pixel tool on its website capturing and disclosing patients' PII/PHI to Facebook.**

128. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

129. Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites. [51] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

130. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals

[50] https://www.facebook.com/business/ads/ad-targeting
[51] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

through future Facebook ads. [52] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria. [53] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

131. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[54] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[55]

132. For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

133. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, logout, or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

134. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. At least as recently as October 2022, Defendant had incorporated the Meta Pixel on

---

[52] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[53] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[54] https://instapage.com/blog/meta-pixel
[55] https://instapage.com/blog/meta-pixel

Date Filed 3/14/2025 12:25 PM
Superior Court - Suffolk
Docket Number 2384CV02704

pages throughout its website, resulting in the substantial (and unauthorized) disclosure of its patients' communications to Facebook and other third parties.

135. When a patient entered their personal information through Defendant's websites that incorporate Meta Pixel, including to locate a doctor or make an appointment, this information, including what the patient is being treated for, those communications are immediately and instantaneously routed to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

136. This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other PII/PHI is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

137. For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides:




138. All this data is disclosed to Facebook simultaneously in real time via the Meta Pixel as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

139. Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors to assist with them conditions such as HIV:




140. Likewise, a patient who searches the website for information about the most sensitive medical conditions imaginable, including HIV, psychotherapy, and addiction treatment also has information about their queries and the specific web pages that the patient has visited acquired by Defendant and forwarded to Facebook:


About Us Careers Innovation & Academics SEARCH SITE URGENT CARE

Atrius Health Patient Information Online Services Specialties & Services Locations Health & Wellness MYHEALTH ONLINE FIND A DOCTOR

HOME | SPECIALTIES & SERVICES | PSYCHIATRY AND BEHAVIORAL HEALTH | WHICH BEHAVIORAL HEALTH CLINICIAN SHOULD I CHOOSE?

Psychiatry and Behavioral Health

Providing mental health care with compassion and respect for each patient's health and well-being

Psychiatry and Behavioral Health

Which Behavioral Health Clinician Should I Choose?

Locations

WHICH BEHAVIORAL HEALTH CLINICIAN SHOULD I CHOOSE?

There are many types of behavioral health professionals. If you are unclear as to what it is you need, a good start is to have a discussion with your primary care physician and describe the symptoms and/or problems you are experiencing. He or she can then suggest the type of behavioral health professional you should contact. If you prefer, one of our office staff can assist you with this selection.

Types of Behavioral Health Professionals

Psychiatrist

A psychiatrist is a physician who is trained in the medical and psychological components of mental, emotional, and behavioral disorders. They are qualified to prescribe medications, order diagnostic tests, and practice psychotherapy.

141. Defendant also discloses patient information from across its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, communications made when patients access Defendant's patient portal, and communications made when patients are researching specific medical conditions such as COVID-19.

142. Defendant made similar disclosures to Facebook, Google, and other third parties when patients click on the "Log in" buttons of the password protected portions of its website, including its patient portal and bill pay functions, confirming to these companies that the website

users are Atrius Health patients. For example, Defendant allows patients to search for information about "Services" such as "Cardiology," "Fertility and Reproductive Health," "Neurology," and "Gastroenterology."[56] A patient searching for information about cancer treatment or pregnancy, however, not only shares their Personal Health Information with Defendant, but also unknowingly shares their Personal Health Information with Facebook and Google, such as the fact that the patient is pregnant:




143. Defendant has disclosed patient PII/PHI collected across their websites including (but not limited to) the following communications:

- when patients search via Defendant's search bars for their required care (e.g., for "substance abuse");
- when patients search for a physician or provider—which reveal their

[56] https://www.atriushealth.org/services

location and required medical services and medical conditions (e.g., searching for "Gynecology");

- when patients search for, register for, and/or click on classes or events;
- when patients research treatment information and medical services; and
- when patients select "Locations" and then enter their ZIP code, the medical service they are seeking (e.g., "Behavioral Health"), and required location type (e.g., "Hospital").

144. In other words, Facebook and Google learned not just that patients were seeking treatment, but where and typically when they were seeking treatment, along with other information that patients would reasonably assume that Defendant was not sharing with third party marketing companies.

145. Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

146. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's websites. The path identifies where a file can be found on a website. Likewise, a query string provides a list of parameters. The query string parameters in this search indicate that a search was done at Defendant's website for information about HIV.

In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider and that patient's specific healthcare issue. To illustrate, an example of a full-string URL that provides a query string is https://www.atriushealth.org/search?q=cancer. The query string parameters in this search indicate that a search was done at Defendant's website for information about cancer. In other words, the Meta Pixel captures information that connects a particular user with a particular health condition to a particular healthcare provider.

147. Defendant also provides Facebook and Google with details about online forms that patients fill out in the form of POST requests, including forms such as the online "Prescription Refill" form that Defendant offered. All the information that patients provided when filling out these forms was also disclosed to Facebook and Google.

148. As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendant's website allows Meta Pixel to capture that search term and tell Facebook that the patient is likely pregnant. Indeed, Facebook might learn that the patient is pregnant before the patient's close family and friends. But there is nothing visible on Defendant's website that would indicate to patients that, when they use Defendant's search function, their personally identifiable data and the precise content of their communications with Defendant are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

149. The amount of data collected is significant. Via the Meta Pixel, when patients interact with its website, Defendant discloses a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the

precise file requested. For example, when a patient types a search term into the search bar on Defendant's website, the website returns links to information relevant to the search term. When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

150. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal Health Information to their private identities and target them with advertising. Defendant intentionally shares the Personal Health Information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

151. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) both the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website and the provision of health care to those patients. Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the full-string URL generated by patient searches is acquired by Facebook along with personally identifiable information.

152. The nature of the collected data is also important. Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

Date Filed 3/14/2025 12:25 PM
Superior Court - Suffolk
Docket Number 2384CV02704

153. Defendant also disclosed the same kind of patient data described above to other third parties, including Google, Twitter, New Relic, Acquia, and ShareThis.com via tracking software that Defendant installed on its website. As with the Facebook Meta Pixel, Defendant provides patients and prospective patients with no notice that Defendant is disclosing the contents of their communications to these third parties. Likewise, Defendant does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

154. These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[57] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely discloses patients' personal health information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

155. Google cookies provide personally identifiable data about patients who visit Defendant's website to Google. Defendant transmits personally identifiable Google cookie data to Google.

156. Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

157. Defendant deploys Google tracking tools on nearly every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to

[57] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

Date Filed 3/14/2025 12:25 PM
Superior Court - Suffolk
Docket Number 2384CV02704

Google. These transmissions occur simultaneously with patients' communications with Defendant and include communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, bill payments, and registrations and logins to Defendant's patient portal. Incredibly, Defendant continues to deploy Google Analytics on its website as of March 2025.

158. By compelling visitors to its websites to disclose personally identifiable data and sensitive medical information to Facebook, Defendant knowingly discloses information that allows Facebook and other advertisers to link their patients' PII/PHI to their private identities and target them with advertising (or do whatever else Facebook may choose to do with their information, including running "experiments" on its customers by manipulating the information they are shown on their Facebook pages).[58] Defendant intentionally shares the PII/PHI of their patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

159. The information Plaintiffs and Class Members provide to Atrius Health via its website (and then shared illegally with Facebook) can be combined with other information in Facebook's possession, like their names, dates of birth, and phone numbers, to more effectively target Plaintiffs with advertisements or sell Plaintiffs' data to third parties.

160. Because Defendant embedded the Meta Pixel on their websites, Defendant disclosed intimate details about Plaintiffs' interactions with the websites, including Plaintiffs' scrolling, typing, and selecting options from drop down menus. Each time the Meta Pixel was triggered, it caused Plaintiffs' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' identities. For example, when Plaintiffs and Class Members visited Defendant's

[58] https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

websites, their PII/PHI was transmitted to Facebook, including such engagement as using the website's search bar, using the website's "Find a Doctor" function, and typing content into online forms. During these same transmissions, Defendant's websites would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiffs and Class Members provided. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

161. Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' PII/PHI, including sensitive medical information and personally identifiable data. Defendant was also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Defendant made the decision to barter its patients' PII/PHI to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendant and Facebook, it betrayed the rights of Plaintiffs and Class Members.

**H. Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

162. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

163. For example, when Plaintiffs visited Defendant's website at www.atriushealth.org there was no indication that Meta Pixel or other tracking technologies were embedded on that website or that it would collect and transmit their sensitive medical data to Facebook.

164. Plaintiffs and their fellow Class Members could not consent to Defendant's

Date Filed 3/14/2025 12:25 PM
Superior Court - Suffolk
Docket Number 2384CV02704

conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

165. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




166. Defendant's current "Notice of Privacy Practices," which went into effect on September 30, 2022, gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express written authorization from patients:

> [W]e will use and disclose your health information only with a written authorization from you. This includes, except for limited circumstances allowed by federal privacy law, not using or disclosing psychotherapy notes about you, selling your health information to others, or using or disclosing your health information for certain promotional communications that are prohibited marketing communications under federal law, without your written authorization.[59]

[59] https://www.atriushealth.org/patient-information/privacy-practices

167. Defendant's prior "Notice of Privacy Practices" likewise not only assured patients that Atrius would protect their Personal Health Information, but also expressly promised that Defendant would *never* sell or share patients' health information for marketing purposes without patients' written consent:

> Protecting patient privacy is an important element of the trust between our caregivers and their patients, and an important legal and ethical obligation. Atrius Health is deeply committed to protecting our patients' rights to privacy, and to safeguarding patient information....[60]
>
> In these cases we never share your information unless you give us written permission:
>
> - Marketing purposes
> - Sale of your information

168. These statements are false, deceptive, and misleading Defendant in fact tracks patients' and potential patients' IP addresses, cookies, browser-fingerprints, and device identifiers, which it then causes the transmission of the same to third parties along with patients' and potential patients' sensitive medical information.

169. What's more, even if a patient had stumbled upon Defendant's carefully concealed "Notice of Privacy Practices," nothing in Defendant's various privacy notices would have been understood by any reasonable patient to mean that Defendant is routinely allowing Facebook and Google to capture and exploit patients' Personal Health Information.

170. Defendant does not have a legal right to share Plaintiffs' and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by law. *See* G.L. c. 214, §1B; 45 C.F.R. § 164.508. Moreover, Defendant is not permitted to disclose patients' Personal Health Information to an advertising and marketing

---

[60] https://web.archive.org/web/20220517025937/https://www.atriushealth.org/patient-information/privacy-practices

company like Facebook without express written authorization from patients.

171. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing purposes.

172. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their personal health information without express authorization.

173. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiffs and Class Members' PII/PHI to Facebook or aid in the same.

**I. Defendant's disclosures of personal patient data to Facebook, Google, and other third parties are unnecessary.**

174. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of PII/PHI to Facebook or Google necessary for Defendant to maintain its healthcare website or provide medical services to patients.

175. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

Likewise, it is possible for Defendant to provide medical services to patients without sharing their personal health information with Facebook so that this information can be exploited for advertising purposes.

176. Despite the wholly unnecessary nature of the Meta Pixel for Defendant to run its business, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**J. Plaintiffs and Class Members have a reasonable expectation of privacy in their PHII/PHI, especially with respect to sensitive medical information.**

177. Patient confidentiality "is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." *Alberts v. Devine*, 395 Mass. 59, 65 (1985).

178. As patients, Plaintiffs and Class Members had a reasonable expectation of privacy that their healthcare provider would not disclose their PII/PHI to third parties without their express authorization. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiffs and Class Member's privacy interests.

179. Patient Personal Health Information is specifically protected by law. *E.g.* G.L. 111, §70E(b); G.L. 214, §1B (Right to Privacy). The prohibitions against disclosing patients' Personal Health Information include prohibitions against disclosing personally identifying data such as patient names, IP addresses, and other unique characteristics or codes. *See* G.L. c. 111, § 70E (Patients' and Residents' Rights); 105 Mass. Code Regs. 300.120; 45 C.F.R. § 164.514(b)(2)(i). And both HIPAA and Massachusetts law subject medical providers who treat

conditions such as substance abuse to heightened duties of confidentiality. 42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

180. Moreover, the modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[61] Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications. For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust .... Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should ... [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[62]

181. The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [63]

182. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

---

[61] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html
[62] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).
[63] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

183. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

184. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[64]

185. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[65]

186. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[66]

187. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those

[64] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[65] https://www.wired.co.uk/article/apple-ios14-facebook
[66] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**K. Defendant harmed Plaintiffs when it illicitly collected, disclosed, and exploited Plaintiffs' PII/PHI—which, after all, is Plaintiffs' property and has economic value.**

188. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

189. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[67]

190. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[68] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[69]

191. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[70] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164

[67] https://ig.ft.com/how-much-is-your-personal-data-worth/
[68] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[69] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[70] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

per year between 2013 and 2020.[71]

192. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[72]

193. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[73] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[74]

194. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[75]

195. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs and the Class Member's property.

**L. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' PII/PHI.**

---

[71] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[72] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[73] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounciations-app
[74] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[75] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

196. In exchange for disclosing PII/PHI about its patients, Defendant has been compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

197. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

198. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

199. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

200. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

201. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

202. Defendant seamlessly incorporated Meta Pixel, Google Analytics, and other tracking pixels into its websites, providing no indication to users that they were interacting with a website enabled by such tracking technologies. Defendant had knowledge that its websites

incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with its websites that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

203. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

204. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

205. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiffs' Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

206. Defendant's conduct violates the law and breaches its express and implied privacy promises.

207. Defendant's unlawful conduct has injured Plaintiffs and Class Members.

208. Defendant's conduct is ongoing.

209. Plaintiffs bring this action individually and as a class action against Defendant.

210. Plaintiffs seek class certification for the following proposed Class:

> **The Atrius Health Class:** During the fullest period allowed by law, all current Massachusetts citizens who are, or were, patients

of Atrius Health, Inc. or any of its affiliates and who exchanged communications at Atrius Health, Inc's website(s) and patient portal(s), including www.atriushealth.org, and any other Atrius Health, Inc. affiliated website.

**The Nationwide Class:** During the fullest period allowed by law, all current or former patients of Atrius Healthcare or any of its affiliates who exchanged communications at Atrius Healthcare's websites, including www.atriushealth.org and any other Atrius Health, Inc. affiliated website.

211. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

212. Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

213. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

214. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Classes, based on information and belief, consist of thousands of people, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

215. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate 18 U.S.C § 2510, et seq.;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' PII/PHI to Facebook and other third parties;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of PII/PHI to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

216. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

217. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action

218. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Defendant who used the

websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

219. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

220. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. The damages, harm, and other detriment suffered individually by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impractical for Class Members to individually seek redress for Defendant's wrongful conduct. Moreover, serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a

class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

221. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

222. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of 18 U.S.C. § 2510, *et seq*
### (On Behalf of Plaintiffs and the Nationwide Class)

223. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

224. The Electronic Communications Privacy Act (the "ECPA"), 18 U.S.C. § 2510, protects individuals against eavesdropping committed with an improper purpose.

225. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 of Title 18 of the United States Code.

226. A violation of Chapter 119 and the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of

a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

227. Plaintiffs' communications with Defendant on its web properties and patient portal are covered communications under 18 U.S.C. §§ 2510, 2511.

228. Plaintiffs' and Class Members' communications with Defendant constitute "electronic communications" because each communication was the transfer of data or intelligence, including, but not limited to:

a. the parties to the communications;

b. the precise text of patient search queries;

c. personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. the precise text of patient communications about specific doctors;

e. the precise text of patient communications about specific medical conditions;

f. the precise text of patient communications about specific treatments;

g. the precise text of patient communications about scheduling appointments with medical providers;

h. the precise text of patient communications about billing and payment;

i. the precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. the precise dates and times when patients click to Log-In on Defendant's website(s);

k. The precise dates and times when patients visit Defendant's websites;

l. information that is a general summary or informs third parties of the general subject of communications that Defendant sent back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

229. Plaintiffs and Class Members's communications with Defendant constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers; and

g. Third-party source code used by Defendants.

230. Whenever Plaintiffs and Patient Class members interacted with Defendant's web properties, including their patient portal, Defendant, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally divulged the contents of Plaintiffs and Class members' electronic communications while those communications were in

transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

231. Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs' and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

232. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

233. Thus, although Defendant is a "part[y] to the communications" at issue, it still incurs liability under the ECPA because it captured and redirected Plaintiffs' information to third parties without consent and for criminal and tortious purposes, as alleged throughout this complaint.

234. Defendant's acquisition of patient communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Massachusetts including, among other things:

a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b. Invasion of privacy in violation of G.L. c. 214, § 1B;

c. Breach of confidentiality of medical records in violation of G.L. c. 111, § 70E; and

d. Breach of the common law duty of confidentiality.

235. For example, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

236. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

237. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and
b. Disclosed individually identifiable health information to Facebook and Google without patient authorization.

238. Defendant accessed, obtained, and disclosed Plaintiffs' and Class Members' Personal Health Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

239. As such, Defendant cannot viably claim any exception to ECPA liability.

240. As a result, Defendant harmed Plaintiffs and the Class, breaching the confidentiality of their medical information, violating their privacy, breaching their contract with the hospital, depriving them the full benefit of their bargain with Defendant for care, and causing actual damages in an amount to be proven at trial.

241. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

242. For these reasons, Plaintiffs, individually and on behalf of the Class members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

243. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

244. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

245. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

246. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

247. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

248. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

249. Plaintiffs and Class Members are patients of Defendant.

250. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

251. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

252. The information disclosed included personally identifiable information, Plaintiffs and Class Members' statues as patients of Defendant, and the exact contents of communications

exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

253. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

254. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

255. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

256. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

257. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"),

medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

258. Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

259. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

260. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

261. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the

harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

262. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

263. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

264. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

265. Plaintiffs bring this claim on behalf of themselves and all members of the Class

266. All conditions precedent to this action have been performed or occurred.

267. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

268. As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs or Class Members.

269. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of

their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

270. Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

271. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

272. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

273. Defendant's Medical Information Privacy Notice ("Privacy Notice") assures patients that Defendant is prohibited by law from "selling your health information to others" or

"using or disclosing your health information" for "promotional communications" without patients' "written authorization."[76] Defendant's Privacy Notice further notes that Defendant is "required by law to protect the privacy of your health information."[77]

274. Defendant solicited and invited Plaintiffs and Class Members to provide their Personal Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Personal Health Information, which included personally identifiable information such as their names, telephone numbers, IP addresses, Facebook IDs, browser fingerprints, and device identifiers to Defendant as part of acquiring Defendant's medical services and using its Web Properties. Per its contractual, legal, ethical, and fiduciary duties, Defendant was obligated to take adequate measures to protect Plaintiffs' and Class Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook and Google. These facts give rise to the inference that Defendant took on obligations outside the plain terms of any express contracts that they may have had with Plaintiffs and Class Members.

275. Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendant when they sought medical treatment from Defendant. Specifically, through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement

---

[76] https://www.atriushealth.org/patient-information/privacy-practices. Defendant's current Privacy Notice went into effect on September 30, 2022. Defendant's prior "Notice of Privacy Practices" may be found at https://web.archive.org/web/20220713190254/https://www.atriushealth.org/patient-information/privacy-practices. That Privacy Notice informed patients that "Access" to patients' medical records and other information maintained by Atrius Health "is restricted to clinicians and staff who need the information for treatment, payment, or health care operations purposes." Defendant's prior Privacy Notice further promised patients that "We will not use or share your information other than as described here unless you tell us we can in writing." Defendant's prior Privacy Notice also promised that Defendant would "never share your information" for "Marketing Purposes" or "Sale of your information" unless "you give written permission."

[77] https://www.atriushealth.org/patient-information/privacy-practices

for Defendant to retain and protect the privacy of Plaintiffs' and Class Members' Personal Health Information.

276. Defendant required and obtained Plaintiffs' and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' Personal Health Information. Defendant, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly that it would safeguard Plaintiffs' and Class Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiffs and Class Members.

277. Implied in the exchange was a promise by Defendant to ensure that the Personal Health Information of Plaintiff and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without the knowledge or consent of Plaintiffs and Class Members. By asking for and obtaining Plaintiffs' and Class Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' Personal Health Information was necessary to effectuate the contract between the parties.

278. Plaintiffs and Class Members provided their Personal Health Information in reliance on Defendant's implied promise that this information would be safeguarded and not be shared with third parties without their consent.

279. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiffs and Class Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendant (including the

protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiffs and the Class Members made to Defendant for medical services was intended to ensure the confidentiality of their Personal Health Information.

280. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendant would not allow third parties to collect or exploit their communications with Defendant without their consent.

281. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their Personal Health Information to Defendant but for the prospect of Defendant's promise of medical treatment and other benefits. Conversely, Defendant presumably would not have taken Plaintiffs and Class Members' Personal Health Information if it did not intend to provide them with medical treatment and other benefits.

282. Defendant was therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiffs and Class Members from unauthorized disclosure and/or use by third parties.

283. Plaintiffs and Class Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their Personal Health Information to Defendant among other obligations. Plaintiffs and Class Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the

opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant.

284. Plaintiffs and Class Members relied on Defendant's implied promises to safeguard their Personal Health Information to their detriment. Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' Personal Health Information from disclosure to Facebook and other third parties.

285. Defendant's failure to implement adequate measures to protect the Personal Health Information of Plaintiffs and Class Members and Defendant's intentional disclosure of the same to Facebook violated the purpose of the agreement between the parties: Plaintiffs' and Class Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

286. Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiffs and Class Members.

287. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

288. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of

surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

289. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's websites.

290. Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

291. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

292. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiffs and Class Members' Private Health Information without consent. By soliciting and acquiring Plaintiffs' and Class Members' Personal Health Information Defendant assumed an independent duty to handle Plaintiffs' and Class Members' Personal Health Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

293. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

294. A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

295. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

296. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiffs' and Class Members' consent.

297. Defendant also materially breached its contractual obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and

procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants' website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook and Google.

298. As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

299. As a result of Defendant's material breaches, Plaintiffs and Class Members were deprived of the benefit of their bargain with Defendant because they spent more on medical

services with Defendant than they would have if they had known that Defendant was not providing the reasonable data security and confidentiality of patient communications that Defendant represented that it was providing in its privacy policies. Defendant's failure to honor its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiffs and Class Members overpaying Defendant for the services they received.

300. The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

301. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

302. Defendant's conduct in sharing Plaintiffs' and Class Members' Personal Health Information with third parties also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then disclosed to third parties). For example, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by

the dissemination of their Personal Health Information and by losing the sales value of that information.

303. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Personal Health Information, the loss of control of their Personal Health Information, the diminution in value of their Personal Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

304. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

305. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health Information both because such information remains within Defendant's control and because anytime that Plaintiffs and/or Class Members interact with Defendant's websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information. Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Personal Health Information.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

306. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

307. Plaintiffs hereby plead this Count in the alternative to Count IV.

308. Plaintiffs bring this claim on behalf of herself and all members of the Massachusetts Class.

309. Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

310. Plaintiffs and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

311. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

312. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

313. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in their favor, and that the Court enter an order as follows:

a. Certifying the Classes and appointing Plaintiffs as the Classes' representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $10,000 per Plaintiff and Class Members pursuant to 18 U.S.C. § 2520;

f. Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiffs and Class Members may be entitled.

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Warren Postman (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
wpd@kellerpostman.com
adj@kellerpostman.com

**COUNSEL FOR PLAINTIFFS JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHER CURRENT MASSACHUSETTS CITIZENS SIMILARLY SITUATED**

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ________
Assistant Clerk

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, counsel of record for the Plaintiffs in this action, do hereby certify that on March 14, 2025, the foregoing Second Amended Class Action Complaint and Demand for Jury Trial was filed electronically and e-served on all counsel of record.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO #: 681627

SL 37

COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.** **SUPERIOR COURT**

JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ATRIUS HEALTH, INC.

Defendant.

U.S. Dist # 25-cv-10670-FDS

**Superior Court Department**
**Of the Trial Court**
**Business Litigation Session**

Civil Action No. 2384CV02704-BLS1

## NOTICE OF FILING OF NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT on March 21, 2025, Defendant Atrius Health, Inc. ("Atrius") removed this action to federal court by filing a Notice of Removal pursuant to 28 U.S.C. § 1441 in the United States District Court for the District of Massachusetts. A true and correct copy of the Notice of Removal is attached hereto as Exhibit A.

PLEASE TAKE FURTHER NOTICE that pursuant to Local Rule 81.1(a) of the Local Rules of the United States District Court for the District of Massachusetts, Atrius respectfully requests that the Court provide it with certified or attested copies of all records and proceedings in the action pending in the Business Litigation Session of the Suffolk County Superior Court and a certified or attested copy of all docket entries in the action pending in Business Litigation Session of the Suffolk County Superior Court.

PLEASE TAKE FURTHER NOTICE that, upon the filing of the Notice of Removal with the United States District Court for the District of Massachusetts, and filing copies thereof with the Clerk at the Business Litigation Session of the Suffolk County Superior Court, Atrius has

effected removal and the Superior Court shall proceed no further in this action unless the action is remanded pursuant to 28 U.S.C. § 1446(d).

Dated: March 21, 2025

Respectfully submitted,

*/s/ Anthony E. Fuller*

Anthony E. Fuller (BBO # 633246)
Kayla H. Ghantous (BBO # 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan (*admitted pro hac vice*)
Adam A. Cooke (BBO # 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

I HEREBY ATTEST AND CERTIFY ON April 16, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______________
Assistant Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2025, a copy of the foregoing was served on counsel of record via electronic mail by operation of the Court's electronic filing system.

*/s/ Anthony E. Fuller*
Anthony E. Fuller

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

Certified to be a true and correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts
By: Deputy Clerk
Date: 03/21/2025

| | |
|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ATRIUS HEALTH, INC.<br><br>Defendant. | Civil Action No. __<br><br>[Superior Court Department of the Trial Court Business Litigation Session Case No. 2384CV02704-BLS1]<br><br>**DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1441(a)** |

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1441(a) and 1446, Defendant Atrius Health, Inc. ("Atrius") gives notice of the removal of this action from the Business Litigation Session of the Suffolk County Superior Court, Case No. 2384CV02704-BLS1, to the United States District Court for the District of Massachusetts. In support of its Notice of Removal, Atrius states as follows:

**NATURE OF THE REMOVED ACTION**

1. On October 17, 2022, Plaintiffs John Doe and Jane Doe filed a Class Action Complaint ("Complaint") against Atrius in the Superior Court of Norfolk County, Case No. 2282CV00982. The Complaint included a claim for relief under the Massachusetts Wiretap Act, Mass. Gen. Laws c. 272 § 99 (the "Massachusetts Wiretap Act") as well as four other state law claims, all of which were predicated on Atrius' alleged use of technologies on its public website, www.atriushealth.org (the "Website").

2. This suit is one of at least twenty similar putative class actions lodged against hospitals, healthcare providers, and healthcare systems in federal and state courts in the Commonwealth of Massachusetts, including a second case against Atrius, *see Jane Doe v. Atrius*

*Health, Inc.*, No. 1:25-cv-10020-FDS (D. Mass.) (the "Related Action"), which was originally filed in the Business Litigation Session of Suffolk County Superior Court (the "BLS"), Case No. 2384CV00597-BLS1.

3. On December 23, 2022, Atrius timely removed this case to the United States District Court for the District of Massachusetts, maintaining that removal was proper pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See John Doe, et al. v. Atrius Health, Inc.*, No. 1:22-cv-12196-FDS (D. Mass. Dec. 23, 2022), Doc. 1. Plaintiffs subsequently moved to remand the suit, *see John Doe, et al. v. Atrius Health, Inc.*, No. 1:22-cv-12196-FDS (D. Mass. Mar. 30, 2023), Doc. 23, and the Court granted that motion on October 20, 2023, *see John Doe, et al. v. Atrius Health, Inc.*, No. 1:22-cv-12196-FDS (D. Mass. Oct. 20, 2023), Doc. 41.

4. In the weeks that followed, Atrius moved with Plaintiffs' assent to transfer this suit from the Superior Court of Norfolk County to the BLS so that it could be consolidated with the Related Action as well as to stay all case deadlines pending their consolidation. *See John Doe, et al. v. Atrius Health, Inc.*, No. 2284CV00982, (Mass. Super. Ct., Norfolk Cnty.), Doc 33. That motion was granted, and this case was accepted into the BLS soon thereafter. *See John Doe, et al. v. Atrius Health, Inc,*, No. 2384CV02704-BLS1 (Mass. Super. Ct., Suffolk Cnty., Nov. 22, 2023), Doc. 30. Prior to the cases' consolidation, however, Plaintiffs in this action elected to amend their complaint as a matter of right. *See John Doe, et al. v. Atrius Health, Inc.*, No. 2384CV02704-BLS1 (Mass. Super. Ct., Suffolk Cnty., Dec. 12, 2023) Doc. 31 (the "Amended Complaint").

5. Meanwhile, the BLS denied motions to dismiss filed in two parallel suits asserting claims under the Massachusetts Wiretap Act against other hospital defendants. *See Vita v. Beth Israel Deaconess Med. Cntr., Inc.*, No. 2384CV00480-BLS1 (Mass. Super. Ct., Suffolk Cnty. Oct 31, 2023), Doc. 17, and *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 (Mass.

Super. Ct., Suffolk Cnty. Oct. 31, 2023), Doc. 16. The BLS reported these decisions for interlocutory review to the Massachusetts Appeals Court pursuant to Mass. R. Civ. P. 64(a). *See id.* And on January 17, 2024, the Massachusetts Supreme Judicial Court granted the hospital defendants' application for direct appellate review, which proceeded as *Vita v. Beth New England Hospital et al.*, No. SJC-13542 (the "*Vita* Appeals").

6. Atrius then moved with Plaintiffs' assent to stay both cases pending resolution of the *Vita* Appeals and pending the subsequent consolidation of the two cases. *See Doe et al. v. Atrius Health, Inc.*, No. 2384CV02704-BLS1 (Mass. Super Ct., Suffolk Cnty., Jan. 30, 2024), Doc. 33; *Doe v. Atrius Health, Inc.*, No. 2384CV00597-BLS1 (Mass. Super. Ct., Suffolk Cnty., Jan. 22, 2024), Doc. 23. Both motions were soon granted. *See Doe et al. v. Atrius Health, Inc.*, No. 2384CV02704-BLS1 (Mass. Super Ct., Suffolk Cnty., Jan. 30, 2024), Doc. 33-1; *Doe v. Atrius Health, Inc.*, No. 2384CV00597-BLS1 (Mass. Super. Ct., Suffolk Cnty., Jan. 24, 2024), Doc. 23-1.

7. On October 24, 2024, the Massachusetts Supreme Judicial Court issued its decision in *Vita v. New England Baptist*, 494 Mass. 824 (2024), reversing the BLS's denial of the motions to dismiss in those cases. Rescripts issued on November 27, 2024. *See Vita v. Beth Israel Deaconess Med. Cntr., Inc.*, No. 2384CV00480-BLS1 (Mass. Super. Ct., Suffolk Cnty. Nov. 27, 2024), Doc. 22.

8. A few days later, on December 5, 2024, the complaint in the Related Action was amended to include for the first time a claim under the federal wiretap statute, 18 U.S.C. § 2510 *et seq*. (the "Federal Wiretap Act"), and on January 3, 2025, Atrius removed that case to this Court. *See Jane Doe v. Atrius Health, Inc.*, No. 1:25-cv-10020-FDS (D. Mass. Jan. 3, 2025), Doc. 1. That case was then stayed pending consolidation with this suit upon its then-anticipated removal to

federal court. *See Doe v. Atrius Health, Inc.*, No. 1:25-cv-10020-FDS (D. Mass. Feb. 5, 2025), Doc. 13 (granting assented-to motion to stay proceedings pending consolidation).

9. On March 14, 2025, Plaintiffs amended their complaint for the second time in this action. *See John Doe, et al. v. Atrius Health, Inc.*, No. 2384CV02704-BLS1 (Mass. Super. Ct., Suffolk Cnty., Mar. 14, 2025), Doc. 36 ("Second Amended Complaint" or "SAC"). The Second Amended Complaint abandoned Plaintiffs' claim under the Massachusetts Wiretap Act, and in its place, asserted a claim under the Federal Wiretap Act. It also preserved Plaintiffs' other state law claims set forth in the Amended Complaint. *See* SAC ¶¶ 243-313.

10. Atrius understands that the parties in this matter and the Related Action anticipate coordinating with one another to consolidate the suits following removal of this case to federal court.

**BASIS FOR REMOVAL**

11. Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

12. Federal courts have original jurisdiction over civil actions arising under federal statutes pursuant to 28 U.S.C. § 1331. Further, 28 U.S.C. § 1367(a) provides that courts may exercise supplemental jurisdiction over state law claims that "derive from a common nucleus of operative facts" as federal claims. *See Lanciani v. Allstate Ins. Co.*, 2023 WL 6172457, at *3 (D. Mass. Sept. 22, 2023) (explaining that supplemental jurisdiction "exist[s] over all state-law causes of action that 'derive from a common nucleus of operative fact'" as a federal law claim "'or are

such that they would ordinarily be expected to be tried in one judicial proceeding'") (citation omitted).

13. Here, the Court has original jurisdiction over Count I of the Second Amended Complaint, which asserts a claim under the Federal Wiretap Act. *See* 28 U.S.C. § 1331. Plaintiffs' remaining claims all relate to the same factual allegations that undergird their federal claim: Atrius's alleged use of technologies on the Website. *Compare* SAC ¶¶ 223-42 (Count I) *with id.* ¶¶ 243-313 (Counts II through V). Therefore, the Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

**PROCEDURAL REQUIREMENTS**

14. All the procedural requirements for removal under 28 U.S.C. § 1446 are satisfied.

15. Atrius is filing this Notice of Removal within thirty days of its receipt of the Second Amended Complaint on March 14, 2025. 28 U.S.C. § 1446(b)(3); *see Romulus v. CVS Pharma., Inc.*, 770 F.3d 67, 74 (1st Cir. 2014) (explaining that the thirty-day deadline in "Section 1446(b)(3) does not apply until removability can first be ascertained from the plaintiffs' own papers").

16. This Court is the federal court that encompasses the BLS, where the suit was originally filed. Venue is therefore proper under 28 U.S.C. §§ 101 and 1441(a).

17. Atrius has attached hereto a copy of the Second Amended Complaint and all other publicly available filings from the BLS docket as Exhibits 1-36.

18. Upon filing this Notice, Atrius will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the BLS, as required under 28 U.S.C. § 1446(d), and will also file certified or attested copies of the State Court record, in accordance with Local Rule 81.1(a) of the United States District Court for the District of Massachusetts.

**WHEREFORE**, Notice is given that this action is removed from the BLS to the United States District Court for the District of Massachusetts.

Dated: March 21, 2025

Respectfully submitted,

*/s/ Anthony E. Fuller*
Anthony E. Fuller (BBO # 633246)
Kayla H. Ghantous (BBO # 709197)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000
Facsimile: (617) 371-1037
anthony.fuller@hoganlovells.com
kayla.ghantous@hoganlovells.com

Allison Holt Ryan*
Adam A. Cooke (BBO # 679637)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
allison.holt-ryan@hoganlovells.com
adam.a.cooke@hoganlovells.com

**Pro hac vice application forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2025, a copy of the foregoing document was filed electronically and served on counsel of record by email.

*/s/ Anthony E. Fuller*
Anthony E. Fuller